directly in the practices or acts or had authority to control them," and had some knowledge of the practices. *Amy Travel*, 875 F.2d at 573. *See also Dion* slip op. at 3 (Ex. 2) (FTC had offered sufficient evidence of defendant's involvement to warrant preliminary injunction) (quoting *Amy Travel*).[14] Authority to control can be evidenced by "active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." *Amy Travel*, 875 F.2d at 573.[15] And, the defendant's "degree of participation in business affairs is probative of knowledge." *Id.* at 574.[16] In this case, ITV, DMC, Healthy Solutions, and Health Solutions are all small companies in which the principals clearly are deeply involved in – and exercise control over – the business affairs, which appear to consist almost entirely of the sale of Supreme Greens. In this case, all of the individual defendants knew as early as October 2003 that the Supreme Greens claims were suspect based on the concerns raised by the FTC and by counsel for DMC. PX A, Att. 26, 27; PX G ¶ 7. They continued to make the claims and knew that they were selling product based upon suspect claims.[17] None of the TRO defendants – including the individual defendants –

---

[14] *Accord FTC v. Patriot Alcohol Testers*, 798 F. Supp. 851, 859, 860 (D. Mass. 1992) (an individual is liable for a corporation's deceptive acts if he (1) knew of the material misrepresentations, was recklessly indifferent to their truth or falsity, or was aware of high probability of fraud and intentionally avoided the truth; (2) participated in the acts or had authority to control the conduct; and (3) customers relied on the misrepresentations) (citing *Amy Travel*, 875 F.2d at 573).

[15] *See also FTC v. Publishing Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1996) (Defendant's "assumption of the role of president . . . and her authority to sign documents on behalf of the corporation demonstrate that she had the requisite control over the corporation.")

[16] The knowledge requirement can be satisfied by showing that the individuals had actual knowledge of material misrepresentations, [were] recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of the truth." *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1234 (9th Cir. 1999) (citation omitted).

[17] Some of the individual Guerrero defendants argue that Barrett was not completely forthcoming with them with respect to the extent of the FTC's concerns about the Supreme Greens infomercial, but this argument does not absolve them of liability. The Guerrero

took any steps to disengage from the fraudulent enterprise and they are all jointly and severally liable.[18]

### 2. The Balance of Equities Favors the Commission's Position.

In balancing the equities, the Court should assign greater weight to the public interest advanced by the FTC than to the defendants' private concerns. *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1236 (9th Cir. 1999) (quoting *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989); *World Travel*, 861 F.2d at 1029. Specifically, the FTC brought this action to halt and prevent further violations of federal law and to protect consumers from defendants who market products claimed to prevent and cure life-threatening diseases. In such statutory enforcement cases, the government proceeds "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the . . . laws." *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975) (securities laws context). *See Affordable Media*, 179 F.3d at 1236 ("Obviously, the public interest in preserving the illicit proceeds . . . for restitution to the victims is great."); *see also, e.g., Sabal*, 32 F. Supp. 2d at 1009 (balance of equities favors FTC in case involving hair growth product).

In contrast, the TRO defendants have no legitimate interest that would be infringed by the requested injunction. *Id.* The FTC's proposed temporary restraining order is narrowly drafted to tailor the specific relief that is required from each TRO defendant in order to restrain these

---

defendants all knew that the Commission had concerns about the disease cure claims in the infomercial, yet still, to this day, are claiming on their website, www.hsnow.com that Supreme Greens "prevent[s] and fight[s] disease." PX A, Att. 11.

[18] As demonstrated by a November 2003 email from Geremesz to Eileen Barrett (defendant Barrett's sister), although Geremesz was on notice as to the FTC's concerns, he took steps to ensure that the Barrett defendants continued airing the infomercial with the challenged claims by providing purported – and wholly inadequate – substantiation for some of the claims. PX A, Att. 27.

21

defendants from committing the specific acts that they have committed and continue to commit in violation of the FTC Act and to protect the further dissipation of assets and hiding of documents. "'[T]here is no oppressive hardship to defendants in requiring them to comply with the FTC Act, [or] refrain from fraudulent representation[s].'" *World Wide Factors,* 882 F.2d at 347 (citation omitted). Because the injunction will preclude harmful, illegal behavior, the balance of equities tips strongly in the FTC's favor. As this court stated when it granted the FTC's motion for a preliminary injunction against the sellers of ineffective coin-operated alcohol testing devices marketed for installation in restaurants and bars, "In balancing the equities between the public interest in halting fraudulent and deceptive acts or practices which, in this instance, could have [had] potentially devastating consequences [sic], and the defendants' interest in continuing in business, . . . the public equities should be accorded greater weight." *Patriot Alcohol Testers,* 1992 WL 27334 *7 (citing *World Wide Factors*).

### 3. Injunctive Relief is in the Public Interest.

Immediate injunctive relief is necessary to protect the public from the financial and physical harm that inevitably result from TRO the defendants' deceptive practices.[19] Consumers suffering from cancer, heart disease, arthritis and diabetes are injured if they purchase Supreme Greens in lieu of pursuing treatments that may offer them real health benefits. Additionally, there

---

[19] Even if defendants immediately pull the infomercial and argue that temporary or preliminary relief is therefore unnecessary, injunctive relief is still appropriate where, as here, there is a risk that harm will recur. *See United States v. W.T. Grant Co.,* 345 U.S. 629, 633 (1953) ("Along with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct. . . . The purpose of an injunction is to prevent future violations") (citations omitted). Indeed, the Barrett defendants previously agreed to remove the challenged infomercial from the air, but then did not do so. *See* note 2, *supra.* Further, the Guerrero defendants continue to claim on their website that Supreme Greens helps your body and "prevent[s] and fight[s] disease" and have established a separate distributor network in which similar false claims about Supreme Greens could be disseminated. PX A, Att. 11.

is the direct economic injury that arises from purchasing Supreme Greens under false pretenses. Furthermore, use of certain of the ingredients in Supreme Greens could exacerbate health problems in patients who are already being treated for cancer or other serious diseases; and using Supreme Greens as a prenatal vitamin may be dangerous. PX C ¶¶ 27-29. Consumers are also misled to their detriment by the use of advertising that appears in a format that attempts to hide its true commercial nature by mimicking conventional programming. Finally, purchase of these products – and the defendants' imposition of additional charges to consumers' credit or debit cards without their knowledge or authorization – produces direct economic injury that the FTC hopes to redress.[20] In short, the injunctive relief requested herein is strongly in the public interest.

**C.    Appointment of a Temporary Receiver, an Asset Freeze for the Barrett Defendants and Restrictions on the Dissipation of Assets for the Guerrero Defendants and Preservation of Records Is Necessary for Effective Final Relief.**

    **1.    Appointment of Temporary Receiver**

In order to maintain the status quo and preserve the potential for a complete remedy in this case, the FTC seeks the appointment of a temporary receiver for DMC and ITV, who will locate and preserve corporate assets and records to obviate the threat of destruction, dissipation, or secretion. A temporary receiver is appropriate "where necessary to prevent the dissipation of a defendant's assets pending further action by the court" and to help preserve the status quo to allow an examination of the defendant's past business transactions. *SEC v. American Board of Trade, Inc.*, 830 F2d. 431, 436 (2d Cir. 1987). And, the appointment of a receiver is a well-established equitable remedy available to the FTC in law enforcement actions for injunctive relief. *See, e.g.,*

---

[20] The Commission frequently obtains consumer redress when courts find that individuals or companies made false or unsubstantiated claims for their products. *See, e.g., FTC v. Febre*, 128 F.3d 530 (7th Cir. 1997) (affirming consumer redress of more than $16 million); *SlimAmerica*, 77 F. Supp. 2d at 1277 (awarding consumer redress of $8.3 million).

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984); *see also FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 533-34 (S.D.N.Y. 2000) (permanent injunction, ordering receiver to wind up the business affairs of corporate defendants); *FTC v. Seasilver USA, Inc.* (Ex. 1) (issuing a TRO and appointing a temporary receiver).

Appointment of a temporary receiver is particularly appropriate in a case such as this where pervasive fraud presents the likelihood of continued misconduct. *See In re Nat'l Credit Management Group, LLC*, 21 F. Supp. 2d 424, 463 (D.N.J. 1998) (granting FTC's request for receiver, stating that "[a] temporary receiver can preserve records and make an accounting that will assist in (1) identifying the assets of the Defendants, (2) determining the size and the extent of the fraud, and (3) identifying the individuals injured."). Simply stated, DMC and ITV are knowingly marketing a bogus cancer preventative/cure, and are then further injuring consumers by enrolling them in continuity programs without their permission. Moreover, this fraudulent scheme was launched while DMC and Barrett understood the fraudulent nature of their coral calcium scheme and had offered to resolve that issue with the Commission in supposed good faith. PX G ¶ 4-7. Moreover, the Barrett defendants have recently launched yet another questionable product, Urocaps, claiming in infomercials that this product prevents prostate cancer. PX A ¶ 30.

Documents are being hidden and corporate assets are being dissipated and used for improper purposes. *See* PX D ¶¶ 20-28; PX E ¶¶ 12-15 (defendants converted assets to cash in anticipation of government action and used corporate assets for personal mortgage payments, expensive suits and property; documents were hidden in personal storage facilities). Barrett told a former employee that he was concerned that the FTC might try to fine him or freeze his assets, and therefore began placing company assets into an account held by his wife's parents. PX E ¶ 14. Barrett also had coral calcium revenue funds from defendant Allen Stern and his companies made

24

payable directly to him, rather than the corporate entities. PX D ¶ 23; PX E ¶ 12.

If the individuals currently running these companies are permitted to remain in control of these businesses, it is likely that evidence of their fraud will be destroyed and the fruits of their illegal activity misappropriated. The appointment of a temporary receiver would eliminate those risks without disrupting any legitimate business activity that may exist.[21] At the same time, a temporary receiver would be helpful to the Court in determining the extent of the defendants' fraud, tracing the proceeds of the fraud, preparing an accounting, and making an independent report of the companies' activities to the Court.[22]

In addition, the receiver will be able to put a temporary halt to the substantial sums of money the receivership defendants are spending in private litigation spawned by their Supreme Greens scheme and in litigation relating to the coral calcium fraud. In addition to the breach of contract and trademark litigation, *ITV Direct Inc. v. Healthy Solutions, LLC*, 04-CV-10421-JLT *(D. Mass.)*, pending in this District, DMC and ITV are involved in litigation in the Central District of California (*Trudeau v. DMC*, 02-2707) and cases pending in the Eastern District of Pennsylvania.[23] All of the money at issue in these cases – as well as the funds being used to litigate it – should be reserved for consumer redress in this action.

---

[21] To the extent that DMC and ITV are selling products and/or services that are not fraudulent, the proposed TRO would allow the receiver to continue selling such products or services. *See* Proposed TRO, Part VIII.O.

[22] The Commission also has submitted a memorandum naming Proposed Receiver, in which we recommend a highly qualified receiver for the Court's consideration.

[23] Although some of the defendants are parties to a case currently pending before Judge Tauro, the Commission has not filed this case as a related case pursuant to Local Rule 40.1(G) because the cases involve substantially different questions of law. The primary issue in the Commission's case is the falsity of the claims made in the Supreme Greens and Coral Calcium infomercials and this issue is not raised in the other litigation.

2. **Asset Freezes and Restrictions, Financial Information and Record Preservation**

The Commission is requesting that an asset freeze be imposed on the Barrett defendants because these three defendants have demonstrated both fraudulent conduct (through their imposition of unauthorized charges on consumers' accounts), and a record of hiding and misappropriating assets. *See* IV.C.1; PX E ¶¶ 6-15; PX D ¶¶ 12-28. As noted *supra*, courts have frequently ordered such relief in Section 13(b) cases, *see, e.g., Dion,* slip op. At 2 (Ex. 2); *see also* note 7, *supra*, and accompanying text. The Commission is not requesting an asset freeze for the Guerrero defendants, but it does seek an asset restriction to prevent wasting of assets through unreasonable and unnecessary expenses, such as acquisition or improvements of real property.

As part of the final recovery in this case, the FTC seeks redress for consumers who have incurred financial injury due to defendants' deceptive practices. To ascertain the extent of the injury caused by the TRO defendants' actions and preserve the possibility of restitution, the FTC requests that the Court prohibit them from destroying business and financial records and other evidence, and require them to provide immediate financial information regarding product sales. The TRO defendants would also complete sworn financial disclosure forms. Such provisions, combined with an asset transfer restrictions and freezes discussed above will increase the likelihood of preserving existing assets pending final determination of this matter. *See, e.g., SEC v. Bankers Alliance Corp.*, 881 F. Supp. 673, 677 (D.D.C. 1995) (ordering accounting).

3. **Expedited Discovery Is Also Necessary for Effective Final Relief.**

Finally, the Commission also seeks to engage in expedited discovery on a narrow range of issues so that it may: (1) obtain the proprietary formula for Supreme Greens, so that our experts can more fully consider potential safety issues; and (2) quickly and efficiently locate assets that the

TRO defendants have wrongfully taken from consumers, identify possible additional defendants, and locate documents pertaining to defendants' businesses. Federal Rules of Civil Procedure 26(d), 33(a), and 34(b) authorize this Court to alter the standard discovery provisions, including the applicable time frames, that govern depositions and the production of documents. Expedited discovery is particularly appropriate where, as in this case, a party seeks preliminary relief in a matter that affects the public interest.

## V.   CONCLUSION

Defendants have caused and are likely to continue to cause substantial consumer injury because of their violations of the FTC Act. To prevent ongoing consumer harm and to help ensure the possibility of effective final relief, including monetary redress, the FTC respectfully requests that the Court issue the requested Temporary Restraining Order and order to show cause.

Respectfully Submitted,

WILLIAM E. KOVACIC
General Counsel

_____
DANIEL KAUFMAN
KIAL S. YOUNG (BBO # 633515)
EDWARD GLENNON
Federal Trade Commission
600 Pennsylvania Avenue, NW,
NJ-3212
Washington, DC  20580
(202) 326-2675, - 3525, -3126 (voice)
(202) 326-3259 (fax)
dkaufman@ftc.gov, kyoung@ftc.gov or
eglennon@ftc.gov

ATTORNEYS FOR PLAINTIFF

Dated: June 1, 2004