**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     CIVIL ACTION NO. 04-CV-11136GAO |
| | ) |
| DIRECT MARKETING CONCEPTS, INC., et | ) |
| al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR**
**TEMPORARY RESTRAINING ORDER, EXPEDITED**
**<u>DISCOVERY  AND PRELIMINARY INJUNCTION</u>**

DIRECT MARKETING CONCEPTS, INC., ITV
DIRECT, INC., AND DONALD W. BARRETT

By their attorney(s),

Peter S. Brooks, BBO #058980
Christopher F. Robertson, BBO #642094
Susan W. Gelwick, BBO #567115
Seyfarth Shaw LLP
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Telephone:  (617) 946-4800
Telecopier:  (617) 946-4801

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER WITH APPOINTMENT OF TEMPORARY RECEIVER, ASSET FREEZE AND PRELIMINARY INJUNCTION

Defendants, Direct Marketing Concepts, Inc. d/b/a Today's Health ("DMC") and Direct Fulfillment, ITV Direct, Inc. d/b/a Direct Fulfillment ("ITV Direct"), and Donald W. Barrett ("Barrett") (collectively "DMC Defendants"), submit this opposition to the Motion for Temporary Restraining Order with Appointment of Temporary Receiver, Asset Freeze and Order to Show Cause Why a Preliminary Injunction Should Not Issue filed by the Plaintiff, the Federal Trade Commission ("FTC" or "Plaintiff") against the DMC Defendants. For the reasons set forth below, the FTC has failed to show that there are any exigent circumstances entitling them to the drastic relief that they seek, and their motion must be denied.

## PRELIMINARY STATEMENT

The FTC's claim for false and deceptive advertising against the DMC Defendants is based on two infomercials that the FTC claims are false and misleading. Notwithstanding that there is a triable issue as to whether the FTC's position is sound, the DMC Defendants have already voluntarily agreed to cease airing the infomercials, and there is therefore no continuing conduct the FTC deems unlawful. The FTC also asserts, based upon two highly suspect and biased affidavits, that the DMC Defendants have used unfair and deceptive sales tactics. The FTC's "evidence" regarding these alleged practices is far from persuasive, and fails to take into account additional technologies and procedures implemented by the DMC Defendants over the last several months. In short, these practices simply do not exist and the FTC has failed to demonstrate otherwise with credible evidence.

Thus, based upon conduct that is admittedly no longer occurring, the FTC has raced into this Court claiming that there is an emergency necessitating immediate action to prevent irreparable harm, including the extreme relief of an asset freeze and appointment of a receiver that will shut down the DMC Defendants' business only seven days after the filing of the FTC's

Complaint.[1]  Although the FTC has been investigating the infomercial relating to the supplement "Supreme Greens with MSM" ("Supreme Greens") for at least ten months, the FTC's sole "evidence" supporting this supposed emergency are the affidavits of two disgruntled former employees of DMC and ITV Direct who both have a personal bias against DMC, ITV Direct and Barrett, have both threatened to harm the defendants, and both have something to gain if DMC and ITV Direct go out of business.[2]  Other than this extremely biased and unreliable testimony, which is directly refuted by no less than nine affidavits filed in opposition to the FTC's motion, there is no evidence to support the FTC's allegations that the DMC Defendants are dissipating assets, hiding documents, and improperly using corporate funds, necessitating the immediate and extreme relief it seeks.  DMC's outside accountant has already prepared financial statements for the FTC in October of 2003, and the DMC Defendants are willing to submit additional financial statements and/or undergo a comprehensive financial review by an outside auditing firm approved by the FTC.  There is simply no evidence of any fraudulent conduct on the part of the DMC Defendants warranting the drastic relief sought by the FTC.

---

[1] Although the FTC ignores it in their motion, the DMC Defendants have cooperated with the FTC and its investigation for over a year.  For example, when the FTC notified the DMC Defendants that it had concerns over the infomercial on a dietary supplement known as coral calcium in June 2003, the DMC Defendants immediately took the infomercial off the air.  Then, in October 2003, ITV voluntarily edited the Supreme Greens infomercial and provided a copy for the FTC's review.  In December 2003, Mr. Barrett agreed to accept service of a subpoena for documents and testimony and made himself available for an FTC deposition concerning coral calcium, during which he cooperated completely.  Finally, after hearing nothing from the FTC for over three months, ITV agreed to remove all versions of the Supreme Greens infomercial in April 2004, when the FTC continued to express concerns about the product.  To the DMC Defendants' knowledge, neither infomercial is running on any media station and the DMC Defendants have complied with every request by the FTC.

[2] In fact, the FTC could not have chosen two more unreliable witnesses with substantial motives to lie about the DMC Defendants.  One witness was recently fired by ITV for violating his agreement not to compete with the business and stealing from the company.  He has established a separate business to compete with the DMC Defendants, and would personally greatly benefit from any damage done to their operations.  The second witness has an extensive criminal record, was terminated from the company back in 2003, is in the midst of contentious divorce proceedings with Mr. Barrett's wife's sister, is subject to a restraining order and no trespass order, and is incompetent to testify as to current operations at the companies.

Moreover, there is a substantial triable issue of fact as to whether the DMC Defendants are liable for any of the claims asserted by the FTC.   The DMC Defendants did not themselves make any false or deceptive representations in the challenged infomercials, which were accompanied by clear disclaimers stating that the products were not a cure for any disease.  In its overzealous attempt to shut down the operations of the DMC Defendants and put 140 employees out of work, the FTC has failed to even consider the implications of these disclaimers and has simply rejected the infomercial outright, ignoring settled law that requires an analysis of disclaimers in connection with advertising that even admittedly is inherently misleading. Consequently, the FTC has failed to demonstrate an element of its prima facie case with supporting evidence, namely that the infomercial is misleading to reasonable consumers in light of the accompanying disclaimers.  Based on the fact that there are triable issues of fact as to DMC's liability, this Court should allow the parties to take discovery in this action before awarding any drastic preliminary relief.

In any event, the DMC Defendants are willing to desist from:  (1) airing the Supreme Greens infomercial, which already has been taken off the air; (2) destroying or altering any documents, which they have not done; and (3) transferring any assets except in the ordinary course of DMC's and ITV Direct's business.  The DMC Defendants are also willing to make all of their records available for an independent and comprehensive review, and will agree to expedited discovery on a reasonable schedule established by this Court.[3]  As these voluntary measures will fully protect all consumer interests and address the FTC's concerns, the FTC has

---

[3] The FTC's request for the production of documents from the DMC Defendants on 48 hours notice is completely unreasonable, especially given the fact that the DMC Defendants are willing to undergo a comprehensive financial review and that there is no need for immediate relief in this case.

no basis for its claims that emergency relief is necessary in this case, and its motion for the appointment of a receiver and an asset freeze against the DMC Defendants must be denied.

## I.      STATEMENT OF FACTS AND PROCEDURAL HISTORY

DMC and ITV Direct, located in Beverly, Massachusetts, are media and marketing companies that collectively employ over 140 individuals in Massachusetts.  DMC's and ITV Direct's business includes the production of infomercials, in which an individual is provided the opportunity to discuss an existing product to a larger audience through wider media, including television and radio.  Neither DMC nor ITV itself manufactures any products. (Affidavit of Donald Barrett ("Barrett Aff."), ¶2.)  DMC and ITV Direct have maintained accurate and complete financial records of their business transactions since their inception in 2001.  (Affidavit of Wayne Callahan ("Callahan Aff."), ¶3 .)  All of their bank business transactions have been properly recorded in their financial records, including all payments to employees and principals, whether salaries or distributions.  (Id.)

DMC and ITV Direct stress the importance of quality control to all their employees and require them to disclose to customers the terms of any of their programs, including the autoship program, fully and clearly.  (Affidavit of Robert Maihos ("Maihos Aff."), ¶12.)  It is also ITV Direct's stated policy to fully disclose, both orally and in written materials, its return policy and the right for a customer to receive a refund at any time.  (Barrett Aff., ¶21.)  A new system purchased by the company in late 2003 called "Contract Genie" also assures that sales personnel are monitored and adhere to the company's policies.  The Contract Genie is a computerized system for use with every sales order with a re-supply component.  The system records each conversation and confirms that the terms of the autoship program are clearly communicated and affirmative assent is obtained.  (Id.; Callahan Aff., ¶12.)  If a sales representative is discovered violating these policies, it is the company's policy to immediately fire the employee.  (Id.; Affidavit of Catherine Ratcliffe "Ratcliffe Aff."), ¶¶6-10.)

In connection with any agreement entered into by the DMC Defendants to produce an infomercial for a third party, DMC and ITV Direct make clear that the individual advertising the product is responsible for each and every representation he makes about a product, including confirming that he has competent and reliable scientific support for any claims made about the product.  (Barrett Aff., ¶4.)  In each case, DMC and ITV Direct require that the individual provide specific representations about their support for their claims, and to provide indemnification to DMC and ITV Direct for any claims made by the individual that are later challenged by any governmental agency.  (Id.)

In 2001, DMC agreed to produce an infomercial featuring Robert Barefoot, who had written a book claiming that a dietary supplement known as coral calcium had substantial health benefits.  In his book and in other conversations, Barefoot claimed that he possessed significant research, studies, documentation, testimonials and other scientific information, to support his claims concerning the health benefits of coral calcium.  (Barrett Aff., ¶5.)  Barefoot and another party, Kevin Trudeau, appeared in DMC's thirty minute infomercial, where they discussed Barefoot's book and the benefits of coral calcium.  (Id., ¶6.)  The taping of the infomercial was entirely unscripted, and DMC did not appear in the infomercial or control any of its content.

The FTC received a tape of the infomercial in or about April 2002, and never notified the DMC Defendants that it had any issues or concerns over the content of the infomercial until over a year later, in June 2003.  (Barrett Aff., ¶9.)  In response to the FTC's concerns, the DMC Defendants sought to obtain copies of the studies and supporting documentation that Barefoot had assured them existed.  (Id., ¶11 and Exhibit C.)  Notwithstanding that there did appear to be support for the claims made in the infomercial, DMC nonetheless agreed to immediately pull the infomercial and cease any future airings.  (Id., ¶12.)  The FTC subsequently filed an action against Barefoot and Trudeau, which Barefoot eventually settled without any receiver being appointed, any freeze of his assets, and without having to make any monetary payment at all.

In late 2002, ITV Direct was contacted by defendant Gregory Geremesz ("Geremesz"), who stated that he knew a "Dr. Alejandro Guerrero" ("Guerrero"), who had developed a greens

product named Supreme Greens that Geremesz believed would likely be successful if marketed through an infomercial.  (Barrett Aff., ¶13.)  ITV Direct reviewed the materials provided by Geremesz, and then met with Geremesz and defendant Guerrero, who represented that he was a doctor and OMD (doctor of oriental medicine), who operated a clinic in California with regular patients.  Geremesz and Guerrero also represented on numerous occasions that the greens product developed by Guerrero had been clinically tested on over 200 patients in California and had shown tremendous results, including on patients with cancer, AIDS, MS, diabetes and Parkinson's disease.  (Id.¶¶ 13 &14, and Ex. F; Maihos Aff., ¶4 and Ex. B.)

On April 4, 2003, ITV Direct entered into a "Distribution Agreement" with Guerrero's company, defendant Healthy Solutions, LLC ("Healthy Solutions"), for the production of an infomercial for Supreme Greens.  ITV Direct then produced an infomercial for the product, which was unscripted, where it merely posed questions to Guerrero and elicited his responses. ITV Direct did not dictate any of the statements by Guerrero in the infomercial, including his statements regarding his credentials, his clinical practice or the scientific support for Supreme Greens.  (Barrett Aff., ¶¶14,16; Maihos Aff., ¶5.)

The infomercials and all promotional materials for Supreme Greens had express disclaimers, clearly stating that results could vary and that the product was not a cure for any disease.  (Maihos Aff., ¶5.)  The infomercial also disclosed that ITV Direct was not confirming or attesting that there existed any scientific support for the claims made by Guerrero.  (Id.) These disclaimers ran throughout the infomercials, and were also required by the networks who ran them.  (Id.; Affidavit of Luke Goljan ("Goljan Aff."), ¶¶12, 13 and Exhibits A & B.)  In addition to these disclaimers, ITV also received indemnification from Guerrero's company Healthy Solutions for the health claims made in the infomercial.  (Maihos Aff., ¶6 and Exhibit C; Barrett Aff., ¶15.)  The DMC Defendants have never manufactured any of the Supreme Greens product, and all of the product has been manufactured and sold to ITV Direct by Healthy Solutions. (Barrett Aff., ¶17.)

During September and October 2003, the DMC Defendants' counsel was contacted by the FTC concerning the Supreme Greens infomercial.  In those conversations, the FTC identified several concerns with the content of the infomercial.  (Barrett Aff., ¶18.)  In response to these concerns, ITV Direct both sought additional scientific evidence from Guerrero and Healthy Solutions, and edited the program to address the FTC's concerns.  (Id.; Goljan Aff., ¶7.)  In October 2003, the edited tape was sent to the FTC, and the FTC concluded that the edited tape was a "substantial improvement."  (Barrett Aff., ¶18.)  ITV Direct then rolled the edited tape out to national markets, and then to the local markets.  (Id., ¶19; Goljan Aff., ¶7.)  As the FTC acknowledges, ITV Direct also received additional materials from Guerrero to provide some support for the claims he made in the infomercials.  (Barrett Aff., ¶19 and Exhibit F.)

Between December 2003 and April 2004, the FTC had no communications with the DMC Defendants or its counsel.  Then, beginning in March 2004, ITV Direct began reducing its media purchases for Supreme Greens, with the intention of pulling the infomercial completely by Summer 2004.  (Barrett Aff., ¶24.)  On April 7, 2004, the FTC informed the DMC Defendants that it continued to have concerns over the Supreme Greens infomercial and that it believed that the original infomercial was running in certain media markets.  The DMC Defendants investigated the matter, determined that certain stations were airing the original infomercial, and immediately notified all media outlets to cease running any of the Supreme Greens versions.  (Id.)  ITV Direct has halted all media for Supreme Greens, and has no intention of running the infomercial in the future.  (Id.)

As a result of the FTC's concerns, in April 2004, the DMC Defendants conducted their own investigation of Guerrero when they became concerned that Guerrero may have made misrepresentations to them.  Based on this investigation, it appears that Guerrero is not a doctor, and that he never received a doctorate of any kind.  (Barrett Aff., ¶25.)  It also appears that contrary to his repeated representations and assurances, Guerrero has no clinical support for the health claims he made about Supreme Greens.  On this basis, the DMC Defendants have sought indemnification from Guerrero in connection with the FTC's investigation and any possible

7

remedies it may seek in this action pursuant to their rights under their contract with Guerrero. (Id., ¶25.)

Thus, at present, there are currently no infomercials for either coral calcium or Supreme Greens being run by the DMC Defendants and they have agreed to not run the infomercials in the future. To the contrary, Guerrero, who misrepresented to the DMC Defendants and the public that he is a doctor and that he had scientific support for his claims about Supreme Greens, continues to sell the product from his website to this day, making the same false representations about his credentials and Supreme Greens, and linking the product to the allegedly offending infomercial. (Maihos Aff., ¶19 and Exhibit D.) Despite this continuing offending conduct, the FTC is not seeking to freeze the assets of Guerrero or Healthy Solutions, or to appoint a receiver to run that business.

Moreover, contrary to the FTC's contentions, the DMC Defendants still possess complete and accurate financial information regarding the operations of DMC and ITV Direct and they have not destroyed or altered any documents. (Callahan Aff., ¶¶3, 7, 8, 9.) The DMC Defendants are prepared to provide an accounting in whatever form the FTC deems appropriate, and have already done so on one occasion. The DMC Defendants do not have any secret or offshore bank accounts, have not engaged in any fraudulent transfers, and continue to operate the business in the ordinary course, including engaging in profitable operations that have nothing to do with the products featured in the infomercials, or any ingestible dietary supplement. (Id.)

## II.    LEGAL ARGUMENT

A temporary restraining order is only appropriate if this Court determines both that the FTC is likely to succeed on the merits and that the FTC has shown irreparable injury. FTC v. Freeman Hosp., 69 F.3d 260, 267 (8th Cir. 1995) (upholding district court's denial of preliminary injunction where FTC failed to meet its burden); FTC v. Simeon Management Corp., 532 F.2d

708 (9th Cir. 1976) (upholding district court's denial of preliminary injunction where FTC was unlikely to establish falsity of advertising and equities weighed against granting injunction). Where the FTC also seeks to freeze assets against a potential recovery, courts may also require the FTC to establish that the balance of the equities and the public interest favor granting the preliminary relief.  FTC v. Evans Prod. Co., 775 F.2d 1084, 1088-1089 (9th Cir. 1985).  Courts have recognized that a company's ability to continue its business is a factor that can tip the balance of the equities against a preliminary injunction and a freeze of a company's assets.  Id. at 1089; FTC v. Crescent Pub. Group, Inc., 129 F. Supp. 2d 311 (S.D.N.Y. 2001) (court denied FTC's motion for receiver and asset freeze, recognizing that profits earned during the pendency of litigation may create a fund from which the corporate defendants may pay any liability).

Because such relief is extraordinary and essentially shuts down the business of a defendant based on incomplete evidence, before any discovery has been taken or any liability has been assigned, courts should carefully assess the FTC's overall evidence to determine if it has met its burden.  See Evans Product Co., 775 F.2d 1084.  In this case, the FTC has not made a strong showing of irreparable injury, and the balance of hardships do not tip in its favor.  The FTC fails to meet the standard for this Court to award such extreme relief.

**A.      THE REQUESTED EMERGENCY RELIEF IS NOT WARRANTED.**

The FTC's claim that there is an emergency warranting such extraordinary relief as an asset freeze and the appointment of a receiver without an evidentiary hearing is predicated on the affidavits of two former disgruntled employees of DMC and ITV Direct who stand to benefit both personally and professionally if these companies are put out of business.  This is clearly insufficient evidence on which to award the FTC the drastic and immediate relief they seek at this early stage in the case, and before the parties have had the benefit of any discovery.

1.      **The Evidence Does Not Warrant The Requested Extreme Measures.**

The FTC may not use Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) (2003), to remedy

past violations of the law.  Instead, the "FTC may only seek a temporary restraining order or a

preliminary injunction when it believes that a person 'is violating, or is about to violate' any law

enforced by the FTC," or when such prior violations are likely to reoccur.  Evans Products Co.,

775 F.2d at 1087-88 (internal citation omitted).  When determining whether the FTC's request

for preliminary relief is appropriate, courts also must consider the voluntary cessation by a

defendant of challenged practices, and its efforts to conform to the applicable laws.  U.S. v. Toys

"R" Us, Inc., 754 F.Supp. 1050, 1058-59 (D.N.J. 1991).  Given the fact that the DMC

Defendants have voluntarily taken the allegedly offending infomercials off the air and have

agreed not to run the infomercials in the future, in addition to agreeing to other measures that

will address all of the FTC's immediate concerns, the FTC will be unable to offer evidence that

there is a reasonable likelihood of future violations by the DMC Defendants, or that the relief it

now seeks is necessary to protect consumers.

The FTC is aware that there is no irreparable consumer injury warranting this immediate

and extreme relief, as it has been investigating the Supreme Greens infomercial since at least

September 2003 and ITV Direct's autoship program since at least October 2003.  Despite that

extensive period of time to collect evidence of the DMC Defendants' alleged unlawful acts, the

FTC has produced outdated information and two very questionable witnesses to support its

allegations that the DMC Defendants are currently engaging in deceptive practices and

fraudulent activity.  In particular, the FTC relies exclusively on the testimony of two former

employees, Scot Sarver ("Sarver") and Richard Cushman ("Cushman"), to support its assertion

that that a receiver and an asset freeze are necessary in order to prevent the further destruction of

documents, dissipation of assets, and improper use of corporate funds by the DMC Defendants. The numerous affidavits and supporting documents submitted by the DMC Defendants completely contradict the statements of both Sarver and Cushman, and establish that these two witnesses are biased, unreliable, and unstable. Where the FTC's only evidence to justify the draconian and broad measures they seek is so deficient, their motion for the appointment of a receiver and asset freeze must be denied.

        a.    <u>Scot Sarver</u>

According to the evidence submitted by the DMC Defendants, Sarver is "an accomplished liar" who was recently fired by ITV for violating his agreement not to compete with ITV by establishing a competing business and stealing from the company. (Barrett Aff., ¶27; Maihos Aff., ¶7; Affidavit of Michael Wood ("Wood Aff."), ¶8.) When confronted with these facts, Sarver admitted that he had broken into a secure location, and shredded his employment agreement in an effort to destroy evidence of his wrongful conduct. Since his termination from ITV, Sarver has been actively seeking to compete with ITV by selling identical products, and reaching out to ITV's distributors and customers. (Barrett Aff., ¶27; Maihos Aff., ¶7; Goljan Aff., ¶10)

While employed by ITV, Sarver was the subject of several complaints of sexual harassment and was officially reprimanded on one occasion. (<u>Id.</u>; Wood Aff., ¶12.) He also provided erroneous 800 numbers that directed callers to ITV Direct to other call centers, one of them being a phone sex hotline, in order to disrupt ITV's business and harm the DMC Defendants. (Goljan Aff., ¶11.) After his termination from ITV, Sarver also attempted to defraud the Massachusetts unemployment bureau by lying about his employment status, and was extremely upset when ITV refused to participate in his lie. (Maihos Aff., ¶10; Barrett Aff., ¶27.)

Thus, the testimony of Sarver is of very questionable reliability when he has an axe to grind against the DMC Defendants, and would personally greatly benefit from any damage done to the operations of DMC and ITV Direct. The DMC Defendants have also submitted substantial evidence that to show that the claims Sarver made are completely false. For example, Sarver was never present in the studio during the filming of the Supreme Green infomercials, so his claim that he heard Barrett direct Guerrero to make false statements during the infomercial regarding the clinical support for Supreme Greens is absolutely false. (Wood Aff., ¶11; Goljan Aff., ¶¶3-4.) In addition, Sarver's statements about the autoship program are also untrue, as Barrett never encouraged sales staff to fraudulently place customers on autoship, and has personally fired sales representatives who have violated the company's clear policies in connection with the autoship program. (Ratcliffe Aff., ¶¶8-10; Callahan Aff., ¶12; Barrett Aff., ¶ 28; Maihos Aff., ¶12.).

Most importantly for purposes of this motion, Sarver's statements regarding the fraudulent transfer of assets, destruction of documents, and improper use of corporate funds by the DMC Defendants are completely false. As established by the unbiased affidavit of the DMC Defendants' outside accountant, there have been no fraudulent transfers or secretion of DMC or ITV Direct's assets, and no destruction or improper alteration of their financial records or documentation concerning their business operations. (Callahan Aff., ¶¶7, 8, 11; see also Barrett Aff., ¶28; Maihos Aff., ¶11.) The DMC Defendants are also willing to provide updated financial statements to the FTC, and subject themselves to an independent review in order to demonstrate that no such fraudulent transactions have occurred.

b.    <u>Richard Cushman</u>

As for the FTC's second witness, the evidence submitted by the DMC Defendants establishes that Cushman has an extensive criminal record, which includes an arrest and conviction for firebombing a car, arson of a dwelling, violating a restraining order, and intimidating witnesses, for which he served two years in a House of Correction, and an arrest for burglary.  (Barrett Aff., ¶29 and Exhibit J; Affidavit of Karen Cushman ("K. Cushman Aff."), ¶4.)  He also has had a restraining order taken out against him for threats that he made against his soon to be ex-wife, and has threatened to commit suicide on at least one occasion.  (K. Cushman Aff., ¶¶5, 7; Barrett Aff., ¶29.)

Cushman was fired by ITV Direct in 2003, and on several occasions thereafter, has threatened Barrett and other employees of ITV Direct with physical violence, including making threats to confront employees at the company's Christmas party.  As a result of these threats, the Middleton, Massachusetts police assigned two officers to the party as protection based on a review of Cushman's extensive criminal record.  (Barrett Aff., ¶29; K. Cushman Aff., ¶6; Maihos, ¶13.)  He also received a Notice of Trespass prohibiting him from trespassing on DMC's business premises.  (<u>Id.</u>)

Contrary to the statements made in his affidavit, Cushman never held the position of "manager" at DMC or ITV Direct, or worked in any true supervisory capacity.  He is also not competent to testify as to the general practices of the call center, as he had a very limited role working with a small group of sales personnel, and may have monitored only one or two calls a day out of the thousands of telephone calls that were received by the company.  (K. Cushman Aff., ¶8; Barrett Aff., ¶30; Maihos Aff., ¶15.)  Moreover, the procedures in the call center have been significantly enhanced by new technologies, all which were acquired after Cushman was

fired from the company in 2003.  Thus, he is not competent to testify about the current policies

and procedures employed by ITV to ferret out rogue sales personnel.  (Maihos Aff., ¶15.)

Based on the affidavits of these witnesses, the FTC requests the immediate and drastic

relief of a receiver and the freezing of assets, without an evidentiary hearing and before the

parties can undertake any discovery.  The FTC offers no evidence to support their claim that the

DMC Defendants are currently violating the law, and that such violations are likely to reoccur.[4]

In addition, the FTC fails to consider the substantial compliance procedures that are in place at

ITV Direct to ensure that its sales representatives are making complete disclosures to consumers.

See Toys "R" Us, 754 F.Supp. at 1060 (preliminary injunction denied in view of defendants'

efforts at compliance with federal safety guidelines, where government was more interested in

filing the action and obtaining the injunction than improving defendant's quality control

procedures.)  The FTC has utterly failed to meet the evidentiary predicate for obtaining the

overbroad and extreme relief it seeks.  See Crescent Pub. Group, 129 F. Supp. 2d at 326 (court

refused to appoint a receiver at preliminary injunction stage when evidence was incomplete and

less restrictive measures would suffice).

## 2.    Emergency Relief Is Unnecessary As DMC Defendants Have Voluntarily Desisted From Showing the Allegedly Offending Infomercials.

The remedy requested by the FTC must have a "reasonable relation to the unlawful

practices found to exist."  Standard Oil Co. v. FTC, 577 F.2d 653, 662 (9th Cir. 1978) (citing

FTC v. Colgate-Palmolive Co., 380 U.S. 374, 394-5 (1965).  The FTC's request for the

---

[4] Obviously aware that there is no continuing violation by the DMC Defendants in connection with the infomercials, the FTC also raises the specter of allegedly aggressive or deceptive sales tactics used by the DMC Defendants in their call center.  Again, the evidence in support of this claim falls far short of persuasive.  First, the affidavit submitted by the FTC investigator discusses alleged interactions that occurred in October of 2003, over eight months ago.  As the evidence submitted by the DMC Defendants demonstrates, these practices, if they happened at all, were extremely uncommon.  Moreover, substantial improvements to the call center have occurred since 2003, including technology that records each and every sales call and confirms that appropriate disclosures were made and assents obtained.  (Callahan Aff., ¶12; Barrett Aff., ¶21.)

appointment of a receiver and asset freeze here is an "extraordinary remedy, to be employed cautiously and usually when no lesser relief would be effective." <u>Crescent Pub. Group</u>, 129 F. Supp. 2d at 326. Such measures have been called "Draconian," as they effectively put a defendant out of business. <u>Id.</u> Thus, "on a preliminary injunction motion, when the evidence is incomplete, the Court should not grant relief beyond what is needed." <u>Id.</u> Based on the evidence submitted by the FTC, the appointment of a receiver and a freeze of assets are not warranted at this early stage. There are less restrictive measures that will protect the public interest while the parties engage in discovery, measures that the DMC Defendants have already voluntarily agreed to undertake. <u>See</u> <u>Crescent Pub. Group</u>, 129 F. Supp. 2d at 326.

These less restrictive measures are even more appropriate where, as here, constitutional freedom of speech considerations are involved. <u>See</u>, <u>e.g.</u>, <u>In re R.M.J.</u>, 455 U.S. 191, 203 (1982) ("the remedy [for potentially misleading advertising] in the first instance is not necessarily a prohibition but preferably a requirement of disclaimers or explanation"); <u>Zauderer v. Office of Disciplinary Counsel</u>, 471 U.S. 626, 651 (1985)(warnings or disclaimers might be more appropriate to dissipate possibility of consumer confusion rather than flat prohibitions on speech). It is well-established that "[t]he First Amendment does not permit a remedy broader than that which is necessary to prevent deception . . . or correct the effects of past deception." <u>National Comm'n on Egg Nutrition v. FTC</u>, 570 F.2d 157, 164 (7th Cir. 1977); <u>see also</u> <u>Standard Oil Co.</u>, 577 F.2d at 662 ("First Amendment considerations dictate that the Commission exercise restraint in formulating remedial orders which may amount to a prior restraint on protected commercial speech.") Thus, in this case, the FTC has failed to demonstrate that the draconian remedy of an asset freeze and a receiver is justified – particularly in light of the lack of any competent evidence to support their claims.

3.    **The Drastic Relief The FTC Seeks Will Prevent The DMC Defendants From Obtaining Assets Which Could Satisfy Potential Consumer Redress.**

The DMC Defendants have profitable business operations unrelated to the infomercials they produced for dietary/nutritional supplements that are the subject of the FTC investigation and this action.  This business includes non-ingestible non-supplement products on which it has been generating profit for the past several months.  (Callahan Aff.,¶9.)  The FTC's requested relief would essentially put the DMC Defendants out of business and prevent them from earning a profit that could be available for consumer redress should the DMC Defendants be found to have any liability.

In addition, the DMC Defendants have a right to indemnification against Guerrero and Healthy Solutions for any claims or actions arising out of the Supreme Greens product, and from Barefoot for any claims arising out of the coral calcium supplement.  These indemnification rights, which the FTC completely ignores, are a significant asset of the business, which would also be available to satisfy any liability on the part of the DMC Defendants.  See In re Louisiana World Exposition, Inc., 832 F.2d 1391, 1400 (5th Cir. 1987) (right of indemnification considered asset of bankruptcy estate).  If their assets are frozen, the DMC Defendants will not be in a position to pursue these indemnification rights against Guerrero and his companies, a claim which has already been asserted in a separate action that is currently pending before Judge Tauro of this Court.

For all of these reasons, the appointment of a receiver and the freezing of all the DMC Defendants' assets, which will be fatal to their business, is completely unnecessary in order to prevent the misleading advertising that forms the basis for the FTC's claims.  The restrictive measures that the DMC Defendants will voluntarily agree to are more than sufficient at this stage in the case to address the FTC's immediate concerns.

**B.     THE FTC IS NOT LIKELY TO SUCCEED ON THE
        MERITS OF ITS CLAIMS AGAINST THE DMC DEFENDANTS**

There are significant triable issues of fact as to whether the DMC Defendants will have

any liability for the FTC's claims.  First, the allegedly false and misleading health claims in the

Supreme Greens infomercial are the expressed opinions of another defendant, Guerrero, and

were not made by the DMC Defendants.  Nonetheless, the opinions that were expressed in the

infomercial, even if they were made by the DMC Defendants, are protected by the First

Amendment.  In any event, should Guerrero's claims be actionable, the DMC Defendants

included several disclaimers in the Supreme Greens infomercial to inform consumers that the

infomercial was a paid advertisement, as well as disclaimers as to the health claims made about

the Supreme Greens product.  According to settled law, the FTC is required to consider these

disclaimers, which it failed to do, as they can render even scientifically unsupported

advertisements lawful.  Because the FTC ignored these disclaimers, it failed to demonstrate that

it will be able to establish a prima facie element of its case, that the infomercials are even

deceptive to consumers in light of the disclaimers.  Based on these significant issues, which

cannot be determined as a matter of law prior to trial, the FTC is not entitled to the extraordinary

relief it seeks without discovery, evidentiary hearing, or finding as to the merits of its claims.

**1.     The Expressions of Opinion Are Protected by the First Amendment.**

Although the FTC presents its arguments concerning the Supreme Greens infomercial as

unassailable, there is a significant triable issue of fact as to whether the DMC Defendants have

any liability for the expressions of opinion of another defendant.  It is firmly established that the

First Amendment protects commercial speech.  Virginia State Bd. of Pharmacy v. Virginia

Citizens Consumer Council, 425 U.S. 748 (1976).  This is based on the principle that "such

speech serves individual and societal interests in assuring informed and reliable decision

making." Standard Oil Co., 577 F.2d at 662 (citations omitted). The government does not have

complete power to suppress or regulate commercial speech, even if it deems such speech

controversial. Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n, 447 U.S. 557, 562

(1980). Thus, administrative agencies may not simply pursue rigorous enforcement to the extent

of discouraging advertising. Standard Oil Co., 577 F.2d at 662.

In this case, the infomercial in question is protected commercial speech, which invites the

viewers to consider the nutritional value of Supreme Greens for the overall health of an

individual. The views expressed on the infomercial are that of Guerrero, who created the

supplement and maintains that he conducted clinical trials that support the health claims he made

in the infomercial about Supreme Greens. The infomercial was not scripted; rather, the DMC

Defendants simply posed questions to Guerrero and elicited his responses. The DMC

Defendants themselves made no claims about the Supreme Greens product in the infomercials,

and were unaware that Guerrero apparently does not have the credentials or the scientific support

for the supplement, as he represented to the DMC Defendants and to the public.

Given the First Amendment protections on commercial speech, the FTC does not have

the right to halt all advertising by the DMC Defendants and shut down its business where it has

not demonstrated that the DMC Defendants made any false or deceptive claims to consumers.

There is a triable issue as to whether, in light of the First Amendment concerns, the FTC has any

basis for requesting the relief it seeks against the mere producer of an infomercial, who was

unaware that any of the claims made about Supreme Greens may lack scientific support.[5] In any

event, First Amendment considerations will not permit a remedy broader than necessary to

---

[5] Moreover, the FTC fails to recognize that the DMC Defendants have a contractual right of indemnification against Guerrero and his companies for any claims, lawsuits or actions in any court or by any governmental unit arising out of or relating to the Supreme Greens product or its impact on the health of any person. Thus, any judgment that may be obtained against the DMC Defendants will ultimately be satisfied by Guerrero and his companies, although the FTC is not seeking to freeze the assets of these defendants or to appoint a receiver to run their business.

correct the effects of any past deception, such as the freezing of assets and halting of the business of the DMC Defendants.  <u>National Comm'n on Egg Nutrition</u>, 570 F.2d at 164; <u>Standard Oil Co.</u>, 577 F.2d at 662.  The extreme relief sought by the FTC must be denied.

> **2.    The FTC's Sweeping Rejection of the Supreme Greens**
> **Infomercial Is Unconstitutional and Fails to Consider Disclaimers.**

There is also a significant triable issue of fact as to whether the FTC can meet its prima facie case and demonstrate that the claims made in the infomercial were false or deceptive when the DMC Defendants included disclaimers throughout the infomercials regarding the claims made about Supreme Greens.  In order to establish a violation of Section 5 of the FTCA, the FTC must demonstrate that the representations of the DMC Defendants would mislead consumers acting reasonably under the circumstances.  15 U.S.C. §§ 45, 52; <u>see</u>, <u>e.g.</u>,  <u>FTC v. Marketing Response Group, Inc.</u>, 1996 WL 420865 (M.D. Fla.).  The FTC failed to offer any evidence to show that consumers were actually misled by the claims in the Supreme Greens infomercial or that the infomercials were false and deceptive in light of these disclaimers.

In fact, the FTC fails to even inform this Court that the DMC Defendants included disclaimers throughout the infomercial, which alerted consumers to the fact that, *inter alia*, it was a paid advertisement, that the views expressed on the infomercial are solely the opinion of the guest (Guerrero), that the product does not claim to heal or cure any illness, and that individual results may vary.  (Goljan Aff., ¶¶12, 13 and Ex. A & B.)  The disclaimers even informed consumers that the opinions expressed may not be supported by scientific evidence, and that no representation or warranty as to any specific result is intended.  (<u>Id.</u>)  There is clearly a triable issue as to whether the FTC can meet its prima facie case in light of these disclaimers and prove a Section 5 or Section 12 violation.  <u>See</u> <u>Marketing Response Group</u>, 1996 WL 420865 at *3 (district court denied FTC's motion for preliminary injunction as it failed to prove

that defendant's promotional materials would be construed as material misrepresentations to the average consumer.)

The FTC's outright rejection of the infomercials without considering the DMC Defendants' disclaimers goes against settled law that requires an analysis of disclaimers in connection with advertising that is admittedly inherently misleading.  Specifically, in Pearson v. Shalala, 164 F.3d 650 (D.D.C. 1999) ("Pearson I"), a case also involving the labeling and advertising of dietary supplements and claims that such supplements could cure certain forms of cancer, the District of Columbia Circuit rejected the FDA's sweeping rejection of the challenged claims.  In so doing, the Appeals Court held as a preliminary matter that the speech was protected by the First Amendment.  Id. at 655 ("It is undisputed that the FDA's restrictions of appellants' health claims are evaluated under the commercial speech doctrine.")  The Court of Appeals then recognized that disclaimers not only could render otherwise potentially misleading claims lawful, but mandated that federal agencies such as the FTC and FDA consider first whether disclaimers cure the offending speech.  Id. at 658.

In this case, the FTC simply ignores the existence of disclaimers in the Supreme Greens infomercial.  In Pearson v. Thompson, 141 F. Supp. 2d  105 (D.D.C. 2001) ("Pearson III"), the district court rejected similar conduct by the FDA in connection with claims by designers of dietary supplements containing folic acid.  In particular, the FDA took the position that in no circumstances could disclaimers cure the claims by the manufacturers that folic acid might prevent neural tube defects.  Rejecting the FDA's argument, the court, citing Pearson v. Shalala, 130 F. Supp. 2d 105, 121 (D.D.C. 2001), stated:

> In short, even if the FDA's criticism of the sub-claim is valid, this criticism does not make the Claim inherently misleading; rather, it suggests the need for a well-drafted disclaimer, which the FDA has steadfastly refused to even consider.

See Pearson III, 141 F. Supp. 2d at 112 (the Government "*must* demonstrate with empirical evidence that disclaimers similar to [those] suggested . . . would bewilder consumers and fail to correct for deceptiveness.").

Here, where the FTC has not offered one affidavit from a consumer complaining that he or she was misled by the claims in the Supreme Greens infomercials, or even considered whether the infomercials are misleading to consumers in light of the disclaimers, it has not made out its prima facie case. This action, therefore, is similar to Whitaker v. Thompson, 248 F. Supp.2d 1 (D.D.C. 2002). In Whitaker, as here, the promoters of a dietary supplement claimed that "consumption of antioxidant vitamins may reduce the risk of certain kinds of cancers." The FDA, as the FTC has done here, determined that such claims were "inherently misleading" and unsupported by competent and reliable scientific evidence, and refused to even consider the effect of disclaimers on the plaintiffs' commercial speech. The court rejected the FDA's position under the framework established in Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York, 447 U.S. 557 (1980) and Thompson v. Western States Med. Ctr., 535 U.S. 357 (2002), holding that "[t]he First Amendment does not allow the FDA to simply assert that Plaintiffs' Claim is misleading in order to 'supplant [its] burden to demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.'" Whitaker, 248 F. Supp. 2d at 9 (quoting Ibanez v. Florida dep't of Bus. & Prof'l Regulation, 512 U.S. 136, 146 (1994).

As in Whitaker, "[i]n this case, the Government has not satisfied its burden – there is no evidence that the proposed [anti-cancer] claim, if accompanied by a disclaimer, would be deceptive or unlawful." 248 F. Supp. 2d at 9. Numerous other cases are in accord. See, e.g., Bioganic Safety Brands, Inc. v. Ament, 174 . Supp. 2d 1168, 1182 (D. Col. 2001) (holding that

even if claim that pesticide is "Safe for Kids" is inherently misleading, "any misleading impression can be cured by a disclaimer), citing Zauderer v. Office of the Disciplinary Counsel, 471 U.S. 626 (1985); Symes v. Bahama Joes, Inc., 1988 WL 92462 (D. Mass. Aug. 12, 1988) (Zobel, J.) ("The specific disclaimers bar plaintiffs' claims of misrepresentation"); cf. American Home Prods. Corp. v. FTC, 695 F.2d 681 (3d Cir. 1983) (recognizing curative effect of disclaimers on otherwise potentially misleading commercial speech).

Although DMC, ITV and Barrett have agreed to completely cease any of the allegedly misleading commercial speech by pulling all advertising for the products, there is a significant question whether the FTC can demonstrate that the infomercials are misleading and deceptive to consumers in light of the disclaimers.[6]  Thus, at a minimum, the FTC's complete rejection of the defendant's disclaimers raises a triable issue concerning whether the FTC will even be able to establish an element of its prima facie case.

### 3.    A Balance of the Equities Does Not Favor Favor The Extreme Order Sought By The FTC.

The FTC claims to have brought this action to "halt and prevent further violations of federal law and to protect consumers from defendants who market products claimed to prevent and cure life-threatening diseases."  (Memorandum, p. 21.)  This Court cannot balance the hardships by considering, on the one hand, claims that must be finally adjudicated after substantial discovery.  The issue on this motion is whether the FTC is entitled to the extreme,

---

[6] Even if the current disclaimers did not go far enough, in light of Pearson I and its progeny, the FTC should have considered requiring additional disclaimers rather than seeking an outright suppression of speech, appointment of a receiver and an asset freeze.  As noted in Whitaker, "[t]he case law makes it very clear that plaintiffs are harmed by the FDA's suppression of the [cancer cure] claims because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  248 F. Supp. 2d at 15, citing Elrod v. Burns, 427 U.S. 347, 373 (1976); New York Times Co. v. United States, 403 U.S. 713 (1971); Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 758 (1988).

broad, and immediate relief it seeks without any time for discovery or an evidentiary hearing, based solely on the FTC's allegations and the flimsy evidence it submitted.

The balance of the hardships clearly favors the DMC Defendants under the circumstances of this case. Granting the FTC an order that would shut down DMC and ITV Direct and put 140 Massachusetts employees out of work would cause significant irreparable injury that cannot be remedied if the FTC's position is later overturned. The injury to the DMC Defendants is even more significant in view of the fact they are currently conducting a profitable business with a non-ingestible product that is not challenged by the FTC, and that they have significant indemnification rights against Guerrero and Barefoot that they will be unable to pursue if their business is halted. On the other hand, the DMC Defendants' agreement to, *inter alia*, cease running the infomercials, operate their business in the ordinary course, and submit to an independent and comprehensive audit, address the FTC's immediate concerns, but preserves the status quo in the event the FTC fails to succeed on the merits of its case. In light of these voluntary measures, there will be no hardship to the FTC or to the public if the DMC Defendants are given a reasonable period during which expedited discovery may occur in this case.[7]

As the DMC Defendants will suffer an incredible hardship if the FTC's requested order is entered, which will essentially end their business regardless of the eventual outcome on the merits of the FTC's claims, the balance of hardships and the equities unambiguously favor the voluntary undertakings proposed by the DMC Defendants and a denial of the FTC's requested relief. Here, where there is no competent evidence of fraudulent conduct on the part of the DMC

---

[7] The FTC does not claim that Supreme Greens, in and of itself, is dangerous to public safety. In fact, the United States Food and Drug Administration ("FDA") conducted an inspection of the DMC Defendants' inventory of Supreme Greens over a period of several months, and identified certain advertising and labeling issues, but did not identify any health problems with the product. The DMC Defendants addressed all of the FDA's concerns, and on May 12, 2004, the FDA responded that this proposed corrective action "appears to be adequate." (Barrett Aff., ¶20 and Exhibit G.)

Defendants, the appointment of a receiver and the freezing of assets is completely unnecessary to protect the public interest.[8]

### III.    CONCLUSION

Based on the foregoing reason, including the DMC Defendants' voluntary undertakings, this Court should deny the temporary relief requested by the FTC and allow the parties to take expedited discovery on a reasonable schedule established by the Court.

<div style="margin-left: 40%;">

Respectfully submitted,
DIRECT MARKETING CONCEPTS, INC., ITV
DIRECT, INC., AND DONALD W. BARRETT

By their attorney(s),


 /s/ Peter S. Brooks
Peter S. Brooks, BBO #058980
Christopher F. Robertson, BBO #642094
Susan W. Gelwick, BBO #567115
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Telephone:    (617) 946-4800
Telecopier:    (617) 946-4801

</div>

Dated: June 7, 2004

---

[8] The cases cited by the FTC to support their justify their request for the appointment of a receiver and an asset freeze involved companies whose business operations were permeated with misrepresentations and fraud, and where there existed a significant threat of the dissipations of assets.  See In re National Credit Management Group, LLC, 21 F.Supp.2d 424, 462-63 (D. NJ 1998) (appointment of receiver appropriate where defendants engaged in fraud and there was a real threat assets would be dissipated.); FTC v. Amy Travel Service, Inc., 875 F.2d 564(7th Cir. 1989) (asset freeze allowed where FTC had evidence of numerous consumer complaints in a number of states, based on defendants' deceptive practices in selling a vacation voucher of virtually no value, which amounted to millions of dollars in chargebacks for disputed charges, and an eventual judgment against the defendants of over $6 million.)