UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>          Plaintiff,<br><br>v.<br><br>DIRECT MARKETING CONCEPTS, INC., et al.,<br><br>          Defendants. | )<br>)<br>)<br>)<br>)   CIVIL ACTION NO. 04-CV-11136GAO<br>)<br>)<br>)<br>)<br>)<br>) |

### AFFIDAVIT OF DONALD BARRETT

I, DONALD BARRETT, under oath, declare as follows:

1.  I am a principal shareholder of defendants Direct Marketing Concepts ("DMC") and ITV Direct, Inc. ("ITV Direct"), and am responsible for the management and operations of each company. I make this affidavit on the basis of my own personal knowledge of the facts set forth herein and could testify competently thereto if called to do so.

2.  DMC and ITV Direct, located in Beverly, Massachusetts, are media and marketing companies that collectively employ over 140 individuals in Massachusetts. DMC's and ITV Direct's business includes the production of infomercials, in which an individual is provided the opportunity to advertise an existing product to a larger audience through wider media, including television and radio. Neither DMC nor ITV itself manufactures any products.

3.  I am the primary person responsible for identifying business opportunities for DMC and ITV Direct. This responsibility includes meeting with numerous individuals who believe that they have products that will experience enhanced distribution and sales through infomercial marketing. Before agreeing to commit to an infomercial for a particular product, I will meet personally with the representatives of the company manufacturing and selling the product, and attempt to ascertain the credibility of the spokesperson concerning their own credentials and the merits of the product that he or she is seeking to sell through direct marketing.

4. In connection with any agreement to produce an infomercial for a third party, DMC and ITV Direct make clear that the individual advertising the product is responsible for each and every representation he makes about a product, including confirming that he has competent and reliable scientific support for any claims made about the product. In each case, DMC and ITV Direct require that the individual provide specific representations about their support for their claims, and to provide indemnification to DMC and ITV Direct for any claims made by the individual that are later challenged by any governmental agency.

5. In 2001, I was introduced to Robert Barefoot and his company Deonna Enterprises, which was producing a dietary supplement known as coral calcium, and distributing a book written by Barefoot called "The Calcium Factor". Barefoot claimed that coral calcium had substantial health benefits, and claimed that he had significant research, studies, documentation, testimonials and other scientific information to support the benefits he claimed in his books. After reading Barefoot's book and engaging in several discussions with Barefoot personally, I introduced Barefoot to Kevin Trudeau, a well-known host of infomercials for a number of products. DMC agreed to produce an infomercial for Barefoot, featuring Mr. Trudeau as the interviewer. This infomercial, which runs 30 minutes, is titled "A Closer Look". As is common practice, the infomercial was shot in one take on a single day, and the filming was entirely unscripted. Set in a interview format, Barefoot discussed the benefits of coral calcium and encouraged viewers to read his book "The Calcium Factor". No specific product was discussed in the infomercial.

6. After filming of A Closer Look, Barefoot confirmed that he possessed support for the claims made in the infomercial, in the form of studies and research, and on February 18, 2002 signed a distribution agreement in which he agreed to provide DMC with all research, studies and documentation, and agreed to fully indemnify DMC in connection with all of the statements and claims he had made in the infomercial. A true and accurate copy of the Distribution Agreement is attached as Exhibit A.

7.      From early 2002 through June 2003, "A Closer Look" was aired on various media outlets. In connection with the airing of the infomercial, DMC agreed to sell Barefoot's books and coral calcium products to consumers. However, because DMC was a new company and did not have the resources to establish merchant accounts to process credit cards, all processing of credit cards was done by the defendant Triad ML Marketing, Inc. of Swedesboro, Pennsylvania. I have no ownership interest in Triad and there was no written agreement between DMC and Triad concerning how the money collected by Triad would be distributed to DMC. Because all the money from the sales of coral calcium was flowing to Triad, I relied upon Triad and its president Allen Stern to provide me and DMC with an accounting. No such accounting has ever been provided, and Triad has retained the vast majority of the revenues generated from the sales of coral calcium products and Barefoot's books sold through the airing of the infomercial.

8.      Shortly after A Closer Look began airing, Kevin Trudeau sought to change the terms of his original agreement with DMC and a dispute arose. Trudeau then filmed a second infomercial, entitled "the Debbie and Kevin Show" in which Trudeau conducted a second filmed interview with Barefoot and Barefoot made many of the same claims he had made in "A Closer Look." Also, unknown to me at the time, Trudeau began a campaign with the Federal Trade Commission seeking to convince the FTC to halt the running of "A Closer Look" while allowing the "Debbie and Kevin Show" to continue airing. For example, I subsequently became aware of a letter written by counsel for Trudeau to the FTC on April 24, 2002, in which Trudeau confirms that the FTC has been provide a copy of A Closer Look and identifying all of the areas that Trudeau contends the infomercial violates the law. The letter, a true and accurate copy of which is attached as Exhibit B, specifically requested that the FTC enjoin the airing of "A Closer Look" because the claims in the infomercial could harm consumers.

9.      Despite receiving the tape and transcript of "A Closer Look" at least as early as April 2002, the FTC did nothing to stop the airing of the infomercial and never notified me or DMC that it had any issues or concerns over the content of the infomercial, until June 2003, over a year after the FTC had received a copy of the tape.

10. Specifically, on June 9, 2003, the FTC filed an action against Kevin Trudeau in the United States District Court for the Northern District of Illinois, seeking to enjoin the running of the "Debbie and Kevin Show" and seeking to hold Trudeau in contempt of a FTC injunction order issued by that Court in 1998. It was only when this action was filed that I then learned that Trudeau had been subject to a prior FTC consent decree and injunction. A few days after the FTC filed its action against Trudeau, DMC was contacted for the first time by the FTC concerning the "Closer Look" show. The FTC raised concerns that Barefoot did not possess the level of competent and reliable scientific support for his claims in the infomercial that would satisfy the FTC's dietary supplement guidelines.

11. In response to the FTC's concerns over the "Closer Look" show, DMC sought to obtain copies of the studies, articles and other support that Barefoot had assured DMC existed. DMC then obtained a copy of the materials that were submitted in connection with the Trudeau action, including numerous articles, documents and testimonials. These supporting materials are attached as Exhibit C.

12. Notwithstanding that there did appear to be support for the claims made in the "Closer Look" show, and Barefoot's continued defense of his book and his claims, DMC nonetheless agreed to immediately pull the show and cease any future airings. On June 19, 2003, DMC sent letters to each of its distributors in possession of the "Closer Look" show and notified them that they should immediately cease airing the show. Copies of these letters are attached as Exhibit D. The "Closer Look" show has not been aired by DMC since June 2003.

13. In late 2002, defendant Gregory Geremesz contacted representatives of ITV Direct and stated that he knew a Dr. Alejandro Guerrero, who had developed a greens product that Mr. Geremesz believed would likely be successful if marketed through an infomercial. ITV Direct reviewed the materials provided by Geremesz and Guerrero, including testimonials by fitness celebrity Tony Robbins, and decided to pursue additional discussions. At all times, Geremesz and Guerrero represented that Guerrero was a doctor and OMD, and operated a clinic in California with regular patients. Geremesz and Guerrero also represented that the greens

product developed by Guerrero had been clinically tested on patients in California and had shown tremendous results.

14. On April 4, 2003, ITV Direct entered into a "Distribution Agreement" with Healthy Solutions for the production of an infomercial for Guerrero's greens product, called "Supreme Greens with MSM", a copy of which is attached as Exhibit E. In connection with agreeing to produce an infomercial featuring Guerrero, Guerrero confirmed that he had competent and reliable scientific evidence and studies for the health benefits of Supreme Greens. In several direct conversations, as well as a presentation to the ITV Direct employees, Guerrero confirmed the results of his patient studies. Attached hereto as Exhibit F is a transcript of the sales presentation where Guerrero confirmed that he had conducted a study, and the results of that study. I never encouraged Guerrero to fabricate any facts about the study or the existence of the study, but relied entirely on Guerrero's affirmation of the study and its results.

15. In the Distribution Agreement, Guerrero provided complete indemnification to ITV Direct, its officers, directors, employees and affiliates in the event that any of his health claims were later challenged by the FTC or any other federal agency.

16. On April 11, 2003, Guerrero traveled to ITV Direct's studios in Beverly, Massachusetts to film the infomercial. Prior to filming, Guerrero once again identified himself as a doctor, and stated that he had received his doctorate in Traditional Chinese Medicine in California. As is standard practice, the infomercial filming was unscripted and ITV Direct, Inc. did not dictate any of the statements by Guerrero, including his statements regarding his credentials, his clinical practice in California or the scientific support for the Supreme Greens with MSM product. All I ever did in connection with the infomercial was pose questions to Guerrero and elicited his responses. At no time did I ever make any affirmative representation concerning Supreme Greens with MSM or any of the health benefits of the product espoused by Guerrero.

17. ITV Direct has never manufactured any of the Supreme Greens with MSM product. Rather, all of the product has been manufactured and sold to ITV Direct by Healthy

5

Solutions.  Despite numerous requests made to Healthy Solutions and Guerrero for the formula for the product, he has repeatedly refused, asserting that the formula is proprietary.  Thus, neither I nor ITV Direct has ever been provided the formula for the product.

18.     During September and October 2003, ITV Direct's counsel was contacted by the FTC concerning the Supreme Greens infomercial.  In those conversations, the FTC identified several concerns with the content of the infomercial.  The FTC claimed that it did not believe that there existed competent and reliable scientific evidence for the claims in the infomercial.  In response to these concerns, ITV Direct both sought additional scientific evidence from Guerrero and Healthy Solutions, and edited the program to address the FTC's concerns.  In October 2003, the edited tape was sent to the FTC, and the FTC concluded that the edited tape was a "substantial improvement."

19.     Based upon the FTC's concerns, the edited tape was rolled out first in national markets, with local markets to follow.  Because media time is often purchased months in advance, particularly in local markets, it takes substantial time to substitute master tapes at each station.  Nonetheless, ITV Direct sought to substitute the edited tape for the original tape as quickly as feasible.  In the meantime, ITV Direct also received additional materials from Guerrero which appeared to provide some support for the claims he had made in the infomercial, including articles and studies.  These materials are attached hereto as Exhibit F.  We also requested additional details about Guerrero's study, but were told that the specific patient results and data were confidential.  Instead, we were provided a summary of the study, attached hereto as Exhibit G.

20.     On February 11, 2004 an investigator from the United States Food and Drug Administration ("FDA") conducted an inspection of ITV Direct's existing inventory of Supreme Greens with MSM.  The FDA's inspection continued over the next several months, and ITV Direct provided the FTC with samples of all its products, access to all of its records and a comprehensive tour of its facilities.  There was never any effort to hide anything from the FDA, and the investigator was provided complete answers to all of her questions.  After months of

investigation, the FDA issued a Warning Letter on April 19, 2004, which identified certain advertising and labeling issues, but did not identify any health problems with the product. ITV Direct subsequently addressed all of the FDA's concerns and responded by letter dated May 10, 2004. On May 12, 2004, the FDA responded by stating that ITV Direct's proposed corrective action "appears to be adequate." A copy of the FDA's May 12, 2004 letter, which is nowhere mentioned by the FTC, is attached hereto as Exhibit H.

21. I have reviewed the Declaration of Christina Turner, who is apparently an investigator with the Federal Trade Commission. According to her declaration, she ordered products from ITV Direct in October 2003, and was involuntarily charged for additional products by ITV Direct. While I cannot deny that this incident may have occurred, it is ITV Direct's stated policy to fully disclose, both orally and in written materials, its return policy and the right for a customer to receive a refund at any time. It is also the policy of ITV Direct to provide notice to customers and receive specific confirmation from the customer approving inclusion in its autoship program. If a sales representative is discovered violating these policies, it is the company's policy to immediately fire the employee. In addition, the incident discussed by Ms. Turner occurred prior to the implementation by ITV Direct of the Contract Genie in late 2003. The Contract Genie is a computerized system for use with every sales order with a re-supply component. The system records each conversation and confirms that the terms of the autoship program are clearly communicated and affirmative assent is obtained. We are prepared to provide all of the information concerning the Contract Genie to the FTC, which will demonstrate that the FTC's contention that unauthorized autoships are occurring is simply untrue. Finally, Ms. Turner would have been notified in writing with her first shipment that she was on autoship, and could have called at any time to remove herself from the program without charge.

22. In the Fall of 2003, DMC and I provided the FTC with complete statements of our respective financial conditions. I am fully prepared to provide updated financial statements in whatever form the FTC deems sufficient, and DMC, ITV and Direct Fulfillment are prepared to provide comprehensive financial statements.

23. Demonstrating my continued willingness to cooperate with the FTC, on December 22, 2003, I was deposed by the FTC in Boston in connection with its pending litigation against Kevin Trudeau and Robert Barefoot. I agreed to accept service of a subpoena and did not refuse to answer any question posed by the FTC Staff. I also produced responsive documents. A copy of the FTC subpoena is attached as Exhibit I. I remain willing and able to cooperate with the FTC staff in its investigation of both coral calcium and Supreme Greens, particularly if it will assist in validating the ITV Direct's indemnification rights against Guerrero and Healthy Solutions.

24. Between December 2003 and April 2004, the FTC had no communications with DMC, ITV Direct or its counsel. Then, beginning in March 2004, ITV Direct began reducing its media purchases for Supreme Greens with MSM, with the intention of pulling the infomercial completely by Summer 2004. On April 7, 2004, the FTC called to state that it continued to have concerns over the Supreme Greens with MSM infomercial and that it believed that the original infomercial was running in certain media markets. We then investigated the matter, determined that certain stations were airing the original infomercial, and immediately notified all media outlets to cease running any of the Supreme Greens versions. ITV Direct has halted all media for Supreme Greens with MSM, and has no intention of running the infomercial in the future. I do not believe that the infomercial is currently running, and, if it is, it is not being run by ITV Direct, DMC or any other company associated with ITV Direct or DMC.

25. In addition, in connection with the FDA and FTC investigations, ITV Direct conducted its own investigation of Guerrero, who represented to me, my employees, his own employees, the public and the Court that he is a doctor and an OMD. Neither claim appears to be true. Rather, it appears that Guerrero received only a Masters Degree from SAMRA University in Los Angeles, and has never received a doctorate of any kind at any time. I believe that Guerrero lied to me and defrauded ITV Direct in connection with his true background, as the FTC now contends. On this basis, ITV Direct has sought indemnification from Guerrero in connection with the FTC's investigation and any possible remedies it may seek in this action.

However, at no time prior to April 2004 was I or any other employee aware that Guerrero's prior claims regarding his background and the support for his products might be false. As soon as we discovered these facts, we immediately stopped running the infomercial.

26. All of the books and records of ITV Direct, DMC and Direct Fulfillment are still in existence an available to the FTC. No entries in any of the books and records of ITV Direct, DMC and Direct Fulfillment have been altered, and all transactions engaged in by these companies are reflected on the books and records of the business. As we have told the FTC, and as we were prepared to agree at a meeting in Washington, D.C. on Friday May 28, 2004, we have had discussions with an independent auditing firm and are prepared to engage that firm to review the books and records of the business and provide the FTC with a complete accounting of the business and subject products.

27. I have reviewed the declaration of Scot Sarver submitted by the FTC in this action. Mr. Sarver, a former employee of ITV Direct, was fired by ITV Direct because he was caught stealing from the company and attempting to establish a competing business while employed by ITV Direct. He is currently under a non-compete agreement and has received a demand letter from the company regarding his competing business. A copy of the demand letter sent to Mr. Sarver is attached as Exhibit J. He has acknowledged to other employees that he shredded his employment agreement, and was required to break into a locked desk to do so. A copy of the affidavit of John Maihos describing this incident is attached as Exhibit K. His competing business would likely greatly benefit from any damage caused to ITV Direct by the FTC, including the appointment of a receiver and an asset freeze. I am also aware that he attempted to defraud the Massachusetts unemployment office by claiming that he was unemployed when he had an existing business. He was very upset when ITV Direct would not act as a co-conspirator in his scheme by certifying his unemployed status and then his claim was denied. Finally, in November 2003, a sexual harassment complaint was filed against Mr. Sarver by a female employee, charging him with an inappropriate sexual advance. A copy of the memorandum concerning this incident is attached as Exhibit L.

28.     The falsity of Mr. Sarver's affidavit is easily demonstrated. For example, Mr. Sarver states that I bought a house in Florida and made comments about Florida's homestead laws. That is simply untrue. I do not own any home in Florida. Mr. Sarver also states that I have bought a boat and jet-skis. That is also untrue. I have never bought a boat or jet-skis and do not currently own either. Mr. Sarver's remaining statements are also untrue. All of the records of ITV Direct, DMC and Direct Fulfillment are available for review by the FTC and no improper transactions have occurred in an effort to hide assets, fraudulently transfer assets or otherwise impede the FTC's review of financial information maintained by these companies. Likewise, Mr. Sarver's statements regarding the autoship program are untrue. At no time have I encouraged the sales staff to fraudulently place customers on autoship and I have personally fired sales representatives for violating the company's clear policies in connection with the autoship program. ITV Direct operates a dedicated customer service department with representatives available to field calls six days a week, and guarantees complete customer satisfaction. All customers are entitled to refunds if they are not completely satisfied with the products they have purchased. I have never stated differently to my employees.

29.     I have also reviewed the declaration of Richard Cushman. Mr. Cushman is married to my wife's sister, Karen, and they are currently engaged in divorce proceedings. In my opinion, Mr. Cushman is an extremely unstable person, having been arrested and convicted several years ago for firebombing his then-girlfriend's father's car after she left him. He has also been arrested and convicted for arson, intimidating a witness and violating a protective order, and arrested for burglary. Karen Cushman has sought and obtained a restraining order against him after several threats were made by him against her and her family. Copies of public records relating to these incidents are attached hereto as Exhibit M. On several occasions after Mr. Cushman was fired by ITV Direct, he has threatened me and other employees of ITV Direct with physical violence. For example, he threatened to confront me and others at the company's Christmas party on December 19, 2003. We called the Middleton, Massachusetts police, and after they reviewed his criminal record they assigned not one, but two officers to the party as

protection. He has also received a Notice of Trespass prohibiting him from trespassing on ITV Direct's business premises, a copy of which is attached as Exhibit N. On other occasions, Mr. Cushman has stated that he will do whatever it takes to bring down the company and me personally. I have also been told that he has lied to others about me and my company on many occasions.

30.     Mr. Cushman's claim that held the position of "manager" of quality control is untrue. While one of Mr. Cushman's many positions was located in the customer service area, he was only privy to a fraction of the total calls that were handled by ITV Direct's customer service representatives and salespeople. Records indicate that although ITV Direct received thousands of calls per day during Mr. Cushman's employment, he monitered as few as one or two calls per day. Thus, Mr. Cushman is not competent to testify about general practices in the call center. Moreover, as noted above, his testimony in this regard is false, as customer service and sales representatives are subject to the highest standards of quality control, as evidenced by the Contract Genie and similar controls.

31.     I personally have not made any fraudulent transfers of cash or other assets. I do not maintain any foreign or offshore bank accounts, nor have I attempted to secrete or disguise my assets in light of the FTC's investigation. The FTC's contention that I am doing so, based upon the affidavits of two former disgruntled employees, one of whom has a criminal record and has threatened me and my family with physical harm, is simply not true. I am prepared to file whatever certifications and/or financial statements the Court might require in connection with this matter.

32.     Within the last year, DMC and ITV Direct have undertaken significant efforts to improve all aspects of their operations, including sales, management compliance and customer service. In connection with this effort, DMC and ITV Direct have retained Mage, LLC, a group of business advisors who focus primarily on providing private and emerging companies with a broad range of business and organizational services. DMC and ITV Direct have always taken

the allegations asserted by the FTC seriously, have sought to address issues as they have been raised, and intend to do so in the future.

33. The damage to DMC and ITV Direct and their 140 employees by allowing the relief that the FTC seeks would be devastating. The companies have significant business operations that have nothing to do with the conduct challenged by the FTC, and these activities can and will generate revenues that could be utilized to pay any ultimate judgment that the FTC obtains in this action. Neither DMC, ITV Direct nor I have destroyed documents, Also, given Healthy Solutions' and Robert Barefoot's agreements to indemnify DMC and ITV Direct, these claims, against the real wrongdoers in this matter, will be lost. I will certainly agree to conduct the operations of the business in the ordinary course and not make any non-business transfers or transactions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of June, 2004 at Beverly, Massachusetts.

                                                         /s/Donald Barrett
                                                         DONALD BARRETT