UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 JUN -8 P 12: 32

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| FEDERAL TRADE COMMISSION, )<br><br>Plaintiff, )<br>v. )<br><br>DIRECT MARKETING CONCEPTS, INC., d/b/a )<br>TODAY'S HEALTH and DIRECT FULFILLMENT, )<br>ITV DIRECT, INC., d/b/a DIRECT FULFILLMENT, )<br>DONALD W. BARRETT, )<br>HEALTHY SOLUTIONS, LLC d/b/a DIRECT )<br>BUSINESS CONCEPTS, )<br>HEALTH SOLUTIONS, INC., )<br>ALEJANDRO GUERRERO, a/k/a ALEX GUERRERO, )<br>MICHAEL HOWELL, GREG GEREMESZ, )<br>TRIAD ML MARKETING, INC., KING MEDIA, INC., )<br>and ALLEN STERN, )<br><br>Defendants. ) | Civ. No. 04-11136-GAO |

(Proposed)

**PRELIMINARY INJUNCTION WITH APPOINTMENT OF RECEIVER, ASSET
FREEZE, RETENTION OF RECORDS AND EXPEDITED DISCOVERY AS TO
DEFENDANTS DIRECT MARKETING CONCEPTS, INC., ITV DIRECT, INC., AND
DONALD W. BARRETT**

This case is before the court on Plaintiff Federal Trade Commission's ("FTC" or

"Commission") motion for Temporary Restraining Order and Order to Show Cause Why a

Preliminary Injunction Should Not Issue as to Defendants Direct Marketing Concepts, Inc., ITV

Direct, Inc., Donald W. Barrett, Health Solutions, Inc., Healthy Solutions, LLC, Alejandro

Guerrero, Michael Howell and Greg Geremesz. Defendants Alejandro Guerrero, Michael

Howell, Greg Geremesz, Health Solutions, Inc. and Healthy Solutions, LLC stipulated to

Preliminary Injunctions with the Commission that were submitted to the Court on June 7, 2004.

The plaintiff and defendants Direct Marketing Concepts, Inc. ("DMC"), ITV Direct, Inc.

("ITV"), and Donald W. Barrett "Barrett") ("Defendants") have agreed to consolidate the motion

for temporary restraining order with the show cause request for a preliminary injunction.

Plaintiff seeks a preliminary injunction (1) prohibiting the Defendants from making the

challenged representations in connection with the advertising, promotion, offering for sale,

distribution, or sale of Supreme Greens or any product containing one or more of the ingredients

in Supreme Greens' proprietary blend; (2) prohibiting the Defendants from imposing

unauthorized charges on consumers' accounts; (3) appointing a receiver over DMC and ITV; (4)

freezing the assets of Defendants; (5) requiring the Defendants to preserve their sales and

financial records and other related evidence and providing a right for immediate access for the

FTC to the Defendants' office premises; (6) requiring the Defendants to provide completed

financial disclosure forms; and (7) granting expedited discovery to the Commission.

This action was filed on June 1, 2004. The FTC alleges, *inter alia,* that Defendants'

promotion of two dietary supplements, Coral Calcium Daily and Supreme Greens with MSM,

violates Sections 5(a) and 12 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C.

§§ 45(a) and 52. Pursuant to Section 13(b) of the Act, 15 U.S.C. § 53(b), the Commission is

seeking preliminary and permanent relief including restitution for injured consumers.

A hearing on plaintiff's motion for preliminary relief as to DMC, ITV and Barrett was

held on July 7, 2004. Based on the pleadings and exhibits entered into the record, the following

findings of fact and law are entered:

## Proposed Findings of Fact

### Parties

1.    The FTC is an independent agency of the United States Government created by

2

the FTC Act, 15 U.S.C. §§ 41-58. The Commission is charged, *inter alia*, with enforcement of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, which respectively prohibit deceptive acts or practices in or affecting commerce, and false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce.

2.      Direct Marketing Concepts, Inc. and ITV Direct, Inc. are both Massachusetts corporations with their principal places of business in Saugus and Beverly Massachusetts, respectively. Donald W. Barrett is the President and a Director of both DMC and ITV, and he directs, controls, formulates, or participates in the acts and practices of both entities. Since at least August 2003, Barrett, DMC and ITV have advertised, promoted, offered for sale, and/or distributed a dietary supplement product called Supreme Greens with MSM ("Supreme Greens").

**Business Practices**

3.      It is undisputed that Barrett, DMC and ITV produced and widely disseminated a thirty minute infomercial for Supreme Greens. Additionally, Defendants marketed Supreme Greens on their website, www.todayshealth.com.

**Advertising Claims**

4.      The infomercial features Donald Barrett and Alejandro Guerrero a/k/a Alex Guerrero discussing the health benefits of Supreme Greens– in a setting that mimics a conventional talk show -- and includes the following passages:

> BARRETT: Dr. Guerrero claims that most chronic degenerative diseases – such as cancer, arthritis, diabetes, even the number one killer out there, heart disease – can and are being cured and there are natural healing techniques being suppressed in this country. We have a very controversial show, so stay with us.
>
> Complaint Ex. 6 at 3-4.
>
> MR. BARRETT: And now here's the question: If I alkalize my body, am I going to come up with one of these chronic degenerative diseases?

DR. GUERRERO: No.

MR. BARRETT: Such as cancer, arthritis --

DR. GUERRERO: No.

MR. BARRETT: How can you say that so confidently?

DR. GUERRERO: I'm very confident in saying that, primarily because of the clinical studies we've done. I've seen it in my -- in my -- in my clinical practice. I've seen it every day in my clinical practice.

MR. BARRETT: Tell me about --

DR. GUERRERO: I treat patients that have conditions --

MR. BARRETT: -- the studies -- tell me about a study that you've done with -- with chronic disease.

DR. GUERRERO: Well, based on acid alkaline principles we wanted to take groups of people that had degenerative conditions -- and, to me, it didn't really matter what their degenerative condition was and I preferred them to have a variety of conditions. So I certainly just didn't want to have a base of liver cancer or bone cancer or prostate cancer or breast cancer. I wanted to, you know, lump them into a group and see what the response would be over time.

Well, now it's been -- you know, now we're going into, you know, eight years and within a five year period of time we took 200 people that had a variety of degenerative conditions. They weren't all the same conditions, they --

MR. BARRETT: Were they terminal?

DR. GUERRERO: They were diagnosed as terminal.

MR. BARRETT: Two hundred people -- now, eight years later, how many of them are still alive?

DR. GUERRERO: Well, I've got -- out of that -- out of those 200 people that were terminal we lost eight. Eight passed away.

MR. BARRETT: And that's amazing. People must have been amazed by those studies.

DR. GUERRERO: Yeah. I mean, it was -- it was really exciting to see at the

4

time. And that's really what solidified, for me, this -- you know, the concepts of acid and alkaline balance. And so, now, over the years I've just been afraid to deviate from what has worked for me in my clinic.

Complaint Ex. 6 at 11-13.

MR. BARRETT: Now, explain. When a patient comes to your office -- whether they have cancer or arthritis, diabetes, you start them on a few standard supplements.

DR. GUERRERO: Right.

MR. BARRETT: One being a product called Supreme Greens, the other one being a coral calcium type product.

DR. GUERRERO: Yes.

Complaint Ex. 6 at 15.

MR. BARRETT: Okay. Alex, why do so many people lose weight on the product? I know that a lot of people get on the product to either help with their diabetes or maybe their heart disease or even cancer, but they lose weight as a by-product. How come?

Complaint Ex. 6 at 22.

DR. GUERRERO: It's great for women that are pregnant because it certainly applies –

MR. BARRETT: So she can take it when she's pregnant?

DR. GUERRERO: No question. My wife took it, my wife took it through all of her pregnancies.

MR. BARRETT: And you have five children?

DR. GUERRERO: We have five children.

MR. BARRETT: Okay.

DR. GUERRERO: And she took it through all of her pregnancies, never had to deal with, you know, prenatal vitamins, never got morning sickness.

Complaint Ex. 6 at 22.

MR. BARRETT: * * * What are the other nutrients in there and does it interfere with any medication?

DR. GUERRERO: Because I have, you know, a wide range of patients in different conditions, I needed to ensure that the formula was synergistic with all medications. And so, you know, the Supreme Greens with MSM is synergistic with medication. There is no contra-indication.

MR. BARRETT: So anybody out – anybody –

DR. GUERRERO: (Inaudible).

MR. BARRETT: – anybody out there basically on any type of medication, they can take the Supreme Greens product?

DR. GUERRERO: Yes.

Complaint Ex. 6 at 29-30.

5.    Defendants' website makes the following statements about Supreme Greens:

If you or someone you love is suffering from Cancer, Arthritis, Osteoporosis, Fibromyalgia, Heart Disease, Diabetes, Heartburn, Fatigue, Excess Weight, or simply the everyday ravages of aging - **it's time to start down the path to a healthier lifestyle ...**

A number of health problems and degenerative conditions have been **linked to highly acidic cell pH:**

- Cancer
- Arthritis
  *        *        *
- High Blood Pressure
- High Cholesterol
  *        *        *
- Diabetes
  *        *        *
- Endometriosis
  *        *        *
- Overweight
- Heart Disease

So How Do You Rebalance Your Cells pH Levels and Get the Minerals and Nutrients You Need?

6

According to Health professionals, supplements are needed to give the body what it needs. But where most supplements either provide vitamins or proteins, Supreme Greens works to help rebalance your cell pH.

*       *       *

Supreme Greens was formulated by Dr. Alex Guerrero, a renowned physician who has focused his career on working with people with various degenerative and chronic ailments. His breakthrough supplement has already helped thousands of people with cancer, diabetes, arthritis, lupus, fibromyalgia, chronic fatigue syndrome, and many others.

Compl., Ex. 7 at pp. 2-3.

6.      The FTC has alleged that through the above representations, and others, Defendants have falsely or without substantiation represented that Supreme Greens can cure, treat or prevent cancer, diabetes, arthritis and heart disease, and that Supreme Greens can be safely used by pregnant women, children, and consumers taking any medications.

**Lack of Substantiation for Claims**

7.      The Commission has provided the declarations of two experts: Barrie Cassileth, Ph.D, Chief of the Integrative Medicine Service of the Memorial Sloan-Kettering Cancer Center and Landon King, M.D., Associate Professor of Medicine and Biological Chemistry at the John Hopkins University School of Medicine. Together, their declarations express the opinions that the above claims are either false or not supported by reliable scientific evidence.

8.      Defendants have not proffered any experts to contradict the opinions of Drs. Cassileth and King.

**Unauthorized Charges**

9.      It is undisputed that Defendants have at times caused consumers to incur unauthorized charges on their credit and debit cards, by enrolling them in an automatic shipment

program for a supplement called E-8 Daily – without their prior approval – when they ordered Supreme Greens.

## Danger of Recurrence

10.    It is undisputed that in the Fall of 2003, the FTC contacted counsel for Defendants and informed them that the Supreme Greens infomercial made claims that were false and/or unsubstantiated. Shortly thereafter, Defendants agreed to pull the infomercial and replace it with a substantially modified version that did not make the above challenged claims.

11.    Notwithstanding Defendants' above promise to pull the original infomercial, it is undisputed that Defendants failed to abide by that promise and continued to run the original version of the Supreme Greens infomercial at least through April 2004.

## Consumer Injury

12.    Although the Court has not yet seen any specific sales figures, Defendants have not disputed plaintiff's contention that sales through the infomercial likely totaled in the tens of millions of dollars. Additionally, it is undisputed that the overwhelming majority of the sales revenues went to DMC, ITV and Barrett, and not to the remaining defendants in this litigation.

## Asset Dissipation & Potential Document Destruction

13.    Two individuals who have engaged in business transactions with DMC and/or ITV have provided documentary evidence, in the form of bank records, that demonstrate that although the declarants' companies had contracted with DMC, Defendant Barrett requested that declarants' companies send hundreds of thousands of dollars directly to Barrett instead of to DMC.

14.    Additionally, one of the declarants – again acting at the request of Barrett – forwarded hundreds of thousands of dollars to a separate company that was unrelated to their

8

agreement with DMC.

15.     Three former employees of DMC have provided declarations stating that they witnessed corporate funds at DMC and ITV being used to pay for non-business purchases, such as home furnishings and personal vehicles.

16.     Two declarants provided declarations stating that in or about June 2003, after Barrett learned that the FTC has concerns about one of his earlier infomercials – for a product called Coral Calcium Daily – Barrett withdrew funds from certain accounts and distributed the funds to close relatives.

17.     One declarant stated that in or about June 2003, at Barrett's direction, he removed approximately 40-50 boxes relating to Coral Calcium Daily from DMC's warehouse to his own storage facility because Barrett stated that he was concerned about the FTC pursuing him with respect to the product.

## Conclusions of Law

18.     This Court has jurisdiction over the subject matter of this case, and there is good cause to believe it will have jurisdiction over all the parties hereto.  15 U.S.C. §§ 45(a), 52, and 53(b), and 28 U.S.C. §§ 1331, 1337(a), and 1345.

19.     Venue in this District is proper under 15 U.S.C. § 53(b) and 28 U.S.C. § 1391(b) and (c).

20.     The acts and practices of defendants are or have been in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. §§ 44.

9

21.    This Court has authority to grant a preliminary injunction with an asset freeze and receiver, and other appropriate relief pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) and Rule 65 of the Federal Rules of Civil Procedure. *FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 468 (11th Cir. 1996); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1026 (7th Cir. 1988).

22.    Section 13(b) authorizes the issuance of such preliminary relief upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest. *FTC. v. Rare Coin Galleries of America, Inc.*, 1986-2 Trade Cas. (CCH) ¶ 67,338 at 61,473 (D. Mass. 1986); *Patriot Alcohol Testers, Inc.*, No. 91-11812-C, 1992 WL 27334 *3 (D. Mass. 1992).

23.    Once the Commission has established the likelihood of ultimate success, it is appropriate to issue the injunction, based on the public interest in enforcement of the law. *Hecht Co. v. Bowles*, 321 U.S. 321, 331, (1944)   The FTC need not prove irreparable injury. *FTC v. Elder Grain, Inc.*, 868 F. 2d 901, 903 (7th Cir. 1989).

24.    In balancing the equities, the Court should assign greater weight to the public interest advanced by the FTC than to the defendants' private concerns. *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1236 (9th Cir. 1999) (quoting *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989).

**Likelihood of Success on the Merits**

25.    The Commission has demonstrated that there is a substantial likelihood of success on the merits.  Section 5(a) of the FTC Act prohibits deceptive acts and practices in or affecting commerce; Section 12 prohibits the dissemination of false advertising in order to induce the purchase of foods, drugs, devices, or cosmetics.  To prevail under Sections 5(a) and 12, the FTC

10

must demonstrate that "first, there is a representation, omission, or practice that second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994), *citing Cliffdale Associates, Inc.*, 103 F.T.C. 110, 164-65 (1984); *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001). The FTC has established all three of these sufficiently for the Court to grant a preliminary injunction.

26.     In determining what claims an advertisement makes, trial courts, as finders of fact, may draw reasonable inferences and make factual determinations as to both the express claims and the implied claims that are conveyed by the face of an advertisement. *See FTC v. Febre*, 1996 WL 396117 at *4 (N.D. Ill. July 3, 1996) (magistrate judge recommendation), *adopted by* 1996 WL 556957 (N.D. Ill. Sept. 27, 1996), *aff'd* 128 F.3d 530 (7th Cir. 1997). *See also Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 652 (1985); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1043 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001).

27.     As demonstrated by the infomercial and website excerpts above, and despite the use of infrequent and/or inconspicuous disclaimers, the Defendants have made the claims that Supreme Greens can cure, treat or prevent cancer, diabetes, arthritis and heart disease, and that Supreme Greens can be safely used by pregnant women, children, and consumers taking any medications.

28.     The Commission is likely to prevail in demonstrating the falsity and/or lack of substantiation of these claims. This conclusion is based on the undisputed declarations of Drs. Cassileth and King.

29.     The Defendants' misrepresentations are likely to mislead reasonable consumers. Consumers have no obligation to doubt the veracity of express claims, and false or

unsubstantiated claims are inherently "likely to mislead." *Thompson Med. Co.*, 104 F.T.C. 648,

788, 818-19 (1984) (discussing with approval FTC's Policy Statement on Deception (Oct. 14,

1983)), *aff'd* 791 F.2d 189 (D.C. Cir. 1986).

30.    Given the express nature and importance of the challenged claims, and the fact

that they go to the core reasons why consumers buy Supreme Greens, they are presumed to be

material. It is well-established that "[e]xpress claims or deliberately-made implied claims used

to induce the purchase of a particular product or service are presumed to be material." *FTC v.

SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999). Moreover, because the claims

here involve "health, safety, or other areas with which the reasonable consumer would be

concerned, [such as] . . . the purpose, safety, efficacy, or cost of the product . . . [or its]

durability, performance, warranties or quality," they are presumed material as a matter of law. *In

re Cliffdale Assocs.*, 103 F.T.C. at 182-83 (FTC's Policy Statement on Deception).

31.    Additionally, Defendants' misrepresentation that the infomercial for Supreme

Greens was not a commercial advertisement is also likely to mislead consumers and constitute a

deceptive act or practice in violation of Section 5.

32.    Further, Defendants' practice of causing charges for automatic shipments of E-8

Daily dietary supplement to be billed to consumers' credit or debit cards without the consumers'

authorization has caused or is likely to cause substantial injury to consumers that is not

reasonably avoidable by consumers themselves and is not outweighed by countervailing benefits

to consumers or competition. Therefore, this practice constitutes an unfair practice, in or

affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

33.    The FTC is also likely to succeed in holding all of the Defendants jointly and

severally liable for these violations of the FTC Act. First, with respect to the corporate

Defendants, DMC and ITV produced and disseminated the Supreme Greens infomercial. Their purported reliance upon co-defendant Alex Guerrero's representations regarding the product – even if true – is not a valid defense to a violation of the FTC Act. Additionally, as early as the Fall of 2003, Defendants were on notice from the Commission as to the suspect nature of the Supreme Greens claims.

34.     As far as the individual defendant, the law holds such individuals liable for corporate practices if they have "participated directly in the practices or acts or had authority to control them," and had some knowledge of the practices.  *FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 573 (7th Cir. 1989).  Authority to control can be evidenced by "active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." *Amy Travel*, 875 F.2d at 573.

35.     In this case, Barrett knew as early as Fall 2003 that the Supreme Greens claims were suspect, based on the concerns raised by the FTC, yet he continued to make the claims. Barrett is likely to be found liable because he actively participated in making the challenged claims and because he is the President and a Director of both corporations that engaged in the unauthorized billing practices. At a minimum, Barrett had reckless indifference for the truth and is therefore likely personally liable.

**Balance of Equities**

36.     The FTC brought this action to halt and prevent further violations of federal law and to protect consumers from Defendants who market products claimed to prevent and cure life-threatening diseases. In such statutory enforcement cases, the government proceeds "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the . . . laws." *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975)

(securities laws context).

37.    The FTC interest in protecting consumers outweighs any of Defendants' interests that would be infringed by the requested injunction. Defendants have no legitimate interest in engaging in practices that likely violate the FTC Act.

**Injunctive Relief is in the Public Interest**

38.    Immediate injunctive relief is necessary to protect the public from the financial and/or physical harm that results from Defendants' practices. Consumers suffering from cancer, heart disease, arthritis and diabetes are injured if they purchase Supreme Greens in lieu of pursuing treatments that may offer them real health benefits. Additionally, there is the direct economic injury that arises from purchasing Supreme Greens under false pretenses. Finally, purchase of these products – and the Defendants' imposition of additional charges to consumers' credit or debit cards without their knowledge or authorization – produces direct economic injury.

**Necessity for Preliminary Relief**

39.    There is good cause to believe that immediate and irreparable harm to consumers will result from ongoing violations of Section 5(a) and 12 of the FTC Act by defendants Direct Marketing Concepts, Inc., ITV Direct, Inc. and Donald W. Barrett unless these defendants are enjoined by order of this Court.

40.    The Court has the authority to enter an asset freeze to prevent dissipation of assets and to preserve funds for restitution pending final resolution of this litigation. *Gem Merchandising*, 87 F.3d at 469; *FTC v. Dion*, Civ. No. 03-40005-NMG, slip op. at 4 (D. Mass. 2003) (converting previously issued TRO with asset freeze into preliminary injunction); *FTC v. American Inventors Corp.*, Civ. A. No. 95-30219-MAP, 1996 WL 641642 (D. Mass. Mar. 13, 1996) (noting prior issuance of TRO and preliminary injunction, court issues revised preliminary

injunction with asset freeze); *see also FTC v. Patriot Alcohol Testers, Inc.*, No. 91-11812-C, 1992 WL 27334 *3 (D. Mass. 1992) ("the Court is authorized to issue a preliminary injunction as well as an order freezing assets when the attendant facts and circumstances so warrant as an exercise of its broad equitable powers.")  Where, as in this case, business operations are permeated by deceptive practices, and there is proof of on-going transfers of business assets to unknown businesses, Barrett and his relatives, there is a strong likelihood assets may be dissipated during the pendency of the legal proceedings.  Without an immediate freeze of assets, it is likely that dissipation of assets will continue and funds will not be available to satisfy any final order granting restitution to defrauded consumers.

41.    A freeze of Mr. Barrett's assets is warranted because of his direct participation in and control of the activities of the corporation.  There is strong evidence that he has transferred hundreds of thousands of dollars from the corporation and that he has used corporate funds for personal needs of him and his relatives.

42.    As set forth by the findings of fact above, good cause exists for appointing a receiver over corporate defendants DMC and ITV and imposing an asset freeze on DMC, ITV and Barrett, in order to stop any practices that are in violation of the FTC Act, preserve and locate corporate and individual assets and documents and provide a full accounting to the court as to the extent of potential consumer harm.  Additionally, a receiver can assess whether the business can be run legitimately.

43.    The Commission has established a likelihood of success on the merits in that it is likely that the Commission will establish that Defendants engaged in deceptive practices; and that Donald Barrett controlled the corporations and knew or should have known of the deceptive practices.  It is in the public interest to prohibit these deceptive practices and to freeze the assets

15

of the Defendants and to appoint a receiver over the corporate defendants pending a final determination on the merits. There is clearly a danger, based on the history of these deceptive practices, that the Defendants will resume their deceptive practices and dissipate assets without such relief.

44.    Weighing the equities and considering the Commission's likelihood of ultimate success, a preliminary injunction is in the public interest, and it is hereby ordered that:

## DEFINITIONS

For the purpose of this order, the following definitions shall apply:

1.    "DMC" means Direct Marketing Concepts, Inc., d/b/a/ "Today's Health" and "Direct Fulfillment," a Massachusetts corporation with its principal place of business at 20 Oakpoint Ext., Saugus, MA 01906. DMC also does business at 100 Cummings Center, Suite 139F, Beverly, MA 01915.

2.    "ITV" means ITV Direct, Inc., d/b/a "Direct Fulfillment," a Massachusetts corporation with its principal place of business at 100 Cummings Center, Suite 506E, Beverly, MA.

3.    "Barrett" means Donald W. Barrett, individually and as an officer and director of DMC, and as an officer and director of ITV.

4.    "Advertising" means any written or verbal statement, illustration or depiction that is designed to effect a sale or create interest in the purchasing of goods or services, whether it appears in a brochure, newspaper, magazine, pamphlet, leaflet, circular, mailer, book insert, free standing insert, letter, catalogue, poster, chart, billboard, public transit card, point of purchase display, packaging, package insert, label, film, slide, radio, television or cable television, audio program transmitted over a telephone system, program-length commercial ("infomercial"), the

16

Internet, email, or in any other medium.

5.    "Promotion" shall mean any written or verbal statement, illustration, or depiction that is designed to effect a sale or create interest in the purchasing of goods or services that is not "advertising," including but not limited to video news releases and press releases.

6.    "Substantially similar product" means any dietary supplement containing one or more of the ingredients contained in the proprietary blend of Supreme Greens with MSM.

7.    "Assets" means any legal or equitable interest in, right to, or claim to, any real, personal, or intellectual property, including, but not limited to, chattel, goods, instruments, equipment, fixtures, general intangibles, effects, leaseholds, mail or other deliveries, inventory, checks, notes, accounts, credits, receivables (as those terms are defined in the Uniform Commercial Code), and all cash, wherever located.

8.    "Receivership Defendants" means, collectively, DMC and ITV, and their respective subsidiaries, divisions, affiliates, successors, and assigns; and "Receivership Defendant" means any of the Receivership Defendants;

9.    "Defendants" shall mean DMC, ITV, and Barrett, individually or collectively.

10.    "Continuity program" shall mean any plan, arrangement, or system pursuant to which a consumer receives periodic shipments of products without prior notification by the seller before each shipment or service period, regardless of any trial or approval period allowing the consumer to return or be reimbursed for the product.

# PROHIBITED BUSINESS ACTIVITIES

## I.

**IT IS THEREFORE ORDERED** that the Defendants, directly or through any

corporation, partnership, subsidiary, division, trade name, or other entity, and their officers, agents, servants, employees, and all persons and entities in active concert or participation with any of them who receive actual notice of this Order by personal service or otherwise, including by facsimile, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of Supreme Greens with MSM or any substantially similar product, in or affecting commerce, are hereby enjoined from making, or assisting others in making, directly or by implication, including through the use of endorsements or trade names, any representation that such product:

     A.    Is an effective treatment, cure, or preventative for cancer;

     B.    Is an effective treatment, cure, or preventative for heart disease;

     C.    Is an effective treatment, cure, or preventative for diabetes;

     D.    Is an effective treatment, cure, or preventative for arthritis; or

     E.    Can be taken safely by pregnant women, by infants and children, or by any person taking any type of medication.

## II.

**IT IS FURTHER ORDERED** that the Defendants, directly or through any corporation, partnership, subsidiary, division, trade name, or other entity, and their officers, agents, servants, employees, and all persons and entities in active concert or participation with any of them who receive actual notice of this Order by personal service or otherwise, including by facsimile, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any product, program or service, in or affecting commerce, are hereby enjoined from making, or assisting others in making, directly or by implication, including through the use

18

of endorsements or the product name, any representation that such product, program, or service can prevent, treat, or cure any disease.

## FORMATTING FOR BROADCAST ADVERTISING

### III.

**IT IS FURTHER ORDERED** that the Defendants, directly or through any corporation, subsidiary, division, or other device, in connection with the labeling, advertising, promotion, offering for sale, sale, or distribution of any product, program, or service, in or affecting commerce, do forthwith cease and desist from creating, producing, selling, or disseminating:

    A.    Any advertisement that misrepresents, expressly or by implication, that it is not a paid advertisement; and

    B.    Any commercial or other video advertisement fifteen (15) minutes in length or longer or intended to fill a broadcasting or cablecasting time slot of fifteen (15) minutes in length or longer that does not display visually in the same language as the predominant language that is used in the advertisement, in a clear and prominent manner, and for a length of time sufficient for an ordinary consumer to read, within the first thirty (30) seconds of the commercial and immediately before each presentation of ordering instructions for the product or service, the following disclosure:

> "THE PROGRAM YOU ARE WATCHING IS A PAID ADVERTISEMENT FOR [THE PRODUCT, PROGRAM, OR SERVICE]."

Provided that, for the purposes of this provision, the oral or visual presentation of

a telephone number or address through which viewers may obtain more information or place an order for the product, program, or service shall be deemed a presentation of ordering instructions so as to require the display of the disclosure provided herein; and

C.    Any radio advertisement fifteen (15) minutes in length or longer or intended to fill a time slot of fifteen (15) minutes in length or longer that does not state in the same language as the predominant language that is used in the advertisement, in a clear and prominent manner, and in a volume and cadence sufficient for an ordinary consumer to hear, within the first thirty (30) seconds of the commercial and immediately before each presentation of ordering instructions for the product, program, or service, the following disclosure:

"THE PROGRAM YOU ARE LISTENING TO IS A PAID ADVERTISEMENT FOR [THE PRODUCT, PROGRAM, OR SERVICE]."

Provided that, for the purposes of this provision, the presentation of a telephone number or address through which listeners may obtain more information or place an order for the product, program, or service shall be deemed a presentation of ordering instructions so as to require the stating of the disclosure provided herein.

## CONTINUITY PROGRAM

### IV.

**IT IS FURTHER ORDERED** that:

A.    The Defendants, directly or through any corporation, subsidiary, division, trade

20