UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>Plaintiff,<br><br>v.<br><br>DIRECT MARKETING CONCEPTS, INC., d/b/a<br>TODAY'S HEALTH and DIRECT FULFILLMENT;<br>ITV DIRECT, INC., d/b/a DIRECT FULFILLMENT;<br>DONALD W. BARRETT;<br>HEALTHY SOLUTIONS, LLC d/b/a DIRECT<br>BUSINESS CONCEPTS;<br>HEALTH SOLUTIONS, INC.;<br>ALEJANDRO GUERRERO, a/k/a ALEX GUERRERO;<br>MICHAEL HOWELL; GREG GEREMESZ;<br>TRIAD ML MARKETING, INC.; KING MEDIA, INC.;<br>and ALLEN STERN,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>CIVIL ACTION<br>NO. 04-11136-GAO |

## PRELIMINARY INJUNCTION ORDER
## AS TO DEFENDANTS DIRECT MARKETING
## CONCEPTS, INC., ITV DIRECT, INC., AND DONALD W. BARRETT

June 23, 2004

The Federal Trade Commission ("FTC" or "Commission") filed a complaint against the above listed defendants pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and moved for a preliminary injunction with other equitable relief against defendants Direct Marketing Concepts, Inc. ("DMC"), ITV Direct, Inc. ("ITV"), and Donald W. Barrett ("Barrett") (collectively, the "Defendants") pursuant to Fed. R. Civ. P. 65. The Court having considered the pleadings, declarations and exhibits filed in support of and opposing said motion, and after hearing on the motion, enters the following order:

### Findings of Fact

On the basis of the affidavits presented, the Court finds the following facts:

1. The FTC is an independent agency of the United States Government created by the FTC Act, 15 U.S.C. §§ 41-58. The Commission is charged, among other things, with enforcement of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, which respectively prohibit deceptive acts or practices in or affecting commerce, and false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce.

2. DMC and ITV are both Massachusetts corporations with their principal places of business in Saugus and Beverly Massachusetts, respectively. Barrett is the President and a director of both DMC and ITV, and he directs, controls, formulates, or participates in the acts and practices of both entities. Since at least August 2003, Barrett, DMC and ITV have advertised, promoted, offered for sale, and/or distributed a dietary supplement product called Supreme Greens with MSM ("Supreme Greens").

3. Barrett, DMC and ITV produced and widely disseminated a thirty-minute "infomercial" for Supreme Greens shown on cable television stations. Additionally, the Defendants marketed Supreme Greens on their website, www.todayshealth.com.

4. The infomercial features Donald Barrett and Alejandro Guerrero a/k/a Alex Guerrero discussing the health benefits of Supreme Greens – in a setting that mimics a conventional talk show – and includes the following passages:

BARRETT:    Dr. Guerrero claims that most chronic degenerative diseases – such as cancer, arthritis, diabetes, even the number one killer out there, heart disease – can and are being cured and there are natural healing

2

techniques being suppressed in this country. We have a very controversial show, so stay with us.

Complaint Ex. 6 at 3-4.

BARRETT:   And now here's the question: If I alkalize my body, am I going to come up with one of these chronic degenerative diseases?

GUERRERO: No.

BARRETT:   Such as cancer, arthritis –

GUERRERO: No.

BARRETT:   How can you say that so confidently?

GUERRERO: I'm very confident in saying that, primarily because of the clinical studies we've done. I've seen it in my – in my – in my clinical practice. I've seen it every day in my clinical practice.

BARRETT:   Tell me about –

GUERRERO: I treat patients that have conditions –

BARRETT:   – the studies – tell me about a study that you've done with – with chronic disease.

GUERRERO: Well, based on acid alkaline principles we wanted to take groups of people that had degenerative conditions – and, to me, it didn't really matter what their degenerative condition was and I preferred them to have a variety of conditions. So I certainly just didn't want to have a base of liver cancer or bone cancer or prostate cancer or breast cancer. I wanted to, you know, lump them into a group and

see what the response would be over time. Well, now it's been – you know, now we're going into, you know, eight years and within a five-year period of time we took 200 people that had a variety of degenerative conditions. They weren't all the same conditions, they –

BARRETT: Were they terminal?

GUERRERO: They were diagnosed as terminal.

BARRETT: Two hundred people – now, eight years later, how many of them are still alive?

GUERRERO: Well, I've got – out of that – out of those 200 people that were terminal we lost eight. Eight passed away.

BARRETT: And that's amazing. People must have been amazed by those studies.

GUERRERO: Yeah. I mean, it was – it was really exciting to see at the time. And that's really what solidified, for me, this – you know, the concepts of acid and alkaline balance. And so, now, over the years I've just been afraid to deviate from what has worked for me in my clinic.

Complaint Ex. 6 at 11-13.

BARRETT: Now, explain. When a patient comes to your office – whether they have cancer or arthritis, diabetes, you start them on a few standard supplements.

4

GUERRERO: Right.

BARRETT:   One being a product called Supreme Greens, the other one being a coral calcium type product.

GUERRERO: Yes.

Complaint Ex. 6 at 15.

BARRETT:   Okay. Alex, why do so many people lose weight on the product? I know that a lot of people get on the product to either help with their diabetes or maybe their heart disease or even cancer, but they lose weight as a byproduct. How come?

Complaint Ex. 6 at 22.

GUERRERO: It's great for women that are pregnant because it certainly applies --

BARRETT:   So she can take it when she's pregnant?

GUERRERO: No question. My wife took it, my wife took it through all of her pregnancies.

BARRETT:   And you have five children?

GUERRERO: We have five children.

BARRETT:   Okay.

GUERRERO: And she took it through all of her pregnancies, never had to deal with, you know, prenatal vitamins, never got morning sickness.

Complaint Ex. 6 at 22.

BARRETT:   What are the other nutrients in there and does it interfere with any medication?

5

GUERRERO: Because I have, you know, a wide range of patients in different conditions, I needed to ensure that the formula was synergistic with all medications. And so, you know, the Supreme Greens with MSM is synergistic with medication. There is no contra-indication.

BARRETT: So anybody out -- anybody --

GUERRERO: (Inaudible).

BARRETT: -- anybody out there basically on any type of medication, they can take the Supreme Greens product?

GUERRERO: Yes.

Complaint Ex. 6 at 29-30.

5. The Defendants' website made the following statements about Supreme Greens:

If you or someone you love is suffering from Cancer, Arthritis, Osteoporosis, Fibromyalgia, Heart Disease, Diabetes, Heartburn, Fatigue, Excess Weight, or simply the everyday ravages of aging -- it's time to start down the path to a healthier lifestyle . . .

A number of health problems and degenerative conditions have been linked to highly acidic cell pH:

- Cancer
- Arthritis

    *        *        *

- High Blood Pressure
- High Cholesterol

    *        *        *

- Diabetes

6

\*    \*    \*

- Endometriosis

\*    \*    \*

- Overweight
- Heart Disease

So How Do You Rebalance Your Cells pH Levels and Get the Minerals and Nutrients You Need?

According to Health professionals, supplements are needed to give the body what it needs. But where most supplements either provide vitamins or proteins, Supreme Greens works to help rebalance your cell pH.

\*    \*    \*

Supreme Greens was formulated by Dr. Alex Guerrero, a renowned physician who has focused his career on working with people with various degenerative and chronic ailments. His breakthrough supplement has already helped thousands of people with cancer, diabetes, arthritis, lupus, fibromyalgia, chronic fatigue syndrome, and many others.

Complaint Ex. 7 at 2-3.

6. The Commission has alleged that through the above representations, and others, the Defendants have falsely or without substantiation represented that Supreme Greens can cure, treat or prevent cancer, diabetes, arthritis and heart disease, and that Supreme Greens can be safely used by pregnant women, children, and consumers taking any medications.

7. The Commission has provided the declarations of two experts: Barrie Cassileth, Ph.D, Chief of the Integrative Medicine Service of the Memorial Sloan-Kettering Cancer Center and Landon King, M.D., Associate Professor of Medicine and Biological Chemistry at the

John Hopkins University School of Medicine. Together, their declarations express the opinions that the above claims are either false or not supported by reliable scientific evidence.

8. The Defendants have not proffered any experts to contradict the opinions of Drs. Cassileth and King.

**Continuity Program**

9. The Defendants have at times caused consumers to incur unauthorized charges on their credit and debit cards by enrolling them in an automatic shipment program for a supplement called E-8 Daily – without their prior approval – when they ordered Supreme Greens. The Defendants maintain they have taken steps to prevent recurrence of such unauthorized charges, but do not dispute that they occurred in the past.

**Danger of Recurrence**

10. In the Fall of 2003, the FTC contacted counsel for the Defendants and informed them that the Supreme Greens infomercial made claims that were false and/or unsubstantiated. Shortly thereafter, the Defendants agreed to withdraw the infomercial and replace it with a substantially modified version that did not make the above challenged claims.

11. Notwithstanding their above promise to withdraw the original infomercial, the Defendants continued to run the original version of the Supreme Greens infomercial at least through April 2004.

**Consumer Injury**

12. Although the Court has not yet seen any specific sales figures, the Defendants have not disputed the Commission's contention that sales through the infomercial likely totaled in the tens of millions of dollars. Additionally, it is undisputed that the bulk of the sales revenues went to DMC, ITV and Barrett, and not to the remaining defendants in this litigation.

## Asset Dissipation & Potential Document Destruction

13. Two individuals who have engaged in business transactions with DMC and/or ITV have provided documentary evidence, in the form of bank records, that demonstrates that although the declarants' companies had contracted with DMC, Defendant Barrett requested that declarants' companies send hundreds of thousands of dollars directly to Barrett instead of to DMC. Additionally, one of the declarants says that he, at Barrett's request, forwarded hundreds of thousands of dollars to a separate company controlled by Barrett rather than to DMC.

14. Three former employees of DMC have provided declarations stating that they witnessed corporate funds at DMC and ITV being used to pay for non-business purchases, such as home furnishings and personal vehicles.

15. Two declarants provided declarations stating that in or about June 2003, after Barrett learned that the FTC had concerns about one of his earlier infomercials – for a product called Coral Calcium Daily – Barrett withdrew funds from certain accounts and distributed the funds to close relatives.

16. One declarant stated that in or about June 2003, at Barrett's direction, he removed approximately 40-50 boxes relating to Coral Calcium Daily from DMC's warehouse to his own storage facility because Barrett stated that he was concerned about the FTC pursuing him with respect to the product.

17. Defendants contend that the declarants relied on by the FTC are biased and untrustworthy and that their statements are false. It is difficult to make a credibility assessment on the basis of affidavits alone. Defendants make a plausible showing of bias. Nevertheless, even disregarding the most accusatory assertions, some of which are conclusory, the statements do

show at least an ability on the part of Defendants to move assets among related entities and/or persons.

## Conclusions of Law

18. This Court has jurisdiction over the subject matter of this case and over these Defendants.

19. Venue in this District is proper under 15 U.S.C. § 53(b) and 28 U.S.C. § 1391(b) and (c).

20. The acts and practices of the Defendants are or have been in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

21. This Court has authority to grant a preliminary injunction and other appropriate relief pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) and Rule 65 of the Federal Rules of Civil Procedure. FTC v. Gem Merch. Corp., 87 F.3d 466, 468-69 (11th Cir. 1996); FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1025-26 (7th Cir. 1988).

22. Section 13(b) authorizes the issuance of such preliminary relief upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest. 15 U.S.C. § 53(b); FTC v. Patriot Alcohol Testers, Inc., No. 91-11812-C, 1992 WL 27334, at *3 (D. Mass. Feb. 13, 1992).

## Likelihood of Success on the Merits

23. The Commission has demonstrated a likelihood of success on the merits. Section 5(a) of the FTC Act prohibits deceptive acts and practices in or affecting commerce. Section 12 prohibits the dissemination of false advertising in order to induce the purchase of foods, drugs, devices, or cosmetics. To prevail under Sections 5(a) and 12, the FTC must demonstrate that

10

"first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." FTC v. Pantron I Corp., 33 F.3d 1088, 1095 (9th Cir. 1994) (citing Cliffdale Assocs., Inc., 103 F.T.C. 110, 164-65 (1984)). The FTC has established all three of these sufficiently for the Court to grant a preliminary injunction.

24. As demonstrated by the infomercial and website excerpts above, and despite the use of infrequent and/or inconspicuous disclaimers, the Defendants have made the claims that Supreme Greens can cure, treat or prevent cancer, diabetes, arthritis and heart disease, and that Supreme Greens can be safely used by pregnant women, children, and consumers taking any medications.

25. The Commission is likely to prevail in demonstrating the falsity and/or lack of substantiation of these claims, based on the uncontradicted declarations of Drs. Cassileth and King.

26. The Defendants' misrepresentations are likely to mislead reasonable consumers. Consumers have no obligation to doubt the veracity of express claims, and false or unsubstantiated claims are inherently "likely to mislead." In re Thompson Med. Co., 104 F.T.C. 648, 788, 818-19 (1984) (discussing with approval FTC's Policy Statement on Deception (Oct. 14, 1983)), aff'd 791 F.2d 189 (D.C. Cir. 1986).

27. Given the express nature and importance of the challenged claims, and the fact that they go to the core reasons why consumers buy Supreme Greens, they are presumed to be material. FTC v. SlimAmerica, Inc., 77 F. Supp.2d 1263, 1272 (S.D. Fla. 1999) ("Express claims or deliberately-made implied claims used to induce the purchase of a particular product or service are presumed to be material.").

28. In addition, the airing of the infomercial for Supreme Greens in a talk-show format with only limited disclaimers before and after the broadcast is likely to mislead consumers and constitute a deceptive act or practice in violation of Section 5.

29. Further, the Defendants' practice of causing charges for automatic shipments of E-8 Daily dietary supplement to be billed to consumers' credit or debit cards without the consumers' authorization has caused or is likely to cause substantial injury to consumers that is not reasonably avoidable by consumers themselves and is not outweighed by countervailing benefits to consumers or competition. Therefore, this practice likely constitutes an unfair practice, in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

30. The Commission is also likely to succeed in holding the Defendants jointly and severally liable for these violations of the FTC Act. DMC and ITV produced and disseminated the Supreme Greens infomercial. Their purported reliance upon co-defendant Alex Guerrero's representations regarding the product – even if true – is not a valid defense to a violation of the FTC Act. Moreover, as early as the Fall of 2003, the Defendants were on notice from the Commission as to the suspect nature of the Supreme Greens claims.

31. Individuals such as Barrett may be liable for corporate practices if they have "participated directly in the practices or acts or had authority to control them," and had some knowledge of the practices. FTC v. Amy Travel Serv., Inc., 875 F.2d 564, 573 (7th Cir. 1989). Authority to control can be evidenced by "active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." Id.

32. The information presented indicates that Barrett knew as early as the Fall of 2003 that the Supreme Greens claims were suspect, based on the concerns raised by the FTC, yet he

continued to actively participate in making the challenged claims as President and a director of DMC and ITV.

## Balance of Equities

33. The Commission brought this action to halt and prevent further violations of federal law and to protect consumers from the marketing of products claimed to prevent and cure life threatening diseases. In such statutory enforcement cases, the government proceeds "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the . . . laws." SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801, 808 (2d Cir. 1975) (securities laws context).

34. The Commission's interest in protecting consumers outweighs the Defendants' interests that would be infringed by the requested injunction. The Defendants have no legitimate interest in engaging in practices that likely violate the FTC Act.

## Injunctive Relief is in the Public Interest

35. Immediate injunctive relief is necessary to protect the public from the financial and/or physical harm that results from the Defendants' practices. Consumers suffering from cancer, heart disease, arthritis and diabetes are injured if they purchase Supreme Greens in lieu of pursuing treatments that may offer them real health benefits. In addition, direct economic injury arises from purchasing Supreme Greens under false pretenses and from the Defendants' imposition of charges to consumers' credit or debit cards without their knowledge or authorization.

## Necessity for Preliminary Relief

36. There is good cause to believe that immediate and irreparable harm to consumers will result from ongoing violations of Sections 5(a) and 12 of the FTC Act by the Defendants unless they are preliminarily enjoined by order of this Court.

37. Where, as in this case, business operations are permeated by deceptive practices, and there is evidence of on-going transfers of business assets to unknown businesses, Barrett and his relatives, there is a possibility that assets may be dissipated during the pendency of the legal proceedings. An accounting and a restriction on the dissipation of the Defendants' assets is appropriate at this time to ensure the enforceability of any judgment that may be entered. However, should the accounting reveal that the Defendants have, presently are, or are likely to conceal or place assets beyond the Court's reach pending final resolution of this case, the Court will consider additional requests from the Commission for further relief necessary to ensure the enforceability of any judgment, including a freeze of the Defendants' assets and the appointment of a receiver.

38. Weighing the equities and considering the Commission's likelihood of ultimate success, a preliminary injunction is in the public interest, and it is hereby ordered that:

### DEFINITIONS

For the purpose of this order, the following definitions shall apply:

1. "DMC" means Direct Marketing Concepts, Inc., d/b/a "Today's Health" and "Direct Fulfillment," a Massachusetts corporation with its principal place of business at 20 Oakpoint Ext., Saugus, MA 01906, and also doing business at 100 Cummings Center, Suite 139F, Beverly, MA 01915, and its divisions, subsidiaries, successors, assigns, and its officers, agents, representatives, and employees.

14

2. "ITV" means ITV Direct, Inc., d/b/a "Direct Fulfillment," a Massachusetts corporation with its principal place of business at 100 Cummings Center, Suite 506E, Beverly, MA 01915, and its divisions, subsidiaries, successors, assigns, and its officers, agents, representatives, and employees.

3. "Barrett" means Donald W. Barrett, individually and as an officer and director of DMC and ITV.

4. "Defendants" shall mean DMC, ITV, and Barrett, whether acting individually or through any corporation, subsidiary, division, or other entity.

5. "FTC" or "Commission" or "Plaintiff" means the Federal Trade Commission.

6. "Advertising" means any written or verbal statement, illustration or depiction that is designed to effect a sale or create interest in the purchasing of goods or services, whether it appears in a brochure, newspaper, magazine, pamphlet, leaflet, circular, mailer, book insert, free standing insert, letter, catalogue, poster, chart, billboard, public transit card, point of purchase display, packaging, package insert, label, film, slide, radio, television or cable television, audio program transmitted over a telephone system, program-length commercial ("infomercial"), the Internet, email, or in any other medium.

7. "Promotion" means any written or verbal statement, illustration, or depiction that is designed to effect a sale or create interest in the purchasing of goods or services that is not "advertising," including but not limited to video news releases and press releases.

8. "Endorsement" has the meaning set forth in 16 C.F.R. § 255.0(b).

9. "Substantially similar product" means any dietary supplement containing one or more of the ingredients contained in the proprietary blend of Supreme Greens with MSM.

10. "Assets" means any legal or equitable interest in, right to, or claim to, any real, personal, or intellectual property, including, but not limited to, chattel, goods, instruments, equipment, fixtures, general intangibles, effects, leaseholds, mail or other deliveries, inventory, checks, notes, accounts, credits, receivables (as those terms are defined in the Uniform Commercial Code), and all cash, wherever located.

11. "Continuity program" shall mean any plan, arrangement, or system pursuant to which a consumer receives periodic shipments of products without prior notification by the seller before each shipment or service period, regardless of any trial or approval period allowing the consumer to return or be reimbursed for the product.

12. "Assisting others" means knowingly providing any of the following services to any person or entity: (a) performing customer service functions for any person or entity, including but not limited to, receiving or responding to customer complaints; (b) formulating or providing or arranging for the formulation or provision of any telephone sales script or any other advertising or marketing material for any person or entity; or (c) performing advertising or marketing services of any kind for any person or entity.

13. "Commerce" has the meaning set forth in Section 4 of the FTC Act, 15 U.S.C. § 44.

14. "Competent and reliable scientific evidence" means tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that has been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results.

## PROHIBITED BUSINESS ACTIVITIES

### I.

IT IS ORDERED that the Defendants, directly or through any corporation, partnership, subsidiary, division, trade name, or other entity, and their officers, agents, servants, employees, and all persons and entities in active concert or participation with any of them who receive actual notice of this Order by personal service or otherwise, including by facsimile, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of Supreme Greens with MSM or any substantially similar product, in or affecting commerce, are hereby preliminarily enjoined from making, or assisting others in making, directly or by implication, including through the use of endorsements or trade names, any representation that such product:

A. Is an effective treatment, cure, or preventative for cancer;

B. Is an effective treatment, cure, or preventative for heart disease;

C. Is an effective treatment, cure, or preventative for diabetes;

D. Is an effective treatment, cure, or preventative for arthritis; or

E. Can be taken safely by pregnant women, by infants and children, or by any person taking any type of medication.

### II.

IT IS FURTHER ORDERED that the Defendants, directly or through any corporation, partnership, subsidiary, division, trade name, or other entity, and their officers, agents, servants, employees, and all persons and entities in active concert or participation with any of them who

17

receive actual notice of this Order by personal service or otherwise, including by facsimile, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of Supreme Greens with MSM or any substantially similar product, in or affecting commerce, are hereby preliminarily enjoined from making, or assisting others in making, directly or by implication, including through the use of endorsements or the product name, any representation that such product can prevent, treat, or cure any disease unless, at the time the representation is made, the Defendants possess and rely upon competent and reliable scientific evidence that substantiates the representation.

## FORMATTING FOR BROADCAST ADVERTISING

### III.

IT IS FURTHER ORDERED that the Defendants, directly or through any corporation, subsidiary, division, or other device, in connection with the labeling, advertising, promotion, offering for sale, sale, or distribution of any product, program, or service, in or affecting commerce, do forthwith cease and desist from creating, producing, selling, or disseminating:

A. Any advertisement that misrepresents, expressly or by implication, that it is not a paid advertisement; and

B. Any commercial or other video advertisement fifteen (15) minutes in length or longer or intended to fill a broadcasting or cablecasting time slot of fifteen (15) minutes in length or longer that does not display visually in the same language as the predominant language that is used in the advertisement, in a clear and prominent manner, and for a length of time sufficient for

18

an ordinary consumer to read, within the first thirty (30) seconds of the commercial and immediately before each presentation of ordering instructions for the product or service, the following disclosure:

"THE PROGRAM YOU ARE WATCHING IS A PAID ADVERTISEMENT FOR [THE PRODUCT, PROGRAM, OR SERVICE]."

(For the purposes of this provision, the oral or visual presentation of a telephone number or address through which viewers may obtain more information or place an order for the product, program, or service shall be deemed a presentation of ordering instructions so as to require the display of the disclosure provided herein); and

C. Any radio advertisement fifteen (15) minutes in length or longer or intended to fill a time slot of fifteen (15) minutes in length or longer that does not state in the same language as the predominant language that is used in the advertisement, in a clear and prominent manner, and in a volume and cadence sufficient for an ordinary consumer to hear, within the first thirty (30) seconds of the commercial and immediately before each presentation of ordering instructions for the product, program, or service, the following disclosure:

"THE PROGRAM YOU ARE LISTENING TO IS A PAID ADVERTISEMENT FOR [THE PRODUCT, PROGRAM, OR SERVICE]."

(For the purposes of this provision, the presentation of a telephone number or address through which listeners may obtain more information or place an order for the product, program, or service shall be deemed a presentation of ordering instructions so as to require the stating of the disclosure provided herein.).

19

# CONTINUITY PROGRAM

## IV.

IT IS FURTHER ORDERED that:

A. The Defendants, directly or through any corporation, subsidiary, division, trade name, or other entity, and their officers, agents, servants, employees, and all persons and entities in active concert with them who receive actual notice of this Order by personal service or otherwise, including by facsimile, in connection with the manufacturing, labeling, promotion, offering for sale, sale, or distribution of any product, program, or service, in or affecting commerce, are hereby preliminarily enjoined from:

1. Selling or distributing or causing to be sold or distributed products, programs, or services, by means of a Continuity Program without first obtaining the express, informed consent of consumers to participate in that program before any shipment is made; *Provided*, that the consumer's consent will be deemed to be informed for the purpose of this Part IV only if the Defendants clearly and conspicuously disclose, before the consumer consents to any purchase, all material terms and conditions of the Continuity Program, including but not limited to:

    a.     the fact that periodic shipments will occur without further action by the consumer;

    b.     a description of each good or type of good to be included in each shipment;