statement:

> DONALD BARRETT: Hello, my name is Donald Barrett, and welcome back to a very controversial edition of ITV. Today we're going to be talking about the poisoning of our water supply. On our show today, you'll learn why our drinking and bathing water is causing millions of Americans to become sick and riddled with disease.. . . We have a very controversial show. Stay with us.
>
> **ON SCREEN: Today's Guest: Charles Strand, Water Quality Expert**
> **Is Our Drinking Water Poisoning Our Society?**
>
> DONALD BARRETT: Charles, thanks for being my guest.
>
> CHARLES STRAND: Thanks for having me.

*Id.*, Att. 12 at 3-4. In fact, Charles Strand is the President of Sun Water Systems, Inc., the company that markets the Aquasana filter system. *Id.* at ¶ 37 and Att. 28.

Defendants used the same approach in the Sea Vegg infomercial:

> DONALD BARRETT: On our show today we have Scott Kennedy, who's a firm believer that most chronic degenerative diseases can be prevented and reversed from nutrients that come from the ocean. We have a very controversial show, so stay with us. Scott Kennedy, welcome to the show.
>
> SCOTT KENNEDY: Nice to be here, Donald. Thank you very much for having me.

*Id.*, Att. 2 at 4. Kennedy is the applicant of the trademark for Sea Vegg and the registrant of the trademark for Farmasea (the company that owns the Sea Vegg product). *Id.*, ¶ 36 and Att. 27, 16.

These tactics, as the Court previously found with respect to the Supreme Greens infomercial, are likely to mislead consumers about the fundamental nature of Defendants' programming. Indeed, consumers do not expect advertisements to be controversial; controversy – and guests – are for conventional talk shows, not for selling questionable disease cures.

Finally, as he did with Supreme Greens, *see* Complaint, Ex. 6 at 29, Barrett adds one additional element to this illusion of independent programming by telling consumers that he has

worked out a special deal for ITV viewers who are interested in the product touted by his "guest":

> DONALD BARRETT: We only have a minute left, but if you're watching right now and you'd like some more information on the Aquasana water filtration unit, whether it's the shower unit or the countertop water filter, pick up the phone and call the number on the screen. As always on ITV, we've worked out a special arrangement with our guest, so when you do call, mention ITV and you will receive a substantial savings off the regular price of the units. . . . It's been a very exciting edition on ITV, I want to thank you for being on our show.
>
> CHARLES STRAND: Thanks, Donald.
>
> DONALD BARRETT: My name is Donald Barrett and we'll see you on another edition of ITV. Thanks for being with us.

Turner Dec., Att. 12 at 33-34.

> DONALD BARRETT: If you're watching right now and you'd like some more information on Dr. Alex Duarte or the Regenalife product that he's been talking about, pick up the phone and call the number on the screen. As always on ITV, we've worked out a special arrangement with our guest, so when you do call, mention ITV and you will receive a substantial savings off the regular price of the product.
>
> And for a limited time we're making available Dr. Duarte's special health reports. There's actually five of them in there and you'll get them when you order Regenalife. So, pick up the phone and give us a call.
>
> Now, Dr. Duarte, is there any research out there that Regenalife can actually help people with chronic degenerative diseases?

*Id.*, Att. 13 at 14-15.

    **B.**     **Failure to Supervise Sales Representatives' Compliance with the Preliminary Injunction's Continuity Program Requirements**

The Preliminary Injunction enjoined Defendants from selling products through continuity programs without "first obtaining the express, informed consent of consumers" to participate in the program, and set forth in clear and unambiguous terms all of the information that Defendants' sales representatives needed to give consumers before signing them up for continuity programs.

*Id.* at 8-9.[11]

ITV also violated the Court's specific requirement that consumers be informed "clearly and conspicuously" of all material terms and conditions of the continuity program. Specifically, although assuring Ms. Turner that she was protected by Scott Kennedy's "90-day moneyback guarantee" if she purchased a three month supply – rather than the single bottle she wanted – ITV failed to tell her its return policy states that "When returning an order consisting of more than one of the same item/product, you will be refunded for one trial item (i.e. open item) and all other *unopened* items." *Id.*, ¶ 21 and Att. 15 (emphasis added).[12] In other words, if Ms. Turner bought three bottles and used the product for 45 days, she presumably would receive a refund only for two bottles (the opened "trial bottle" and the unopened bottle); if she tried the product for 75 days (and thus opened all three bottles), she would be refunded for only one bottle (the opened "trial bottle"). And this assumes that ITV would not deny her refund request completely, in reliance on the provision of its return policy that states that in order to receive a refund, consumers must call Customer Satisfaction and ask for an RA within 30 days and then return the product within 10 days of the issuance of the RA. *Id.*, Att. 15.[13]

ITV also demonstrated that it has not taken adequate steps to endure than its sales

---

[11] According to John Maihos, ITV's Human Resources manager, the commission system Defendants have put in place for Sea Vegg is different than that which they have traditionally used: instead of receiving only a single, commission for signing a customer up on a continuity program, sales representatives get multiple, recurring commissions for Sea Vegg autoship customers. Turner Dec., ¶ 41 and Att. 32 at 179-80. By instituting such a system, ITV might have increased the incentive for sales representatives to sign consumers up for autoship plans.

[12] The Sea Vegg website – which is registered to ITV – says the same thing. Turner Dec., Att. 16.

[13] The Commission believes that RA is an abbreviation for a term like "Return Authorization."

representatives are complying with the Preliminary Injunction when Ms. Turner called the toll-free numbers shown in the infomercials for Dr. Day's Home Juice Bar and Renuva. The sales representatives who signed Ms. Turner up for both continuity programs did ask her whether she wanted the "re-supply program," but both failed to expressly tell her that her credit card would be charged automatically each month, as opposed to receiving an invoice for each shipment after it arrived. Turner Dec., ¶¶ 24-25 and Att. 17 at 10, Att. 18 at 7-8. The Preliminary Injunction expressly requires ITV to provide such autoship consumers with "a description of the billing procedure to be employed" in connection with the autoship programs. Preliminary Injunction, Part IV(d).[14]

### C.   ITV Distributors are Also Making Suspect Health and Disease Claims

Finally, the Commission has recently discovered that Defendants are apparently allowing their own distributors to market Supreme Greens, Coral Calcium, Sea Vegg, and other ITV products using strong health and disease claims. Specifically, the website for DMN Industries, Inc., www.dmnnow.com, features pictures that clearly have been reproduced from ITV infomercials: they show, among others, Donald Barrett with Scott Kennedy (Sea Vegg) and Alex Guerrero (Supreme Greens) in their respective infomercials, and Kevin Trudeau sitting with Bob

---

[14] Ms. Turner also placed three additional undercover Sea Vegg orders in March 2005. Turner Dec., ¶ 23. In one of those calls, ITV sales representative's violated the autoship provision of the Preliminary Injunction by failing to inform her specifically that her credit card would be billed upon the shipment of her order each month – just as occurred in the Renuva and Dr. Day's Juice Bar calls. *Id.* In another call, Ms. Turner declined the autoship option offered by the sales representative; in the remaining call, she was not offered an autoship option. In that call, however, ITV's sales representative signed Ms. Turner to purchase a full year's supply of Sea Vegg ($299 plus shipping), without specifically asking her whether that was what she wanted. *Id.* Although the sales representative ultimately did allow Ms. Turner to purchase a three-month supply, after she repeatedly insisted that she did not want to spend that much money, *id.*, this incident – together with the others discussed above – indicates inadequate supervision of sales representatives by ITV's management.

Barefoot during the infomercial Barrett produced for Coral Calcium Daily that the Commission challenged in its complaint. Turner Dec., Att. 33. It also features other products previously sold by Defendants: a diet product called Alka Slim, and a Vitamin E supplement called E8. *Id.*

The health claims made on the dmnnow.com website for these products include the following examples: that "sea plants can transform your health" and "strengthen and detoxify," and that "many people believe Sea Vegetation acts as [a] miraculous healing agent" (on the pages promoting Sea Vegg); and that more than 150 diseases, including cancer, heart disease, diabetes, fibromyalgia, and arthritis "have been linked to acidity and lack of calcium in the body fluids" (on the page promoting coral calcium). *Id.*

DMN Industries, Inc. is a Massachusetts corporation whose sole officer and director is David M. Noone. Turner Dec., ¶ 43 and Att. 34. Dave Noone is an ITV distributor who has ordered thousands of bottles of various products from ITV for resale. *Id.*, Att. 35. Defendants' willingness to allow their own distributors to engage in these practices is further evidence of the need for a receiver. Morever, the Commission is particularly concerned that ITV is expanding its distributor network by inviting would-be Sea Vegg distributors to contact Jason Bernabei, ITV and DMC's Vice President of Business Development. Turner Dec., ¶ 45 and Att. 33, 36. Such an expansion can only lead to more deception and harm to consumers.

## V.    MODIFICATION OF THE PRELIMINARY INJUNCTION IS NECESSARY AND APPROPRIATE

### A.    The Preliminary Injunction Should Be Modified By Appointing a Receiver Based Upon New Events and the Need to Protect the Public From Defendants' Deceptive Business Practices

In evaluating whether and how to exercise their inherent power to modify a preliminary injunction, courts primarily consider the events precipitating the request and the purpose of the

preliminary injunction. *See FTC v. Austin Galleries of Illinois, Inc.*, 1988-2 Trade Cas. ¶ 68,340 at 59,920, 1988 WL 118840, at *2 (N.D. Ill. Nov. 2, 1988) ("[I]n deciding whether to grant the FTC's motion for modification of the injunction, we will consider the events that prompted its motion and will tailor our decision to protecting the public with the least disruption possible to defendants' business."); *B.R.G. Autoland Jeep-Eagle, Inc. v. Chrysler Credit Corp.*, 799 F. Supp. 1250, 1258 (D. Mass. 1992) (Nelson, J.) (The court has "'complete power over interlocutory orders made therein and should be able to revise them when it is 'consonant with equity' to do so.'") (quoting 7 James W. Moore, *Moore's Federal Practice*, ¶ 60.15[4], pp. 60-124 - 60-125 (2d ed. 1992).[15] *See also Movie Systems, Inc. v. MAD Minneapolis Audio Distributors*, 717 F.2d. 427, 430 (8th Cir. 1983) ("In modifying a preliminary injunction, a district court is not bound by a strict standard of changed circumstances but is authorized to make any changes in the injunction that are equitable in light of subsequent changes in the facts or the law, or for any other good reason."); *Loudner v. United States*, 200 F. Supp.2d 1146, 1148 (D.S.D. 2002); *Basic Research, L.L.C. v. Cytodyne Technologies, Inc.*, No. 2:99-CV-343K, 2000 WL 33363261, at *11 (D. Utah Dec. 20, 2000).[16]

---

[15] Some courts have used a different standard in deciding motions for modifications of preliminary injunctions, evaluating whether there has been a "change of circumstances" such that the original preliminary injunction was "inequitable." *Favia v. Indiana Univ. of Penn.*, 7 F.3d 332, 340 (3rd Cir. 1993). Notably, in *Austin Galleries*, the court held that the "change in circumstances" standard, applicable to "private applicants," has "little relevance in a statutory enforcement action seeking to protect the public from fraud." 1988-2 Trade Cas. ¶ 68,340 at 59,920, 1988 WL 118840, at *2. The Commission's motion meets either standard.

[16] Although a modification of the preliminary injunction does not require a showing that the Defendants are likely violating the FTC Act, it is worth noting that the dissemination of the Sea Vegg and Renuva infomercials likely violates Sections 5 and 12 of the FTC Act. To prevail under Sections 5(a) and 12, the FTC must demonstrate that "first, there is a representation, omission, or practice that second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994), *citing Cliffdale Associates, Inc.*, 103 F.T.C. 110, 164-

The appointment of a receiver is a remedy that is clearly available to courts of equity. *See, e.g., SEC v. Keller*, 323 F.2d 397, 403 (7th Cir. 1963) ("The district court was vested with inherent equitable power to appoint a trustee-receiver under the facts of this case. The prima facie showing of fraud and mismanagement, absent insolvency, is enough to call into play the equitable powers of the court."); *see also FTC v. Seasilver USA, Inc.*, CV-S-03-0676-RLH(LRL) (D. Nev.) (appointing receiver in case involving fraudulent claims for dietary supplement where receiver continued operating business during pendency of receivership) (decision attached as Exhibit 1 to Memorandum in Support of Plaintiff's Motion for Temporary Restraining Order [Dkt. #3]).

The primary purposes of the Preliminary Injunction entered against Barrett, ITV and DMC were to prevent Defendants from harming consumers by disseminating false and unsubstantiated advertising claims and enrolling consumers in continuity plans without their informed consent. Clearly, it has not worked. The appointment of a receiver is now necessary to carry out the Court's intent.

The Commission recognizes that the Court denied its previous request for appointment of a receiver for DMC and ITV, concluding that the accounting and restriction on asset dissipation that it included in the Preliminary Injunction would be sufficient to ensure the enforceability of any judgment eventually entered against Defendants. Preliminary Injunction at 14. The Commission is not suggesting that the issue before the Court now is the secretion of assets,

---

65 (1984); *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001). The Commission's two new expert declarations demonstrate that Defendants' claims for Sea Vegg and Renuva are unsubstantiated, and those health claims are, without question, likely to influence consumers' purchase or use of those products. *See generally* Memorandum in Support of Plaintiff's Motion for Temporary Restraining Order at 16-19 [Dkt. #3].

although as noted below, Defendants continue to use corporate assets to air new, deceptive infomercials. Rather, Defendants' current dissemination of several new deceptive or highly dubious infomercials – despite Barrett's express representation to the Court that he would not market ingestibles – is the primary reason why the Commission believes that the appointment of a receiver is necessary to achieve the purposes of the Preliminary Injunction: to protect consumers from Defendants' violative business practices and thereby prevent continuing consumer injury.

The Commission believes that Defendants' dissemination of new, misleading infomercials alone constitutes more than sufficient grounds for the Court to modify the Preliminary Injunction and appoint a receiver over DMC and ITV for the rest of this litigation, and that, as discussed *infra*, appointment of a receiver is the least disruptive means of protecting consumers. However, Defendants' continuing fraudulent practices extend beyond the airing of deceptive claims and include the continued use of the talk show format that the Court specifically found to be misleading, lax oversight of sales representatives, and expansion of a deceptive distributor network.[17] Together, these actions provide further evidence that ITV and DMC are permeated by fraud and will continue to harm consumers as long as current management remains at the helm; a receiver must take charge and rein in Defendants' fraudulent practices.

---

[17] The Commission does not know how widespread the problems are associated with ITV placing consumers on continuity plans without their consent. Thus, the Commission has not alleged contempt of the Preliminary Injunction, and does not seek to ban Defendants' autoship program outright. The experiences of our investigator show, however, that despite the Court's clear instructions, some consumers continue to incur economic injury as a result of the Defendants' zeal to enroll them in autoship programs – programs that are presumably quite lucrative. Additional supervision of Defendants' business practices – the kind a receiver would provide – is thus needed.

**B.  A Receiver Is Also Needed to Stop Mounting Consumer Injury and Prevent Defendants from Spending Corporate Assets on Fraudulent Infomercials**

Defendants are spending substantial resources to repeatedly air the new, unsubstantiated Sea Vegg and Renuva infomercials. Both infomercials have ranked high in IMS' list of most frequently aired infomercials for the past few months, demonstrating that Defendants – in addition to causing further consumer harm – are spending substantial resources to purchase media time that otherwise would be available for consumer redress at the conclusion of this litigation. The appointment of a temporary receiver would prevent Defendants from continuing to use their assets to fund fraudulent behavior, without disrupting legitimate business activities.

Further, Defendants have been uncooperative in providing full disclosure about some of their spending habits. Parts VIII and IX of the Preliminary Injunction limit DMC, ITV and Barrett to spending for reasonable and necessary expenses. DMC paid American Express $52,625 in October 2004, and $56,806 in December 2004. Turner Dec., ¶ 29 and Att. 22. The Commission has been trying to obtain the underlying credit card statements from Defendants since November 2004, but has been unable to obtain simple credit card statements since that time. *Id.* at ¶ 28 and Att. 21.[18]

---

[18] The Commission first raised this issue in November 2004. Turner Dec., Att 21. In response to the Commission's numerous follow-up communications, counsel for Defendants informed the Commission on January 24, 2005, that neither company maintained any American Express accounts. *Id.* The Commission clarified its request on January 31, 2005 by informing Defendants that the Commission sought, and was entitled to obtain, copies of American Express billing statements "regardless of the person or entity in whose name the account may be, for which DMC or ITV has made payment in excess of $5,000." *Id.* Despite numerous follow up requests for these documents, however, Defendants have yet to provide them to the Commission. Additionally, Donald Barrett paid more than $40,000 to American Express in March 2005 and the Commission has just learned that he paid $30,488 to American Express in April 2005. *Id.* at ¶ 30 and Att. 22.

### C.  Barrett's Lack of Trustworthiness Demonstrates the Need for His Removal from Management of DMC and ITV, and for the Appointment of a Receiver

Barrett has demonstrated his lack of trustworthiness at least twice in this case. First, as noted *supra*, after telling the Court last June that he "[had] no plans" to run any infomercials for ingestible products in the future, he started running or buying air time and providing other services for infomercials for at least four such products by January 2005.

Second, Barrett represented to the Court that he never purposely ran the original Supreme Greens infomercial after replacing it with an edited version in response to the Commission's October 2003 notification of its concerns about that program. Indeed, in response to the Commission's motion for a temporary restraining order, Barrett represented to the Court that it was the FTC that informed him that the original Supreme Greens infomercial was running in April 2004. He stated:

> Based upon the FTC's concerns, the edited [Supreme Greens] tape was rolled out first in national markets, with local markets to follow. . . . ITV Direct sought to substitute the edited tape for the original tape as quickly as feasible.
> 
> ***
> 
> On April 7, 2004, the FTC called to state that it continued to have concerns over the Supreme Greens with MSM infomercial and that it believed that the original infomercial was running in certain media markets. We then investigated the matter, determined that certain stations were airing the original infomercial, and immediately notified all media outlets to cease running any of the Supreme Greens versions.

Turner Dec., Att. 19 at ¶¶ 19, 24. The clear implication of Barrett's statement is that those airings of the original infomercial were neither intended by, nor known to, ITV. In fact, ITV had deliberately switched back to the original Supreme Greens infomercial by at least early February, a move that boosted revenues according to ITV's Vice President for Media, who emailed Barrett on February 7, 2004 to say "I was going over the results of the Supreme Green shows that ran this Friday. I was so excited to see the results go up because we switched back to [the] original

Page 29 of 32

version Supreme Greens." *Id.* at ¶ 33 and Att. 23-24. Two weeks later, Barrett himself wrote to all ITV managers that "We should now be using the original version Supreme Greens (SGRN)." *Id.*, Att. 25. Simply stated, Barrett is not trustworthy as the guardian to carry out this Court's orders.

### D.  Appointment of a Receiver Will Protect Consumers and Is the Appropriate Remedy

The public interest would be greatly served by the relief requested by the Commission. There is a strong public interest in protecting consumers from fraudulent health-related products.[19] Yet Barrett has demonstrated that he is either unwilling or incapable of resisting the urge to make unsubstantiated health and disease claims for dietary supplements and there is every reason to believe he will continue to disseminate such claims so as long as he is permitted to do so. He and his companies have also shown their willingness to injure consumers in other ways. Absent appointment of a receiver, Defendants will likely continue to use Barrett's time-tested faux talk show format, provide inadequate supervision of sales representatives, and allow deceptive distributor networks to flourish. In short, these enterprises are permeated by such fraud that continued misconduct is likely unless the current management is replaced and a receiver is put in charge.[20] *See, e.g., SEC v. Bowler,* 427 F.2d 190, 198 (4th Cir. 1970) (Court of Appeals

---

[19] Courts have frequently found that "the public has a particularly strong interest in an accurate description of health and medical products." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 841 (9th Cir. 2002) (citation omitted); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 129 F. Supp. 2d 351, 597 (D.N.J. 2000), *aff'd*, 290 F.3d 578, 597 (3d Cir. 2002) ("there is a strong public interest in the prevention of misleading advertisements, and this interest is particularly strong where over-the-counter drugs are concerned") (citation omitted); *Abbott Lab. v. Mead Johnson & Co.*, 971 F.2d 6, 19 (7th Cir. 1992) (costs to the public "are even higher when, as here, important health concerns are involved").

[20] Nor can Barrett's partner, Robert Maihos, be allowed to run these enterprises. Mr. Maihos, as the co-owner and an officer and director of both DMC and ITV, who has stated under

reverses district court's decision to not appoint receiver where "it is obvious, as here, that those who have inflicted serious detriment in the past must be ousted"); *SEC v. S&P National Corp.*, 360 F.2d 741, 750-51 (2d Cir. 1966) ("[T]he primary purpose of the appointment [of a receiver] was promptly to install a responsible officer of the court who could bring the companies into compliance with the law, 'ascertain the true state of affairs . . . and report thereon' to the court and public shareholders and preserve the corporate assets.").

The Commission recognizes that the appointment of a receiver will change how Defendants conduct their business. It should not, however, disrupt any legitimate business activity that may exist. For instance, Defendants will still be able to market Sea Vegg as a source of vitamins and minerals – the receiver would not, however allow them to promote it as a cancer preventative and treatment. Nor can there be any serious objection to a receiver based on the notion that the receiver would discontinue business practices that injure consumers.

Moreover, any other alternatives short of appointment of a receiver would actually require greater restrictions on ITV's and DMC's business operations. Absent appointment of a receiver, the only way to protect consumers adequately would be to prohibit Defendants from making <u>any</u> health claims – not just misleading claims, prohibit the faux talk-show format, and prohibit the use of any continuity programs.[21] In short, the Commission's requested relief provides the most protection to consumers with the least disruption to Defendants' legitimate business activities. Barrett has had ample time to clean up the business activities of DMC and ITV, and has clearly

---

oath that he is in charge of the companies' day-to-day operations, clearly has condoned the practices at issue.

[21] Defendants may argue that expansion of product coverage in Section I of the Preliminary Injunction would be adequate protection. We strongly disagree. Defendants have shown themselves to be incorrigible and incapable of resisting the urge to prey on consumers' fears and vulnerabilities.

decided that it is more profitable to continue to defraud consumers and prey on those who are coping with, or afraid of, serious illnesses, diseases and other conditions. It is time for a receiver to make sure that this fraudulent activity stops.[22]

## VI. CONCLUSION

For the reasons set forth above, the Commission respectfully requests that the Court modify the Preliminary Injunction and appoint a receiver over DMC and ITV. A proposed Order with findings of fact and conclusions of law is attached.

Respectfully submitted,

_____
DANIEL KAUFMAN
KIAL S. YOUNG (BBO # 633515)
EDWARD GLENNON
Federal Trade Commission
600 Pennsylvania Avenue, NW, NJ-3212
Washington, DC 20580
(202) 326-2675, -3126 (voice)
(202) 326-3259 (fax)
dkaufman@ftc.gov or eglennon@ftc.gov

ATTORNEYS FOR PLAINTIFF

Dated May 25, 2005

---

[22] The Commission also has submitted a memorandum in which we recommend a highly qualified receiver for the Court's consideration, Craig R. Jalbert of Verdolino & Lowey, P.C.