UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>          Plaintiff,<br><br>v.<br><br>DIRECT MARKETING CONCEPTS, INC., et al,<br><br>          Defendants | CIVIL ACTION NO. 04-CV 11136GAO |

## AFFIDAVIT OF DONALD BARRETT

I Donald Barrett, under oath declare as follows:

1. I am President and CEO of Direct Marketing Concepts Inc. and ITV Direct, Inc. (collectively "ITV") and responsible for the management and operations for each company.

2. ITV is located in Beverly, Massachusetts and we are a marketing company that employs almost 200 individuals in Massachusetts. Our business includes the production of infomercials, in which an individual or company is provided with an opportunity to advertise the product to a larger audience through television, radio and other media outlets.

3. We also act as a call center for companies that have products and need teleservices.

4. I have read the Federal Trade Commissions motion to modify the Preliminary Injunction entered on June 23, 2004 and have personal knowledge of the facts contained herein.

5. With respect to my affidavit previously submitted to this Court in June 2004 regarding the business decision not to produce infomercials for ingestible products, that was

a true and accurate statement at the time I submitted that affidavit. As of June 2004, I had made the decision to stop running infomercials for ingestible products.

6. Consistent with my decision to move the company away from infomercials for ingestible products, since early June of 2004 ITV has produced and/or aired no less than fifteen infomercials for non-ingestible products. One of these products is the Aquasana infomercial referenced in the FTC's present motion.

7. Although it is not discussed by the FTC, the longest running infomercial produced by ITV in the last year was not for an ingestible product. This infomercial is in the same exact format as Regenalife, Sea Vegg, Dr. Day Home Juice Bar and Aquasana. This infomercial features a medical doctor, discussing the benefits of healthy living, eating well, belief in God and nature. In connection with this infomercial, the FTC advised us in 2004 that we should add one additional disclaimer. I was advised by Michael Sciucco, that the additional disclaimer had already been added after reviewing the June 23, 2004 Preliminary Injunction. The FTC did not raise any additional questions or issues with the show.

8. During 2004, we were also in the process of producing an infomercial for an air purifier for a major multi-national corporation, but because of the FTC's press release, they backed out at the last minute. Similarly, we have been in discussions with large and small companies in electronics, financial services, real estate and other non-health industries regarding producing infomercials. In many cases, the pendency of the FTC action and the FTC's press releases regarding ITV have negatively impacted these negotiations.

9. Prior to the FTC's original complaint I hired attorney Michael Sciucco as in-house counsel for the company. Among his many responsibilities, Mr. Sciucco is responsible for ensuring that ITV remains in compliance with this Court's Preliminary Injunction entered

June 23, 2004, as well as the relevant rules and regulations as they pertain to our business. His duties include attending all filming of infomercials, reviewing documentation and substantiation for the infomercials, editing the infomercials, implementing internal policies and working with management.

10. In addition to his salary, I have fully supported Mr. Sciucco's efforts to educate himself regarding proper advertising practices and FTC laws and regulations. I have required him to attend several national conferences on FTC compliance. If the Electronic Retailers Association ("ERA") or the FTC has held a conference that relates to the legal aspect of our business, I require Mr. Sciucco to attend.

11. Since 2004, ITV has continued to receive hundreds of proposals regarding dietary supplements and ingestible products. I require Mr. Sciucco to review each of these proposals to determine whether there is any substantiation for the claims that are being asserted. Most of these proposals are immediately rejected, and virtually all of them were rejected in 2004.

12. One person who approached us several times regarding the possible production of an infomercial was Scott Kennedy. Mr. Kennedy was proposing an infomercial on the benefits of seaweed and sea vegetation in a healthy diet. Given the pendency of the FTC action and injunction, we initially rejected him. A few months later, Mr. Kennedy again approached us about his proposal. This time, however, he provided us a number of studies, articles and scientific literature to support the benefits of sea vegetation. I requested that Mr. Sciucco review these materials and report back to me regarding substantiation. Although we were impressed by the materials provided by Mr. Kennedy, we nonetheless rejected him again. Several months later, he approached us one more time with

even more substantiation, which we reviewed again. He also provided us with the name of a marine botanist in Europe who had done extensive studies on the benefits of seaweed. This time, we believed there existed sufficient substantiation to film an infomercial with Mr. Kennedy. Whether this infomercial would ever air, however, was still unknown at this time.

13. When we filmed the infomercial, I made an effort to directly challenge Mr. Kennedy's claims during filming. I also made clear in the discussion to have Mr. Kennedy state that he is not a doctor. Mr. Kennedy does not state that seaweed can cure any disease. Rather, ingestion of seaweed may lead to a healthier body. This is supported by a vast amount of research and studies, which we reviewed.

14. I also requested that Mr. Sciucco review the infomercial for content and disclaimers, to confirm that the show made clear that seaweed was not being advertised as a cure for any disease. I also asked Mr. Sciucco to consult with outside counsel to review the infomercial and make any changes he believed were necessary to make the show compliant with all relevant regulations and this Court's Preliminary Injunction. After this review a number of material changes were made to the show.

15. We have produced a few other infomercials for dietary supplements this year. These infomercials were only produced after Mr. Sciucco and others within the company reviewed substantiation about the products and ingredients. If the product and or the ingredients of the product does not have competent and reliable scientific evidence then we will not air the infomercial.

16. With regard to the Renuva product, ITV did not produce this infomercial and had no input into its contents or format. Rather, we were initially approached by the producers of the infomercial who inquired whether we would be willing to answer phones for

the infomercial and process customer orders. Again, after reviewing the infomercial, we raised a number of questions with the producers of the show, questioning the substantiation for the claims. In response, the producers provided substantial documentation to Mr. Sciucco, which he reviewed at my direction. The producers also informed me that they had requested a Washington, D.C. law firm with expertise in FTC compliance to review the show. Based upon these representations and our limited involvement in connection with the show, we agreed to proceed. Later, we expanded our relationship with the producers of the show and took a more active role in distribution. However, after participating in the voluntary compliance process established by our industry group in conjunction with the FTC, we made the business decision to pull the current version of Renuva from the airwaves in an effort to comply with the self regulatory process. We have not purchased any new air time for the Renuva infomercial in question.

17. With respect to the sales staff, I have personally been at the call center on a daily basis in order to monitor sales representatives. I hired two more sales managers, a full time Quality Control Manager, specifically to monitor the sales representatives and a Vice President of Sales with an extensive training background. Upon receiving the Preliminary Injunction in June 2004, the company has taken extraordinary efforts to assure sales compliance. ITV does not tolerate any violations of company policy and seeks to have continuous monitoring of its sales professionals to assure that these policies are followed. All calls are monitored and continuity orders must be recorded, all sales professionals are aware of this fact.

18. ITV's policy, which is strictly enforced, is that any customer may cancel at any time and receive a refund. When a refund is given, the sales professional does not

receive a commission. Thus, there is no financial incentive to place a customer on the continuity program without clearly informing them of the program and receiving informed and clear consent. ITV has no interest in angering customers and generating ill will. Our commission and sales policies seek to reinforce this belief.

19.     In early 2005, I announced a new commission structure to the sales staff. With this new structure, my intent was to ensure that the sales representatives obtain the express informed consent of the consumers. The sales representative is paid a small commission on the first sale and only receives an additional commission if the customer continues to receive the product. Again, because of this policy, there is no incentive for a sales professional to play games with customers, because that will only ensure that they receive less commission and are disciplined or fired by the company.

20.     I have also directed my sales managers to openly reward compliance with our customer policies and procedures. If a sales representative follows our guidelines and procedures, they will be recognized in front of their peers. If they do not follow our guidelines, they will not last long with the company.

21.     Based upon our review of the FTC's affidavits and our own records, we have determined through the credit card number provided by the FTC investigator that she called our call center at least seven times in the last year. I assume that the FTC has been calling at least once or twice a week in an effort to "catch" our sales personnel violating company policies. I have communicated this to our sales managers as an added incentive for compliance. According to the FTC's filing, they have identified just three calls that they claim violate what the FTC considers appropriate. My review of these transcripts indicates that in two of them, the continuity policy was in fact communicated to the FTC agent and

there was express consent. I am at a loss to understand what more is required. Thus, despite the fact that the FTC has likely called our call center dozens of times over the last year, they have identified just one call where the sales representative may not have perfectly followed the script and company policies.

22. Although it is impossible with our current phone system to listen and monitor every phone call twenty-four hours a day, it is obvious from the FTC's ongoing undercover conversations with our sales staff that our new policy, coupled with our training, compliance and script review, is working and that we are maintaining a high ethical standard on our sales floor.

23. The FTC request for my removal is anything but "least restrictive" and is not justified by the limited evidence that the FTC has produced of supposed violations by the company. ITV has complied with every aspect of the Court's Preliminary Injunction order, producing detailed financial reports, allowing a week long on-site review of the business by the FTC investigators, distributing the Court's order to every existing employee, hiring new compliance and legal personnel, placing disclaimers on every infomercial in strict compliance with the Court's direction and actually exceeding those requirements, obtaining a wealth of scientific data in connection with any shows requiring such data, and assuring compliance with all policies and procedures in connection with customer orders. In short, while the FTC has not called us once to inform us of any specific problems with our business, or requested any of our substantiation in connection with the current shows in question, we have taken extraordinary steps to conduct the business the right way and ensure compliance.

24. Through my leadership and direction this company has grown from a small in-home business to a company that employs almost 200 Massachusetts residents in its Beverly facility. I have taken extraordinary measures over the past three years to build the business and a loyal and committed customer base, and have consistently demonstrated my commitment to comply with all applicable rules and regulations.

25. Managing the business requires significant industry expertise and involves daily interactions with media outlets, manufacturers and new clients. I am intimately involved with these day-to-day operations; my removal would be extremely disruptive and detrimental to the business.

26. Both in connection with this case and otherwise, I have provided the FTC with all of the information they have required and agreed to meet with them at any time at their request to discuss and resolve any issues they may have with our business. I have cooperated at all times with the FTC and I intend to continue that cooperation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7th day of June, 2005 in Beverly, Massachusetts.

_____
DONALD BARRETT