UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FEDERAL TRADE COMMISSION,

    Plaintiff,

v.

DIRECT MARKETING CONCEPTS, INC., et al,

    Defendants

CIVIL ACTION NO. 04-CV 11136GAO

## AFFIDAVIT OF CATHERINE RATCLIFFE

I Catherine Ratcliffe, under oath declare as follows:

1.    I am the Vice President of Customer Service for Direct Marketing Concepts, Inc. ("DMC") and ITV Direct ("ITV") and have personal knowledge of the facts contained herein.

2.    I have been employed by Direct Marketing Concepts and its affiliates since May of 2002. I began as a supervisor of Customer Service and eventually was promoted to Vice President of Customer Service on or about April, 1 2003.

3.    My duties as Vice President of Customer Service include managing a staff of about twenty Customer Service Representatives.

4.    The duties of the Customer Service Representatives include working with customers and their orders. Customer Service Representatives handle all incoming calls from customers. Representatives handle issues ranging from delay in shipment, explanation of the continuity program, crediting back the customer for returned product, and explanation of the products we sell. The most important part of my job is to take care of the consumer as well as protecting the integrity of the company.

5. Our department also has two floor supervisors that work closely with the customer service representatives, as well as the customers themselves. Pamela Welch and Kathleen Badore ("Sunni") handle all customer service issues that go beyond the scope of what the phone representative is able to handle. For example, they would handle product returns outside of the written policies, credit card issues and banking issues, among others.

6. I personally work with the Sales Managers on a daily basis. One of my main duties is monitoring Sales Representatives and ensuring compliance. On a daily basis, Sales Managers listen to random phone calls of the Sales Representatives and document the phone calls in our database. The Sales Managers also record individual representatives for both compliance and training issues. The Sales Managers then sit with the individual representative and review the tape and critique the calls that were recorded.

7. On or about January 1, 2004 we initiated a recording system called Contract Genie for all of our calls. When a customer calls in they are put on notice that their calls may be monitored for quality control issues or training purposes.

8. We distributed a script that Sales Representatives must follow when recording a call. (See <u>Exhibit</u> 1). That script is posted on our intranet and at all desks on the sales floor. When a customer calls in, orders a product and agrees to the continuity program, we have mandated that all calls are to be recorded. The customer must give their express consent. The customers are also made aware that they can cancel or modify the continuity program at any time.

9. Members of my staff listen to these recordings on a daily basis. The result of these recorded calls is documented and forwarded to the Sales Managers, Legal Counsel and Director of Human Resources. In the event there are deviations from the company's policies, disciplinary action may be taken, including written warnings and or termination.

**AUTOSHIP/CONTINUITY**

10. If a customer calls the Customer Service Department in regards to an auto ship order that they have received, but claims was unwanted, our first step is to listen to the Contract Genie Recording. In addition we also offer the customer the option of listening to the recording with the representative. Depending on the outcome of the recording several different actions can take place. If the recording is clear and the customer did agree to the auto ship, which is not uncommon, they now have one of two options.

    a. They can keep the package and cancel any future shipments

or    b. Return the current package received for a refund for the product.

11. If the recording is not clear because the customer's response in inaudible, then we would then issue an immediate refund. We will likewise issue an immediate refund if there is no recording to verify the transaction. In these instances, it is always our practice to side with the consumer. Depending on the type of product and amount of the package, we would either tell the customer to keep the package or we would issue a prepaid call tag so the customer can return the package at our expense. A call tag allows

the customer to return the product without paying any shipping or handling. Either way, the customer is issued a full refund.

12.  The FTC's memorandum references the auto ship program for a product known as E-8 Daily, which was sold with the company's Supreme Greens product in late 2003 and early 2004. This promotion was voluntarily discontinued by DMC and ITV approximately a year and a half ago, before the FTC case was filed last year. No similar promotion involving auto ship exists at this time.

13.  The memorandum also mentions that thousands of records referencing unauthorized auto ships were taken from our database. First, the word "unauthorized" is used in order to keep consistency with in the department in regards to customer notations. It does not necessarily mean that the auto ship was unauthorized. During this time we did not have Contract Genie and we were unable to determine if the customer had agreed to the auto-ship. Regardless, we always would refund the customer or allow them to keep the product for free. Second, I reviewed the auto ship queue table taken from our database, Exhibit ITV-54 and found that the referenced accounts in this exhibit were from a year and a half ago. These invoices were also created before we instituted our Contract Genie Recordings policy.

**RETURN POLICY**

14.  The FTC's analysis of our Sea Vegg return policy is not accurate.

15.  If, for example, a customer bought a 3 month supply of Sea Vegg, our return policy is that the customer may return the product for a full refund within 90 days. This policy is stated in the infomercial and assumes that the customer will use one bottle of the product per month. Nonetheless, if the customer calls in for an RA # (Return

4

Authorization) at day 75 and three bottles are open the customer will still receive a full refund for the product. The original shipping is non-refundable per the printed policy.

16. The customer must return all three bottles in order to receive a full refund. However, the bottles need not be sealed for the refund to be paid. Rather, the return of the actual bottles assures us that the customer has not resold the product and is attempting to obtain a double recovery, which we believe has been attempted in the past. For similar control purposes, the customer must return the items with in 10 days of being given the RA#, which is also stated in the printed policy. None of these policies are designed to make it difficult for the customer to return product. To the contrary, we seek to make the return policy as seamless as possible to generate goodwill among our customers in the hopes they will order additional products in the future.

**CHARGEBACKS**

17. The FTC's memorandum also states that the FTC is unable to determine how widespread the "problem" is in regards to placing customers on the continuity program. I do not believe there is any such widespread problem and our customer interactions do not indicate that such a problem as asserted by the FTC exists. To the contrary, any issues that arise are handled quickly and professionally at the company level. I am not aware of any consumer complaints filed with the FTC, Better Business Bureau or the Attorney General's office in regards to our auto ship program. The few complaints I am aware of were issues other than auto ships and have been resolved.

18. We also have an excellent chargeback record with our merchant account. Customer disputes are almost nonexistent. Again this is due to handling customer concerns at company level quickly and efficiently, almost always in the customer's favor.

19. In July 2004, I met with a number of agents from the FTC when they were conducting an on-site inspection. I explained our customer service procedures, auto ship procedures and chargeback procedures. I believe I answered all of their questions and provided them all of the information they requested. I do not believe this information demonstrated that there were any widespread problems in 2004. To the extent there were any issues, significant new compliance measures and controls have made the occurrence of those issues even less frequent.

20. Since my discussions with the FTC agents in July 2004, I do not believe the FTC has informed us of any specific problems with our customer service function or the sales floor.

**Orders placed by FTC agents**

21. The FTC mentions orders that were placed by one of their agents. Through my investigation of these most recent orders I also found several other orders placed using two different credit cards.

**AGENT # 1**

22. The first credit card was used under the name of "Patricia Sanborn." Four orders were placed since April 2004. The first order was placed on April 30, 2004 (See Exhibit #2). This order was for 1 package of Uro Caps. Our records do not indicate any subsequent phone calls or returns in regards to this order.

23. The second order was placed on August 12, 2004 (See Exhibit #3). This order was for the Conquering Confusion audio series by Dr. Lorraine Day. Again our records do not indicate any subsequent phone calls or returns in regards to this order.

24.     The third order was placed on September 13, 2004 (See <u>Exhibit</u> #4). This order was for a two video package and a workbook by Dr. Lorraine Day. Again our records do not indicate any subsequent phone calls or returns in regards to this order.

25.     The fourth and most recent order, which was mentioned in the FTC's motion, was placed on March 2, 2005 (See <u>Exhibit</u> #5). This order was for 3 bottles of SeaVegg, a sample PH test kit and insurance. The order was also set up on our auto ship (continuity) program, which was also mentioned in the FTC's motion. Once again our records do not indicate any subsequent phone calls or returns in regards to this order. Because it became clear that this order was not a real order, it was cancelled on May 31, 2005.

**AGENT # 2**

26.     The second credit card was used under the names of "Betty Stuart," "Betty Stewart" and "Erica Stewart." The first order was placed on June 17, 2004 (See Exhibit #6). This order was for the 7 Day Miracle Cleanse Kit. Our records do not indicate any subsequent phone calls or returns in regards to this order. We tested this product briefly and we no longer carry the product.

27.     The second order was placed on February 24, 2005 (See Exhibit #7). This order was for a one month supply of Dr. Day's juice bar which consisted of 1 Barley Greens Capsules, 1 Beta Carrot and 1 Beta Beet. This order was set up on our auto ship (continuity) program. The customer was to receive the same three items every 30 days. Our records do not indicate any subsequent phone calls or returns in regards to this order.

7

28. On March 30, 2005 the first shipment (See <u>Exhibit</u> #8) on this program was sent out. Again, our records do not indicate any subsequent phone calls or returns in regards to this continuity order.

29. On April 27, 2005 the second shipment (See <u>Exhibit</u> #9) on this program was sent out. Our printed return policy clearly states that the customer is required to obtain a Return Authorization number in order to return product. Our records indicate that this particular order was returned with out acquiring a Return Authorization number. Even though it was returned against our printed return policy, a courtesy refund against product was issued on May 20, 2005 (See <u>Exhibit</u> #10).

30. A subsequent phone call was made by this "customer" in regards to this account on April 28, 2005 to cancel any further shipments. This was done without incident and the account was cancelled. (See <u>Exhibit</u> #11).

31. The third and most current order was placed on April 25, 2005 (See <u>Exhibit</u> #12). The order was for a one month supply of the Renuva system which consisted of 1 infuser, 1 generator powder and 1 Daily Balance with Express shipping. This order was set up on our auto ship (continuity) program. The "customer" was to receive the 1 month Renuva system every 30 days. Our records do not indicate any subsequent phone calls or returns in regards to this order.

32. On May 26, 2005 the first shipment (See <u>Exhibit</u> #13) on this program was sent out. A subsequent phone call was made in regards to this account on June 1, 2005 to cancel any further shipments. This was done without incident and the account was cancelled. (See <u>Exhibit</u> #14).

8

33.     Of all of these orders, we do not have a single instance where the FTC's undercover agent called to complain about being put on auto ship or indicated that the auto ship program had not been fully communicated to her both orally and in writing. Moreover, we have no record that the agent provided any reason or explanation for canceling her order. Nonetheless, the cancellation was processed immediately without incident.

### Statement made by Agent Turner

34.     Agent Turner mentions in her affidavit that "the sales representative *charged* my credit card for a year's supply of Sea Vegg, (12 bottles for $299 plus shipping) without first clearly asking." She then states that the sales representative "finally allowed me the option of purchasing only three bottles." It is our practice to charge only for what the customer actually ordered. The statement by Ms. Turner that the sales "finally allowed me the option of purchasing only three bottles" would indicate that she was not actually *charged* for the 12 bottles but for only the three bottles she was "finally allowed" to purchase.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7th day of June, 2005 in Beverly, Massachusetts.

_Catherine M. Ratcliffe_
CATHERINE RATCLIFFE