# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

FEDERAL TRADE COMMISSION,      )
     )
         Plaintiff,      )
     )
     )
v.      )     CIVIL ACTION NO. 04-CV-11136GAO
     )
DIRECT MARKETING CONCEPTS, INC., et    )
al.,      )
     )
         Defendants.      )
     )
     )

## THE DMC DEFENDANTS' SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO THE FTC'S MOTION TO MODIFY THE COURT'S PRELIMINARY INJUNCTION AND APPOINT A RECEIVER

### PRELIMINARY STATEMENT

Continuing its determined effort to suppress all future commercial speech of any kind by Direct Marketing Concepts, Inc., ITV Direct, Inc., and Donald Barrett (collectively the "DMC Defendants"), the Federal Trade Commission ("FTC") has come before this Court with "supplemental" arguments based upon an incomplete record that ignores the FTC's own policies and procedures.  Specifically, the FTC admits that it has not undertaken any significant effort to review and analyze the scientific support for the DMC Defendants' most recent advertising.  Despite a standard that has become a moving target for the Defendants – at times described as "sound" scientific evidence, "valid" scientific evidence, or scientific "agreement" – the FTC nonetheless continues to accuse the DMC defendants of ignoring the Court's prior orders, failing to substantiate their advertising claims and engaging in unfair and deceptive business practices.[1]  Nothing could be further from the truth.

---

[1] Likewise, the ERSP's analysis of the DMC Defendants' advertising was evaluated under an incomprehensible and moving standard that was never adequately explained.  As set forth in the accompanying affidavits, it is now clear that the ERSP's review of the subject advertising was simply the subjective opinion of one ERSP attorney, who is not a scientist or a doctor.  It also clear that the ERSP's conclusions, such as its assertions of certain "claims" in the

As demonstrated by the significant volume of scientific literature and studies (including the FTC's magic "controlled double-blind" studies) submitted with this response, the DMC Defendants have taken the FTC's concerns regarding substantiation of advertising extremely seriously, retaining scientists, doctors and counsel to review all advertising before it is disseminated.[2]  Nonetheless, the FTC brushes all of this information aside, arguing that the only adequate remedy is to halt all speech of any kind by the DMC Defendants, because in its subjective view they cannot be "trusted."  Unfortunately for the FTC, the United States Constitution and the findings of the Congress require more to impose such an extraordinary prior restraint on all speech, particularly where the FTC admits it cannot determine with any certainty whether that speech in fact is supported by its own "substantial scientific evidence" standard.

Notwithstanding the FTC's arguments to the contrary, the DMC Defendants have taken their obligations to comply with the law very seriously.  As evidence of this fact, the FTC has presented no actual consumer complaints indicating that the DMC Defendants' advertising, products or sales practices are deceptive or misleading.  Instead, the FTC has manufactured arguments based on its subjective (and undoubtedly passionate) belief that the only appropriate remedy in this case is to put the DMC Defendants out of business permanently, because it has concluded that all speech by the DMC Defendants will necessarily violate what the FTC deems is appropriate in their subjective view.  These arguments, based upon a misleading and partial factual record, include the contention that the DMC Defendants have violated this Court's prior order, which they have not, and that consumers are somehow being harmed, which they are not.

---

advertising and the lack of scientific support, are entirely without basis.  In light of these facts, it is remarkable that the FTC has placed so much emphasis on this process in its supplemental submission to this Court.  *See, e.g.,* Affidavit of Michael Sciucco, dated September 28, 2005.  It also further demonstrates how little independent analysis the FTC has been willing, or able, to conduct on DMC's advertising and support.

[2] Additional supporting materials are being submitted with this supplemental memorandum, including two additional affidavits from Ph.D.'s related to Sea Vegg, as well as four binders of scientific substantiation that were reviewed in detail in connection with the Flex Protex advertising prior to the dissemination of any advertising by the DMC Defendants.  *See* Affidavit of Stefan Kraan, hDip, BSc. MSc, PhD; Affidavit of David Myslabodski, PhD.; and Exhibits to Affidavit of A. Aldrich.

Without more, the extraordinary relief requested by the FTC, before any trial on the merits, is simply unwarranted. *See, e.g., FTC v. Enforma Natural Prods., Inc.*, 362 F.3d 1204, 1216-17 (9th Cir. 2004) (reversing injunction entered by district court where there existed "genuine disputes" regarding the substantiation for the advertising and whether the advertising was misleading).

## ARGUMENT

### I.    The DMC Defendants' Advertising Is Supported By Scientific Evidence

Although a reading of the FTC's most recent submission would imply that federal policy is to strike down all advertising of dietary supplements, no matter how well supported, unfortunately for the FTC, Congress has expressed a vastly different view. In connection with the Dietary Supplement Health and Education Act, Congress published the following findings of fact concerning dietary supplements:

> 2.    the importance of nutrition and the benefits of dietary supplements to health promotion and disease prevention have been documented increasingly in scientific studies;
>
> 3(A).    there is a link between the ingestion of certain nutrients or dietary supplements and the prevention of chronic diseases such as cancer, heart disease and osteoporosis;
>
> 5.    preventative health measures, including education, good nutrition, and appropriate use of safe nutritional supplements will limit the incidence of chronic diseases, and reduce long-term health care expenditures;
>
> 7.    there is a growing need for emphasis on the dissemination of information linking nutrition and long-term good health;
>
> 8.    consumers should be empowered to make choices about preventive health care programs based on data from scientific studies of health benefits related to particular dietary supplements;
>
> 12.    the nutritional supplement industry is an integral part of the economy of the United States;
>
> 13.    although the Federal Government should take swift action against products that are unsafe or adulterated, the Federal Government should not take any actions to impose unreasonable regulatory barriers limiting or slowing the flow of safe products and accurate information to consumers …

- 3 -

14.    dietary supplements are safe within a broad range of intake, and safety
problems with the supplements are relatively rare; and

15(B). a rational Federal framework must he established to supersede the current
*ad hoc* patchwork regulatory policy on dietary supplements.

21 U.S.C.A. § 321, at p.169, Congressional Finding Nos. 2, 3(A), 5, 7, 8, 12, 13, 14, and 15(B).

*See, e.g., Nutritional Health Alliance v. Shalala*, 953 F. Supp. 526, 528 (S.D.N.Y. 1997)

("agencies of government charged with promoting the food supply and the rights of consumers

have paradoxically limited the information to make healthful choices in an area that means a

great deal to over 100 million people").

Notwithstanding the foregoing, the FTC asks this Court to ignore the volumes of

scientific evidence submitted by the DMC Defendants, including medical literature published in

leading journals, clinical studies, well controlled double blind studies and affidavits from

numerous scientific experts, in favor of the FTC's blanket assertions that somehow this evidence

is insufficient in their subjective view.  In doing so, the FTC rejects Congress' mandate that

consumers should be empowered to make their own choices about health and the value of dietary

supplements.  Worse, the FTC's arguments demonstrate the application of the very *ad hoc*

standard that Congress stated could no longer stand.[3]  *See Pearson v. Shalala*, 130 F.Supp.2d

105, 115 (D.D.C. 2001) (conclusion that claim was against the "weight" of scientific evidence,

as opposed to unsupported by any scientific evidence "was arbitrary, capricious and otherwise in

violation of law").

The scientific evidence submitted by the DMC Defendants clearly demonstrates that they

undertook extraordinary efforts to substantiate the health benefits of the products now challenged

---

[3] Similar to the FTC's attempts to apply an *ad hoc* moving standard to the DMC Defendants' advertising, so too was the standard applied by the Electronic Retailers Association in its ERSP self-regulatory program.  As was learned by the DMC defendants during that process, the ERSP is overseen by a single attorney with no scientific or medical background or training.  Moreover, the ERSP has no medical or scientific experts on staff and has no ability to review the scientific substantiation submitted by a participant.  These failings undermined the entire ERSP process, and made it clear to the DMC Defendants that the only credible forum for reviewing this advertising was this Court.

- 4 -

by the FTC.  As the FTC itself has recognized, and as Congress has declared, the evidence
gathered by the DMC Defendants need only provide them with a reasonable basis for the
statements made in the advertising.  *See id.* at 118 (advertising may not be banned "simply
because the scientific literature is inconclusive").  Based upon the scientific evidence gathered by
the DMC Defendants, even more controversial claims could have been made under this standard,
but they were not.  Instead, the DMC Defendants made certain that no specific curative or
treatment "claims" were made at all, and placed numerous and conspicuous disclaimers
throughout the advertising that stated specifically that the product was not a "cure" or
"treatment" for any disease, nor was the product designed to "diagnose" or "prevent" any
disease.  *Pearson v. Shalala*, 164 F.3d 650, 657 (D.C. Cir. 1999) (recognizing that commercial
speech must be evaluated in total, with consideration of disclaimers).

      The DMC Defendants ask that the Court review the substantiation provided to the Court
in detail, including the hundreds of studies and articles, as well as the detailed affidavits
submitted by the DMC Defendants' experts.  A review of this evidence leads to only one
conclusion:  that the DMC Defendants have taken very seriously the FTC's and this Court's
admonition to support its advertising, and has amassed such support.  The FTC seeks to shut
down the DMC Defendants' business while admitting that it has not even conducted a cursory
analysis of much of the scientific literature, has not reviewed the materials submitted by the
DMC Defendants, nor consulted more than one scientist.  If the substantiation provided by the
DMC Defendants does not even allow a trial on these issues, then the FTC's standard is no
standard at all, and Congress' mandate is meaningless.  *See Enforma*, 362 F.3d at 1216-17
(rejecting FTC's argument that its factual assertions should be accepted without a trial, in light of
contrary evidence submitted by defendants).

II.     **The DMC Defendants' Advertising Does Not Make**
        **the "Claims" Alleged by the FTC and is Not Misleading**

Much as it has done with its claims regarding the DMC call center, as discussed below, the FTC has come into this Court seeking the extraordinary relief of a receiver, based upon misleading arguments and a misleading record.  Specifically, the FTC extracts snippets from the DMC Defendants' advertising and claims that these snippets represent the entirety of the advertising.  That is simply untrue.  For example, in the advertising for Sea Vegg, the FTC ignores that on several occasions the show's guest, Scott Kennedy, states clearly that consumers on traditional pharmacological medications and treatments should remain on those medications and treatments in consultation with their doctors.  Likewise, Mr. Kennedy states clearly that patients should continue to seek the advice of medical professionals and should ask those professionals about any and all supplements before they take them.  The point is repeated over and over again that the products are *supplements*, and may have benefits to the overall health of consumers, who may otherwise lack the various nutrients and minerals contained in the products in their regular diets.  Combined with the scientific evidence gathered by the DMC Defendants, and the volume of disclaimers, this advertising is not misleading.  *See Pearson v. Shalala*, 164 F.3d at 659.

As with the substantiation provided to the Court, the DMC Defendants ask the Court to review the advertising challenged by the FTC closely, in context, and in light of the substantiation provided.[4]  When viewed in this fashion, the advertising is not misleading and

---

[4] Well aware that the FTC itself has conducted no studies or research whatsoever on the Flex Protex product, the FTC argues that the Flex Protex product is somehow substantially similar to the Supreme Greens product, because each product shares MSM and a ginger-based ingredient.  As set forth in the accompany affidavits, however, Flex Protex is an entirely different product, with a different core ingredient – rice – and a different intended use.  The Flex Protex product is therefore not similar at all to a greens product, and is certainly not "substantially" similar.  Moreover, as required by this Court's prior order, the DMC Defendants amassed an extraordinary amount of substantiation in connection with the Flex Protex product, which is produced by a publicly-traded company that has spent over $50 million developing and researching its products.  *See, e.g.*, *Langton v. Johnson*, 928 F.2d 1206, 1220 (1st Cir. 1991) (no violation of prior order where defendant has been "reasonably diligent and energetic" in

- 6 -

simply does not make the "claims" alleged by the FTC.  Moreover, the advertising allows consumers to make their own informed choices about dietary supplements, as Congress has directed.

### III.    The FTC's Misleading and Partial Evidence Regarding the DMC Call Center Should Be Rejected

In support of its motion for a receiver, the FTC alleged that the DMC sales staff is continuing to engage in a "widespread" practice of placing customers on its autoship program without receiving the customer's consent.  As evidence of this practice, the FTC placed before this Court certain select transcripts of undercover calls made by an agent of the FTC, Christina Turner, and implied that these transcripts were representative of the overall calls that were made to the call center.  The FTC selected just three transcripts to submit to the Court, but provided the Court with no information about how many total calls were made by Ms. Turner, what the substance of those calls contained, or whether those calls demonstrated that the practices alleged were in fact widespread.  As the FTC well knows, DMC's sales staff handles thousands of calls per day.  Thus, the context of the FTC's select sampling of a few calls is critical, and the lack of that context renders the FTC's "evidence" meaningless.[5]  Nonetheless, the FTC has provided no information to determine that context, despite repeated requests.

---

attempting to comply), citing *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990) ("Conduct that evinces substantial, but not complete, compliance with the court order may be excused if it was made as part of a good faith effort at compliance") and *Drywall Tapers, Local 1974 v. Local 530*, 889 F.2d 389, 394 (2d Cir. 1989).

[5] Similarly without basis is the FTC's contention that the DMC Defendants are somehow attempting to violate the Court's order through their distributors.  As has been explained previously to the Court and the FTC, DMC's distributors are independent companies with independent management and are not owned or controlled by the DMC Defendants.  These distributors may buy their products from a number of sources and are in no way required to purchase products from DMC.  Nonetheless, as required by the Court's order, the DMC Defendants distributed copies of the Court's order to their distributors and, when the DMC Defendants have become aware of statements made by distributors that appear to be unsupported, the DMC Defendants have contacted those distributors to request that the statements be removed or modified.

Given the importance of the context of the FTC's evidence of its calls to DMC's sales personnel, the FTC's conduct before this Court alone provides grounds for denial of the motion.[6] Specifically, upon finally receiving copies of the transcripts it had requested months ago, it is becoming clear that the FTC has deliberately withheld this information for as long as possible and misled this Court and the DMC Defendants about the true pattern of calls into the DMC call center.[7] Rather than demonstrating a pattern of efforts to place consumers on the autoship program without their consent, the transcripts provided demonstrate that the majority of DMC sales staff conduct themselves exactly as they should, by making certain the customer understands the terms of DMC's various programs and by obtaining their consent to the program before placing the order or charging the customer.[8] For example, in one such instance only disclosed within the last several weeks, the sales representative spent extra time with the undercover agent to explain the program, repeatedly stating that she wanted the customer to be comfortable with her order and understand the different plans. Contrary to the FTC's arguments, the sales representative then stated that she was *not* placing the customer on autoship, and so the customer did not need to worry about subsequent charges. Finally, the sales representative explained that the customer could return the product for a full refund for ninety days, as per company policy with every customer.

---

[6] Because of the egregiousness and manifest unfairness of the FTC's conduct in connection with the call center transcripts and evidence, the DMC Defendants have moved the Court for a continuance and for sanctions. That motion, which is incorporated herein, remains pending. The DMC Defendants believe that further discovery will completely undermine any validity of the FTC's undercover operation in connection with the DMC sales staff.

[7] The FTC further misled the Court in its Reply Brief, stating that Ms. Turner made nine calls to the DMC call center. Based just on the transcripts produced so far, including the four tapes recently "discovered", Ms. Turner appears to have made at least eleven calls, not nine, and another investigator made at least one additional call. Further, the FTC has never confirmed whether these are the only calls that were made. These misrepresentations render the FTC's evidence incredible, and it should be disregarded entirely.

[8] As noted in the DMC Defendants' motion for a continuance and sanctions, the FTC would agree to produce these transcripts only if the DMC Defendants would agree to restrict them to "attorneys' eyes only" and would not file them with the Court unless filed under seal. Given the Court's local rules regarding filings under seal, the transcripts have not been filed with this supplemental memorandum. However, the DMC Defendants will file the transcripts in whatever form the Court deems appropriate if it wishes to review them.

The FTC's conduct before this Court in connection with its arguments about DMC's sales practices is outrageous. By selectively placing evidence before this Court without placing that evidence in context, the FTC has shown that in its zeal to shut down DMC at any cost, it is willing to distort the record and mislead the Court. For example, the FTC still has not provided this Court or the DMC Defendants with any representation regarding the total number of calls to the DMC call center, despite repeated requests and written discovery seeking this information.[9] Without this basic information, the FTC's "evidence" is not evidence at all and must be rejected by the Court. On that basis alone, the FTC's motion for the extraordinary relief of a receiver should be denied.

## IV.    The Appointment Of A Receiver In This Case Would Be In Contravention Of Defendants' Commercial Speech Rights Under the First Amendment

The FTC's renewed call for a receiver is a not-too-subtle attempt to kill two birds with one stone. The receiver inevitably will close down the business operations of defendants who have not simply capitulated to the FTC's conclusory pronouncements and heavy-handed tactics. In the process, the FTC will be relieved of the time, effort and proof necessary to actually substantiate its claims in this Court. To be sure, the FTC does not argue that a receiver is needed to prevent the dissipation or secretion of assets (the alleged basis for the receiver in the first place) or that the defendants have violated the Court's Order in this regard.[10] FTC Memo. at 26. The ostensible purpose of the FTC's motion is to regulate the content and format of defendants'

---

[9] The FTC originally submitted three transcripts to the Court. After pressing for any and all other transcripts or recordings that might exist, the FTC initially stated just within the last several weeks that there were four additional transcripts. Then, after more time passed, the FTC admitted that four additional recordings existed, but they had not been transcribed. After they were quickly transcribed, they were produced. How many additional recordings of calls exist, or how many total calls were made remains unknown. In addition, the FTC still has not produced the tapes themselves, preventing the DMC Defendants from truly understanding the context of these calls.

[10] The Order enjoined the defendants from dissipating corporate assets and required an accounting. The Court declined to impose an asset freeze or to appoint a receiver, noting, however, that it would consider such relief **to ensure the enforceability of any judgment** if the accounting revealed that the defendants have, or are likely to conceal or place assets beyond the Court's reach pending final resolution of this case. Order at 14. The Commission begrudgingly acknowledges that there is no issue concerning the secretion of assets. FTC Memo. at 26 (emphasis added).

business products beforehand by replacing current management with a receiver who will be empowered, among a vast number of other powers, to "[d]etermine and implement the manner in which the Receivership Defendants will comply with, and prevent violations of, this Order and all other applicable laws, including, but not limited to, revising sales materials and implementing monitoring procedures." Proposed Order at 23. Obviously, especially given the identity of the FTC's proposed receiver, the FTC intends the receiver to serve as its functionary and close down the DMC Defendants' business.[11]  Its proposed receiver is Craig R. Jalbert, a principal of Verdolino & Lowrey, a firm of certified public accountants experienced in liquidating financially distressed companies. *See* Plaintiff Federal Trade Commission's Memorandum Regarding Proposed Receiver. It is disingenuous for the FTC to suggest, as it does, that Jalbert, after taking custody and control of defendants' business, "would manage the going concern portion of the business by working with qualified local personnel."[12] *Id.* Jalbert has no knowledge of or experience with television advertising or the health industry, nor does he have any experience in the marketing or sale of health-related products. Equally important, Jalbert certainly will not have the inclination and motivation to generate and develop new business opportunities to produce business income or the wherewithal to contend with and challenge the FTC's aggressive tactics and overreaching. It does not take a psychic to perceive the FTC's endgame, including the receiver's settlement and compromise of the instant action.[13]

---

[11] For example, because of his complete lack of experience in ITV's business, it clear that the receiver will quickly put an end to ITV's income stream, thus depleting the Company's assets. Further, the receiver will undoubtedly add significantly to the Company's expenses, through his own fees and the fees of third parties he will be required to retain to operate the business.

[12] The proposed order (¶O, p. 24) provides that the receiver shall:

> Continue and conduct the business of the Receivership Defendants in such manner, to such extent, and for such duration as the Receiver may in good faith deem to be necessary or appropriate to operate the business profitably and lawfully, if at all; provided, however, that the continuation and conduct of the business shall be conditioned upon the Receiver's good faith determination that the business can be lawfully operated at a profit using the assets of the receivership estate.

[13] Under the proposed order, the receiver would be empowered to defend, compromise or otherwise dispose of any actions or proceedings instituted against the Receivership Defendants, whether now pending or hereinafter filed, that

It is not surprising then that the FTC glosses over the lethal consequences of appointing a receiver over the DMC Defendants' businesses and ignores completely the ramifications of a receiver on their commercial speech rights under the First Amendment.[14]  Indeed, the FTC fails to discuss or even acknowledge the well-established legal analysis that guides and constrains the government's hand in regulating commercial speech, especially where, as here, the receiver would act as a de facto agent of the FTC and effectively serve as a prior restraint on the DMC Defendants' commercial speech.  Instead, the FTC gives short shrift to these constitutional issues by (i) "assuring" the Court that the appointment of a receiver is the least disruptive means of protecting consumers (FTC Memo. at 27) and (ii) essentially arguing that a receiver is needed because the FTC's statutory enforcement mechanisms and procedures are too cumbersome and slow to be effective.  FTC Supplemental Memo. at 11.

On the first point, the FTC argues that alternatives short of appointment of a receiver would actually require greater restrictions on defendants' business operations.  FTC Memo. at 31 ("Absent appointment of a receiver, the only way to protect consumers adequately would be to prohibit Defendants from making any health claims – not just misleading claims, prohibit the faux talk-show format, and prohibit the use of any continuity programs.").  The FTC goes so far as to put these words into the mouth of the Court in the proposed modified preliminary injunction (p. 19).

> 36.    Although the appointment of a receiver is an intrusive remedy; it is less intrusive than the other remedies the Court could consider to provide comparable protections to consumers and stop Defendants from spending corporate assets to air

---

the Receiver deems necessary to preserve the assets of the Receivership Defendants or to carry out the Receiver's mandate under this Order. *See* proposed order (¶ I) at 22.

[14] The FTC similarly fails to acknowledge that the appointment of a receiver is an extraordinary remedy that should be employed with the utmost caution and granted only in cases of clear necessity to protect plaintiff's interest in the property.  Wright, Miller & Marcus, 12 *Federal Practice and Procedure*, §2983 at 24; *FTC v. The Crescent Publishing Group, Inc.*, 129 F. Supp.2d 311, 326 (S.D.N.Y. 2001) (appointment of receiver is extraordinary remedy, to be employed cautiously and usually when no lesser relief would be effective); *Commodity Futures Trading Commission v. Comvest Trading Corp.*, 481 F. Supp. 438, 441 (D. Mass. 1978).

deceptive infomercials, which would be an absolute ban on any advertising of health benefits for any product, a ban on infomercials using the potentially deceptive talk-show format, and a prohibition on the enrollment of any new consumers onto continuity plans[.]

The FTC's characterization that the receiver will be merely "intrusive" is, of course, to make a molehill out of a mountain, especially given the extraordinary breadth of powers the receiver will exercise.  Even assuming that a receiver could somehow be deemed merely "intrusive" on defendants' business, the FTC's argument incorrectly assumes that "an absolute ban on any advertising of health benefits for any products, a ban on infomercials using the potentially deceptive talk show format, and a prohibition on the enrollment of any new consumers onto continuity plans" would pass muster under the same commercial speech analysis that constrains the Court's use of a receiver in these circumstances.  To the contrary, an absolute prohibition or suppression of commercial speech is justified under the First Amendment only in the narrowest of circumstances, not present here, and this is most especially true where the restrictions or remedies sought or imposed by a government agency such as the FTC acts as a prior restraint to speech.  The law is clear that the government cannot utilize restrictive remedies to regulate even potentially misleading commercial speech which are broader than reasonably necessary, and that there is a heavy burden against the constitutionality of imposing a prior restraint on commercial speech.  Here (even accepting the charade that the receiver will actually conduct business) the receiver, effectively serving as an arm of the Court and the de facto functionary of the FTC, is to decide and approve unilaterally the content of the commercial speech that the defendants will be allowed to pursue.  How this passes constitutional muster is not explained by the FTC, nor could it be.

These same First Amendment constraints equally answer the FTC's second point: that a receiver is required for the sake of "efficiency."  On this issue, the FTC argues that by the time experts are identified and retained, their reports prepared and briefs submitted to the Court, "ITV

has the benefit of several months of unimpeded access to millions of consumers, many of whom

may be particularly vulnerable to smooth sales pitches touting cures for chronic and, in some

cases, life-threatening diseases." FTC Supplemental Memo. at 11. While a justification for

restrictions on commercial speech based on the supposed gullibility of consumers has been

deemed in another case to be "almost frivolous,"[15] the underlying suggestion that efficiency

somehow trumps First Amendment (and Fifth Amendment) safeguards is wrong and nothing

short of fanciful.[16]

        In sum, the appointment of a receiver in this case will trample on defendants' First

Amendment rights, will effect the demise of defendants' business operations and thus will have

the opposite effect of preserving assets to satisfy any judgment in this case.

        A.    **First Amendment Restrictions On Commercial Speech.**

        It is axiomatic that commercial speech is protected by the First Amendment. *Central*

*Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 100 S.

Ct. 2342, 65 L.Ed.2d 341 (1980); *Virginia State Board of Pharmacy v. Virginia Citizens*

*Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d. 346 (1976); *Pearson v. Shalala*,

164 F.3d at 655 (FDA restrictions on appellants' health claims are evaluated under the

commercial speech doctrine); *FTC v. Brown & Williamson Tobacco Corp*., 778 F.2d 35, 43

(D.D.C. 1985). A restriction on protected commercial speech is valid only if it seeks to

implement a substantial government interest, directly advances that interest and reaches no

---

[15] *See Pearson v. Shalala*, 164 F.3d 650, 655 (D.C. Cir. 1999) where the court rejected the FDA's similar argument that health claims lacking significant scientific agreement are inherently misleading because they have such an awesome impact on consumers so as to make it virtually impossible for them to exercise any judgment at the point of sale. "It would be", the *Pearson* court continued, "as if the consumers were asked to buy something while hypnotized, and therefore they are bound to be misled. We think this contention is almost frivolous." *Id.*.

[16] The FTC's efforts to end-run their own processes and procedures in an effort to prohibit all of the DMC Defendants' speech violate the First and Fifth Amendment's to the Constitution, as well as the Administrative Procedure Act. Because of the seriousness of these Constitutional violations, the DMC Defendants filed a complaint with this Court against the FTC on September 23, 2005, captioned *Direct Marketing Concepts, Inc. v. FTC*, 05-11930 GAO, seeking declaratory and injunctive relief protecting the DMC Defendants' Constitutional and statutory rights in connection with its future advertising.

further than necessary to accomplish the given objective. *Central Hudson*, 447 U.S. at 563-66; *Pearson*, 164 F.3d at 655-59; *Lorillard Tobacco Co. v. Reilly*, 84 F. Supp.2d 180, 184 (D. Mass. 2000). While false and deceptive advertising may be regulated or potentially banned, "any restrictions imposed on deceptive commercial speech can be no 'broader than reasonably necessary to prevent the deception." *Brown & Williamson*, 778 F.2d at 43 *citing In re R.M.J.*, 455 U.S. 191, 203 (1982). Indeed, "the restriction imposed may not 'place an absolute prohibition on potentially misleading information if the information may also be presented in a way that is not deceptive.'" *Id.*; *Pearson*, 164 F.3d at 655.[17]

The appointment of a receiver in this case also implicates the law of prior restraints of speech.[18] A prior restraint on speech prohibits or censors speech before it can take place and includes judge issued injunctions against the publication of information. *Cooper v. Dillion*, 403 F.3d 1208, 1215 (11th Cir. 2005).[19] Prior restraints raise any number of important concerns on the Constitutional right to free speech. A prior restraint imposes censorship prior to an adjudication that the speech is in fact misleading or fraudulent. As the Supreme Court has noted, "[t]he special vice of a prior restraint is that communication will be suppressed, either directly or indirectly, by inducing excessive caution in the speaker, before an adequate determination that it

---

[17] In *Pearson*, which also concerned the regulation of health care supplements, the court rejected the FDA's contention that the government is free under the First Amendment to choose a policy of suppression over disclosure. The government may not choose substantially excessive restrictions and disregard far less restrictive and precise means. 164 F.3d at 657-58.

[18] The Second Circuit in *New York Magazine, A Division of Primedia Magazines, Inc. v. The Metropolitan Transportation Authority*, 136 F.3d 123, 131 (2d Cir. 1998) rejected the contention that commercial speech is outside the ambit of prior restraint law, noting the Supreme Court's test in commercial speech cases that regulation be no more extensive than necessary.

[19] *Overstreet v. United Brotherhood of Carpenters and Joiners of America, Local No. 1506*, 409 F.3d 1199, 1218 (9th Cir. 2005) (preliminary injunction against speech creates significant risks to the First Amendment); *Weaver v. Bonner*, 309 F.3d 1312, 1323 (11th Cir. 2002) *citing Alexander v. United States*, 509 U.S. 544, 550 (1993) (prior restraints include administrative and judicial orders forbidding communications).

- 14 -

is unprotected by the First Amendment." *Pittsburg Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390 (1973).[20]

Moreover, a prior restraint often improperly prohibits *future* speech on the basis of *past* misconduct. The mere prospect that future speech may be unlawful is not sufficient to impose a prior restraint. *Weaver*, 309 F.3d at 1323 *citing Near v. Minnesota*, 283 U.S. 697 (1931) and *Vance v. Universal Amusement Co.*, 445 U.S. 308 (1980).[21] Thus, a prior restraint may well suppress future speech that is not misleading and therefore is entitled to full protection,

Equally forbidden is any mechanism imposed by the government requiring prior review and approval of the content of speech. Again, the Supreme Court has often recognized that a government may not implement a scheme of prior restraint of future speech by placing unbridled discretion in the hands of a government official or agency to review or approve the speech. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225-26, 110 S.Ct. 596, 107 L.Ed.2d. 603 (1990); *see also Café Erotica of Florida, Inc. v. St. John's County*, 360 F.3d 1274, 1284 (2004) (ordinance determined to be an unconstitutional prior restraint because of discretion granted to County Administrator extended beyond permissible boundaries); *Telco Communications, Inc. v. Carbaugh*, 885 F.2d 1225, 1233 (4th Cir. 1989).[22] For these reasons and others, it has often been

---

[20] *See also Overstreet*, 409 F.3d at 1218 ("While [t]he First Amendment does not protect fraud, an injunction issued 'before an adequate determination that it is unprotected by the First Amendment' presents the 'special vice of a prior restraint.'") *quoting Pittsburg Press, supra; Weaver*, 309 F.3d at 1323 ("The Supreme Court has consistently recognized a distinction between remedial injunctions and unconstitutional prior restraints").

[21] *Securities & Exchange Commission v. Wall Street Publishing Institute, Inc.*, 851 F.2d 365, 370 (D.C. Cir. 1988); s*ee also Lowe v. Securities and Exchange Commission*, 472 U.S. 181, 235, 105 S.Ct. 2557, 86 L.Ed.2d 135 (1985) (White, J. concurring) ("Our commercial speech cases have consistently rejected the proposition that such drastic prohibitions on speech may be justified by the mere possibility that the prohibited speech will be fraudulent."); *Commodity Futures Trading Commission v. Vartulli*, 228 F.3d 94, 110 (2d Cir. 2000) (while past fraud ordinarily may be punished without provoking First Amendment concerns the same is not true of measures that restrict speech in an attempt to guard against future misrepresentation or abuse).

[22] *Telco Communications* is instructive. In that case, the Fourth Circuit considered a Virginia law governing charitable solicitations. In pertinent part, the law required solicitors to submit the script of an oral solicitation to the Commissioner of the Department of Agriculture and Consumer Services at least 10 days prior to commencing the solicitation. 885 F.2d at 1232. The Commissioner argued that this restriction promoted the state's interest in the prevention of fraud and misrepresentation in solicitation and that the requirement was the only effective regulation of telephone solicitation. The Court struck down the requirement as an unconstitutional prior restraint, noting that

noted that any system of prior restraint bears a heavy presumption against its constitutional

validity. *FW/PBS, Inc.*, 493 U.S. at 225; *Telco*, 885 F.2d at 1233 *quoting Bantam Books v.*

*Sullivan*, 372 U.S. 58, 70 (1963).

These First Amendment principals apply equally to agencies such as the FTC. As the

Third Circuit has noted, the FTC, like any governmental agency, must start from the premise that

any prior restraint is suspect, and that a remedy, even for deceptive advertising, can go no further

than is necessary for the elimination of the deception. *Beneficial Corporation v. FTC,* 542 F.2d

611, 619-620 (3d Cir. 1976); *Standard Oil Co. of California v. FTC*, 577 F.2d 653, 661-62 (9th

Cir. 1978) (FTC's discretion is not unlimited: remedy must have a reasonable relation to the

unlawful practice found to exists and the FTC must exercise restraint in formulating remedial

orders that may amount to a prior restraint on protected commercial speech).[23]

## B.     The Appointment Of A Receiver In This Case Would Violate These First Amendment Principles

The appointment of a receiver in this matter would be fundamentally at odds with First

Amendment restraints on defendants' commercial speech rights.[24] A receiver goes far beyond

any reasonable measures needed to prevent any perceived false or misleading health claims in

the new advertising of which the FTC complains. The FTC makes no attempt to explain how the

---

prior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment rights. While acknowledging that the restriction may be the most effective means of monitoring telephone solicitations, the court noted that "the First Amendment does not permit the State to sacrifice speech for efficiency." 885 F.2d at 1233 *quoting Riley v. National Federation of the Blind of N.C.*, 487 U.S. 781, 108 S.Ct. 2667, 2676, 101 L.Ed.2d 669 (1988). Vigorous enforcement of the Commonwealth's anti-fraud and misrepresentation statutes, the court found, "'punish[es] the few who abuse rights of speech **after** they break the law' rather than 'throttle them and all others beforehand.'" *Id. citing Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975) (emphasis in original).

[23] In *Standard Oil* the FTC's cease and desist order required a written report from the company reciting compliance with the order. The court noted that orders were overbroad where they go far beyond elimination of the specific misrepresentations made and beyond what in fairness could be deemed necessary to deter unlawful conduct. *Standard Oil*, 577 F.2d at 661-662. "At a minimum, administrative agencies may not pursue rigorous enforcement to the extent of discouraging advertising with no concomitant gain in assuring accuracy and truthfulness. *Id*. at 662.

[24] Under these First Amendment principles, the FTC is patently wrong in its suggestion that the Court would be empowered to place an absolute ban on any advertising of health benefits for any products, a ban on infomercials using the potentially deceptive talk show format, and a prohibition on the enrollment of any new consumers onto continuity plans."

appointment of a receiver squares with *Central Hudson* and its progeny. It can hardly be said that a receiver in this case "reaches no further than necessary to accomplish the [FTC's] given objective." *Central Hudson*, 447 U.S. at 563; *Beneficial Corporation,* 542 F.2d at 620 (remedy, even for deceptive advertising, can go no further than is necessary for the elimination of the deception). Moreover, imposing a receiver effectively would violate the rule that any "restriction imposed may not 'place an absolute prohibition on potentially misleading information if the information may also be presented in a way that is not deceptive.'" *Brown & Williamson*, 778 F.2d at 43; *Pearson*, 164 F.3d at 655. Clearly, notwithstanding the defendants' abundant evidence that the new programming is based on substantial scientific evidence and is not misleading, any difficulties the Court may perceive with this programming could have been addressed adequately through an appropriately tailored disclaimers or other orders of the Court.

Nor does the FTC's constant refrain of "pervasive fraud" justify a receiver. The so-called pervasive fraud is based on the continued use of what the FTC repeatedly characterizes as a deceptive talk show format and the alleged improper sales practices by defendants' sales representatives concerning the autoship or continuity program. On the first issue, the Commission simply ignores the Court's previous judgment that any potential for misleading consumers based on a talk show format would be remedied by a disclosure that the programming is a paid advertisement.[25] The FTC does not argue that the new programming lacks these disclaimers, nor does it offer evidence that the disclaimers are ineffective. It simply brushes aside the Court's judgment and plows ahead in its pleadings with repeated pronouncements of defendants' use of a "deceptive format."

---

[25] Indeed, the premise that consumers would mistake commercial programming obviously devoted with the sale of a product with such talk shows as Larry King and thereby (one assumes) invest the product with a veneer of credibility is far fetched and again is based on the perceived notion that consumers are essentially brain dead at the point of sale. *See Pearson*, 164 F.3d at 655.

On the autoship issue, aside from the fact that the Commission's "evidence" on this score is thoroughly misleading and deceptive, there is no reasonable argument that the extraordinary remedy of a receiver is required to address the few instances cited by the FTC when the defendants' sales representatives arguably could have been more clear on the terms of the autoship program.  This is particularly so where it is undisputed by the FTC that all of the DMC Defendants' customers have a money-back guarantee that is communicated to them with every purchase.  Thus, even if a few customers claim they were placed on autoship in error, there already exists a simple remedy that falls far short of a receiver – the customer can simply call and cancel the order for a full refund.

In sum, even aside from the First Amendment's substantial limitations on regulating commercial speech and imposing prior restraints, the FTC's basis for imposing a receiver in this case is woefully deficient when measured against the common law standard for this extraordinary equitable relief.  *See FTC v. The Crescent Publishing Group, Inc.*, 129 F. Supp.2d 311, 326 (S.D.N.Y. 2001) (appointment of receiver is extraordinary remedy, to be employed cautiously and usually when no lesser relief would be effective).  As the Ninth Circuit recognized in reversing the district court's imposition of injunctive relief in *Enforma*, the existence of genuine factual disputes prevents such extraordinary remedy.  362 F.3d at 1215 (evidence presented by FTC in support of injunctive relief was insufficient where evidence presented by defendants raised "a genuine dispute as to whether the FTC would prevail on the merits").

The inappropriateness of a receiver in this case is magnified when First Amendment prior restraint law is considered.  Here, even ignoring the obvious – that the receiver will simply close down defendants' businesses – the plain fact is that the receiver will control the content of the DMC Defendants' commercial speech and in all likelihood serve the bidding of the FTC.  It is

- 18 -

patently unrealistic to expect the receiver to resist the pressure of the FTC and champion the DMC Defendants' constitutionally protected commercial speech rights. Instead, the receiver will simply seek the FTC's approval of whatever programming the receiver thinks appropriate in the first instance. In this way, the DMC Defendants' commercial speech rights effectively will be subject to the FTC's veto *prior* to dissemination.[26] Further, as the receiver is an arm of the Court there is a significant potential of entangling the Court – the impartial arbiter of the parties' disputes – in the receiver's substantive decisions on the content of defendants' commercial speech. In short, whether unilaterally dictated by the receiver or subject to review and approval by the FTC, the DMC Defendants' speech will be suppressed without any adjudication by the Court whether or not the programming is constitutionally protected commercial speech. *Pittsburg Press Co.*, 413 U.S. at 390. This is clearly akin to a scheme of prior restraint of future speech, by placing unbridled discretion in the hands of a government official or agency to review or approve the speech. *FW/PBS, Inc.*, 493 U.S. at 225-26. Such suppression is presumptively unconstitutional, *FW/PBS, Inc.*, 493 U.S. at 225; *Telco*, 885 F.2d at 1233, and the FTC provides no compelling justification to warrant such an extreme measure. Certainly, as noted, the suppression of defendants' future commercial speech cannot be predicated on the existence of a preliminary injunction and the FTC's mere belief that defendants' future programming will likely be misleading. *Lowe*, 472 U.S. at 235.

In the end, the FTC's sole argument for the imposition of a receiver is simply based on prophylactic efficiency: it is easier and involves less time and effort for the FTC to control defendants' programming through a receiver that it does for it to seek judicial intervention. See

---

[26] *See Standard Oil* where the court noted that the vice inherent in an overly broad FTC order lies in part in the requirement that one who is subject to its terms must 'either expose his major business decisions to a Commission veto, or remain in the dark regarding their legal consequence. 577 F.2d at 661-62.

FTC Supplemental at 11.  This rationale, of course, has been repeatedly rejected as a basis for the

prior suppression of speech.  As the Supreme Court long ago observed,

> Frauds may be denounced as offences and punished by law. . . .  If it be said that
> these means are less efficient and convenient that bestowal of power on police
> authorities to decide what information may be disseminated . . . and who may
> impart the information, the answer is that considerations of this sort do not
> empower [government] to abridge freedom of speech and press.

*Scheinder v. State*, 308 U.S. 147, 164, 60 S.Ct. 146 (1939).  *See also Telco*, 885 F.2d at 1233.

The appointment of a receiver in this case would violate fundamental principles

protecting the defendants' commercial speech rights under the First Amendment and must be

denied.

## CONCLUSION

For all of the foregoing reasons, as well as those set forth in the DMC Defendants'

Opposition, the FTC's motion to amend the Court's Preliminary Injunction and appoint a

receiver should be denied.

DIRECT MARKETING CONCEPTS, INC., ITV
DIRECT, INC., AND DONALD W. BARRETT

By their attorney(s),


 /s/ Christopher Robertson
Peter S. Brooks, BBO #058980
Christopher F. Robertson, BBO #642094
Susan W. Gelwick, BBO #567115
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Telephone:     (617) 946-4800
Telecopier:     (617) 946-4801

Dated: September 29, 2005