UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

2005 DEC 15  A 9: 12

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| Plaintiff | ) |
| v. | ) |
| | ) |
| DIRECT MARKETING CONCEPTS, INC., et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

Civ. No. 04-11136 - GAO

**FEDERAL TRADE COMMISSION'S RULE 56.1
STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

## I.    PARTIES

1.    The Federal Trade Commission is an independent agency of the United States

Government created by the FTC Act, 15 U.S.C. §§ 41-58.  The Commission is charged, among

other things, with enforcement of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and

52, which, respectively, prohibit deceptive acts or practices in or affecting commerce, and false

advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce.

2.    On June 1, 2004, the Commission filed the initial Complaint in this action,

naming as defendants Direct Marketing Concepts, Inc., d/b/a Today's Health and Direct

Fulfillment; ITV Direct, Inc., d/b/a Direct Fulfillment; Donald W. Barrett; Healthy Solutions,

LLC d/b/a Direct Business Concepts; Health Solutions, Inc.; Alejandro Guerrero, a/k/a Alex

Guerrero; Michael Howell; Greg Geremesz; Triad ML Marketing, Inc.; King Media, Inc.; and

Allen Stern.  FTC Summary Judgment Exhibit 1 ("S.J. Ex.") (Complaint for Permanent

Injunction and Other Equitable Relief [Dkt. # 1]).[1]

3.      In April 2005, the Complaint was amended to name one additional liability

defendant, Robert Maihos ("Maihos"), and three relief defendants: B.P. International, Inc.,

Steven Ritchey and Lisa Stern. S.J. Ex. 2 (Complaint for Permanent Injunction and Other

Equitable Relief ¶¶ 18-20 [Dkt. No. 67] (hereafter "Amended Complaint")).[2]

4.      On September 28, 2005, the Court entered the Stipulated Final Order for

Permanent Injunction  and Settlement of Claims for Monetary Relief As to Defendants Health

Solutions, Inc. and Alejandro Guerrero that had been submitted by the Commission.  [Dkt. #114]

5.      On September 29, 2005, the Court entered the Stipulated Final Order for

Permanent Injunction  and Settlement of Claims for Monetary Relief As to Defendants Healthy

Solutions, LLC, Gregory Geremesz, and Michael Howell that had been submitted by the

Commission.  [Dkt. #116]

6.      On May 26, 2005, the Commission filed a motion seeking modification of the

Preliminary Injunction and appointment of a receiver over DMC and ITV, citing, *inter alia*, the

DMC/ITV Defendants' recent dissemination of infomercials making health and disease claims

for several new products.  [Dkt. #68].  The motion was fully briefed by the parties – including the

DMC/ITV Defendants' violation of the Preliminary Injunction via the advertising of one of those

new products – and argument was heard by the Court on October 14, 2005. [Dkts. #70, 89, 94,

---

[1]  For the Court's convenience, a copy of the Commission's original complaint is
included as S.J. Ex. 1 in the accompanying volumes of exhibits.

[2]  A copy of the Amended Complaint is included as S.J. Ex. 2.  The Commission is not,
however, including with the instant Motion copies of the video cassettes containing the two
infomercials at issue, which were submitted as Exhibits 1 and 5 to the Amended Complaint.  See
Dkt. #67.

104, 117]

7.      Defendant Direct Marketing Concepts ("DMC") is a Massachusetts corporation with its principal place of business at 55 Cherry Hill Drive, Beverly, Massachusetts. S.J. Ex. 3, at ¶ 2.

8.      DMC was incorporated in Massachusetts in June 2001. S.J. Ex. 5, at ¶ 3 and Attachment 1 (Declaration of Christina E. Turner in Support of Plaintiff's Motion for Temporary Restraining Order [Dkt. #6]); S.J. Ex. 12, at ¶ 2, and Att. 1 .[3]

9.      The DMC/ITV Defendants[4] admit that DMC has advertised, offered for sale, sold, and/or distributed Coral Calcium Daily. S.J. Ex. 4, at ¶ 22 (Answer of Direct Marketing Concepts, ITV Direct, Inc., Donald W. Barrett and Robert Maihos to the Amended Complaint).

10.     The DMC/ITV Defendants admit that DMC has sold Coral Calcium Daily and produced a coral calcium infomercial featuring Robert Barefoot. Id. at ¶ 5.

11.     The DMC/ITV Defendants admit that DMC's coral calcium infomercial was aired on various national and local networks, and that a toll-free number appeared during the course of the infomercial for consumers to call to purchase Coral Calcium Daily. Id. at ¶ 24.

12.     Defendant ITV Direct, Inc. ("ITV") is a Massachusetts corporation with its principal place of business at 55 Cherry Hill Drive, Beverly, Massachusetts. S.J. Ex. 3, at ¶ 3.

13.     ITV was incorporated in Massachusetts in January 2003. S.J. Ex. 5, at ¶ 5 and

---

[3] Ms. Turner's May 30, 2004 declaration, accompanied by those exhibits on which the Commission is now relying in its motion for summary judgment, is included as S.J. Ex. 5.

[4] Defendants Direct Marketing Concepts, Inc., ITV Direct, Inc., Donald W. Barrett, and Robert Maihos will jointly be referred to as "the DMC/ITV Defendants." Defendants King Media, Inc., Triad ML Marketing, Inc., and Allen Stern will jointly be referred to as "the Stern Defendants."

Att. 3; S.J. Ex. 12, at ¶ 4, and Att. 2

14.    The DMC/ITV Defendants admit that ITV has advertised, offered for sale, sold, and/or distributed Supreme Greens. S.J. Ex. 4, at ¶ 28.

15.    The DMC/ITV Defendants admit that ITV has sold Supreme Greens with MSM and produced an infomercial for Supreme Greens featuring Alejandro Guerrero. Id. at ¶ 5.

16.    The DMC/ITV Defendants admit that ITV's Supreme Greens infomercial was aired on various national and local networks, and that a toll-free number for consumers to call was provided in the infomercial. *Id.* at ¶ 30.

17.    DMC and ITV have both transacted business in Massachusetts. *Id.* at ¶¶ 5, 6.

18.    Defendant Donald Barrett ("Barrett") is the President and a Director of both DMC and ITV. S.J. Ex. 4, at ¶ 7.

19.    Barrett testified that DMC and ITV produce infomercials, buy media time for them, answer the telephones when consumers call to order products, ship the products to consumers and handle customer service for those infomercials. S.J. Ex. 6, at 15:22 - 16:12.[5]

20.    In addition to selling direct to consumers, the DMC/ITV Defendants use distributors, who are independent companies with independent management and control, and are not owned or controlled by the DMC/ITV Defendants to sell their advertised products. S.J. Ex. 18, at ¶ 33.

21.    Barrett testified that there was overlap between the functions of DMC and ITV, and that he did not think there were specific functions for one company versus the other. S.J. Ex. 7, at 10:6 - 10:12.

---

[5] The citation "15:22 - 16:12" means that the transcript portion at issue runs from page 15, line 22, though page 16, line 12.

22.     Barrett testified that Direct Fulfillment, Inc., DMC, and ITV are "all really one in the same." *Id.* at 10:24 - 11:4.

23.     Barrett testified that "Today's Health" is a d/b/a used by DMC and ITV.  S.J. Ex. 6, at 15:3 - 15:21.

24.     Barrett owns 50% of DMC and ITV.  S.J. Ex. 8, at 31:19 - 31:24.

25.     Barrett resides in Massachusetts.  S.J. Ex. 7, at 9.

26.     Barrett oversees the editing and revising of DMC's infomercials.  S.J. Ex. 9, at 119:3 - 119:5.

27.     Barrett was ultimately responsible for contents of brochures and packaging inserts disseminated by the DMC/ITV Defendants.  S.J. Ex. 9, at 141:8 - 141:14.

28.     Barrett had the final say on all matters involving the sales room, including the contents of the scripts and power sheets used by the sales representatives.  S.J. Ex. 10, at 21:3 - 21:12, 27:14 - 28:19, and at Att. 2 (ITV-4).

29.     Defendant Robert Maihos ("Maihos") is an officer and director of DMC and ITV.  S.J. Ex. 4, at ¶ 8.

30.     Maihos owns 50% of DMC and ITV.  S.J. Ex. 8, at 31:13 - 31:18, 42:23 -43:4.

31.     Maihos resides in Massachusetts.  S.J. Ex. 11 at ¶ 7.

32.     Barrett and Maihos are the sole officers of DMC and ITV.  S.J. Ex. 12 and Att. 1 and 2.

33.     For approximately the first year after DMC was incorporated, Maihos was the company's President.  Barrett became President of DMC in approximately October 2002.  S.J. Ex. 8, at 11; S.J. Ex. 5, and Att. 1.

34.     Maihos filed a declaration in this case in which he stated that he is responsible for

the day-to-day operations of both DMC and ITV. S.J. Ex. 13, at ¶ 1. *See also* S.J. Ex. 8, at Att. 1 (ITV-210) at 6:9 - 6:12, 7:22 - 8:3.

35.     Maihos' responsibilities on behalf of DMC include overseeing shipping, customer service, and finances. He makes sure bills are paid, works with vendors to purchase the products sold to consumers, and has authority to sign checks for DMC and to enter into contracts for the company. S.J. Ex. 8, at 11:5- 11:7, 12:16 - 13:3, 13:25 - 14:22, 17:12 - 17:18, 29:25 - 30:2.

36.     Maihos' responsibilities for ITV include handling the company's merchant account. S.J. Ex. 8, at 188:5 - 188: 14; S.J. Ex. 9, at Att. 10 (ITV-81) at DMC041329 (meeting minutes from Dec 5, 2002 state that "Bob is still waiting for final word from Chase").

37.     Maihos has authority to write checks and sign contracts on behalf of ITV. S.J. Ex. 8, at 58:11 - 58:21.

38.     Barrett and Maihos are the ultimate decisionmakers for both DMC and ITV. S.J. Ex. 12, at ¶ 5 and Att. 3 at 8:1 - 8:5.

39.     Triad ML Marketing, Inc. ("Triad") is a Pennsylvania corporation with its principal place of business at 656 East Swedesford Road, Suite 330, Wayne, PA 19087. Triad transacted business in Massachusetts. S.J. Ex. 14, at ¶ 13.[6]

40.     King Media, Inc ("King Media") is a Pennsylvania corporation with its principal place of business at 656 East Swedesford Road, Suite 330, Wayne, PA 19087. King Media transacted business in Massachusetts. *Id.* at ¶ 14.

41.     Allen Stern ("Stern") admits that he is the President and CEO of Triad and King

---

[6] Defendants King Media, Inc., Triad ML Marketing, Inc., and Allen Stern did not file an answer to the Commission's Amended Complaint. Accordingly, the paragraph numbers in their Answer cited herein by the Commission correspond to the paragraphs of the Commission's original Complaint.

Media and that he directs, controls, formulates or participates in the acts and practices of Triad and King Media. *Id.* at ¶ 15; S.J. Ex. 15, at 11:18 - 11:20, 21:15 - 23:3, 24:13 - 24:14.

42.    Stern has been the President of both King Media and Triad since the companies' inceptions. S.J. Ex. 15, at 11:18- 11:23, 18:5 - 18:12,

43.    Stern is the ultimate decision-maker for both Triad and King Media. S.J. Ex. 16, at 15:17 - 15:24, 20:17 - 20:22.

44.    Stern currently owns two-thirds of both King Media and Triad. S.J. Ex. 15, at 11:18 - 12:4, 18:13 - 18:17.

45.    King Media is a TV media-buying agency that purchases television time for direct response clients. S.J. Ex. 15, at 11:2 - 11:9; S.J. Ex. 16, at 10:23 - 11:2.

46.    The Stern Defendants admit that King Media purchased media time for an infomercial entitled "Coral Calcium Daily." S.J. Ex. 14, at ¶ 14.

47.    Steven Ritchey testified that Triad's business is to assist direct response clients by finding third-party vendors to fulfill whatever requirements those clients have, such as managing fulfillment (the packaging and shipping of products to consumers), and assisting with order volumes. S.J. Ex. 16, at 17:13 - 17:24.

48.    Triad used its merchant account to process credit card charges for clients that did not have merchant accounts. S.J. Ex. 15, at 17:11 - 17:15.

49.    The Stern Defendants admit that Triad contracted for and oversaw fulfillment of consumer orders for the Coral Calcium Daily product and that Triad's merchant account was used to process credit card transactions for consumer orders and to administer consumer refunds. S.J. Ex. 14, at ¶ 13.

50.    Triad handled all management of the coral calcium infomercial, including

purchasing the product from a manufacturer, processing consumer orders, packaging and

shipping the product to consumers, and processing credit card orders. S.J. Ex. 15, at 59:13 -

60: 3, and Att. 6 (Triad-49) at 12:14 - 13:8.

51.    The Stern defendants admit that their acts and practices as alleged in this

Complaint are or have been in or affecting commerce, as "commerce" is defined in Section 4 of

the FTC Act, 15 U.S.C. §§ 44. S.J. Ex. 14, at ¶ 17.

52.    The Stern defendants admit that this Court has subject matter jurisdiction over this

case and that venue in this district is proper. S.J. Ex. 14, at ¶¶ 2, 3.

53.    Relief Defendant Lisa Stern is Allen Stern's ex-wife. S.J. Ex. 15, at 12:16 -

12:25.

54.    Relief Defendant Lisa Stern is a former owner and officer of Triad and King

Media. *Id.* at 21:15 - 23:22.

55.    Relief Defendant Lisa Stern's maiden name was Lisa Sagett. *Id.* at 12:21 - 13:5.

56.    Records from the Pennsylvania Department of State list Lisa Stern as an officer of

Triad as of March 2003, and Lisa Sagett as an officer of King Media as of March 2003. *Id.* at

Att. 3 (Triad-37).

57.    From the time King Media was incorporated until approximately mid-2003, Relief

Defendant Lisa Stern owned 33% of King Media, and Stern owned 33%. *Id.* at 12:13 - 13:9.

58.    From 1996 to approximately mid-2003, Relief Defendant Lisa Stern owned 66%

of Triad, according to Triad's income tax returns. *Id.* at 123:16 - 124:24.

59.    According to Stern, she shared her 66% ownership with him: 33% for her and

33% for him. *Id.* at 124:5 - 124:24.

60.    Relief Defendant Steven Ritchey is a corporate officer of both King Media and

Triad, and has owned 33% of both companies since their respective inceptions. S.J. Ex. 16, at

10:8 - 10:16, 12:11 - 12:21, 16:19 - 16:23, 18:15 - 18:21.

61.    Relief Defendant BP International, Inc., is a Nevada corporation with its principal

place of business in Reno, Nevada, and its Massachusetts office located at 40 Elliot Street., Apt,

1, Beverly, Mass. 01915. S.J. Ex. 12, at ¶ 6 and Att. 4.

62.    The records of the Commonwealth of Massachusetts show that BP International,

Inc., was incorporated in Nevada on April 18, 2002. S.J. Ex. 12, at Att. 4.

63.    Steve Paris is the sole officer and director of BP International, Inc. *Id.*

64.    Steve Paris is the Registered Agent of BP International, Inc., and he resides at 40

Elliot Street., Apt, 1, Beverly, Mass. 01915. *Id.*

65.    Steve Paris is Donald Barrett's cousin, and a former employee of DMC. S.J. Ex.

8 , at 117, 158; S.J. Ex. 7, at 244:17 - 244:18.

66.    Barrett is a signatory on the BP International, Inc. bank account. S.J. Ex. 20, at

¶ 8 and Att. 2.

67.    Barrett is not aware of any difference between BP Marketing and BP

International. S.J. Ex. 7, at 241:9 - 241:21.

## II.    CORAL CALCIUM

### A.    The Advertising and Sale of Coral Calcium Daily

68.    In late 2001, Barrett sent a letter to Kevin Trudeau ("Trudeau") asking Trudeau if

he would be interesting in working with Barrett on a project involving a coral calcium product.

In the letter, Barrett stated "I'm working closely with Allen Stern and King Media on these two

projects and have the ability to ramp up the media. If it interests you to improve on what we

have I would be more than glad to pay you 5% of the net sales including autoship." S.J. Ex. 6, at

22:13 - 23:9, and Att. 1 (Barrett Ex. 2).

69.     On November 6, 2001, Stern sent a letter to Trudeau that enclosed two coral calcium infomercials that had been filmed with Robert Barefoot ("Barefoot"). The letter stated that "Donald Barrett asked to send you the T-Coral show." The letter also stated that "Donald mentioned that you might be interested in redoing the show with Barefoot" and that "Our deal with Donald is that we test and roll out the shows buying the time ourselves, using either Donald or West [Telemarketing] to take the calls and our merchant accounts." S.J. Ex. 15, at 36:9 - 36:20, and Att. 4 (Triad-38).

70.     Stern drafted a proposed contract between Barrett and Trudeau relating to the coral calcium infomercial. *Id.* at 58:23 - 59:17, and Att. 6 (Triad-49) at 60:2 -61:23.

71.     Stern included Triad as a party to the proposed contract between Barrett and Trudeau relating to the coral calcium infomercial because Triad was "involved." S.J. Ex. 15, at 60:23 - 61:15, and Att. 6 (Triad-49) at 64:8 - 64:19.

72.     In late 2001, Barrett paid Trudeau $25,000 to film an infomercial for a coral calcium product. S.J. Ex. 6, at 27:12 - 28:21, 41:22 - 42:3, and Att. 2 (Barrett Ex. 4).

73.     The coral calcium infomercial, featuring Trudeau and Barefoot (hereinafter "coral calcium infomercial") was filmed at Burbank Studious in California in December 2001. *Id.* at 40:19 - 41:11.

74.     On or about December 24, 2001, Trudeau sent a copy of the finished infomercial to Barrett. *Id.* at 44:21 - 45:9, 48:17 - 48:19.

75.     In late December 2001, the coral calcium infomercial started to air. S.J. Ex. 7, at Att. 8 (ITV-134) at ¶ 23.

76.     The DMC/ITV Defendants did not have the coral calcium infomercial reviewed

by an attorney prior to it going on the air. S.J. Ex. 8, at 96:1 - 96:6.

77.    Maihos did not request or receive substantiation for the claims made in the coral calcium infomercial before it began to air. S.J. Ex. 8, at 77:22 - 78:20.

78.    King Media and Triad do not have a practice of having infomercials reviewed for compliance with FTC law prior to dissemination. S.J. Ex. 16, at 145:5 - 145:25.

79.    Prior to purchasing air time for the coral calcium infomercial, Stern and his companies did not ask for or receive substantiation for the claims made in the infomercial. S.J. Ex. 15, at 62:11 - 62:19; S.J. Ex. 16, at 143:9 - 143:18.

80.    Prior to purchasing air time for the coral calcium infomercial, Stern and his companies did not have anyone with a science background review the infomercial. S.J. Ex. 15, at 63:8 - 63:11.

81.    Numerous statements were made in the coral calcium infomercial about the benefits of coral calcium, including the following passages:

> A.    KEVIN TRUDEAU: Okay. So here's the question. I asked myself, will I get cancer? Can I know?
>
> ROBERT BAREFOOT: Yes.
>
> KEVIN TRUDEAU: I mean, people out there watching right now are all wondering, I hope I don't get cancer or I wonder if I am going to get cancer.
>
> ROBERT BAREFOOT: Yes.
>
> KEVIN TRUDEAU: Is there a way for us to know whether we will or won't?
>
> ROBERT BAREFOOT: Yes, there is, and it's very simple. First off, we just review what you're eating. Are you getting the minerals? And if you're not, you will become acidic and you will get one of the major diseases. You can have heart disease, cancer, lupus, fibromyalgia, multiple sclerosis. Name the disease, they're all caused by acidosis.

* * *

KEVIN TRUDEAU: Okay. Now, here's the question. So, if that's the case, is there a way to change the body pH from being acidic to being more alkaline?

ROBERT BAREFOOT: Yes, you need to enrich the body with minerals and there are all kinds of minerals and all kinds of ways of doing that, some vastly superior to others.

KEVIN TRUDEAU: Okay. What's a good way, in your opinion, that a person can get rid of that acidity?

ROBERT BAREFOOT: Well, they have to consume a lot more calcium. You see, just like you've heard in the past, there are cultures all over the world that never get sick and they live to be 100, and all these cultures have one thing in common and it doesn't matter whether the Hunzas in Pakistan or the Titicaca Indians – in China, there's a band of millions of them, or the Okinawans over in Japan, on the Oprah Winfrey Show talked about how they live long and they never get sick. * * * They all have one thing in common. They all consume over 100,000 milligrams of calcium a day * * * They eat 100 times as much as you and I.

KEVIN TRUDEAU: Is that the only common denominator, consuming more calcium?

ROBERT BAREFOOT: No, the other common denominator is they're all in the sun for several hours a day.

B.    KEVIN TRUDEAU: Okay. Now, so, are you saying the simplest thing a person can do to increase their health is consume more calcium?

ROBERT BAREFOOT: That's the case, and that's why all these cultures all over the world, who eat 10 to 100 times as much as we do, virtually never have heart disease or cancer.

KEVIN TRUDEAU: Okay. But I can't go to a store, a drug store or a health food store, and just get calcium in a bottle, in a pill and take it.

ROBERT BAREFOOT: No.

KEVIN TRUDEAU: Because you're saying that's not going to have as good of an effect.

ROBERT BAREFOOT: No, no, no, and it's really the wrong thing to do. I

Page 12 of 77

tell people who drink milk, you can drink more, but I never tell you to drink milk if you don't because, you see, the milk contains a lactic acid which will aggravate your acid problem. So, it's not necessarily the thing to do. When we discovered back in '82, when we knew that the calcium factor was the key to these people staying healthy, we discovered that in Okinawa, that they were eating this coral sand called coral calcium. Well, boy, since 1982, we've been studying the coral calcium and I can tell you there are tens of millions of people, millions of testimonials. I've had 1,000 people tell me how they've cured their cancer. I've witnessed people get out of wheelchairs with multiple sclerosis just by getting on the coral.

C.    ROBERT BAREFOOT: There's no such thing as a bad nutrient. Some are much better than others. The real key with calcium is it does not want to absorb in the human body. If you, for example, take a calcium antacid, it will absorb 2 percent. If you take milk, you absorb 17 percent. If you take some of these citrates, you absorb 10 percent.

KEVIN TRUDEAU: Um-hum.

ROBERT BAREFOOT:  But you know, there is a substance out there where you get 100 percent absorption.

KEVIN TRUDEAU: Hmm.

ROBERT BAREFOOT: And America hasn't heard about it. And that's strange because, you know, for hundreds of years, tens of millions of people around the world have taken it. Today, there are tens of millions of people around the world that are taking this substance with 100 percent absorption.

KEVIN TRUDEAU: And this is the coral from –

ROBERT BAREFOOT: Yes.

KEVIN TRUDEAU: – Okinawa, Japan that people add in water.

ROBERT BAREFOOT: Yeah.

D.    [ON SCREEN: 1-800-870-4122]

* * *

KEVIN TRUDEAU: * * * If you want information on these books or the coral calcium, just call the number on your screen for some more information.

E.    KEVIN TRUDEAU: You're saying if a person wants to be healthier, to live longer –

ROBERT BAREFOOT: Yes.

KEVIN TRUDEAU: – disease-free in your opinion, they do two simple things, stay in the sun two hours a day, get sunlight on their face –

ROBERT BAREFOOT: And take coral calcium.

KEVIN TRUDEAU: And that's it?

ROBERT BAREFOOT: That's it. And, boy, I can introduce you to thousands that do and you won't believe their stories.

KEVIN TRUDEAU: But will people feel a difference if they're –

ROBERT BAREFOOT: Oh, yes. Oh, yes. Especially those that were sick. People don't come to me, you know, with a disease, they come to me dying and they don't die.

KEVIN TRUDEAU: But taking –

ROBERT BAREFOOT: And all they do is change their lives.

KEVIN TRUDEAU: But taking calcium is not a cure for anything.

ROBERT BAREFOOT: No, no. What the calcium does is it gives the body what it needs to cure itself. You know, with your DNA, you can grow a whole new brain? Now, they're discovering this. You can grow whole new body parts. But your DNA only will work when smothered in calcium. So, you've got to give it a chance. Look at these people like Michael Fox who got Parkinson's, which we know is caused by free radicals chewing up his brain.

KEVIN TRUDEAU: Um-hum.

ROBERT BAREFOOT: Free radical, by definition, is starved for electrons and it's positively charged. Now, if you smother it in electrons, you destroy it. So, if you make your body alkaline by taking calcium, the free radicals are destroyed on entry, you can't get Parkinson's. In other words, every disease can be explained.

KEVIN TRUDEAU: Then why doesn't – why isn't he taking calcium?

ROBERT BAREFOOT: You can't get to Michael J. Fox. I've tried and —

KEVIN TRUDEAU: Michael J. Fox, if you're watching right now or if somebody's watching that knows, get some calcium. That's what you're telling him?

ROBERT BAREFOOT: Oh, yes. The first thing we can do is arrest the disease and stop it from happening further. Then what we want is for his DNA to kick in and help him grow a new brain.

F.    ROBERT BAREFOOT: * * * But the best way, of course, is to consume it whole.

KEVIN TRUDEAU: The actual coral itself?

ROBERT BAREFOOT: Yes. In capsule form.

KEVIN TRUDEAU: Oh, really? And so, this actually is adding calcium into your system.

ROBERT BAREFOOT: Yes. As a matter of fact, since within about 20 minutes you get 100 percent absorption, you're literally getting 50 times as much calcium, 50 times as fast if you take the coral calcium versus, say, an antacid calcium.

G.    KEVIN TRUDEAU: Now, the medical community would say to say that calcium is a cure for cancer is ridiculous.

ROBERT BAREFOOT: Then why did the Journal of the AMA this year quote the Strang Cancer Research Institute and said that calcium supplements reverse cancer. That's a quote from the Journal of the AMA and they quoted how much. They said 1,500 milligrams a day is enough to reverse colon cancer and they said other cancers will grow back to normal. They don't use the "cure" word, they say grow back to normal. But the Journal of the AMA is quoting medical researchers now that say, calcium reverses cancer.

H.    KEVIN TRUDEAU: * * * I was just watching TV yesterday. There was a doctor on and the question was, what — how do we know if you're going to have cancer? And the doctor said, if your genetic make-up is for cancer, like, you know, there was cancer in your mother's side of the family and there was cancer in your father's side, you have a high chance of having cancer.

ROBERT BAREFOOT: Not if you're on calcium.

Page 15 of 77

> KEVIN TRUDEAU: And – but there's got to be somebody – a doctor would say, that has to be just your opinion, there's no scientific basis for that statement.
>
> ROBERT BAREFOOT: Oh, yeah. But then I go to the Strang Cancer Research Institute, I quote the Journal of the AMA. Doctors are too busy to read their own journals. How many doctors read the article that calcium supplements prevent cancer?
>
> KEVIN TRUDEAU: That's what the article said?
>
> ROBERT BAREFOOT: In their own journal. Yes. And it – that's a quote. And it said it from, also, the New England Journal of Medicine also carried the same story with the same quote.

S.J. Ex. 2, at Ex. 2 , at 5:20 - 6:10, 8:3 - 9:9, 19:12 - 20:15, 11:14 - 12:10, 17:22 - 18:11, 32:1 -

33:25, 13:18 - 14:3, 20:16 - 21:3, 27:16 - 28:11.  *See also* S.J. Ex. 4, at ¶¶ 24-25.

82.    According to Barrett, the coral calcium infomercial performed "tremendous,"

"getting 80 to 90 calls per thousand."  S.J. Ex. 6, at 37:12 - 38:9.

83.    Barrett testified that his graphic designer created, and Stern briefly disseminated, a

"FSI"(free standing insert) advertisement.  The document, titled "The Calcium Factor," provided

ordering instructions and contained the following statements:

> The Scientific Secret of Health and Youth Finally Revealed...
> **THE CALCIUM FACTOR**
>
> **Coral Calcium's miraculous age-defying power** has been reported to have been used for centuries by the people of Okinawa, Japan to prevent and even reverse **Heart Disease, Cancer, Parkinson's Disease, Arthritis, Alzheimer's, Diabetes, and more.**
>
> * * *
>
> An intriguing culture in Okinawa, Japan lives an average life span of over 100 years without doctors and without disease! It was discovered that their calcium rich waters act as an elixir of life which perfectly balances their body's pH level to alkaline rather than acid, allowing their bodies to naturally fight and even reverse life-threatening diseases such as diabetes, arthritis, Alzheimer's disease, heart disease, and even cancer!

* * *

[Y]ou too can join the millions of people who have unlocked their bodies' self-curing potential with all natural **100% pure Coral Calcium Daily!** This amazing nutrient, with over 70 additional trace minerals, digests easily with **100% absorption in just 20 minutes.**

S.J. Ex. 7, at 259:21 - 260:22, and Att. 13 (ITV-294) (emphasis in original). *See also* S.J. Ex. 2, at Ex. 3.

84.    Barrett testified that the toll-free number shown in the ad would ring in the DMC call center. S.J. Ex. 7, at 260:23 - 261:2.

85.    DMC employed sales representatives who answered calls from consumers who called the toll-free number provided in the coral calcium infomercial. S.J. Ex. 6, at 49:21 - 50:17.

86.    DMC's commission was 10% for part of the period it answered those calls, and then increased to 12.5% for the rest of that period. S.J. Ex. 7, at 33:11 - 34:4.

87.    DMC provided its sales representatives with scripts, "product power sheets" and other hand-outs that sales representatives were to use when talking to consumers. S.J. Ex. 9, at 26:9 - -27:15, 32:15 - 32:21, 33:5 - 33:7, 79:6 - 79:9, and Att. 1, 2 and 3 (ITV-1, ITV-2, ITV-3); S.J. Ex. 10, at17:19 - 18:24, 28:20 - 29:24, 30:21 - 32:3, and Att. 13 (ITV-134).

88.    One document DMC provided to sales representatives was titled "Direct Marketing Concepts, Inc. Sales Resource Binder." S.J. Ex. 10, at 47:9 - 48:3, and Att. 3 (ITV-6).

89.    Among the materials in the Sales Resource Binder were the following:

A.    Three pages of "testimonials," including the following:

1.    Earl Bailey          age: ?
       Illness(es)         Multiple Sclerosis

He was diagnosed with M.S. in 1978, along with the disease came excruciating pain. . . . After 9 years of surgeries and colloidal minerals he had heard about Coral Calcium and tried it on June 29th. By July 1st, he realized he had "no pain and could work a full day without stopping to lie down."

2.      Dan                     age: 69
        Illness(es)             Prostate Cancer

Instead of enduring the horror of conventional treatment, he started the Coral Calcium. After three weeks he went back for x-rays, and no cancer was found. Three weeks later, (skeptical) he went for a second set of extensive x-rays. Still no cancer was found.

3.      Sue Ann Miller          age:63
        Illness(es)             Diabetes, Bells Palsy, Carpel Tunnel
                                Syndrome, also knee and hip replacements

She was taking upward of thirty pills a day and was in constant pain. She could barely walk and could not [sic] longer climb the stairs. Within the first three weeks of her taking Coral Calcium the pain was completely gone. Two weeks later she returned to full mobility.

The swelling caused from the diabetes dissipated, and her hands straightened. Within a total of 2 months the Coral Calcium had allowed this once immobilized woman to again be able to tie her own shoes. And more importantly she had her independence back.

S.J. Ex. 10, at Att. 3 (ITV-6), at DMC 039620 - DMC 039622.

B.      Four pages of "Facts About Diseases Coral Calcium Can Help." including the following:

        1.      **Alzheimer's Disease**
                Alzheimer's disease is a brain disorder in which nerve cells in the brain die, making it difficult for the brain's signals to be transmitted properly.

        2.      **Chronic Fatigue Syndrome**
                A syndrome characterized by debilitating fatigue and a combination of flu like symptoms such as sore throat, swollen lymph glands, low-grade fever, headaches, and muscle pain or weakness.

3.    **Fibromyalgia**
       The disorder is characterized by muscle pain, stiffness and easy
       fatigability [sic.]

4.    **Lupus**
       Many people with active lupus feel poorly in general and complain
       of fever, weight loss and tiredness.

5.    **Parkinson's**
       Early symptoms of Parkinson's disease are usually mild and
       generally occur gradually. . . .  As the disease progresses it begins
       to interrupt daily activities.

S.J. Ex. 10, at Att. 3 (ITV-6), at DMC 039616 - DMC 039619.

C.    One page of Frequently Asked Questions, including the following:

1.    *How does it work?*  Because it is Ionic Calcium (small particles,
       even smaller than colloidal supplements) and 100% water soluble
       (your body contains over 70% water), it can be absorbed by the
       body within 10 minutes of taking it.  Most other calciums are only
       absorbed about 17-50% by the body.  The product takes your body
       frm an Acidic State to a healthy Alkaline State.

2.    *Why do I want to monitor my pH level (alkalinity levels)?*  It has
       been found that when the body is at an Acidic Level you suffer
       from Acidosis wherein over 500 diseases are caused because
       disease thrives in an acidic environment.  By ridding your body of
       acid, oxygen is then allowed to be present which enables your body
       to then heal itself.

S.J. Ex. 10, at Att. 3 (ITV-6), at DMC 039616 - DMC 039596.

D.    Two pages of Coral Calcium FAQ's [sic], including the following:

1.    **What makes this calcium different than other forms of
       calcium?**
       The Coral Calcium is 100% absorbable by the body, whereas most
       other forms of calcium are only 17 tp 50% absorbable. . . .

2.    **Will the Coral Calcium cure my _____ ?**
       We do not claim, nor do we guarantee, that the Coral Calcium
       cures anything because results vary for the individual.  We have
       heard testimonials where people with different diseases have seen
       them reversed.

S.J. Ex. 10, at Att. 3 (ITV-6), at DMC 039597 - DMC 039598.

90.    Another document titled "Facts About Diseases Coral Calcium Can Help" was given to the sales representatives to help them in discussions with consumers. S.J. Ex. 10, at 69:12 - 70:13.

91.    Sales representatives were instructed that when consumers calling in response to the coral calcium infomercial stated that they had a particular disease, they should tell them to take higher doses, "upwards of three times what the normal person would take." S.J. Ex. 10, at 58:3 - 58:7, 62:12 - 63:7.

92.    Sales representatives were permitted to tell consumers that if they had a degenerative disease or condition, coral calcium would help break down the acid associated with that disease, and when their body became alkaline, they would be healthy. S.J. Ex. 10, at 64:11 - 64:23.

93.    Several different versions of the coral calcium scripts contained the following representation – verbatim or almost verbatim: "it is 100% absorbed by the body within 20 minutes of taking the product. Most other calcium is only absorbed about 17-50%. The product takes your body from an Acidic State to a healthy Alkaline State." S.J. Ex. 10, at Att. 3, 14, 1, and 15 (ITV-6) at DMC 039590, (ITV-135), (ITV-3), and (ITV-136).

94.    In 2002, when a consumer stated that they suffered from a particular disease, the sales representative would enter customer information into the computer system according to the disease. The main customer order screen contained 6 boxes listing 6 different diseases: cancer, arthritis, heart disease, diabetes, osteoporosis, and fibromyalgia. S.J. Ex. 10, at 75:12 - 76:24, and Att. 18 (ITV-142).

95.    According to a former DMC sales manager, cancer, arthritis, osteoporosis,

Page 20 of 77

fibromyalgia, diabetes, and heart disease were the diseases consumers most often said they had

when they called the coral calcium line. S.J. Ex. 10, at 76:25 - 77:7.

96.    Some consumers who responded to the coral calcium infomercial received – along

with their product shipment – a document titled "President's Handshake," that was signed by

Donald Barrett. The President's Handshake included the following statements:

> To: Our Valued Customer
> From: Donald Barrett
> President
> Today's Health
>
> My name is Donald Barrett and I am the President of Today's Health in Beverly,
> Massachusetts. We are the largest distributor of marine-grade coral calcium in the
> United States. I was raised in the town of Saugus, just a few miles north of
> Boston. In February 1997 my father, who is my best friend, was diagnosed with a
> severe Carcenoid liver cancer. Our physician's prognosis was grim. My family
> was willing to try anything to find a solution. In searching for an alternative
> therapy, a friend introduced us to marine grade coral calcium from Okinawa,
> Japan. The island's inhabitants, whose rate of affliction with cancer and other
> degenerative diseases is less than 10%, get coral calcium daily through the water
> they drink. We gave the coral calcium to my father and within a few months the
> tumors started to shrink. Within a year no traces of cancer remained.
>
> ***"I thank God first...and coral calcium second."***
>
> In short, coral calcium added years to my father's life...and it inspires me now to
> bring it to the world.
>
> * * *
>
> Donald Barrett

S.J. Ex. 7, at 55:2 - 56:18, and Att. 9 (ITV-262) at FTCITV011627. *See also* S.J. Ex. 2, at Ex. 4.

97.    Barrett wrote The President's Handshake. S.J. Ex. 7, at 56:5 - 56:16.

98.    A 90-capsule bottle of Coral Calcium Daily represented a one-month supply.

According to the bottle's label, a three-capsule daily serving of Coral Calcium Daily contains 530

milligrams of calcium. The cost of a bottle representing a one-month supply of Coral Calcium

Daily ranged from $14.95 to $39.95, plus shipping and handling.  S.J. Ex. 14, at ¶ 19.

99.    According to Stern and Barrett, Triad handled the management of the coral calcium infomercial, including purchasing the product from the manufacturer, processing customers' credit card purchases, orders, and arranging for packaging and shipping the product to customers.  S.J. Ex. 15, at 59:13 - 60:3, and Att. 6 (Triad-49) at 12:14 - 13:8; S.J. Ex. 6, at 39:21 - 40:4, 51:16 - 52:9, and Att. 4 (Barrett Ex. 18) at ¶ 7-8, and Att. 6 (Barrett Ex. 21) at ¶ 13; S.J. Ex. 14, at ¶ 13.

100.    Triad allowed its merchant account to be used to process credit card orders for coral calcium from December 2001 to February 2003.  S.J. Ex. 16 at 35:23 - 36:10; S.J. Ex. 6, at Att. 4 (Barrett Ex. 18) at ¶ 7-8; S.J. Ex. 14, at ¶ 13.

101.    Triad applied to register a trademark for the product "Coral Calcium Daily."  S.J. Ex. 15, at 113:7 - 113:9.

102.    Triad was to be compensated for its services by receiving one-half of the net profits earned on coral calcium sales resulting from the infomercial.  S.J. Ex. 15 at 28:8 - 28:19; S.J. Ex. 16, at 22-23, and Att. 1 (Triad-1).

103.    The other half of the net profits was to go to DMC.  S.J. Ex. 15 at 28:8 - 28:19; S.J. Ex. 16, at 23:20 - 24:9, and Att. 1 (Triad-1).

104.    In addition to selling Coral Calcium Daily directly to consumers, the DMC/ITV Defendants had relationships with distributors who purchased their own media time to run the coral calcium infomercials, bought the product at wholesale, and sold it to consumers who called them.  S.J. Ex. 15, at 157:25 - 158:6.

105.    King Media purchased media time for the coral calcium infomercial from approximately December 2001 to March 2003.  S.J. Ex. 15, at 25:24 - 26:10, 30:7 - 30:19; S.J.

Ex. 17, at 1; S.J. Ex. 14, at ¶ 14; S.J. Ex. 6 at Att. 4 (Barrett Ex. 18) at ¶ 7-8, and Att. 5 (Barrett Ex. 19) at ¶ 15-17.

106.    King Media received a 15% commission as compensation for its media purchasing services. S.J. Ex. 15, at 26:11 - 26:16.

107.    King Media required DMC's distributors of Coral Calcium Daily to use its services to purchase their media time, coordinated the distributors' media purchases in order to reduce the cost of the air time, and retained the right to determine when and where the distributors' coral calcium infomercials would air. S.J. Ex. 15, at 157:23 - 158:6, 158:14 - 159:19, 161:4 - 161:9, and Att. 8 (Triad-62).

108.    In January 2002, Stern testified that he sent a copy of the coral calcium infomercial to an attorney named Jim Abrams for his review, but that Abrams did not review the infomercial because "we didn't want to spend the money." S.J. Ex. 15, at 71:17 - 72:20, 73:4 - 73:14, and Att. 7 (Triad-50).

109.    Stern testified that he believes it is the responsibility of TV stations to review the content of infomercials before they are aired. S.J. Ex. 15, at 66:5 - 66:12.

110.    Stern became aware by late January or early February 2002 that Kevin Trudeau had previously entered into a consent decree with the FTC, and been convicted of felonies. S.J. Ex. 15, at 98:7 - 98:16, 109:18 - 111:21.

111.    On January 24, 2002, Richard Zeeb of Shop America (the company that was then handling the shipping of coral calcium to consumers) sent an email to Barrett that attached a transcript of the coral calcium infomercial. In the email, Zeeb explained that he had highlighted some statements in bold type – some in blue and some in red – and that if any one "profits from the sale of 'Coral Calcium . . .all BLUE and RED statements will have to be SUBSTANTIATED

Page 23 of 77

with sound clinical or scientific studies." S.J. Ex. 6, at 52:10 - 52:22, 58:12 - 59:5, and Att. 3 (Barrett Ex. 9) (emphasis in original).

112.    Barrett forwarded Richard Zeeb's email and the transcript to Stern. S.J. Ex. 6, at 58:25 - 59:15.

113.    Shortly after the coral calcium infomercial started airing, a dispute arose between Barrett and Trudeau. S.J. Ex. 15, at 48:6 - 48:24; S.J. Ex. 6, at 64:21 - 65:13.

114.    Stern tried to help Trudeau and Barrett resolve their differences because Triad had deals with DMC to get 50% of the net profits from the coral calcium infomercial and for King Media to receive a 15% commission from media purchases. S.J. Ex. 15, at 50:4 - 52:3, and Att. 5 (Triad-41).

115.    Stern was aware as of April 2002 that Trudeau's attorney had expressed the view that the coral calcium infomercial did not comply with the law. S.J. Ex. 15, at 105:6 - 107:24.

116.    The Stern Defendants demanded that Trudeau fix any problems regarding the legality of the claims made in the infomercial, as they believed it was Trudeau's responsibility to have produced an infomercial that complied with the law. *Id.* at 91:21 - 92:25, 107:1 - 107:10.

117.    Much later in the coral calcium program – after Trudeau failed to address the legal issues regarding the infomercial's claims – the Stern Defendants sent the Coral Calcium Daily infomercial to the Venable law firm for review. *Id.* at 79:20 - 80:10, 91:18 - 91:20.

118.    Stern testified that "we tested" at least one edited version of the coral calcium infomercial, but that it was "economically unfeasible" to air the edited version because the original infomercial was so much more successful. *Id.* at 97:12 - 98:1.

119.    Barrett obtained his own merchant account in early 2003, and for a period of time DMC handled every aspect of the coral calcium infomercial: running the media, answering

consumer calls, processing charges, and overseeing fulfillment and customer service. S.J. Ex. 7, at 31:11 - 32:1. S.J. Ex. 15, at 137:5 - 137:11.

120.    According to Barrett, DMC ran the entire coral calcium program itself for only a short period of time, which ended when the Commission contacted DMC with its concerns about the infomercial. S.J. Ex. 7, at 31:21 - 32:11.

121.    On or about June 17, 2003, the Commission initiated its contact with the DMC/ITV Defendants when Commission attorney Kial Young sent a letter to Barrett stating that the Commission had conducted a non-public investigation, and had "concluded that DMC and [Barrett] have violated Sections 5 and 12 in connection with the advertising and sale of Coral Calcium Daily." S.J. Ex. 19, at ¶ 4; S.J. Ex. 12, at Att. 5.[7]

122.    Shortly after receiving this letter, counsel for the DMC/ITV Defendants (Peter S. Brooks and Christopher Robertson, of the law firm Seyfarth Shaw) contacted Commission staff and stated that DMC would withdraw all of its advertising for Coral Calcium Daily. S.J. Ex. 19, at ¶ 5. *See also* S.J. Ex. 12, at Att. 6. The Commission then started settlement negotiations with Messrs. Brooks and Robertson on behalf of the DMC/ITV Defendants. S.J. Ex. 19, at ¶ 5.

123.    As late as September 4, 2003, more than two months after DMC was contacted by the FTC, DMC sales representatives were still using coral calcium scripts that stated that coral calcium "is 100% absorbed by the body within 20 minutes of taking the product." S.J. Ex. 10, at 39:14 - 41:1, and Att. 15 (ITV-136).

124.    On October 5, 2003, sales manager, Erik Limbaugh sent an email to the DMC

---

[7] For the Court's convenience, the Commission is resubmitting as S.J. Ex. 19 a copy of the declaration submitted by FTC attorney Kial Young in support of the Commission's June 2004 motion for a temporary restraining order.