mean the pH of the blood, and that the natural state of the human body is slightly alkaline, with a pH level of 7.4. *Id.* at 4.

246.    Dr. King stated that the body employs multiple systems to keep its pH level stable, and will use both the lungs and the kidneys to return the body to its normal state if it detects a change in that level. *Id.* at 4-5.

247.    Dr. King stated that to evaluate whether an intervention such as the consumption of Supreme Greens affects pH levels, researchers would develop a protocol for a controlled clinical trial that would measure subjects' pH balance prior to receiving the test compound (or placebo) and at an appropriate period(s) after receiving either the test compound or a placebo. *Id.* at 5.

248.    Dr. King stated that in order to claim that a product increases alkalinity, reasonable scientists would expect the product to have been subject to such an appropriate clinical study. *Id.*

249.    Dr. King stated that he was aware of no scientific evidence supporting the proposition that any chronic disease is caused by the blood being too acidic, and stated that high acidity typically is not a sign of chronic disease. *Id.* at 5-6. Indeed, most patients suffering from chronic disease have normal pH levels, and insofar as some chronic disease patients have pH levels that are lower than normal, those lower pH levels are an effect, rather than a cause, of the underlying condition. *Id.* at 6.

250.    Dr. King stated that he was not aware of any scientific evidence supporting the proposition that increasing the alkalinity of the body will prevent, cure, or treat cancer, heart disease, arthritis, or diabetes. *Id.* at 6.

251.    Dr. King stated that, in general, in order to conclude that increasing alkalinity

through consumption of a dietary supplement would cure cancer, heart disease, diabetes or heart disease, reasonable scientists would require at least one well-controlled clinical study analyzing whether the product actually increased alkalinity and whether it had any effect on that disease. *Id.* at 6-7.

252.    Dr. King stated that he was aware of no circumstances where medical doctrine prescribes increasing the body's alkalinity to prevent any disease or condition, and that medical doctrine prescribes increasing that alkalinity to treat medical conditions only in very limited circumstances. *Id.* at 7.

253.    Dr. Cassileth is the Chief of the Integrative Medicine Service at Memorial Sloan-Kettering Cancer Center ("MSKCC"). S.J. Ex. 27, at 1.

254.    Dr. Cassileth has published 124 original articles in the medical literature and 27 chapters in medical textbooks, and has written or edited 8 books, including The Alternative Medicine Handbook: The Complete Reference Guide to Alternative and Complementary Therapies (1998) and Herb-Drug Interactions in Oncology (2003). *Id.*

255.    Dr. Cassileth is an expert in the field of complementary and alternative therapies for cancer. *Id.* at 2.

256.    Dr. Cassileth stated that in her opinion, there is no reliable scientific evidence that the ingredients in Supreme Greens – separately or together – can treat, cure or prevent cancer, heart disease, diabetes or arthritis. *Id.* at 6.

257.    Dr. Cassileth also stated that she was not aware of any scientific evidence that those ingredients – either individually or as combined – will cause significant weight loss. *Id.*

258.    Dr. Cassileth stated that the most scientifically valid way to determine whether Supreme Greens produces any results is a double-blind, placebo controlled study of the product

as it is actually formulated and sold to consumers. *Id.* at 9.

259.   Dr. Cassileth stated that she had been unable to locate any published scientific literature indicating that any clinical studies had been conducted on Supreme Greens or on any substantially similar formula, and that she had been informed by the FTC staff that they had not located any proprietary studies evaluating the efficacy of Supreme Greens. *Id.*

260.   Dr. Cassileth stated that in the absence of a proper study of Supreme Greens, one might attempt to hypothesize about how the product would work based on properly designed clinical studies of its ingredients. *Id.* at 10. Dr. Cassileth stated that the studies must be properly designed and conducted and the amounts of the ingredients tested must be comparable to the amounts of each in Supreme Greens, and that even then there were limitations in extrapolating from the results of such studies. *Id.*

261.   Dr. Cassileth stated that anecdotal evidence is never a sufficient basis from which to conclude that a product works in a particular way, in part because of the placebo effect. *Id.*

262.   Dr. Cassileth stated that based on a literature search conducted first on the MSKCC's AboutHerbs database and then elsewhere for information on each of the ingredients in Supreme Greens, there is no reliable scientific evidence that any of the ingredients in Supreme Greens prevent, treat or cure cancer, heart disease, diabetes or arthritis. *Id.* at 10-11.

263.   Dr. Cassileth stated that the way to determine whether Supreme Greens is an effective weight loss product is through a double-blind, placebo controlled study of the product as formulated. *Id.* at 11-12.

264.   Dr. Cassileth stated that she had been unable to locate any published scientific literature indicating that any clinical studies had been conducted to evaluate the potential weight loss efficacy of Supreme Greens or on any substantially similar formula, and that the FTC staff

had informed her that they had not located any studies evaluating the efficacy of Supreme Greens on weight loss. *Id.* at 12.

265.    In an April 2004 report that appeared on the television news program, 20/20,

Alejandro Guerrero was interviewed and the following is a transcript of the report that aired:

> JAMI FLOYD (voice over): . . . in the infomercial, Guerrero says he has a clinical study of 200 terminal patients to prove it.
>
> JAMI FLOYD (voice over): But even more amazing was what Guerrero told us when we showed up and asked him to see those studies. So what kind of study do you have that supports this product?
>
> ALEX GUERRERO, Supreme Greens: Well, there is no study.
>
> JAMI FLOYD (off camera): So when you say your clinical experience, what are you referring to?
>
> ALEX GUERRERO: Just the -my clients that I see.
>
> JAMI FLOYD (off camera): So we have only your word, there's nothing published?
>
> ALEX GUERRERO: Nothing published.
>
> JAMI FLOYD (off camera): There's nothing written.
>
> ALEX GUERRERO: No.
>
> JAMI FLOYD (off camera): So you have no scientific support for Supreme Greens?
>
> ALEX GUERRERO: No, there is no scientific support for Supreme Greens.

S.J. Ex. 5, at ¶ 31, and Att. 23.

## C.    Consumer Injury Resulting From the DMC/ITV Defendants' Sale of Supreme Greens with MSM

266.    Pursuant to the Preliminary Injunction entered on June 23, 2004, Pannell Kerr

Foster PC ("PKF") conducted an accounting that tabulated, among other things, the amount of

revenues that the DMC/ITV Defendants received from sales of Supreme Greens. S.J. Ex. 23.

267.    According to the PKF accounting, the DMC/ITV Defendants collected
$16,052,800 in revenues (including $1,599,300 in shipping charges) from consumers in
connection with the sale of Supreme Greens through June 2004. S.J. Ex. 23, at Appendix,
Schedule 1, at ITV 00549.

268.    Of that $16,052,800, $1,369,364 (including $45,323 of shipping charges) was
refunded to consumers, leaving the DMC/ITV Defendants with net revenues of $14,683,436. *Id.*
at Schedule 2, at ITV 00550 - ITV 00551.

## IV.    UNAUTHORIZED AUTOSHIPMENT AND CONTINUITY SALES

269.    Autoship is a system in which a customer automatically receives, and is charged
for, a new shipment of product each month. S.J. Ex. 9, at 35:10-19, 156:9-23.

270.    Autoship is also known as a "continuity program." S.J. Ex. 9, at 35:10-19.

271.    Autoship sales are an important source of revenue to the DMC/ITV Defendants.
S.J. Ex. 9, at 156:17 - 157:20.

272.    Barrett testified that having consumers reorder product meant "everything" as a
revenue source, and that reorders were a "big, big part" of running sales for consumable
products. S.J. Ex. 7, at 188:15 - 188:22.

273.    According to DMC Sales Manager Erik Limbaugh, the company's sales managers
pressured sales representatives to sign people up for autoship. S.J. Ex. 10, at 191:3 -22.

274.    Erik Limbaugh was employed by DMC as a sales representative, a part-time sales
manager, and a full time sales manager. S.J. Ex. 10, at 9:2 - 10:2, 12:4-7, 16:16-18.

275.    Erik Limbaugh testified that he saw a sign reading "Autoships equals job security"
taped to the wall in the DMC sales rep area, and that he heard the phrase "autoships equal

Christmas bonuses." S.J. Ex. 10, at 191-93.

276.    John Maihos, defendant Maihos' cousin and DMC employee, saw posted on a message board at DMC the statement that "Autoships equal Christmas bonus", and heard the phrase "autoship equals job security." S.J. Ex. 9, at 17:20-24, 159:6 - 159:25.

277.    John Maihos began his employment at DMC as a sales representative, served as an acting sales manager for two to three months, and currently is ITV's Vice President of Human Resources. S.J. Ex. 9, at 16:7 - 18:23, 66:8-20; S.J. Ex. 29, at ¶ 2.

278.    According to John Maihos, DMC sales representatives generally get a larger commission by selling a product on autoship than by just selling a single unit of that product S.J. Ex. 9, at 179: - 179:9.

279.    Sales representatives earned a $2 commission for selling a bottle of Supreme Greens, or $4, if the bottle was sold to a consumer who was signed up for autoship. S.J. Ex. 7, at 187:21 - 188:7, and Att. 2 (ITV-57).

280.    Barrett was ultimately responsible for approving autoship scripts. S.J. Ex. 9, at 223:20 - 223:22.

281.    One of the earlier coral calcium scripts written by Barrett, was titled "Calcium Factor Script." At the end of the script, after sales representatives obtained billing information, the sales rep was to state "As a bonus today we will enroll you in our Coral Calcium Club. After you run out, you will receive the lowest price of $29.99 per month supply and of course you can cancel anytime." S.J. Ex. 10, at 31:1 - 31:13, 33:22 - 34:6, and Att. 13 (ITV-134) at DMC 041530; S.J. Ex. 7, at 13:12 - 14:6.

282.    If the consumer did not object to the statement provided above, the consumer was enrolled in an autoship program for coral calcium. S.J. Ex. 10, at 33:22 - 34:11.

283. DMC sales manager Erik Limbaugh thought that this coral calcium script was ambiguous, but sales reps, rather than being directed to provide further information about the autoship program, were told to follow the script. S.J. Ex. 10, at 34:14 - 35:14.

284. Another coral calcium sales script had similar autoship language that would result in consumers being enrolled in an autoship program if he or she didn't object. S.J. Ex. 10, at 47:9 - 51:8, and Att. 3 (ITV-6) at DMC039590-039591.

285. John Maihos was aware in early 2002 of consumers complaining about being put on autoship w/out their consent S.J. Ex. 9, at 160:21 - 161:15.

286. Minutes from an October 31, 2002 DMC/ITV managers' meeting reference "an excess of chargebacks" through merchant accounts. S.J. Ex. 9, at 229:16 - 231:20 and Att. 10 (ITV-81).

287. DMC manager meeting minutes from January 31, 2003 indicate that Donald Barrett discussed the issue of sales reps putting customers on autoship without their consent. Meeting minutes from February, 10 2003 show Barrett was present when the unauthorized autoship issue was raised. Barrett Tr. at 193:13-22, 195:13 - 196:19, and Att. 3 (ITV-81).

288. A Supreme Greens script stated that "Best of all, buy [sic] purchasing this package today you will be able to receive a month's supply of the alkalizing system for the same low price of 49.99 every month." If the consumer purchased that package, they would be placed on the autoship program to receive those same products each month for $49.99. S.J. Ex. 10, at 145:9 - 146:18 and Att. 11 (ITV-22).

289. Sales reps were supposed to follow the official Supreme Greens script. S.J. Ex. 10, at 148:2-4.

290. DMC also had an "outbound" Supreme Greens sales program, in which sales

representatives called consumers who had previously inquired about SG but not purchased the product. S.J. Ex. 10, at 150:14-25.

291.    The outbound Supreme Greens script instructed sales reps to state that "I can offer a one-month supply of Supreme Greens for just 19.99 plus another $6 shipping and handling. I will also include you in the club that allows you to receive the Greens monthly at our lowest price of only 29.99." S.J. Ex. 10, at 150:3 - 151:21 and Att. 12 (ITV-25).

292.    Consumers who agreed to purchase Supreme Greens at that price and did not object, would be placed on autoship. S.J. Ex. 10, at 151:15 - 152:1.

293.    DMC/ITV defendants offered to consumers who called in about Supreme Greens a product known as E8 Daily. S.J. Ex. 10, at 161:21 - 163:14, 166:9-16.

294.    Erik Limbaugh testified that sales representatives were encouraged to offer E8 as an upsell. S.J. Ex. 10, at 166:17-19.

295.    Barrett testified that in July 2003 he considered raising the commission on E8 autoships "to dangle the carrot for the sales reps a little bit" and reduce the company's "substantial inventory" of E8. S.J. Ex. 7, at 206:21 - 207:5.

296.    Barrett wasn't sure if the company did raise the commission. S.J. Ex. 7, at 207:1.

297.    The E8 daily script read as follows: "So I can give you a bottle of E8 today absolutely free. If you don't want the product next month, please call me back and cancel." S.J. Ex. 10, at 161:21 - 164:1 and Att. 19 (ITV-158).

298.    Persons who agreed to accept the free bottle were placed on an autoship program and charged $12.50 per monthly shipment. S.J. Ex. 10, at 163:18 - 164:8.

299.    Barrett testified that the E8 Daily scripts "may have been more confusing than, you know, save $10 today and go on auto ship. If you don't want the product next month, call

Page 62 of 77

back and cancel. . . . And I agree with you there was some confusion." S.J. Ex. 7, at 199:7:10.

300.   Barrett acknowledged that "some sales reps might have been taking advantage of the confusion on the E-8 program." S.J. Ex. 7, at 199:13-15.

301.   The minutes from a September 9, 2003 DMC managers' meeting state that "[m]any customers are stating that they never agreed to the Autoship Program" for E8 and that "[s]ome customers are incurring bank service charges due to unexpected autoships." S.J. Ex. 10, at 156:21 - 158:13 and Att. 20 (ITV-157).

302.   Minutes from an October 28, 2003 DMC managers' meeting state that "E8 generates the most complaints; script is deceiving. Customer is not expecting two bottles of continuity." S.J. Ex. 10, at 179:24 - 181:23 and Att. 21 (ITV-169).

303.   Erik Limbaugh testified that he spent at least one-third to half of his time dealing with customer service issues, as so many consumers were calling in to complain. S.J. Ex. 10, at 181:2-24, 183:16 - 185:16.

304.   Barrett testified that DMC remedied "the confusion" regarding the E8 program by stopping the program, but acknowledged that it ran for at least a few months. S.J. Ex. 7, at 199:7-25.

305.   On January 13, 2004, ITV Director of Operations Eileen Barrett sent an email saying that effective immediately, the company would start pulling commission from sales representatives on orders that customers claimed were unauthorized. S.J. Ex. 9, at 193:20 - 194:6, and Att. 7 (ITV-65).

306.   Donald Barrett testified that Eileen's January 13, 2004 email regarding pulling commissions marked "a change in policy." S.J. Ex. 7, at 210:11-24; S.J. Ex. 9, at Att. 7 (ITV-65).

307.    A January 20, 2004 email from John Maihos to the DMC sales force stated that the placement of customers on autoships without their consent "has caused flack with our merchant account, flack with our customers, and now, flack with Ideal Health." S.J. Ex. 9, at 202:12-15, 204:6 - 205:15; S.J. Ex. 10, at 186:12 - 187:6 and Att. 22 (ITV-69).

308.    On February 19, 2004, Erik Limbaugh wrote in an email that "I told them months ago that we were going to get return after return because of the working of our autoship script. That's not our fault. We used the script that was handed down from on high." S.J. Ex. 9, at 215:2 - 215:5 and Att. 9 (ITV-76).

309.    On March 12, 2004, Chase Merchant Services wrote to defendant Maihos, stating that because of "the extensive risk associated with your account," it was increasing the reserve account from $500,000 to $1,000,000. S.J. Ex. 8, at 206:18 - 207:2, and Att. 8 (ITV-250).

310.    An April 15, 2004 internal DMC email states that one of the employees responsible for providing refunds for customers who complained about unauthorized billing "hates to do it . . . because . . . she thinks the customers are all frauds, trying to pull something over on us." S.J. Ex. 12, at ¶ 28, and Att. 26. The email also states that in light of the FTC's interest in the issue, the company would "start refunding more." *Id.*

311.    In a May 9, 2004 email, Eileen Barrett wrote that "*Our merchant account* and the FTC has [sic.] been on top of us about unauthorized autoships." S.J. Ex. 12, at ¶ 28, and Att. 25 (emphasis added).

312.    Barrett submitted a June 4, 20004 affidavit as part of the DMC/ITV Defendants opposition to the Commission's motion for a temporary restraining order in which he stated that it was DMC's policy "to immediately fire" sales reps who were discovered violating the company's policies regarding providing notice to customers about autoship and receiving

confirmation of their inclusion on the autoship program.  S.J. Ex. 7, at 102:16 - 103:18, 154:18-20, 156:11-17 and Att.14 (ITV-270).

313.    In their opposition to the Commission's motion to modify the Court's preliminary injunction, the DMC/ITV Defendants submitted the affidavit of John Maihos, ITV's Vice-President of Human Resources, to which were attached numerous written warnings DMC had issued to its sales representatives for failing to adhere to company policy.  S.J. Ex. 29, ¶¶ 2, 32 and Att. 4 (excerpts of exhibit).

314.    The written warnings indicated that several sales reps were cited multiple times for failing to mention or properly explain the autoship program.  S.J. Ex.29, excerpts of Att. 4.

315.    Several of the warnings to the sales reps cited for multiple violations directed them to "Please follow the spirit of the script going forward," and the warnings advised that further violations would lead "to further disciplinary action, up to and including loss of your job." S.J. Ex. 29, Att. 4 (excerpts of exhibit).

316.    One rep was cited in a May 18, 2005 memo for seven violations, including four where the rep didn't mention autoship and/or didn't communicate that the customer would continue to receive the product, and one violation where the rep apparently offered the customer "a free 'gift'" for which the customer would see a charge.  S.J. Ex.29, Att. 4 (excerpts of exhibit).

317.    The written warning to the rep cited for the seven violations directed him to "[p]lease follow the spirit of the script to eliminate customer confusion and the possibility of backlash.  If this type of recording continues, you will receive further disciplinary action, up to and including loss of your job."  S.J. Ex.29, Att. 4 (excerpts of exhibit).

318.    The same rep cited on May 18, 2005 for seven violations was cited again on May 27, 2005 for "a number of unclear explanations of our auto ship program."  The May 27, 2005

written warning advised the rep "to follow the spirit of the script" and stated that "future unclear or vague Contract Genie recording will lead to further disciplinary action, up to and including loss of your job." S.J. Ex.29, Att. 4 (excerpts of exhibit).

319.    Pursuant to the preliminary injunction, the DMC/ITV Defendants provided the FTC with copies of their customer database. S.J. Ex. 31, at ¶¶ 4, 12, and Att. 1.

320.    Stefano Sciolli, a Program Analyst with the FTC, ran a series of computer queries on certain DMC database tables to identify records associated with DMC customers who had been placed on the company's autoship without their consent. S.J. Ex. 31, at ¶¶ 1-10.

321.    Mr. Sciolli limited the results of his searches to consumers who either (1) purchased a Supreme Greens product and who, on the same date or subsequently, purchased any product on an autoship program; or (2) purchased a coral calcium product and who also purchased a coral calcium product (together, "Relevant Customers"). S.J. Ex. 31, at ¶ 7.

322.    Mr. Sciolli's searches of the relevant database tables determined that there are 142,494 records relating to Relevant Customers, which correspond to 50,053 unique customers. S.J. Ex. 31, at ¶ 8. The total number of unique customers does not equal the number of records because multiple records may relate to the same individual customer. S.J. Ex. 31, at ¶ 8, fn. 3.

323.    Mr. Sciolli's queries revealed that there are 8,213 records relating to Relevant Customers that contain a reference to unauthorized autoship enrollment (*i.e.*, records that contain a reference to placement on the autoship program without the customer's consent) ("Unauthorized Autoship Records"). These 8,213 records correspond to 5,998 unique Relevant Customers. S.J. Ex. 31, at ¶¶ 10, 24.

324.    Mr. Sciolli ran additional queries that determined that there were 59,984 records, relating to 38,355 unique Relevant Customers, that contained a reference to the cancellation of an

autoship program for any reason. S.J. Ex. 31, at ¶¶ 35-39. Brian Middendorf, the former DMC employee who created and maintained the database, testified that DMC customer representatives would not always enter into the database the reason a consumer called to cancel their autoship program. S.J. Ex. 31, Att. 2, at 9:4-7, 36:20 - 38:12, 46:1-12, 50:6-14, 56:13-25.

325.    Mr. Sciolli determined, after eliminating overlap between the two groups, that there were 42,869 unique Relevant Customers who either (1) cancelled their autoship for any reason or (2) whose records contained a reference to placement on an autoship program without the customer's consent. S.J. Ex. 31, at ¶ 40.

326.    Mr. Sciolli additionally searched for all records that contained a reference to cancellation of an autoship program for any reason (*i.e.*, not just those records that involved unauthorized autoships). This search resulted in 189,218 records associated with 115,617 unique customers. S.J. Ex. 31, at ¶¶ 43-44.

327.    Mr. Sciolli also ran a search to determine the number of records that contained a reference to unauthorized autoship enrollment without any restriction on the types of products purchased (*i.e.*, without limiting the search to Relevant Customers). This search resulted in 19,114 records associated with 9,181 unique customers. S.J. Ex. 31, at ¶¶ 45-46.

328.    Mr. Sciolli determined, after eliminating overlap between the two groups, that there were 118,442 unique customers (not just Relevant Customers) who either (1) cancelled their autoship for any reason or (2) whose records contained a reference to placement on an autoship program without the customer's consent. S.J. Ex. 31, at ¶ 47.

329.    The database tables in which Mr. Sciolli conducted his searches contain a total of 1,149,796 records, which correspond to 728,324 unique customers. S.J. Ex. 31, at ¶¶ 13, 18, 42.

330.    On October 7, 2003, using an undercover name, address, credit card, and phone

line, FTC investigator Christina Turner ordered Supreme Greens through the phone number given during the Supreme Greens infomercial, 1-800-554-2818. S.J. Ex. 5 , at ¶ 24 and Att. 19.

331.    Ms. Turner was told that each bottle of Supreme Greens ordinarily cost $49.99, but that because she mentioned having seen the Today's Health show a few days earlier, she was eligible to receive three bottles of Supreme Greens, as well as a free two month supply of Vitamin E8 Daily, for $99, plus $14 for shipping and handling. She agreed to try the $99 package. *Id.* at ¶ 24 and Att. 19 at 3-4, 6-7.

332.    On or around October 20, 2003, the Commission received the shipment from Ms. Turner's undercover order. The package contained three bottles of Supreme Greens, two bottles of Vitamin E8 Daily, an order invoice, and various product inserts and packaging materials. *Id.* at ¶25.

333.    On or about November 18, 2003, the Commission received another shipment from Direct Marketing Concepts. The package contained two bottles of Vitamin E8 Daily and some product inserts. *Id.* at ¶ 26.

334.    On or about November 20, 2003, the Commission received a copy of the credit card statement for the undercover credit card that had been used to purchase the Supreme Greens product package. In addition to a charge of $113.95 listed by "Direct Marketing Concepts," an additional charge of $32.95 had been posted to the credit card by "Direct Marketing Concepts." . *Id.* at ¶ 26 and Att. 2.

335.    John Maihos admitted that the sales rep taking Ms. Turner's order had sold the product improperly. S.J. Ex. 9, at 162:14 - 165:19.

## V.   OTHER HEALTH PRODUCT INFOMERCIALS DISSEMINATED BY DEFENDANTS

336.   Prior to the Commission's filing of the complaint that commenced this litigation, the DMC/ITV Defendants disseminated an infomercial for a weight loss product called AlkaSlim. S.J. Ex. 12, at Att. 3 at 25:9 - 25:14; S.J. Ex. 8, at 208:7 - 208:18, and Att. 7 (ITV-251) at DMC 037057 - DMC 037058.

337.   According to Barrett, the DMC/ITV Defendants' Alka Slim, coral calcium, and Supreme Greens infomercials each ranked in the top 10 of all infomercials. S.J. Ex. 12, at Att. 3 at 25:9 - 25:14.

338.   The Infomercial Monitoring Service ("IMS") is an organization that monitors 39 national cable channels twenty-four hours a day, seven days a week, and compiles data on the paid programming aired. IMS issues a report each month which, among other things, identifies new infomercials that IMS has detected and reports the 100 most frequently aired infomercials for that month. S.J. Ex. 12, at ¶ 14.

339.   The IMS report for March 2004 reports that on March 6, 2004, IMS detected an ITV infomercial for a dietary supplement called UroCaps, featuring Donald Barrett. According to IMS, the infomercial discusses, among other things, prevention of prostate disease. S.J. Ex. 12, at ¶ 15 and Att. 12.

340.   The IMS report for April 2004 reports that on April 3, 2004, IMS detected an ITV infomercial for the Serotonin-Plus Diet, featuring Donald Barrett. According to IMS, the "Serotonin-Plus Diet consists of the safe, all natural Serotonin-Plus supplement that raises the serotonin levels in one's body and the Serotonin-Plus low-fat diet plan." S.J. Ex. 12, at ¶ 16 and Att. 13.

341.    The April 2004 IMS report also reports that on April 16, 2004, IMS detected an ITV infomercial for a dietary supplement called Femerex, featuring Donald Barrett. According to IMS, the infomercial discusses how Femerex is the answer to dangerous hormone therapy for women experiencing the symptoms of menopause. S.J. Ex. 12, at ¶ 16 and Att. 13.

342.    The IMS report for May 2004 reports that on May 14, 2004, IMS detected an ITV infomercial for a dietary supplement called Stress Shield, featuring Donald Barrett. According to IMS, the infomercial discusses how the connection between stress and diseases, and how Stress Shield protects individuals from the effects of stress at a cellular level. S.J. Ex. 12, at ¶ 17 and Att. 14.

343.    In 2004, the DMC/ITV Defendants also briefly aired an infomercial for the 7-Day Miracle Cleanse. S.J. Ex. 7, at 230:23 - 231:1.

344.    The DMC/ITV Defendants also sold the video and newsletter for a diabetes dietary supplement called Eleotin, and took consumer calls for a penis enlargement product called Extenze. S.J. Ex. 7, at 121:24 - 122: 9; S.J. Ex. 9, at 181:9 - 181:24.

345.    On June 4, 2004, Barrett submitted an affidavit to this Court in which he stated that:

> In light of the FTC's continuing concerns over the Supreme Greens with MSM infomercial and other infomercials involving ingestible products, *ITV determined several weeks ago that it would no longer produce or air any infomercials involving ingestible products*. As of the date of this affidavit, I am unaware of any infomercial for any ingestible product that is being aired by ITV or DMC, and ITV, DMC and *I have no plans to run any such infomercial in the future.*

S.J. Ex. 30, at ¶ 12 (emphasis added).

346.    Since January 2005, the DMC/ITV Defendants have disseminated infomercials for at least five other ingestible products for which health claims are made:  Renuva, Sea Vegg,

Dr. Day's Home Juice Bar, RegenaLife, and Flex Protex. *See* Memorandum in Support of

Motion to Modify June 23, 2004 Preliminary Injunction as to Defendants Direct Marketing

Concepts, Inc., ITV Direct, Inc., and Donald W. Barrett [Dkt. #69]; Supplemental Memorandum

in Support of Motion to Modify June 23, 2004 Preliminary Injunction [Dkt# 104].

347.    The DMC/ITV Defendants have admitted that they disseminated the Renuva, Sea

Vegg, RegenaLife, Dr. Day's Home Juice Bar, and Flex Protex infomercials. S.J. Ex. 18; S.J.

Ex. 29.

348.    Barrett appears in the Sea Vegg, Dr. Day, RegenaLife, and Flex Protex

infomercials. S.J. Ex. 12, at ¶¶ 18 - 22 and Att. 15-18.

349.    The Renuva system consists of two products – a sublingual spray and a powder

that is mixed into a beverage and drunk, and the infomercial presented it as the solution to the

problem of aging:

> MALE ANNOUNCER: [N]ow, you can experience more energy and the
> phenomenal wonders of increasing your levels of HGH.
>
> Introducing the Renuva System, a revolutionary two-part system that could turn
> back the clock five, 10, even 15 years or more on the way you look and feel,
> guaranteed. And it's so easy.

S.J. Ex. 12, at Att. 16, at 14 - 15, 38.

350.    The infomercial also made claims about Renuva's ability to stimulate the body's

production of human growth hormone ("HGH") and about the benefits that result from those

increased HGH levels, including increased energy, improved memory and clarity of thought, and

thicker hair. S.J. Ex. 12, at Att. 16, at, e.g., 7, 10, 13, 17, 22-23, 40-41.

351.    In support of its motion to modify the Preliminary Injunction, the Commission

submitted a declaration from Mary Lee Vance, M.D., addressing the claims made for Renuva.

S.J. Ex. 12, at Att. ¶ 12, and Att. 10.

352.    Dr. Vance is a Professor of Medicine and a Professor of Neurosurgery at the University of Virginia Medical School. She is an expert in the areas of endocrinology, including growth hormone (GH) secretion and the analysis of clinical trials to evaluate potential mechanisms to increase GH levels in adults. S.J. Ex. 12, at Att. 10, at ¶ 3.

353.    According Dr. Vance, the claims that Renuva will produce benefits such as increased energy and stamina, decreased weight and body fat, increased muscle mass, reduced aches and pains, improved quality of sleep, younger, thicker skin, and fewer wrinkles, improved memory, and increased sex drive, experts would require a long term, double-blind, placebo controlled clinical trial of an adequate number of human subjects based on the listed outcome measures. S.J. Ex. 12, at Att. 10, at ¶ 13.

354.    Dr. Vance is not aware of any clinical trial evidence showing that a product containing the ingredients in either Renuva product, when used by healthy adults, will increase GH or IGF-1 levels and/or produce increased energy and stamina, decreased weight and body fat, increased muscle mass, reduced aches and pains, improved quality of sleep, younger, thicker skin, and fewer wrinkles, improved memory, or increased sex drive. *Id.* at ¶¶ 16-17. Indeed, as she explained, there are a few small studies on the benefits of injected GH that show mixed results at best. S.J. Ex. 12, at Att. 10, at ¶¶ 9, 17.

355.    The infomercial for Dr. Day's Home Juice Bar promoted three ingestible products: Barley Greens, Beta Carrot, and Beta Beet. S.J. Ex. 12, at Att. 17, at 16-18.

The RegenaLife infomercial, which promoted a multi-ingredient dietary supplement, opened with Barrett telling viewers that they were probably going to die from one of several named diseases, unless they follow the advice of his guest:

> DONALD BARRETT: Let's face it, most of us don't eat right, yet we know we need to. The vast majority of people out there are going to die of some chronic degenerative disease, such as cancer, diabetes, arthritis, even heart disease. These diseases can be directly related to what we eat and what we're exposed to in our environment. . . . The fact of the matter is, folks, most of us are not going to change how or what we eat.
>
> My next guest says there's something out there that's easy, simple and effective that we can do and he can prove it.

S.J. Ex. 12, at Att. 18, at 3-4.

356.    The Sea Vegg infomercial opens with Barrett stating:

> DONALD BARRETT: This half an hour, again, we're going to be talking about health. If you're out there and you suffer from cancer, arthritis, diabetes, fibromyalgia, really any chronic degenerative disease, or if you don't want to get a chronic degenerative disease, this is a show you're not going to want to miss. On our show today we have Scott Kennedy, who's a firm believer that most chronic degenerative diseases can be prevented and reversed from nutrients that come from the ocean. We have a very controversial show, so stay with us.

S.J. Ex. 12, at Att. 15, at 3-4.

357.    The Sea Vegg infomercial also states that eating seaweed has made Mr. Kennedy so healthy that he no longer carries health insurance, that seaweed's benefits are scientifically proven, that seaweed helped Mr. Kennedy's mother's multiple sclerosis, and that eating seaweed is the single most important thing people should do if they want to live a "healthier, happier, disease-free life." *Id.* at 19:1 - 19:11, 19:25 - 20:2, 33:15 - 33:23, 34:12 - 34:18.

358.    In support of its motion to modify the Preliminary Injunction, the Commission also submitted a declaration from Christine Skibola, Ph.D., addressing the claims made for Sea Vegg. S.J. Ex. 12, at ¶ 13 and Att. 11.

359.    Dr. Skibola is a Research Toxicologist in the Molecular Epidemiology and Toxicology Laboratory, which is in the Department of Environmental Health Sciences at the University of California at Berkeley's School of Public Health. S.J. Ex. 12, at Att. 11, at ¶ 1.

Page 73 of 77

She has conducted research into the health benefits of seaweed and is familiar with the existing research in this area. *Id.* at ¶¶ 15, 19, 22-23. She is an expert in the field of environmental health sciences and in public health. *Id.* at ¶ 8.

360. According to Dr. Skibola, the disease prevention and treatment and weight loss claims made in the infomercial for Sea Vegg are not supported by reliable scientific evidence. S.J. Ex. 12, at Att. 11 at ¶ 15.

361. The Flex Protex infomercial features, among other things, Barrett telling viewers: "If you have arthritis, osteoarthritis, rheumatoid arthritis, gout, even fibromyalgia, this is a product, I believe, that you cannot live without." S.J. Ex. 12, at ¶26 and Att. 19.

362. The Flex Protex infomercial made arthritis treatment and prevention claims for a product that contained ingredients (MSM and ginger) that were also contained in the proprietary formula of Supreme Greens with MSM. Preliminary Injunction, at 17. S.J. Ex. 5, at Att. 5 (Supreme Greens label); S.J. Ex. 12, at Att. 19 at 28-29 (Flex Protex script).

363. The Electronic Retailing Association ("ERA") is a trade association of direct response marketers. S.J. Ex. 12, at ¶ 24 and Att. 21. The Electronic Retailing Self-Regulatory Program ("ERSP") is an advertising self-regulatory program created by ERA in partnership with the National Advertising Review Council, the self-regulatory body for the advertising industry and a division of the Better Business Bureau. *Id.*

364. In June 2005, ERSP referred the Renuva infomercial to the FTC as a result of ITV's failure to comply with the self-regulatory process. *Id.* at ¶ 25 and Att.22 .

365. In August 2005, ERSP referred the Sea Vegg infomercial to the FTC as a result of ITV's failure to comply with the self-regulatory process. *Id.* at ¶ 26 and Att. 23.

366. In August 2005, ITV was expelled from the ERA. *Id.* at ¶ 27 and Att. 24.

## VI.    DEFENDANTS PROFITED FROM THEIR LAW VIOLATIONS

367.    Vendor Ledgers kept by Triad show that during the period from January 1, 2002 through October 31, 2004, Triad sent $5,054,266 to DMC, $2,532663 to Direct Fulfillment, Inc., $953,724 to Barrett, and $574,274 to BP Marketing, Inc.  S.J. Ex. 16, at 53:15 - 54:9, 54:25 - 54:18, 58:18 - 59:18, 124:14 - 125:18, 133:7 - 133:19, and Att. 3, 4, 5, and 6 (Triad-10, Triad-11, Triad-19, Triad-20).

368.    Maihos received $267,415 in wages from DMC in 2002, $355,000 in 2003, and $340,000 through the first six months of 2004.  S.J. Ex. 12, at ¶ 23 and Att. 20.

369.    Maihos received $97,127, in Subchapter S property distributions from DMC in 2002, $679,131 in 2003, and $682,217 through the first six months of 2004.  S.J. Ex. 12, at Att. 20.

370.    Barrett received $231,000 in wages from DMC in 2002, $425,000 in 2003, and $270,000 through the first six months of 2004.  *Id.*

371.    Barrett received $43,810 in Subchapter S property distributions from DMC in 2002, $154,599 in 2003, and $621,351through the first six months of 2004.  *Id.*

372.    Between November 2002 and May 2003, Triad sent $953,724.94 directly to Barrett's personal bank account.  S.J. Ex. 8, at 127:11 - 127:23, and Att. 2 (ITV-229); S.J. Ex. 15, at Att. 2 (Triad-10).

373.    Barrett gave $249,784 to Maihos from his Triad transfers.  S.J. Ex. 8, at 129:9 - 130: 18.

374.    Barrett used the money that Triad sent to his bank account to pay for a new home that he was building.  S.J. Ex. 8, at 128:19 - 129:8.

375.    Stern claims that Lisa Stern – who received $1.5 million in 2002 Triad profit

distributions – evenly shared with him her 66% ownership in the company. S.J. Ex. 15, at 124:5
- 124:24.

## VII.   ILL-GOTTEN GAINS REALIZED BY RELIEF DEFENDANTS LISA STERN, STEVEN RITCHEY AND BP INTERNATIONAL

376.    Relief Defendant Lisa Stern received $1,545,305 in Subchapter S distributions
from Triad for profits earned in 2002. S.J. Ex. 15, at 123:16 - 123:19.

377.    Relief Defendant Steven Ritchey received $772,652 in Subchapter S distributions
from Triad for profits earned in 2002. S.J. Ex. 16, at 163:3 - 163:21; S.J. Ex. 15, at 125:11 -
125:15.

378.    Triad estimated that 90% of its 2002 revenues and 60% of its 2003 revenues were
from Coral Calcium Daily. S.J. Ex. 16, at 43:25 - 44:12, 44:22 - 45:15.

379.    At Barrett's instructions, Triad sent $574,274 earned on sales of Coral Calcium
Daily to BP Marketing in 2002. S.J. Ex. 15, at 133:6 - 134:2, 135:14 - 135:17, and Att. 1 (Triad-
4).

380.    The records of the Commonwealth of Massachusetts show that BP was
incorporated eleven days before Triad made the first of the payments directed by Barrett. S.J. Ex.
12, and Att. 4.

381.    Stern is not aware of the services that BP performs. S.J. Ex. 15, at 134:6 - 134:11.

382.    Barrett did not tell Stern why he wanted money sent to BP. S.J. Ex. 15, at 133:23
- 134:5.

383.    Maihos was not aware of any services performed by BP with respect to the coral

calcium infomercial, or what the money sent to BP was supposed to have been earned for.  S.J.

Ex. 8, 118:19 - 119:2., 119:23 - 120:13.


Respectfully submitted,


HEATHER HIPPSLEY
KIAL S. YOUNG (BBO # 633515)
EDWARD GLENNON
SHIRA D. MODELL
Federal Trade Commission
600 Pennsylvania Avenue, NW, NJ-3212

Washington, DC  20580
(202) 326-3285,  -3126 (voice)
(202) 326-3259 (fax)
hhippsley@ftc.gov, kyoung@ftc.gov or eglennon@ftc.gov

ATTORNEYS FOR PLAINTIFF

Dated: December 14, 2005