UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FEDERAL TRADE COMMISSION,      )
                               )
        Plaintiff              )
            v.                 )
                               )        Civ. No. 04-11136 - GAO
DIRECT MARKETING CONCEPTS, INC., et al.,   )
                               )
        Defendants.            )
                               )

**FEDERAL TRADE COMMISSION'S MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. STATEMENT OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.  Plaintiff the Federal Trade Commission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    B.  Liability Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        1.  Direct Marketing Concepts and ITV Direct . . . . . . . . . . . . . . . . . . . . . . . 3
        2.  Donald Barrett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        3.  Robert Maihos . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        4.  Triad ML Marketing and King Media . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        5.  Allen Stern . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    C.  Relief Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        1.  Lisa Stern . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        2.  Steven Ritchey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        3.  BP International, Inc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    D.  Coral Calcium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        1.  The Marketing and Sale of Coral Calcium Daily . . . . . . . . . . . . . . . . . . . 7
        2.  The Defendants' Claims about Coral Calcium Daily Were
            False and Unsubstantiated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            a.  The Defendants' disease cure claims are false and
                unsubstantiated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
            b.  The Defendants' absorption and bioavailability claims
                are false and unsubstantiated . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
            c.  The Defendants' claims that scientific research proves
                that calcium supplements are able to prevent, reverse,
                or cure cancer are false . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        3.  Consumer Injury Resulting From The Defendants' Sale of
            Coral Calcium Daily . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    E.  Supreme Greens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        1.  The Marketing and Sale of Supreme Greens With MSM . . . . . . . . . . . . 16
        2.  The DMC/ITV Defendants' Claims for Supreme Greens
            With MSM are False and Unsubstantiated . . . . . . . . . . . . . . . . . . . . . . . 21
            a.  The DMC/ITV Defendants' disease cure and prevention
                claims are false and unsubstantiated . . . . . . . . . . . . . . . . . . . . 22
            b.  The DMC/ITV Defendants' weight loss claims are
                false and unsubstantiated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        3.  The DMC/ITV Defendants Used a Deceptive Format for the
            Supreme Greens With MSM Infomercial . . . . . . . . . . . . . . . . . . . . . . . 23
        4.  Consumer Injury Resulting From The DMC/ITV Defendants'
            Sale of Supreme Greens With MSM . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

i

F.   The DMC/ITV Defendants Enrolled Coral Calcium Daily and
     Supreme Greens With MSM Purchasers in Autoship Programs
     Without Their Consent .................................................... 25
     1.   Defendants' Course of Conduct Regarding Unauthorized
          Autoships ...................................................... 25
     2.   Complaint Database Regarding Unauthorized Charges .............. 29
     3.   Commission Purchase of Supreme Greens Resulted in
          Unauthorized Billing ........................................... 30
G.   Transfers of Ill-Gotten Gains to Defendants and Relief Defendants .......... 30
H.   The DMC/ITV Defendants' Ongoing Activities ......................... 31

III.   THE COMMISSION IS ENTITLED TO SUMMARY JUDGMENT AGAINST
       DEFENDANTS ........................................................ 32

A.   The Standard for Granting Summary Judgment ........................ 32
B.   Defendants' Acts and Practices Violated the FTC Act ................... 32
     1.   The Jurisdictional and Venue Requirements Are Met ............... 32
     2.   Defendants' Misrepresentations Violated the FTC Act .............. 33
     3.   The DMC/ITV Defendants' Utilization of a Deceptive Format
          for the Supreme Greens Infomercial Violated the FTC Act ......... 39
     4.   Defendants' Unauthorized Billing Violated the FTC Act ............ 40
C.   Section 13(b) of the FTC Act Authorizes This Court to Grant the
     Requested Relief ..................................................... 42
     1.   This Court Has Authority to Grant Permanent Injunctive and
          Monetary Relief ................................................ 42
     2.   The Defendants are Liable for Permanent Injunctive and
          Equitable Monetary Relief ...................................... 43
          a.   The corporate defendants are liable for permanent
               injunctive relief .......................................... 43
          b.   The individual defendants are liable for permanent
               injunctive relief .......................................... 46
               i.    Donald Barrett and Robert Maihos .................. 46
               ii.   Allen Stern .................................... 49
          c.   The corporate defendants are liable for equitable
               monetary relief ........................................... 50
          d.   The individual defendants are liable for equitable
               monetary relief ........................................... 51
               i.    Donald Barrett and Robert Maihos ................ 52
               ii.   Allen Stern .................................... 53
          e.   Defendants are jointly and severally liable for
               equitable monetary relief ................................. 54

     D.     The Proposed Orders Provide Appropriate Permanent Equitable Relief
to Remedy the Defendants' Violations of the Law . . . . . . . . . . . . . . . . . . . . . . . 55

          1.     Order Covering DMC, ITV, Barrett, and Maihos . . . . . . . . . . . . . . . . . 55

               a.     Prohibitions against false and unsubstantiated claims
and unfair practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

               b.     The proposed monetary judgment and consumer redress . . . . . . 57

               c.     Monitoring and other provisions . . . . . . . . . . . . . . . . . . . . . . . . 58

          2.     Order Covering Allen Stern, King, Triad, and Relief Defendants
Lisa Stern, Steven Ritchey, and BP International . . . . . . . . . . . . 59

               a.     Prohibitions against false and unsubstantiated claims . . . . . . . . 59

               b.     The proposed monetary judgment and consumer redress . . . . . . 59

               c.     Monitoring and other provisions . . . . . . . . . . . . . . . . . . . . . . . . 60

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

# TABLE OF AUTHORITIES

## CASES

American Financial Services Assn. v. FTC, 767 F.2d 957 (D.C. Cir. 1985) . . . . . . . . . . . . 40, 41

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505 (1986) . . . . . . . . . . . . . . . . . 32

FTC v. Affordable Media, LLC, 179 F.3d 134 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 51

FTC v. American Standard Credit Sys., Inc., 874 F. Supp. 1080 (C.D. Cal. 1994) . . . . . . . . . 46

FTC v. Amy Travel Service, Inc., 875 F.2d 564 (7th Cir. 1989) . . . . . . . . . . . . . . . . . 43, passim

FTC v. Atlantex Assocs., No. 87-0045-CIV-NESBITT, 1987 WL 20384 (S.D. Fla.
      Nov. 25, 1987), aff'd, 872 F.2d 966 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . 35, 52

FTC v. California Pacific Research, Inc., 1991 U.S. Dist. LEXIS 12967
      (D. Nev. Aug. 27, 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

FTC v. Cliffdale Assoc., Inc., 103 F.T.C. 110 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 38

FTC v. Colgate-Palmolive Co., 380 U.S. 374 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 56

FTC v. Cresent Publ'g Group, Inc., 129 F. Supp. 2d 3211 (S.D.N.Y. 2001) . . . . . . . . . . . . . . 41

FTC v. Febre, No. 94 C. 3625, 1996 WL 396117 (N.D. Ill. Jul. 3, 1996), adopted by
      1996 WL 556957 (N.D. Ill. Sep. 27, 1996), aff'd 128 F.3d 530 (7th Cir. 1997) . . . . . . . 35

FTC v. Figgie Int'l, Inc., 994 F.2d 595 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 35

FTC v. Five-Star Auto Club, Inc., 97 F. Supp. 2d 502 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . 48

FTC v. Gem Merchandising Corp., 87 F.3d 466 (11th Cir. 1996)) . . . . . . . . . . . . . . . . . . . . 42, 43

FTC v. Gill, 71 F. Supp. 2d 1030 (C.D. Cal. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

FTC v. Gill, 265 F.3d 944 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

FTC v. H.N. Singer, Inc., 668 F.2d 1107 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

FTC v. H.N. Singer, Inc., 1982-83 Trade Cas. (CCH) ¶ 65,011, 1982
      WL 1907 (N.D. Cal. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

FTC v. International Diamond Corp., 1983-2 Trade Cas. (CCH) ¶ 65,725, 1983
    WL 1911 (N.D. Cal. 1983) ........................................... 38, 52, 54

FTC v. J.K. Publications, Inc., 99 F. Supp. 1176 (C.D. Cal. 2000) ....:......... 40, 41, 42, 46

FTC v. Kitco of Nevada, Inc. 612 F. Supp. 1282 (D. Minn. 1985) .................... 51, 57

FTC v. Medicor, LLC., 217 F. Supp. 2d 1048 (C.D. Cal. 2002) .......................... 48

FTC v. Munoz, No. 0055319, 2001 WL 970352 (9th Cir. Aug. 27, 2001) ................ 57

FTC v. Pantron I Corp., 33 F.3d 1088 (9th Cir. 1994) .......................... 33, passim

FTC v. Patriot Alcohol Testers, Inc., 798 F. Supp. 851 (D. Mass. 1992). ......... 32, 34, 45, 46

FTC v. Patriot Alcohol Testers, No. 91-11812H 1994 WL 706748
    (D. Mass. May 4, 1994). ........................................... 43

FTC v. Pharmtech Research, Inc., 576 F. Supp. 294 (D.D.C. 1983). ...................... 34

FTC v. Publishing Clearing House, Inc., 104 F.3d 1168 (9th Cir. 1997) ............. 46, 47, 51

FTC v. Publishing Clearing House, Inc., 1995-1 Trade Cas. (CCH)
    ¶ 71,006, 1995 WL 367901 (D. New. 1995) ................................... 58

FTC v. Sabal, 32 F. Supp. 1004 (N.D. Ill. 1998) ................................. 37, 41

FTC v. Security Rare Coin & Bullion, 931 F.2d 1312 (8th Cir. 1991) .................... 43

FTC v. Sharp, 782 F. Supp. 1445 (D. Nev. 1991) ............................... 51, 54, 58

FTC v. Silueta Distribs., Inc., No. C 93-3131 SBA, 1995 WL 215313
    (N.D. Cal. Feb. 24, 1995) .................................................. 54

FTC v. Simeon Mgt. Co., 570, F.2d 1137 (9th Cir.1978) ................................ 36

FTC v. SlimAmerica, Inc., 77 F. Supp. 2d 1263 (S.D. Fla. 1999) ................. 34, passim

FTC v. Southwest Sunsites, Inc., 665 F.2d 711 (5th Cir. 1982) .......................... 43

FTC v. Think Achievement, Inc., 144. F. Supp. 2d 993 (N.D. Ind. 2000) ........... 51, 53, 59

FTC v. U.S. Sales Corp., 785 F. Supp. 737, 745, 753-74 (N.D. Ill. 1992) .............. 35,54

FTC v. U.S. Oil & Gas Corp., 748 F.2d 1431 (11th Cir. 1984) .......................... 43

FTC v. Wilcox, 926 F. Supp. 1091 (S.D. Fla. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 57

FTC v. Windward Marketing, 1997 U.S. Dist. LEXIS 17114
(N.D. Ga. Sept. 30, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42, 54

FTC v. World Travel Vacation Brokers, Inc. 861 F.2d 1020 (7th Cir. 1988) . . . . . . . . . . . . . . . 38

Ford Motor Co. v. FTC, 120 F.2d 175 (6th Cir. 1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Goodman v. FTC, 244 F.2d 584 (9th Cir. 1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

In re Bogdana Corp., 216 FTC 37 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

In re International Harvester Co., 104 F.T.C. 949 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

In re Mega Systems Int'l., Inc., 125 FTC 973 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

In re Porter & Dietsch, Inc. v. FTC, 605 F.2d 294 (7th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . 37

In re Thompson Medical., 104 F.T.C. 648 (1984), aff'd,791 F.2d 189 (D.C. Cir. 1986) . 35, 36, 37

Koch v. FTC, 2006 F.2d 311 (6th Cir. 1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Kraft Inc. v. FTC, 970 F. 2d 311 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35, 36

Litton Industries, Inc. v. FTC, 676 F.2d 364, 370 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . 56

Nat'l Bakers Servs., Inc. v. FTC, 329 F.2d 365 (7th Cir 1964). . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Norvartis Corp. v. FTC, 223 F.3d 783 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

U.S. v. Andreadis, 366 F.2d 423 (2d Cir. 1955), cert. denied, 385 U.S. 1001 (1967) . . . . . . . . 51

United States v. W.T. Grant Co., 345 U.S. 629 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 652-53, 105
S. Ct. 2265, 2282 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## STATUTES AND RULES

15 U.S.C. § 53(b) .............................................................. 2

15 U.S.C. §§ 41-58 ............................................................ 4

15 U.S.C. §§ 45(a) and 52 ................................................. 4, 36

15 U.S.C. 52(b) ............................................................. 36

28 U.S.C. § 1331 ............................................................ 34

28 U.S.C. § 1337(a) ......................................................... 34

28 U.S.C. § 1345 ............................................................ 35

28 U.S.C. § 1391(b)(3) ...................................................... 35

Federal Rules of Procedure 12(h)(1)) ........................................ 35

Federal Rules of Procedure 56(c), (e) .................................... 2, 34

## I.    INTRODUCTION

Plaintiff.Federal Trade Commission ("FTC" or "Commission") hereby respectfully

moves, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, for summary

judgment against defendants Direct Marketing Concepts, Inc. ("DMC"), ITV Direct, Inc.

("ITV"), Donald Barrett ("Barrett"), Robert Maihos ("Maihos"), Allen Stern ("Stern"), King

Media, Inc., ("King"), Triad ML Marketing, Inc. ("Triad"), and relief defendants Lisa Stern,

Steven Ritchey, and BP International, Inc.  Proposed orders covering, respectively, (1)

Defendants DMC, ITV, Barrett and Maihos (hereafter "the DMC/ITV Defendants"), and (2)

Defendants Stern, King, and Triad (hereafter "the Stern Defendants"), and relief defendants Lisa

Stern, Steven Ritchey, and BP International, Inc. have been filed together with this motion.[1]

The DMC/ITV Defendants deceived tens of thousands of United States consumers by

making false and deceptive disease prevention and cure claims for two dietary supplements:

Coral Calcium Daily and Supreme Greens with MSM ("Supreme Greens").  The Stern

Defendants played crucial roles in the deceptive marketing and sale of Coral Calcium Daily.[2]

Consumers' purchases of Coral Calcium Daily were over $40 million; net purchases of Supreme

Greens (*i.e.*, after refunds) exceeded $14 million.  Additionally, the DMC/ITV Defendants took

further advantage of consumers by unlawfully imposing unauthorized charges on consumers'

credit and debit accounts in connection with the sale of both products.

The Commission brought this action pursuant to Section 13(b) of the FTC Act, 15 U.S.C.

§ 53(b), seeking a permanent injunction against future deceptive practices and equitable

---

[1]  For purposes of this Memorandum, the term "Defendants" shall be used to refer to both the DMC/ITV Defendants and the Stern Defendants collectively.

[2]  The Stern Defendants were not involved in the marketing and sale of Supreme Greens.

monetary relief. Summary judgment should be granted in favor of the FTC because there are no genuine issues of fact for trial. The DMC/ITV Defendants are jointly and severally liable for injunctive and monetary relief with respect to both Coral Calcium Daily and Supreme Greens; the Stern Defendants are jointly and severally liable for injunctive and monetary relief with respect to Coral Calcium Daily. *See* Fed. R. Civ. P. 56(c).

The FTC seeks permanent injunctions that: (1) prohibit the Defendants from making or assisting others in the making of false, misleading, or unsupported claims in connection with the marketing of Supreme Greens, Coral Calcium Daily or other similar products; (2) prohibit the Defendants from making or assisting others to make false, misleading, or unsupported claims about other health products; (3) prohibit the DMC/ITV Defendants from engaging in unauthorized billing practices; (4) order the Defendants and the Relief Defendants to pay restitution for consumer redress; and (5) enable the FTC to monitor Defendants' compliance with the order.

## II.    STATEMENT OF MATERIAL FACTS[3]

On June 1, 2004, the Commission filed its original complaint seeking an injunction and monetary relief against DMC, ITV, Barrett, Stern, King, Triad and others.[4] *FTC Rule 56.1 Stmt.* ¶ 2. Concurrent with filing its original complaint, the Commission filed a noticed motion for a temporary restraining order and on June 23, 2004, the Court issued a preliminary injunction

---

[3] Pursuant to Local Rule 56.1, the FTC has submitted its Statement of Material Facts Not in Dispute ("*FTC Rule 56.1 Stmt.*") as a separate document, together with eight volumes of exhibits. The FTC's Rule 56.1 Statement cites to the appropriate pleadings, affidavits, declarations, and other evidence upon which the FTC relies.

[4] The Court entered Stipulated Final Orders against those other Defendants -- Alejandro Guerrero, Health Solutions, Inc., Gregory Geremesz, Michael Howell, and Healthy Solutions, LLC -- in September 2005. *FTC Rule 56.1 Stmt.* ¶¶ 4, 5.

prohibiting the challenged practices and finding that the Commission "demonstrated a likelihood of success on the merits." [Dkt. # 2; Dkt. 32, at 10].

In April 2005, the Commission amended its complaint to, *inter alia,* name Robert Maihos ("Maihos") as an additional liability defendant, and Lisa Stern, Steven Ritchey, and BP International, Inc. as relief defendants. *FTC Rule 56.1 Stmt.* ¶ 3.

On May 26, 2005, the Commission filed a motion seeking modification of the Preliminary Injunction and appointment of a receiver over DMC and ITV, citing, *inter alia*, the DMC/ITV Defendants' recent dissemination of infomercials making misleading health and disease claims for several new products. *Id.* ¶ 6. The motion was fully briefed by the parties – including the DMC/ITV Defendants' violation of the Preliminary Injunction via the advertising of one of those new products – and argument was heard by the Court on October 14, 2005. *Id.* The motion was taken under advisement.

### A.    **Plaintiff the Federal Trade Commission**

The Commission is an independent agency of the United States Government created by the FTC Act, 15 U.S.C. §§ 41-58. The Commission is charged, among other things, with enforcing Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, which respectively prohibit deceptive acts or practices in or affecting commerce, and false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce. *Id.* ¶ 1.

### B.    **Liability Defendants**

#### 1.    Direct Marketing Concepts and ITV Direct

DMC and ITV are Massachusetts corporations, both of which have their principal place of business at 55 Cherry Hill Drive, Beverly, MA. *FTC Rule 56.1 Stmt.* ¶¶ 7, 12. The two corporations – which share the same owners and officers – produce infomercials, buy media time

for them, answer the telephones when consumers call to order products, ship the products to

consumers and handle customer service for those infomercials. *Id.* ¶ 19. According to the

President of both DMC and ITV, the functions of the two corporations overlap. *Id.* ¶ 21. The

companies also use "Today's Health" as a d/b/a. *Id.* ¶ 23. Direct Fulfillment, Inc. is also part of

the DMC/ITV family. *Id.* ¶ 22. In addition, DMC and ITV use a network of distributors to sell

their products. *Id.* ¶ 20.

      The DMC/ITV Defendants admit that DMC (which was incorporated in 2001) advertised

and sold Coral Calcium Daily, that it produced an infomercial featuring Robert Barefoot

discussing coral calcium, and that this infomercial aired on various national and local networks.

*Id.* ¶¶ 9-11. Similarly, they admit that ITV (which was incorporated in 2003) advertised and sold

Supreme Greens, that it produced an infomercial for that product featuring Alejandro Guerrero,

and that this infomercial also aired on various national and local networks. *Id.* ¶¶ 14-16.

      2.    Donald Barrett

      Donald Barrett owns 50% of the stock of both DMC and ITV. *FTC Rule 56.1 Stmt.* ¶ 24.

He is the President and a Director of both companies, and, together with Robert Maihos, is one of

the two ultimate corporate decisionmakers. *Id.* ¶¶ 18, 32, 38. Barrett oversees infomercial

editing, and is ultimately responsible for the contents of brochures, packaging inserts, and all

matters involving the sales room. *Id.* ¶¶ 26-28. From 2002 through mid-2004, he received more

than $1.7 million in income and Subchapter-S distributions from DMC, plus nearly $1 million

more in Coral Calcium Dily proceeds sent directly to his personal bank account. *Id.* ¶¶ 370-372.

He resides in Massachusetts. *Id.* ¶ 25.

      3.    Robert Maihos

      Robert Maihos, who also resides in Massachusetts, owns the remaining 50% of DMC and

ITV. *Id.* ¶¶ 30-31. Up until October 2002, Mr. Maihos was the President of DMC, and he continues to be one of the two officers and directors of ITV and DMC. *Id.* ¶¶ 29, 33, 32. Mr. Maihos' responsibilities on behalf of DMC include overseeing shipping, customer service, and finances; his responsibilities for ITV include handling the company's merchant account. *Id.* ¶¶ 35-37. He has authority to sign checks and enter into contracts on behalf of both companies, and has stated under oath that he is "responsible for day-to-day operations" of both DMC and ITV." *Id.* ¶ ¶ 35, 37 34. From 2002 through mid-2004, he received more than $2.4 million in income and Subchapter-S distributions from DMC. *Id.* ¶¶ 368-369.

### 4. Triad ML Marketing and King Media

Triad is a Pennsylvania corporation with its principal place of business at 656 East Swedesford Road, Suite 330, Wayne, Pennsylvania 19087. *Id.* ¶ 39. Triad assists direct response clients by finding third-party vendors to fulfill whatever requirements those clients have, such as managing fulfillment (the packaging and shipping of products to consumers), assisting with order volumes, and using its merchant account to process credit cards for clients that do not have a merchant account. *Id.* ¶¶ 47-48. Triad handled all management of the coral calcium infomercial from approximately January 2002 to February 2003 and allowed its merchant account to be used to process transactions for consumer orders of Coral Calcium Daily from approximately the end of December 2001 to February 2003. *Id.* ¶¶ 49-50. Triad split the profits from the coral calcium infomercial with DMC. *Id.* ¶¶ 102-103. The Stern Defendants admit that Triad has transacted business in Massachusetts. *Id.* ¶ 39.

King Media is a Delaware corporation with its principal place of business at 656 East Swedesford Road, Suite 330, Wayne, Pennsylvania 19087. *Id.* ¶ 40. King Media purchases television time for direct response clients and admits that it purchased media time for the Coral

Calcium Daily infomercial from approximately December 2001 to March 2003. *Id.* ¶¶ 45, 46, 105. King Media decided when and where to purchase media time for the coral calcium infomercial, for both DMC and its distributors. *Id.* ¶ 105, 107. King received a commission on its media purchases. *Id.* ¶ 106. King admits to transacting business in Massachusetts. *Id.* ¶ 40.

### 5.  Allen Stern

Allen Stern is the President and CEO of both Triad and King Media. *Id.* ¶ 41. The Stern Defendants admit that Stern directs, controls, formulates, or participates in the acts and practices of both companies. *Id. See also FTC Rule 56.1 Stmt.* ¶¶ 42, 43. Stern owned one-third of King Media and through his wife, claims to have owned one-third of Triad from the time of each company's inception through approximately mid-2003; since that time, he has owned two-thirds of both companies. *Id.* ¶¶ 57-59, 44.

### C.  **Relief Defendants**

#### 1.  Lisa Stern

Relief Defendant Lisa Stern is the ex-wife of Allen Stern and a former owner and officer of Triad and King Media. *Id.* ¶¶ 53-58. From the time King Media was incorporated until approximately mid-2003, Lisa Stern owned 33% of King Media. *Id.* ¶ 57. From 1996 until approximately mid-2003, Lisa Stern was the official owner of 66% of the shares of Triad. *Id.* ¶ 58.

#### 2.  Steven Ritchey

Steven Ritchey is an officer of both King Media and Triad, and has owned 33% of both companies since their respective inceptions. *Id.* ¶ 60.

#### 3.  BP International, Inc.

BP International, Inc. ("BP") is a Nevada corporation with its principal place of business

in Reno, Nevada. *FTC Rule 56.1 Stmt.* ¶ 61 . Its sole officer and director – Steve Paris – is

Donald Barrett's cousin, and a former employee of DMC. *Id.* ¶¶ 63-65. Barrett is a signatory on

BP's corporate bank account. *Id.* ¶ 66. BP was incorporated on April 18, 2002. *Id.* ¶ 62.

### D.    Coral Calcium

#### 1.    The Marketing and Sale of Coral Calcium Daily

In late 2001, Barrett paid Kevin Trudeau ("Trudeau") $25,000 to film an infomercial for a

coral calcium product. *FTC Rule 56.1 Stmt.* ¶¶ 68, 69, 71. This infomercial, which featured

Trudeau and Robert Barefoot ("Barefoot"), was filmed in December 2001. *Id.* ¶ 73. Shortly

after the filming, on or about December 24, 2001, Trudeau sent the finished coral calcium

infomercial to Barrett, and the Defendants began airing it on nationwide television.[5] *Id.* ¶ 74-75.

Throughout the coral calcium infomercial, Trudeau and Barefoot made numerous claims

about the benefits of coral calcium, including its ability to prevent and cure cancer, heart disease,

Parkinson's Disease, and multiple sclerosis, including through the following excerpts:

- KEVIN TRUDEAU: Okay. Now, so, are you saying the simplest thing a person
  can do to increase their health is consume more calcium?

  ROBERT BAREFOOT: That's the case, and that's why all these cultures all over
  the world, who eat 10 to 100 times as much as we do, virtually never have heart
  disease or cancer.

  \*\*\*

  KEVIN TRUDEAU: You're saying if a person wants to be healthier, to live longer
  –

  ROBERT BAREFOOT: Yes.

  KEVIN TRUDEAU: – disease-free in your opinion, they do two simple things,
  stay in the sun two hours a day, get sunlight on their face –

---

[5] The Commission notes that ITV was not incorporated until January 2003, and thus
would not have participated in the marketing of coral calcium prior to that time.

ROBERT BAREFOOT: And take coral calcium.

KEVIN TRUDEAU: And that's it?

ROBERT BAREFOOT: That's it. And, boy, I can introduce you to thousands that do and you won't believe their stories.

***

• KEVIN TRUDEAU: * * * I was just watching TV yesterday. There was a doctor on and the question was, what – how do we know if you're going to have cancer? And the doctor said, if your genetic make-up is for cancer, like, you know, there was cancer in your mother's side of the family and there was cancer in your father's side, you have a high chance of having cancer.

ROBERT BAREFOOT: Not if you're on calcium.

*FTC Rule 56.1 Stmt.* ¶ 81B, 81E, 81H. They also represented that 100% of the coral calcium that a person ingested was absorbed by the body, that it was absorbed up to 50 times faster than other forms of calciums were absorbed[6], and that research published in the Journal of the American Medical Association ("JAMA") and the New England Journal of Medicine ("NEJM") proved that calcium supplements prevent, reverse, and cure cancer. *Id.* ¶ 81F, 81G, 81H, 81C.

During the infomercial, consumers were instructed to call a toll-free number for further information. *Id.* ¶ 81D. DMC answered the consumers' telephone calls, and its sales representatives were given scripts, "product power sheets," and other hand-outs to use when talking to consumers. *Id.* ¶¶ 85, 87, 88. These materials, which sales representatives were expected to follow in their discussions with consumers, *id.* ¶ 196, contained claims about coral calcium's absorption and disease-fighting properties. *Id.* ¶ 89. For example, a document, entitled "Facts About Diseases Coral Calcium Can Help," specifically listed Alzheimer's disease,

---

[6] Barefoot stated in the infomercial that "As a matter of fact, since within about 20 minutes you get 100 percent absorption, you're literally getting 50 times as much calcium, 50 times as fast if you take the coral calcium versus, say, an antacid calcium." *Id.* ¶ 81F.

chronic fatigue syndrome, fibromyalgia, lupus, and Parkinson's disease, thus strongly implying that coral calcium could treat these diseases. *Id.* ¶¶ 89B, 90.

According to a former DMC sales manager, callers frequently stated that they were suffering from a specific disease, such as cancer or diabetes. *Id.* ¶ 95. Sales representatives were told that they should tell such consumers to take higher doses, "upwards of three times what the normal person would take." *Id.* ¶ 91. Sales representatives were also permitted to tell consumers that if they had a degenerative disease or condition, coral calcium would help break down the acid associated with that disease, and when their body became alkaline, they would be healthy. *Id.* ¶ 92. And if consumers asked whether coral calcium would cure a specific disease from which they suffered, the representatives would say that they had heard testimonials from people who had various diseases reversed. *Id.* ¶ 89D.

Printed material making strong absorption and disease claims was also included in the packaging materials that some consumers received with their shipments of coral calcium: a memorandum from Donald Barrett entitled "President's Handshake" that related how coral calcium had purportedly reversed his father's liver cancer. *Id.* ¶¶ 96, 97.

Stern testified that his companies managed the infomercial. *Id.* ¶¶ 50, 99. Specifically, King purchased air time for the infomercial, and Triad handled all other aspects of the coral calcium program – except for answering consumers' telephone calls – including purchasing the product from the manufacturer, processing customers' credit card purchases through its merchant account, and arranging for third parties to package and ship the product to customers. *Id.* ¶¶ 46, 50, 99, 105. King continued to purchase media for the infomercial until March 2003, and Triad continued to use its merchant account to process consumers' orders through February 2003. *Id.* ¶¶ 105, 100.

DMC took over more phases of the operation from Triad over time, as it developed fulfillment capabilities and obtained its own merchant account. *FTC Rule 56.1 Stmt.* ¶ 119. DMC's total management of the coral calcium program was relatively short-lived according to Barrett, because of the Commission's intervention. *Id.* ¶ 120. DMC still appeared to be selling Coral Calcium Daily in September 2003, however, despite assurances to the Commission that it had stopped. *Id.* ¶¶ 123, 122.

The Defendants did not have the coral calcium infomercial reviewed by an attorney prior to it's going on the air, nor did they consult any scientific experts. *Id.* ¶¶ 76, 77, 79, 80. Nor did they subsequently seek substantiation for the claims made in the infomercial and the other promotional materials, even though Barrett and Stern were on notice in January 2002 – *i.e.*, almost immediately after the coral calcium infomercial aired – that such substantiation in the form of "sound clinical or scientific studies" was needed.[7] *Id.* ¶¶ 111-112.

Indeed, Stern's knowledge of the problematic nature of the infomercial claims, and his unwillingness to address those problems because of the money being generated by the program, are demonstrated by the fact that he sent the infomercial to a law firm in January 2002 – although it was not reviewed at that time to save money – and then sent it to another firm months later. *Id.* ¶¶ 108, 117. Stern testified that the Defendants opted not to air a revised version of the infomercial that subsequently was created because it did not perform as well as the original program. *Id.* ¶ 118.

_____

[7] Indeed, the Stern Defendants testified that they still do not have a practice of reviewing infomercials for compliance with FTC law prior to dissemination. *Id*. at ¶ 78.

2.    The Defendants' Claims about Coral Calcium Daily Were False and
      Unsubstantiated

The FTC has alleged that the Defendants made multiple false and unsubstantiated claims

in their marketing and sale of Coral Calcium Daily. Count One of the Amended Complaint

alleges that they represented, falsely or without substantiation, that the coral calcium ingredient

contained in Coral Calcium Daily is an effective treatment or cure for cancer, autoimmune

diseases (including multiple sclerosis and lupus), Parkinson's disease, and heart disease. S.J. Ex.

2, at ¶¶ 35-36. Count Two alleges that they represented, falsely or without substantiation, that:

(a) the body absorbs significantly more – in some cases up to fifty (50) times as much – of the

calcium contained in Coral Calcium Daily, and at a rate significantly faster – in some cases up to

fifty (50) times faster – than the calcium contained in a commonly available antacid calcium

product; and (b) the body absorbs 100 percent of the calcium contained in Coral Calcium Daily.

*Id.* at ¶¶ 37-38. Count Three alleges that they falsely represented that scientific research

published in the Journal of the American Medical Association and the New England Journal of

Medicine proves that calcium supplements are able to prevent, reverse, or cure cancer in humans.

*Id.* at ¶¶ 39-40.

To establish that the Defendants' claims are false and unsubstantiated, the Commission

has submitted the reports of expert witnesses Richard J. Wood, Ph.D. , Laboratory Director at the

Mineral Bioavailability Laboratory of the USDA Human Nutrition Research Center on Aging at

Tufts University, and an Associate Professor in the Friedman School of Nutrition at Tufts

University, and MaryFran Sowers, Ph.D., Professor in the Department of Epidemiology at the

University of Michigan's School of Public Health and Director of the Center for Integrated

Approaches to Complex Diseases. *Id.* ¶¶ 126, 130, 140.[8]  These two experts concluded that there is no competent and reliable evidence supporting the Defendants' disease claims, their claims about coral calcium's absorption and bioavailability, or their claims that research in leading medical journals proves that calcium supplements can prevent, reverse, or cure cancer. *Id.* ¶¶ 132-139, 143-157.

The Defendants have not provided the Commission with any expert reports regarding the purported health benefits or absorption of coral calcium, nor have they deposed the Commission's experts. *Id.* ¶¶ 127-129. Thus, since Dr. Woods' and Dr. Sowers' conclusions are uncontroverted, the Court should find that the challenged claims about coral calcium are false and unsubstantiated, and that Summary Judgment can be granted as to Counts I through III of the Amended Complaint.

> a.    The Defendants' disease cure claims are false and unsubstantiated

Dr. Sowers stated that there is no competent and reliable scientific evidence to support the claim that calcium or coral calcium is an effective treatment or cure for cancer, heart disease, Parkinson's disease, or autoimmune diseases (including multiple sclerosis and lupus). *Id.* ¶¶ 143-147. She also stated that although some published studies suggest that calcium may be associated with lower occurrence of pre-cancerous polyps in the colon, the findings of these studies cannot be extrapolated to support a claim that calcium is an effective means to treat or cure cancer, including colorectal cancer. *Id.* ¶ 150.

With respect to heart disease, Dr. Sowers concluded that, taken together, epidemiological

---

[8] Dr. Wood is an expert on the bioavailability of minerals, including calcium, in the human body. *FTC Rule 56.1 Stmt.* ¶ 131. Dr. Sowers is an expert on calcium and its relationship to disease. *Id.* at ¶ 141.

and clinical studies suggest that calcium supplementation may have a statistically significant, although very small, blood pressure-lowering effect in certain populations, but that those studies do not suggest that calcium supplementation is effective in the treatment or cure of heart disease or chronic high blood pressure in the general population. *Id.* ¶ 156. Dr. Sowers is not aware of any studies that support a finding of calcium as an effective means to treat or cure hypertension – one of the four risk factors for heart disease – let alone heart disease. *Id.* ¶¶ 154-155.

Finally, having conducted several bibliographic searches and relying on her extensive knowledge of calcium, Dr. Sowers is aware of no scientific research literature that suggests a possible association between calcium intake and treatment of lupus, multiple sclerosis, or any other autoimmune disease or Parkinson's disease. *Id.* ¶ 157. In sum, Dr. Sowers' report demonstrates that the Defendants' disease claims are unsupported, and thus false and unsubstantiated.

Moreover, a recent FDA decision on a petition seeking authorization to make health claims linking calcium consumption and reduced risk of certain cancers and other health related conditions confirms Dr. Sowers' conclusions. The petitioners sought permission to claim, *inter alia*, that calcium may reduce the risk of colon cancer, rectal cancer, colorectal cancer, breast cancer, and prostate cancer; or that it may reduce the risk of recurrent colon polyps. *FTC Rule 56.1 Stmt.* ¶ 158. After analyzing the hundreds of publications cited by the petitioners – and explaining why certain types of publications did not provide information from which it could draw <u>any</u> scientific conclusions, *id.* ¶¶ 159, 160 – FDA concluded there was no credible evidence to support qualified health claims about calcium and breast cancer or prostate cancer, although it would consider exercising enforcement discretion for the following carefully limited (*i.e.*, containing strong disclaimers) *prevention* claims:

"Some evidence suggests that calcium supplements may reduce the risk of colon/rectal cancer, **however, FDA has determined that this evidence is limited and not conclusive**."

"Very limited and preliminary evidence suggests that calcium supplements may reduce the risk of colon/rectal polyps. **FDA concludes that there is little scientific evidence to support this claim**."

*Id.* ¶ 161 (emphasis added). FDA's letter clearly confirms that the Defendants' disease cure claims far outstripped the existing science, and were false and unsubstantiated.

> b.  The Defendants' absorption and bioavailability claims are false and unsubstantiated

Dr. Wood stated that it is generally accepted that human studies are required to support a scientific finding concerning the bioavailability (that is, the extent to which a nutrient is absorbed into the body's bloodstream after ingestion) of a test compound in the human body, that no dietary calcium source is 100 percent absorbable in the body, and that there is no reliable and competent scientific evidence that the body absorbs 100 percent of the calcium contained in Coral Calcium Daily. *FTC Rule 56.1 Stmt.* ¶¶ 134, 135, 133.

In reviewing the body of scientific literature on the absorbability of different sources of calcium, Dr. Wood found only one small study that evaluated the bioavailability of any type of coral-derived calcium source. *Id.* ¶ 136. Although this study suggests that more of the calcium derived from coral calcium may be absorbed in the body than the calcium from calcium carbonate forms, Dr. Wood explained that it cannot be extrapolated to support the Defendants' strong claims of 100 percent absorption or substantially greater absorption than from other calcium sources. *Id.* ¶¶ 137, 138. In short, Dr. Wood's report concluded that there was no reliable and competent evidence supporting the Defendants' absorption claims for coral calcium. *Id.* ¶ 139. Thus, those claims were false and unsubstantiated.

c.    The Defendants' claims that scientific research proves that calcium supplements are able to prevent, reverse, or cure cancer are false

According to the infomercial, articles published in JAMA and the NEJM prove that calcium supplements reverse cancer. *FTC Rule 56.1 Stmt.* ¶¶ 81G, 81H. This statement is false. Dr. Sowers stated that in reviewing the scientific literature, she found no scientific studies published in JAMA, the NEJM, or other reputable medical journals proving that calcium supplements are able to reverse and/or cure cancer in humans. *Id.* ¶¶ 148, 149.

Dr. Sowers described a 1998 study published in JAMA and a 1999 study from the New England Journal of Medicine, both of which involved subjects who had a history of colorectal polyps. *Id.* ¶¶ 150, 151. As Dr. Sowers explained, neither study supports the proposition that calcium supplements reverse or cure any form of cancer. *Id.* ¶ 151. Rather, at most, the JAMA study suggests that a low-fat dairy diet containing 1,200 mg. of calcium may marginally reduce the proliferation rate and nuclei size of abnormal cells in the colon. *Id.* ¶ 152. It does not suggest that increased calcium intake can reverse cancer, and does not provide any support for claims involving cancers other than colon cancer. *Id.* Similarly, the NEJM study found that calcium supplementation was associated with a modest reduction of recurrent polyp formation among test subjects who had a recent history of pre-cancerous colon polyps; it did not suggest that calcium supplements are an effective treatment or cure for colorectal cancer, or any other form of cancer, and does not suggest that calcium supplements cure or reverse cancer. *Id.* ¶ 153.[9]

Dr. Sowers' uncontroverted testimony is the only evidence on the record on this issue. Accordingly, the Court should find that the Defendants' claims are false.

---

[9] Indeed, the carefully limited claims for which FDA will exercise enforcement discretion are based in part on the agency's analysis of these studies. S.J. Ex. 12, at Att. 7.

3.    Consumer Injury Resulting From The Defendants' Sale of Coral Calcium
      Daily

According to the Stern Defendants, consumers paid between $14.95 and $39.95, plus

shipping and handling, for a one-month supply of Coral Calcium Daily. *Id.* ¶ 98.  Triad and

Barrett estimate consumer purchases of coral calcium from the infomercial at a minimum of $40

million. *Id.* ¶¶ 162-163.

**E.    Supreme Greens**

1.    The Marketing and Sale of Supreme Greens With MSM

In April 2003, ITV entered into a distribution agreement with Healthy Solutions, LLC for

Supreme Greens (a dietary supplement consisting of nearly 40 ingredients, including alfalfa leaf,

parsley leaf, and MSM). *FTC Rule 56.1 Stmt*. ¶¶ 166-167, 164.  That same month, Barrett and

Alejandro ("Alex") Guerrero taped the infomercial for Supreme Greens that the DMC/ITV

Defendants edited and started airing in August 2003. *Id.* ¶ 171-173, 175.

The infomercial began with Barrett announcing that Guerrero knows of cures for "most

chronic degenerative diseases -- such as cancer, arthritis, diabetes, even the number one killer out

there, heart disease." *Id.* ¶ 188A.  It continued with Guerrero stating that the underlying cause of

all disease is "acidification" of the body, and that by returning the body to its naturally alkaline

state, Supreme Greens creates an environment in which disease cannot exist. *Id.* ¶ 188C.  Barrett

and Guerrero then touted how effective Supreme Greens is for preventing and curing cancer and

other diseases, including arthritis, as well as for losing weight:

    A.    MR. BARRETT: And when you alkalize the body, these -- a lot of these
          symptoms, a lot of these diseases are going to --

          DR. GUERRERO: Well, they --

          MR. BARRETT: -- fall by the wayside.

DR. GUERRERO: Well, they all do, because they're a result of over acidification of the blood and tissues. . . .

* * *

MR. BARRETT: And now here's the question: If I alkalize my body, am I going to come up with one of these chronic degenerative diseases?

DR. GUERRERO: No.

B.    MR. BARRETT: Okay. Alex, why do so many people lose weight on the product? I know that a lot of people get on the product to either help with their diabetes or maybe their heart disease or even cancer, but they lose weight as a by-product. How come?

DR. GUERRERO: They lose weight as a by-product because, again remember, weight is the – fat is your body's way of protecting itself from the acidic fluids. And so when you alkalize your –

MR. BARRETT: So when your body's acid – * * * when you have a high acid system your body needs a layer of protection which is called fat.

DR. GUERRERO: It's called fat.

MR. BARRETT: So when you alkalize your body you don't need that fat?

DR. GUERRERO: You don't need that fat. Your body burns it actually for fuel.

*FTC Rule 56.1 Stmt.* ¶ 188C, 188H.[10] The DMC/ITV defendants further strengthened their disease cure claims by representing that a 200 person clinical study provided extraordinary results establishing Supreme Greens' curative powers. *Id.* ¶ 188D. The study, however, does not exist. *Id.* ¶ 265. The infomercial provided toll-free telephone numbers for consumers to call for "more information" and to purchase Supreme Greens. *Id.* ¶ 189.

The DMC/ITV Defendants also made similar representations about the purported health and disease benefits of Supreme Greens on their website www.todayshealth.com/supremegreens,

---

[10] The infomercial also included a conversation with a consumer who claimed to have lost 81 pounds in eight months using Supreme Greens. *Id.* ¶ 188G.

where they stated, among other things, that Supreme Greens "has already helped thousands of people with cancer, diabetes, arthritis, lupus, fibromyalgia, chronic fatigue syndrome, and many others." *Id.* ¶ 195.

As with the coral calcium program, the DMC/ITV Defendants' sales representatives were provided with scripts, "Product Power Sheets" and other materials to use when answering Supreme Greens calls. *Id.* ¶¶ 196-202. One set of Frequently Asked Questions ("FAQs") provided that a sales representative could respond to the question "will it help with my _____?" by stating that Supreme Greens gives the body what it needs to heal itself." *Id.* ¶ 200. And at least one Supreme Greens power sheet discussed the mechanism by which Supreme Greens would cause weight loss, as did the FAQs. *Id.* ¶¶ 199-201.

The DMC/ITV Defendants handled all aspects of the Supreme Greens program, including buying the media, answering the phones, shipping the product to consumers, and customer service. *FTC Rule 56.1 Stmt.* ¶ 170.

At the time the Supreme Greens infomercial started airing, Barrett was well aware of the FTC's concerns about his coral calcium infomercial. *Id.* ¶ 187. [11] Moreover, Barrett had told Healthy Solutions, LLC that ITV and its attorneys would make sure that the infomercial was compliant with FTC and FDA law. *Id.* ¶ 168. Nonetheless, despite that knowledge, his representations to Healthy Solutions, and the fact that ITV Director of Operations Eileen Barrett characterized the Supreme Greens infomercial as "very controversial," *id.* ¶ 174, the DMC/ITV

---

[11] In mid-June 2003, the Commission initiated its contact with the DMC/ITV Defendants when Commission attorney Kial Young wrote Barrett that the Commission had conducted a non-public investigation, and had "concluded that DMC and [Barrett] have violated Sections 5 and 12 in connection with the advertising and sale of Coral Calcium Daily. *Id.* ¶ 121. Counsel for the DMC/ITV Defendants informed the staff shortly thereafter that DMC would withdraw all of its advertising for Coral Calcium Daily. *Id.* ¶ 122.

Defendants did not have it reviewed by an attorney or by anyone with a science or medical background. *Id.* ¶¶ 178-180. In fact, Barrett had decided to go ahead with the infomercial based on successful results of test airings. *Id.* ¶ 176.

The DMC/ITV Defendants then decided to continue airing the infomercial, despite receiving little in the way of substantiation from Healthy Solutions, and after repeated requests. *Id.* ¶ 181-185. Indeed, as early as August or September 2003, the DMC/ITV Defendants knew that the study of 200 terminal cancer patients described in the infomercial was not "a well-documented study." *Id.* ¶ 186. Then, on October 3, 2003, Maihos received a transcript of the infomercial bearing handwritten comments by his own legal counsel raising numerous questions about various statements in the infomercial, including "sounds like BS," "need scientific support for this" and "the study says it worked for pigs" at various places next to the transcript. *Id.* ¶ 209. On approximately the same day, the Commission had informed counsel for the DMC/ITV Defendants that it believed many claims made in the Supreme Greens infomercial were false and/or unsubstantiated, and that DMC and Barrett should cease airing the infomercial. *Id.* ¶ 208.[12]

Over the next few weeks, the DMC/ITV Defendants agreed to make substantial revisions to the infomercial. *FTC Rule 56.1 Stmt.* ¶ 210. In late October, they had Guerrero return to Boston to shoot a new infomercial with Barrett,[13] and on December 3, 2003, their counsel indicated to the FTC that a revised Supreme Greens infomercial had been "dubbed and

---

[12] During the first few months that the Supreme Greens infomercial ran, a few television stations also declined to air the infomercial because of the "cancer cure language in the show." *Id.* ¶ 207.

[13] Unlike the original infomercial, which featured a nighttime skyline behind Guerrero and Barrett, the October 2003 version used a daytime vista. *Id.* ¶ 213.

substituted in over two dozen stations," and that "the changeover process [was] continuing." *Id.*
¶ 212, 221. *See also FTC Rule 56 Stmt.* ¶¶ 214-218.

The DMC/ITV Defendants did not, however, cease airing the original Supreme Greens
infomercial. *Id.* ¶ 222. After testing the revised infomercial, they found that it performed poorly,
*id.* ¶¶ 219, 220, 223-226, and – without notifying the Commission – they started to air the
original version of the infomercial again. *Id.* ¶ 222. Indeed, in a February 7, 2004 email to
Barrett, a DMC employee wrote "I was going over the results of the Supreme Greens shows that
ran this Friday. I was so excited to see the results go up because we switched back to the original
version Supreme Greens." *Id.* ¶ 227. On February 23, 2004, Barrett sent an email to "All
Managers" stating that "We should now be using the original version Supreme Greens (SGRN)."
*Id.* ¶¶ 228-230.[14]

On February 11-13, 2004, two weeks before Barrett's "All Managers" email, the Food
and Drug Administration ("FDA") conducted an onsite inspection of ITV and DMC. *Id.* ¶ 231.
On April 19, 2004, FDA issued a warning letter to both companies concerning their marketing of
Supreme Greens. FDA concluded among other things, that the DMC/ITV Defendants' website,
www.todayshealth.com, was making disease prevention, treatment, mitigation, and cure claims
for Supreme Greens. *Id.* ¶ 232. That same month, Guerrero acknowledged on national television
that he had not conducted a clinical study of Supreme Greens, and that there was, in fact, no

_____

[14] Amazingly, Barrett had the temerity to state in a sworn affidavit to this Court that
upon being told by the FTC on April 7, 2004 that "the original Supreme Greens infomercial was
running in certain media markets. We then investigated the matter, determined that certain
stations were airing the original infomercial, and immediately notified all media outlets to cease
running any of the Supreme Greens versions," *id.* ¶ 234, clearly implying that the DMC/ITV
Defendants had no idea that the original Supreme Greens infomercial was airing, and it was all
just some innocent mistake.

scientific support for Supreme Greens. *Id.* ¶ 264. On June 23, 2004, this court ordered in a litigated Preliminary Injunction that the Supreme Greens claims challenged in the FTC's complaint were prohibited. Preliminary Injunction, at p. 17, ¶ I.

> 2. The DMC/ITV Defendants' Claims for Supreme Greens With MSM are False and Unsubstantiated

The FTC has challenged multiple Supreme Greens claims as false and unsubstantiated: Count IV of the Amended Complaint alleges that the DMC/ITV Defendants falsely, or without adequate substantiation claimed that Supreme Greens is an effective treatment, cure, or preventative for cancer, heart disease, diabetes, and arthritis. S.J. Ex. 2, at ¶¶ 41, 42. Count V alleges that Defendants falsely, or without adequate substantiation claimed that Supreme Greens will cause significant weight loss of up to 4 pounds per week and up to 80 pounds in 8 months. *Id.*, at ¶¶ 43-44.

To establish that the Supreme Greens claims are false and unsubstantiated, the FTC has submitted the testimony of expert witnesses Barrie Cassileth, Ph.D, Chief of the Integrative Medicine Service of the Memorial Sloan-Kettering Cancer Center and Landon King, M.D., Associate Professor of Medicine and Biological Chemistry at the John Hopkins University School of Medicine. *FTC Rule 56.1 Stmt.*, ¶ 235. [15] The DMC/ITV Defendants have not provided the Commission with a single expert report regarding the efficacy or health benefits of Supreme Greens or deposed Drs. Cassileth and King; accordingly, our experts' uncontroverted reports are the only evidence before the Court on this issue. *Id.* ¶¶ 238, 237. Thus, there is no

---

[15] Dr. King is an expert in the diagnosis and management of patients with pulmonary diseases and critical illness, both of which require an understanding of the body's relative acidity or alkalinity, the causes and effects in changes in that acid-alkaline balance, and the methods the body uses to keep that balance from changing. *Id.* ¶ 241. Dr. Cassileth is an expert in the field of complementary and alternative therapies for cancer. *Id.* ¶ 255.

Page 21 of 61

question that the challenged claims are false and unsubstantiated, and Summary Judgment can be granted as to Counts IV and V of the Amended Complaint.[16]

               a.       The DMC/ITV Defendants' disease cure and prevention claims are false and unsubstantiated

First, Dr. King's report explains why the DMC/ITV Defendants' assertions that Supreme Greens prevents and cures disease – and facilitates weight loss – by returning the body's pH from an acid state to an alkaline state, are false. *FTC Rule 56.1 Stmt.* ¶¶ 242-252. Specifically, he explains that the body uses multiple systems to keep its pH level as stable as possible, and undertakes both short-term and long-term measures to compensate for any changes and return the balance to its normal state. *Id.* ¶¶ 242, 245-246. Dr. King concludes that the basic method of action set forth in the Supreme Greens infomercial – that changing the body's pH level can cure, treat or prevent disease – is not substantiated. *Id.* ¶ 250. There is no scientific evidence that disease is caused by too much acidity in the blood or that increasing the alkalinity of the body will prevent, cure, or treat cancer, heart disease, arthritis, or diabetes. *Id.* ¶¶ 249, 243, 244. Indeed, most persons suffering from chronic disease will have normal pH levels. *Id.* ¶ 249. Additionally, there are no scientific studies, or any other scientific evidence, supporting the proposition that increasing the alkalinity of the body will prevent, cure, or treat cancer, heart disease, arthritis, or diabetes. *Id.* ¶ 251.

Second, according to Dr. Cassileth, the scientifically valid way to determine whether Supreme Greens (or any other product) produces any health results is a double-blind, placebo

---

[16] If the Commission prevails in this Motion for Summary Judgment on all other counts, it will recommend to the Court that the allegation in Count VI of the Amended Complaint that the DMC/ITV Defendants made false or unsubstantiated safety claims for Supreme Greens be dropped.