controlled study. *Id.* ¶ 258. There are, however, no human clinical studies conducted on

Supreme Greens as formulated. *Id.* ¶ 259. Moreover, based on a review of published literature

regarding the component ingredients of Supreme Greens, Dr. Cassileth concluded that there is no

reliable scientific evidence that any of the ingredients in Supreme Greens prevent, treat or cure

cancer, heart disease, diabetes or arthritis. *Id.* ¶¶ 262, 260. Accordingly, her report concludes

that there is no reliable scientific evidence that the ingredients in Supreme Greens – separately or

together – can treat, cure or prevent cancer, heart disease, diabetes, or arthritis. *Id.* ¶ 262. The

DMC/ITV Defendants' disease claims are, therefore, false and unsubstantiated.

> b.    The DMC/ITV Defendants' weight loss claims are false and
>       unsubstantiated

Dr. Cassileth's report also explains that anecdotal evidence of a few consumers who

claim to have lost weight using Supreme Greens would not constitute adequate scientific

evidence that the product causes weight loss. *FTC Rule 56.1 Stmt.* ¶ 261. To the contrary, as

with disease claims, properly designed and conducted – *i.e.*, double blind, placebo controlled –

studies of the product as formulated are necessary. *Id.* ¶ 263. Having been unable to find any

such studies for Supreme Greens, Dr. Cassileth concluded that there was no adequate scientific

evidence that Supreme Greens causes weight loss. *Id.* ¶ 364. Thus, the DMC/ITV Defendants'

claims are false and unsubstantiated.

> 3.    The DMC/ITV Defendants Used a Deceptive Format for the Supreme
>       Greens With MSM Infomercial

Although the Supreme Greens infomercial was paid advertising, it was made to look and

sound like an ordinary talk show. Seated at a desk with an impressive skyline visible through the

window behind him, Barrett opened the show by welcoming viewers to "another edition of

Today's Health." *Id.* ¶ 190. He concluded the infomercial the same way: "Again, my name is

Donald Barrett and we'll see you next time on Today's Health. Thanks." *Id.* ¶ 191. He also introduced Guerrero as his guest. *Id.* ¶ 192. Of course, Guerrero was not a really a guest, in the sense of being an unaffiliated person invited to share his views on a health topic of current interest; rather, his appearance in the infomercial was specifically called for in the April 2003 Supreme Greens Distribution Agreement between ITV and Healthy Solutions, LLC. *Id.* ¶ 193. All of these techniques contributed to the impression that this was regularly scheduled conventional programming.[17]

Furthermore, the infomercial contained only minimal disclosures that it was paid programming: brief written acknowledgments at the very beginning and the very end of the infomercial. *Id.* ¶ 194. Consumers who missed these disclaimers -- which this Court has characterized as "infrequent and/or inconspicuous," Preliminary Injunction , at 11 -- were given no other notice during the 28 minute infomercial that this was simply a program-length advertisement.

4.    Consumer Injury Resulting From The DMC/ITV Defendants' Sale of Supreme Greens With MSM

Consumers paid amounts varying from $32.99 to $49.99, plus shipping, for a bottle of Supreme Greens. *FTC Rule 56.1 Stmt.* ¶ 206. In total, from August 2003 to June 2004, consumers paid at least $16,052,800 (including shipping) to the DMC/ITV Defendants, of which $1,369,364 was refunded for a variety of reasons. *Id.* ¶¶ 266-268. Accordingly, net sales for Supreme Greens were at least $14,683,436. *Id.* ¶ 268.

---

[17] The name "Today's Health," in and of itself, also suggests that consumers are watching a health-related program, not an advertisement.

**F.     The DMC/ITV Defendants Enrolled Coral Calcium Daily and Supreme Greens With MSM Purchasers in Autoship Programs Without Their Consent**

The DMC/ITV Defendants placed great importance on their autoship program: the company's sales managers pressured sales representatives to sign people up for autoship, the phrases "Autoships equal Christmas bonus" and "autoship equals job security" were seen and heard around the company, and sales representatives generally received larger commissions for selling a product on autoship than for selling just a single unit of that same product. *FTC Rule 56.1 Stmt.* ¶¶ 271-279.[18] Donald Barrett testified that having people reorder product meant "everything" as a revenue source and that reorders were "a big, big part" of running sales for consumable products. *Id.* ¶ 272. Although there is nothing inherently illegal about autoship or continuity programs (as they are also called), the evidence here demonstrates that <u>unauthorized</u> autoships – facilitated by misleading sales scripts and, at best, managerial indifference resulted in substantial consumer injury. Although consumers had complained to DMC about unauthorized autoships in early 2002, *id.* ¶ 285, the DMC/ITV Defendants continued to use misleading scripts into the Supreme Greens campaign. *Id.* ¶¶ 288-302. Indeed, as described below, the DMC/ITV Defendants' recent declarations in the instant litigation show that they continue to fail to implement effective policies to prevent further unauthorized billing of consumers. *Id.* ¶¶ 313-318.

　　　　　　　　　1.     <u>Defendants' Course of Conduct Regarding Unauthorized Autoships</u>

An early coral calcium script – written by Barrett himself – provided that after the representative obtained the consumer's billing information, he or she was to state "As a bonus

---

[18] For example, sales representatives earned $2 for selling a single bottle of Supreme Greens, but $4 if the bottle was sold to a consumer who was signed up for autoship. *Id.* ¶ 279.

today we will enroll you in our Coral Calcium Club. After you run out, you will receive the lowest price of $29.99 per month supply and of course you can cancel anytime." *FTC Rule 56.1 Stmt.* ¶ 281. The script did not seek consumers' affirmation. *Id.* ¶ 282. Instead, unless consumers specifically objected, they were automatically enrolled in an autoship program, pursuant to which they would receive (and be billed for) periodic shipments of coral calcium. *Id.* ¶¶ 262, 289. Sales representatives, rather than being directed to provide further information about the autoship program, were told to follow the scripts. *Id.* ¶ 282. A second coral calcium script contained similar language, and resulted in consumers being enrolled in an autoship program if they did not affirmatively object. *Id.* ¶ 284.

DMC employees were aware of consumer complaints about unauthorized autoships from early 2002 onward. *Id.* ¶ 285. DMC managers' meeting minutes from January and February 2003 also reveal that Barrett himself discussed the issue of unauthorized autoships or was present at meetings were the issue was raised. *Id.* ¶ 287.

Despite these complaints, the DMC/ITV Defendants continued to use the same type of misleading sales scripts with the Supreme Greens program. For example, at least one Supreme Greens script stated that "Best of all, by purchasing this package today you will be able to receive a month's supply of the alkalizing system for the same low price of 49.99 every month." *Id.* ¶ 288. Consumers purchasing the package would be placed on the autoship program and receive those same products each month for $49.99. *Id.* Again, sales representatives were to follow the script. *Id.* ¶ 289.[19]

---

[19] An "outbound" Supreme Greens script, used by sales representatives calling consumers who had previously inquired about Supreme Greens, instructed sales reps to state that "I can offer a one-month supply of Supreme Greens for just 19.99 plus another $6 shipping and handling. I will also include you in the club that allows you to receive the Greens monthly at our

The DMC/ITV Defendants' use of misleading autoship scripts extended to other products as well, including E8 Daily, a product that was offered by DMC sales reps to persons calling in about Supreme Greens. *Id.* ¶ 293. Sales representatives offered consumers a "free" bottle of E8 Daily without disclosing that acceptance of the offer would cause consumers to receive the product on a monthly basis at $12.50 per shipment. *Id.* ¶¶ 297-98. Barrett himself acknowledged the problematic nature of the E8 scripts, and the fact that some sales representatives might have taken advantage of consumers' confusion.[20] *Id.* ¶¶ 299-300.

Not surprisingly, Defendants' offer of the "free" E8 resulted in numerous consumer complaints about unauthorized autoships. Erik Limbaugh, a former DMC sales manager, testified that he spent at least one-third to half of his time dealing with customer service issues, as so many consumers were calling in to complain. *Id.* ¶ 303. The minutes from a September 9, 2003 managers' meeting state that "[m]any customers are stating that they never agreed to the Autoship Program" for E8 and that "[s]ome customers are incurring bank service charges due to unexpected autoships." *Id.* ¶ 301. Minutes from an October 28, 2003 DMC manager meeting also state that "E8 generates the most complaints; script is deceiving. Customer is not expecting two bottles of continuity." *Id.* ¶ 302. The evidence also reveals that the company's problems

---

lowest price of only 29.99." *Id.* ¶ 291. Consumers who agreed to purchase Supreme Greens at that price and did not further object, would be placed on autoship. *Id.* ¶ 292.

[20] Barrett acknowledged that he considered using the E8 autoship program to reduce the company's inventory of the product. *FTC Rule 56.1 Stmt.* ¶ 295. He testified that in July 2003, he considered raising the commission on E8 autoships "to dangle the carrot for the sales reps a little bit" and reduce the company's "substantial inventory" of E8, although he was not sure if the company did raise the commission. *Id.* at ¶¶ 295-296.

with unauthorized autoships continued for months.[21]  A January 20, 2004 email from John Maihos to the DMC sales force stated that the placement of customers on autoships without their consent "has caused flack with our merchant account, flack with our customers, and now, flack with Ideal Health."  *Id.* ¶ 307.  The problems with unauthorized autoships caused the DMC/ITV Defendants' merchant account holder to double its reserves against chargebacks.  *Id.* ¶ 309.

Remarkably, the DMC/ITV Defendants' own filings in the instant litigation reveal that they remain unwilling or unable to ensure that their sales force adequately informs consumers of the terms and conditions of its autoship program.  Despite Barrett's assertion in his June 4, 2004 affidavit filed with this Court that it was DMC/ITV's policy to "immediately fire" sales representatives who were found to be violating company autoship policy, *id.* ¶ 312, this still does not appear to be the case.  In their opposition to the Commission's motion to modify the Court's preliminary injunction, the DMC/ITV Defendants submitted the June 6, 2005 affidavit of John Maihos, ITV's Vice President of Human Resources, to which were attached numerous "written warnings" DMC has issued to its sales representatives for failing to adhere to company policy.  *Id.* ¶ 313.  The warnings indicate that several reps cited multiple times for failing to mention or properly explain the autoship program were told only to "Please follow the spirit of the script going forward" and that further violations would result "in further disciplinary action, up to and including loss of your job."[22]  *Id.* ¶¶ 314, 315.

---

[21] Barrett testified that a January 2004 email from Eileen Barrett saying that effective immediately, the company would start pulling commission from sales representatives on orders that customers claimed were unauthorized marked "a change in policy" for DMC.  *Id.* ¶¶ 306, 304..

[22] One rep was cited in a May 18, 2005 warning for seven violations, including four where the rep didn't mention autoship and/or didn't communicate that the customer would continue to receive the product, and one violation where the rep apparently offered the customer

### 2.    Complaint Database Regarding Unauthorized Charges

An analysis of the DMC/ITV Defendants' customer database confirms that unauthorized autoships was a pervasive issue that was rampant at the company for months. Thousands of consumers complained to Defendants about their unauthorized billing practices. *FTC Rule 56.1 Stmt.*, ¶ 323. At a minimum, DMC sales representatives reported that 5,998 out of 50,053 consumers who had been put on an autoship for coral calcium or an autoship for any product upon purchasing Supreme Greens, complained about unauthorized autoships. *Id.* ¶¶ 322-23. These numbers represent the bare minimum, and do not reflect the thousands of other instances in which consumers cancelled their autoships because they had been placed on the program without their consent and the customer service representative did not set forth a reason for the autoship cancellation. *Id.* ¶ 324. For purposes of this motion, however, this high volume of express complaints about unauthorized autoships makes it clear that there is no question of fact that this was a pervasive practice by Defendants.[23]  Indeed, the Commission found itself on autoship when it placed an undercover order for Supreme Greens.

---

"a free 'gift'" for which the customer would see a charge. *FTC Rule 56.1 Stmt.* ¶ 316. The rep's "punishment" for these transgressions consisted only of the admonishment to "please follow the spirit of the script to eliminate customer confusion and the possibility of backlash. If this type of recording continues, you will receive further disciplinary action, up to and including loss of your job." *Id.* ¶ 317. The same rep was cited again on May 27, 2005 for "a number of unclear explanations of our auto ship program." *Id.* ¶ 318. The May 27 warning merely directed the representative again "to follow the spirit of the script" and provided another notice regarding the consequences of future violations. *Id.*

[23]  Indeed, the data analysis determined that 118,442 customers, out of 728,324 total DMC customers, either requested cancellations of their autoship or complained it was unauthorized.

3.    Commission Purchase of Supreme Greens Resulted in Unauthorized
       Billing

On October 7, 2003, FTC investigator Christina Turner placed an order for Supreme

Greens using the phone number given during the infomercial. *FTC Rule 56.1 Stmt.* ¶ 330.  Ms.

Turner was told that in addition to receiving three bottles of Supreme Greens for $99, plus $14

for shipping and handling, she would also get a free two month supply of Vitamin E8 Daily. *Id.*

¶ 331.  Ms. Turner was not asked for her express authorization to receive additional shipments of

E8 or advised that she would be billed for such shipments.  In mid-November 2003, however, the

Commission received another shipment from DMC containing contained two more bottles of

Vitamin E8 Daily, and its credit card statement showed that an additional $32.95 charge had been

posted by "Direct Marketing Concepts." *Id.* ¶¶ 333-334.  John Maihos admitted that the sales rep

taking Ms. Turner's order had sold the product improperly. *Id.* ¶ 335.

**G.    Transfers of Ill-Gotten Gains to Defendants and Relief Defendants**

Barrett, Maihos, Stern and all three relief defendants have benefitted from the activities

challenged by the Commission.  Barrett received $926,000 in wages and $819,760 in Subchapter

S property distributions – *i.e.*, distributions of corporate profits – between 2002 and mid-2004;

during this same period, Maihos received $962,415 in wages and $1,458,475 in Subchapter S

distributions. *FTC Rule 56.1 Stmt.* ¶¶ 368-371.  Furthermore, between November 2002 and May

2003, Barrett arranged to have Triad send $953,724.94 of the coral calcium proceeds directly to

his personal bank account, from which he paid for a new home and  gave approximately

$225,000 to Maihos.[24] *Id.* ¶¶  372-374.

---

[24]  Triad also sent $5 million to DMC, and $2.5 million to Direct Fulfillment, Inc.  *FTC
Rule 56.1 Stmt.* ¶ 367.

Allen Stern also benefitted from the marketing and sale of Coral Calcium Daily, insofar as his wife, Lisa Stern, split with him her two-thirds ownership of Triad, resulting in his sharing in the $1.5 million of Triad profits she received. *Id.* ¶¶ 375-76.

Relief Defendants Lisa Stern and Steven Ritchey received $1,545,305 and $772,652, respectively, in distributions from Triad for coral calcium profits earned in 2002.[25] *Id.* ¶¶ 376-377. And, upon the instructions of Donald Barrett (an authorized signatory on BP's bank account), Triad sent a total of $574,274 earned on sales of Coral Calcium Daily to Relief Defendant BP, which was incorporated only 11 days before the first installment of those payments was made. *Id.* ¶¶ 66, 379-383.

### H.    The DMC/ITV Defendants' Ongoing Activities

In the months preceding the filing of the Commission's complaint, the DMC/ITV Defendants disseminated infomercials for dietary supplements making claims for, among other things, weight loss, prostate disease prevention, menopause symptom relief, and prevention of stress-induced disease. *FTC Rule 56.1 Stmt.* ¶¶ 336-343. They also sold the video and newsletter for a diabetes supplement called Eleotin, and took consumer calls for a penis enlargement product called Extenze. *Id.* at ¶ 344.

Since the entry of the Court's June 23, 2004 Preliminary Injunction, the DMC/ITV Defendants have disseminated new dietary supplement infomercials making disease claims, including Sea Vegg, Renuva, and Flex Protex. *FTC Rule 56.1 Stmt.* ¶¶ 346-349, 355-357. According to the Commission's experts, the Sea Vegg and Renuva infomercials made claims that were not supported by competent and reliable scientific evidence. *Id.* ¶¶ 351-354, 358-360.

---

[25] Ninety percent of Triad's 2002 revenues were from Coral Calcium Daily. *Id.* at ¶ 378.

Moreover, we have flagged for the Court the DMC/ITV's Defendants' flagrant violation of the Preliminary Injunction, and the fact that their failure to comply with their industry self-regulatory process has resulted in the infomercials for Sea Vegg and Renuva being referred to the Commission for enforcement, and in ITV being expelled from its own trade association. *Id.* ¶¶ 361-366.

## III.    THE COMMISSION IS ENTITLED TO SUMMARY JUDGMENT AGAINST DEFENDANTS

### A.    The Standard for Granting Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Once the moving party has demonstrated the absence of a factual issue, the opposing party "may not rest upon the mere allegations or denials of [their] pleading[s]," Fed. R. Civ. P. 56(e), but must produce specific facts showing a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "A material fact is one that 'might affect the outcome of the suit under the governing law.'" *FTC v. Patriot Alcohol Testers, Inc.,* 798 F. Supp. 851, 854 (D. Mass. 1992). There are no material facts in dispute.

### B.    Defendants' Acts and Practices Violated the FTC Act

The FTC is entitled to summary judgment against both the DMC/ITV Defendants and the Stern Defendants because the undisputed evidence shows that all of them engaged in unfair or deceptive acts or practices prohibited by Sections 5(a) and 12 of the FTC Act.

1.    The Jurisdictional and Venue Requirements Are Met

The FTC brings this case under Sections 45(a), 52, and 53(b) of the Federal Trade

Commission Act, and this Court has jurisdiction over such cases. 28 U.S.C. §1331.[26] The Court

also has personal jurisdiction over the all of the Defendants, pursuant to Section 53(b) of the FTC

Act, and venue is also proper under 28 U.S.C. §§ 1391(b)(3). DMC and ITV are domiciled in the

district, and Barrett and Maihos both reside here. *FTC Rule 56.1 Stmt.* ¶¶ 7, 13, 25, 31. The

Stern Defendants admit that jurisdiction and venue are proper. *Id.* at ¶ 52. The Defendants' acts

and practices in connection with the advertising, marketing, and sale of both Coral Calcium

Daily and Supreme Greens (and other products) to consumers throughout the country are "in or

affecting commerce," for purposes of Section 5. *Ford Motor Co. v. FTC*, 120 F.2d 175, 183 (6th

Cir. 1941).[27]

### 2.    Defendants' Misrepresentations Violated the FTC Act

The FTC alleges that the misrepresentations made by the DMC/ITV Defendants and the

Stern Defendants concerning Coral Calcium Daily, as well as the misrepresentations made by the

DMC/ITV Defendants concerning Supreme Greens, violated Sections 5(a) and 12 of the FTC

Act. *See* S.J. Ex. 2, at ¶¶ 35-40. Section 5(a) prohibits unfair or deceptive acts and practices in

or affecting commerce. 15 U.S.C. § 45(a). An act or practice is deceptive under Sections 5(a) if

"first, there is a representation, omission or practice, that second, it is likely to mislead

consumers acting reasonably under the circumstances, and third, the representation, omission, or

practice is material." *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994) (adopting

standard in *FTC v. Cliffdale Associates, Inc.*, 103 F.T.C. 110, 164-65 (1984)); *FTC v. Gill*, 265

---

[26]    In addition, the Court has subject matter jurisdiction because this is a civil action
arising under an Act of Congress regulating commerce, 28 U.S.C. §1337(a), and an agency of the
United States is plaintiff, 28 U.S.C. §1345.

[27]    The Stern Defendants admit that their actions were "in or affecting commerce." *FTC
Rule 56.1 Stmt.* ¶ 52.

F.3d 944, 950 (9th Cir. 2001) (same); *Kraft Inc. v. FTC*, 970 F.2d 311, 314 (7th Cir. 1992) (same); *FTC v. Wilcox*, 926 F. Supp. 1091, 1098 (S.D. Fla. 1995) (same); *Patriot Alcohol Testers*, 798 F. Supp. at 855.

Section 12 of the FTC Act prohibits the dissemination of any false advertisement in order to induce the purchase of foods, drugs, devices, or cosmetics. 15 U.S.C. § 52. An advertisement is "false" under the FTC Act if it is "misleading in a material respect." 15 U.S.C. § 55. *See also Pantron I*, 33 F.3d at 1095. A false express or implied claim used to induce the sale of a food or drug, as defined in Section 15 of the FTC Act, 15 U.S.C. § 55, constitutes a false advertisement in violation of Section 12 of the FTC Act, *Pantron I Corp.*, 33 F.3d at 1096, and the dissemination of such a false advertisement constitutes an unfair or deceptive act or practice in violation of Section 5 of the FTC Act. 15 U.S.C. § 52(b).[28]

This Court can determine based on the record before it that the Defendants made the challenged claims. *See Nat'l Bakers Servs., Inc. v. FTC*, 329 F.2d 365, 367 (7th Cir. 1964) ("[t]he meaning of an advertisement is a question of fact."); *see also FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 386 (1965) (advertising interpretation is "a matter of fact resting on an inference that could reasonably be drawn from" the advertisement itself). Advertisements make two types of claims: express claims, which directly state the representation at issue, and implied

---

[28] Coral Calcium Daily and Supreme Greens can both be considered either a "food" or a "drug" under the law. Section 15(c) of the Act defines a drug, in part, as any article, other than a food, "intended to affect the structure or function" of the human body and Section 15(a) defines food as an article used as a food. Advertisements for drugs and dietary supplements fall under Section 12 of the FTC Act. *See, e.g., FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1273 (S.D. Fla. 1999) (purported weight loss tablets); *Porter & Dietsch, Inc. v. FTC*, 605 F.2d 294 (7th Cir. 1979) (same); *FTC v. Pharmtech Research, Inc.*, 576 F. Supp. 294, 299-301 (D.D.C. 1983) (same). For purposes of this action, it is not necessary to determine whether these products are foods or drugs, because Section 12 applies equally to both.

claims, which are any claims not express. *In re Thompson Medical Co., Inc.*, 104 F.T.C. 648, 788-89 (1984), *aff'd* 791 F.2d 189 (D.C. Cir. 1986); *Kraft*, 970 F.2d at 319. Courts routinely determine the existence of express and implied claims on summary judgment motions, even where defendants argue that there are issues of fact as to whether they made the representations or not. *See Gill*, 71 F. Supp. 2d at 1043 (granting summary judgment to the FTC in an action challenging implied claims after determining the ads' "overall net impression"); *FTC v. U.S. Sales Corp.*, 785 F. Supp. 737, 745 (N.D. Ill. 1992) (granting summary judgment to the FTC after reviewing ads and determining their overall "net impression"). *See also FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1272-74 (S.D. Fla. 1999) (determining express claims made in weight-loss advertisement). The claims made by the Defendants that are challenged in this case are express or virtually express, and extrinsic evidence is not necessary to find that the challenged claims were made.[29]

The uncontroverted facts set forth in Section II.D. above, and supported by the declarations and other materials submitted to this Court, amply demonstrate that the DMC/ITV Defendants and the Stern Defendants disseminated advertisements and other promotional

---

[29] Even were the Court to conclude that the claims here were implied, not express, it could determine such claims on its own. A well-established body of law guides courts in determining any implied claims without resort to extrinsic evidence. When presented with an ad in which an implied message is clearly conveyed on its face, courts routinely rely on their own fact-finding ability to determine the "net-impression" of an ad and decide what messages the ad conveys to consumers. *FTC v. Gill*, 71 F. Supp. 2d 1030, 1043 (C.D. Cal. 1999); *see also FTC v. Febre*, No. 94 C. 3625, 1996 WL 396117 at *4 (N.D. Ill. Jul. 3, 1996), *adopted by* 1996 WL 556957 (N.D. Ill. Sep. 27, 1996), *aff'd* 128 F.3d 530 (7th Cir. 1997); *Kraft*, 970 F.2d at 321. Extrinsic evidence is not required. *Febre*, 1996 WL 396117 at *4; *FTC v. Atlantex Assocs.*, 1987-2 Trade Cas. (CCH) ¶ 67,788 at 59,250, 1987 WL 20384, at *2-*5 (S.D. Fla. Nov. 25, 1987), *aff'd* 872 F.2d 966 (11th Cir. 1989). *See also Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 652-53, 105 S. Ct. 2265, 2282 (1985) ("when possibility of deception is "self-evident," consumer survey is not required); *Kraft*, 970 F.2d at 321 (same).

materials that contained material representations about Coral Calcium Daily's purported ability to cure or prevent cancer, heart disease, Parkinson's disease and autoimmune diseases, about its purported bioavailability, and about whether research published in prestigious medical journals proves that calcium supplements can prevent, reverse, or cure cancer,[30] and that these claims misled consumers in violation of Sections 5(a) and 12 of the FTC Act.

Similarly, the uncontroverted facts set forth in Section II.E. above, and supported by the declarations and other materials submitted to this Court, amply demonstrate that the DMC/ITV Defendants disseminated advertisements that contained material representations about Supreme Greens' purported ability to treat, cure or prevent cancer, diabetes, arthritis and heart disease as well as its efficacy for weight loss purposes, and that these claims misled consumers in violation of Sections 5(a) and 12 of the FTC Act. Indeed, the Court previously found that the DMC/ITV Defendants "have made the claims that Supreme Greens can "cure, treat or prevent cancer, diabetes, arthritis and heart disease. . .." Preliminary Injunction, at p. 11 ¶ 24.

It is well established that such disease and weight loss claims must be substantiated by competent and reliable scientific evidence. *See, e.g. , FTC v. Simeon Management Corp.,* 570 F.2d 1137, 1143-44 (9th Cir. 1978) (anecdotal evidence of weight loss is not sufficient to support weight loss claims); *Koch v. FTC,* 206 F.2d 311, 316 (6th Cir. 1953) (evidence regarding case histories did not support cancer claims); *SlimAmerica,* 77 F. Supp. 2d at 1273 (anecdotal evidence of weight loss is not sufficient to support weight loss claims).

Courts have consistently found or upheld that double-blind, placebo-controlled studies are required to provide adequate substantiation for the truthfulness of health-related efficacy

---

[30] The claims are made either expressly or are implied strong enough as to be "virtually synonymous with an express claim." *See Thompson Medical,* 104 F.T.C. at 789.

claims. *See, e.g., Pantron I*, 33 F.3d at 1097-98 (placebo-control required for hair growth product); *SlimAmerica*, 77 F. Supp. 2d at 1274 ("Scientific validation of the defendants' product claims requires a double blind study of the combination of ingredients used in [the product formula]."); *FTC v. Sabal*, 32 F. Supp. 2d 1004, 1008-09 (N.D. Ill. 1998) (rejecting study as valid substantiation, in part, because it was not blinded or placebo-controlled); *FTC v. California Pacific Research, Inc.*, 1991 U.S. Dist. LEXIS 12967, at \*12-13 (D. Nev. Aug. 27, 1991) (only placebo-controlled, double-blind clinical studies meet "the most basic and fundamental requirements for scientific validity and reliability").

The DMC/ITV Defendants' claims for both Coral Calcium Daily and Supreme Greens, and the Stern Defendants' claims for Coral Calcium Daily, were all false and/or unsubstantiated. Just as the Defendants have neglected to submit any evidence to the Court purporting to substantiate their claims, they did not bother to seek any support for their claims prior to disseminating them to the public. Drs. Sowers' and Woods' conclusions show that there are no questions of fact as to the falsity or lack of substantiation for the Defendants' coral calcium claims. *See* Section II.D.2, *supra*. Similarly, the conclusions of Drs. Cassileth and King show that there are no questions of fact as to the falsity or lack of substantiation for the DMC/ITV Defendants' strong efficacy claims for Supreme Greens. *See* Section II.E.2, *supra*.

The undisputed evidence also shows that the Defendants' misrepresentations were likely to mislead reasonable consumers seeking to cure or prevent serious diseases. Reasonable consumers have no obligation to doubt the veracity of express claims, and false or unsubstantiated claims are inherently "likely to mislead." *Thompson Med.*, 104 F.T.C. 648 at 818-19 (advertisements are likely to mislead if the express or implied message is false or if the advertiser lacked a reasonable basis for asserting the message was true).

Page 37 of 61

Of course, the clearest evidence that consumers were misled by the Defendants'
advertising is the fact that they purchased more than $40 million of Coral Calcium Daily from the
infomercial. *FTC Rule 56.1 Stmt.* ¶¶ 162-163. Similarly, consumers purchased hundreds of
thousands of bottles of Supreme Greens for a net (after refunds) total of $14.7 million,
demonstrating that the DMC/ITV Defendants' misrepresentations also did, in fact, mislead
reasonable consumers. *Id.* ¶¶ 266-268. *See FTC v. World Travel Vacation Brokers, Inc.*, 861
F.2d 1020, 1029-30 (7th Cir. 1988).[31]

These misrepresentations are presumed material given: (1) the express nature of the
Defendants' disease prevention and cure claims; (2) the fact that those misrepresentations go to
the core reason why consumers would buy Coral Calcium Daily or Supreme Greens; and (3) the
fact that the claims involved "health, safety, or other areas with which the reasonable consumer
would be concerned, [such as] . . . the purpose, safety, efficacy, or cost of the product." *Cliffdale
Assocs.*, 103 F.T.C. at 176-84 (*citing* FTC's Policy Statement on Deception); *Novartis Corp. v.
FTC*, 223 F.3d 783, 786 (D.C. Cir. 2000) (same); *Pantron I Corp.*, 33 F.3d at 1095-96 (same);
*Kraft*, 970 F.2d at 322 (same); *SlimAmerica*, 77 F. Supp. 2d at 1272 (same). Consumers would
not likely have spent $14 to $40 for a bottle of Coral Calcium Daily (plus shipping), or $33 to
$50 dollars for a bottle of Supreme Greens, if not for the Defendants' misrepresentations that

---

[31] The FTC need not prove actual reliance by each individual consumer on the
defendants' misrepresentations. "It would be inconsistent with that statutory purpose [of the
FTC Act] for the court to stifle effective prosecution of large consumer redress actions by
requiring proof of subjective reliance by each individual consumer." *FTC v. Int'l Diamond
Corp.*, 1983-2 Trade Cas. (CCH) ¶ 65,725, 1983 WL 1911 at *6 (N.D. Cal. 1983). Instead,
reliance may be presumed when the FTC shows that the defendants made material
misrepresentations, that those misrepresentations were widely disseminated, and that consumers
purchased the products at issue. *See FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605-06 (9th Cir.
1993). The FTC has made such a showing here.

these products would cure or prevent cancer, heart disease, and other serious illnesses. *See FTC v. Sabal*, 32 F. Supp. 2d at 1009 (finding defendant's misrepresentations material because they induced consumers to spend large sums on purported hair growth products).

There is substantial uncontroverted evidence, therefore, that the DMC/ITV Defendants made false and unsubstantiated claims for Coral Calcium Daily and for Supreme Greens, and that the Stern Defendants did so for Coral Calcium Daily, that those claims were likely to mislead reasonable consumers, and that those claims were material to consumers.

3.   The DMC/ITV Defendants' Utilization of a Deceptive Format for the
      Supreme Greens Infomercial Violated the FTC Act

The DMC/ITV Defendants' substantive misrepresentations about Supreme Greens were accompanied by misrepresentations about the fundamental nature of the program consumers were seeing: *i.e.*, that it was conventional programming, rather than paid advertising. See Part II.E.3, *supra*. These misrepresentations would mislead reasonable consumers about the objectivity of both Barrett and Guerrero. Knowing that the Supreme Greens infomercial was simply a long paid advertisement – rather than a genuine health talk show with an impartial host – would have increased their skepticism about the strong claims being made about Supreme Greens' efficacy in, *inter alia*, treating and preventing cancer and heart disease, and thus affected their decision to buy the product. Thus the DMC/ITV Defendants' practices constitute deception under Section 5.[32] Indeed, the Court has already found that "the airing of the infomercial for Supreme Greens in a talk-show format with only limited disclaimers before and after the

_____

[32] *See Bogdana Corp.*, 216 FTC 37, 110-101 (1998) (consent) (prohibiting advertisements that misrepresent that they are not a paid advertising, and requiring specified disclosures for program length television and radio advertisements); *Mega Systems Int'l, Inc.*, 125 FTC 973, 1218-19 (1998) (consent) (same).

broadcast is likely to mislead consumers and constitute a deceptive act or practice in violation of

Section 5. Preliminary Injunction at 12.[33]

4.    Defendants' Unauthorized Billing Violated the FTC Act

Section 5(a) of the FTC Act prohibits "unfair . . . practices in or affecting commerce[.]"

15 U.S.C. § 45(a). An act or practice is unfair if it causes or is likely to cause substantial injury

to consumers that is not outweighed by countervailing benefits to consumers or competition, and

is not reasonably avoidable by consumers. 15 U.S.C. § 45(n).[34] That standard is clearly met

here. *See* Preliminary Injunction, at pp. 8 (DMC/ITV Defendants have caused consumers to

incur unauthorized charges in connection with E-8 supplement, and do not dispute this fact), and

12 (causing charges for automatic shipments of E-8 to be billed to consumers without

authorization is likely unfair).[35]

First, the injury to consumers from the DMC/ITV Defendants' practices is substantial.[36]

---

[33]    The relief being sought by the Commission in connection with the deceptive format allegation is virtually identical to the relief that the Court ordered in the Preliminary Injunction.

[34]    *See also* Letter from Federal Trade Commission to Senators Ford and Danforth (Dec. 17, 1980), appended to, *International Harvester Co.*, 104 F.T.C. 949, 1064 (1984) (letter delineated boundaries of Commission's unfairness authority).

[35]    The database shows that 11.98% of consumers who purchased either coral calcium on autoship or any other product on autoship concurrently or subsequently to purchasing Supreme Greens complained that the autoship was unauthorized. *See* Section II.F.2, *supra*. Furthermore, 16.26% of consumers who purchased anything from Defendants either requested cancellations of their autoship or complained it was unauthorized. *Id.* Significantly lower complaint or so-called chargeback rates have been cited in the course of proving liability for unfair billing practices. *See FTC v. J.K. Publications, Inc.*, 99 F. Supp. 2d 1176, 1203 (C.D. Cal. 2000) (citing, *inter alia*, "very high" charge back rate of 7.3% in holding defendants liable for unfair billing practices).

[36]    Injury is considered substantial if it is not "trivial or speculative" or "based merely on notions of subjective distress or offenses to taste." *See American Financial Services Assn v. FTC*, 767 F.2d 957, 975 (D.C. Cir. 1985).

It is well-settled that "[i]njury may be sufficiently substantial if it causes a small harm to a large class of people." *FTC v. J.K. Pubs. Inc.*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000). [37] The significant scope, and consequent harm to consumers, of the DMC/ITV Defendants' unauthorized billing practice is evidenced by DMC's own meeting minutes and internal emails, which repeatedly referenced the problems of unauthorized autoship enrollment, the fact that DMC's merchant bank was compelled to double the amount of DMC's reserve account, and the FTC's database analysis showing that thousands of consumers complained about placement on the autoship program without their consent. "Substantial injury" can also be established by showing that "consumers were injured by a practice for which they did not bargain." *J.K. Pubs.*, 99 F. Supp. 2d at 1201. *See also FTC v. Windward Mktg.*, 1997 U.S. Dist. LEXIS 17114, *31 (N.D. Ga. Sept. 30,1997). Here, consumers surely did not bargain that when they made a purchase of a product advertised in an infomercial, that the DMC/ITV Defendants would impose additional charges without their consent.

Second, the injury here was not outweighed by offsetting benefits to consumers or competition. *See J.K. Pubs.*, 99 F. Supp. 2d at 1201; *see also Am. Fin. Serv. Ass'n v. FTC.*, 767 F.2d 957, 975 (D.C. Cir. 1985) (a practice is unfair if it "is injurious in its net effects."). There cannot be any benefit to consumers or to competition when consumers are shipped and billed for products without their consent or knowledge. Thus, because the DMC/ITV Defendants' conduct "produces clear adverse consequences for consumers that are not accompanied by an increase in services or benefits" to them or the market as a whole, this prong of the unfairness standard is

---

[37] *See also FTC v. Pantron Corp.,* 33 F.3d 1088, 1102 (9th Cir. 1994) ("[C]onsumer injury is substantial when it is the aggregate of many small individual injuries."); *FTC v. Crescent Publ'g Group, Inc.*, 129 F. Supp. 2d 311, 322 (S.D.N.Y. 2001) (finding that "injury to consumers was substantial in the aggregate").

met. *See Windward Mktg.*, 1997 U.S. Dist. LEXIS 17114, at *32.

Finally, the unfairness standard considers "whether consumers had a free and informed choice that would have enabled them to avoid the unfair practice." *Windward Mktg.*, 1997 U.S. Dist. LEXIS 17114, at *32. *See also J.K. Pubs.*, 99 F. Supp. 2d at 1201. Consumers do not have a "free or informed choice" when they are subjected to carefully worded scripts that result in their accounts being charged without their consent, and indeed, do not learn of the unauthorized charges until they receive an unrequested package or review their credit or debit card statements.

Thus, because consumers could not reasonably have avoided the substantial injury inflicted by the DMC/ITV Defendants, and that injury was not offset by countervailing benefits, there is no question of fact that their practice of imposing unauthorized charges on consumers' credit and debit cards is an unfair act or practice under the FTC Act.

## C. Section 13(b) of the FTC Act Authorizes This Court to Grant the Requested Relief

### 1. This Court Has Authority to Grant Permanent Injunctive and Monetary Relief

In its Complaint, the FTC seeks a permanent injunction against the Defendants under the second proviso of Section 13(b) of the FTC Act.[38] This Court has the authority to impose the permanent injunction and the ancillary equitable remedies sought by the FTC. "Section 13(b) of the [FTC Act, 15 U.S.C. § 53(b)] authorizes the FTC to seek, and the district courts to grant , . . . permanent injunctions against practices that violate any of the laws enforced by the Commission." *FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 468 (11th Cir. 1996). This

---

[38] Section 13(b) gives the FTC the authority to bring a permanent injunction action in district court. *See Pantron I Corp.,* 33 F.3d at 1102; *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1110-13 (9th Cir. 1982).

Page 42 of 61

"unqualified grant of statutory authority . . . carries with it the full range of equitable remedies[.]"
*Id; see also FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1433 (11th Cir. 1984) ("'We hold that
Congress, when it gave the district court authority to grant a permanent injunction against
violations of any provisions of law enforced by the Commission, also gave the district court
authority to grant any ancillary relief necessary to accomplish complete justice[.]'"), *quoting FTC
v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir.1982)); *Pantron I Corp.*, 33 F.3d at 1102
(same); *FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 571 (7th Cir. 1989); *FTC v. Southwest
Sunsites, Inc.*, 665 F.2d 711, 718 (5th Cir. 1982) (same); *FTC v. Security Rare Coin & Bullion*,
931 F.2d 1312, 1314-15 (8th Cir. 1991); *FTC. v. Patriot Alcohol Testers*, No. 91-11812H 1994
WL 706748 (D. Mass. May 4, 1994) (final order issued after granting of FTC's motion for
summary judgment includes injunctive relief and monetary relief) .

> 2.    The Defendants are Liable for Permanent Injunctive and Equitable
>        Monetary Relief
>
>        a.    The corporate defendants are liable for permanent injunctive relief

Injunctive relief is appropriate where, as here, there is a risk that harm will recur. *See
United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) ("Along with its power to hear the
case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct. .
. . The purpose of an injunction is to prevent future violations.") (citations omitted).  The
commission of past illegal conduct is highly suggestive of the likelihood of future violations.  In
this case, all four corporate defendants have demonstrated – through the conduct described *supra*
– a strong cognizable danger that they will violate the law again if not enjoined.

As established in Section II, *supra*, DMC and ITV disseminated outrageous claims for
Coral Calcium Daily, and engaged in unauthorized credit card billing.  The false claims pervaded

the advertising and were central to the marketing of the product. DMC and ITV then engaged in the same practices in marketing Supreme Greens (this time, with a deceptively formatted infomercial) – despite being aware of both the FTC's concerns about such claims and the problems consumers were experiencing with the companies' autoship programs. Although the coral calcium and Supreme Greens infomercials are off the air, the DMC/ITV Defendants' current conduct in running new health- related infomercials – as well as their running of health-related infomercials prior to the filing of the Commission's complaint [39] – reveals their substantial capacity for fraudulent business activities. There is a strong likelihood that similar conduct will recur unless the Court orders a permanent injunction.

As established in Section II.D, *supra*, King and Triad also played major roles in the dissemination of the Coral Calcium Daily claims, and in the provision of services critical to the success of the coral calcium program. Like DMC and ITV, these two corporate defendants were on notice of the need to substantiate the health claims made in the coral calcium infomercial, but took no action to determine whether those claims were actually supported. Given the Stern Defendants' blithe attitude about substantiation, and their ongoing business providing similar services to others, there is a strong likelihood of recurrence absent a Court order including a permanent injunction.

The Defendants may claim that they are not liable under Section 5 because (1) they themselves did not make the claims for Coral Calcium Daily or Supreme Greens – i.e., any health

---

[39] Prior to the filing of the Commission's complaint, the DMC/ITV Defendants had marketed, among other things, a weight loss product called Alka Slim, a prostate product called UroCaps, and a dietary supplement called Stress Shield, and had also taken consumer calls for a penis enlargement product called Extenze. See *FTC Rule 56.1 Stmt.* ¶¶ 336-344.

Page 44 of 61