**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION,  )<br>  )<br>            Plaintiff,  )<br>  )<br>v.  )<br>  )<br>DIRECT MARKETING CONCEPTS, INC., et )<br>al.,  )<br>  )<br>            Defendants.  )<br>  ) | CIVIL ACTION NO. 04-CV-11136 GAO |

### SUPPLEMENTAL AFFIDAVIT OF DONALD BARRETT

I, DONALD BARRETT, under oath, declare as follows:

1. I am a principal shareholder of defendants Direct Marketing Concepts ("DMC") and ITV Direct, Inc. ("ITV"), and am responsible for the management and operations of each company. I make this affidavit on the basis of my own personal knowledge of the facts set forth herein and could testify competently thereto if called to do so. I also incorporate my prior affidavits filed in this case, including my affidavits filed in connection with the FTC's original motion for preliminary injunction and motion to modify the preliminary injunction. These affidavits are dated June 4, 2004, June 8, 2004, June 23, 2004 and June 7, 2005. I adopt that testimony herein. I submit this supplemental affidavit to address and dispute some specific issues raised by the FTC in its summary judgment motion.

2. DMC and ITV, located in Beverly, Massachusetts, are media and marketing companies that collectively employ over 380 individuals in Massachusetts. DMC and ITV were incorporated at separate times and are separate companies. They maintain separate books and records and file separate tax returns. ITV was incorporated in January 2003 and was originally formed to function primarily as a media buying company, with the long-term goal of adding additional functions. ITV did not engage in any activities for several months, until April 2003, when it entered into a contractual agreement with Healthy Solutions.

3. I do not have any ownership interest in Direct Fulfillment, LLC. Likewise, the corporate records for BP Marketing, attached as Exhibit 1, show that the only officer of BP Marketing is Steven Paris. BP Marketing was established to coordinate relationships with independent distributors, who would buy product and media from Triad and King Media. I believe that all payments made to BP Marketing by Triad were made in connection with these distributor relationships.

4. In connection with the coral calcium infomercial featuring Kevin Trudeau and Robert Barefoot, DMC acted as a call center and did not purchase media time with stations, nor did it purchase or deliver products or process customer funds. All of these tasks were handled by Allen Stern and his companies until March 2003. In addition, all product information and labeling was supplied by Stern and his companies. For example, on January 23, 2003, I received an email from Susan Graham, an employee of King Media and Triad, forwarding postcards and marketing information for Coral Calcium Daily. A true and accurate copy of this email and its attachments, which is typical of the emails I would receive from Ms. Graham, is attached as Exhibit 2. King Media and Triad similarly created newspaper advertisements, circulars and other materials. We did not produce these materials.

5. I typed up the first coral calcium script for our sales force and sent this to Allen Stern for review. A true and accurate copy of this script is attached as Exhibit 3. In connection with all of the scripts for coral calcium, I relied on Allen Stern, who was much more experienced in the industry. Other than the first script, he provided all of the other scripts and "power sheets" given to the sales force. I was told by Stern that his employees had prepared these materials based upon consultation with materials provided by Robert Barefoot, and Allen told me that the scripts conformed to Barefoot's books and the infomercial. Stern also had his nephew, Stephen Horst, located at DMC's facilities. Horst was responsible for reviewing all scripts in consultation with Stern and others at Triad. I have reviewed the various scripts submitted by the FTC, and I do not believe I drafted any of these scripts other than the first one, which made no claims about the product. I also do not believe I drafted the power sheets submitted by the FTC.

6.  Stern also advised me concerning the data that he believed we should collect from customers for informational purposes. He advised that customers would often disclose information that would be useful to know if they called customer service or made repeat sales calls. Thus, we provided sales representatives with fields in the customer contact information to note any specific items, including any particular medical condition that might be disclosed. However, we never instructed sales representatives to ask about specific medical conditions, nor did we encourage customers to disclose that information.

7.  The coral calcium sold by Triad to consumers was manufactured by various third-party manufacturers. These manufacturers used only marine grade coral calcium from Marine Bio in Okinawa, Japan. This is the highest quality coral calcium available, with the highest level of quality control. There has never been any assertion by anyone, including the FDA, that the coral calcium sold was not of the highest quality and manufactured from marine grade coral. Coral calcium is still one of the most popular dietary supplements sold in the United States. It is sold at Wal-Mart, CVS, Rite-Aid and other large drug store chains. It is also sold on the internet and at health food stores. Finally, it is still sold by Robert Barefoot with his books.

8.  Unlike the later version of the infomercial produced separately by Kevin Trudeau and Robert Barefoot (known as the "Kevin & Debbie Show"), the "A Closer Look" coral calcium infomercial did not display any product at any time, nor did the show refer to any product by name. Rather, the show only referred to Robert Barefoot's research and books, and discussed his opinions about coral calcium generally.

9.  Both Kevin Trudeau and Allen Stern told me on several occasions that they had provided the A Closer Look show to counsel for review, and had also worked with Robert Barefoot to obtain and review his substantiation for the show. They confirmed to me that the show was compliant. I also was told that the FTC had been provided a copy of the tape in April 2002 by Trudeau's attorneys, and that the FTC had not raised any concerns or requested that the show be removed from the air. I was also told that stations would review the show and would not air it if they believed there were any issues. The first time any concerns were raised was in

3

June 2003, and we immediately agreed to stop airing the show. I never had any control over the airing of any versions of the infomercial, edits to the infomercial or similar matters. These issues were all controlled by Allen Stern. All I ever saw was the final, edited "master" tape provided to me from Trudeau, which I understood had been reviewed in detail in consultation with Trudeau's attorneys, scientific advisers and Robert Barefoot. All decisions regarding legal edits to the show were made by Trudeau and Stern, and all decisions regarding which versions to run in which markets were made by Stern.

10. I had no knowledge of any criminal record or FTC consent decree between Kevin Trudeau and the FTC prior to introducing Mr. Trudeau to Robert Barefoot in December 2001. In addition, although I had heard rumors concerning various regulatory and/or FTC issues surrounding Kevin Trudeau during 2002, these rumors were not confirmed until DMC was contacted by the FTC in 2003 and DMC agreed to cease airing the A Closer Look program.

11. I was never provided a complete or credible accounting by Allen Stern in connection with the coral calcium infomercial and sales. All funds went directly to Allen Stern and the only way DMC would be paid for its telemarketing services was if Stern saw fit to forward those funds. Often Stern forwarded insufficient funds to pay staff and we were routinely seeking additional payments. These issues eventually led to litigation seeking an accounting, which was never provided. Also, Stern did forward funds at various times to different accounts, including accounts in my name. These funds often were then transferred to the DMC account for commissions, salaries and other administrative expenses.

12. My father did have cancer, took coral calcium and is still alive. I personally believe in the curative benefits of coral calcium, and credit my father's recovery to coral calcium. I disagree with the FTC and its experts who say that my belief, based upon the materials I have read, including Bob Barefoot's books, is unreasonable or not credible. The FTC has spent years keeping beneficial studies and health information from consumers, based upon the misguided belief that consumers cannot think for themselves. I disagree and believe that

truthful, although often controversial, information should be provided to consumers, so that they can evaluate the information themselves, as opposed to the government evaluating it for them.

13.     In connection with the Supreme Greens infomercial, I was told repeatedly by Alejandro Guerrero that he possessed significant scientific support and studies concerning his Supreme Greens product. Although I personally did not review each and every page of the materials he provided, I was aware that materials had been provided to my employees and they had been reviewed by them prior to filming. Guerrero also reviewed the tape and stated that he had no concerns or edits, commenting only that he thought it was "fantastic" and he thought he presented well. Had Guerrero raised any concerns over the content of the infomercial, I would have made changes to address those concerns. While DMC now employs a scientific adviser and in-house counsel to review all materials supplied in connection with any show that it is considering producing, at the time we believed that the references provided by Guerrero, including citations to clinical studies, double blind studies and scientific literature, were sufficient. We also derived comfort from the fact that Tony Robbins had praised Guerrero and his clinical studies, and Guerrero had indemnified ITV. In October 2003, in part in response to our continuing discussions with the FTC regarding its concerns over the coral calcium infomercial, we also were provided additional studies from Guerrero, including at least one double blind clinical study, which provided additional support for his repeated assurances that he had collected these materials and had them on site at his clinic in California. Until April 2004, I continued to believe that Guerrero's study that he had discussed with us was real and credible, and that he could produce the substantiation we had discussed.

14.     At the time, and in light of our role, I believed in connection with both the coral calcium and Supreme Greens infomercials the steps that we took to substantiate the claims made in the shows was reasonable. Barefoot's books contained dozens of citations to scientific literature and I was told that he had provided additional materials to Trudeau and his advisers. Guerrero also provided citations to journals which appeared credible and supported his opinions. I was also comforted in both cases by the fact that the FTC was provided a copy of the coral

5

calcium show in April 2002 and did not raise concerns for over a year. The FTC was also provided an edited copy of the Supreme Greens show in October 2003, and appeared to bless that show by stating it was a "substantial improvement." Because of these communications with Trudeau's lawyers in 2002, and our lawyers in 2003, we felt that both shows were compliant. I also believed that stations running the shows reviewed them as well, and may have requested edits as to content, running time, or required additional disclaimers.

15. Similar to the coral calcium product, the quality and safety of the Supreme Greens product has never been questioned by the FTC or the FDA. The FDA conducted a comprehensive review of the product, concluding only that certain literature sent with the product should be modified. *See* Exhibit 4. ITV also sold the Supreme Greens product at various prices and under various price plans, and sought to remain competitive with other greens products in the marketplace. Like coral calcium, greens products are very popular and may be found at a variety of health and convenience stores, as well as on the Internet.

16. When we were contacted by the FTC in June 2003 regarding the coral calcium show, we immediately contacted stations and instructed them to stop airing the show. We had only just begun running some of our own media, and this was quickly terminated, with few sales compared to the period the media was controlled by Stern and his companies. Although the media stopped running, many existing customers would still call in for information or to order more product. As a result, sales personnel still had information available to them the information regarding Barefoot's books and other published materials to answer any questions.

17. Notwithstanding that we have not run the subject advertisements since 2003 and 2004, respectively, since that time we have nonetheless undertaken to collect scientific materials and studies that support the advertisements. These materials are significant, and do appear to support many of the opinions expressed in the advertising. Moreover, I do not believe the FTC ever stated that they would refuse to continue discussing a resolution of the coral calcium claims unless ITV ceased airing the Supreme Greens infomercial. To the contrary, the FTC stated that ITV needed to obtain substantiation for the claims in the show, or needed to edit the show to

6

meet the level of substantiation that ITV did possess at the time, or to remove any claims that in the FTC's view were overly controversial. On the basis of these conversations, we obtained additional information and edited the show.

18. DMC and ITV have always had a policy of "customer first." We offer money back guarantees on all of our products, and allow customers to cancel any long-term purchase plan, including continuity plans, at any time. I have never encouraged our sales staff to record an order or charge a customer if they have not consented to the charge. Such a practice would make no sense, as the customer will simply cancel the charge with us or their credit card company, costing us the customer and the disruption of reversing the sale.

19. I believe our customer complaints are low for the industry and our customer relationships are excellent. I have never been advised that our customer complaints are excessive or are out of proportion with the direct response industry.

20. The E8 promotion discussed by the FTC was designed as a program to provide a free product, E8 Daily as an incentive for customers to sign up to a reorder program for other products. The E8 program was designed as a "negative option" program, where the customer was told that they would receive a free bottle of E8 Daily in exchange for signing up for the reorder program. Customers were told expressly that they would be charged for the program unless they canceled, and their consent was obtained to the entire program, including the free bottle and the reorder. I later learned that the sales staff were manipulating the program. We then canceled the promotion after only a short time, and DMC has not duplicated it, or any program like it, since 2003. I believe overall we lost money on this particular promotion. In addition, as I have stated previously, if any customer complained, we immediately provided the customer a full refund and canceled any future orders.

21. As I have testified previously, DMC an ITV have undertaken extraordinary efforts to improve their compliance in all areas of their business. These efforts include both the review of all advertising and oversight of the sales floor. Since 2003, we have hired in-house counsel, a scientific adviser, a senior compliance manager, and numerous additional customer service and

8

sales managers. We do not tolerate violations of company policy, and employees are disciplined appropriately depending on the level and seriousness of their conduct.

22. We have produced many programs for non-ingestible products since 2001, including books, home products and electronics.

23. Through our counsel, we have approached the FTC on several occasions about resolving the present litigation. We have asked the FTC to provide a proposal, but he FTC has repeatedly refused.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10th day of February, 2006 at Beverly, Massachusetts.

                                                            /s/Donald Barrett
                                                          DONALD BARRETT