## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|   |   |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>        Plaintiff,<br><br>v.<br><br>DIRECT MARKETING CONCEPTS, INC., et al.,<br><br>        Defendants. | CIVIL ACTION NO. 04-CV-11136 GAO |

### AFFIDAVIT OF JASON BERNABEI

I, JASON BERNABEI, under oath, declare as follows:

1.  I am currently the Vice President of Business Development at Direct Marketing Concepts. I have been employed by the company since July 2002, when I began as a sales representative.

2.  Direct Marketing Concepts, Inc. ("DMC") and ITV Direct, Inc. located in Beverly, Massachusetts, are media and marketing companies that collectively employ over 350 individuals in Massachusetts. DMC's business includes the production of infomercials, in which an individual is provided the opportunity to advertise an existing product to a larger audience through wider media, including television and radio. ITV operates primarily as a media purchasing company. Neither DMC nor ITV itself manufactures any products.

3.  I was employed by DMC as a sales representative during the period that DMC was acting as a call center for the coral calcium infomercial. During this period, the salespeople answered the telephones when media was running in certain markets and forwarded orders from customers offsite to a third party fulfillment house.

4.  It has always been DMC's policy to never make any claim to a customer that any dietary supplement product will treat, prevent or cure any disease. We were trained to never make any such claims, and we were consistently told to inform customers that we are not doctors

and that customers should consult their doctors before commencing any dietary supplement program. This was the case with coral calcium and with Supreme Greens.

5. With regard to purchase programs such as continuity programs, it has always been DMC's policy to fully inform the customer regarding the terms of any such program and to obtain their express consent to the program before assessing any charges. It has never been the policy of DMC to charge a customer without their consent. I also have personally witnessed employees being disciplined for such practices.

6. DMC's policy has always been to offer customers money-back guarantees, and the opportunity to cancel any long-term purchase plan at any time. During my employment at DMC, I am not aware of any time where this guarantee has not been honored.

7. I am not aware of any widespread complaints by customers claiming that they were placed on autoship without their consent.

8. After being promoted from sales to marketing in late 2002, I became responsible for assisting Donald Barrett in identifying business opportunities for DMC. This responsibility includes identifying and meeting with individuals who believe that they have products that will experience enhanced distribution and sales through infomercial marketing. As part of those meetings, one of my primary responsibilities is to attempt to ascertain the credibility of the spokesperson concerning their own credentials and the merits of the product that he or she is seeking to sell through direct marketing.

9. In connection with any agreement to produce an infomercial for a third party, DMC makes clear that the individual advertising the product is responsible for the representations he or she makes about a product, including confirming that there is substantiation for any claims made about the product. In each case, DMC requires that the individual provide materials regarding the product for our review and provide specific representations about their support for their claims.

10. In late 2002, defendant Michael Howell contacted me and stated that he knew a Dr. Alejandro Guerrero, who had developed a greens product that he believed would likely be

successful if marketed through an infomercial. Howell and Guerrero then provided me with some materials about Guerrero, including testimonials by fitness celebrity Tony Robbins, information about his clinic in California, and articles he had written with his wife. At all times, Howell and Guerrero represented that Guerrero was a doctor and OMD, which I understood to be a Doctor of Oriental Medicine, and that Guerrero operated a clinic in California with regular patients. Howell and Guerrero also represented that the greens product developed by Guerrero had been clinically tested on patients in California and had shown tremendous results.

11. In April 2003, Guerrero traveled to DMC's studios in Beverly, Massachusetts to film the infomercial. Prior to filming, Guerrero once again identified himself as a doctor, and stated that he had received his doctorate in Traditional Chinese Medicine in California. As is standard practice, the infomercial filming was unscripted and neither Donald Barrett nor anyone else from DMC dictated any of the statements by Guerrero, including his statements regarding his credentials, his clinical practice in California or the scientific support for the Supreme Greens product. I was present during part of the filming and never witnessed any suggestion of any statements by Barrett to Guerrero. Guerrero also provided some scientific materials for our review but claimed that he needed to check with his counsel regarding whether he could provide the clinical data from his patient study, which he repeatedly explained involved 200 terminally ill patients in California.

12. After the "raw" footage of the show was edited, a copy of the finished program was sent to Guerrero for his review. We explicitly told Guerrero to review the show for content and to inform us if any of his statements in the show were problematic. After he reviewed the show, he called us back and stated that he thought the show looked "excellent" and that he was very pleased with how it turned out. At no time during the entire run of the show did he ever complain about the content or claim that it was altered in any way. He also confirmed once again that he possessed substantiation for every statement in the show, including medical citations, clinical studies and patient data.

13. After the infomercial began airing, Guerrero traveled to Beverly, Massachusetts to speak to the sales staff. During this discussion, he encouraged the sales staff to take notes. He then proceeded to discuss with the sales staff his background and credentials as a doctor, his medical research and clinical studies, and his patients in California. He also discussed the research and studies he had conducted in connection with his greens product.

14. It is my understanding that Guerrero made himself available to the sales managers to review and edit the sales scripts. I believe that all of the sales scripts were provided to Guerrero for his review and he often suggested changes to the scripts. Sales staff were regularly told that they must not deviate from the scripts, because the scripts had been reviewed and approved by Guerrero and conformed to his statements on the infomercial, his clinical studies and his scientific research.

15. In late 2003, I became aware from Donald Barrett that the FTC had raised concerns about the content of the Supreme Greens infomercial. In response, I, Eileen Barrett and others reached out to Guerrero to provide additional substantiation for the opinions he had expressed in the infomercial. He responded by providing additional materials, but he also continued to claim that he could not provide the clinical data and studies because he had concerns over patient confidentiality. We pressed for him to provide these materials as soon as possible. In response, he provided a summary of the data to Eileen Barrett and confirmed that additional patient specific data would be provided once he was comfortable with the confidentiality issues.

16. In addition to seeking additional supporting materials from Guerrero, the Supreme Greens infomercial was edited for content in conjunction with our outside counsel and modified to address the FTC's concerns. This edited version of the show was then sent to media outlets, which were directed to replace the old show with the edited show. I have no knowledge of any effort by DMC to subsequently go back to the old show from the edited version. My understanding was that multiple versions of the edited show ran, but the original unedited show was permanently removed from circulation.

4

17. In addition, Guerrero returned to Beverly in 2003 to film a second show. This show was filmed with a "daytime" background. I often heard Donald Barrett refer to the daytime backdrop as the "new" or "second" show, and all of the various versions of the nighttime backdrop as the "original" show or "old" version. I know he also referred to this show, and all versions of the nighttime backdrop, as the "SGRN" show.

18. For almost six months we did not hear anything from the FTC regarding the Supreme Greens show, and we understood that the FTC was satisfied with the edits that had been made to the show. Then, in the Spring of 2004, the FTC staff contacted counsel for the company and stated that they still had issues with the show. In response, DMC made a decision to reduce the media for the show and take it off the air. At the same time, we began to have our own suspicions about Guerrero, which were later confirmed during abroadcast of ABC's 20/20. These concerns further hastened our efforts to pull the show from the air and replace the show with other media. The show has not run since May 2004.

19. In May and June 2004, I had several discussions with Donald Barrett about the direction that he wished to take the company in light of the continuing FTC concerns. He told me during this period that he believed the company should no longer advertise or market ingestible products, but should focus on books and other consumer products, such as electronics, self-help programs, and finance products, among others. Based on his instruction, I began seeking opportunities for the company in these areas, bringing dozens of non-ingestible product proposals to Mr. Barrett. Many of these were filmed, and one of the most successful shows during 2004 was a book. However, I was also frustrated, because many of these opportunities, such as one with a very large electronics manufacturer, fell through because of the FTC action and contacts by the FTC with certain of our vendors, distributors and others. I also heard from several distributors that our merchant accounts had been contacted by the FTC. Shortly after these contacts, several of these merchant accounts were shut down, causing significant disruption to the business.

BO1 15759108.1

20. Several months after the FTC action was filed, I began on my own to make contacts with nutritional companies at trade shows and similar events. At many of these events, prospects would inquire whether we were ready to discuss a new dietary supplement show. In response, I would explain that I would not bring any proposal to Mr. Barrett unless I had assurances that there was valid and significant substantiation for the product and any claims made about the product. Finally, several months after the FTC action was filed and faced with many lost opportunities in other areas, I approached Mr. Barrett with some of the proposals that I had been pursuing. With each of these, however, I also conferred with our counsel and assured that there was significant substantiation for the show. Even then, many shows, including the Sea Vegg show, were rejected several times.

21. All new prospects that I bring to DMC must undergo a very stringent review by counsel and by the company's scientific adviser. Every prospect with whom we meet is advised up front that they must provide substantiation for their product before we will move forward. They also are advised that the materials must be reviewed by counsel and verified before discussions will commence.

22. I also am responsible for communicating with distributors to assure that they are not making any claims that exceed what has been reviewed and approved by counsel. When we learn that a distributor is making claims that are problematic, I will contact them and demand that they remove the claim. If they fail to do so, we will no longer do business with them.

23. As the original contact with Guerrero, at no time until we decided to pull down the Supreme Greens show did I have any suspicion that Guerrero did not possess all of the studies and clinical data that he repeatedly confirmed he had gathered. I also had no knowledge that his credentials were not what he stated them to be and confirmed to us on several occasions. Guerrero appeared credible and did provide us some materials that appeared to support and substantiate his claims.

24. While I believe that DMC has always sought to comply with the law, and I have heard Donald Barrett say so, I also believe that since 2004 the company and its 350 employees

have undertaken extraordinary steps to build compliance.  I have seen improved controls in the identification and selection of shows, and improvements in connection with the sales floor.  I am confident that to the extent the company has experienced any issues in the past, these issues will not be repeated in the future.

      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

      Executed this 25th day of January, 2006 at Beverly, Massachusetts.

                                                               /s/Jason Bernabei
                                                               JASON BERNABEI