UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

```
FEDERAL TRADE COMMISSION         )
         Plaintiff               )
                                 )
V.                               )    DOCKET # 1:04-cv-11136-GAO
                                 )
DIRECT MARKETING CONCEPTS, INC.  )
et al,      Defendants           )
------------------------------------
```

TRIAD ML MARKETING, INC., KING MEDIA, INC., LISA MOUNT,
ALLEN STERN AND STEVEN RITCHEY'S MEMORANDUM IN OPPOSITION TO
FEDERAL TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT

**Introduction**

FTC's complaint is with DMC, about infomercials owned by DMC.  DMC dismissed Triad as a vendor in January 2003, and King Media ceased its vendor relationship with DMC in March 2003, more than a year prior to FTC's filing of this action.  Nevertheless, regrettably, FTC has seen fit to single out and to sue these former vendors, King Media and Triad ML Marketing, who were not responsible for the creation or content of the one infomercial in connection with which they were hired by DMC to render services.  Not content with that, FTC also seeks to hold employees and stockholders of those companies personally liable.

**Facts**

*King Media* –  King Media, Inc ("King Media") was incorporated as a Delaware corporation in 1992, and registered as a foreign corporation in Pennsylvania.  Stern Affid. ¶ 40. King Media was in the business of locating television stations to run infomercials, and

purchasing air time for the infomercials on behalf of clients for ten years, before it was hired by DMC to provide similar services.  King Media was entitled to receive a Standard Agency Commission of 15% of what the TV stations charged for running an infomercial. Stern Affid. ¶ 106.  The 15% commission thus bore no relation to DMC's or any other clients' sales.  King Media does not buy products and does not deal with fulfillment companies.  FTC Ex. 15, Attachment 6, p. 9.

King Media did not produce infomercials.  King Media would arrange for a client's infomercial to be sent to a so-called "dub house" where multiple copies of the infomercial are made from the original copy.  King Media would contact TV stations to line up air time, and would arrange for copies of the infomercial to be shipped to the TV station for airing.

King Media performed the function of purchasing air time for a DMC infomercial for Robert Barefoot's books on coral calcium. [1]  Id. at 26.  The infomercial only offered information on Barefoot's books.  There was no coral calcium product endorsed in the infomercial, and no coral calcium product was displayed.  King Media had no input into the content or production of DMC's. infomercial. Id. at 35, 62.  FTC Ex. 6, pp. 41-46.  Furthermore, Robert Barefoot's and DMC's executed contract fully indemnified media placement agencies like King Media from any loss or damage arising out of claims, representations made by Barefoot or DMC.  FTC Ex. 6, Attachment 4, Ex. A. ¶ 4.

The completed infomercial was presented by Trudeau to duplicators, "sight unseen" by

---

[1] A later infomercial, starring Trudeau and Barefoot, did promote a coral calcium product, namely, the product that Barefoot "endorses."  Neither King Media nor Triad had any involvement whatsoever with this infomercial or any sales resulting therefrom.  The FTC routinely and continuously fails to differentiate between the two infomercials.

King Media. FTC Ex. 15-Attachment 1 Int. 11. King Media did not research any of the claims made in the infomercial, as that is the function of the advertiser and the producer, Trudeau. Id. at 62-63. It is not King Media's or Triad's practice to have infomercials reviewed for compliance with FTC law, since neither King Media nor Triad make any claims of ownership of these shows. Id. at 63-64. TV stations have the responsibility to, and routinely do, review submitted media. to approve its content prior to airing. Id. at 65-66. No TV station ever raised any concerns about the infomercial or rejected it because of its content. Id. at 69-70.

King Media was totally independent from DMC. There were no common directors or officers. King Media performed its services on behalf of DMC in return for which King Media charged a Standard Agency Commission.

King Media lost money as a result of its purchasing air time on behalf of DMC for its infomercial, because DMC failed to pay for approximately $1 million of King Media's media buys for DMC's infomercial.

*Triad ML Marketing, Inc*. – Triad was in the business of order fulfillment. Triad commenced business in 1996-1997. FTC Ex. 15, p. 17-18. Order Information taken by Telemarketing Companies was submitted to Triad for transmittal to the fulfillment companies. Triad would procure product from the manufacturers and allowed clients to use Triad's merchant account to process credit card transactions, as a service for those clients who did not have a merchant account. Id. at 17. In return, clients agreed to compensate Triad for this service. Triad did not take orders for product, did not package product and did not ship product.

Triad made these services available to DMC in conjunction with orders for coral calcium until such time that DMC secured its own merchant account. Triad was not involved with the

sales or advertising of the coral calcium dietary supplement product.  Triad's involvement was in permitting DMC to  process credit card payments through Triad's merchant account, and in contracting for fulfillment, in return for which it was entitled to a percentage of the net profits. Id. at 27-28, 31.  Triad has had similar arrangements with other clients.  Id. at 33.   Triad was totally independent from DMC; there were no common directors, officers or shareholders.  Once DMC secured its own merchant account, DMC terminated its relationship with Triad in January 2003.

Thanks in large part to FTC's present action, and in addition to DMC's failure to pay for media time,  King Media and Triad were forced to cease doing business in June 2005.  There are no employees, no office, and no money.

Among the parties involved in the advertising and sale of the coral calcium product are Publishers of Barefoot's book, Production studio, Merchant, Banks, Duplication House, TV Stations, Telemarketing companies, Manufacturer of the product, Fulfillment Companies, and "Distributors."  DMC set up Distributors, who managed everything themselves. DMC allowed them to air DMC's show. These Distributors purchased their own TV time, handled their own telemarketing, used their own merchant accounts,  managed their own fulfillment, and ordered product from DMC.  There is no indication that the FTC has pursued these Distributors or any other vendors, although FTC.

*The individual defendants* –  Allen Stern,  his now-former wife, Lisa Mount, and Steven Ritchey, each had an ownership interest in Triad and in King Media. Initially Lisa Stern was listed as president of King Media.  Id. at 25.  However, she was not active in either company during the time period that is the subject of FTC's Complaint. Since 1996, Lisa has been an at-

home mother raising two young children, except for a brief period during 2001. During the time period that is the subject of FTC's Complaint, Lisa divorced Allen Stern and negotiated an arms-length settlement that included sale of her interest in King Media and Triad. Since then, she has plowed back into the companies more than she received in her divorce settlement in an unsuccessful effort to save the companies.

**Argument**

Defendants King Media, Triad, Stern, Mount and Ritchey incorporate herein by reference all of the arguments advanced by other defendants both as to why airing of the infomercial did not violate FTC law, and as to why the FTC is not entitled to summary judgment.

Further, the FTC has shown nothing in the way of "illegal acts" with respect to King Media, Triad, Stern, Mount and Ritchey, and it simply is unfair for FTC to have singled them out of all the vendors with whom DMC did business, and attempt to hold them liable for acts of others.

FTC acknowledges that in order to hold any of these defendants liable under Section 5(a) of the FTC Act, the FTC must demonstrate that each of these defendants was responsible for a representation, omission or practice likely to mislead consumers acting reasonably under the circumstances and that the representation, omission or practice was material. FTC v. Pantron I Corp., 33 F.3d 1088, 1095 (9th Cir. 1994). None of these defendants did so. Further, none of these defendants "disseminated" any false advertisement in order to induce the purchase of foods, drugs, devices or cosmetics. 15 U.S.C. § 52. In fact, the infomercial promotes only Barefoot's books and information.

      1.      <u>It would be Unfair to Hold King Media Liable for arranging Media Buys</u>

The infomercial that King Media asked the "dub house" to send to television stations is an interview of Robert Barefoot, author of widely-read books concerning coral calcium, in which he expresses his views concerning the benefits of coral calcium. The infomercial does not mention any specific product nor endorse any product by name; it only discussed Barefoot's books with an 800 toll-free number to find out more information about these books.

King Media did not create the infomercial. King Media did not script the infomercial. King Media did not hire the talent for the infomercial. King Media did not participate in the development of the infomercial. King Media did not pay for production of the infomercial.

King Media did not have any ownership interest in this infomercial whatsoever. King Media had no involvement in the content or creation of the infomercial. The infomercial was prepared by others over whom King Media had no control and was delivered to a "dub house" as a completed, finished infomercial in final form. King Media never saw any rough cuts of the infomercial, and never added or subtracted anything from the show.

King Media's function was simply to locate appropriate TV outlets to run the infomercial and to arrange for the dub house to provide the TV outlet with a copy of the infomercial. TV stations billed King Media for air time, and King Media in turn billed DMC. For its services, King Media was to receive a standard agency fee for placement of media, based on the TV station's charge.

In arranging for the dub house to deliver the infomercial to TV stations, King Media made no representations of any kind to any consumer. Indeed, in arranging for delivery of an infomercial to a TV Station, King Media made absolutely no representations even to the TV

station as to the content of the infomercial.   Likewise, arranging for the dub house to deliver an infomercial to a TV station is not an "omission or practice likely to mislead consumers."

Presumably, and as a general standard practice, TV stations previewed and reviewed the infomercial prior to permitting it to go out on their airwaves, by their own standards and practices legal department. TV Stations were free to reject the infomercial, or to condition airing of the infomercial upon receiving verification that the content of the infomercial was in all respects lawful. No TV station ever made any requests to King Media regarding the content of the infomercial.  No TV station was known to have refused to air the infomercial due to its content.

TV stations, not King Media, made the bulk of the money from airing of the infomercials. TV stations are responsible for the content of their programming. TV stations are the gatekeepers. If there is something unlawful about the content of the tape, they are in a better position than King Media to catch it. And they are the ones who have the responsibility to catch it.

In short, King Media's arranging for the dub house to deliver a tape to a TV station, (1) did not constitute "a representation, omission or practice", (2) was not "likely to mislead consumers acting reasonably under the circumstances, and (3) there was no "representation, omission, or practice" that was "material."  Cf. FTC v. Pantron I Corp., 33 F.3d 1088, 1095.

Additionally, arranging for the dub house to deliver an infomercial to a TV station does not constitute "dissemination" of the infomercial.  "The word 'disseminate' means to broadcast widely; to spread, scatter or disperse." Hany v. General Elec. Co., 221 Ill.App.3d 390 (1991). People v. Witzerman, 29 Cal.App.3d 169, 180 (1972).   The gravamen of "dissemination" is that

the information be shared with the public.  See OMB "Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies" Eff. Oct. 1, 2001 ("...disseminate (meaning to share with, or give access to, the public).").  TV broadcasts and publishing/distribution of newspapers are typical forms of "dissemination"[2] Thus, arranging for a dub house to deliver a copy of an infomercial to a TV Station does not constitute "dissemination."   "Dissemination" does not occur until the TV station broadcasts the infomercial.

It is axiomatic that until a representation is "disseminated" to a "consumer", it cannot be "likely to mislead consumers."  It is the TV station that "disseminates" the infomercial; and it is the TV station that is in the position to refuse to "disseminate" it.  Thus, even if there is something wrong with the infomercial, unless and until it is aired by the TV stations, no consumer is harmed.

 When a TV station elects to ":disseminate" the infomercial, that should not give rise to a claim against persons whose only role was to see to delivery of the infomercial.  Airing of the infomercial on TV stations was not King Media's decision and was not King Media's doing. It was in the TV stations' sole decision and discretion.

FTC's suggestion that King Media should have conducted scientific analyses prior to buying air time grossly and unfairly mischaracterizes King Media's function, and the fair scope of obligation of a media buying company.   King Media is a media buyer, not a research and development facility.  It does not create infomercials.  It gets paid for lining up TV time, not for

---

[2]  "The main use of newspapers, as opposed to tabloids, is to disseminate information and comment to those who know what 'disseminate' means."  BBC
http://www.bbc.co.uk/dna/h2g2/A103122

engaging doctors, scientists and engineers to review infomercials. If there were something wrong with the infomercial, it was the obligation of the producers and DMC, the show owner, to ensure that the infomercial they were delivering conformed to all lawful requirements.  And it was the obligation of TV stations to review the content of what they authorized to be transmitted over their airwaves.  Not one TV station ever raised any question with King Media concerning the content of the infomercial.  If TV stations, who have the ultimate responsibility for what goes out over their airwaves, saw nothing in the infomercials to question the content, and FTC has found no basis for proceeding against them, or against the dub house that created the copies, there is no basis for FTC proceeding against a media buying agency such as King Media for its limited role in arranging for the dub house to send tapes to the tv stations.

King Media had no involvement whatsoever in the handling of any phone calls generated by the infomercial. King Media did not receive the calls.  King Media's compensation was not based upon the calls.  King Media simply performed the usual and customary services of a media placement service, for which it was to be compensated the Standard Industry Commission.

There is no rational basis for FTC singling out King Media from among all the vendors involved and asserting that King Media should have independently verified every statement being made in the infomercial. There was nothing about the nature of the product to put King Media on guard about the infomercial. The infomercial was about calcium – a very common product, very commonly sold and very commonly recommended by doctors. Books had been written about the many potential benefits of calcium. If there was anything wrong with the show, it was the responsibility of the Producer to review it and to make any necessary changes.

      2. <u>It would be unfair to hold Triad liable for performing order fulfillment services.</u>

      Triad is a totally independent company from DMC. It had no involvement with either the development of the infomercial or arranging for the showing of the infomercial. It simply performed administrative functions for which it was entitled to compensation. Triad did not advertise for orders. Triad did not accept orders from consumers. Triad did not produce the product. Triad simply coordinated manufacturing of the product, and allowed DMC to use its Merchant Account.

      If FTC's position is that the orders never should have been taken, FTC's complaint should be against the telemarketing companies that took the orders from consumers. Triad did not function as a telemarketing company. It simply transmitted orders taken by others to the fulfillment companies. There are no allegations that there was anything wrong with the coral calcium product. Even if there were, FTC's complaint should be directed against the manufacturer of the product, not against the company that merely facilitated outside vendor fulfillment of the orders.

      3.     <u>It would be Unfair to Hold Allen Stern or Steven Ritchey Liable</u>

      It would be unfair to hold Stern or Ritchey liable on account of their positions with King Media and Triad, because neither company has done anything that fairly can be said to violate the FTC Act. Further, Stern and Ritchey cannot be held liable for any actions of DMC, because Stern and Ritchey had no ownership interest in or position with DMC. Stern and Ritchey neither personally, nor as company employees, ever paid for any development or production of the infomercial or hiring of the Talent. Stern, as president of King Media and Triad, operated

these companies since 1992 without any legal entanglements with the FTC or any other governmental agency. There is simply no adverse history regarding Stern or Ritchey personally or any former companies with which they were associated.

    4. <u>There is no Basis for Asserting Claims Against Lisa Mount as a "Relief Defendant"</u>

Section 13 (b) of the FTC Act invests the Court with equitable powers over "innocent persons" in order to accomplish such relief as repayment, restitution, rescission or disgorgement of any unjust enrichment. In order to grant relief against a person who is not accused of wrongdoing, the Court must find that (1) there has been a wrongful act, (2) specific property acquired by the wrongdoer must be traceable to the wrongful behavior, and (3) there must be a reason why the party holding the property should not be allowed in good conscience to keep it. <u>Alsco-Harvard Fraud Litigation</u>, 523 F. Supp. 790 (D.D.C. 1981). <u>FTC V. Capital City Mortgage Corp.</u>, Civil Action No. 98-237 (DDC 2004 ) (Order denying Defendants' Motion to Dismiss). The FTC must prove that a person who was not accused of wrongdoing (1) has received ill-gotten funds, and (2) does not have a legitimate claim to those funds. S<u>ee</u> <u>CFTC V. Kimberlynn Creek Ranch, Inc</u>., 267 F. 3rd 187, 192 (4th Cir.2002). The FTC must prove that the relief defendant has been unjustly enriched by receipt of the property that the FTC wishes to reach, because it is the "unjust enrichment" that triggers application of the doctrine of constructive trust. <u>FTC V. Think Achievement Corp</u>., 144 F Supp.2d 1013, 1020-1021 (N.D. Ind. 2000).

Mount is not charged with any personal wrongdoing. She was not a person who was in control of the decisions being made either at King Media or at Triad. Mount did not direct,

control, formulate or participate in any of the practices complained of by the FTC.  Cf.  FTC v. Ameridebt, Inc., 343 F. Supp. 451, 462 (D. Md. 2004). Except for a six-month interlude in 2001, since 1996, Mount has been an at-home mother, trying to raise two young children.

As a part owner of King Media and Triad, Mount received some compensation resulting from those companies performing routine functions.  As noted above, King Media and Triad's actions as vendors in performing the usual functions of media placement and overseeing product fulfillment is no grounds for FTC proceeding against either of them.  Hence, there is no basis for pursuing Mount as "relief defendant."

Further, Mount does not have specific property that is traceable to any alleged wrongful behavior.  The FTC has not articulated any account presently standing in the name of Mount that the FTC alleges to represent specific property that is traceable to the alleged wrongful behavior of any other defendant.  In fact, between what Mount contributed to trying to preserve the companies, and what she was required to pay on her personal guaranty of the companies' loans, Mount has paid more than she received from the companies.

Additionally, Mount has a legitimate claim to all property in her possession and has not been unjustly enriched.  Well prior to the commencement of this action, the Sterns' marriage began to falter. They separated on October 15, 2002 and  Mount filed for divorce on July 2, 2003.  Mount received  compensation in connection with her divorce from Stern as a result of arms-length negotiations between their respective counsel as to the terms of a divorce settlement and the related sale of Mount's stock interest in the companies.  The terms of the divorce settlement were reduced to a written settlement agreement.  Mount was given custody of the Sterns' two minor children.  As part of the negotiated divorce settlement, the Sterns' cash assets

were divided approximately 50-50.   Thus, this is not a case where Mount has received anything to which she is not entitled.  She gave up her ownership interest in companies.  She gave up claims to child support.   She gave up claims to alimony.  The transactions were arms-length.  Mount has a legitimate claim to all of the funds that she received.

The terms of the Marital Settlement Agreement are eminently reasonable and are consonant with what a court likely would have done in the circumstances, had the parties not reached a negotiated settlement agreement.  See Teodorski V. Teodorski, 2004 PA Super 313, 857 A.2d 194 (2003) (when a court divides the marital property, it must do so only after considering "all relevant factors," including eleven specific factors listed in the Divorce Code. 23 Pa.C.S.A. § 3502(a)).[3]

Thus, this is not a case where a wrongdoer shuffled proceeds from unlawful activities from account to account, in an attempt to hide them.  Compare FTC v. Think Achievement Corp., 144 F.Supp.2d 993 (2000).   All of the accounts held by either Stern or Lisa Stern are set

---

[3] *23 Pa.C.S.A. § 3502*. **Equitable division of marital property (a) General rule.** — In an action for divorce or annulment, the court shall, upon request of either party, equitably divide, distribute or assign, in kind or otherwise, the marital property between the parties without regard to marital misconduct in such proportions and in such manner as the court deems just after considering all relevant factors, including: (1) The length of the marriage. (2) Any prior marriage of either party. (3) The age, health, station, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties. (4) The contribution by one party to the education, training or increased earning power of the other party. (5) The opportunity of each party for future acquisitions of capital assets and income. (6) The sources of income of both parties, including, but not limited to, medical, retirement, insurance or other benefits. (7) The contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property, including the contribution of a party as homemaker. (8) The value of the property set apart to each party. (9) The standard of living of the parties established during the marriage. (10) The economic circumstances of each party, including Federal, State and local tax ramifications, at the time the division of property is to become effective. (11) Whether the party will be serving as the custodian of any dependent minor children.

forth in their Marital Settlement Agreement. This is not a case where one spouse has transferred money to their spouse, without consideration and thus have no legitimate claim to the funds. Compare FTC v. Ameridebt, Inc., C.A. No. PJM 03-3317, Sept. 24, 2004 Opinion, D. Md. 2004.

     To the contrary, whatever monies Lisa Stern has received are the result of her having engaged counsel and negotiated the terms of a marital settlement agreement. If the Court were to permit FTC to reach any of Mount's assets, the affect would be to interfere with and frustrate her rights under her marital settlement agreement, to her prejudice..

     After her divorce, and King Media and Triad's loss of it major source of income, Mount loaned money back to King Media, to keep the company in business, for a two-fold reason: (1) so that it could generate income that, in turn , would enable Allen Stern to meet his financial obligations to her, and (2) because she was personally liable on debts of the companies. It did not work, and Mount has lost both her investment and her source of financial support. She was required to pay off a substantial portion of the companies' bank loans.
Presently Mount is living off of funds she received in connection with her divorce. Her remaining funds total $140,000, in a joint account with her new husband, and are substantially less than the money she had in her own name prior to King Media and Triad doing any business for DMC and prior to her divorce.

     To require Mount to repay any more money would upset the divorce settlement agreement and require reopening probate proceedings.

**Conclusion**

FTC has failed to prove that King Media, Triad Marketing Co., Inc., Allen Stern, Lisa Mount and Steven Ritchey, or any of them, made any "representation omission or practice . . . likely to mislead consumers acting reasonably under the circumstances, and . . . the representation, omission, or practice is material." FTC Memo, p. 33. These defendants already have been unjustly harmed by FTC's bringing this action against them. Upon the foregoing points and authorities, these defendants respectfully submit that FTC's Motion for Summary Judgment as to them, individually and collectively, should be denied and, in the circumstances, judgment should enter for each of them.

By their attorney,

Joseph F. Ryan BBO# 435720
Lyne Woodworth & Evarts LLP
600 Atlantic Avenue
Boston, MA 02210
Telephone 617/523-6655 - Telecopy 617/248-9877
E-mail: Jryan@LWELaw.com

Certificate of Service

I hereby certify that this document filed through the ECF system and the accompanying supporting affidavits and Response to FTC's Rule 56.1 Statement will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 10, 2006.

February 10, 2006                     Joseph F. Ryan BBO# 435720