UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | |
|     Plaintiff | ) | |
| | ) | |
| V. | ) | DOCKET # 1:04-cv-11136-GAO |
| | ) | |
| DIRECT MARKETING CONCEPTS, INC. | ) | |
| *et al*,    Defendants | ) | |

-----------------------------------------------------

### TRIAD ML MARKETING, INC., KING MEDIA, INC., ALLEN STERN, LISA MOUNT AND STEVEN RITCHEY'S RESPONSE TO FEDERAL TRADE COMMISSION'S RULE 56.1 <u>STATEMENT OF MATERIAL FACTS NOT IN DISPUTE</u>

Defendants Triad ML Marketing, Inc., King Media, Inc., Allen Stern, Lisa Mount (formerly known as Lisa Stern), and Steven Ritchey respond to the numbered paragraphs of the Federal Trade Commission's Rule 56.1 Statement of Material Facts Not in Dispute" as follows:

1. Admitted that the Federal Trade Commission ("FTC") was created by 15 U.S.C. § 41 and that the remaining referenced sections relate to its formation and powers; but state that FTC has failed to articulate the several limitations on its authority.

2. Admitted

3. Admitted

4-38. These facts are not relevant to any of the Triad defendants. Although paragraph 11 is addressed solely to the DMC/ITV Defendants, the statement "that a toll-free number appeared during the course of the infomercial for customers to call to purchase Coral Calcium Daily" is false and wholly incorrect. A review of the transcript will show that the toll free number that appeared was specifically for further information; there was no request to call to

order calcium supplements of any kind.  No sale of product was offered anywhere in the infomercial.  Stern Affidavit ¶ 11.

39.  Admitted that Triad formerly existed as stated, but says that Triad is no longer in business and no longer is at the address stated.  Stern Affidavit ¶ 39.

40. Denied.  Admitted that King Media is a Delaware corporation, registered as a foreign corporation in Pennsylvania, but says that King Media is no longer in business.  Stern Affidavit ¶ 40.

41.  Admitted that Allen Stern formerly was President and CEO of Triad and King Media, but says that King Media and Triad are no longer in business.  Stern Affidavit ¶ 39-40.

42.  Denied as to the first year of operation of King Media.  Otherwise admitted that Allen Stern was President of Triad and King Media, but says that King Media and Triad are no longer in business.  Stern Affidavit ¶ 42.

43.  Admitted that Allen Stern was the decision-maker for Triad and King Media, but says that King Media and Triad are no longer in business.  Stern Affidavit ¶ 39-40.

44.  Admitted that Stern currently owns two-thirds of both King Media and Triad, but says that King Media and Triad are no longer in business.  Stern Affidavit ¶ 39-40.

45.  Admitted that King Media was a TV media-buying agency that purchased television time for direct response clients, but says that King Media is no longer in business.  Stern Affidavit ¶ 40.

46.  Admitted, except the correct name of the long-form infomercial that includes Robert Barefoot and Kevin Trudeau and discussed the "Calcium Factor" book was called "The Calcium Factor."  Stern Affidavit ¶ 46.

47.  Admitted that Steven Ritchey testified that Triad's business was to assist direct

response clients by finding third-party vendors to fulfill whatever requirements those clients have, such as managing fulfillment (the packaging and shipping of products to consumers) and assisting with order volumes, but says that Triad is no longer in business. Stern Affidavit ¶ 39.

48. Admitted

49. Triad recommended vendors were used for limited periods of time when DMC required such services and requested Triad' assistance. At other times, DMC handled Fulfillment through Kevin Trudeau's company, Shop America, or through DMC's own firm, Direct Fulfillment. Stern Affidavit ¶ 49.

50. Admitted that Triad handled purchasing of some coral calcium product from a manufacturer, assisted in facilitating the processing of consumer orders for DMC (including credit card orders) taken by others and forwarded to third party Fulfillment centers which, handled packaging and shipping the product to consumers; but Triad denies that it "handled all management of the coral calcium infomercial." Triad never had any control over the telemarketing sales and order taking operations, order database management, order fulfillment, or shipping, where actual sales of any calcium were made, and all Triad's activities were subject to DMC's control and decision-making. Stern Affidavit ¶ 50.

51. Admitted as to King Media and Triad. Denied as to Stern, Ritchey and Mount. Mount Affid. ¶ 21. Stern Affid. ¶ 51.

52. Admitted as to King Media and Triad. Denied as to Stern, Ritchey and Mount. Mount Affid. ¶ 21. Stern Affid. ¶ 52.

53. Admitted

54. Admitted

55. Admitted

56. Admitted

57. Admitted

58. Admitted

59. Admitted

60. Admitted that Steven Ritchey was a corporate officer of both King Media and Triad, but says that King Media and Triad are no longer in business. Stern Affid. ¶ 39-40.

61-67. These facts relate to other defendants

68. These facts relate to other defendants

69. Admitted

70. Denied

71. Admitted that Triad was "involved" as would be the case of any potential vendor attempting to secure new business. Stern Affid. ¶ 71.

72.-77. These facts relate to other defendants

78-80. Admitted. However, King and Triad did require Barefoot and DMC to provide assurances that any claims could be substantiated, and required proof of contractual inclusion of an indemnification of all vendors and agents (specifically to include Triad and King) against any and all such claims, Both Barefoot and DMC provided, and have admitted to providing, such indemnification. Stern Affid. ¶ 78-80.

81. These facts relate to other defendants, but Triad denies that they have been fairly placed into context. For example, FTC's 81D infers that the infomercial was for the sale of coral calcium, when, in fact, the infomercial was for the sale of books. FTC's 81D reads:

> [ON SCREEN: 1-800-870-4122]
> ***
> KEVIN TRUDEAU: *** If you want information on these books or the coral calcium,

just call the number on your screen for some more information.

The comments preceding and following this excerpt, that put the excerpt in context are:

[ON SCREEN: 1-800-870-4122]

ROBERT BAREFOOT: (Laughter)

KEVIN TRUDEAU: But if you are watching – because that's a whole other story. If you are watching right now, we're talking with Bob Barefoot, who's the author of Death By Diet and also The Calcium Factor, the Scientific Secrets of Health and Youth, one of the most incredible books on health I've ever read. He also has information on this coral calcium, which is a great form of calcium that you can absorb and actually physically take. We're going to talk about – more about that in a moment.

If you want information on these books or the coral calcium, just call the number on your screen for some more information. We worked out an arrangement here on A Closer Look always with our guests. If you do call today, mention A Closer Look, you will get a substantial discount off the price of the books or you can get all your questions answered or get additional information sent to you on this or the coral calcium, which you can actually take.

Stern Affid. ¶ 81.

82-87. These facts relate to other defendants

88. These facts relate to other defendants. No such material was provided by Triad.

89-95. These facts relate to other defendants.

96. These facts relate to other defendants. Triad defendants never knowingly allowed, or ever were aware that, "The President's Handshake" was enclosed with any orders handled by fulfillment centers that Triad assisted in locating for DMC's use in the "Calcium Factor" program. Stern Affid. ¶ 96.

97-98. These facts relate to other defendants

99. Denied. Triad had no involvement whatsoever with the creation of the infomercial. King Media, not Triad, arranged for the dub house to delivery copies of the infomercial to TV stations. Triad's function, as a vendor and supplier of various services to DMC, on DMC's

behalf and with DMC's knowledge and consent, facilitated the production and purchase of books and calcium product and, during times when DMC was unable to provide fulfillment services or card processing, Triad facilitated use of third party vendors to provide those services, or allowed use of its merchant accounts for credit card processing. In order to protect its credit card processing, and abide by the rules promulgated by VISA and generally accepted by other credit card companies, Triad was <u>required</u> to be able to assure order fulfillment in a generally acceptable time frame and , therefore, <u>required</u> to have some ownership interest or control of the product(s), including the books and calcium supplements, as a threshold matter in order to utilize its merchant accounts. However, Triad never fulfilled any orders itself, and Triad never shipped any orders itself. If the order was not handled by DMC/DFI, then it was handled by another vendor, FP Video in Indianapolis, Indiana  FTC is aware of who these vendors were, but has taken no action with respect to them. Triad did not "handle the management of the coral calcium infomercial." Stern Affid. ¶ 99.

     100. Denied in part. DMC processed its credit card orders through Triad's merchant account until it terminated Triad in January, because DMC secured its own merchant account. When Triad was terminated in January, DMC still maintained King Media as an agency to place TV time on behalf of DMC until March 2003, but DMC never paid King Media for media time that King Media purchased on behalf of DMC during February and March 2003, which cost King Media approximately $1 million. Stern Affid. ¶ 100.

     101. Admitted

     102. Admitted, but only for such periods as Triad acted as a vendor and supplier to DMC. Stern Affid. ¶ 102-103.

     103. Admitted, but only for such periods as Triad acted as a vendor and supplier to

DMC.  Stern Affid. ¶ 102-103.

104.  These facts relate to other defendants

105.  Admitted

106  Admitted that King Media was to receive commission at the rate of 15%, an industry standard rate, calculated by the TV stations and cable networks as gross and net media costs.  Denied that King Media received all of the commissions to which it was entitled.  Stern Affid. ¶ 106.

107.  Admitted that King Media tried to persuade DMC's distributors of Coral Calcium Daily to use its services to purchase their media time in order to avoid duplication of air dates and times and other scheduling issues that would diminish the quality and performance of the media buying services, but King Media was not in a position to require all distributors to utilize its media buying services and most distributors purchased some or all of their own commercial air time.  Stern Affid. ¶ 107.

108.  Denies this is a fair statement.  "We felt it was Mr. Trudeau's responsibility.  I might also add, Shefsky & Froelich also thought it was Mr. Trudeau's responsibility and sent a number of e-mails to Mr. Bradford specifically saying that it's Mr. Trudeau's responsibility to fix the show if indeed there are problems with the show.  Stern Affid. ¶ 108.

109.  Admitted, as TV networks maintain "compliance" departments for just that reason.  Stern Affid. ¶ 109.

110.  Denies this is a fair statement.  Stern became aware <u>in</u> Late January or early February 2002 that Kevin Trudeau had previously entered into a consent degree with the FTC and that Mr. Bradford said that he had been convicted of two felonies.  Stern Affid. ¶ 110.

111-113.  These facts relate to other defendants

114. Admitted

115-116. Admitted, but Stern was under the belief, as was DMC's counsel at the time, that this was a negotiation tactic and ploy on the part of Trudeau. This was further evidenced by the fact that Trudeau proceeded to produce a second infomercial commonly referred to as the "Kevin and Debbie" show which departed from the issues of free speech and book sales, and instead, offering in the infomercial presentation and solicitation of the consumer to directly purchase a specific brand of Coral Calcium offered and endorsed by Robert Barefoot. Stern Affid. ¶ 115-116.

117. Denied. Defendants lack sufficient information as to who actually mailed the infomercial to the Venable law firm, but it was only one person. . DMC, with Chicago counsel;'s input, made the decision to send the show to the Venable law firm for review, based upon Trudeau's reluctance. At the time, the Venable law firm represented DMC as well as King Media. Stern did not object. Stern Affid. ¶ 117.

118. FTC's statement that "we tested" an edited version of the infomercial is misleading insofar as it implies that King Media or Triad had any control over decisions relating to the infomercial. Neither King Media nor Triad owned that infomercial. Any decisions regarding editing or testing another show were decisions made by DMC. Stern Affid. ¶ 118.

119-126. These facts relate to other defendants

127-129. Admitted as to these defendants. No knowledge as to other defendants.

130-139. Admit that Wood, a Ph.D. makes these representations. Lack knowledge of their truth.

140-157. Admit that Sowers, a Ph.D., makes these representations. Lack knowledge of their truth.

158-161.  No Knowledge.

162.  Admitted that this was an estimate made by Triad, which includes sales of products other than sales of a calcium supplement, and sales not made through or in conjunction with the "Calcium Factor" infomercial.  Triad has provided FTC with all of its relevant Documents which would produce more accurate information.  Stern Affid. ¶ 162.

163.  These facts relate to other defendants

164-374.  These facts relate to other defendants

375.  Admits that Lisa Stern was credited for tax purposes as earning $1.5 million in 2002 Triad profit and that while they were married Stern evenly shared in her ownership of the company.  Denied that Lisa Stern actually received $1.5 million.  Stern Affid. ¶ 375-376.  Mount Affid. ¶ 14,

376-377.  Admitted that Lisa Stern and Steven Ritchey were charged with those earnings for tax purposes, as Triad is an S-corporation.  FTC Ex. 16, p. 162.   Denies that they were able to retain those earnings, as a substantial portion of the earnings, on which taxes were paid, had to be used to try to keep King Media operating after King Media was saddled with over $1 million in unreimbursed media costs. Stern Affid. ¶ 375-377.  Mount Affid. ¶ 14.

378.  Admitted.

379.  Admitted

380.  These facts relate to other defendants

381.  Admitted.

382.  Admitted.

383.  These facts relate to other defendants

        By their attorneys,

        Joseph F. Ryan BBO# 435720
        Lyne Woodworth & Evarts LLP
        600 Atlantic Avenue
        Boston, MA 02210
        Telephone 617/523-6655 - Telecopy 617/248-9877
        E-mail: Jryan@LWELaw.com

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 10, 2006.

        _____
        Joseph F. Ryan BBO# 435720