UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

FEDERAL TRADE COMMISSION )
          Plaintiff )
           )
V. )      DOCKET # 1:04-cv-11136-GAO
           )
DIRECT MARKETING CONCEPTS, INC. )
*et al*,      Defendants )
----------------------------------------------------

AFFIDAVIT OF ALLEN STERN IN OPPOSITION TO
FEDERAL TRADE COMMISSION'S
<u>MOTION FOR SUMMARY JUDGMENT</u>

I, Allen Stern, upon oath depose and say as follows:

A.  I am a named defendant in this action.  I am one of the owners of Triad ML Marketing, Inc. and King Media, Inc.

B.  King Media was started in 1992.   King Media was never more or less than a media placement agency.   King Media was set up to place media time on behalf of clients in the Direct Marketing Industry for programs, products and services.  We placed TV time on behalf of clients' products, programs, and services.

C.   Triad Marketing was started in 1996 to support our clients in the Direct Marketing Industry with "back end / project management" support.

D.  King Media and Triad are no different from numerous other companies that provide the same services, from a media placement standpoint and from a project management standpoint.

E.   Both King Media and Triad now have ceased doing business, thanks in large measure to this action brought against us by the Federal Trade Commission.

F.   The companies owed substantial sums to banks at the time they ceased doing business.  Because the companies did not have the money, the Bank sought to collect from Lisa Mount, on her personal guaranty.  Lisa Mount paid approximately $750,000 of the Bank's loan.

G.   Other than having to communicate with Massachusetts counsel in this case, the only business I have had in Massachusetts was in my role as an officer and employee of King Media, in my dealings with DMC, strictly in the role of DMC being a client of King Media.  I have never held any office or position in DMC.

H.   I have reviewed the "Federal Trade Commission's Rule 56.1 Statement of Material Facts Not in Dispute."  I find that some of the facts are not true, and some of the stated facts are half-truths or misleading in at least the following respects (NOTE: The following paragraph numbering corresponds to FTC's paragraph numbering in its Statement of Material Facts):

11.   FTC's statement in paragraph 11 "that a toll-free number appeared during the course of the infomercial for customers to call to purchase Coral Calcium Daily" is false and wholly incorrect.  A review of the transcript will show that the toll free number that appeared was specifically for further information; there was no request to call to order calcium supplements of any kind.  No sale of product was offered anywhere in the infomercial.

39.   FTC's statement in paragraph 39 regarding Triad's existence was true at one time.  However, as noted above, Triad is no longer in business and no longer is at the address stated.

40.  FTC's statement in paragraph 40 regarding King Media's existence is incorrect.  King Media is a Delaware corporation, registered as a foreign corporation in Pennsylvania.

Further, as noted above, King Media is no longer in business.

42.  FTC's statement in paragraph 42, that I "have been the President of both King Media and Triad since the companies' inceptions" is not true with respect to the first year of operation

of King Media.

46.  FTC's statement in paragraph 46 incorrectly identified the name of the infomercial for which King Media purchased media time.  The correct name of the long-form infomercial that includes Robert Barefoot and Kevin Trudeau and discussed the "Calcium Factor" book is "The Calcium Factor."

49.  FTC's statement in paragraph 49 concerning Triad's activities is misleading to the extent that it fails to identify the limited time period during which DMC contracted for Triad's services.   Triad-recommended vendors were used for limited periods of time when DMC required such services and requested Triad' assistance.  At other times, DMC handled Fulfillment through Kevin Trudeau's company, Shop America, or through DMC's own firm, Direct Fulfillment.

50.  FTC's statement that Triad handled "all management of the coral calcium infomercial" is false and misleading.  Triad had no involvement with the infomercial.  Triad handled purchasing of some coral calcium product from a manufacturer, assisted in facilitating the processing of consumer orders for DMC (including credit card orders) taken by others and forwarded to third party Fulfillment centers which, handled packaging and shipping the product to consumers. Triad never had any control over the telemarketing sales and order taking operations, order database management, order fulfillment, or shipping, where actual sales of any

calcium were made, and all Triad's activities were subject to DMC's control and decision-making.

51.  FTC's statement that the acts and practices as alleged in the Complaint are or have been in or affecting commerce is admitted to be true with respect to acts and practices of King Media and Triad.  However, it is not true with respect to Steven  and I personally, as any involvement that I or Steven Ritchey had was solely in our capacities as officers and employees of King Media and Triad.

52.  FTC's statement that the Court has subject matter jurisdiction over this case and that venue in this district is proper is admitted to be true with respect to King Media and Triad.  However, it is not true with respect to Steven  and I personally, as neither I nor Steven Ritchey had any contacts with Massachusetts other than in our capacities as officers and employees of King Media and Triad.

70. FTC's statement that I drafted a proposed contract between Barrett and Trudeau relating to the coral calcium infomercial is misleading in three respects.  First, Trudeau and Barrett already had a contract, and they were acting on that contract.  Second, Trudeau never signed any contract in which I had any input or involvement.  Third, although I may have had input into another proposed contract that was never executed or implemented, I would not, nor could I have been, a signatory to such a contract.

71.  FTC's statement that Triad was included as a party to a proposed contract because Triad was "involved" is true in the sense that any potential vendor attempting to secure new business is "involved."

78-80.  FTC's statements that King Media and Triad did not have a practice of having

infomercials reviewed for compliance with FTC law are correct. However, King Media and Triad did require Barefoot and DMC to provide assurances that any claims could be substantiated, and required proof of contractual inclusion of an indemnification of all vendors and agents (specifically to include Triad and King) against any and all such claims, Both Barefoot and DMC provided, and have admitted to providing, such indemnification. Further, although King Media was responsible for contracting with the dub houses to ship the infomercial to TV stations, neither King Media nor Triad "disseminated" the infomercial and, in fact, never shipped any infomercials from their office..

     81. FTC has accurately excerpted from the referenced transcripts. However, they have not fairly been placed into context. For example, FTC's 81D infers that the infomercial was for the sale of coral calcium, when, in fact, the infomercial was for the sale of books. FTC's 81D reads:

> [ON SCREEN: 1-800-870-4122]
> ***
> KEVIN TRUDEAU: *** If you want information on these books or the coral calcium, just call the number on your screen for some more information.

The comments preceding and following this excerpt, that put the excerpt in context are:

> [ON SCREEN: 1-800-870-4122]
>
> ROBERT BAREFOOT: (Laughter)
>
> KEVIN TRUDEAU: But if you are watching – because that's a whole other story. If you are watching right now, we're talking with Bob Barefoot, who's the author of Death By Diet and also The Calcium Factor, the Scientific Secrets of Health and Youth, one of the most incredible books on health I've ever read. He also has information on this coral calcium, which is a great form of calcium that you can absorb and actually physically take. We're going to talk about – more about that in a moment.
>
>     If you want information on these books or the coral calcium, just call the number on your screen for some more information. We worked out an arrangement here on A

Closer Look always with our guests.  If you do call today, mention A Closer Look, you will get a substantial discount off the price of the books or you can get all your questions answered or get additional information sent to you on this or the coral calcium, which you can actually take.

Again, no specific calcium product was ever shown on the screen, or advertised for purchase.

96.  FTC's statements in paragraph 96, that some consumers received a document titled "President's Handshake", is not correct as regards Triad or King Media. Triad never knowingly allowed, or ever was aware that, "The President's Handshake" was enclosed with any orders handled by fulfillment centers that Triad assisted in locating for DMC's use in the "Calcium Factor" program.

99.  FTC's statement in paragraph 99 that Triad "handled the management of the coral calcium infomercial" is false.  Triad had no involvement whatsoever with the creation of the infomercial.  King Media, not Triad, arranged for delivery of copies of the infomercial to TV stations.  Triad's function, as a vendor and supplier of various services to DMC, on DMC's behalf and with DMC's knowledge and consent, facilitated the production and purchase of books and calcium product and, during times when DMC was unable to provide fulfillment services or card processing, Triad facilitated use of third party vendors to provide those services, or allowed use of its merchant accounts for credit card processing.  In order to protect its credit card processing, and abide by the rules promulgated by VISA and generally accepted by other credit card companies, Triad was required to be able to assure order fulfillment in a generally acceptable time frame and , therefore,  required  to have some ownership interest or control of the product(s), including the books and calcium supplements, as a threshold matter in order to utilize its merchant accounts.  However, Triad never fulfilled any orders itself, and Triad never shipped any orders itself.  If the order was not handled by DMC/DFI, then it was handled by

Page -6-

another vendor, FP Video in Indianapolis, Indiana  FTC is aware of who these vendors were, but has taken no action with respect to them.

100.  FTC's statement in paragraph 100 that Triad allowed its merchant account to be used to process credit card orders for coral calcium from December 2001 to February 2003 is inaccurate as to the time frame.  DMC processed its credit card orders through Triad's merchant account until it terminated Triad in January, because DMC secured its own merchant account. When Triad was terminated in January, DMC still maintained King Media as an agency to place TV time on behalf of DMC until March 2003, but DMC never paid King Media for media time King Media purchased on DMC's behalf during February and March 2003,  which cost King Media approximately $1 million.

102-103.  FTC's statement in paragraph 102 that Triad was to be compensated for its services is correct,  but  Triad was entitled to be compensated only for such periods as Triad acted as a vendor and supplier to DMC.

106  FTC's statement in paragraph 106  that King Media "received" a 15% commission is not correct.  King Media was entitled  to receive commission at the rate of 15%, an industry standard rate, calculated by the TV stations and cable networks as gross and net media costs. However, King Media did not receive payment for close to $1 million of media that it placed.

107.  FTC's statement in paragraph 107 that King Media "required" DMC's distributors to use its services is not correct.  King Media wanted and  tried to persuade DMC's distributors to use its services to purchase their media time, in order to avoid duplication of air dates and times and other scheduling issues that would diminish the quality and performance of the media buying services,  but King Media was not in a position to require all distributors to utilize its

media buying services and most distributors purchased some or all of their own commercial air time.

108.  FTC's statement in paragraph 108 that Stern "didn't want to spend the money" to have a copy of the infomercial reviewed is misleading and out of context.  As I said in my deposition,  "We felt it was Mr. Trudeau's responsibility.  I might also add, Shefsky & Froelich also thought it was Mr. Trudeau's responsibility and sent a number of e-mails to Mr. Bradford specifically saying that it's Mr. Trudeau's responsibility to fix the show if indeed there are problems with the show."

109.  FTC's statement in paragraph 109, that I believe it is the responsibility of TV stations to review the content of infomercials before they are aired is correct. I am aware that TV networks maintain "compliance" departments for just that reason.

110.  FTC's statement in paragraph 110 as to what I learned about Kevin Trudeau and when I learned it is imprecise.  I became aware <u>in</u> late January or early February 2002 that Kevin Trudeau had previously entered into a consent degree with the FTC and that Mr. Bradford <u>said</u> that he had been convicted of two felonies.

115-116.  FTC's statements in paragraphs 115-116 that I had been told by Trudeau's attorney that the infomercial did not comply with the law is true.  The demand that  Trudeau fix any problems, because it was Trudeau's responsibility to produce an infomercial that complied with the law, was a demand first made by Chicago counsel and later repeated by me and DMC., to fix any problems.   However, I was under the belief –  as was DMC's counsel at the time -- that this was a negotiation tactic and ploy on the part of Trudeau.  This was further evidenced by the fact that Trudeau proceeded to produce a second infomercial, commonly referred to as the

"Kevin and Debbie" show, that departed from the issues of free speech and book sales, and instead, offered in the infomercial presentation and solicitation of the consumer to directly purchase a specific brand of Coral Calcium offered and endorsed by Robert Barefoot, called "Coral Calcium Supreme."

117.   FTC's statement that "the Stern Defendants" sent the infomercial to the Venable law firm is not true.  I do not recall who actually mailed the infomercial to the Venable law firm, but it certainly was only one person.  DMC, with Chicago counsel;'s input, made the decision to send the show to the Venable law firm for review, based upon Trudeau's reluctance.  At the time, the Venable law firm represented DMC as well as King Media.  I did not object.

118.   FTC's statement that "we tested" an edited version of the infomercial is misleading insofar as it implies that King Media or Triad had any control over decisions relating to the infomercial.  Neither King Media nor Triad owned that infomercial.  Any decisions regarding editing or testing another show were decisions made by DMC, the show owner.

162.   FTC's statement in paragraph 162, regarding Triad's best estimate of gross coral calcium revenues is correct.  However, this was just an estimate and includes sales of products other than sales of a calcium supplement, and sales not made through or in conjunction with the "Calcium Factor" infomercial.  Triad has provided FTC with all of its relevant Documents which would produce more accurate information.

375-376.   FTC's statements in paragraphs 375-376, that Lisa Stern (now Lisa Mount) "received $1.5 million in 2002 Triad profit" are false.  Lisa Mount did not "receive" this money.  While she and I were married, she and I evenly shared in the ownership of the company.  Triad is an S-corporation.  Hence, for tax purposes she was charged with those earnings, even though she did not receive them.  Neither of us were able to retain those earnings, as approximately $735,000 of those earnings, on which taxes were paid, had to be used to try to keep King Media

operating after King Media was saddled with over $1 million in unreimbursed media costs.

377.  FTC's statement in paragraph 377, that Steven  "received" $772,652 in Subchapter

S "distributions, likewise is false.  Ritchey was <u>charged</u> with those earnings for <u>tax</u> purposes, but

he was not able to retain whatever portion of the distribution that he did receive, as he also

returned funds to the corporations in attempting to keep them afloat.

The foregoing statements are made and given under the pains and penalties of perjury.

SUBSCRIBED and SWORN TO under the pains and penalties of perjury this 10th day of

February 2006.

/s/ Allen Stern

_____

Allen Stern


**NOTARY JURAT CERTIFICATE**

On this ___10th___ day of ___February____, 2006___, before me, the undersigned notary
public, personally appeared ___Allen Stern_____, proved to me
through satisfactory evidence of identification, which were __Drivers license_____, to
be the person whose name is signed on the preceding or attached document, and who swore or
affirmed to me that the contents of the document are truthful and accurate to the best of  his
knowledge and belief.

/s/ Jeffrey P. Simek

[NOTARIAL SEAL]                _____
 Jeffrey P. Simek, Notary Public        _____Notary
Public
 Radnor Twp., Delaware County
My Commission Expires June 20, 2009


<u>Certificate of Service</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to
the registered participants as identified on the Notice of Electronic Filing (NEF) and a paper
copy will be sent this date to any persons indicated as non registered participants.

February 10, 2006                _____

Joseph F. Ryan BBO# 435720

**CONFORMED COPY**