UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS


FEDERAL TRADE COMMISSION            )
                Plaintiff                      )
                         )
V.                                  )        DOCKET # 1:04-cv-11136-GAO
                         )
DIRECT MARKETING CONCEPTS, INC. )
*et al,*          Defendants            )
---------------------------------------------------

AFFIDAVIT OF LISA MOUNT IN OPPOSITION TO
<u>FEDERAL TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT</u>

     I, LISA N. MOUNT, formerly known as Lisa Stern, named herein only as a "Relief

Defendant," upon oath depose and say as follows:

     1.  When King Media was incorporated on March 31, 1992, I went to work for the

company, full time, as Media Director.  I was one of the two original stockholders in King

Media..  I owned two-thirds of the stock in King Media, Inc.

     2.  Allen Stern and I were married on October 25, 1992.  We have two children, our

daughter born in January 1996, presently age 10, and our son born in May 1998, presently age 7.

     3.  I remained employed, full-time, as the Media Director for King Media from March

31, 1992 until January 12, 1996, just prior to the birth of our daughter.  King Media bought

media time for a variety of different clients.  King Media was successful.   King Media did not

market any products during this time.

     4. For several years after January 1996,  I remained at home, to raise our children.  King

Media continued to be successful in selling media time, and we were able to save and put money

into savings and investment accounts.

5.  All of our accounts were joint accounts. In November 2001, prior to King Media's involvement with Coral Calcium, our joint bank and investment accounts totaled approximately $400,000.

6.  During 2001, I returned to work at King Media, part-time, for a 6-month period during late 2001 through early 2002. I tried to generate new media business and to strengthen the media department. I did not receive any salary for my work during this period.

7.  Other than my employment until January 1996 and for the six-month period during late 2001 through early 2002, I have been only remotely involved with King Media. My involvement since January 1996 has consisted mostly of conversations with my then husband, Allen Stern, regarding the status of the business. I had no involvement in King Media's activities concerning coral calcium.

8.  I am informed that King Media was hired as an agency to place media for a Coral Calcium infomercial in 2002. As of December 31, 2001, I believe that Allen and I had bank and investment accounts totaled approximately $300,000. None of that money was attributable to Coral Calcium sales. The decrease from the $400,000 November balance noted above in paragraph 5 was attributable to our practice of putting money back into the company, from time to time, to keep the company afloat.

9.  Allen Stern and I separated on October 15, 2002, and he moved out on January 5, 2003.

10.  I engaged an attorney to represent me. With the assistance of counsel, I negotiated a Marital Settlement Agreement with Allen Stern. The Marital Settlement Agreement was finalized and signed on July 3, 2003, and my attorney filed for divorce for me on that same day, July 3, 2003. A true copy of the Marital Settlement Agreement is attached as **Exhibit 1.**

11.  As part of the divorce settlement, our cash assets were divided approximately 50-50. I received approximately $600,000.00 in cash and securities.

12.  As part of the divorce settlement, although Allen and I share joint custody of our two children,  I have physical custody more frequently than Allen.  I do not receive child support or alimony payments.  In lieu thereof, it was agreed that I would start receiving a salary from King Media in July 2003 of $150,000 per year.  This represents one-half of the salary that Allen Stern previously had been receiving from King Media.

13.  The divorce became final on January 10, 2004.

14.  I have read the following FTC's allegations concerning me:

> Lisa Stern, defendant Allen Stern's former wife, owned at least one-third of the stock of both King Media, Inc. and Triad ML Marketing, Inc.. during the period that those Defendants were involved in the marketing and sale of Coral Calcium Daily. Kaufman Decl., ¶¶ 9-10.  Ms. Stern received substantial funds, which the Commission believes represent proceeds from the sale of the coral calcium product, from Triad ML Marketing, Inc. to which she has no legitimate claim.  *See id.*, ¶ 10.  During the period of time that Triad ML Marketing was involved in the sale of Coral Calcium Daily through the challenged infomercial, substantial subchapter-S. distributions were made to Lisa Stern that were far in excess of what one would reasonably assumed to be salaries for work performed.  *See id.*  As a recipient of funds derived directly from Defendants' unlawful conduct, Ms. Stern is an appropriate relief defendant.

As noted above, I did not receive any salary at any time during the period January 1996 until July 2003.  I did remain as a shareholder of King Media, a subchapter-S corporation.  However, there were no distributions made to me any time during the period that King Media and Triad ML Marketing, Inc. were working on behalf of Direct Marketing Concepts, Inc..

15.  In view of our divorce, Allen Stern desired to acquire my stock in King Media. About the same time that I filed for divorce, I sold all of my stock in King Media (two-thirds of all of the stock in the company) to Allen Stern in return for a cash payment of approximately $400,000.00.  The payment was made by Allen Stern transferring  a Merrill Lynch account to my

name.

16. King Media's survival was very important to me and to my children, because it was to be the principle source of my income. When my former husband Allen Stern reported that King Media had been operating at a loss for several months, at his request and as we had done in the past, I loaned King Media money from time to time in order to ensure that King Media could continue to operate.

17. On July 23, 2005, I remarried. I sold my house in which I had $375,000 in equity. I used $200,000 of the money as a down payment on a new house into which I moved with my new husband and my two children. I put the remainder into savings, but subsequently used it toward paying off bank loans of King Media for which I had given a personal guaranty.

18. During calendar years 2004 and 2005, I loaned King Media a total of approximately $ 365,000, to keep the company afloat, in the expectation that things would improve and become successful again. That did not happen. The company is gone, and so is the money.

19. In addition to lending money directly to King Media, I paid $760,000 in order to pay off the companies' bank loans, which amounted to approximately $850,000, and for which I had given my personal guaranty. Because these payments totaled more than I received in my divorce settlement and in the sale of my stock, I had to use some of the money I received from the sale of my home, and I also took out a $185,000 second mortgage on my present home. At Allen Stern's request, and based on his oral promise to repay me, I also paid off the companies' American Express debt which amounted to just over $72,000. I also signed a promissory note for another debt totaling approximately, $22,000

20. I am financially much worse off today than I was before the Coral Calcium infomercial started and cannot understand why I am considered a relief defendant. Everything I

was awarded in the divorce settlement (and then some) has been put back into the company in an unsuccessful attempt to salvage the operation of King Media and Triad Marketing, and I am left with no alimony, no child support, no income, and very little savings.  Presently my savings, that are in a joint name with my present husband, total $140,000, which is being used to support me and my children.

21.  Other than having to communicate with an attorney in Massachusetts on this case, I have had no business contacts with anybody in Massachusetts since at least 1996.

The foregoing Affidavit is made and given under the pains and penalties of perjury this ___10th____ day of February 2006.

____/s/ Lisa N. Mount_____

Lisa N. Mount

## NOTARY JURAT CERTIFICATE

On this __10th___ day of _February_____, 2006___, before me, the undersigned notary public, personally appeared _____Lisa N. Mount_____, proved to me through satisfactory evidence of identification, which were
 __Drivers License_____, to be the person whose name is signed on the preceding or attached document, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of  her knowledge and belief.

/s/ Jeffrey P. Simek

[NOTARIAL SEAL]                          _____
 Jeffrey P. Simek, Notary Public          _____Notary
Public
 Radnor Twp., Delaware County
My Commission Expires June 20, 2009


Certificate of Service

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and a paper copy will be sent this date to any persons indicated as non registered participants.

February 10, 2006                          _____

Joseph F. Ryan BBO# 435720

**CONFORMED COPY**