1

1       IN THE UNITED STATES DISTRICT COURT

     FOR THE NORTHERN DISTRICT OF ILLINOIS

2            EASTERN DIVISION

                  -    -    -

3

  KEVIN TRUDEAU and      :    No. 02 C 1586

4  ROBERT BAREFOOT       :

                         :

5        vs.             :

                         :

6  DIRECT MARKETING CONCEPTS

  INC., and DONALD       :

7  BARRETT, JR.          :

8

9                 -    -    -

10            March 25, 2002

11                -    -    -

12            Oral Deposition of ALLEN

13  STERN, held at the Valley Forge Hilton,

14  DeKalb Pike, King of Prussia,

15  Pennsylvania, commencing at 3:20 p.m., on

16  the above date, before MARIA N. DAMIANI,

17  Registered Professional Reporter,

18  Certified Shorthand Reporter for New

19  Jersey and Delaware, and Notary Public.

20

21

22                -    -    -

23        ESQUIRE DEPOSITION SERVICES

    1880 JFK Boulevard, 15th Floor

    Philadelphia, Pennsylvania 19103

24            (215) 988-9191

**EXHIBIT**

Triad-49
7/15/05 JSW

DMC-FTC 0328

2

```
1
2 APPEARANCES:
3
   JENNER & BLOCK
4  BY: DANIEL J. HURTADO, ESQUIRE
   One IBM Plaza
5  Chicago, Illinois 60611-7603
   (312) 222-9350
6  Email: Dhurtado@jenner.com
   Email: Sherman@jenner.com
7  Counsel for Plaintiffs
8
9  SHEFSKY & FROELICH, LTD
   BY: CHANNING BLAIR HESSE, ESQUIRE
10 444 N. Michigan Avenue, Suite 2500
   Chicago, Illinois 60610
11 (312) 836-4015
   Email: Cblairhesse@shefskylaw.com
12 Counsel for Defendants
13
14
15
16
17
18
19
20
21
22
23
24
```

4

```
1
2         ALLEN STERN, after
3  having been duly sworn, was
4  examined and testified as follows:
5
6         EXAMINATION
7       - - -
8 BY MR. HURTADO:
9    Q.   Mr. Stern, could you please
10 state your full name for the record?
11    A.   Allen Stern.
12    Q.   And my name is Dan Hurtado
13 and I represent Mr. Trudeau and
14 Mr. Barefoot, and you are here for
15 deposition today pursuant to a subpoena;
16 is that correct?  Is that correct?
17    A.   I'm -- is it a subpoena?
18       MS. HESSE:  Yes.
19       THE WITNESS:  Yes.
20 BY MR. HURTADO:
21    Q.   Otherwise, you are also here
22 voluntarily?
23    A.   I'm here voluntarily.
24    Q.   Okay.  Have you had your
```

3

```
1
2        - - -
3        I N D E X
4  WITNESS                PAGE NO.
5  ALLEN STERN
6    By Mr. Hurtado..............4
7    By Ms. Hesse...............107
8        - - -
9        E X H I B I T S
10 NO.    DESCRIPTION     PAGE NO.
11       N O N E
12
13
14
15
16
17
18
19
20
21
22
23
24
```

5

```
1 deposition taken before?
2    A.   For this?
3    Q.   No, at all?
4    A.   Yes.
5    Q.   You have?  Have you had
6 several depositions taken?
7    A.   One time.
8    Q.   Just one time, how long ago
9 was that?
10   A.   Over a year.
11   Q.   And I will just briefly go
12 through the ground rules which I am sure
13 you are familiar with.
14       Of course, you understand
15 that you're under oath today and even
16 though there's no judge here you are
17 under oath as if you were in a court?
18   A.   Correct.
19   Q.   Okay.  And I will be asking
20 you a series of questions and you will do
21 your best to answer them.  And if you --
22 if I phrase a question that you don't
23 understand, which is eminently likely,
24 please ask me to rephrase or let me know
```

ALLEN STERN

**6**

1 that you don't understand.
2    Is that okay with you?
3    A.   Sure.
4    Q.   Okay. And we can take
5 breaks if you need, we won't be here too
6 long, but if you need a break, certainly
7 let me know and we will try to
8 accommodate that.
9    If a question is pending you
10 should answer the question before we take
11 a break, unless there's an issue of
12 attorney/client privilege.
13    A.   Okay.
14    Q.   I think that's it.
15    Do you have any questions of
16 me --
17    A.   None.
18    Q.   -- before we begin?
19    A.   No.
20    Q.   Okay. Mr. Stern, have you
21 done anything to prepare yourself for
22 this deposition?
23    A.   Not really.
24    Q.   Okay. Anything at all to

**7**

1 prepare for it?
2    A.   I read the -- the -- the
3 filings that you guys did.
4    Q.   The court filings?
5    A.   The court filings.
6    Q.   Did you read anything else?
7    A.   And I read your response.
8    Q.   Okay. Did you meet with
9 counsel prior to the deposition?
10    A.   We had dinner last night,
11 but that was just a welcome dinner.
12    Q.   You didn't discuss the
13 deposition at that meeting?
14    A.   Not really.
15    Q.   Have you spoken to anyone
16 other than counsel regarding the
17 deposition today?
18    A.   I spoke to Mr. Trudeau.
19    Q.   Oh, okay.
20    A.   And Mr. Barrett.
21    Q.   When did you speak to
22 Mr. Barrett about the deposition?
23    A.   Not about the deposition.
24    Q.   Oh, okay.

**8**

1    A.   About the issues.
2    Q.   All right.
3    A.   Yeah.
4    Q.   Were you speaking of
5 conversations regarding the deposition?
6    A.   None.
7    Q.   Okay. Did you have any
8 conversations or discussions with
9 Mr. Barrett today after his deposition?
10    A.   I had lunch and said
11 goodbye.
12    Q.   And any discussions about
13 the substance of his deposition?
14    A.   Not substantive.
15    Q.   Okay.
16    A.   Not substantive.
17    Q.   Can you tell me what your
18 current occupation is?
19    A.   I'm president of King Media
20 and Triad Marketing.
21    Q.   And what do those two
22 entities do? Let's start with Triad
23 Marketing, what is Triad Marketing's
24 business?

**9**

1    A.   Triad Marketing's business
2 is a product marketing and management
3 company.
4    Q.   And what does that mean?
5    A.   It means a number of
6 things: It means that we buy and sell
7 products, we do packaging, we write
8 brochures, we -- we handle all of the
9 communications with respect to marketing
10 infomercials and those sorts of
11 activities, very different from King
12 Media.
13    King Media is a -- a buying
14 agency that doesn't take title or buy
15 products or deal with fulfillment
16 companies, et cetera. It is solely there
17 to buy and negotiate television time.
18    Q.   Okay.
19    A.   So we are clear, King Media
20 is actually the company that's been in
21 business much longer than Triad. Triad
22 just came in to play a part in our
23 overall business strategies in 1996.
24    Q.   Okay. How long has King

DMC-FTC 0330    ESQUIRE DEPOSITION SERVICES

ALLEN STERN

**10**

1 Media been in business?
2    A.    Ten years.
3    Q.    Okay. And you are president
4 of both organizations?
5    A.    I am.
6    Q.    What is the corporate
7 relationship between Triad and King
8 Media?
9    A.    Triad would be a client of
10 King Media.
11    Q.    So there's no common
12 ownership between those two entities?
13    A.    Yeah, I'm the president of
14 both of them.
15    Q.    All right. And do you own
16 both of those companies?
17    A.    I have -- I have a
18 percentage ownership in both those
19 companies.
20    Q.    They are both corporations?
21    A.    Uh-huh.
22    Q.    And they are both
23 incorporated in Pennsylvania?
24    A.    Actually, no, Delaware.

**11**

1    Q.    Both are incorporated in
2 Delaware?
3    A.    I think Triad is
4 Pennsylvania, but King Media is
5 definitely in Delaware.
6    Q.    And you are the -- you own a
7 controlling interest in both of those
8 companies?
9    A.    Correct.
10    Q.    Okay. Do either of those
11 companies have any formal or corporate
12 affiliation with Direct Marketing
13 Concepts?
14    A.    None.
15    Q.    All right. Completely
16 independent?
17    A.    Completely.
18    Q.    Okay. I would like to start
19 here, Mr. Stern, by showing you what's
20 been previously marked this morning as
21 Barrett Exhibit Number 9.
22    A.    Uh-huh.
23    Q.    And this is an affidavit of
24 Donald Barrett, Jr.

**12**

1    A.    Uh-huh.
2    Q.    Have you seen this document
3 before?
4    A.    I have not.
5    Q.    All right. Did you have any
6 conversations with Mr. Barrett about any
7 affidavit that he had submitted this
8 morning?
9    A.    I have not.
10    Q.    I would just like to show
11 you something in here, if you'd turn to
12 paragraph 13 of the affidavit.
13    A.    Uh-huh.
14    Q.    I would just like to read
15 what that says, pursuant to DMC's
16 agreement with Triad ML Marketing, Triad
17 handled all management of the Coral
18 Calcium infomercial, including purchasing
19 the product from a manufacturer, the
20 processing of customer orders, packaging
21 and shipping of the product to
22 customers. Any sales, i.e., the
23 processing of credit card purchases, are
24 performed by Triad. Triad also handles

**13**

1 the payment of any royalties for the
2 show.
3          Do you agree with the
4 statements in that paragraph?
5    A.    Yes.
6    Q.    Okay. Anything in that
7 paragraph you don't agree with?
8    A.    No.
9    Q.    All right. It mentions here
10 an agreement between DMC and Triad, are
11 you familiar with that agreement?
12    A.    There's no written
13 agreement.
14    Q.    Okay. So it's your
15 assumption he's referring here to an oral
16 agreement?
17    A.    The -- the agreement is
18 this: His agreement with Triad is no
19 different than anybody else who brings us
20 a deal. That's what it is.
21          He brings us a deal, we
22 think the deal looks good, we -- we begin
23 to market.
24    Q.    Okay. And what is the

ALLEN STERN

14

1 consideration that Triad receives for
2 marketing the infomercial?
3    A.    We get a piece of the
4 profit.
5    Q.    Okay. Mr. Barrett indicated
6 that you split the profits; is that
7 correct?
8    A.    Correct.
9    Q.    Okay. What do you consider
10 Triad's obligations to be to DMC pursuant
11 to that oral agreement?
12    A.    Well, our obligations are to
13 make sure that vendors get paid, to make
14 sure that customers get satisfied to the
15 best of our ability, and to make sure
16 that the program is running as
17 efficiently and -- and as
18 cost-effectively as possible.
19        And the better Triad can do
20 its job, the better King Media could do
21 its job, and the better the program does
22 and the happier our customers are. And
23 -- and that's what the overall goal of
24 what Triad does is in terms of developing

15

1 the program.
2    Q.    Okay. Who has the
3 decision-making power with respect to all
4 of these activities mentioned by
5 Mr. Barrett in paragraph 13 of his
6 affidavit?
7    A.    Mostly Triad.
8    Q.    Are there instances in which
9 Mr. Barrett or DMC has decision-making
10 authority?
11    A.    He has input, but I -- I
12 would venture to say that -- that
13 ultimately the final decision with
14 respect to who we buy product from, how
15 we package the product, how we manage the
16 program, an ongoing program, is generally
17 he would defer to us on that.
18    Q.    That's because of your
19 experience and expertise in it?
20    A.    I have been doing it fifteen
21 years longer than Donald Barrett.
22    Q.    So, for example, who decides
23 what manufacturers from whom to purchase
24 product?

16

1    A.    We vend out as a custom in
2 our business, and Triad for sure, we look
3 for the lowest competitive price from a
4 number of different quality vendors, so
5 we don't select just one vendor generally
6 for one product unless there's something
7 that require they make something so
8 special and so unique that we can't go
9 anywhere else for it.
10        That is unusual in our
11 business. Why? It's a consumer
12 business, so you generally can find other
13 manufacturers who would like to compete
14 for that business and it keeps the
15 playing field even. Okay?
16    Q.    And if Mr. Barrett directs
17 you to purchase product from a specific
18 manufacturer, would you comply with that
19 request?
20    A.    I would comply with that
21 request as long as Mr. Barrett or anybody
22 else understood that there's -- there's a
23 good reason to go to other vendors who
24 could make a product that does not

17

1 compromise the quality.
2        You might be able to secure
3 better terms and conditions of sale, you
4 might be able to secure a faster delivery
5 time, you might be able to get a vendor
6 that's closer to your distribution
7 center; so there's a variety of reasons
8 why you want to use more than one vendor.
9        So I'm always willing to be
10 compliant, but -- but -- but there needs
11 to be a willingness that as related to a
12 vendor, that you want to be able to look
13 to more than one vendor. We've learned
14 sorry lessons in the past by doing that.
15    Q.    Would you regard Mr. Barrett
16 as having the ultimate authority
17 regarding the decision who to purchase
18 product from?
19    A.    I thought I just answered
20 that.
21    Q.    Well, I'm not sure you did.
22    A.    Ask me again.
23    Q.    If after advising
24 Mr. Barrett regarding the wisdom of his

ALLEN STERN

18

1 choice of manufacturer he nevertheless
2 directs you to purchase product from a
3 specific manufacturer, would you regard
4 yourself as contractually obligated to do
5 so?
6    A.    I'm not contractually
7 obligated to do anything. Let me tell
8 you what our agreement is, our agreement
9 is a deal. Okay? It's no different than
10 any other deals that have been brought to
11 me.
12         It says we would like you to
13 get involved in this project, if you
14 would like to, and here's what we would
15 like you to do, okay, potentially with
16 Triad and King, and -- and then we begin
17 to negotiate what the deal is going to
18 be.
19         So there hasn't come to the
20 point where he says you have to do this
21 because I'm telling you to do this. If
22 he -- if it came to that point on any
23 issue I may capitulate, I don't know.
24         Did that answer your

19

1 question?
2    Q.    For now.
3         Who makes the decision of
4 where or from whom to purchase media
5 time?
6    A.    King Media.
7    Q.    Okay. If Mr. Barrett asked
8 you to purchase media time from a certain
9 outlet in a certain market, would you
10 comply with that request?
11    A.    No.
12    Q.    Why not?
13    A.    Because Mr. Barrett is not
14 -- is not a media guy and King Media is
15 a very well-respected media agency in
16 this business, so it would be foolhardy
17 for Mr. Barrett to try to determine where
18 and how and when King Media should buy
19 advertising time.
20         If that would be the case,
21 then King Media is not doing its job and
22 there's numerous clients that would
23 testify that King Media does a very good
24 job, so in that respect I would try to --

20

1 to mention to Mr. Barrett that his
2 recommendations are probably not
3 grounded. In fact, unless he had some
4 special deal, it would be just something
5 that might have come across his desk, you
6 know.
7    Q.    Okay. You notice that the
8 last part of that paragraph 13 in the
9 affidavit says, Triad also handles the
10 payment of any royalties for the show?
11    A.    Correct.
12    Q.    That's correct?
13    A.    Uh-huh.
14    Q.    Okay. Is it accurate that
15 no royalties have been paid to date under
16 this arrangement to Robert Barefoot in
17 excess of paying for product?
18    A.    That would be incorrect.
19    Q.    Why is that?
20    A.    Because -- because if you
21 looked at the -- at the quote that he
22 has, it says it was $4.32 including
23 royalty. Look at the paperwork. $4.32
24 including royalty.

21

1    Q.    We will. Okay.
2    A.    Okay? Would you like to
3 know the deal with Robert Barefoot? I
4 can tell it to you real quickly.
5    Q.    We will get into that.
6 Okay?
7    A.    Okay.
8         So to answer your question,
9 your question is incorrectly phrased.
10 Robert Barefoot was under our agreement
11 the way we saw the agreement, he may see
12 it different, being paid including his
13 royalties when he was getting $4.32.
14    Q.    And that was my question,
15 actually, has he been paid royalties in
16 excess of the amount that was paid for
17 the cost of the products?
18    A.    He was being paid $4.32 a
19 bottle which included his royalties.
20    Q.    Okay. Is it accurate that
21 Mr. Kevin Trudeau has not been paid
22 royalties on the sale of Coral Calcium?
23    A.    That would be correct.
24    Q.    Why not?

6 (Pages 18 to 21)

ALLEN STERN

22

1    A.   Because Mr. Trudeau still
2 owes $12,500 for a second show which he
3 has failed to perform.
4    Q.   Okay. Do you know of any
5 written agreement between Mr. Trudeau and
6 you or DMC that requires him to do both
7 shows before he can be paid royalties?
8    A.   There's no written agreement
9 between Kevin Trudeau and Triad
10 Marketing, however, I think there is an
11 agreement between one of Kevin's
12 employees that says clearly that
13 Mr. Trudeau is to do the show for $25,000
14 and five percent.
15    And I might add, there's
16 nothing anywhere that suggests when those
17 royalties would be paid, however, there
18 can be no royalties paid until Kevin
19 either fulfills his obligation or we look
20 at how much has been profited in terms of
21 royalty payments, and that would be put
22 against the $12,500 that Kevin still owes
23 back in a second show.
24    So as soon as those royalty

23

1 dollars are gone, that means Kevin then
2 would be entitled to his royalty.
3    Q.   Now, the $25,000 was paid to
4 Mr. Trudeau to shoot the two
5 infomercials; is that correct?
6    A.   Correct.
7    Q.   And the royalties would be
8 paid with respect to sales generated by
9 the infomercial; isn't that correct?
10    A.   That's correct.
11    Q.   Okay. All right. So what
12 is the basis for your contention that
13 Mr. Trudeau should not be paid for
14 royalties with respect to sales
15 independently of whether he's done both
16 infomercials for which he would get the
17 25K payment?
18    A.   Because if Kevin Trudeau's
19 royalties does not exceed the 12.5 or
20 once they exceed the $12,500, then his
21 royalties obviously he would be -- he
22 should be paid for those royalties.
23    If, on the other hand, Kevin
24 Trudeau says here's $12,500 back, okay,

24

1 that means we would have to look at the
2 accounting and our controller would and
3 say therefore you are entitled to
4 royalties this Friday. It's just a point
5 of economics.
6    Q.   So what you're saying is
7 that as of now the royalties generated by
8 the Coral Calcium product have not
9 exceeded $12,500?
10    A.   I don't know the answer to
11 that.
12    Q.   Let's look at paragraph 17.
13 of Mr. Barrett's affidavit. It says, per
14 my agreement with Triad and in accordance
15 with my agreement with Mr. Barefoot,
16 Triad is responsible for making all
17 royalty payments to Mr. Barefoot.
18    Do you agree with that
19 statement?
20    A.   I do.
21    Q.   Okay. And so is it the case
22 that you have an obligation to
23 Mr. Barrett to make royalty payments to
24 Barefoot?

25

1    A.   No, I have an obligation to
2 Barefoot.
3    Q.   What is that obligation?
4    A.   One dollar a bottle over
5 cost, and costs are determined by
6 wherever we get the best price for the
7 product given that the product does not
8 change; in other words, we are not going
9 to make a worse product. So whatever the
10 cost of the product is, 37, 54, 75, 4
11 cents, it doesn't matter. Okay? His
12 royalty does not change, he gets one
13 dollar a bottle in royalty.
14    Q.   Okay. Do you have an
15 agreement with Mr. Barefoot?
16    A.   No.
17    Q.   Okay. That's what I was
18 asking you.
19    A.   No. His agreement with
20 Barefoot the way we have read the
21 agreement seems clear to us, okay, that's
22 where the issue is, that he is entitled
23 to a dollar a bottle.
24    Q.   All right. Now, my question

DMC-FTC 0334

ESQUIRE DEPOSITION SERVICES

ALLEN STERN

26

1 is, with respect to this statement here
2 in paragraph 17 that Triad is responsible
3 for making all royalty payments to Mr.
4 Barefoot --
5      A.   That's true.
6      Q.   So my question is whether
7 you have a contractual obligation,
8 whether Triad has a contractual
9 obligation to Barefoot to make royalty
10 payments?
11     A.   No.
12         MS. HESSE:  I will object on
13     the basis that it calls for a
14     legal conclusion.
15         MR. HURTADO:  You can still
16     answer.
17         THE WITNESS:  I think the
18     agreement is between the -- the
19     written agreement is between DMC
20     and Barefoot, but the
21     understanding if you look at the
22     six letters that Bob Barefoot said
23     is that those royalty payments as
24     all royalty payments would come

27

1      from Triad.
2 BY MR. HURTADO:
3      Q.   So the source of your
4 responsibility, though, to pay those
5 royalties, is that an agreement with
6 Barrett or an agreement with
7 Mr. Barefoot?
8      A.   It's -- it's -- the
9 agreement to pay the royalties is an
10 agreement between Barrett and Barefoot
11 wherein the -- but the only one that is
12 capable of paying or of making those
13 royalty payments would be us because we
14 process the credit cards, it goes into
15 our account.
16     Q.   Okay.
17     A.   So we are the ones that are
18 processing those orders, we are the ones
19 that do the accounting, we are the ones
20 that pay those royalties.
21     Q.   All right.  And so when he
22 says per my agreement with Triad Triad is
23 responsible for making all royalty
24 payments to Barefoot, so it's part of

28

1 your agreement with Barrett that you will
2 make royalty payments to Barefoot?
3      A.   Correct.
4      Q.   That's what I was trying to
5 get at.  It's not quite as complicated as
6 it seemed.
7         If Mr. Barrett directed you
8 to make additional royalty payments to
9 Mr. Barefoot, would you do so?
10     A.   Yes.
11     Q.   Okay.  I'm now showing you,
12 Mr. Stern, what's been premarked as
13 Barrett Exhibit Number 8.
14     A.   Uh-huh.
15     Q.   And it's a document that
16 says King Media, Incorporated, at the top
17 and entitled distributor agreement?
18     A.   Correct.
19     Q.   Are you familiar with this
20 document?
21     A.   I am.
22     Q.   And so can you tell me what
23 it is?
24     A.   It's an agreement that

29

1 Mr. Barrett has with distributors who
2 would like to air, market, this
3 infomercial.
4      Q.   Okay.  And could the
5 distributors that would be filled in
6 these blanks be any one of a number of
7 distributors?
8      A.   Could be.
9      Q.   Any distributors?
10     A.   Could be.
11     Q.   Is there an agreement like
12 this in existence that relates to the
13 Coral Calcium infomercial?
14     A.   This would be for the Coral
15 Calcium, but it could be used for the
16 benefit of any of them.
17     Q.   My assumption was this was
18 just a standard agreement without the
19 name filled in; is that not correct?
20     A.   It's relatively standard.
21 It could be used for any infomercial and
22 this Coral Calcium infomercial is one of
23 them.
24     Q.   Okay.  If you look at

ALLEN STERN

30

1 paragraph 3 in that it says, King Media
2 is the agency of record for those
3 programs and in its capacity will have
4 final authority over where distributor
5 shows will air?
6    A.   Correct.
7    Q.   Is that a correct statement?
8    A.   That's a correct statement.
9    Q.   Who is King Media the agency
10 of record for?
11    A.   King Media is the agency of
12 record for -- the media agency of record
13 for where these distributors would like
14 to air the show.
15         So here's what happens:
16 They send where they would like to run
17 the show to where the dub house is, the
18 dub house sends over where they would
19 like to run the show, and I look at where
20 they would like to run it, and then we in
21 our capacity as the media agency of
22 record make those decisions and say fine
23 or they are not fine.
24         And the reason that's there

31

1 is because we don't want these
2 distributors competing with each other on
3 the same stations, which causes nothing
4 but aggravation and creating competition
5 where there's no need for it. So there
6 needs to be somebody there who is saying
7 this distributor is already on this
8 station so you go to another station and
9 that's why we put it there.
10    Q.   Okay. And if you understand
11 this question, who is the or who are the
12 principals of the agency?
13    A.   I don't understand.
14         MS. HESSE: I will object
15    because it assumes that what we
16    are talking about is a legal sense
17    of the word agency versus what the
18    -- what the witness has already
19    testified is the media agency.
20 BY MR. HURTADO:
21    Q.   As an agency is there a
22 party or parties that King Media
23 represents?
24    A.   I don't understand your

32

1 question.
2    Q.   Are you performing this
3 service that you just talked about? Is
4 King Media performing this service on
5 behalf of any entity or entities?
6    A.   I still don't understand
7 your question.
8    Q.   Okay.
9    A.   You want me to explain it
10 again to you? I will be more than happy
11 to and see if I can answer it for you.
12    Q.   Okay.
13    A.   Let me see if I can.
14    Q.   King Media -- first of all,
15 if you could briefly explain what it is
16 again that King Media does as the agency
17 of record, I would appreciate that?
18    A.   Okay. King Media gets a
19 list from each one of these distributors
20 where they would like to run the show.
21 Okay? So these distributors don't know
22 where their other distributors run the
23 show. And what we're trying to do is
24 keep them in a non-competitive situation.

33

1         So if one distributor is
2 running on a station that distributors --
3 and the other distributors would not run
4 the same station if they would run on
5 another station, so this way these
6 distributors feel they are not competing
7 against one another and there's somebody
8 there who is directing traffic, if you
9 will.
10         So King Media is the media
11 policeman for these distributors.
12    Q.   Okay. And what is King
13 Media's compensation or consideration for
14 acting as the policeman for those
15 distributors?
16    A.   None.
17    Q.   Okay. So why does King
18 Media do it?
19    A.   Because I have seen these
20 programs happen before and they blow up.
21 They blow up because these distributors
22 very quickly start fighting with one
23 another and the program comes to a halt
24 because they see the other distributors

ALLEN STERN

34

1 not as -- not as allies but as -- nothing
2 more or less than competitors.
3        So in order to make this
4 thing work, that is why it was important
5 to have somebody who was the traffic
6 policeman for the -- for the media and
7 distribution of these shows as it relates
8 to these distributors.
9     Q.   And why is -- and I take it
10 that's important to King Media?
11     A.   No, it's important -- we
12 felt it was important for these
13 distributors in order to have this
14 program survive or at least begin to take
15 some shape, and so far it's worked out
16 fine.
17     Q.   All right. But why is that
18 important to King Media to have that lack
19 of --
20     A.   It's not necessarily
21 important to King Media. I mean, it's
22 just I didn't want to have stations and
23 these distributors calling me and -- and
24 -- and screaming at our company because

35

1 they are finding themselves in a
2 competitive situation with other
3 distributors.
4        It was just a way to keep
5 everybody on the same page. If there was
6 no distributor from a King Media
7 perspective, that would be fine.
8     Q.   Okay.
9     A.   So we are not compensated,
10 and, in fact, we don't even buy their
11 time, they buy their own time.
12     Q.   In other words, the
13 distributors supply the funds for
14 purchasing media time?
15     A.   Correct.
16     Q.   Okay. Does DMC provide any
17 funds for purchasing media time?
18     A.   No.
19     Q.   Does Triad provide any funds
20 for the purchase of media time?
21     A.   Triad is the client.
22     Q.   The client of King Media?
23     A.   Correct.
24     Q.   Okay. So it matters to

36

1 Triad that the purchasing of media time
2 be coordinated or policed?
3     A.   It matters to the sanctity
4 of the program that somebody is sitting
5 there one step removed from the
6 distributors' day-to-day business that
7 can keep everybody out of each other's
8 hair.
9        Let me explain, maybe flush
10 this out for you a little bit. These
11 guys run their own business, they are
12 independent business people just like we
13 are.
14     Q.   You mean the distributors?
15     A.   Just like we are, right,
16 just like DMC is, so -- so these guys do
17 everything on their own. Whatever their
18 businesses are, I don't know what they
19 are even, but as it relates to being
20 involved in this program they are needed
21 to be -- from what I have saw in these
22 programs in the past there needed to be
23 some kind of policeman, if you will, that
24 keeps everybody out of each other's way

37

1 and keeps these guys all relatively
2 happy.
3        And so far, again, I can
4 just tell you that it seemed to have
5 worked pretty good. They don't have one
6 of these guys around falling over one guy
7 and the next guy falling over another guy
8 and then call us and yelling at us and
9 causing a lot of headache and confusion.
10        So that's why we wanted to
11 put something in place so everybody who
12 joins this program would know some of the
13 ground rules.
14     Q.   Okay. Is it your view,
15 Mr. Stern, that Donald Barrett owns the
16 Coral Calcium show?
17     A.   Yes.
18     Q.   What's that view based on?
19     A.   It's based on that I saw a
20 note that says what Donald Barrett sent
21 money to Kevin for and he was going to
22 get something for that money that he
23 sent.
24        I think, if I remember

DMC-FTC 0337

ESQUIRE DEPOSITION SERVICES

ALLEN STERN

38

s to get two
,000. There might be
there regarding
end payments, but
note that I read —
arrett paid him $25,000
and produce two

I'm going to
een premarked as Barrett

u can look at
hibit 2 to that
rd the back?

signature page.

E-mail that
o?

any other E-mail
luded in what you're
than this?

40

1      A.   Next week.
2      Q.   Right.  So that E-mail does
3 not constitute a contract, does it?
4      A.   I think it does.
5      Q.   Why do you think that?
6      A.   KT will have a contract to
7 you next week.  In essence, I believe it
8 will be 25K for two shows and five
9 percent on the back end.
10      Q.   Do you have any reason to
11 believe that Mr. Sant is authorized to
12 bind Mr. Trudeau to a contract?
13      A.   I think he is.
14      Q.   On what basis?
15      A.   Because what we seen on
16 another deal where Kevin gets a royalty
17 check above his name is on that as well.
18      Q.   Mr. Sant's signature?
19      A.   No, it says payment to care
20 of Neil Sant, c slash o, so he obviously
21 has some relationship to Kevin Trudeau or
22 he wouldn't have sent that.
23      Q.   The question is, do you have
24 any reason to believe that he has

39

e only E-mail that

And could you look at
message from Mr. Sant

ld you, you know, do
just read what the note

have a contract to
essence, I believe it
o shows and five
k end.
So that says that KT
n contract to you next
ight?

says, in essence, I
these $25,000 and five
ack end?
Correct.
contemplates a
that is to be sent in
hat right?

41

1 authority to sign contracts for
2 Mr. Trudeau or to bind Mr. Trudeau to the
3 contract?
4          MS. HESSE:  And I will
5      object just on the basis of asked
6      and answered.
7          Go ahead.
8          MR. HURTADO:  Go ahead.
9          THE WITNESS:  I don't know.
10          MR. HURTADO:  All right.
11          THE WITNESS:  I think it is
12      clear that he does, but I guess
13      you will have to ask Kevin what
14      the exact relationship of Neil
15      Sant is to Kevin Trudeau
16          MR. HURTADO:  Uh-huh.
17 BY MR. HURTADO:
18      Q.   But as far as your
19 understanding of the relationship between
20 him and between Mr. Trudeau, you don't
21 know that Mr. Sant has the authority to
22 bind Mr. Trudeau to a contract?
23      A.   Well, I don't know what his
24 relationship is to Kevin, again, but he

11 (Pages 38 to 41)

ALLEN STERN

42

1 probably has some relationship or he
2 would not have sent back KT will have a
3 contract to you next week. In essence, I
4 believe it will be 25K for two shows at
5 five percent on the back end.
6         I don't think anyone who has
7 no relationship to Kevin would send
8 something if he had no authority to send
9 something.
10    Q.    But certainly you understand
11 there's a difference between having a
12 relationship with someone and having the
13 legal authority to bind them to a
14 contract?
15    A.    Ask Kevin Trudeau.
16    Q.    No. My question was, you
17 understand there's a difference between
18 those two things?
19    A.    I think there's a
20 difference, but I don't know -- again, I
21 don't know the relationship that Neil
22 Sant has with Kevin Trudeau, but I'm
23 going to assume that he has a
24 relationship of some authority or he

43

1 wouldn't have sent a note to Don, KT will
2 have a contract to you next week. In
3 essence, I believe it will be 25K for two
4 shows. It's pretty definitive.
5    Q.    Pretty definitive as passing
6 on the message from Mr. Trudeau that he
7 will send a contract, right?
8    A.    It's pretty definitive.
9    Q.    Right. Well, I would like
10 an answer to my question.
11         It's pretty definitive that
12 he's passing on a message from
13 Mr. Trudeau to Mr. Barrett that Mr.
14 Trudeau will send him a contract?
15    A.    And, in essence, I believe I
16 think it is Neil. Is I Neil?
17    Q.    Uh-huh.
18    A.    I believe it will be $25,000
19 for two shows and five percent on the
20 back end.
21    Q.    Right.
22    A.    So -- so he obviously has
23 some authority and some relationship or
24 he would not have responded, right? He

44

1 would -- he would -- nobody would have
2 responded and said something like that if
3 they had no authority and no relationship
4 to Kevin Trudeau.
5    Q.    Right. But the question is
6 whether they would -- whether they might
7 respond like that even though they don't
8 have the authority to bind that person to
9 the contract?
10    A.    I can't answer that.
11         MS. HESSE: Objection.
12 Calls for speculation.
13         THE WITNESS: Yeah, I can't
14 answer that. I can't answer.
15 BY MR. HURTADO:
16    Q.    Okay. Have you been
17 involved in the negotiating of a contract
18 between Mr. Trudeau and Mr. Barrett
19 relating to the Coral Calcium?
20    A.    No. Here's what I was
21 involved in: I was involved in trying to
22 get something better and more fully
23 developed wherein Mr. Trudeau and
24 Mr. Barrett could live with one another

45

1 and there would be no need to come to
2 this kind of situation, and I still
3 believe that's the case.
4    Q.    I'm sorry, you still believe
5 what's the case?
6    A.    I still believe that should
7 be the case, that -- that there should be
8 somebody, somewhere who can intervene,
9 which is what I tried to do to get these
10 guys on the same page so we could run the
11 show and pay everybody their royalties
12 and everybody would have a good time.
13         That was the idea, to try to
14 -- to intervene and try to help out the
15 situation, to no avail I might add.
16    Q.    Were you asked to intervene
17 by Mr. Barrett?
18    A.    He sent me the -- the --
19 this contract, this wish list of four
20 pages that Kevin sent weeks after the
21 show was on the air, and I said let me
22 see if I can help try to get this thing
23 moved forward.
24    Q.    So did he ask you to

ALLEN STERN

46

1 intervene on his behalf?
2    A.   He asked me to take a look
3 at it and I asked him would he have any
4 problems if I intervened on his behalf
5 and he thought that might be a good idea,
6 because it seemed that the two of them
7 were increasingly getting further and
8 further apart and since I didn't have
9 that animosity with Kevin or have that --
10 that negative relationship, I thought
11 maybe I could be successful, and I still
12 believe that's possible.
13    Q.   Okay. Mr. Barrett stated
14 this morning that he asked you to become
15 involved and that you were negotiating
16 the contract on his behalf; is that
17 correct?
18    A.   I think it was a two-way
19 street. I think he sent it to me -- as I
20 said, I called him up I said maybe I can
21 help, and he said great, go help.
22    Q.   Okay.
23    A.   So I think it was both of us
24 trying to work together to get something

47

1 done that wasn't getting done, and I
2 thought he felt that he may not be the
3 best person to do it.
4    Q.   Why is that?
5    A.   Him and Kevin were
6 increasingly moving further apart.
7    Q.   Uh-huh. Well, let me get
8 into some of these exchanges, these
9 correspondences here.
10    A.   Sure.
11    Q.   I'm showing you what's been
12 marked previously as Barrett Exhibit
13 Number 2. It's a letter or I should say
14 a memorandum from yourself to Mr. Trudeau
15 dated January 10th, 2002?
16    A.   Correct.
17    Q.   I take it you have seen this
18 document before?
19    A.   Correct.
20    Q.   And you authored it?
21    A.   Correct.
22    Q.   Okay. To what location did
23 you send this memorandum to Kevin
24 Trudeau?

48

1    A.   I don't remember, so I don't
2 know where I faxed it to. It could have
3 been to his home in California, I just
4 don't remember.
5    Q.   Okay. And the first
6 sentence there says, thank you for
7 sending me a copy of the talent agreement
8 for signature?
9    A.   Uh-uh.
10    Q.   Is that referring to the
11 prospective talent agreement between
12 Mr. Trudeau and Mr. Barrett relating to
13 Coral Calcium?
14    A.   Correct.
15    Q.   If you would look at the
16 second paragraph it says, I think the
17 five percent royalty you are asking for
18 is an open issue until we see which
19 version of the show works.
20       So as of January 10, 2002,
21 the percentage rate of the royalty was
22 still an open issue?
23    A.   The -- there was a question
24 over this gross and net language.

49

1    Q.   So that's what your --
2    A.   So that was open.
3    Q.   But the -- the percentage
4 rate itself was not open, the five
5 percent?
6    A.   It was five percent, yeah.
7    Q.   Okay. So it was still open
8 as to whether or not it would be gross or
9 net?
10    A.   Correct.
11    Q.   Okay. And as of January
12 10th that was still an open issue?
13    A.   It was still an open issue.
14    Q.   All right. Looking down to
15 point number 10, and I apologize
16 beforehand, I don't have the draft
17 agreement that this is pertaining to, but
18 looking at point number 10 it says or it
19 says point number 10 should be reviewed
20 by legal counsel with respect to claims
21 made by Robert Barefoot.
22       Do you recall or understand
23 what that's referring to?
24    A.   Yeah, it was in reference to

DMC-FTC 0340

ESQUIRE DEPOSITION SERVICES

ALLEN STERN

50

1 the talent agreement that Kevin sent over
2 talking about indemnification and claims
3 made by Barefoot. Clearly nobody on our
4 side could sign off on something on
5 claims or representations that we didn't
6 make, so somebody needs to look at it and
7 it wasn't going to be us.
8     Q.   Okay. Is that the case --
9 well, let me ask you, looking at the next
10 page, point 12 through 14, needs to be
11 reviewed by legal counsel?
12    A.   Uh-huh.
13    Q.   And do you recall what that
14 is referring to?
15    A.   Yeah, it was regarding
16 around the FTC problems that we found out
17 later that Kevin had. It was regarding
18 this past criminal situation that Kevin
19 had that was kind of -- kind of sprung on
20 us. It was regarding indemnification of
21 Kevin with respect to claims or
22 representations about what Barefoot said,
23 what -- which we had no input into
24 whatsoever, Barefoot said what Barefoot

52

1 or your answers go way beyond what I ask,
2 which is fine but --
3     A:   I think you deserve an
4 answer to the question.
5     Q.   Well, but the question here
6 was quite simple, that as of January
7 10th, 2002, you and Mr. Barrett were
8 aware of those issues?
9     A.   We were aware of those
10 issues.
11    Q.   Right. Okay.
12        MS. HESSE: And I guess I
13 would like to just make a record
14 here, when you say aware of those
15 issues, I guess I would like -- I
16 guess I would like to make a point
17 on the record it's a little
18 unclear as to what those issues
19 are other than what the witness
20 already stated, which is that
21 there were some claims by Kevin
22 Trudeau for indemnification and
23 something with respect to the FTC.
24        MR. HURTADO: Well,

51

1 said on his own volition.
2        So I thought all those
3 points should be reviewed by some
4 lawyers.
5     Q.   All right. So at least as
6 of January 10th, 2002, you were -- you
7 were aware of these issues regarding
8 indemnification and compliance with the
9 FTC regulations?
10    A.   After Kevin sent these four
11 pages after the show was on the air, he
12 then started sending this new full-blown
13 agreement that contained a number of
14 points that were -- were, A, new and, B,
15 difficult to -- to -- to agree to
16 in the framework that he -- that he --
17 that he posited.
18        I mean, it was just very,
19 very difficult, and given that I thought
20 it might be important for him and for
21 everybody to have some lawyers actually
22 start taking a look at some of this
23 stuff.
24    Q.   Sometimes your questions go

53

1        Mr. Stern just, you know,
2 testified at fair length about
3 what those issues were and that's
4 what I was referring to, the
5 issues that he had just gone
6 through testifying to.
7        MS. HESSE: Okay. I just
8 want it to be limited to that and
9 not some broader aspect that this
10 infomercial for some reason had
11 any problems, because I don't
12 think that's what we're talking
13 about.
14        THE WITNESS: Uh-huh.
15 BY MR. HURTADO:
16    Q.   I would like to show you
17 what's previously been marked as Barrett
18 Exhibit 3.
19    A.   Uh-huh.
20    Q.   This is a letter on King
21 Media letterhead?
22    A.   Uh-huh.
23    Q.   Dated January 16, 2002.
24 It's from yourself, Mr. Stern, to David

ALLEN STERN

**54**

1 Bradford of Jenner & Block. Do you
2 recognize this letter?
3    A.   I do.
4    Q.   You sent this to David
5 Bradford in Chicago?
6    A.   Correct.
7    Q.   First sentence says, I
8 received your note this morning. I have
9 indeed sent my comments to Kevin for
10 review and comment. I will also send
11 them on to you this morning.
12       Is it your understanding
13 that the comments are -- that these
14 comments refers to the Exhibit Number 2
15 that we just looked at?
16    A.   I think it is this.
17    Q.   Exhibit 2, right?
18    A.   Yeah.
19    Q.   Okay.
20    A.   Uh-huh.
21    Q.   And so as of January 16th,
22 2002, there was still no executed written
23 contract between Mr. Trudeau and DMC?
24    A.   No, I think there was, the

**55**

1 only contract that I can point to is the
2 one between what Donald sent and what
3 Donald received from Neil, which is not
4 to say that anyone was unwilling to do
5 something bigger and better and more
6 full-blown for both sides, and that is
7 what these letters between me and
8 Mr. Bradford were trying to get to.
9    Q.   You understand what I mean
10 when I say an executed contract?
11    A.   No.
12    Q.   Okay. Let me rephrase the
13 question then.
14       As of January 16, 2002,
15 there was no signed written contract
16 between Mr. Trudeau and DMC; isn't that
17 correct?
18    A.   There's no signed written
19 contract between Kevin Trudeau and DMC,
20 but there is in my opinion a contract
21 between Kevin and/or his representatives
22 or employees and DMC.
23    Q.   Okay. By the way,
24 Mr. Stern, do you have a law degree?

**56**

1    A.   No.
2    Q.   So you are not a lawyer?
3    A.   Uh-uh.
4    Q.   Is that right?
5    A.   And your point is?
6    Q.   I'm not here to make
7 points.
8    A.   So you asked me if I am not
9 a lawyer, no, I am not a lawyer.
10    Q.   I'm showing you, Mr. Stern,
11 what's been marked as Barrett 4. It's a
12 letter on King Media letterhead and it's
13 to Mr. David Bradford dated January 22,
14 2001. Do you see that?
15    A.   Correct.
16    Q.   Is that your signature at
17 the bottom?
18    A.   That is.
19    Q.   Okay. And this was copied
20 to Mr. Donald Barrett; is that correct?
21    A.   Correct.
22    Q.   Okay. And is this letter
23 referring to again to the negotiations of
24 the contract between Kevin Trudeau and

**57**

1 DMC and/or Triad?
2    A.   It reflects a lot of -- more
3 than that. It reflects trying to bring
4 all of us together in a conference call
5 so we can clear up any confusion that
6 might exist because it is -- in these
7 back and forth memoranda between David
8 Bradford and myself it didn't seem
9 productive, that it wasn't moving
10 forward.
11       So what I tried to do in the
12 spirit of -- of cooperation was to get
13 all of us involved in trying to work this
14 thing through. So this note was sent to
15 try to get everybody together in a
16 conference call on that date. That was
17 the point of this memorandum.
18    Q.   Okay. And the ultimate
19 purpose of this was to reach agreement on
20 a written contract that would be executed
21 by both parties?
22    A.   No. No. No. Not at all.
23 The -- the reason to have a conference
24 call was to try in the spirit of -- of

ALLEN STERN

58

1 trying to play on the same side of the
2 fence was to get everybody on the phone
3 and Kevin Mr. Bradford said was going to
4 be available in California, Mr. Bradford
5 was going to be available in Chicago,
6 Mr. Barrett was going to be available in
7 Boston, and I was going to be available
8 here in Philadelphia.
9        So the -- so the reason to
10 have this communication was to make sure
11 that everybody was talking from the same
12 hymnal book. That was the reason to have
13 this conference call, which did take
14 place.
15     Q.   Did take place at the time
16 indicated in the letter?
17     A.   Very close.
18     Q.   All right. What happened
19 during that conference call?
20     A.   Mr. Trudeau -- I was told by
21 Mr. Bradford that morning that
22 Mr. Trudeau unfortunately would not be
23 available, and I don't know why, but he
24 was not going to be available.

59

1        And then I said, do you
2 think that you and me and Mr. Barrett
3 should still get in this conference call
4 and try to sort this thing through? He
5 thought it was a good idea. We did, in
6 fact, have that conference call.
7     Q.   And what was said during
8 that call?
9     A.   In that conference call I
10 tried to give him a clear understanding
11 of what we were trying to do in terms of
12 this show and in terms of how we were
13 trying to go to markets and in terms of
14 testing and trying to package the product
15 properly and get the best consumer
16 response doing all the things a good
17 marketing company does.
18        So I made him aware of where
19 we were at, and it was kind of an overall
20 status report. He thanked me profusely.
21 He thought it was -- it was very, very
22 nice of -- of Donald Barrett and myself
23 to bring him up to speed as quickly and
24 as succinctly as we did in that

60

1 twenty-minute conversation.
2     Q.   Was it nevertheless
3 contemplated at this point in time
4 January 22nd, 2001, or thereabouts that
5 the parties would both sign the written
6 agreement?
7     A.   No, it was -- what we were
8 trying to do was get all of us together
9 so we could sort out any of the issues,
10 and if we had to have a second more
11 fully-developed contract outlining all
12 the points getting rid of all the
13 confusion, hopefully with David
14 Bradford's assistance and Kevin Trudeau's
15 willingness to cooperate and Donald
16 Barrett's willingness to cooperate and my
17 willingness to cooperate we could get rid
18 of this and move on to more productive
19 things. That was why I initiated this
20 conference call with all of us.
21     Q.   All right. I'm showing you
22 now Barrett Exhibit 5.
23     A.   Right.
24     Q.   It is a document that has at

61

1 the top Triad Marketing TM entitled
2 talent agreement. Are you familiar with
3 this document?
4     A.   I think, and I can be wrong,
5 that this was an agreement when Erik
6 Petersen of Monte & McGraw took over the
7 negotiations where I was not able to move
8 it forward. I think that's what this
9 is.
10     Q.   Are you not certain of that,
11 though?
12     A.   Can I look at it?
13     Q.   Absolutely.
14     A.   (Reviewing.)
15        I think there is the first
16 draft that I actually did and then the
17 second draft was between Erik and
18 Mr. Bradford. So I think there's another
19 subsequent agreement, draft, that was
20 from Mr. Petersen and Monte & McGraw to
21 Bradford.
22        So I think this is one that
23 I actually wrote myself.
24     Q.   Okay. And, in fact, do you

16 (Pages 58 to 61)

ALLEN STERN

**62**

1 see at the bottom it was faxed somewhere
2 around January 29, 2002?
3    A.    Correct.
4    Q.    So this was in existence at
5 least as early as January 29, 2002?
6    A.    Correct.
7    Q.    And I take it at that point
8 that Mr. Petersen had not yet gotten
9 involved?
10    A.    I think he came a couple of
11 weeks later.
12    Q.    Is this a revision of
13 something that Mr. Trudeau had sent to
14 you or to DMC?
15    A.    This was the next iteration
16 of trying to get something bigger,
17 better, and more robust.  That's what
18 this is.
19    Q.    And I note this list in
20 addition to Direct Marketing Concepts
21 Triad Marketing as a party to the
22 agreement?
23    A.    Triad, yeah.  In actuality
24 if Triad was going to be an additional

**63**

1 party it would be Triad and not King, so
2 that is accurate.
3    Q.    And why was Triad Marketing
4 added as a party to this draft agreement?
5    A.    No reason.  Should have
6 probably had DMC on there, but since I
7 wrote it I sent it.
8    Q.    Well, it does have DMC, but
9 it has Triad as well.  Do you see that?
10    A.    Yeah.  Well, and it really
11 would not have mattered to us if we were
12 part of it or not part of it, but Mr.
13 Bradford said a week later when Erik got
14 involved that Triad is not party to this
15 agreement, so therefore Triad -- any
16 agreement that we eventually get to
17 bigger and better than the initial
18 agreement contract won't have Triad or
19 King Media in the agreement and -- and
20 Erik acknowledged that.
21    Q.    All right.  Prior to that
22 did Mr. Barrett ask you to see if Triad
23 could be a party?
24    A.    He never asked.

**64**

1    Q.    Did anybody ask you?
2    A.    No.
3    Q.    And you don't recall exactly
4 why you did add Triad as a party?
5    A.    It came from me so it was
6 either on King letterhead or Triad
7 letterhead.
8    Q.    I guess if you look at the
9 first paragraph, maybe I'm confusing you,
10 it says this commercial talent agreement
11 is entered in to this blank between Kevin
12 Trudeau and Direct Marketing Concepts and
13 Triad Marketing?
14    A.    Correct.
15    Q.    So the question is why you
16 added Triad Marketing as a party to the
17 contract?
18    A.    Because we were involved.
19 We were involved.  We were involved.
20    Q.    Any other reason?
21    A.    No.
22    Q.    Okay.  You know what, if you
23 look down to paragraph 3, it indicates
24 that --

**65**

1    A.    Uh-huh.
2    Q.    For the term of this
3 agreement the company will pay talent a
4 royalty of blank percent of the gross
5 receipt, of the adjusted gross receipts
6 in all of the above sold by the company
7 through a commercial in which talent has
8 appeared?
9    A.    Correct.
10    Q.    Then it goes on to define
11 adjusted gross receipts?
12    A.    Correct.
13    Q.    Okay.  So at this point in
14 time you were willing to pay a royalty on
15 adjusted gross receipts as opposed to
16 net?
17    A.    Correct.
18    Q.    Okay.
19    A.    And I am still not -- still
20 not opposed to putting together something
21 on this five percent net and gross
22 confusion which is going to be
23 satisfactory to everybody.  I don't think
24 it's as big an issue as -- as -- as it

DMC-FTC 0344

ESQUIRE DEPOSITION SERVICES

ALLEN STERN

66

1 may seem on its face so I'm not opposed.
2     Q.    But that leaves the amount
3 of the percentage blank here at least in
4 this paragraph?
5     A.    Yeah.
6     Q.    So at that point it was --
7 as far as you were concerned, the
8 percentage rate was an open item?
9     A.    Not really.  I think there
10 was an agreement that it was five
11 percent, but -- but when you have -- when
12 you have quote, unquote, adjusted gross
13 receipts, you need the excluded shipping
14 and handling, you need the excluded
15 refunds, you need to hold something back
16 for returns.
17        If you look at Kevin's
18 initial agreement he wanted -- he wanted
19 to be paid five percent on all sales
20 including shipping and handling and --
21 and -- and that is something that I think
22 is -- is not -- not really fair and it's
23 generally not accepted standard practice
24 in our industry.

67

1        We generally do not include
2 shipping and handling in a royalty
3 payment and you do get refunds, you have
4 to make refunds and you get people who
5 want to return their product, so I think
6 it was fairly standard.
7     Q.    So that's what this
8 definition of adjusted gross receipts is
9 driving at?
10     A.    Yeah, trying to.
11     Q.    Okay.  If you look at
12 paragraph 9 on the second page?
13     A.    Uh-huh.
14     Q.    Company agrees to indemnify
15 talent for any and all liability claims
16 and legal fees arising out of any breach
17 by the company of its obligations
18 hereunder or its representative in
19 warranties with respect to product
20 featured in the commercials?
21     A.    Uh-huh.
22     Q.    So at this point in time you
23 were willing to have a provision to
24 indemnify Mr. Trudeau for liability

68

1 arising out of breaches by you and/or
2 DMC?
3     A.    Correct.
4     Q.    Okay.  And --
5     A.    However, where the problem
6 was was indemnifying Kevin not because we
7 don't want to, it's because we can't
8 indemnify to something we didn't say or
9 something that we can't make
10 representations about.
11        So I said to Mr. Bradford
12 that we need to make sure that
13 Mr. Barefoot is included because he is
14 responsible for the claims made in
15 relationship to -- to the sale of the
16 product in this infomercial.
17        I didn't say it, Barrett
18 doesn't say it, and even Kevin didn't say
19 it, so I was trying again to be solemn in
20 here and appease both sides.
21     Q.    Okay.  And in paragraph 9
22 indemnification refers to liability for
23 breaches by the company; isn't that
24 right?

69

1     A.    Uh-huh.
2     Q.    Okay.  Paragraph 10, company
3 acknowledges that talent is subject to a
4 consent decree with the Federal Trade
5 Commission and agrees to take all
6 reasonable steps to ensure the show is
7 produced in compliance with that consent
8 decree.  Company agrees to indemnify
9 talent for any and all liability, claims
10 associated therewith arising out of any
11 legal proceedings whatsoever, including
12 but not limited to, investigation or
13 proceedings initiated by the FTC?
14     A.    Correct.
15     Q.    Okay.  So at this point in
16 time, sometime in late January 2002, you
17 were willing to include a provision to
18 indemnify Kevin Trudeau for liability
19 arising from proceedings initiated by the
20 FTC?
21     A.    Correct.
22     Q.    Okay.  In paragraph 11 it
23 states, company acknowledges that talent
24 has been convicted of two felonies?

ALLEN STERN

70

A. Correct.

Q. And at this point in time you were willing to include a provision in the contract acknowledging that Mr. Trudeau has been convicted of two felonies?

A. Correct.

Q. Okay. In paragraph 12, company acknowledges that if talent's legal counsel believes that the commercials are in any way in violation of any state or federal laws or in violation of talent's consent decree with the FTC, upon written notice company will cause to change commercial in order to satisfy talent's legal consent. Talent nor its legal counsel will not unreasonably withhold its approval?

A. Correct.

Q. At this time you were willing to include a provision, include this provision?

A. Correct.

Q. Can you just take a look at

71

paragraph 13 and we won't read it out loud and can you just take a quick look at that, I won't impose that upon you.

A. (Witness complies with request.)

Okay.

Q. Okay? So as of the date of this draft you were willing to include a provision in which Mr. Trudeau grants to you the right to use his name and likeness?

A. Yeah. Talent grants company the right to use its name and likeness.

Q. Looking at paragraph 15 --

A. Uh-huh.

Q. -- and starting with the last sentence in that paragraph with the due to the unique nature?

A. Uh-huh.

Q. Due to the unique nature of talent's name and likeness and the personal nature of the services talent shall not be entitled to assign this agreement or assign or delegate any

72

1 portion or duty under this agreement. Do
2 you see that?
3      A.   Yes.
4      Q.   So at this point in time you
5 wanted a provision in there that would
6 prevent Mr. Trudeau from signing the
7 right to his name and likeness?
8      A.   Correct.
9      Q.   Okay. So as of the time of
10 this draft, there was still no signed
11 written agreement between Mr. Trudeau and
12 DMC?
13      A.   No, there was a written
14 agreement between Kevin Trudeau and/or
15 his representatives and/or his employees
16 with DMC.
17           The idea here was to try to
18 more fully develop and expand the
19 situation in this -- this -- this jam
20 that we were in so Kevin could get what
21 he was looking for and Barrett could
22 still have what he wanted and all the
23 parties would be happy.
24           If it does not come to

73

1 fruition, it was nothing more than draft
2 agreements between David Bradford and
3 myself.
4      Q.   So there was no signed
5 written agreement as of this time between
6 Mr. Trudeau and DMC?
7      A.   No, there was an agreement
8 between DMC and Kevin Trudeau and/or his
9 representatives or his employees and
10 there is no -- there was no other
11 agreement other than that one.
12           So what we were attempting
13 to do here was to come up with a better,
14 more fully-developed agreement that would
15 make everybody happy and we could all go
16 on our merry ways. That was what the
17 drive here was, at least that was what I
18 was looking to do.
19      Q.   But still there was no
20 signed agreement between Kevin Trudeau
21 and DMC?
22      A.   The only agreement that I
23 have seen related to this project and
24 program was the agreement between Neil

19 (Pages 70 to 73)

ALLEN STERN

74

1 and saying that Kevin, KT, is looking for
2 $25,000 and five percent.
3    Q.   All right.
4    A.   That's the only agreement
5 that I have seen in the weeks that this
6 show has been -- has been developed.
7    Q.   I'm showing you what's been
8 marked as Barrett Exhibit Number 7.
9    A.   Okay.
10    Q.   And this is a letter on
11 Monte & McGraw letterhead?
12    A.   Correct.
13    Q.   From Mr. Petersen to
14 Mr. Bradford, and it's copied to Triad as
15 well as to Direct Marketing Concepts?
16    A.   Correct.
17    Q.   And attached to it is what
18 appears to be a draft agreement?
19    A.   Correct.
20    Q.   Okay.  Have you seen this
21 before?
22    A.   I have.
23    Q.   Is this something that
24 Mr. Petersen prepared?

75

1    A.   Correct.
2    Q.   All right.  And did he
3 prepare this in consultation with you?
4    A.   Some parts he did, some
5 parts he didn't, some parts he took the
6 lead because he is a lawyer.
7    Q.   Okay.
8    A.   Uh-huh.
9    Q.   In this agreement Triad is
10 not posed as a party; is that correct?
11    A.   Correct.
12    Q.   And Triad was removed as a
13 party at Mr. Bradford's behest?
14    A.   Correct.
15    Q.   And you had no problem with
16 that?
17    A.   No.
18    Q.   Paragraph number 3, even
19 though you were at one time willing to
20 agree to that the royalties would be on
21 the adjusted gross receipts as defined in
22 the prior draft?
23    A.   Correct.
24    Q.   You now go back to the

76

1 royalties being based on net profit?
2    A.   No, I don't go back to it.
3 Mr. Petersen went back to the only thing
4 he could go back to, which was a letter
5 from Mr. Barrett to Mr. Trudeau that says
6 I'm willing to pay you five percent of
7 the net, so he tried to be legally
8 precise.  And that's why he writes five
9 percent of the net, because he could only
10 go by that which I had which was a letter
11 from Mr. Barrett to Mr. Trudeau which
12 says five percent of the nets.
13    Q.   So you did not make
14 Mr. Petersen aware of the negotiations
15 that you had been having with
16 Mr. Trudeau?
17    A.   No.  Of course he has all
18 the documents you want.
19    Q.   I'm sorry, he?
20    MS. HESSE:  I think it's
21 Exhibit Number 5 you are looking
22 for.
23    MR. HURTADO:  Number 5?
24 Thanks.

77

1 BY MR. HURTADO:
2    Q.   So Mr. Petersen was provided
3 with a copy of what's marked here as
4 Exhibit Number 5?
5    A.   Yeah, he has everything.
6    Q.   All right.  Okay.  So is
7 there any reason that he couldn't have
8 continued with the negotiations as they
9 had been proceeding?
10    A.   I think he did continue with
11 the negotiations and tried to continue
12 the -- with the negotiations and
13 unfortunately Mr. Bradford was unwilling
14 to continue the negotiations.
15    Q.   Well, as of the time that
16 Exhibit 5 was generated you were -- you
17 were agreeable to having the royalties
18 based on the adjusted gross receipts?
19    A.   I was agreeable to a number
20 of different things and I -- and I am
21 still very agreeable to doing a number of
22 different things, jump through hoops, if
23 you will, to make sure that Mr. Trudeau
24 and Mr. Barrett and Mr. Barefoot and us

20 (Pages 74 to 7

ALLEN STERN

**78**

1 can all live together peacefully and
2 harmoniously, and there's no reason why
3 we shouldn't.
4          We are drawing lines in the
5 sand and at this point in time seems to
6 me silly, so what I tried to do with
7 Mr. Bradford in a number of letters and
8 conversations and draft agreements was to
9 get us together. It was failing. So I
10 asked Mr. Petersen to try to pick up
11 where I was being unsuccessful and that's
12 what that attempt is to do.
13          Q.   Is there anything that would
14 have prevented Mr. Petersen from
15 retaining the provision providing for
16 royalties based on adjusted gross
17 receipts?
18          A.   There's nothing that
19 prevented him from that. He could have.
20          Q.   Did you instruct him to do
21 that?
22          A.   We talked about it and he
23 said speaking as a lawyer I see five
24 percent of the net, it seems reasonable

**79**

1 that we should say it's five percent of
2 the net. That's what he said in his
3 letter.
4          And I said -- I deferred. I
5 said okay.
6          Q.   And you also I think note,
7 you may have to read through it, but that
8 all of the provisions regarding
9 indemnification, regarding compliance
10 with the FTC have been removed from this
11 draft?
12          A.   Correct.
13          Q.   And do you know why that is?
14          A.   I don't know -- I know
15 generally, but I don't know -- you would
16 have to ask Mr. Petersen specifically.
17          Q.   All right. Was that based
18 -- was that removal based on
19 conversations with you?
20          A.   I had numerous conversations
21 with him.
22          Q.   I'm sorry?
23          A.   Okay. The conversations
24 circled around did we know that .

**80**

1 Mr. Trudeau had -- was convicted,
2 whatever the language is, criminal, I
3 don't know what the exact language is,
4 and what were the FTC issues?
5          Well, we didn't know them
6 until -- until -- until the show was on
7 the air for a month, so it was his
8 opinion I think, and you can ask him,
9 that we shouldn't agree to something that
10 we didn't know about. We only knew about
11 it after the fact.
12          Q.   Do you know whether -- well,
13 did you -- let's start with you, did you
14 make any communications to either
15 Mr. Bradford or Mr. Trudeau prior to this
16 draft being sent regarding these
17 provisions being deleted?
18          A.   We had no conversations
19 after that, I turned it over to Erik.
20          Q.   Okay.
21          A.   He -- the last conversation
22 I had with Mr. Bradford was a voicemail
23 message from Mr. Bradford who said these
24 aren't the exact words, but these are

**81**

1 close, Mr. Trudeau is not going to -- or
2 does not want to continue in this attempt
3 to come together if we are unwilling to
4 let him air the show, period.
5          And I called him back and I
6 left a voicemail, because he wasn't
7 there, and I said, it appears that this
8 is breaking down. I will send it over to
9 our legal counsel and they will try to
10 pick up where I have -- you know, we have
11 fallen off. And that was the end of it
12 and I -- we never talked again.
13          Q.   Okay. Is your understanding
14 of what Mr. Bradford said in that
15 conversation was that Mr. Trudeau wanted
16 to exclusively air the show?
17          A.   Mr. Trudeau wanted to air
18 the show.
19          Q.   In addition to --
20          A.   And he said -- initially in
21 our conversations I said that is
22 something that I think is not going to
23 happen. And he said in his voicemail to
24 me was that is, quote/unquote, a deal

ALLEN STERN

82

1 breaker.
2      Q.   Okay. Just to clarify, it
3 was to air the show not exclusively, but
4 to air the show in addition to King
5 Media?
6      A.   With us, yeah.
7      Q.   And you were not willing to
8 do that?
9      A.   I was not willing to do it
10 unbridled, but -- but he didn't give me
11 an opportunity to explain to him in
12 detail why I think that would cause
13 enormous difficulties for us and Kevin.
14          So I'm not willing --
15 unwilling to continue to negotiate, and I
16 even had what I thought was a reasonable
17 solution that would allow Kevin to air
18 Mr. Barrett's show that might help him
19 and help us, but we never got to that
20 conversation.
21          So then I turned it over to
22 Erik and then Erik did what I guess
23 lawyers do, and that is they try to
24 protect their client and try to draft

83

1 agreements which are probably more legal
2 and less marketing. Mine was an attempt
3 to be more marketing and more
4 conciliatory and less legal.
5      Q.   Not all that bad.
6      A.   I would agree, it's not all
7 that bad.
8          MS. HESSE:  You want to take
9 a break?
10          MR. HURTADO:  Yeah, you want
11 a short break?
12          MS. HESSE:  Let's continue
13 for a little bit.
14          MR. HURTADO:  I think we are
15 done in less than half hour or
16 so.
17          - - -
18          (Whereupon, there was an
19 off-the-record discussion.)
20          - - -
21 BY MR. HURTADO:
22      Q.   I would like to show you
23 what I have marked as Exhibit 10 in
24 Barrett's deposition.

84

1      A.   Correct.
2      Q.   Have you seen this document
3 before?
4      A.   I have.
5      Q.   Okay. Well, there should be
6 one with Mr. Barrett's signature?
7      A.   Do you not have that one?
8      Q.   Yes, I do, but I wanted to
9 ask you about this one.
10      A.   Oh, I don't know. I'm sure
11 I have seen it, but the one that I am
12 most interested in is one that was signed
13 by both parties.
14      Q.   Have you ever seen this one
15 before?
16      A.   Maybe I have, I don't
17 remember the one. I do absolutely
18 positively remember the one signed by
19 Mr. Barrett and Mr. Barefoot.
20      Q.   I will represent to you --
21      A.   Is this the same as the one
22 that was signed?
23      Q.   Well, it's not completely
24 the same, you'll see.

85

1      A.   Okay.
2      Q.   But this is the one that was
3 signed by both parties?
4      A.   Got it.
5      Q.   Okay. But I will represent
6 to you that Exhibit Number 10, and this
7 was confirmed by Mr. Barrett, is the
8 version that was sent by Mr. Barefoot to
9 Mr. Barrett on or about February 18,
10 2002.
11      A.   Uh-huh.
12      Q.   Okay?
13      A.   Okay.
14      Q.   And you'll see that that was
15 executed by Mr. Barefoot; correct?
16      A.   Uh-huh.
17      Q.   In fact, it's the very same
18 signature as is on --
19      A.   Okay.
20      Q.   As is on this copy?
21      A.   Sure.
22          MS. HESSE:  Which is Exhibit
23 9.
24          MR. HURTADO:  Well, what I

DMC-FTC 0349

ALLEN STERN

**86**

1 am pointing to is attached to
2 Mr. Barrett's affidavit, but I
3 guess we have more than one.
4         MS. HESSE: Which is Exhibit
5 9.
6         MR. HURTADO: Oh, it is?
7         MS. HESSE: Yeah. Yeah,
8 that affidavit is Exhibit 9 and --
9         MR. HURTADO: Oh, it's
10 Exhibit 3 for some reason.
11         MS. HESSE: You marked the
12 affidavit of Donald Barrett as
13 Exhibit 3 and it is attached as
14 Exhibit 3 to Exhibit 9, just for
15 the record.
16         MR. HURTADO: I'm sorry.
17         MS. HESSE: So we know.
18         MR. HURTADO: Great.
19 BY MR. HURTADO:
20     Q.   All right. So in looking at
21 Exhibit Number 10, is it fair to say that
22 Mr. Barefoot executed that agreement
23 without any of the notes in the margin on
24 it?

**88**

1 writing expert, but if you look at the
2 signature of Mr. Barefoot on Exhibit 9
3 and the one on Exhibit 10 looks like the
4 very same document, very same signature,
5 doesn't it?
6     A.   Absolutely.
7     Q.   Yeah.
8     A.   Okay.
9     Q.   So is there anything on the
10 document that Mr. Barefoot signed that
11 says that the cost includes all
12 royalties?
13     A.   Well, there's this agreement
14 that says it doesn't -- it says cost will
15 be $5 and 4.32 and there's a second
16 agreement signed by Mr. Barefoot again
17 and Mr. Barrett that has these two
18 points, which is probably the cause for
19 some confusion.
20     Q.   Meaning isn't it evident to
21 you this signature was affixed prior to
22 these notes being written down?
23         MS. HESSE: I'm going to
24     continue my running objection that

**87**

1     A.   Correct.
2         MS. HESSE: Let me just
3 object in the sense of we've got a
4 lack of personal knowledge here,
5 but go ahead.
6         THE WITNESS: Well, I was
7 going to say the same thing
8 actually without being a lawyer.
9         MS. HESSE: Okay.
10         THE WITNESS: That agreement
11 or this agreement went and those
12 conversations are from Barrett to
13 Barefoot and Barefoot back to
14 Barrett.
15         I may be somewhat in the
16 dark, other than this one does not
17 have those two points and this one
18 does.
19 BY MR. HURTADO:
20     Q.   And but Exhibit 10 was, in
21 fact, signed by Mr. Barefoot; is that
22 correct?
23     A.   Correct.
24     Q.   And I know you are not a

**89**

1 this witness is not privy to the
2 conversations or to -- it was not
3 -- did not either send or receive
4 these documents which upon which
5 he's being asked and therefore I
6 would like to have a standing
7 objection on this issue.
8         MR. HURTADO: Okay.
9 BY MR. HURTADO:
10     Q.   Mr. Stern, you have
11 testified that in your view there is a
12 contract, an executed contract, between
13 Mr. Barefoot and Mr. Barrett; isn't that
14 correct?
15     A.   Absolutely. Yes.
16     Q.   So I'm clarifying the basis
17 for your belief that there is such a
18 contract?
19     A.   This is -- that is the only
20 contract that I know of that has the
21 signature of both Mr. Barefoot and
22 Mr. Barrett.
23     Q.   Okay. And let me sort of
24 turn the question around a little bit,

DMC-FTC 0350          ESQUIRE DEPOSITION SERVICES

ALLEN STERN

.90

1 you don't have -- do you have any basis
2 to believe that from this document that
3 Mr. Barefoot signed this contract after
4 these notations had been added?
5    A.   I don't know.
6    Q.   Okay. Are there any
7 initials next to the notations in the
8 Exhibit Number 9?
9    A.   No.
10    Q.   Okay. In your experience is
11 it customary for parties to initial
12 written changes to a contract to
13 demonstrate that it was accepted?
14    A.   That's generally the case, I
15 would say.
16    Q.   Mr. Stern, are you aware of
17 where the -- where the Coral Calcium
18 Supreme product that's being used to
19 fulfill orders resulting from Coral
20 Calcium shows are purchased?
21    A.   I'm sorry?
22    Q.   Let me do that again.
23       What manufacturer supplies
24 the Coral Calcium to fulfill orders for

91

1 the Coral Calcium show?
2    A.   Most of them come from
3 Pro-Tec and we will -- as I told you
4 earlier in the afternoon, we will have
5 Pro-Tec compete against other vendors for
6 our business.
7    Q.   Okay. Is product being
8 supplied currently by any manufacturer
9 other than Pro-Tec?
10    A.   We have an order in place
11 with another vendor. We contemplate an
12 order potentially going to two other
13 vendors and we have made Pro-Tec aware of
14 that and Pro-Tec has -- has now gotten to
15 a more competitive situation with us.
16    Q.   All right. And by that you
17 mean lowered its price?
18    A.   Correct.
19    Q.   But no product presently has
20 been shipped by other manufacturers than
21 Pro-Tec?
22    A.   Not yet.
23    Q.   And who are those other
24 vendors?

92

1       MS. HESSE: I think that we
2 want to object and make the same
3 -- this is confidential and the
4 terms of their agreement are
5 confidential.
6       So if we can have the same
7 agreement that we made with
8 Mr. Barrett, then I think the
9 witness would be more comfortable
10 answering these questions.
11       MR. HURTADO: I would agree
12 with that.
13       MS. HESSE: Okay.
14       You want to wait until the
15 end or do it now?
16       MR. HURTADO: We can just
17 do it now while we have it in our
18 mind and designate from this point
19 forward as attorneys' eyes only.
20       MS. HESSE: Okay.
21       THE WITNESS: So what is --
22 where are we at?
23       MS. HESSE: We are in a --
24 in a protective order from this

93

1 point on, so it's only attorneys'
2 eyes only at this point.
3       - - -
4 CONFIDENTIAL
5       - - -
6       THE WITNESS: So the other
7 vendors that we're contemplating
8 is Holt Manufacturing in New
9 Jersey, H-o-l-t, Cornerstone and I
10 have to get you -- and they are in
11 -- I want to say -- I have to get
12 you -- Idaho, where was the
13 Olympics?
14       MR. HURTADO: Utah.
15       THE WITNESS: Utah, they are
16 in Utah, and then there's one on
17 the West Coast and their name I
18 want to say is Maxum (ph). Steve
19 Richey could actually give you
20 those three manufacturers and give
21 you the correct spellings.
22       But I know those are three
23 manufacturers they are
24 contemplating, and there may be

DMC-FTC 0351       ESQUIRE DEPOSITION SERVICES

ALLEN STERN

94

1      more I don't know, and Pro-Tec
2   knows that and they have been
3   great, they reduced their price to
4   us and -- and they have just been
5   -- they probably will continue to
6   get a big chunk of the business.
7 BY MR. HURTADO:
8      Q.   Has Pro-Tec in any way
9 changed the composition of the product?
10     A.   I have no idea.
11     Q.   Is there someone who might
12 have an idea?
13     A.   Pro-Tec.
14     Q.   Is there anyone that you
15 know of at Triad or King Media that's
16 requesting that they change the
17 composition of the product?
18     A.   I don't know. I mean, if we
19 request to make any change it will only
20 be to improve the product.
21     Q.   But you don't know of any
22 changes that have been requested?
23     A.   I don't know. I -- I don't
24 know.

95

1      Q.   Would Mr. Richey know?
2      A.   He might.
3      Q.   Okay. All right. Just a
4 few more questions, actually.
5            Do you or your company as a
6 matter of course have videotapes that are
7 to be broadcast, reviewed for compliance
8 with the Federal Trade Act or other state
9 laws?
10     A.   We don't as a matter of
11 course.
12     Q.   Do you do it in some
13 instances?
14     A.   We have helped assist people
15 before. We said I think you might want
16 to get this show looked at, but one of
17 the things we don't do and we are not
18 very good at is production. King Media
19 or Triad are really not production guys,
20 we do other good things but not that.
21           So we may say to somebody,
22 hey, you might want to get this product
23 looked at or, hey, you might want to get
24 this product reviewed, and that would be

96

1 probably the extent.
2      Q.   Okay. Do you or King Media
3 or Triad have any agreement or contract
4 with Mr. Trudeau that grants you the
5 right to use his name and likeness?
6      A.   We have no contract with
7 Mr. Trudeau. No contract with
8 Mr. Trudeau.
9      Q.   Has Mr. Trudeau asked you
10 either, you know, directly or through
11 counsel to stop airing the show?
12     A.   Mr. Trudeau has -- had a
13 conversation with me on Friday and
14 Saturday and said that his compliance
15 people have reviewed the infomercial and
16 they recommended to Mr. Trudeau to make
17 some edit changes in the show.
18           And my response to that was,
19 whatever you want to do is fine. You --
20 you are the guy, you are the expert in
21 the production business, so whatever
22 changes you have to make, make them and
23 send the show over to -- to us.
24     Q.   And that was this past

97

1 weekend?
2      A.   Uh-huh.
3      Q.   Were there any instances
4 when Mr. Trudeau either himself or
5 through his counsel requested that you
6 stop airing the show?
7      A.   Yeah, Mr. Bradford requested
8 me stop airing the show.
9      Q.   When was the first request?
10     A.   When I first started talking
11 to him five, six weeks after the show was
12 on the air.
13     Q.   About the time of the first
14 correspondence between you and him,
15 around January 10th?
16     A.   Right around when it
17 started, uh-huh.
18     Q.   Okay.
19     A.   I don't know if it was as
20 early as January 10th. You would have to
21 go back and look at the file and see when
22 he actually --
23           Although it's interesting,
24 he did send a letter after we had a

ALLEN STERN

**98**

1 conversation on that conference call and
2 I explained to him everything that we
3 were doing, and then he did follow up
4 with a letter which was -- which was
5 unusual, that he thanked Mr. Barrett for
6 his continued cooperation not to air the
7 show when in the previous date of that
8 conference call we fully explained to him
9 what we were doing with -- with that
10 show. I found that most unusual.
11    Q.    I think sometimes that's
12 sort of legalese for trying to put a
13 demand in a polite way.
14        Have you ever actually, you
15 know, retained counsel to review any
16 infomercials?
17    A.    I had one production client
18 who I asked -- he asked me if I would
19 help him find somebody to review a show,
20 and that's how I actually found
21 Mr. Abrams, if that's who you are
22 alluding to.
23        I found him through one of
24 my other clients because I didn't know

**99**

1 where to begin for something like this.
2 It is just not something we practically
3 deal with.
4        So this client asked me, I
5 in turn asked the client if he could help
6 me, and that's how I was able to find
7 Mr. Abrams.
8    Q.    Now that you have
9 anticipated that, let's just take a quick
10 look at that correspondence.
11    A.    Sure. Sure.
12    Q.    I'm showing you, Mr. Stern,
13 what's been marked as Barrett 16?
14    A.    Right.
15    Q.    This is a letter from
16 yourself, Allen Stern, to Mr. Jim Abrams,
17 Esquire, dated January 28th, 2002, and
18 you recognize this letter?
19    A.    Absolutely.
20    Q.    And you asked Mr. -- Well,
21 you sent Mr. Abrams some materials
22 relating to the Coral Calcium show?
23    A.    Correct.
24    Q.    And you asked him to --

**100**

1 well, it says -- let's just read this
2 first sentence.
3        Let me give you a little
4 background in what you will be receiving,
5 there's a --
6    A.    New.
7    Q.    -- new infomercial called
8 The Calcium Factor that I would like you
9 to closely review. Along with the
10 infomercial are two books that the author
11 who appears in the show wrote. We have
12 also included the label of the
13 ingredients so you can see more of the
14 product, although it is not specifically
15 mentioned, nor does he endorse his own
16 product in the infomercial?
17    A.    Correct.
18    Q.    Okay. Did Mr. Abrams, in
19 fact, conduct the review that you
20 requested here?
21    A.    No, not even close.
22    Q.    Did he do anything with
23 respect to in response to this letter?
24    A.    No.

**101**

1    Q.    Why not?
2    A.    He called me.
3    Q.    He called you?
4    A.    Uh-huh.
5    Q.    Okay. And he did not
6 conduct any review?
7    A.    Correct.
8    Q.    Why not?
9    A.    Because what I didn't
10 communicate to him fully and completely
11 in this note was that he was -- until he
12 spoke with me he was under the
13 impression, and maybe it is my own fault
14 for not putting this in the letter, that
15 I actually produced this Calcium Factor
16 infomercial.
17        When I told him no, clearly
18 we did not produce it, he then jumped to
19 the next point. He said, oh, well, then
20 the people who brought you the deal, they
21 produced the show, and since you are in a
22 deal with them they are asking you and
23 you're asking them on their behalf to
24 review the infomercial. I said, well,

ALLEN STERN

**102**

tly.
So he said, well, exactly
going on here? And I said, well,
ter produced the infomercial or
n the infomercial. So he -- we
dialoguing a little bit and he
it was odd that he was being
> review this show that neither I
:d nor had any control of or that
who brought me the deal produced,
id of just fell apart then.
   All right. So based on that
cided not to have a review done?
   We just let it go.
   Now, do you know if
>rams has or purports to have
ise in the area of FTC compliance?
   Only as it relates to my
vho says he used him before and he
ie seemed to be okay.
   Your client said or your
or your associate who referred you
Abrams informed you that
>rams has expertise in the area of

**103**

>mpliance?
   Correct.
   And your understanding based
versations with Mr. Abrams is that
arketer of infomercials but as a
>ducer of them you don't have
re to liability to the FTC?
   That's not what I said. Not
ose to what I said.
   What I said to you was that
rams found it rather odd that --
r the person who brought me the
onald Barrett, would be asking for
w of something which we had no
over.
   He said it would seem to him
: people who actually produced the
they had any discomfort or even
thought it was a wonderful show
get that show reviewed prior to you
he show.
   It seemed to make sense to

   Okay. So that didn't relate

**104**

1 to whether or not you had had exposure to
2 the FTC based on that?
3     A.   Didn't come up, wasn't even
4 part of the conversation.
5     Q.   Were you, yourself,
6 concerned that you might have exposure to
7 the FTC?
8     A.   No, it never went through my
9 mind.
10    Q.   Not at all?
11    A.   Not really, because I don't
12 know -- I don't know if the show is -- if
13 there's anything wrong with the show
14 whatsoever. I have no idea if there's
15 anything with his show that needs to be
16 changed or should be changed. If there
17 is, then Kevin should change it.
18    Q.   Uh-huh. Would you be -- if
19 there were and it were not changed, would
20 you be concerned that you would be
21 exposed to liability to the FTC?
22    A.   Not really. I mean, I
23 haven't really given that that much
24 thought.

**105**

1     Q.   Okay. As of the present
2 date, the Coral Calcium infomercial is
3 being aired?
4     A.   Correct.
5     Q.   Do you know what geographic
6 jurisdictions it's being aired in?
7     A.   Not specifically, but it's
8 generally being aired.
9     Q.   If I asked you certain
10 states, would you know whether it's being
11 aired there?
12    A.   I mean, I can guess.
13    Q.   No, I don't want you to
14 guess.
15         You don't have knowledge of
16 where they're being aired?
17    A.   Our company has knowledge of
18 where they are being aired.
19    Q.   The company meaning?
20    A.   King Media.
21    Q.   Is there someone at King
22 Media who would inform, let me finish,
23 anyone who could inform us regarding the
24 -- regarding where the infomercial is

C 0354        ESQUIRE DEPOSITION SERVICES

ALLEN STERN

106

1 being aired?
2    A.   I'm sure that our media
3 department would run a report which shows
4 where this show, what states the show has
5 been aired in. I don't think that would
6 be too problematic for them to do. They
7 probably do that sort of thing every day.
8    Q.   I would like to ask that be
9 done and produced if possible.
10       MS. HESSE: I have some
11 follow-up questions on that issue.
12 I mean, is that your last
13 question?
14       MR. HURTADO: No, but -- but
15 I will put the request on the
16 record that that be produced.
17       MS. HESSE: You can make the
18 request and then I'm going to do
19 some follow-up questions and then
20 we can talk about a request
21 later.
22       I mean, to be honest with
23 you, I will -- we can talk about
24 it between you and I later.

107

1       MR. HURTADO: Uh-huh, yeah.
2       That's all I have.
3       - - -
4       EXAMINATION
5       - - -
6 BY MS. HESSE:
7    Q.   Mr. Stern, do you buy media
8 time in states or with stations?
9    A.   Both.
10    Q.   When you buy media -- buy
11 with respect to states, how does that
12 work?
13    A.   Two ways: We either go in
14 to the local markets and buy the local
15 broadcast station in the market or we
16 will buy a cable station that reaches
17 across state boundaries.
18    Q.   Okay. Has King Media
19 purchased any air time in local Illinois
20 stations?
21    A.   No, not to my knowledge.
22    Q.   Has King Media purchased air
23 time with cable stations?
24    A.   Correct. Yes, we have.

108

1    Q.   And it is possible that
2 those cable stations reach Illinois
3 markets, Illinois residents?
4    A.   There's no doubt about it,
5 that they would be able to -- able to get
6 or see the show if we ran it on a cable
7 station that they subscribe to.
8    Q.   Is it possible that -- is it
9 even possible to know whether or not what
10 the market is for those cable stations?
11    A.   What we know is the
12 subscriber base and we buy based on
13 eyeballs. That's how we buy, we buy
14 based on how many potential eyeballs are
15 out there, and then we negotiate a rate
16 from that.
17       So I can't tell you how many
18 -- how many subscribers in Cooke County,
19 for example, might be able to see Bravo,
20 and it's not even important to us. Even
21 if I could, it's not important.
22       What's important to us is
23 that is the time available and can we
24 negotiate the rate, because we're always

109

1 negotiating rates, so that's what we base
2 it on, availability of time and how far
3 can we drive those rates down.
4    Q.   Okay. Now, how many cable
5 stations have you purchased air time?
6    A.   For this show?
7    Q.   Yes.
8    A.   I don't know.
9    Q.   Do you know how many local
10 television stations you have purchased?
11    A.   No, but we certainly could
12 run a report that would give you and the
13 court or whoever the stations, both
14 broadcast stations and cable stations
15 that this infomercial has appeared on.
16    Q.   But such a report does not
17 exist today?
18    A.   No, but we could create it.
19       MS. HESSE: Okay. No
20    further questions.
21       Do you have anything?
22       MR. HURTADO: No, only to
23    restate the request that that
24    information be generated and

ALLEN STERN

110

1  produced.
2      MS. HESSE:  What information
3  are you talking about?
4      MR. HURTADO:  The
5  information regarding the states
6  in which the Coral Calcium show
7  has been broadcast.
8      MS. HESSE:  Okay.  All
9  right.  We will talk about it off
10  the record.
11      MR. HURTADO:  That's it.
12      - - -
13      (Whereupon, the deposition
14  concluded at 4:52 p.m.)
15      - - -
16
17
18
19
20
21
22
23
24

112

1  - - - - - - - -
2      E R R A T A
3  - - - - - - - -
4 PAGE    LINE    CHANGE
5 _____  ___  _____
6 _____  ___  _____
7 _____  ___  _____
8 _____  ___  _____
9 _____  ___  _____
10 _____  ___  _____
11 _____  ___  _____
12 _____  ___  _____
13 _____  ___  _____
14 _____  ___  _____
15 _____  ___  _____
16 _____  ___  _____
17 _____  ___  _____
18 _____  ___  _____
19 _____  ___  _____
20 _____  ___  _____
21 _____  ___  _____
22 _____  ___  _____
23 _____  ___  _____
24 _____  ___  _____

111

1
2      C E R T I F I C A T E
3
4      I hereby certify that the
5  proceedings and evidence noted are
6  contained fully and accurately in the
7  notes taken by me on the deposition of
8  the above matter, and that this is a
9  correct transcript of the same.
10
11
12
13
14      MARIA N. DAMIANI, RPR, CSR
15
16
17
18      (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24

113

1      ACKNOWLEDGEMENT OF DEPONENT
2      I, _ _ _ _ _ _ _ _ _ _ _, do hereby
3  certify that I have read the foregoing
4  pages, _ _ _ _ _ _ and that the same is a
5  correct transcription of the answers
6  given by me to the questions therein
7  propounded, except for the corrections or
8  changes in form or substance, if any,
9  noted in the attached Errata Sheet.
10 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
11 DATE
12
13 Subscribed and sworn to before me this
14 _ _ _ _ _ day of _ _ _ _ _ _ _ _ _,
15 199 _ _
16 My commission expires: _ _ _ _ _ _ _
17          Notary Public
18
19
20
21
22
23
24

ALLEN STERN

114

1
2
3     LAWYER'S NOTES
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14
15
16
17
18
19
20
21
22
23
24

**A**

ability 14:15
able 17:2,4,5,12 61:7
99:6 108:5,5,19
Abrams 98:21 99:7,16
99:21 100:18 102:16
102:23,24 103:4,11
absolutely 61:13 84:17
88:6 89:15 99:19
accepted 66:23 90:13
accommodate 6:8
account 27:15
accounting 24:2 27:19
accurate 20:14 21:20
63:2
accurately 111:6
acknowledged 63:20
ACKNOWLEDGE...
113:1
acknowledges 69:3,23
70:9
acknowledging 70:4
Act 95:8
acting 33:14
activities 9:11 15:4
actuality 62:23
add 22:15 45:15 64:4
added 63:4 64:16 90:4
addition 62:20 81:19
82:4
additional 28:8 62:24
adjusted 65:5,11,15
66:12 67:8 75:21
77:18 78:16
advertising 19:19
advising 17:23
affidavit 11:23 12:7,12
15:6 20:9 24:13
38:15 86:2,8,12
affiliation 11:12
affixed 88:21
afternoon 91:4
agency 9:14 19:15 30:2
30:9,11,12,21 31:12
31:17,19,21 32:16
aggravation 31:4
ago 5:8
agree 13:3,7 24:18
51:15 75:20 80:9
83:6 92:11
agreeable 77:17,19,21
agreement 12:16 13:10
13:11,13,16,17,18
14:14,18:8,8 21:10
21:11 22:5,8,11
24:14,15 25:15,19,21
26:18,19 27:5,6,9,10
27:22 28:1,17,24
29:11,18 48:7,11
49:17 50:1 51:13
57:19 60:6 61:2,5,19
62:22 63:4,15,16,18
63:19 64:10 65:3
66:10,18 71:24 72:1
72:11,14 73:5,7,11
73:14,20,22,24 74:4
74:18 75:9 86:22
87:10,11 88:13,16
92:4,7 96:3

agreements 73:2 78:8
83:1
agrees 67:14 69:5,8
ahead 41:7,8 87:5
air 29:2 30:5,14 45:21
51:11 80:7 81:4,16
81:17 82:3,4,17
97:12 98:6 107:19,22
109:5
aired 105:3,6,8,11,16
105:18 106:1,5
airing 96:11 97:6,8
103:21
Allen 1:12 3:5 4:2,11
99:16
allies 34:1
allow 82:17
alluding 98:22
amount 21:16 66:2
and/or 55:21 57:1 68:1
72:14,15 73:8 111:21
animosity 46:9
answer 5:21 6:10 18:24
21:8 24:10 26:16
32:11 43:10 44:10,14
44:14 52:4
answered 17:19 41:5
answering 30:18
answers 52:1 113:5
anticipated 99:7
anybody 13:19 16:21
64:1
apart 46:8 47:6 102:11
apologize 49:15
appear 38:7 102:5
appeared 65:8 109:15
appears 74:18 81:7
100:11
appease 68:20
apply 111:19
appreciate 32:17
approval 70:18
area 102:17,24
arising 67:16 68:1
69:10,19
arrangement 20:16
asked 19:7 41:5 45:16
46:2,3,14 56:8 63:24
78:10 89:5 96:9
98:18,18 99:4,5,20
99:24 102:8 105:9
asking 5:19 25:18
48:17 101:22,23
103:13
aspect 53:9
assign 71:23,24
assist 95:14
assistance 60:14
associate 102:22
associated 69:10
assume 42:23
assumes 31:15
assumption 13:15
29:17
attached 74:17 86:1,13
113:9
attempt 78:12 81:2
83:2
attempting 73:12

attorneys 92:19 93:1
attorney/client 6:12
author 100:10
authored 47:20
authority 15:10 17:16
30:4 41:1,21 42:8,13
42:24 43:23 44:3,8
authorized 40:11
avail 45:15
availability 109:2
available 58:4,5,6,7,23
58:24 108:23
Avenue 2:10
aware 51:7 52:8,9,14
59:18 76:14 90:16
91:13

**B**

B 3:9 51:14
back 22:23 23:24 38:15
39:13,20 40:9 42:2,5
43:20 57:7 66:15
75:24 76:2,3,4 81:5
87:13 97:21
background 100:4
back-end 38:4
bad 83:5,7
Barefoot 1:4 4:14
20:16 21:3,10 24:15
24:17,24 25:2,15,20
26:4,9,20,22 27:7,10
27:24 28:2,9 49:21
50:3,22,24,24 68:13
77:24 84:19 85:8,15
86:22 87:13,13,21
88:2,10,16 89:13,21
90:3
Barrett 1:7 7:20,22 8:9
11:21,24 12:6 14:5
15:5,9,21 16:16,21
17:15,24 19:7,13,17
20:1 24:23 27:6,10
28:1,7,13 29:1 37:15
37:20 38:6,10 39:5
43:13 44:18,24 45:17
46:13 47:12 48:12
52:7 53:17 56:11,20
58:6 59:2,22 60:22
63:22 68:17 72:21
74:8 76:5,11 77:24
84:19 85:7,9 86:12
87:12,14 88:17 89:13
89:22 92:8 98:5
99:13 103:13
Barrett's 24:13 60:16
82:18 83:24 84:6
86:2
base 108:12 109:1
based 37:18,19 76:1
77:18 78:16 79:17,18
102:12 103:3 104:2
108:12,14
basis 23:12 26:13
40:14 41:5 89:16
90:1
behalf 32:5 46:1,4,16
101:23
behest 75:13
belief 89:17

believe 39:11,19 40:7
40:11,24 42:4 43:3
43:15,18 45:3,4,6
46:12 90:2
believes 70:10
benefit 29:16
best 5:21 14:15 25:6
47:3 59:15
better 14:19,20,21 17:3
44:22 55:5 62:17
63:17 73:13
beyond 52:1
big 65:24 94:6
bigger 55:5 62:16
63:17
bind 40:12 41:2,22
42:13 44:8
bit 36:10 83:13 89:24
102:6
BLAIR 2:9
blank 64:11 65:4 66:3
blanks 29:6
Block 2:3 54:1
blow 33:20,21
Bob 26:22
book 58:12
books 100:10
Boston 58:7
bottle 21:19 25:4,13,23
bottom 56:17 62:1
Boulevard 1:23
boundaries 107:17
Bradford 54:1,5 55:8
56:13 57:8 58:3,4,21
61:18,21 63:13 68:11
73:2 74:14 77:13
78:7 80:15,22,23
81:14 97:7
Bradford's 60:14
75:13
Bravo 108:19
breach 67:16
breaches 68:1,23
break 6:6,11 83:9,11
breaker 82:1
breaking 81:8
breaks 6:5
briefly 5:11 32:15
bring 57:3 59:23
brings 13:19,21
broadcast 95:7 107:15
109:14 110:7
broader 53:9
brochures 9:8
brought 18:10 101:20
102:10 103:12
business 8:24 9:1,21,23
10:1 16:2,11,12,14
19:16 36:6,11,12
91:6 94:6 96:21
businesses 36:18
buy 9:6,14,17 15:14
19:18 35:10,11 107:7
107:10,10,14,16
108:12,13,13
buying 9:13

**C**

c 1:3 2:2 40:20 93:4

111:2,2
cable 107:16,23 108:2
108:6,10 109:4,14
Calcium 12:18 21:22
24:8 29:13,15,22
37:16 44:19 48:13
90:17,20,24 91:1
99:22 100:8 101:15
105:2 110:6
California 48:3 58:4
call 37:8 57:4,16,24
58:13,19 59:3,6,8,9
60:20 98:1,8
called 46:20 81:5 100:7
101:2,3
calling 34:23
calls 26:13 44:12
capable 27:12
capacity 30:3,21
capitulate 18:23
card 12:23
cards 27:14
care 40:19
case 19:20 24:21 45:3,5
45:7 50:8 90:14
cause 70:15 82:12
88:18
causes 31:3
causing 37:9
Cblairbesse@sbefsk...
2:11
center 17:7
cents 25:11
certain 19:8,9 61:10
105:9
certainly 6:6 42:10
109:11
certification 111:18
Certified 1:18
certify 111:4 113:3
certifying 111:22
cetera 9:16
change 25:8,12 70:15
94:16,19 104:17
112:4
changed 94:9 104:16
104:16,19
changes 90:12 94:22
96:17,22 113:8
CHANNING 2:9
check 40:17
Chicago 2:5,10 54:5
58:5
choice 18:1
chunk 94:6
circled 79:24
claims 49:20 50:2,5,21
52:21 67:15 68:14
69:9
clarify 82:2
clarifying 89:16
clear 9:19 25:21 38:5
41:12 57:5 59:10
clearly 22:12 50:3
101:17
client 10:9 35:21,22
82:24 98:17 99:4,5
102:19,21
clients 19:22 98:24

DMC-FTC 0359

Page 116

| | | | | |
|---|---|---|---|---|
| close 58:17 81:1 100:21 103:9 | consider 14:9 | 87:23 89:14 91:18 93:21 99:23 100:17 101:7 103:2 105:4 107:24 111:9 113:5 | defined 75:21 | 61:3 84:2 88:4,10 90:2 |

close 58:17 81:1 100:21 103:9
closely 100:9
closer 17:6
Coast 93:17
come 18:19 20:5 26:24 45:1 72:24 73:13 81:3 91:2 104:3
comes 33:23
comfortable 92:9
commencing 1:15
comment 54:10
comments 54:9,13,14
commercial 64:10 65:7 70:15
commercials 67:20 70:11
commission 69:5 113:16
common 10:11
communicate 101:10
communication 58:10
communications 9:9 80:14
companies 9:16 10:16 10:19 11:8,11
company 9:3,20 34:24 59:17 65:3,6 67:14 67:17 68:23 69:2,8 69:23 70:9,14 71:12 95:5 105:17,19
compensated 35:9
compensation 33:13
compete 16:13 91:5
competing 31:2 33:6
competition 31:4
competitive 16:3 35:2 91:15
competitors 34:2
completely 11:15,17 84:23 101:10
compliance 51:8 69:7 79:9 95:7 96:14 102:17 103:1
compliant 17:10
complicated 28:5
complies 71:4
comply 16:18,20 19:10
composition 94:9,17
compromise 17:1
Concepts 1:6 11:13 62:20 64:12 74:15
concerned 66:7 104:6 104:20
conciliatory 83:4
concluded 110:14
conclusion 26:14
conditions 17:3
conduct 100:19 101:6
conference 57:4,16,23 58:13,19 59:3,6,9 60:20 98:1,8
confidential 92:3,5
confirmed 85:7
confusing 64:9
confusion 37:9 57:5 60:13 65:22 88:19
consent 69:4,7 70:13 70:16

consider 14:9
consideration 14:1 33:13
constitute 40:3
consultation 75:3
consumer 16:11 59:15
contained 51:13 111:6
contemplate 91:11
contemplated 60:3
contemplates 39:22
contemplating 93:7,24
contention 23:12
continue 77:10,11,14 81:2 82:15 83:12 88:24 94:5
continued 77:8 98:6
contract 39:10,15,23 40:3,6,12 41:3,22 42:3,14 43:2,7,14 44:9,17 45:19 46:16 54:23 55:1,10,15,19 55:20 56:24 57:20 60:11 63:18 64:17 70:4 89:12,12,18,20 90:3,12 96:3,6,7
contracts 41:1
contractual 26:7,8
contractually 18:4,6
control 102:9 103:15 111:21
controller 24:2
controlling 11:7
conversation 60:1 80:21 81:15 82:20 96:13 98:1 104:4
conversations 8:5,8 12:6 78:8 79:19,20 79:23 80:18 81:21 87:12 89:2 103:4
convicted 69:24 70:5 80:1
Cooke 108:18
cooperate 60:15,16,17
cooperation 57:12 98:6
coordinated 36:2
copied 56:19 74:14
copy 48:7 77:3 85:20
Coral 12:17 21:22 24:8 29:13,14,22 37:16 44:19 48:13 90:17,19 90:24 91:1 99:22 105:2 110:6
Cornerstone 93:9
corporate 10:6 11:11
corporations 10:20
correct 4:16,16 5:18 11:9 14:7,8 20:11,12 21:23 23:5,6,9,10 28:3,18 29:19 30:6,7 30:8 35:15,23 39:21 46:17 47:16,19,21 48:14 49:10 54:6 55:17 56:15,20,21 62:3,6 64:14 65:9,12 65:17 68:3 69:14,21 70:1,7,19,23 72:8 74:12,16,19 75:1,10 75:11,14,23 79:12 84:1 85:15 87:1,22

87:23 89:14 91:18 93:21 99:23 100:17 101:7 103:2 105:4 107:24 111:9 113:5
corrections 113:7
correctly 38:1
correspondence 97:14 99:10
correspondences 47:9
cost 21:17 25:5,10 88:11,14
costs 25:5
cost-effectively 14:18
counsel 2:7,12 7:9,16 49:20 50:11 70:10,17 81:9 96:11 97:5 98:15
County 108:18
couple 62:10
course 5:14 76:17 95:6 95:11
court 1:1 5:17 7:4,5 109:13
create 109:18
creating 31:4
credit 12:23 27:14
criminal 50:18 80:2
CSR 111:14
current 8:18
currently 91:8
custom 16:1
customary 90:11
customer 12:20
customers 12:22 14:14 14:22

**D**

D 3:3 93:4
DAMIANI 1:16 111:14
Dan 4:12
DANIEL 2:4
dark 87:16
date 1:16 20:15 57:16 71:7 98:7 105:2 113:11
dated 47:15 53:23 56:13 99:17
David 53:24 54:4 56:13 57:7 60:13 73:2
day 106:7 113:14
day-to-day 36:6
deal 9:15 13:20,21,22 18:9,17 20:4 21:3 40:16 81:24 99:3 101:20,22 102:10 103:13
deals 18:10
decided 102:13
decides 15:22
decision 15:13 17:17 19:3
decisions 30:22
decision-making 15:3 15:9
decree 69:4,8 70:13
Defendants 2:12
defer 15:17
deferred 79:4
define 65:10

defined 75:21
definitely 11:5
definition 67:8
definitive 43:4,5,8,11
degree 55:24
DeKalb 1:14
Delaware 1:19 10:24 11:2,5
delegate 71:24
deleted 80:17
delivery 17:4
demand 98:13
demonstrate 90:13
department 106:3
DEPONENT 113:1
deposition 1:12,22 4:15 5:1 6:22 7:9,13 7:17,22,23 8:5,9,13 83:24 110:13 111:7
depositions 5:6
DESCRIPTION 3:10
deserve 52:3
designate 92:18
desk 20:5
detail 82:12
determine 19:17
determined 25:5
develop 72:18
developed 44:23 74:6
developing 14:24
Dhurtado@jenner.c... 2:6
dialoguing 102:6
difference 42:11,17,20
different 9:11 13:19 16:4 18:9 21:12 77:20,22
difficult 51:15,19
difficulties 82:13
dinner 7:10,11
direct 1:6 11:12 62:20 64:12 74:15 111:21
directed 28:7
directing 33:8
directly 96:10
directs 16:16 18:2
discomfort 103:18
discuss 7:12
discussion 83:19
discussions 8:8,12
distribution 17:6 34:7
distributor 28:17 30:4 31:7 33:1 35:6
distributors 29:1,5,7,9 30:13 31:2 32:19,21 32:22 33:2,3,6,11,15 33:21,24 34:8,13,23 35:3,13 36:6,14
DISTRICT 1:1,1
DIVISION 1:2
DMC 13:10 14:10 15:9 22:6 26:19 35:16 36:16 54:23 55:16,19 55:22 57:1 62:14 63:6,8 68:2 72:12,16 73:6,8,21
DMC's 12:15
document 12:2 28:15 28:20 47:18 60:24

61:3 84:2 88:4,10 90:2
documents 76:18 89:4
doing 15:20 17:14 19:21 59:16 77:21 98:3,9
dollar 25:4,13,23
dollars 23:1
Don 43:1
Donald 1:6 11:24 15:21 37:15,20 38:6 55:2,3 56:20 59:22 60:15 86:12 103:13
doubt 108:4
draft 49:16 61:16,17 61:19 63:4 71:8 72:10 73:1 74:18 75:22 78:8 79:11 80:16 82:24
drawing 78:4
drive 73:17 109:3
driving 67:9
dub 30:17,18
due 71:18,20
duly 4:3
duty 72:1

**E**

E 2:2,2 3:3,9,11 93:4 111:2,2 112:2
earlier 91:4
early 62:5 97:20
EASTERN 1:2
economics 24:5
edit 96:17
efficiently 14:17
either 11:10 22:19 64:6 80:14 89:3 96:10 97:4 107:13
Email 2:6,6,11
eminently 5:23
employees 22:12 55:22 72:15 73:9
endorse 100:15
enormous 82:13
ensure 69:6
entered 64:11
entities 8:22 10:12 32:5 25:22 28:17 61:1 71:23
entity 32:5
Erik 61:5,17 63:13,20 80:19 82:22,22
Errata 113:9
Esquire 1:22 2:4,9 99:17
essence 39:11,18 40:7 42:3 43:3,15
et 9:16
eventually 63:16
everybody 35:5 36:7 36:24 37:11 45:11,12 51:21 57:15 58:2,11 65:23 73:15
evidence 111:5
evident 88:20
exact 41:14 80:3,24
exactly 64:3 102:1,2

**EXAMINATION** 4:6
107:4
examined 4:4
example 15:22 108:19
exceed 23:19,20
exceeded 24:9
excess 20:17 21:16
exchanges 47:8
excluded 66:13,14
exclusively 81:16 82:3
executed 54:22 55:10
57:20 85:15 86:22
89:12
Exhibit 11:21 28:13
38:11,14,14 47:12
53:18 54:14,17 60:22
74:8 76:21 77:4,16
83:23 85:6,22 86:4,8
86:10,13,14,14,21
87:20 88:2,3 90:8
exist 57:6 109:17
existence 29:12 62:4
expand 72:18
experience 15:19 90:10
expert 88:1 96:20
expertise 15:19 102:17
102:24
expires 113:16
explain 32:9,15 36:9
82:11
explained 98:2,8
exposed 104:21
exposure 103:7 104:1,6
extent 96:1
eyeballs 108:13,14
eyes 92:19 93:2
E-mail 38:19,22 39:1
40:2

**F**

F 93:4 111:2
face 66:1
fact 20:3 35:10 59:6
61:24 80:11 85:17
87:21 100:19
Factor 100:8 101:15
failed 22:3
failing 78:9
fair 53:2 66:22 86:21
fairly 67:6
fallen 81:11
falling 37:6,7
familiar 5:13 13:11
28:19 61:2
far 34:15,37:3 41:18
66:7 109:2
faster 17:4
fault 101:13
favor 39:8
faxed 48:2 62:1
featured 67:20
February 85:9
federal 69:4 70:12 95:8
feel 33:6
fees 67:16
fell 102:11
felonies 69:24 70:6
felt 34:12 47:2
fence 58:2

field 16:15
fifteen 15:20
fighting 33:22
file 97:21
filings 7:3,4,5
filled 29:5,19
final 15:13 30:4
find 16:12 98:19 99:6
finding 35:1
fine 30:22,23 34:16
35:7 52:2 96:19
finish 105:22
first 32:14 48:5 54:7
61:15 64:9 97:9,10
97:13 100:2
five 22:14 39:12,19
40:8 42:5 43:19
48:17 49:4,6 65:21
66:10,19 74:2 76:6,8
76:12 78:23 79:1
97:11
Floor 1:23
flush 36:9
follow 98:3
follows 4:4
follow-up 106:11,19
foolhardy 19:16
foregoing 111:18 113:3
Forge 1:13
form 113:8
formal 11:11
forth 57:7
forward 45:23 57:10
61:8 92:19
found 50:16 98:10,20
98:23 103:11
four 45:19 51:10
framework 51:16
Friday 24:4 96:13
friend 102:22
FROELICH 2:9
fruition 73:1
FTC 76:16 51:9 52:23
69:13,20 70:14 79:10
80:4 102:17 103:1,7
104:2,7,21
fulfill 90:19,24
fulfillment 9:15
fulfills 22:19
full 4:10
fully 44:22 72:18 98:8
101:10 111:6
fully-developed 60:11
73:14
full-blown 51:12 55:6
funds 35:13,17,19
further 46:7,8 47:6
109:20
future 39:24

**G**

generally 15:16 16:5
16:12 66:23 67:1
79:15 90:14 105:8
generated 23:8 24:7
77:16 109:24
geographic 105:5
getting 21:13 46:7 47:1
60:12

give 59:10 82:10 93:19
93:20 100:3 109:12
given 25:7 51:19
104:23 113:6
go 5:11 16:8,23 31:8
41:7,8 46:21 51:24
52:1 59:13 73:15
75:24 76:2,4,10 87:5
97:21 102:14 107:13
goal 14:23
goes 27:14 65:10
going 18:17 25:8 37:21
38:9 42:23 50:7 58:3
58:5,6,7,24 62:24
65:22 81:1,22 87:7
88:23 91:12 102:3
106:18
good 13:22 16:23
19:23 37:5 45:12
46:5 59:5,16 95:18
95:20
goodbye 8:11
gotten 62:8 91:14
grants 71:9,12 96:4
great 46:21 86:18 94:3
gross 48:24 49:8 65:4,5
65:11,15,21 66:12
67:8 75:21 77:18
78:16
ground 5:12 37:13
grounded 20:3
guess 41:12 52:12,15
52:16 64:8 82:22
86:3 105:12,14
guy 19:14 37:6,7,7
96:20 102:10
guys 7:3 36:11,16 37:1
37:6 45:10 95:19

**H**

H 3:9
hair 36:8
half 83:15
halt 33:23
hand 23:23
handle 9:8
handled 12:17
handles 12:24 20:9
handling 66:14,20 67:2
happen 33:20 81:23
happened 58:18
happens 30:15
happier 14:22
happy 32:10 37:2
72:23 73:15
harmoniously 78:2
headache 37:9
held 1:13
help 45:14,22 46:21,21
82:18,19 98:19 99:5
helped 95:14
hereunder 67:18
Hesse 2:9 3:7 4:18
26:12 31:14 41:4
44:11 52:12 53:7
76:20 83:8,12 85:22
86:4,7,11,17 87:2,9
88:23 92:1,13,20,23
106:10,17 107:6

109:19 110:2,8
hey 95:22,23
Hilton 1:13
hold 66:15
Holt 93:8
home 48:3
honest 106:22
hoops 77:22
hopefully 60:13
hour 83:15
house 30:17,18
Hurtado 2:4 3:6 4:8,12
4:20 26:15 27:2
31:20 41:8,10,16,17
44:15 52:24 53:15
76:23 77:1 83:10,14
83:21 85:24 86:6,9
86:16,18,19 87:19
89:8,9 92:11,16
93:14 94:7 106:14
107:1 109:22 110:4
110:11
hymnal 58:12
H-o-l-t 93:9

**I**

IBM 2:4
Idaho 93:12
idea 45:13 46:5 59:5
72:17 94:10,12
104:14
Illinois 1:1 2:5,10
107:19 108:2,3
important 34:4,10,11
34:12,18,21 51:20
108:20,21,22
impose 71:3
impression 101:13
improve 94:20
include 67:1 69:17
70:3,21,21 71:8
included 21:19 38:23
68:13 100:12
includes 88:11
including 12:18 20:22
20:24 21:12 66:20
69:11
incorporated 10:23
11:1 28:16
incorrect 20:18
incorrectly 21:9
increasingly 46:7 47:6
indemnification 50:2
50:20 51:8 52:22
68:22 79:9
indemnify 67:14,24
68:8 69:8,18
indemnifying 68:6
independent 11:16
36:12
independently 23:15
indicated 14:5 58:16
indicates 64:23
industry 66:24
infomercial 12:18 14:2
23:9 29:3,13,21,22
53:10 68:16 96:15
100:7,10,16 101:16
101:24 102:4,5 105:2

105:24 109:15
infomercials 9:10 23:5
23:16 38:2,8 98:16
103:5
inform 105:22,23
information 109:24
110:2,5
informed 102:23
ingredients 100:13
initial 63:17 66:18
90:11
initially 81:20
initials 90:7
initiated 60:19 69:13
69:19
input 15:11 50:23
instances 15:8 95:13
97:3
instruct 78:20
interest 11:7
interested 84:12
interesting 97:23
intervene 45:8,14,16
46:1
intervened 46:4
investigation 69:12
involved 18:13 36:20
44:17,21,21 46:15
57:13 62:9 63:14
64:18,19,19
issue 6:11 18:23 25:22
48:18,22 49:12,13
65:24 89:7 106:11
issues 8:1 51:7 52:8,10
52:15,18 53:3,5 60:9
80:4
item 66:8
iteration 62:15
i.e 12:22 38:4

**J**

J 2:4
jam 72:19
January 47:15 48:20
49:11 51:6 52:6
53:23 54:21 55:14
56:13 60:6 62:2,5
69:16 97:15,20 99:17
Jenner 2:3 54:1
Jersey 1:19 93:9
JFK 1:23
Jim 99:16
job 14:20,21 19:21,24
joins 37:12
Jr 1:7 11:24
judge 5:16
jump 77:22
jumped 101:18
jurisdictions 105:6

**K**

keep 32:24 35:4 36:7
keeps 16:14 36:24 37:1
Kevin 1:3 21:21 22:9
22:18,22 23:1,18,23
37:21 38:7 40:16,21
41:13,15,24 42:7,15
42:22 44:4 45:20
46:9 47:5,23 50:1,17

50:18,21 51:10 52:21
54:9 55:19,21 56:24
58:3 60:14 64:11
68:6,18 69:18 72:14
72:20 73:8,20 74:1
82:13,17 104:17
Kevin's 22:11 66:17
kind 36:23 45:2 50:19
50:19 59:19 102:11
King 1:14 8:19 9:11,13
9:19,24 10:7,10 11:4
14:20 18:16 19:6,14
19:18,21,23 28:16
30:1,9,11 31:22 32:4
32:14,16,18 33:10,12
33:17 34:10,18,21
35:6,22 53:20 56:12
63:1,19 64:6 82:4
94:15 95:18 96:2
105:20,21 107:18,22
knew 80:10
know 5:24 6:7 18:23
20:6 21:3 22:4 24:10
32:21 36:18 37:12
39:7 41:9,21,23
42:20,21 48:2 53:1
58:23 64:22 79:13,14
79:14,15,24 80:3,5
80:10,12 81:10 84:10
86:17 87:24 89:20
90:5 93:22 94:1,15
94:18,21,23,24 95:1
96:10 97:19 98:15,24
102:15 104:12,12
105:5,10 108:9,11
109:8,9
knowledge 87:4 105:15
105:17 107:21
knows 94:2
KT 39:10,14 40:6 42:2
43:1 74:1

**L**

L 93:4
label 100:12
lack 34:18 87:4
language 48:24 80:2,3
late 69:16
law 55:24
laws 70:12 95:9
lawyer 56:2,9,9 75:6
78:23 87:8
lawyers 51:4,21 82:23
LAWYER'S 1143
lead 75:6
learned 17:13
leaves 66:2
left 81:6
legal 26:14 31:16 42:13
49:20 50:11 67:16
69:11 70:10,16,17
81:9 83:1,4
legalese 98:12
legally 76:7
length 53:2
lessons 17:14
letter 47:13 53:20 54:2
56:12,22 58:16 74:10
76:4,10 79:3 97:24

98:4 99:15,18 100:23
101:14
letterhead 53:21 56:12
64:6,7 74:11
letters 26:22 55:7 78:7
let's 8:22 24:12 80:13
83:12 99:9 100:1
liability 67:15,24 68:22
69:9,18 103:7 104:21
likeness 71:11,13,21
72:7 96:5
limited 53:8 69:12
LINE 112:4
lines 78:4
list 32:19 45:19 62:19
little 36:10 52:17 83:13
89:24 100:3 102:6
live 44:24 78:1
local 107:14,14,19
109:9
location 47:22
long 5:8 6:9 9:24 16:21
longer 9:21 15:21
look 16:2 17:12 20:23
22:19 24:1,12 26:21
29:24 30:19 38:13
39:3 46:2 48:15 50:6
51:22 61:12 64:8,23
66:17 67:11 70:24
71:2 88:1 97:21
99:10
looked 20:21 54:15
95:16,23
looking 49:14,18 50:9
71:14 72:21 73:18
74:1 76:21 86:20
looks 13:22 88:3
lot 37:9 57:2
loud 71:2
lowered 91:17
lowest 16:3
lunch 8:10

**M**

making 24:16 26:3.
27:12,23
manage 15:15
management 9:2 12:17
manufacturer 12:19
16:18 18:1,3 90:23
91:8
manufacturers 15:23
16:13 91:20 93:20,23
Manufacturing 93:8
March 1:10
margin 86:23
MARIA 1:16 111:14
marked 11:20 47:12
53:17 56:11 74:8
77:3 83:23 86:11
99:13
market 13:23 19:9
29:2 107:15 108:10
marketer 103:5
marketing 1:6 8:20,23
9:2,9 11:12 12:16
14:2 22:10 59:17
61:1 62:20,21 63:3
64:12,13,16 74:15

83:2,3
Marketing's 8:23 9:1
markets 59:13 107:14
108:3
materials 99:21
matter 25:11 95:6,10
111:8
mattered 63:11
matters 35:24 36:3
Maxum 93:18
McGraw 61:6,20 74:11
mean 9:4 34:21 36:14
51:18 55:9 91:17
94:18 104:22 105:12
106:12,22
meaning 88:20 105:19
means 9:5,6 23:1 24:1
111:20
media 8:19 9:12,13,19
10:1,8,10 11:4 14:20
19:4,6,8,14,14,15,18
19:21,23 28:16 30:1
30:9,11,12,21 31:19
31:22 32:4,14,16,18
33:10,10,18 34:6,10
34:18,21 35:6,14,17
35:20,22 36:1 53:21
56:12 63:19 82:5
94:15 95:18 96:2
105:20,22 106:7
107:7,10,18,22
Media's 33:13
meet 7:8
meeting 7:13
memoranda 57:7
memorandum 47:14
47:23 57:17
mention 20:1
mentioned 15:4 100:15
mentions 13:9
merry 73:16
message 39:4 43:6,12
80:23
Michigan 2:10
mind 92:18 104:9.
Mine 83:2
ML 12:16
money 37:21,22
Monte 61:6,20 74:11
month 80:7
morning 11:20 12:8
46:14 54:8,11 58:21
move 60:18 61:7
moved 45:23
moving 47:6 57:9

**N**

N 1:16 2:2,10 3:3,11,11
93:4,4 111:14
name 4:10,12 29:19.
40:17 71:10,13,21
72:7 93:17 96:5
nature 71:18,20,22
necessarily 34:20
need 6:5,6 31:5 45:1
66:13,14,15 68:12
needed 36:20,22
needs 17:10 31:6 50:6
50:10 104:15

negative 46:10
negotiate 9:17 18:17
82:15 108:15,24
negotiating 44:17
46:15 109:1
negotiations 56:23
61:7 76:14 77:8,11
77:12,14
Neil 40:20 41:14 42:21
43:16,16 55:3 73:24
neither 102:4,8
net 48:24 49:9 65:16
65:21 76:1,7,9 78:24
79:2
nets 76:12
never 63:24 81:12
82:19 104:8
nevertheless 18:1 60:2
new 1:18 51:12,14 93:8
100:6,7
nice 59:22
night 7:10
non-competitive 32:24
non-producer 103:6
NORTHERN 1:1
Notary 1:19 113:17
notations 90:4,7
note 37:20 38:5 39:8
43:1 54:8 57:14
62:19 79:6 101:11
noted 111:5 113:9
notes 86:23 88:22
111:7 114:3
notice 20:7 70:14
number 9:5 11:21 16:4
28:13 29:6 38:11
47:13 49:15,18,19
51:13 54:14 74:8
75:18 76:21,23 77:4
77:19,21 78:7 85:6
86:21 90:8
numerous 19:22 79:20

**O**

o 3:11 40:20 93:4
oath 5:15,17
object 26:12 31:14
41:5 87:3 92:2
objection 44:11 88:24
89:7
obligated 18:4,7
obligation 22:19 24:22
25:1,3 26:7,9
obligations 14:10,12
67:17
obviously 23:21 40:20
43:22
occupation 8:18
odd 102:7 103:11
off-the-record 83:19
oh 7:19,24 84:10 86:6
86:9 101:19
Olympics 93:13
once 23:20
ones 27:17,18,19
ongoing 15:16
open 48:18,22 49:2,4,7
49:12,13 66:8
opinion 55:20 80:8

opportunity 82:11
opposed 65:15,20 66:1
oral 1:12 13:15 14:11
91:10,12 92:24
order 34:3,13 70:15
orders 12:20 27:18
90:19,24
organizations 10:4
other's 36:7,24
outlet 19:9
outlining 60:11
overall 9:23 14:23
59:19
owes 22:2,22
ownership 10:12,18
owns 37:15

**P**

P 2:2,2
package 15:15 59:14
packaging 9:7 12:20
page 3:4,10 35:5 38:17
45:10 50:10 67:12
112:4
pages 45:20 51:11
113:4
paid 14:13 20:15 21:12
21:15,16,18,21,22,7
22:17,18 23:3,8,13
23:22 38:6 66:19
paperwork 20:23
paragraph 12:12 13:4
13:7 15:5 20:8 24:12
26:2 30:1 48:16 64:9
64:23 66:4 67:12
68:21 69:2,22 70:8
71:1,14,17 75:18
part 9:22 20:8 27:24
39:4 63:12,12 104:4
parties 31:22 57:21
60:5 72:23 84:13
85:3 90:11
parts 75:4,5,5
party 31:22 62:21 63:1
63:4,14,23 64:4,16
75:10,13
passing 43:5,12
pay 27:4,9,20 45:11
65:3,14 76:6
paying 20:17 27:12
payment 13:1 20:10
23:17 40:19 67:3
payments 22:21 24:17
24:23 26:3,10,23,24
27:13,24 28:2,8 38:4.
peacefully 78:1
pending 6:9
Pennsylvania 1:15,23
10:23 11:4
people 36:12 67:4
95:14 96:15 101:20
103:17
percent 22:14 39:13,20
40:9 42:5 43:19
48:17 49:5,6 65:4,21
66:11,19 74:2 76:6,9
76:12 78:24 79:1
percentage 10:18
48:21 49:3 66:3,8

perform 22:3
performed 12:24
performing 32:2,4
period 81:4
person 44:8 47:3
  103:12
personal 71:22 87:4
perspective 35:7
pertaining 49:17
Petersen 61:6,20 62:8
  74:13,24 76:3,14
  77:2 78:10,14 79:16
pb 93:18
Philadelphia 1:23 58:8
phone 58:2
phrase 5:22
phrased 25:14
pick 78:10 81:10
piece 14:3
Pike 1:14
place 37:11 58:14,15
  91:10
Plaintiffs 2:7
play 9:22 58:1
playing 16:15
Plaza 2:4
please 4:9 5:24
point 18:20,22 24:4
  49:15,18,19 50:10
  52:16 55:1 56:5
  57:17 60:3 62:7
  65:13 66:6 67:22
  69:15 70:2 72:4 78:5
  92:18 93:1,2 101:19
pointing 86:1
points 51:3,14 56:7
  60:12 87:17 88:18
policed 36:2
policeman 33:11,14
  34:6 36:23
polite 98:13
portion 72:1
posed 75:10
posited 51:17
positively 84:18
possible 14:18 46:12
  106:9 108:1,8,9
potential 108:14
potentially 18:15 91:12
power 15:3
practically 99:2
practice 66:23
precise 76:8
premarked 28:12
  38:10
prepare 6:21 7:1 75:3
prepared 74:24
present 105:1
presently 91:19
president 8:19 10:3,13
pretty 37:5 43:4,5,8,11
prevent 72:6
prevented 78:14,19
previous 98:7
previously 11:20 47:12
  53:17
price 16:3 25:6 91:17
  94:3
principals 31:12

prior 7:9 63:21 75:22
  80:15 88:21 103:20
privilege 6:12
privy 89:1
probably 20:2 42:1
  63:6 83:1 88:18 94:5
  96:1 106:7
problem 68:5 75:15
problematic 106:6
problems 46:4 50:16
  53:11
proceeding 77:9
proceedings 69:11,13
  69:19 111:5
process 27:14
processing 12:20,23
  27:18
produce 38:7 101:18
produced 69:7 101:15
  101:21 102:4,9,10
  103:17 106:9,16
  110:1
product 9:2 12:19,21,
  15:14,15,24 16:6,17
  16:24 17:18 18:2
  20:17 24:8 25:7,7,9
  25:10 59:14 67:5,19
  68:16 90:18 91:7,19
  94:9,17,20 95:22,24
  100:14,16
production 95:18,19
  96:21 98:17
productive 57:9 60:18
products 9:7,15 21:17
Professional 1:17
profit 14:4 76:1
profited 22:20
profits 14:6
profusely 59:20
program 14:16,21 15:1
  15:16,16 33:23 34:14
  36:4,20 37:12 73:24
programs 30:3 33:20
  36:22
project 18:13 73:23
properly 59:15
propounded 113:7
prospective 48:11
protect 82:24
protective 92:24
provide 35:16,19
provided 77:2
providing 78:15
provision 67:23 69:17
  70:3,21,22 71:9 72:5
  78:15
provisions 79:8 80:17
Pro-Tec 91:3,5,9,13,14
  91:21 94:1,8,13
Prussia 1:14
Public 1:19 113:17
purchase 15:23 16:17
  17:17 18:2 19:4,8
  35:20
purchased 90:20
  107:19,22 109:5,10
purchases 12:23
purchasing 12:18
  35:14,17 36:1

purports 102:16
purpose 57:19
pursuant 4:15 12:15
  14:10
put 22:21 31:9 37:11
  98:12 106:15
putting 65:20 101:14
p.m 1:15 110:14

─── Q ───
quality 16:4 17:1
question 5:22 6:9,10
  19:1 21:8,9,14 25:24
  26:6 31:11 32:1,7
  40:23 42:16 43:10
  44:5 48:23 52:4,5
  55:13 64:15 89:24
  106:13
questions 5:20 6:15
  51:24 92:10 95:4
  106:11,19 109:20
  113:6
quick 71:2 99:9
quickly 21:4 33:22
  59:23
quite 28:5 52:6
quote 20:21 66:12
quote/unquote 81:24

─── R ───
R 2:2 111:2 112:2,2
ran 108:6
rate 48:21 49:4 66:8
  108:15,24
rates 109:1,3
reach 57:19 108:2
reaches 107:16
read 7:2,6,7 12:14
  25:20 38:5,6 39:8
  71:1 79:7 100:1
  113:3
real 21:4
really 6:23 7:14 63:10
  66:9,22 95:19 104:11
  104:22,23
reason 16:23 30:24
  40:10,24 53:10 57:23
  58:9,12 63:5 64:20
  77:7 78:2 86:10
reasonable 69:6 78:24
  82:16
reasons 17:7
recall 49:22 50:13 64:3
receipt 65:5
receipts 65:5,11,15
  66:13 67:8 75:21
  77:18 78:17
receive 89:3
received 54:8 55:3
receives 14:1
receiving 100:4
recognize 54:2 99:18
recommendations 20:2
recommended 96:16
record 4:10 30:2,10,12
  30:12,22 31:17 52:13
  52:17 86:15 106:16
  110:10
reduced 94:3

reference 49:24
referred 102:22
referring 13:15 38:20
  38:24 48:10 49:23
  50:14 53:4 56:23
refers 54:14 68:22
reflects 57:2,3
refunds 66:15 67:3,4
regard 17:15 18:3
regarding 7:16 8:5
  17:17,24 38:3 50:15
  50:17,20 51:7 79:8,9
  80:16 105:23,24
  110:5
Registered 1:17
regulations 51:9
relate 103:24
related 17:11 73:23
relates 29:12 34:7
  36:19 102:18
relating 44:19 48:12
  99:22
relationship 10:7 40:21
  41:14,19,24 42:1,7
  42:12,21,24 43:23
  44:3 46:10 68:15
relatively 29:20 37:1
remember 37:24 48:1
  48:4 84:17,18
removal 79:18
removed 36:5 75:12
  79:10
rephrase 5:24 55:12
report 59:20 106:3
  109:12,16
reporter 1:17,18
  111:22
represent 4:13 84:20
  85:5
representations 50:5
  50:22 68:10
representative 67:18
representatives 55:21
  72:15 73:9
represents 31:23
reproduction 111:20
request 16:19,21 19:10
  71:5 94:19 97:9
  106:15,18,20 109:23
requested 94:22 97:5,7
  100:20
requesting 94:16
require 16:7
requires 22:6
residents 108:3
respect 9:9 15:3,14
  19:24 23:8,14 26:1
  49:20 50:21 52:23
  67:19 100:23 107:11
respond 44:7
responded 43:24 44:2
response 7:7 59:16
  96:18 100:23
responsibility 27:4
responsible 24:16 26:2
  27:23 68:14
restate 109:23
resulting 90:19
retained 98:15

retaining 78:15
return 67:5
returns 66:16
review 54:10 98:15,19
  100:9,19 101:6,24
  102:8,13 103:14
reviewed 49:19 50:11
  51:3 95:7,24 96:15
  103:20
Reviewing 61:14
revision 62:12
Richey 93:19 95:1
rid 60:12,17
right 8:2 10:15 11:15
  12:5 13:9 23:11
  25:24 27:21 34:17
  36:15 38:9,18 39:14
  39:16,21,24 40:2
  41:10 43:7,9,21,24
  44:5 49:14 51:5
  52:11 54:17 56:4
  58:18 60:21,23 63:21
  68:24 71:10,13 72:7
  74:3 75:2 77:6 79:17
  86:20 91:16 95:3
  96:5 97:16 99:14
  102:12 110:9
Robert 1:4 20:16 21:3
  21:10 49:21
robust 62:17
royalties 13:1 20:10,15
  21:13,15,19,22 22:7
  22:17,18 23:7,14,19
  23:21,22 24:4,7 27:5
  27:9,20 38:4 45:11
  75:20 76:1 77:17
  78:16 88:12
royalty 20:23,24 22:21
  22:24 23:2 24:17,23
  25:12,13 26:3,9,23
  26:24 27:13,23 28:2
  28:8 40:16 48:17,21
  65:4,14 67:2
RPR 111:14
rules 5:12 37:13
run 30:16,19,20 32:20
  32:22 33:3,4 36:11
  45:10 106:3 109:12
running 14:16 33:2
  88:24

─── S ───
S 2:2 3:9
sale 17:3 21:22 68:15
sales 12:22 23:8,14
  66:19
sanctity 36:3
sand 78:5
Sant 39:4 40:11,20
  41:15,21 42:22
Sant's 40:18
satisfactory 65:23
satisfied 14:14
satisfy 70:16
Saturday 96:14
saw 21:11 36:21 37:19
  39:2
saying 24:6 31:6 74:1
says 12:15 18:12,20

20:9,22 22:12 23:24
24:13 27:22 28:16
30:1 37:20 39:9,14
39:18 40:19 48:6,16
49:18,19 54:7 64:10
76:5,12'88:11,14,14
100:1 102:19
screaming 34:24
second 22:2,23 48:16
60:10 61:17 67:12
88:15
secure 17:2,4
see 21:11 32:11,13
33:24 45:22 48:18
56:14 62:1 63:9,22
72:2 78:23 84:24
85:14 97:21 100:13,
108:6,19
seen 12:2 33:19 40:15
47:17 73:23 74:5,20
84:2,11,14
select 16:5
sell 9:6
send 30:16 42:7,8 43:7
43:14 47:23 54:10
81:8 89:3 96:23
97:24
sending 48:7 51:12
sends 30:18
sense 31:16 87:3
103:22
sent 37:20,23 39:23
40:22 42:2 43:1
45:18,20 46:19 50:1
51:10 54:4,9 55:2
57:14 62:13 63:7
80:16 85:8 99:21
sentence 48:6 54:7
71:17 100:2
series 5:20
service 32:3,4
services 1:22 71:22
shape 34:15
Sheet 113:9
SHEFSKY 2:9
Sherman@jenner.com
2:6
shipped 91:20
shipping 12:21 66:13
66:20 67:2
shoot 23:4
short 83:11
Shorthand 1:18
show 12:10 15:2 20:10
22:2,13,23 30:14,17
30:19 32:20,23 37:16
38:10 45:11,21 48:19
51:11 53:16 59:12
69:6 74:6 80:6 81:4
81:16,18 82:3,4,18
83:22 91:1 95:16
96:11,17,23 97:6,8
97:11 98:7,10,19
99:22 100:11 101:21
102:8 103:18,19,20
103:21 104:12,13,15
106:4,4 108:6 109:6
110:6
showing 11:19 28:11

47:11 56:10 60:21
74:7 99:12
shows 22:7 30:5 34:7
39:12 40:8 42:4 43:4
43:19 90:20 106:3
side 50:4 58:1
sides 55:6 68:20
sign 41:1 50:4 60:5
signature 38:17 40:18
48:8 56:16 84:6
85:18 88:2,4,21
89:21
signed 55:15,18 72:10
73:4,20 84:12,18,22
85:3 87:21 88:10,16
90:3
signing 72:6
silly 78:6
simple 52:6
sitting 36:4
situation 32:24 35:2
45:2,15 50:18 72:19
91:15
six 26:22 97:11
slash 40:20
sold 65:6
solely 9:16
solemn 68:19
solution 82:17
somebody 31:6 33:7
34:5 36:4 45:8 50:6
95:21 98:19
somewhat 87:15
soon 22:24
sorry 17:14 45:4 76:19
79:22 86:16 90:21
sort 59:4 60:9 89:23
98:12 106:7
sorts 9:10
source 27:3
speak 7:21
speaking 8:4 78:23
special 16:8 20:4
specific 16:17 18:3
specifically 79:16
100:14 105:7
speculation 44:12
speed 59:23
spellings 93:21
spirit 57:12,24
split 14:6
spoke 7:18 101:12
spoken 7:15
sprung 50:19
standard 29:18,20
66:23 67:6
standing 89:6
start 8:22 11:18 33:22
51:22 80:13
started 51:12 97:10,17
102:6
starting 71:16
starts 71:17
state 4:10 70:12 95:8
107:17
stated 46:13 52:20
statement 24:19 26:1
30:7,8
statements 13:4

states 1:1 69:23 105:10
106:4 107:8,11 110:5
station 31:8,8 33:2,4,5
107:15,16 108:7
stations 31:3 34:22
107:8,20,23 108:2,10
109:5,10,13,14,14
status 59:20
step 36:5
steps 69:6
Stern 1:13 3:5 4:2,9,11
6:20 11:19 28:12
37:15 53:1,24 55:24
56:10 89:10 90:16
99:12,16 107:7
Steve 93:18
stop 96:11 97:6,8
strategies 9:23
street 46:19
stuff 51:23
subject 69:3
submitted 12:7
subpoena 4:15,17
subscribe 108:7
Subscribed 113:13
subscriber 108:12
subscribers 108:18
subsequent 61:19
substance 8:13 113:8
substantive 8:14,16
successful 46:11
succinctly 59:24
suggests 22:16
Suite 2:10
supervision 111:22
supplied 91:8
supplies 90:23
supply 35:13
Supreme 90:18
sure 5:12 6:3 14:13,14
14:15 16:2 17:21
47:10 58:10 68:12
77:23 84:10 85:21
99:11,11 106:2
survive 34:14
sworn 4:3 113:13

T
T 3:9 93:4 111:2,2
112:2
take 6:4,10 9:14 34:9
34:14 46:2 47:17
58:13,15 62:7 69:5
70:24 71:2 83:8 99:9
taken 5:1,6 111:7
talent 48:7,11 50:1
61:2 64:10 65:3,7
67:15 69:3,9,23
70:16 71:12,22
talent's 70:9,13,16
71:21
talk 106:20,23 110:9
talked 32:3 78:22
81:12
talking 31:16 50:2
53:12 58:11 97:10
110:3
television 9:17 109:10
tell 8:17 18:7 21:4

28:22 37:4 108:17
telling 18:21
Ten 10:2
term 65:2
terms 14:24 17:3 22:20
59:11,12,13 92:4
testified 4:4 31:19 53:2
89:11
testify 19:23
testifying 53:6
testing 59:14
thank 48:6
thanked 59:20 98:5
Thanks 76:24
thereabouts 60:4
therewith 69:10
thing 34:4 45:22 57:14
59:4 76:3 87:7 106:7
things 9:6 38:3 42:18
59:16 60:19 77:20,22
95:17,20
think 6:14 11:3 13:22
22:10 26:17 37:24
40:4,5,13 41:11 42:6
42:19 43:16 46:18,19
46:23 48:16 52:3
53:12 54:16,24 59:2
61:4,8,15,18,22
62:10 65:23 66:9,21
67:5 76:20 77:10
79:6 80:8 81:22
82:12 83:14 92:1,8
95:15 98:11 106:5
thought 17:19 46:5,10
47:2 51:2,19 59:5,21
82:16 102:7 103:19
104:24
three 93:20,22
time 5:7,8 9:17 17:5
19:5,8,19 35:11,11
35:14,17,20 36:1
45:12 58:15 60:3
65:14 67:22 69:16
70:2,20 72:4,9 73:5
75:19 77:15 78:5
97:13 107:8,19,23
108:23 109:2,5
title 9:14
TM 61:1
today 4:15 5:15 7:17
8:9 109:17
told 58:20 91:3 101:17
top 28:16 39:4 61:1
Trade 69:4 95:8
traffic 33:8 34:5
transcript 111:9,19
transcription 113:5
Triad 8:20,22,23 9:1
9:21,21 10:7,9 11:3
12:16,16,24,24 13:10
13:18 14:1,19,24
15:7 16:2 18:16 20:9
22:9 24:14,16 26:2,8
27:1,22,22 35:19,21
36:1 57:1 61:1 62:21
62:23,24 63:1,3,9,14
63:15,18,22 64:4,6
64:13,16 74:14 75:9
75:12 94:15 95:19

96:3
Triad's 14:10
tried 45:9 57:11 59:10
76:7 77:11 78:6
Trudeau 1:3 4:13 7:18
21:21 22:1,5,9,13
23:4,13,24 40:12,21
41:2,2,15,20,22
42:15,22 43:6,13,14
44:4,18,23 47:14,24
48:12 52:22 54:23
55:16,19 56:24 58:20
58:22 62:13 64:12
67:24 69:18 70:5
71:9 72:6,11,14 73:6
73:8,20 76:5,11,16
77:23 80:1,15 81:1
81:15,17 96:4,7,8,9
96:12,16 97:4
Trudeau's 23:18 60:14
true 26:5
try 6:7 19:17,24 45:13
45:14,22 57:15,24
59:4 72:17 78:10
81:9 82:23,24
trying 28:4 32:23
44:21 46:24 55:8
57:3,13 58:1 59:11
59:13,14 60:8 62:16
67:10 68:19 98:12
turn 12:11 89:24 99:5
turned 80:19 82:21
twenty-minute 60:1
two 8:21 10:12 23:4
38:1,7 39:12 40:8
42:4,18 43:3,19 46:6
69:24 70:5 87:17
88:17 91:12 100:10
107:13
two-way 46:18

U
uh-huh 10:21 11:22
12:1,13 20:13 28:14
39:6,17 41:16 43:17
47:7 50:12 53:14,19
53:22 54:20 65:1
67:13,21 69:1 71:15
71:19 75:8 85:11,16
97:2,17 101:4 104:18
107:1
Uh-uh 48:9 56:3
ultimate 17:16 57:18
ultimately 15:13
unbridled 82:10
unclear 52:18
understand 5:14,23
6:1 31:10,13,24 32:6
42:10,17 49:22 55:9
understanding 26:21
41:19 54:12 59:10
81:13 103:3
understood 16:22
unfortunately 58:22
77:13
unique 16:8 71:18,20
UNITED 1:1
unquote 66:12
unreasonably 70:18

unsuccessful 78:11
unusual 16:10 98:5,10
unwilling 55:4 77:13
  81:3 82:15
use 17:8 71:10,13 96:5
Utah 93:14,15,16

**V**

Valley 1:13
variety 17:7
vend 16:1
vendor 16:5 17:5,8,12
  17:13 91:11
vendors 14:13 16:4,23
  91:5,13,24 93:7
venture 15:12
version 48:19 85:8
versus 31:17
videotapes 95:6
view 37:14,18 89:11
violation 70:11,13
voicemail 80:22 81:6
  81:23
volition 51:1
voluntarily 4:22,23
vs 1:5

**W**

wait 92:14
want 17:8,12 31:1 32:9
  34:22 53:8 67:5 68:7
  76:18 81:2 83:8,10
  92:2,14 93:11,18
  95:15,22,23 96:19
  105:13
wanted 37:10 66:18,18
  72:5,22 81:15,17
  84:8
warranties 67:19
wasn't 47:1 50:7 57:9
  81:6 104:3
way 21:11 25:20 33:5
  35:4 36:24 52:1
  55:23 70:11 94:8
  98:13
ways 73:16 107:13
week 39:11,16 40:1,7
  42:3 43:2 63:13
weekend 97:1
weeks 45:20 62:11 74:5
  97:11
welcome 7:11
well-respected 19:15
went 76:3 87:11 104:8
West 93:17
we're 32:23 53:12 93:7
  108:24
we've 17:13 87:3
whatsoever 50:24
  69:11 104:14
willing 17:9 65:14
  67:23 69:17 70:3,21
  71:8 75:19 76:6 82:7
  82:9,14
willingness 17:11
  60:15,16,17
wisdom 17:24
wish 45:19
withhold 70:18

witness 3:4 4:19 26:17
  31:18 41:9,11 44:13
  52:19 53:14 71:4
  87:6,10 89:1 92:9,21
  93:6,15
wonderful 103:19
word 31:17
words 25:8 35:12
  80:24
work 34:4 46:24 57:13
  107:12
worked 34:15 37:5
works 48:19
worse 25:9
wouldn't 40:22 43:1
write 9:7
writes 76:8
writing 88:1
written 13:12 22:5,8
  26:19 39:15,23 54:22
  55:15,18 57:20 60:5
  70:14 72:11,13 73:5
  88:22 90:12
wrong 61:4 104:13
wrote 61:23 63:7
  100:11

**X**

X 3:3,9

**Y**

yeah 8:3 10:13 44:13
  49:6,24 50:15 54:18
  62:23 63:10 66:5
  67:10 71:12 77:5
  82:6 83:10 86:7,7
  88:7 97:7 107:1
year 5:10
years 10:2 15:21
yelling 37:8

**$**

$12,500 22:2,22 23:20
  23:24 24:9
$25,000 22:13 23:3
  38:2,6 39:19 43:18
  74:2
$4.32 20:22,23 21:13
  21:18
$5 88:15

**0**

02 1:3

**1**

1 38:11
10 48:20 49:15,18,19
  69:2 83:23 85:6
  86:21 87:20 88:3
10th 47:15 49:12 51:6
  52:7 97:15,20
107 3:7
11 69:22
12 50:10 70:8
12.5 23:19
13 12:12 15:5 20:8 71:1
14 50:10
15 71:14

15th 1:23
1586 1:3
16 53:23 55:14 99:13
16th 54:21
17 24:12 26:2
18 85:9
1880 1:23
19 103 1:23
199 113:15
1996 9:23

**2**

2 38:14,14 47:13 54:14
  54:17
2001 56:14 60:4
2002 1:10 47:15 48:20
  51:6 52:7 53:23
  54:22 55:14 62:2,5
  69:16 85:10 99:17
215 1:24
22 56:13
22nd 60:4
222-9350 2:5
25 1:10
25K 23:17 39:12 40:8
  42:4 43:3
2500 2:10
28th 99:17
29 62:2,5

**3**

3 30:1 53:18 64:23
  75:18 86:10,13,14
3:20 1:15
312 2:5,11
37 25:10

**4**

4 3:6 25:10 56:11
4.32 88:15
4:52 110:14
444 2:10

**5**

5 60:22 76:21,23 77:4
  77:16
54 25:10

**6**

60610 2:10
60611-7603 2:5

**7**

7 74:8
75 25:10

**8**

8 28:13
836-4015 2:11

**9**

9 11:21 67:12 68:21
  85:23 86:5,8,14 88:2
  90:8
988-9191 1:24