UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FEDERAL TRADE COMMISSION,

       Plaintiff,

    v.

NATIONAL UROLOGICAL GROUP,
INC. d/b/a WARNER LABORATORIES
et al.,

       Defendants.

CIVIL ACTION

NO. 1:04-CV-3294-CAP

**O R D E R**

This matter is before the court on the following motions: (1) the defendants' motion for summary judgment [Doc. No. 168]; (2) defendant Hi-Tech Pharmaceuticals, Inc.'s ("Hi-Tech") motion for summary judgment [Doc. No. 170]; (3) the plaintiff's motion for summary judgment [Doc. No. 172]; and (4) the defendants' motion to strike the declaration of Jennifer A. Thomas [Doc. No. 214].

## I.  Case Overview

### A.  The Plaintiff

The Federal Trade Commission ("FTC") is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC is tasked with enforcement of the Federal Trade Commission Act (the "FTC Act"). The FTC Act prohibits unfair or deceptive acts or practices in or affecting commerce. 15 U.S.C. § 45(a). The FTC Act also prohibits false advertisements for food,

drugs, devices, services, or cosmetics in or affecting commerce. 15 U.S.C. § 52.

To aid its enforcement of the FTC Act, the FTC has promulgated regulations that require advertisements: (1) to be truthful and not misleading, and (2) to be supported by adequate substantiation for product claims prior to dissemination. The FTC refers to a violation of the former as a "falsity claim," while a violation of the latter requirement is a "lack of reasonable basis ("LORB") claim."

## B.  **The Defendants**

Defendants National Urological Group ("NUG"), National Institute for Clinical Weight Loss ("NICWL")[1] and Hi-Tech (collectively, the "corporate defendants") are corporations that are or were marketing, distributing and selling weight loss and/or erectile performance dietary supplements under the brand names Thermalean, Lipodrene, and/or Spontane-ES. Defendants Jared Wheat and Thomasz Holda are or were officers and shareholders of NUG and Hi-Tech, and were officers and shareholders of NICWL prior to its dissolution. Defendant Stephen Smith is or was an officer and shareholder of NUG, and was an officer and shareholder of NICWL before its dissolution. Defendant Terrill Mark Wright, M.D., is a

---

[1]     NICWL dissolved in 2004.

-2-

medical doctor who promoted the dietary supplements at issue in this case.

### C.   <u>**Brief Synopsis of Facts**</u>

According to the defendants, the FTC began investigating their advertising practices in May of 2002.  During the course of the investigation, the FTC requested from the defendants the substantiation for their advertising.  The defendants allegedly complied and provided the FTC with substantiation based on each individual active ingredient in their dietary supplements ("ingredient-specific substantiation"), as opposed to substantiation based on the product as a whole.

While the FTC investigation was ongoing, the United States Food and Drug Administration[2] ("FDA") filed a complaint for injunctive relief against the corporate defendants and Wheat in his individual capacity (collectively, the "FDA defendants"), alleging that they introduced misbranded drugs into commerce.  Not long after the suit was filed, the FDA defendants entered into a consent decree with the FDA (the "Consent Decree").  The Consent Decree

---

[2]   The FTC and the FDA work together under an agreement governing the division of responsibilities between the two agencies.  As applied to dietary supplements, the FDA has primary responsibility for claims on product labeling, including packaging, inserts, and other promotional material distributed at the point of sale.  The FTC has primary responsibility for claims in advertising, including print and broadcast ads, infomercials, catalogs, and similar direct marketing materials.

regulates the FDA defendants' behavior along three pertinent veins. First, before the FDA defendants can sell a dietary supplement that is not considered a drug, the Consent Decree requires them to retain an independent expert to inspect their product labeling, including their promotional materials and internet web sites, and certify to the FDA that the FDA defendants are not making drug claims for their products. In addition to the independent expert's report, the FDA defendants must submit to the FDA a written report that details, among other things, the actions they have taken to comply with the FDA Consent Decree. After this, the FDA defendants must await the FDA's approval to resume or initiate operations. After resuming sales, the FDA defendants are prohibited from "directly or indirectly introduc[ing] or deliver[ing] for introduction into interstate commerce, or directly or indirectly caus[ing] the introduction or delivery for introduction into interstate commerce of, any misbranded or unapproved new drug." Consent Decree, ¶ 4(A) [Doc. No. 168, Ex. I]. Finally, the Consent Decree permits FDA representatives to make unannounced inspections of the FDA defendants' facilities, during which the FDA is allowed to investigate, among other things, all equipment, finished and unfinished drugs and dietary supplements, and all labeling, including promotional materials and internet site information. If the FDA determines that the FDA defendants are not in compliance

-4-

with the Consent Decree, the FDA may take any other reasonable measures to monitor and ensure the FDA defendants' continuing compliance.

On November 10, 2004, months after the defendants entered into the Consent Decree, the FTC filed the instant suit pursuant to Section 13(b) of the Act, 15 U.S.C. § 53(b),[3] to secure injunctive and other equitable relief against the defendants. In its complaint, the FTC asserts that the defendants have violated Section 5 of the Act, 15 U.S.C. § 45(a)[4], and Section 12 of the Act, 15 U.S.C. § 52.[5] Specifically, the FTC claims that the defendants have made deceptive representations to the public in their advertisements for the dietary supplements Thermalean, Lipodrene, and Spontane-ES. The FTC has petitioned this court for injunctive relief as well as relief in the form of consumer redress and disgorgement of profits.

On August 24, 2007, the defendants, defendant Hi-Tech, individually, and the FTC filed cross motions for summary judgment [Doc. Nos. 168, 170, and 172]. On December 13, 2007, the

---

[3] Section 13(b) enables the FTC to seek equitable relief from the district court.

[4] Section 5 prohibits unfair or deceptive acts or practices.

[5] Section 12 prohibits false advertisements for food, drugs, devices, services, or cosmetics affecting commerce.

-5-

defendants filed a motion to strike the affidavit of Jennifer Thomas [Doc. No. 214].

## II. **The Defendants' Motion to Strike the Affidavit of Jennifer Thomas [Doc. No. 214]**

Before considering the parties' motions for summary judgment, the court will address the defendants' motion to strike the declaration of Jennifer A. Thomas [Doc. No. 214]. Thomas is Director of the Division of Enforcement in the Center for Food Safety and Applied Nutrition at the FDA. The FTC filed Thomas's declaration in response to the defendants' motion for summary judgment and Hi-Tech's motion for summary judgment on November 5, 2007. Prior to filing Thomas's declaration, the FTC did not disclose Thomas to the defendants as a party likely to have discoverable information. The defendants contend that the FTC's failure to identify Thomas at an earlier date was prejudicial to their case and a violation of the Federal Rules of Civil Procedure. Accordingly, the defendants request that the court strike her affidavit.

### A. **The Defendants' Motion to Strike Is Denied.**

The courts in this district have repeatedly found that it is improper to strike an affidavit attached to a summary judgment brief. Lentz v. Hospitality Staffing Solutions, LLC, No. 1:06-cv-1893-WSD, 2008 U.S. Dist. LEXIS 6291, at *30-31 (N.D. Ga. Jan. 28,

2008) (noting that Federal Rule of Civil Procedure 12(f) permits the court to strike a pleading, not an affidavit attached to a motion for summary judgment). As this court stated in <u>Lentz</u>, "the proper method to challenge such an affidavit is to challenge the admissibility of the evidence contained in the affidavit." <u>Id.</u>; <u>see also</u> <u>Pinkerton & Laws Co. v. Roadway Express, Inc.</u>, 650 F. Supp. 1138, 1141 (N.D. Ga. 1986) (concluding that a party should file a notice of objection rather than a motion to strike to challenge the admissibility of evidence in an affidavit).

Because a motion to strike is a procedurally improper vehicle for challenging Thomas's affidavit, the court must deny the defendants' motion. However, the court "may only consider admissible evidence when deciding a motion for summary judgment," and the defendants' motion raises important questions regarding the admissibility of the Thomas affidavit. <u>Id.</u> Accordingly, the court, "in the interest of efficiency," will "proceed to assess the admissibility of the challenged affidavit." <u>Spratlin Outdoor Media, Inc. v. City of Douglasville</u>, No. 1:04-cv-3444-JEC, 2006 U.S. Dist. LEXIS 20797, at *13 (N.D. Ga. Mar. 27, 2006).

**B.   <u>The Thomas Declaration is Inadmissible.</u>**

Federal Rule of Civil Procedure 26(a)(1) requires parties to provide initial disclosures including "the name and, if known, the address and telephone number of each individual likely to have

discoverable information . . . that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." By rule, the obligation to disclose pertinent parties is continuing, so that a party must supplement its disclosures or discovery responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). If a party does not "provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

It is undisputed that the FTC neither initially disclosed Thomas as a potential witness nor listed her as a witness in response to pertinent interrogatories. Although the FTC supplemented its initial disclosures in February 2006 to note that an "as yet unknown" FDA representative may have information relevant to the case, the FTC did not further supplement its disclosures in April 2006 when it identified Thomas as the FDA representative that it intended to use as a witness. FTC's First Am. Initial Disclosures, ¶ 3(N) [Doc. No. 118]. In fact, the FTC

did not notify the defendants of Thomas or indicate in any other way that it had identified a FDA witness until it filed her declaration at the end of 2007.

The FTC does not offer justification for its substantial delay in disclosing Thomas as a witness, but instead simply contends that her declaration should be admitted because the defendants were neither surprised nor prejudiced by its failure to disclose her as a witness at an earlier date.  Essentially, the FTC contends that its disclosure in February 2006 that it was looking for a witness was enough to put the defendants on notice of Thomas's potential role in this case.  Moreover, the FTC contends that it was not required to disclose Thomas because she was a "witness used solely for impeachment," and thus was not subject to Federal Rule of Civil Procedure 26.  Fed. R. Civ. P. 26(a)(1).

The FTC's arguments are unconvincing.  First, the fact that the FTC notified the defendants that they were looking for a witness in 2006, without more, does not mean that the defendants were not surprised when such a witness suddenly appeared on the record a year and a half later.  Moreover, the court is convinced that the FTC's failure to disclose Thomas's identity was prejudicial to the defendants.  Thomas's declaration addresses the meaning and effect of the Consent Decree, a topic of critical importance to the defendants' summary judgment briefs.  The FTC's

-9-

failure to disclose Thomas as a potential witness prevented the defendants from deposing her or anticipating her testimony before expending the significant resources required to file their dispositive motions. Such a failure can hardly be considered harmless.

Similarly, this court cannot conclude that the FTC presented Thomas's declaration "solely for impeachment." Impeachment evidence is evidence that is "offered to discredit a witness . . . to reduce the effectiveness of her testimony by bringing forth evidence which explains why the jury should not put faith in her or her testimony." Chiasson v. Zapata Gulf Marine Corp., 988 F.2d 513, 517 (5th Cir. 1993). Although Rule 26(a)(1) does not require a party to disclose a witness that it intends to use "solely for impeachment," the Eleventh Circuit has indicated that this is a narrow exception that should be limited to circumstances where the evidence offered by the witness plays no role other than impeachment. See Cooley v. Great Southern Wood Preserving, 138 Fed. Appx. 149, 161 (11th Cir. 2005) (affirming a district court's decision to exclude affidavits because the plaintiff failed to show that the evidence was offered solely for impeachment).

Here, Thomas's declaration does not simply discredit one particular witness or even a group of witnesses; rather, it is substantive evidence supporting the FTC's defense to one of the

-10-

defendants' key summary judgment contentions.  In their motion for summary judgment, the defendants have argued that the FTC's action is not in the public interest because all of the relief the FTC seeks has already been achieved by the FDA's Consent Decree. Thomas's declaration, which the FTC offered "to clarify many of the facts surrounding the FDA consent decree," provides substantive evidence that the relief the FTC seeks is not redundant and that the action the FTC pursues is in the public interest.  FTC's Resp. to Defs.' Mot. for Summ. J., p. 52 [Doc. No. 195].  This evidence was provided to preserve the FTC's case by demonstrating that there is a genuine issue for trial.  Accordingly, it cannot simply be considered impeachment evidence offered solely "to discredit" the defendants.

The FTC's reliance on Sessoms v. Ghertner & Co., C.A. No. 3:05-0257, 2006 U.S. Dist. LEXIS 29863 (M.D. Tenn. April 25, 2006), is misplaced.  In Sessoms, the defendant, in response to a summary judgment motion, sought to impeach specific deposition testimony by filing declarations of individuals not previously disclosed in interrogatories or initial disclosures.  Id. at *9.  That is not the situation here, where Thomas's declaration is offered to rebut legal arguments and interpret the Consent Decree rather than to simply impeach deposition testimony.

-11-

The court concludes that Thomas's declaration was not offered solely for impeachment, and thus holds that the FTC was not exempt from disclosing her as required by Federal Rule of Civil Procedure 26. The FTC has offered no justification for its year and a half delay in disclosing Thomas to the defendants, and the court concludes that this delay was harmful and inexcusable. Consequently, the court will not consider Thomas's declaration or its supporting exhibits in any summary judgment proceeding currently before the court.

## III. <u>Summary Judgment Motions</u>

On August 24, 2007, defendant Hi-Tech individually filed a motion for summary judgment [Doc. No. 170],[6] the defendants collectively filed a motion for summary judgment [Doc. No. 168] and the FTC filed a motion for summary judgment [Doc. No. 172]. These summary judgment motions will be addressed in turn.

### A. <u>Summary Judgment Standard</u>

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as

---

[6] Hi-Tech also joined in the defendants' collective motion for summary judgment, but filed an individual motion to address a liability defense not shared by its co-defendants.

a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears
the initial burden of showing that there is no genuine issue of
material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323
(1986).  This may be accomplished by showing that the nonmoving
party will be unable to "establish the existence of an element
essential to [the nonmoving] party's case, and on which [the
nonmoving] party will bear the burden of proof at trial."  Id. at
322.

Once the moving party has met its burden, the burden shifts to
the nonmoving party to "designate specific facts showing that there
is a genuine issue for trial."  Id. at 324 (internal quotation
marks omitted).  There is a genuine issue if the combined body of
evidence, viewed in the light most favorable to the nonmoving
party, would allow a reasonable jury to find in favor of the
nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986).  In other words, the relevant inquiry is "whether the
evidence presents a sufficient disagreement to require submission
to a jury or whether it is so one-sided that one party must prevail
as a matter of law."  Id. at 251-52.  When, as here, a district
court is presented cross motions for summary judgment on the same
issues, "[t]he court must rule on each party's motion on an
individual and separate basis, determining, for each side, whether
a judgment may be entered in accordance with the Rule 56 standard."

10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal</u> <u>Practice and Procedure</u> § 2720, at 335-36 (3d ed. 1998) (footnote omitted).

**B.   <u>Hi-Tech's Motion for Summary Judgment [Doc. No. 170]</u>**

Hi-Tech premises its motion for summary judgment on one simple contention: it claims that it did not manufacture, advertise, or market the Lipodrene product at issue in this case and, thus, is not liable on the FTC's allegations.  Although Hi-Tech admits that it has produced and marketed multiple products under the name Lipodrene, it claims that these products are "completely different in look and formulation" from the Lipodrene that its co-defendant, NUG, marketed in the advertisements targeted in this action.  Hi-Tech's Resp. to FTC's Statement of Additional Facts, ¶ 9 [Doc. No. 202, Ex. 1].  Hi-Tech contends that it did not participate in or fund the advertisements for the old Lipodrene or any other product, and thus, cannot be held liable for them.

The FTC argues that Hi-Tech is not entitled to summary judgment because Hi-Tech participated in all of the advertising at issue in this case, particularly the Lipodrene advertisements. Specifically, the FTC contends that Hi-Tech, NUG, and NICWL acted as a common enterprise.  Accordingly, the FTC contends that Hi-Tech should be jointly and severally liable with its corporate co-defendants for all of the advertising at issue in this case.

-14-

1.   **Legal Standard for Finding a Common Enterprise**

"The general rule is that, absent highly unusual circumstances, the corporate entity will not be disregarded." Collier & Son Corp. v. FTC, 427 F.2d 261, 266 (6th Cir. 1970). However, "where the public interest is involved, as it is in the enforcement of Section 5 of the Federal Trade Commission Act, a strict adherence to common law principles is not required . . . where strict adherence would enable the corporate device to be used to circumvent the policy of the statute."   Id. at 267 (making this statement in the context of determining whether a parent should be held liable for the acts of its subsidiary).   Thus, in situations where corporations are so entwined that a judgment absolving one of them of liability would provide the other defendants with "a clear mechanism for avoiding the terms of the order," courts have been willing to find the existence of a common enterprise.  See Delaware Watch Co. v. FTC, 332 F.2d 745, 746-47 (2d Cir. 1964) (affirming a FTC order holding a company liable because it was part of a "maze of interrelated companies" through which "the same individuals were transacting an integrated business").  When corporations act as a common enterprise, each may be held liable for the deceptive acts and practices of the other.  CFTC v. Wall Street Underground, Inc., 281 F. Supp. 2d 1260, 1271 (D. Kan. 2003)(citing Sunshine Art Studios, Inc. v. FTC, 481 F.2d 1171, 1175 (1st Cir. 1973)).

-15-

When determining whether a common enterprise exists, "the pattern and frame-work of the whole enterprise must be taken into consideration."  <u>Delaware Watch Co.</u>, 332 F.2d at 746 (citations omitted).  Some of the factors that courts evaluate to determine whether a common enterprise exists include common control; the sharing of office space and officers; whether business is transacted through a maze of interrelated companies; the commingling of corporate funds and failure to maintain separation of companies; unified advertising; and evidence that reveals that no real distinction exists between the corporate defendants.  <u>FTC v. Wolf</u>, No. 94-8119-CIV-FERGUSON, 1996 U.S. Dist. LEXIS 1760, at *22-23 (S.D. Fla. Jan. 30, 1996)(citations omitted).

**2.  <u>Application of Legal Standard to Facts</u>**

In this case, it is clear that all three companies at issue operated as a common enterprise.  First, all three companies were under the common control of Wheat and Holda, and were at least influenced by Smith.  Wheat served as the president and primary decision maker of all three companies.  He developed all of the products at issue in this case, owned all of their trademarks, developed all of their advertising (or at least provided the information for all of the advertisements), wrote checks for all three companies, made deposits and withdrawals on behalf of all

-16-

three companies, and had the authority to enter into contracts and terminate contracts for all three companies.

Holda likewise served as an officer of all three companies. In that role, he participated in business decisions. Holda also ran the shipping operations for each of the companies and testified that he reviewed the advertisements for errors before they were disseminated.

Smith served as an officer of NICWL and NUG, and served as an independent contractor for Hi-Tech beginning in 2003. In all three companies, Smith served as the employee/independent contractor manager. Smith, like Holda, testified that he reviewed all of the advertisements for errors.

Wheat, Holda, and Smith ran the three companies out of the same office space in an integrated fashion. For instance, Hi-Tech – the only company with its name on the door – assumed the duty of leasing the office space, often served as the addressee and mail distributor for the other companies, and ordered goods on behalf of the other companies so that all of the companies could save money.[7] Similarly, NICWL served as the payroll manager for itself, NUG, and other affiliated, non-party companies. All three

---

[7]     Purportedly, Wheat reimbursed each company for the expenditures that it made on behalf of the other companies. However, it does not appear that the companies were compensated for the services that they performed on the other companies' behalf.

-17-

companies shared in the allocation of a number of indirect costs and expense items, including bank charges, credit card fees, depreciation, and - most importantly - consulting fees for the Thermalean and Lipodrene products. Significantly, the defendants' own expert identified NUG, NICWL, and Hi-Tech as among "five companies [that] have overlapping ownership and [which] incur costs and expenses in relation to [Thermalean, Lipodrene, and Spontane-ES]." Abernathy Expert Report, attached as Ex. 2 to Knight Decl. [Doc. No. 172, Ex. 7].

In addition, the companies worked together to develop and advertise their products. For example, in a related trademark infringement action, Hi-Tech alleges that it worked for years with now-dissolved United Metabolic Research Center, Inc. ("UMRC"), which it ultimately equates with NUG, to develop the original Lipodrene product.[8] Trademark Compl., ¶¶ 14-17, attached as Ex. 1

_____

[8]     Although Hi-Tech does not directly state that NUG and UMRC are the same entity, it essentially concedes this point over the course of its briefing. As noted above, Hi-Tech alleges in a related trademark infringement case that it and its self-described "sister company," UMRC, spent years developing the original Lipodrene product. Trademark Compl., ¶¶ 14-17, attached as Ex. 1 to Knight Decl. [Doc. No. 195, Ex. 30]. Hi-Tech then states, in that complaint, that UMRC marketed the original Lipodrene through mail order until the product was reformulated. Id. at ¶ 17.

        Confusingly, in its brief in support of its motion for summary judgment [Doc. No. 170, Ex. 1, p. 11] and its corresponding statement of facts [Doc. No. 171, ¶ 25], Hi-Tech unambiguously asserts that Warner Laboratories, a division of NUG, marketed the

-18-

to Knight Decl. [Doc. No. 195, Ex. 30].  Hi-Tech goes on to represent that NUG/UMRC marketed the original Lipodrene through mail order until the product was reformulated.  At that point, Hi-Tech, using some of the same advertising materials for the original Lipodrene, began to market the new Lipodrene through wholesale and retail outlets.  Hi-Tech later used - almost verbatim - NICWL's Thermalean brochure to market its new Lipodrene.  Similarly, Hi-Tech also used claims, language, and artwork from NUG's Spontane-ES advertisement to market its male potency product, Stamina-RX.

---

original Lipodrene product and transmitted the income to NUG.  This is consistent with the Lipodrene advertisements attached to the complaint, which reflect that Warner Laboratories was the generating entity [Doc. No. 1, Exs. C-E].  However, this is obviously inconsistent with Hi-Tech's allegations in the trademark infringement complaint and with Hi-Tech's expert's report, which notes that Lipodrene was produced, marketed, and sold by UMRC between January 1, 2001, and March 31, 2004.  Abernathy Expert Report, attached as Ex. 2 to Knight Decl., at NUG 0006331 [Doc. No. 172, Ex. 7].

In the defendants' statement of disputed material facts [Doc. No. 198, ¶ 19], in which Hi-Tech joins, they again confuse the companies, this time noting that NUG sold the original Lipodrene product under the corporate name of Warner Laboratories, which they identify as a division of UMRC.

Finally, Hi-Tech begins to refer to NUG and UMRC as "NUG/UMRC" in its reply brief [Doc. No. 202, p. 5, n.3].  Similarly, Hi-Tech begins to use NUG and UMRC's names interchangeably throughout its Response to the FTC's Statement of Additional Facts [Doc. No. 202, Ex. 1].  If Hi-Tech cannot maintain any distinction between UMRC and NUG in its own briefs, then the court must conclude that the companies functioned as a single entity.

When the operations of the companies are considered as a whole, it is clear that they functioned as a common enterprise. All were controlled by the same primary parties, all used and/or shared advertising generated by these controlling individuals, all worked together to achieve profitability, and all shared costs and expenses in relation to the same products.  Most importantly, if one of these companies escaped liability, it  would afford all three a means for continuing their operations.   The few distinctions between the corporations (i.e., the fact that they maintained separate bank, merchant, and UPS accounts and filed their taxes separately) are superficial in nature and would not, when considered in light of the overwhelming evidence of the corporations' interrelated functions, provide a reasonable jury with a basis to reject the application of the common enterprise theory here.  The evidence compels that the court find a common enterprise; thus, NUG, NICWL, and Hi-Tech should share liability for the advertisements at issue.  Accordingly, Hi-Tech is not entitled to summary judgment here.

C.  **The Defendants' Motion for Summary Judgment [Doc. No. 168]**

The defendants' summary judgment argument is two-pronged. First, the defendants contend that the court should not use the FTC's standards in applying the FTC Act because it argues that those standards are unconstitutional.  Second, the defendants

contend that they are entitled to summary judgment because the FTC is not eligible for injunctive relief under Section 13(b) of the FTC Act.  Because the defendants have requested that the court consider their arguments regarding injunctive relief in the FTC's motion for summary judgment, the court will defer a discussion on these arguments until it addresses that motion.  Accordingly, the court need only address the defendants' constitutional arguments at this juncture.

The defendants dedicate a large portion of their briefing to an argument that the FTC's standards in applying the FTC Act are unconstitutional.  Using a test articulated in <u>Central Hudson Gas & Electric Corporation v. Public Service Commission</u>, 447 U.S. 557 (1980), the defendants argue that many of the standards that the FTC uses to determine whether advertising is deceptive violate the First Amendment.  In addition, the defendants contend that the standards that the FTC uses to review advertisements for violations of the FTC Act are unconstitutionally vague and overbroad.  The court will address these arguments separately below.

### 1.  <u>The Defendants' Central Hudson Arguments</u>

In <u>Central Hudson</u>, 447 U.S. 557 (1980), the Supreme Court articulated a four-part analysis for reviewing whether a regulation governing commercial speech violates the First Amendment.  The court stated,

-21-

At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading.  Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

Id. at 566.  Focusing on the last three elements of this analysis, the defendants claim that the following standards that the FTC uses in determining whether advertising is false or deceptive violate the First Amendment:

- The FTC does not consider proof of intent to deceive or permit a good faith defense when an advertisement is challenged as deceptive;

- The FTC relies on its own facial analysis of an advertisement, rather than extrinsic evidence of consumer perceptions, to determine what implicit claims an advertisement promotes;

- The FTC has not promulgated a trade rule to define what misleading implications flow from specified product claims or descriptions, particularly with respect to advertising containing ingredient specific substantiation; and

- The FTC requires all advertising claims that pertain to a supplement's health related benefits to be substantiated by competent and reliable scientific evidence but does not define "competent and reliable scientific evidence."

The court concludes that the defendants have misapplied the Central Hudson test in this situation.  The test the Court

-22-

articulated in <u>Central Hudson</u> was promulgated to assist courts in determining whether a regulation that limits protected commercial speech is constitutional.  Here, the defendants do not attack any particular regulation restricting speech; instead, the defendants attack the guidelines the FTC uses to determine whether speech is protected.  <u>See</u> <u>Bristol-Myers Co. v. FTC</u>, 738 F.2d 554, 562 (2d Cir. 1984) ("[D]eceptive advertising enjoys no constitutional protection.").  Thus, the defendants employ circular logic: they contend that the court must use the <u>Central Hudson</u> test - which only applies to protected speech - to determine whether or not speech is protected.

The court is unpersuaded by this confusing and illogical argument.  Whether or not the advertisements are deceptive, and thus unprotected speech, is a matter that is in the sound discretion of the court.  <u>Kraft, Inc. v. FTC</u>, 970 F.2d 311, 316 (7th Cir. 1992) (citing <u>FTC v. Colgate-Palmolive Co.</u>, 380 U.S. 374, 385 (1965)) ("[T]he words 'deceptive advertising' set forth a legal standard that derives its final meaning from judicial construction.").  Accordingly, the court finds that <u>Central Hudson</u> does not apply in this situation.

**2.  <u>The Defendants' Vagueness and Overbreadth Challenges</u>**

In addition to the <u>Central Hudson</u> concerns presented above, the defendants allege that the FTC's standards regulating

advertising are vague and overbroad.  As an initial matter, the
defendants' arguments regarding the overbreadth doctrine are
unsustainable.  The Supreme Court has explicitly held that the
overbreadth doctrine cannot be used to challenge regulations of
commercial speech.  Village of Hoffman Estates v. Flipside, 455
U.S. 489, 497 (1982) ("the over-breadth doctrine does not apply to
commercial speech.").  All of the standards challenged by the
defendants in this case concern commercial speech; accordingly, the
overbreadth doctrine does not apply.

The defendants' vagueness challenges center around the
standards the FTC uses to determine whether claims that an
advertisement makes regarding health and/or safety are adequately
substantiated.  The FTC requires advertising claims that pertain to
a health benefit to be substantiated by competent and reliable
scientific evidence.  The defendants argue that this standard is
unconstitutionally vague because it does not provide sufficient
certainty about the criteria the FTC uses to evaluate the
scientific support for ingredient-specific claims,[9] does not
establish requirements for size, duration, or protocol of a

---

[9]     As a preliminary matter, the court notes that whether the
FTC's standards provide sufficient certainty about the criteria the
FTC uses to evaluate the scientific support for ingredient-specific
claims is not at issue here, as none of the claims targeted by the
FTC are ingredient-specific.

scientific study, does not provide any single fixed formula for the number or type of scientific studies required to substantiate a claim, and does not specify the proper mechanism for extrapolating results of a study.

The defendants' arguments are not persuasive. As the defendants point out, "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000). Here, the defendants have not demonstrated that the FTC's standard fails for either of these reasons. "Competent and reliable scientific evidence" has been defined in various contexts, including in guidelines promulgated by the FTC, as "tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results." Bureau of Consumer Protection, Federal Trade Commission, Dietary Supplements, An Advertising Guide for the Industry (2001), p. 9, attached as Ex. H to Defs.' Mot. for Summ. J. [Doc. No. 168]. The court can find no reason why this definition would not give people of ordinary

intelligence a reasonable opportunity to understand what evidence is required to substantiate their health-related claims. Obviously, this definition is context specific and permits different variations on "competent and reliable scientific evidence" depending on what pertinent professionals would require for the particular claim made. Thus, the size, duration or protocol of a scientific study, the number or type of scientific studies required to substantiate a claim, and the proper mechanism for extrapolating results from studies will obviously vary from circumstance to circumstance depending upon the expert evidence presented. However, the standard by which these issues of fact are resolved is clear, and an advertiser can be reasonably certain of what substantiation will be required by conferring with appropriate professionals or experts. The fact that different scientific evidence is required for different claims impacting different products does not mean that the FTC can enforce its act arbitrarily; instead, it simply means that different claims require different substantiation. As Judge Dimock wrote in his concurring opinion in <u>United States v. Shackne</u>, 333 F.2d 475, 488 (2nd Cir. 1964), "Statutes are not . . . void for vagueness because they raise difficult questions of fact. They are void for vagueness only where they fail to articulate a definite standard." Here the

FTC has articulated a definite standard; accordingly, the issues of fact that it generates do not render it unconstitutionally vague.

The defendants have failed to demonstrate that the FTC's standards at issue in this case are unconstitutional and, thus, are not entitled to summary judgment on this issue.

### D.   **The FTC's Motion for Summary Judgment [Doc. No. 172]**

In the FTC's motion for summary judgment, the FTC argues that it is entitled to summary judgment on all of its claims because the defendants' advertisements violate the FTC Act.   The defendants respond to the FTC's motion by first asserting that the FTC is legally precluded from litigating its claims by the doctrines of res judicata and collateral estoppel.   The defendants then argue the merits of the case, contending that the FTC does not have sufficient evidence to demonstrate that the advertising was false and misleading and that most of the challenged advertising was non-actionable puffery.   The court will first address the defendants' affirmative defenses before turning to the merits of the case.

### 1.   **The Defendants' Affirmative Defenses**

The defendants allege that the doctrines of res judicata and collateral estoppel preclude the FTC's claims.   Specifically, they argue that the Consent Decree that the defendants entered into with the FDA resolved the claims and issues presented in the current action.

-27-

Collateral estoppel and res judicata are affirmative defenses. Fed. R. Civ. P. R. 8(c). Eleventh Circuit courts have held that the "failure to include an affirmative defense in the answer or have it included in the pre-trial order of the district court, which supersedes the pleadings, will normally result in waiver of the defense." Jackson v. Seaboard C.L.R. Co., 678 F.2d 992, 1012 (11th Cir. 1982); see also Palmer v. Braun, 376 F.3d 1254, 1257 n.2 (11th Cir. 2004)(finding that the defendant waived his affirmative defense when he failed to include it in either his answer or the pretrial order). While parties may raise the res judicata and collateral estoppel defenses in a summary judgment motion if the motion is filed in place of an answer, Concordia v. Bendekovic, 693 F.2d 1073, 1075 (11th Cir. 1982), or if events subsequent to the filing of the answer give rise to the defenses and the assertion of the defenses is not prejudicial to the plaintiff, In re Air Disaster at Brunswick, Georgia, 879 F. Supp. 1196, 1200 (N.D. Ga. 1994), a party may not revive an available defense that he failed to assert in his answer by arguing it on summary judgment. Funding Systems Leasing Corp. v. Pugh, 530 F.2d 91, 96 (5th Cir. 1976).[10] This is consistent with Supreme Court rulings, which hold that

---

[10] Decisions of the former Fifth Circuit issued prior to October 1, 1981, are binding precedent on this court. See Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981).

-28-

preclusion defenses must be asserted in a timely manner.  <u>Arizona v. California</u>, 530 U.S. 392, 410 (U.S. 2000).

In this case, the defendants base their preclusion defenses on a Consent Decree that they entered into with the FDA on September 22, 2003.  Although the Consent Decree had been in place for almost sixteen months, the defendants did not assert res judicata or collateral estoppel when they filed their answers on January 18, 2005.[11]  In fact, it was not until the defendants filed their response to the FTC's motion for summary judgment on November 5, 2007 - over four years after the Consent Decree was signed - that the defendants raised these preclusion defenses.

The court finds the defendants' delay in asserting these defenses inexcusable.  The preclusion defenses that the defendants now attempt to assert have been available to them throughout the three plus years that this case has been pending.  The defendants cannot assert them at this late point simply because the "light finally dawned" that they might be available.  <u>Arizona v. California</u>, 530 U.S. at 410 ("We disapprove of the notion that a party may wake up because a 'light finally dawned,' years after the

---

[11]    The defendants did attempt to reserve the right to assert additional defenses that became apparent during discovery; however, the court struck this "reservation of rights" defense in its June 24, 2005, order and noted that "absent permission of the court, the defendants are required to assert every defense in their answer." [Doc. No. 75, pp. 34-35].

first opportunity to raise a defense, and effectively raise it so long as the party was (though no fault of anyone else) in the dark until its late awakening."). Accordingly, this court concludes that the defendants have waived their right to assert these defenses.

### 2. <u>Analysis of the Defendants' Advertisements for False and Misleading Claims</u>

As noted above, the FTC has asserted that the defendants violated Sections 5 and 12 the FTC Act by (1) making false claims regarding Thermalean, Lipodrene, and Spontane-ES; (2) making unsubstantiated claims regarding Thermalean, Lipodrene and Spontane-ES; and (3) making false claims regarding research and medical facilities. The FTC has also alleged that Dr. Wright violated the FTC Act by making false and unsubstantiated claims in his role as an expert endorser for Thermalean.

The court will first address the legal framework for analyzing the advertisements for violations of the FTC Act and then will apply that framework to the advertisements at issue. Finally, the court will address the defendants' defense that much of the advertising constitutes non-actionable puffery.

### a. <u>Overview of the Law</u>

The FTC's claims are premised on the defendants' alleged violations of Sections 5 and 12 of the FTC Act. Section 5 of the

FTC Act prohibits unfair or deceptive acts or practices in or affecting commerce. 15 U.S.C. § 45(a). Section 12 addresses false advertising and provides that the dissemination of false advertisements – defined as advertisements that are misleading in a material respect – is an unfair or deceptive practice in commerce. 15 U.S.C. §§ 52(b) and 55. "Thus, a violation of Section 12, dissemination of false advertising, constitutes a violation of Section 5(a)." FTC v. QT, Inc., 448 F. Supp. 2d 908, 957 (N.D. Ill. 2006).

To establish liability under Sections 5 and 12 of the FTC Act, the FTC must prove: (1) that there was a representation; (2) that the representation was likely to mislead customers acting reasonably under the circumstances; and (3) that the representation was material. FTC v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003); see also Kraft, Inc., 970 F.2d at 314 (citing Sections 5 and 12 to state that "an advertisement is deceptive under the Act if it is likely to mislead customers, acting reasonably under the circumstances, in a material respect"); QT, Inc., 448 F. Supp. 2d at 957 (using this three part test to find violations of Sections 5 and 12). The court will address each of these elements in depth.

### i. **Was the Representation Made?**

The first step that the court must take to analyze whether the defendants violated the FTC Act is to determine whether the

advertisements made the claims asserted by the FTC in the complaint. QT, Inc., 448 F. Supp. 2d at 957. The meaning of an advertisement, the claims or net impressions communicated to reasonable consumers, is fundamentally a question of fact. See, e.g., id. at 957-58 (citing National Bakers Services, Inc., v. FTC, 329 F.2d 365, 367 (7th Cir. 1964)). This question of fact may be resolved by the terms of the advertisement itself or by evidence of what consumers interpreted the advertisement to convey.

When assessing the meaning and representations conveyed by an advertisement, the court must look to the advertisement's overall, net impression rather than the literal truth or falsity of the words in the advertisement. FTC v. Peoples Credit First, LLC, No. 8:03-cv-2353-T-TBM, 2005 U.S. Dist. LEXIS 38545, at *20-25 (M.D. Fla. Dec. 18, 2005) (finding that an advertisement was implicitly deceptive by looking at the net impression that it was likely to make on the general public). If the advertisement explicitly states or clearly and conspicuously implies a claim, the court need not look to extrinsic evidence to ascertain whether the advertisement made the claim. See In re Thomson Med. Co., Inc., 104 F.T.C. 648, 311-12 (1984) (noting that when an advertisement unequivocally states a claim, "it is reasonable to interpret the ads as intending to make [it]"); QT, Inc., 448 F. Supp. 2d at 958 ("Where implied claims are conspicuous and reasonably clear from

-32-

the face of the advertisements, extrinsic evidence is not required.") (internal citations omitted). However, if the advertisement faintly implies a claim, the court may certainly decline from concluding that the advertisement makes such a representation without extrinsic evidence of consumer perceptions. As another district court noted, "implied claims fall along a continuum from those which are so conspicuous as to be virtually synonymous with express claims to those which are barely discernable. It is only at the latter end of the continuum that extrinsic evidence is necessary." <u>FTC v. Febre</u>, C.A. No. 94-C-3625, 1996 U.S. Dist. LEXIS 9487, at *14-15 (N.D. Ill. July 2, 1996).

In this case, the FTC has not presented any evidence of what claims consumers perceived the advertisements to make; accordingly, any claims that the FTC contends that the advertisements make must be clear and conspicuous from the face of the advertisements.[12]

---

[12]    Despite established case law to the contrary, the defendants argue that the court "cannot reliably or accurately ascertain the meaning of the advertisements." Defs.' Resp. Br., p. 33 [Doc. No. 196]. Citing the FTC's expert's testimony, the defendants contend that only the recipients of the advertising can ascertain the content and meaning of the advertisements and the claims which influenced their purchase decision. <u>Id.</u> at pp. 32-33.

The court is not persuaded by the defendants' argument. As the above case law indicates, the court is well-equipped to discern express claims or clear and conspicuous implied claims from the face of the advertisement. While evidence of consumer perceptions

### ii.  **Is the Representation Likely to Mislead?**

To demonstrate that a claim is likely to mislead a reasonable customer, the FTC may proceed under a "falsity theory," a "reasonable basis theory," or both.  QT, Inc., 448 F. Supp. 2d at 957-58.  If the FTC proceeds under a falsity theory, it "must demonstrate either that the express or implied message conveyed by the ad is false."  FTC v. Natural Solutions, Inc., C.A. No. 06-6112-JFW, 2007 U.S. Dist. LEXIS 60783, at *10 (C.D. Cal. Aug. 7, 2007).  If the FTC proceeds under a "reasonable basis" theory, it must demonstrate that the advertiser lacked a reasonable basis - or adequate substantiation - for asserting that the message was true.  Id.  As discussed in the defendants' motion for summary judgment, in the case of health-related claims or claims concerning the efficacy or safety of dietary supplements, this reasonable basis must, at a minimum, consist of competent and reliable scientific evidence.  QT, Inc., 448 F. Supp. 2d at 961.

All of the products at issue in this case are dietary supplements and/or drugs that are marketed as promoting health benefits in the form of weight loss and sexual enhancement.  Not

---

is always welcomed by the court, it is only necessary when the asserted claims fall on the "barely discernable" side of the continuum.  The court concludes that imposing a legal requirement on the FTC to survey the exact consumer group that the defendants solicited is both unduly burdensome and unnecessary, particularly when the claims are apparent from the face of the advertisement.

surprisingly, all of the unsubstantiated representations that the
FTC claims the advertisements make are related to the safety and/or
efficacy of the dietary supplements and, correspondingly, implicate
health concerns.  Thus, all of the lack of reasonable basis claims
discussed in this case must be supported by "competent and reliable
scientific evidence."

As noted in the discussion of the defendants' motion for
summary judgment [Doc. No. 168], the FTC has defined competent and
reliable scientific evidence as "tests, analyses, research,
studies, or other evidence based on the expertise of professionals
in the relevant area, that have been conducted and evaluated in an
objective manner by persons qualified to do so, using procedures
generally accepted in the profession to yield accurate and reliable
results."  <u>Dietary Supplements, An Advertising Guide for the
Industry</u>, <u>supra</u>, at 9.  The court adopts this definition.  Thus,
what constitutes competent and reliable scientific evidence in this
case is a question of fact for expert interpretation.  <u>Id.</u>

### iii.  <u>Is the Representation Material?</u>

"A representation or omission is material if it is the kind
usually relied on by a reasonably prudent person."  <u>FTC v. Windward
Marketing</u>, No. 1:96-cv-615, 1997 U.S. Dist. LEXIS 17114, at *27
(N.D. Ga. Sept. 30, 1997); <u>see also</u> <u>QT, Inc.</u>, 448 F. Supp. at 960
("A claim is considered material if it involves information that is

-35-

important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.") (internal citations omitted). "Express claims, or deliberately made implied claims, used to induce the purchase of a particular product or service are presumptively material." <u>Windward Marketing</u>, 1997 U.S. Dist. LEXIS 17114, at *28. In addition, other courts have also found claims that "significantly involve health, safety, or other issues that would concern reasonable customers" to be presumptively material. <u>QT, Inc.</u>, 448 F. Supp. 2d at 960, 965-66.[13]

As noted above, all of the representations that the FTC claims the ads make are related to health and/or safety. As a matter of practicality, this court finds it hard to imagine that any reasonable customer would find claims regarding how a product affects his or her health or safety immaterial, but the court need not reach that question at this juncture. For purposes of this case, it is sufficient to state that when a customer makes a decision to purchase a health product that he or she will ingest for purported health benefits, any claim on the label regarding the health benefits (i.e., any product efficacy claims) or any claims

---

[13] As both <u>QT, Inc.</u> and <u>Windward Marketing</u> suggest, the court may presume that some claims are material absent evidence to the contrary. The defendants' argument that the court may not ascertain the materiality of such claims is unavailing and contradicted by the cited case law.

regarding the safety of the product can be presumed material. Thus, the court will presume that all of the asserted claims in this case, if made, were material to the customers' purchasing decisions.

### b.  Application of the Law to Product Claims and False Endorsement Claims

The FTC asserts that the defendants' advertising violates the FTC Act by making false and unsubstantiated claims regarding Thermalean, Lipodrene, and Spontane-ES.  The FTC also alleges that Dr. Wright made false claims and claims without a reasonable basis in his endorsement of Thermalean.  The court will examine the advertisements on a product-by-product basis to determine whether the claims were made.  The court will then address (1) whether the claims are likely to mislead a reasonable consumer; and (2) whether the claims are material.

### i. Do the Advertisements Make the Claims?

### (A)  Thermalean Claims and Wright False Endorsement Claims

As a basis for its allegations, the FTC attached to the complaint a nine-page Thermalean brochure and a two-page letter "from the desk of Dr. Mark Wright, M.D., Chief of Staff, NICWL" ("the Wright letter") endorsing Thermalean. [Doc. No. 1, Exs. A and B].  Based on these advertisements, the FTC has asserted that the defendants made the following false and deceptive claims:

Falsity Claim 1:   Thermalean is clinically
                   proven to be an effective
                   treatment for obesity;

Falsity Claim 2:   Thermalean causes rapid and
                   substantial weight loss,
                   including as much as 30
                   pounds in 2 months;

Falsity Claim 3:   Thermalean is clinically
                   proven to cause rapid and
                   substantial weight loss,
                   including as much as 30
                   pounds in 2 months;

Falsity Claim 4:   Thermalean is clinically
                   proven to enable users to
                   lose 19% of their total body
                   weight, lose 20-35% of
                   abdominal fat, reduce their
                   overall fat by 40-70%,
                   decrease their stored fat by
                   300%, and increase their
                   metabolic rate by 76.9%; and

Falsity Claim 5:   Thermalean is clinically
                   proven to inhibit the
                   absorption of fat, suppress
                   appetite, and safely increase
                   metabolism without dangerous
                   side effects.

Compl., ¶¶ 21-22 [Doc No. 1]. The FTC has also asserted that the

defendants made the following representations ("Lack of Reasonable

Basis ("LORB") Claims") without possessing or relying upon a

reasonable basis to substantiate the claims:

LORB Claim 1:   Thermalean is an effective
                treatment for obesity;

-38-

|                     |                                                                                                                                                                                                          |
|---------------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| LORB Claim 2:       | Thermalean causes rapid and substantial weight-loss, including as much as 30 pounds in two months;                                                                                                        |
| LORB Claim 3:       | Thermalean causes users to lose 19% of their total body weight, lose 20-35% of abdominal fat, reduce their overall fat by 40-70%, decrease their stored fat by 300%, and increase their metabolic rate by 76.9%; |
| LORB Claim 4:       | Thermalean inhibits the absorption of fat, suppresses appetite, and safely increases metabolism without dangerous side effects;                                                                           |
| LORB Claim 5:       | Theramalean is equivalent or superior to the prescription weight loss drugs Xenical, Meridia, and Fastin in providing weight loss benefits; and                                                           |
| LORB Claim 6:       | Thermalean is safe.                                                                                                                                                                                       |

Id. at ¶¶ 23-24.  In addition, the FTC has used the two Thermalean advertisements as the basis for its expert endorsement claims against Dr. Wright.  The FTC asserts that Dr. Wright made the following false endorsements regarding Thermalean:

|                              |                                                                       |
|------------------------------|-----------------------------------------------------------------------|
| False Endorsement Claim 1:   | Thermalean is clinically proven to be an effective treatment for obesity; |

| | |
|---|---|
| False Endorsement Claim 2: | Thermalean is clinically proven to cause rapid and substantial weight loss, including as much as 30 pounds in two months; |
| False Endorsement Claim 3: | Thermalean is clinically proven to enable users to lose 20-35% of abdominal fat, reduce their body fat by 42%, decrease their stored fat by 300%, and increase their metabolic rate by 76.9%; and |
| False Endorsement Claim 4: | Thermalean is clinically proven to inhibit the absorption of fat, suppress appetite, and safely increase metabolism without dangerous side effects. |

Id. at ¶¶ 34-35. The FTC also claims that Dr. Wright made the following claims without a reasonable basis:

| | |
|---|---|
| Wright LORB Claim 1: | Thermalean is an effective treatment for obesity; |
| Wright LORB Claim 2: | Thermalean causes rapid and substantial weight loss, including as much as 30 pounds in 2 months; |
| Wright LORB Claim 3: | Thermalean causes users to lose 20-35% of abdominal fat, reduce their body fat by 42%, decrease their stored fat by 300%, and increase their metabolic rate by 76.9%; |

-40-

| Wright LORB Claim 4: | Thermalean inhibits the absorption of fat, suppresses appetite, and safely increases metabolism without dangerous side effects; |
| Wright LORB Claim 5: | Thermalean is equivalent or superior to the prescription weight loss drugs Xenical, Meridia, and Fastin in providing weight loss benefits; and |
| Wright LORB Claim 6: | Thermalean is safe. |

The court will analyze the advertisements for each of these claims. Where the claims are closely linked and supported by the same or similar evidence, the court will examine the claims in tandem.

> **(1)** **Falsity Claim 1, LORB Claim 1, False Endorsement Claim 1, and Wright LORB Claim 1**

The FTC argues that the advertisements and Dr. Wright falsely represent that Thermalean is clinically proven to be an effective treatment for obesity and represent, without a reasonable basis, that Thermalean is an effective treatment for obesity. The court has surveyed the advertisements, and has identified the following express statements related to obesity:

- Introducing Thermalean (575 mg Capsule)[-] [t]hree specific causes linked to obesity with one solution Thermalean [Doc. No. 1, Ex. A-2];

-41-

- At the National Institute for Clinical Weight Loss, [o]ur research and development team has developed a non-prescription formulation that incorporates a naturally occurring equivalent and substitute for Meridia, Xenical, and Fastin.[14]  Thermalean is the most complete, omni-faceted nutriceutical ever developed for the diet industry! After four full years of product development and feedback from hundreds of thousands of clients, we are very proud to announce that Thermalean is the **FIRST** over-the-counter (OTC) nutriceutical to incorporate all three aspects of obesity into one amazing product called Thermalean [Id.];

- Why Thermalean? Why now? Thermalean is a product of decades of research and development in the field of weight loss.  Thermalean was designed to help the person only needing to los[e] 5 or 10 pounds, as well as the person needing to lose 100 or more pounds. Pharmaceutical "mega-firms" would have you believe that their product is the only product to fight obesity.  If this were true then why is America the most overweight society in the history of the world? With an estimated 75 million Americans clinically considered obese the question should be, Why not now? [Doc. No. 1, Ex. A-7];

- With 75 million Americans clinically considered "obese" [sic] Thermalean could not have come at a better time [Doc. No. 1, Ex. A-6, Wright Endorsement Section];

- Try Thermalean today and win the battle against obesity [Wright Letter, Doc. No. 1, Ex. B-2].

---

[14]    These three products are identified earlier in the advertisement as pharmaceuticals that each "address one aspect of obesity." [Doc. No. 1, Ex. A].

After reviewing these express statements in light of the advertisements in full, the court is persuaded that the defendants' advertisements, including Dr. Wright's endorsement, clearly imply that Thermalean is an effective treatment for obesity.  However, the court is not convinced that the advertisements clearly and conspicuously imply that Thermalean is *clinically proven* to treat obesity.  Throughout the advertisements, the defendants heavily imply that Thermalean is clinically proven to cause weight loss.  However, the defendants have presented evidence that the disease of obesity is different from general weight loss; thus, the court will not presume, without extrinsic evidence, that a recipient of these advertisements would infer that Thermalean is clinically proven to treat obesity from the clinical weight loss claims.  Since the FTC has presented no extrinsic evidence, the court concludes that the advertisements do not represent that Thermalean is clinically proven to treat obesity and thus do not make Falsity Claim 1 or False Endorsement Claim 1.

> **(2)** **Falsity Claims 2 and 3, LORB Claim 2, Wright False Endorsement Claim 2 and Wright LORB Claim 2**

The FTC contends that the Thermalean advertisements and defendant Wright as an endorser falsely and without a reasonable basis represent that Thermalean causes rapid and substantial weight-loss, including as much as 30 pounds in two months.  In

-43-

addition, the FTC contends that the advertisements and Wright falsely represent that Thermalean is clinically proven to cause rapid and substantial weight-loss, including as much as 30 pounds in two months.  The court has reviewed the advertisements, and concludes that they, through Wright's endorsements, make the asserted representations.  The Wright letter states, "Thermalean is the most complete product on the market today for rapid[,] sustainable weight loss . . . Whether you need to lose 10, 20, 100 pounds or more, Thermalean will work for you."  [Doc. No. 1, Ex. B].  Obviously, this portion of the letter expressly states that Thermalean delivers fast, significant weight loss.  However, the court need not hang its hat on this statement alone, as the brochure also unambiguously makes the claims at issue here.  In the "Questions for Dr. Mark Wright, M.D." portion of the brochure, the advertisement states:

> Q:   How much weight can I expect to lose with Thermalean?
>
> A:   Clinical trials based on Thermalean's proprietary components have yielded weight loss to nearly 15% of beginning body weight within the first two months
>
> Example: (to put this statistic in perspective)
>
> Starting Date        June 1
> Starting Weight      200 lbs
> Weight after 60 days 170 lbs
> Weight loss in 60 days  30 lbs

-44-

[Doc. No. 1, Ex. A].

This question and answer segment establishes that Thermalean causes rapid, significant weight loss, and the example given indicates that a consumer can lose up to thirty pounds in two months. In addition, the answer is purportedly based on "clinical trials," providing support for the falsity claims at issue here.[15] Although the defendants have highlighted the language regarding "proprietary components" and argued that the clinical trials and the results thereof were explicitly referring to the ingredients rather than the product as a whole, the court is not persuaded by this argument. The question part of the segment asks about the overall Thermalean product, and the answer, though phrased as an answer regarding the proprietary components, was clearly meant to respond to the query regarding the benefits of the product as a whole. The advertisement's generic reference to "Thermalean's proprietary components" emphasizes not the unnamed ingredients but

_____

[15] Confusingly, the defendants' expert, Dr. Richey, indicated in his report that study participants who were shown a copy of the Lipodrene and Thermalean advertisements did not feel that the marketer did a clinical test. However, in parentheses beside this statement, Dr. Richey indicates that the average participant slightly agreed with the statement, "The company who developed this advertisement did a clinical test of this specific branded product." [Doc. No. 198, Ex. 7, pp. 7 and 35]. Because the court concludes that no reasonable consumer would rely upon an expert's conclusion that is directly contradicted by the expert's own study results, the court will disregard this evidence.

the overall product, and thus achieves the advertisement's goal of promoting the product the defendants are attempting to sell. The unambiguous intent and meaning of the advertisement is that Thermalean – not its "proprietary components" – causes rapid and substantial weight loss, including as much as thirty pounds in two months; thus, the court concludes that the advertisements make the representations alleged by the FTC.[16]

---

[16]     In their brief, the defendants cite a survey conducted by their expert for the proposition that "consumer intent to purchase the products at issue was driven by the claims in the advertisements about the ingredients of the product and not the product itself." [Doc. No. 196, p. 37]. The court notes that even if this statement was supported by the evidence, it pertains to the materiality of claims rather than the question of whether claims were made. However, the portions of the study upon which this statement is based do not provide a foundation for the statement. The study simply reflects that participants mildly agreed with the following statements:

> (1)     I am able to think systematically about information that is given to me about a product, and make my own judgments about the effectiveness of a product; and
>
> (2)     I believe that information about the components of a product is useful to me when deciding whether or not to purchase the product.

Richey Report, p. 13 [Doc. No. 198, Ex. 7]. In the survey results, the court can find no basis for the expert's cited conclusion that consumer intent to purchase the products at issue was not driven by claims about the products themselves.

-46-

### (3)  <u>Falsity Claim 4 and LORB Claim 3</u>

The FTC asserts that the advertisements falsely convey that Thermalean is clinically proven to enable users to lose 19% of their total body weight, lose 20-35% of abdominal fat, reduce their overall fat by 40-70%, decrease their stored fat by 300%, and increase their metabolic rate by 76.9%.  The FTC also asserts that the advertisements, without a reasonable basis, represent that Thermalean causes users to accomplish these same statistical results.

The Thermalean brochure states,

> Clinical studies show the active components in Thermalean yield the following extraordinary results:
>
> - Loss of 19% total body weight
> - Increase metabolic rate by 76.9% without exercise
> - Reduction of 40-70% overall fat under the skin
> - Loss of 20-35% of abdominal fat.

[Doc. No. 1, Ex. A-2].

Similarly, the brochure also states,

> In their precise ratios, the thermogenic components used in Thermalean have achieved the following results in University-sponsored clinical trials (all of these statistics have been reported in such professional journals as the International Journal of Obesity, American Journal of Clinical Nutrition, and The New England Journal of Medicine):

-47-

```
      - 300% decrease in stored fat vs. placebo
      - 29% greater weight loss vs. REDUX
      - 600% increase in total weight loss vs. placebo
      - 42% reduction in body fat in a specified time
        period
```

Id. at A-3.

A quick analysis of the language above demonstrates that the Thermalean brochure conveys the asserted claims. The brochure unequivocally states that Thermalean's "active components" and "thermogenic components" enable users to lose 19% of their total body weight, lose 20-35% of abdominal fat, reduce their overall fat by 40-70%, decrease their stored fat by 300%, and increase their metabolic rate by 76.9%. It also unequivocally represents that these results are backed by clinical studies and independent, university-sponsored clinical trials. Although the defendants go to great lengths to establish that this express language is language about the ingredients rather than language about the Thermalean product, the court is not persuaded by such meaningless distinctions. The brochure does not define these active and/or thermogenic components by name or proportion; instead, it simply uses these references to mysterious ingredients as synonyms for "Thermalean." The obvious implication from the brochure is that Thermalean - as a whole - is scientifically and clinically proven to yield the touted results; accordingly, the court concludes that it makes the alleged claims.

-48-

**(4)  Wright False Endorsement Claim 3 and Wright LORB Claim 3**

The FTC also contends that Dr. Wright, without a reasonable basis, represents that Thermalean causes users to lose 20-35% of abdominal fat, reduce their body fat by 42%, decrease their stored fat by 300%, and increase their metabolic rate by 76.9%.  In addition, the FTC contends that Dr. Wright falsely represents that Thermalean is clinically proven to cause users to achieve these same results.

Under the "Questions for Dr. Mark Wright, M.D." section, the Thermalean brochure states, "Thermalean's scientifically proven formula has yielded the following results in independent university-sponsored trials: 42% reduction in body fat - 300% decrease in stored fat - 76.9% elevation in basal metabolic rate - 20-35% reduction in abdominal fat - 600% greater fat burning capabilities than placebo." Id. at A-6.  This language almost explicitly states that Thermalean causes users to achieve a 20-35% loss of abdominal fat, a 42% reduction in total body fat, a 300% decrease in stored fat, and a 76.9% increase in metabolic rate. Although this portion of the brochure does not specifically state that Thermalean has been *clinically* proven to yield these results, it does state that Thermalean is a scientifically proven formula that has yielded the desired results in independent university-

-49-

sponsored trials.  The court concludes that this language clearly implies that the results were "clinically proven," and is satisfied that Wright made both of the asserted claims.

> **(5)**  **Falsity Claim 5, LORB Claims 4 and 5, Wright False Endorsement Claim 4, and Wright LORB Claims 4 and 5**

The FTC claims that Dr. Wright and the advertisements falsely represent that Thermalean is clinically proven to inhibit the absorption of fat, suppress appetite, and safely increase metabolism without dangerous side effects.  In addition, the FTC claims that the advertisement and Wright, without a reasonable basis, represent that Thermalean inhibits the absorption of fat, suppresses appetite, and safely increases metabolism without dangerous side effects.  Because the advertising language supporting these claims also supports the representation that Thermalean is equivalent or superior to the prescription weight loss drugs Xenical, Meridia, and Fastin in providing weight loss benefits, all claims will be discussed together.

On the second page, the Thermalean brochure states:

> The pharmaceutical drugs Xenical, Meridia, and Fastin all address one aspect of obesity and only one aspect:
> 1.)  Xenical    Inhibits the absorption of dietary fats
>
> 2.)  Meridia    Suppresses the appetite by blocking the re-uptake of serotonin

-50-

3.) Fastin       Burns   fat   by   increasing   the
                 metabolic rate

Each  of  these  novel  pharmaceuticals  attack  <u>one</u>
aspect of obesity, but neglect to address the other
causes of obesity.

At the National Institute for Clinical Weight Loss,
Our  research  and  development  team  has  developed  a
non-prescription  formulation  that  incorporates  a
naturally  occurring  equivalent  and  substitute  for
Meridia,  Xenical,  and  Fastin.   <u>Thermalean</u>  is  the
most  complete,  omni-faceted  nutriceutical  ever
developed  for  the  diet  industry!  After  four  full
years  of  product  development  and  feedback  from
hundreds  of  thousands  of  clients,  we  are  very  proud
to announce that Thermalean is the **<u>FIRST</u>** over-the-
counter  (OTC)  nutriceutical  to  incorporate  all
three  aspects  of  obesity  into  <u>one</u>  amazing  product
called  Thermalean  and  the  results  have  been
extraordinary - <u>without side effects</u>!

[Doc. No. 1, Ex. A-2].   Similarly, Dr. Wright's letter states,

"Thermalean  is  a  pharmaceutical-grade  nutriceutical  containing

naturally  occurring  equivalents  and  substitutes  for  Sibutramine

(Meridia),  Orlistat  (Xenical),  and  Phentermine  (Fastin)  in

Thermalean's Core Pharmaceutical Composition and Formulation." <u>Id.</u>

at Ex. B-1.   A few paragraphs down, the letter goes on to state,

Thermalean's  proprietary  components  have  been
proven to accomplish the following:

• Inhibit  Lipase  for  obesity  management  by
  inhibiting the absorption of dietary fats.

• Slows  the  rate  at  which  the  body  'metabolizes'
  serotonin therefore suppressing the appetite.

-51-

> • Safely increasing the metabolic rate without
>   dangerous side-effects associated with
>   prescription drugs.
>
> Thermalean was engineered upon cutting-edge
> <u>scientific</u> and <u>clinical</u> data which supports our
> claim that Thermalean is unmatched by any other
> prescription or non-prescription diet aid currently
> available.

<u>Id.</u> The above language clearly supports the claim that Thermalean

is equivalent or superior to Meridia, Xenical, and Fastin and the

claim that Thermalean inhibits the absorption of fat, suppresses

appetite, and safely increases metabolism without dangerous side

effects.[17] The court also finds that the advertisements represent

that Thermalean is *clinically proven* to inhibit fat absorption,

suppress appetite, and increase metabolism.  The Wright letter is

printed on National Institute for Clinical Weight Loss letterhead

and claims to be "From the desk of: Dr. Mark Wright M.D. Chief of

Staff, NICWL."   <u>Id.</u>   The letter states that Thermalean's

proprietary components have been *proven* to accomplish the functions

that are the subject of these claims.   <u>Id.</u>  Immediately beneath

this statement, the letter states that Thermalean was engineered

---

[17]   Although the Wright letter incorporates the use of the
term "proprietary components," the court is not persuaded by the
defendants' arguments that the statement refers to Thermalean's
individual ingredients rather than the product as a whole.   As
previously noted, the generic reference to all of a product's
ingredients, without more, essentially functions as a synonym for
the product's name.

upon cutting-edge scientific and clinical data.  Id.  These different components, when read as a whole, create the impression that Thermalean was proven to accomplish the asserted functions through clinical studies and/or trials.  Moreover, the brochure repeatedly emphasizes that Thermalean achieves clinically proven weight loss by blocking the absorption of dietary fats, suppressing the appetite, and increasing the metabolism.  This creates the impression that Thermalean has been clinically proven to achieve its three touted functions.

### (6)  LORB Claim 6 and Wright LORB Claim 6

Finally, the FTC claims that the Thermalean advertisements and Dr. Wright represent that Thermalean is safe without adequate substantiation.  For this claim, the court need look no further than the express language of the advertisements.  For example, the Thermalean brochure states, "New Thermalean is safe and natural" and "New Safe Alternative Just Released - Thermalean."  [Doc. No. 1, Ex. A-8].  Likewise, the Wright letter states "the introduction of Thermalean reflects the cumulative efforts of many top bariatric (weight loss) physicians and researchers to bring the public a safe and effective, scientifically-based formulation that will have a significant impact on your weight loss goals."  Id. at Ex. B-2.  Because the advertisements and Dr. Wright expressly state that Thermalean is safe, no additional analysis is necessary.

-53-

**(B)  Lipodrene Claims**

The FTC attached three Lipodrene advertisements as exhibits to the complaint.  The first exhibit is a one-page advertisement placed in Cosmopolitan Magazine that states - in large, underlined letters across the top - "Clinically PROVEN Weight Loss."  [Doc. No. 1, Ex. C].  The second exhibit is a more detailed, two-page direct mail insert prepared on Warner Laboratories letterhead that provides an overview of Lipodrene's Phase I Review and announces the launch of Phase II.  Id. at Ex. D.  The third exhibit attached to the complaint is a one-page print of an internet web page.  Id. at Ex. E.  It clearly refers to Lipodrene, and states in prominent print, "Clinically PROVEN to be SAFE AND EFFECTIVE!"  Id.

Based on the these advertisements, the FTC contends that the defendants made the following false claims:

| | |
|---|---|
| Falsity Claim 1: | Lipodrene causes substantial weight loss, including as much as 125 pounds; |
| Falsity Claim 2: | Lipodrene is clinically proven to enable users to lose up to 42% of total body fat and 19% of total body weight, and to increase their metabolic rate by up to 50%; |
| Falsity Claim 3: | Lipodrene is clinically proven to be safe; and |

Falsity Claim 4:    Lipodrene is clinically
                    proven to cause virtually no
                    side effects.

[Doc. No. 1, ¶¶ 25-26].  In addition, the FTC also argues that the

defendants made the following representations regarding Lipodrene

without adequate substantiation:

LORB Claim 1:    Lipodrene causes substantial
                 weight loss, including as
                 much as 125 pounds;

LORB Claim 2:    Lipodrene enables users to
                 lose up to 42% of total body
                 fat and 19% of total body
                 weight, and to increase
                 their metabolic rate by up
                 to 50%; and

LORB Claim 3:    Lipodrene is safe.

Id. at ¶¶ 25-26.  Each of these claims will be discussed below.

### (1)  **Falsity Claim 1 and LORB Claim 1**

The FTC claims that the Lipodrene advertisements falsely and

without a reasonable basis represent that Lipodrene causes

substantial weight loss, including as much as 125 pounds.  The

court has reviewed the advertisements and concludes that the first

advertisement does make the asserted representation.  First, the

advertisement clearly represents that Lipodrene causes substantial

weight loss.  Directly beneath the "Clinically PROVEN Weight Loss!"

banner at the top of the page, the ad states: "Lose up to 42% of

your total body fat! Lose up to 19% of your total body weight!"

-55-

[Doc. No. 1, Ex. C].  Underneath this segment, the ad touts an overall 88% success rate.  Id.  The court concludes that, when read together, this ad suggests that Lipodrene is a tried and tested way to lose substantial weight - even up to 19% of one's total body weight.  However, the advertisement does not stop with these assertions.  The ad, in a section "*from Dr. Mark Wright, M.D. - Medical Director for Warner Laboratories*," states, "Lipodrene is a product you simply MUST TRY if you are having trouble losing weight - whether your weight loss goals involve 5 lbs, 25 lbs, or even 125 lbs." Id.  This statement from a doctor clearly implies that Lipodrene can help patients meet their weight loss goals - even if that goal is 125 pounds.  Accordingly, the court finds that the advertisement makes the asserted representation.[18]

### (2)  Falsity Claim 2 and LORB Claim 2

The FTC contends that the Lipodrene advertisements falsely represent that Lipodrene is clinically proven to enable users to lose up to 42% of their total body fat and 19% of their total body weight and to increase their metabolic rate by up to 50%.  In addition, the FTC contends that the Lipodrene advertisements,

---

[18]   The other two advertisements do not contain any language specifying 125 pounds, but they do expressly claim that Lipodrene causes significant weight loss.  Each of the advertisements note that Lipodrene can reduce a consumer's total body fat by 42% and total body weight by 19%.  Thus, this court finds that they provide additional support for the asserted claim.

without a reasonable basis, represent that Lipodrene enables users to accomplish these goals.

All three of the advertisements contain language indicating that Lipodrene enables users to accomplish these asserted statistical goals and that such results are clinically proven. For example, the first advertisement sandwiches statements that a consumer can "Lose up to 42% of your total body fat! Lose up to 19% of your total body weight! Increase your metabolic rate up 50%!" directly underneath a "Clinically proven weight loss" banner and directly beside a segment that states that "Lipodrene technology is backed by volumes of Independent Research and hundreds of published studies by the most prominent Universities and Medical Journals in the world." [Doc. No. 1, Ex. C]. When read in context, the only logical conclusion is that these statistical representations have clinical and scientific support.

The court need not even engage in an analysis of the second advertisement, because that ad, citing Warner Laboratories' Chief of Staff, Dr. Timothy Gaginella, explicitly states that the Lipodrene technology accomplished the statistical results in clinical trials. [Doc. No. 1, Ex. D-2].

The third advertisement is much like the first advertisement in that it squeezes these statistical results beneath a larger statement that Lipodrene is "Clinically PROVEN to be SAFE AND

EFFECTIVE!" and above a segment that states, "The Lipodrene technology is backed by Volumes of Independent Research and hundreds of Published studies by the most prominent Universities and Medical Journals in the world . . . ." [Doc. No. 1, Ex. E]. As was the case with the first ad, this positioning conveys the impression that Lipodrene is clinically proven to accomplish the ambitious statistical results set forth therein.

### (3)   Falsity Claim 3 and LORB Claim 3

The FTC asserts that the Lipodrene advertisements represent that Lipodrene is clinically proven to be safe or, more simply, that Lipodrene is safe.  To find these claims, the court need look no further than the express language in the short, one-page internet print out attached to the complaint that states, in reference to Lipodrene, "**Clinically PROVEN to be SAFE AND EFFECTIVE!**" [Doc. No. 1, Ex. E].  As this language is expressly stated, no further analysis is needed.

### (4)   Falsity Claim 4

The FTC asserts that the advertisements falsely represent that Lipodrene is clinically proven to cause virtually no side effects. Under a header entitled Lipodrene: PHASE I REVIEW, the first advertisement states, "Upon review of 25,000 participants in the Phase I trials, Lipodrene has been shown to yield an 88% SUCCESS RATE with virtually no side effects."  [Doc. No. 1, Ex. C].  As

previously discussed, this advertisement begins with the "Clinically PROVEN weight loss" banner and contains a caption noting that the Lipodrene technology is backed by volumes of respected studies and research <u>Id.</u>  In the second advertisement, the ad recaps the Phase I results and notes that there was "an extremely low incidence of side effects." <u>Id.</u> at Ex. D-2.  The advertisement further cites Dr. Gaginella for the observation that Lipodrene appears to be void of significant or problematic side effects.  <u>Id.</u>  The third advertisement, as just discussed, contains the statement that Lipodrene is "[c]linically PROVEN to be SAFE AND EFFECTIVE!"  <u>Id.</u> at Ex. E.

Although none of these advertisements expressly state that Lipodrene is clinically proven to have virtually no side effects, the claim that Lipodrene is "clinically proven to be safe" in the third ad heavily implies that clinical studies have shown that Lipodrene has no or negligible side effects.  <u>Id.</u> at Ex. E. Moreover, the second ad, which involves a doctor ratifying Lipodrene because of its "near-negligible rate of side effects," heavily implies some sort of clinical backing.  <u>Id.</u> at Ex. D-2. Finally, both the first and second advertisements attribute side-effect claims to the mysterious and undefined "Phase I trials." <u>Id.</u> at Exs. C and D.  In light of the repeated references to clinical studies and studies published in medical journals, the

overall impression that the advertisements promote is that this
"Phase I trial" is a clinical endeavor.  Accordingly, the court
finds that the advertisements make the asserted representation.

### (C)  **Spontane-ES claims**

The FTC attached a two-page Spontane-ES advertisement to the
complaint [Doc. 1, Ex. F].  On the basis of this advertisement, the
FTC has asserted that the defendants made the following false and
deceptive claims:

> Falsity Claim 1:    Spontane-ES is clinically
>                     proven to be effective in
>                     treating 90% of men with
>                     erectile dysfunction;
>
> Falsity Claim 2:    Spontane-ES is clinically
>                     proven to be effective in
>                     treating men with erectile
>                     dysfunction; and
>
> Falsity Claim 3:    Spontane-ES is clinically
>                     proven to cause no harmful
>                     side-effects.

[Doc. No. 1, ¶¶ 29-30].  In addition, the FTC argues that the
defendants made the following LORB claims for Spontane-ES:

> LORB Claim 1:    Spontane-ES is effective in
>                  treating erectile
>                  dysfunction in 90% of users;
>                  and
>
> LORB Claim 2:    Spontane-ES is safe.

Id. at ¶¶ 31-32.

**(1)  Falsity Claims 1 and 2 and LORB Claim 1**

The FTC contends that the Spontane-ES advertisement falsely represents that Spontane-ES is clinically proven to be effective in treating men with erectile dysfunction and that Spontane-ES is clinically proven to be effective in treating 90% of men with erectile dysfunction.   The FTC also contends that the advertisement, without a reasonable basis, represents that Spontane-ES is effective in treating erectile dysfunction in 90% of users.

The advertisement clearly represents that Spontane-ES is effective in treating erectile dysfunction.   The conspicuous, introductory phrase of the brochure states that Spontane-ES is "THE RIGHT MOVE AGAINST SEXUAL DYSFUNCTION." [Doc. No. 1, Ex. F-1].  On another "Question and Answer" flap of the brochure, the advertisement discusses the causes of erectile dysfunction ("ED"). Id.  Two questions later, the advertisement indicates that Spontane-ES will increase libido, "even if you don't have ED." Id. The obvious express and implied meaning of these phrases is that Spontane-ES treats erectile dysfunction, but can be used to enhance the sexual experience "even if you don't have [erectile dysfunction]."

The advertisement also unambiguously states that Spontane-ES has enjoyed a 90 percent success rate among users. [Doc. No. 1,

-61-

Exs. F-1 and F-2] (stating that Spontane-ES has had "success rates as high as 90%" and "in preliminary testing, Spontane-ES's active components have been shown to be effective in nearly 90% of all men who have taken it.").[19]  Moreover, since the advertisement promotes Spontane-ES as treating erectile dysfunction and enhancing the sexual experience, the obvious, overall implication of the advertisement is that Spontane-ES has a 90% success rate of accomplishing these goals.

Finally, the advertisement also clearly represents that Spontane-ES's success rates were achieved in clinical trials.  As noted above, the advertisement states that Spontane-ES has achieved a 90% success rate in "preliminary testing."  Id. at F-1.  This language follows references to the "research and development" conducted by the "pharmacological staff at Warner Laboratories." Id.  Moreover, the testing language is right next to a "Letter from the Doctor," which indicates that Dr. Wright "review[ed]" Spontane-ES.   Id.   Taken together, the obvious implication from the advertisement is that the success rates were the result of clinical testing.

---

[19]    Although one of the references to Spontane-ES's success rates mentions "Spontane-ES's active ingredients," the court concludes that the overall impression conveyed by the advertisement is that Spontane-ES - rather than its individual components - enjoys a 90% success rate.

When the advertisement is read as a whole, it clearly represents that Spontane-ES is clinically proven to be effective in treating men with erectile dysfunction, is clinically proven to be effective in treating 90% of men with erectile dysfunction, and is effective in treating erectile dysfunction in 90% of users. Accordingly, the advertisement makes all three of the claims at issue here.

### (2)  **LORB Claim 2 and Falsity Claim 3**

The FTC contends that the Spontane-ES advertisement represents that Spontane-ES is safe and that it is clinically proven to cause no harmful side-effects.  In the question and answer segment, the advertisement states:

> Q:   "Is Spontane-ES safe?
>
> A:   Extremely.  With five years worth of research and development in each component going into Spontane-ES by the pharmacological staff at WARNER LABORATORIES we have not experienced any harmful side effects to date."

[Doc. No. 1, Ex. F-1].  This segment of the advertisement expressly states that Spontane-ES is safe; therefore, no further analysis of that claim is needed.  In addition, this segment of the advertisement also conveys that Spontane-ES has resulted in no harmful side-effects after years of clinical study.[20]  Accordingly,

---

[20]    In a column entitled "Final Considerations," the advertisement states,

-63-

the court concludes that the advertisement unambiguously makes both claims as alleged.

### ii. **Are the Representations Regarding the Products Likely to Mislead?**

Having concluded that the advertisements make 22 of the 23 claims targeted by the FTC and that Dr. Wright made 9 of the 10 claims alleged, the court must now determine whether these claims were "likely to mislead" consumers.  The court will address the lack of reasonable basis claims before moving on to the falsity claims.

### (A) **Lack of Reasonable Basis Claims**

The FTC has alleged that the lack of reasonable basis claims are likely to mislead consumers because they are unsubstantiated. As indicated above, all of these claims regard the safety and efficacy of dietary supplements; thus, they must be substantiated with competent and reliable scientific evidence.  In this case, the FTC has presented expert testimony to establish what constitutes

---

CAN I TAKE Spontane-ES WITHOUT RISK TO MY HEALTH?
The incidence of side effects is less than 3%!

* The only side effect ever reported is mild nervousness, dizziness, or heart palpitations.  If these occur, discontinue use of Spontane-ES.

[Doc. No. 1, Ex. F-2].  By characterizing the side-effects as rare and mild, this statement merely supports the advertisement's overall representation that Spontane-ES has no *harmful* side effects.

-64-

"competent and reliable scientific evidence" for purposes of these claims.  The FTC's expert, Dr. Aronne, stated that the type of evidence required to substantiate weight loss claims for any product, including a dietary supplement, is appropriately analyzed results of independent, well-designed, well-conducted, randomized, double-blind, placebo-controlled clinical trials, given at the recommended dosage involving an appropriate sample population in which reliable data on appropriate end points are collected over an appropriate period of time.  Dr. Aronne also stated that to scientifically establish the truth of a claim that a product such as Thermalean or Lipodrene has been clinically proven to be efficacious or safe, a reliable clinical study showing that outcome must have been conducted on the product itself.  Dr. Aronne further clarified that anecdotal evidence (i.e. reports from patients) are insufficient to prove the efficacy of a product.

In regard to the Spontane-ES claims, the FTC presented Dr. Melman's expert report.  In his report, Dr. Melman states that, to support claims that Spontane-ES is effective in treating erectile dysfunction in 90% of users and is safe, experts in the field of erectile dysfunction would require well-designed, placebo-controlled, randomized, double-blind clinical trials involving an appropriate sample population in which reliable data on the subject's ability to maintain an erection rigid enough and for a

sufficient length of time to achieve sexual satisfaction is collected over an appropriate period of time.  Dr. Melman stated in his expert report that a study that uses higher doses of the active ingredients or a different combination of active ingredients would not be sufficient to support the efficacy of another product that used lower doses of the active ingredients or a different combination of the ingredients.

The defendants have not countered the testimonies of the FTC's experts regarding what level of substantiation is required for the claims made in this case.[21]  Accordingly, the court concludes that there is no issue of fact regarding the requisite levels of substantiation, and will rely upon the standards set forth by Dr. Aronne and Dr. Melman.  Both Dr. Melman and Dr. Aronne establish that some form of clinical trial must have been conducted on the product itself or an exact duplicate of the product to substantiate the defendants' claims regarding the overall product.  The defendants have admitted that the products themselves have not been clinically or scientifically tested; accordingly, the court finds

---

[21]    Instead, the defendants have simply argued that the claims were not made and have maintained that the numerous studies regarding the products' ingredients that they relied upon support their ingredient-specific claims.  This argument is unavailing because the defendants did, in fact, make the majority of the contested claims.

that the product LORB claims are unsubstantiated and likely to mislead.

### (B) **Falsity Claims**

The FTC has alleged that a number of the defendants' advertising claims are likely to mislead consumers because they are false. The majority of these "falsity claims" assert that a clinical test was performed on the products. All of these claims are inherently false because the defendants have admitted that the products have not been clinically tested.

This leaves only two claims for the court to address on an individual basis. First, the FTC contends that the Thermalean advertisements falsely represent that Thermalean causes rapid and substantial weight loss, including as much as 30 pounds in 2 months. Second, the FTC contends that the Lipodrene advertisements falsely assert that Lipodrene causes substantial weight loss, including as much as 125 pounds.

To demonstrate that both of these claims are false, the FTC cites its expert's testimony that there is no evidence that the active ingredients used in Thermalean and Lipodrene can provide anything more than two pounds per month of weight loss. The defendants dispute this fact; however, rather than specifying the nature of their dispute, they simply point the court to their statement of disputed material facts numbers 370-420. The court

-67-

concludes that the defendants' ambiguous reference to 50 statements of fact, without more, is not a proper citation to evidence as required by Local Rule 56.1(B).  Even after reviewing these 50 statements of fact, the court can find no concise statement facially countering the FTC's expert testimony.  The court is persuaded that the defendants' failure to combat the FTC's expert testimony with anything more than a vague reference to 50 paragraphs is the equivalent of sending the court on a snipe hunt through the defendants' evidence.  It is not the role of the court to pinpoint the defendants' evidence for them; accordingly, the court concludes that there is no factual dispute and that the two representations at issue are false and likely to mislead.

### iii. Are the Representations Regarding the Products Material?

Having concluded that all of the claims at issue are likely to mislead, the court must determine whether the claims were material to consumer purchasing decisions.  As noted at the outset, these health and safety claims are presumed material; however, the defendants may rebut this presumption with extrinsic evidence.

In an effort to do just that, the defendants have presented results from two surveys measuring the impact of the Lipodrene and Thermalean advertisements.  These surveys were conducted by the defendants' expert, Dr. Richey.  In the first study, Dr. Richey

concluded that the advertising as a whole was ineffective in promoting the products and, thus, was not likely a strong driver of consumer intent to purchase the products.   In the second survey, Dr. Richey concluded that many claims in the advertisements would not significantly impact a consumer's decision to purchase a weight loss product.

The court finds that the defendants' evidence is insufficient to create an issue of fact regarding the materiality of the health, safety, and efficacy claims at issue here.   First, the FTC has presented evidence that Lipodrene and Thermalean, marketed through the advertisements at issue in this case, generated in excess of $10.6 million in sales between 2001 and 2004.   Based on these figures, the court concludes that no reasonable jury could find that the advertisements were ineffective and immaterial to consumers as a whole.   Clearly, the advertising appealed to many people and whetted their desire to purchase the Thermalean and Lipodrene products.

Second, the court concludes that Dr. Richey failed to survey the impact of any of the advertising claims at issue in this case, and thus failed to establish that these claims were immaterial. Rather than testing the claims that serve as the basis for the complaint, the study tested small portions of these claims, misstatements of these claims, or claims wholly irrelevant to the

-69-

case.  What survey participants thought of the representations in the survey is irrelevant, as this case concerns only the claims set forth in the complaint.  Accordingly, the defendants have failed to present evidence that the claims at issue in this case are immaterial, and the court concludes that there is no basis for this issue to proceed to a trier of fact.

iv.  <u>Conclusion Regarding the Product Claims</u>

As described in depth above, the court is satisfied that - with the exception of Thermalean Falsity Claim 1 - the advertisements made all of the asserted claims.  The court is likewise satisfied that Dr. Wright made all of the deceptive endorsement claims except for False Endorsement Claim 1.  The court has concluded that all of the claims made were material and likely to mislead.  Accordingly, the court holds that the defendants have violated Sections 5 and 12 of the FTC Act.

c.  <u>Application of the Law to the Defendants' Medical and Research Facility Claims</u>

In addition to the product claims, the FTC alleges that the defendants' advertising for all three products falsely represented that Warner Laboratories and NICWL are bona-fide research or medical facilities that engage in scientific medical research and product testing at on-site facilities.  The FTC argues that the names of the entities alone - "Warner Laboratories" and "National

-70-

Institute for Clinical Weight Loss" - implies that they are research or medical facilities.  In addition, the FTC argues that the defendants used the following excerpts from the advertisements to advance the perception that NICWL and Warner Laboratories were medical or research establishments:

> At the National Institute for Clinical Weight Loss, Our research and development team has developed a non-prescription formulation that incorporates a naturally occurring equivalent and substitute for Meridia®, Xenical®, and Fastin®.  Thermalean™ is the most complete, omni-faceted nutriceutical ever developed for the diet industry!

* * *

> Q. Is Spontane-ES safe? A. Extremely. With five years worth of research and development in each component going into Spontane-ES by the pharmacological staff at WARNER LABORATORIES we have not experienced any harmful side effects to date.

* * *

> SYNOPSIS: Upon review of 25,000 women and men participating in the PHASE I Trials, Lipodrene™ has been shown to yield an 88% SUCCESS RATE with virtually no side effects.

* * *

> On March 1, 1999, the professional staff and Medical Board at WARNER Laboratories aligned with one of the nation's largest manufacturing facilities to begin Phase I testing of Lipodrene, an advanced, pharmaceutical-grade nutriceutical engineered to help women and men lose weight quickly and safely.

* * *

-71-

> *From the desk of*: Dr. Mark Wright M.D. Chief of Staff, NICWL
>
> * * *
>
> [F]rom Dr. Mark Wright, M.D. – Medical Director for Warner Laboratories

Pl.'s Br., pp. 29-30, attached as Ex. 1 to Pl.'s Mot. for Summ. J. [Doc. No. 172].

The court has reviewed the advertisements, and concludes that they represent that NICWL and Warner Laboratories are entities that engage in scientific medical research and on-site product testing. The court need not even address whether the companies' names imply that they are medical or science research companies because the language of the advertisements - as highlighted above - clearly represents that these companies engage in the scientific activities alleged.

The FTC argues that the claims are false because neither NICWL nor NUG ever operated a facility that engaged in clinical testing of dietary supplement products. The defendants assert that they did engage in scientific research, and point the court to their statement of material facts nos. 372-422 and 453-461. As noted above, the defendants' citation to more than fifty statements of fact does not constitute an appropriate response. Upon review of these statements, however, the court has determined that they do

-72-

not represent that NICWL or NUG engaged in on-site research[22] or clinical testing of the weight loss products as the advertisements suggest.  Because neither NICWL nor NUG ever performed any clinical tests on the products themselves or conducted any independent research regarding the products, the court concludes that the representations conveyed by the advertisements are false and, therefore, likely to mislead.  Moreover, because the representation that NUG and NICWL conducted clinical tests and engaged in scientific research before dispensing the products conveys that the products are safe, the court concludes that the claims are entitled to the presumption of materiality.  The defendants have offered no evidence to rebut this presumption; accordingly, the court concludes that these medical and research facility claims violate the FTC Act.

### d.    **The Defendants' Puffery Defense**

As the above analysis indicates, the FTC has demonstrated that the advertisements make false and unsubstantiated claims. Accordingly, the FTC should be entitled to summary judgment.

---

[22]    The statements of fact do represent that NICWL and NUG reviewed the research efforts of independent entities regarding some of the ingredients that were ultimately used in Lipodrene, Thermalean and Spontane-ES.  However, this secondary research does not provide support for the advertisements' overall message that NUG and NICWL conducted clinical trials and other types of primary research.

-73-

However, the defendants argue that summary judgment is precluded because most of the advertising claims challenged by the FTC constitute non-actionable puffery, and thus, cannot be considered violations of Sections 5 or 12.

Although courts have defined puffery in numerous ways, "'[p]uffing' refers generally to an expression of opinion not made as a representation of fact." FTC v. US Sales Corp., 785 F. Supp. 737, 746 (N.D. Ill. 1992); see also In re Sterling Drug, Inc., 102 F.T.C. 395, 749 (1983) ("Puffing claims are usually either vague or highly subjective and, therefore, incapable of being substantiated."). While the law affords a seller "some latitude in puffing his goods . . . he is not authorized to misrepresent them or to assign to them benefits they do not possess. Statements made for the purpose of deceiving prospective purchasers cannot properly be characterized as mere puffing." US Sales Corp., 785 F. Supp. at 746; see also United States v. Simon, 839 F.2d 1461, 1468 (11th Cir. 1988) (citing United States v. New South Farm & Home, 241 U.S. 64 (1916)) ("[W]hen a proposed seller goes beyond [exaggerating the qualities which the article has and] assigns to the article qualities it does not possess, [when the seller] does not simply magnify in opinion the advantages [but] falsely asserts their existence, he transcends the limits of 'puffing' and engages in false representations and pretenses."). Thus, the Eleventh Circuit

-74-

has concluded that when an advertiser places "otherwise general assertions about the value [of a product] into a concrete factual setting," the advertiser creates representations that are either true or false, not mere puffery. <u>Simon</u>, 839 F.2d at 1468.

The advertisements at issue in this case are indisputably riddled with puffery and, thus, create many overall impressions that could not serve as the basis for Section 5 or Section 12 violations. To demonstrate the rampant use of puffery, the defendants go through the advertisements sentence by sentence and sometimes even phrase by phrase to point out any language that could fit - even in the remotest sense - within the definition of puffery. By deconstructing the advertisements, the defendants attempt to create the overall impression that substantive claims could not arise from such vague, subjective statements.

Despite the defendants' focus on the words and phrases of the advertisements, the focus of this case is on the claims derived from each of the advertisements as a whole. All of the claims that the FTC articulates in the complaint are phrased as factual statements that can be verified by research and science. As discussed in-depth above, the court has reviewed the advertisements, and has concluded that they clearly and conspicuously make the majority of these claims. To be sure, some of the advertisements' direct language supporting these claims

-75-

contains puffery; however, the combination of this puffery with the concrete, factual statements and phrases that also comprise the advertisements results in the claims highlighted in the complaint. The fact that puffery is present cannot serve as a shield for the advertisements' deceptive, factual representations. Accordingly, the court concludes that puffery is not a justifiable defense, and the FTC is entitled to summary judgment.

### e. **The Defendants' Liability**

In this case, the FTC seeks to hold all of the defendants liable for the deceptive advertising of Thermalean, Lipodrene, and Spontane-ES. In addition, the FTC seeks to hold Dr. Wright liable for his deceptive endorsements. The parties' respective liability is analyzed below.

### i. **NUG, NICWL, and Hi-Tech's Liability**

As noted in the discussion of Hi-Tech's motion for summary judgment, NUG, NICWL, and Hi-Tech operated as a common enterprise and thus are jointly liable for any deceptive advertising attributable to any of them individually. Since the defendants do not dispute that NUG disseminated the Lipodrene and Spontane-ES advertisements and that NICWL disseminated the Thermalean advertisements, each of the corporate defendants are jointly liable for the FTC Act violations contained in these deceptive advertisements.

-76-

### ii. **Liability of Defendants Wheat, Smith, and Holda**

In a case brought by the FTC, individual defendants:

> are liable for the corporate defendant's violations if the FTC demonstrates that (1) the corporate defendant violated the FTC Act; (2) the individual defendants participated directly in the wrongful acts or practices or the individual defendants had authority to control the corporate defendants; and (3) the individual defendants had some knowledge of the wrongful acts or practices.

Windward Marketing, 1997 U.S. Dist. LEXIS 17114, at *38; see also FTC v. Gem Merchandising Corp., 87 F.3d 466, 470 (11th Cir. 1996)("[T]he FTC must show that the individual defendants participated directly in the practices or acts or had authority to control them . . . . The FTC must then demonstrate that the individual had some knowledge of the practices."). If a defendant was a corporate officer of a small, closely-held corporation, that individual's status gives rise to a presumption of ability to control the corporation. FTC v. Transnet Wireless Corp., 506 F. Supp. 2d 1247, 1270 (S.D. Fla. 2007). To establish the knowledge requirement, the FTC need not demonstrate actual knowledge of material misrepresentations; instead, the FTC may meet this element by "showing that [an] individual had 'actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of truth.'" Transnet,

-77-

506 F. Supp. 2d at 1270 (citing FTC v. Army Travel Services, Inc., 875 F.2d 564, 574 (7th Cir. 1989). "A defendant's participation in corporate affairs is probative of knowledge." FTC v. Wilcox, 926 F. Supp. 1091, 1104 (S.D. Fla. 1995).

In this case, Wheat, Holda, and Smith were all corporate officers, owners, and/or independent contractors or employees of NUG, NICWL, and Hi-Tech. In these roles, these individuals clearly had the ability to control the corporate defendants. Many of the examples in the record of Wheat, Holda, and Smith's involvement with the companies indicate that they knew of, or at least were recklessly indifferent to, the misrepresentations the advertisements made.[23] Rather than repeating each of those instances here, the court finds it sufficient to note that the defendants, in their motion for summary judgment, do not even dispute the individual defendants' knowledge of the advertisements' misrepresentations. Accordingly, this court finds that the individual defendants are liable for the violations of the FTC Act promulgated by the corporate defendants.

---

[23] Significantly, each of the individual defendants testified that he had a hand in creating the advertisements or reviewing them prior to dissemination.

### iii.  Dr. Wright's Liability

The FTC petitions this court to hold Dr. Wright individually liable for his participation in marketing Thermalean.  Here, the record is clear that Dr. Wright participated directly in the advertising and knew that the advertisements made material misrepresentations regarding the product claims or at least was recklessly indifferent to the truth or falsity of the advertisements.  Dr. Wright helped develop the products, reviewed the substantiation regarding the ingredients in the products, and reviewed and edited the advertisements before they were disseminated.  He allowed himself to be called "Chief of Staff" and "Medical Director" in the advertisements.  He knew that no clinical trials had ever been conducted on the products and conducted no such trials himself.  He was aware that none of the studies that he reviewed were conducted on any of the products sold by the defendants.  Most importantly, Dr. Wright does not contest his individual liability for the corporate defendants' wrongs; instead, he simply joins the corporate defendants in arguing that no violations occurred.  As discussed above, the corporate defendants did engage in violations of the FTC Act; accordingly, Dr. Wright is individually liable for his participation in those violations.

The FTC also seeks to hold Dr. Wright liable for his deceptive endorsements of Thermalean. The FTC guidelines state that an expert's endorsement:

> must be supported by an actual exercise of his expertise in evaluating product features or characteristics with respect to which he is expert and which are both relevant to an ordinary consumer's use of or experience with the product and also are available to the ordinary consumer. This evaluation must have included an examination or testing of the product at least as extensive as someone with the same degree of expertise would normally need to conduct in order to support the conclusions presented in the endorsement.

Guides Concerning Use of Endorsements and Testimonials in Advertising, 16 CFR § 255.3 (2008). The FTC has presented evidence that a physician would require scientific evidence regarding the product itself (rather than its individual components) before making many of the claims that Dr. Wright made, and Dr. Wright has not contested this evidence. Dr. Wright has admitted that he did not rely on any scientific studies regarding the Thermalean product when making his endorsement; thus, Dr. Wright did not examine or test the product at least as extensively as someone with the same degree of expertise would normally need to examine or test the product before making the conclusions he presented in the endorsement.

Because Dr. Wright did not base his endorsements on the substantiation that a similarly positioned expert in his field

would require when making such endorsements, his endorsements were deceptive.  Accordingly, the court holds that Dr. Wright is liable for making deceptive endorsements that violate the FTC Act.

### f. <u>Relief Requested by the FTC</u>

In its motion for summary judgment, the FTC has requested an award of permanent injunctive relief, as outlined in its proposed order, from ongoing violations by the corporate defendants and defendants Wheat, Smith, and Holda.  Moreover, the FTC has requested that the court award equitable monetary relief against the corporate defendants and defendants Wheat, Smith, and Holda, and has further requested that the court hold these parties jointly and severally liable.  The FTC has also requested that the court award injunctive and equitable relief against Dr. Wright, as outlined in a proposed final judgment drafted specifically in regard to this defendant.

The defendants contest the FTC's entitlement to the relief requested, and argue that an award of joint and several liability would be unjust.  The court will address the defendants' concerns and liability below.

i.   **The FTC's Entitlement to Permanent Injunctive Relief from the Corporate Defendants and Wheat, Holda, and Smith**[24]

Under Section 13(b) of the FTC Act, the FTC may seek, and the court may grant, a permanent injunction to prevent future violations of "any provisions of law enforced by the FTC."  15 U.S.C. § 53(b); FTC v. Evans Products Co., 775 F.2d 1084, 1086 (9th Cir. 1985).  As this court concluded it its June 24, 2005, order, the FTC must have reason to believe that the violation is ongoing or likely to recur as a prerequisite to seeking a permanent injunction.   Order, June 24, 2005, p. 11 [Doc. No. 75].

Although this court may not grant injunctive relief in favor of the FTC if there is no likelihood that the defendants' violations will recur, "the fact that illegal conduct has ceased does not foreclose injunctive relief."  FTC v. Citigroup Inc., 239 F. Supp. 2d 1302, 1306 (N.D. Ga. 2001).  If the FTC is able to demonstrate that there is "some cognizable danger of recurrent violation, something more than a mere possibility," then the FTC is entitled to injunctive relief.  United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953); United States v. Realty Multi-List, Inc.,

---

[24]   The defendants have requested that the court consider here the arguments articulated in their motion for summary judgment on this issue.  Accordingly, the court will consider both the defendants' and the FTC's briefing on this issue as found in the documents associated with the defendants' motion for summary judgment.

-82-

629 F.2d 1351, 1388 (5th Cir. 1980) (applying standard for injunction in this circuit).  In determining whether there is a "cognizable danger of future violations," this court has previously looked to the nature of the alleged violations, whether the defendants' current occupations position them to commit future violations, and the alleged harm to consumers if the wrongs recur. Citigroup, 239 F. Supp. 2d at 1306.

The court concludes that the FTC is entitled to a permanent injunction impacting NUG, Hi-Tech, Wheat, Holda, and Smith.[25]  The evidence clearly demonstrates that the corporate defendants' previous violations of the FTC Act were numerous and grave.  These parties, acting through their corporate officers, did not engage in a harmless advertising scheme with an isolated incidence of deception; instead, their advertising was chock-full of false, misleading, and unsubstantiated information.  This deceptive propaganda was not simply distributed through magazine advertisements and other general circulation media that could easily be "tuned-out" by consumers; rather, it was also sent directly to pre-determined lists of individuals who were especially

_____

[25]   The defendants have argued that the FTC is not entitled to injunctive relief against NICWL because NICWL is dissolved.  The court is persuaded by the defendants' arguments, and concludes that it is unnecessary to enter a permanent injunction against a corporation that is no longer in existence.  Accordingly, the court DENIES the FTC's request for injunctive relief from NICWL.

vulnerable to such targeted advertisement. In short, the defendants dispensed deception to those with the greatest need to believe it, and - not surprisingly - generated a handsome profit for their efforts.

In addition to the gravity of the past violations, the court concludes that the need for a permanent injunction is supported by the evidence on the record of NUG and Hi-Tech's current activities. Although they contend that they no longer advertise or even make the exact formulations of the products at issue, both NUG and Hi-Tech continue to market - through direct mail - dietary supplements similar to the dietary supplements that are discussed in this lawsuit. Significantly, Hi-Tech continues to market a product called Lipodrene, and callously continues to use - almost verbatim - NICWL's old Thermalean brochure to market this product. Thus, it is readily apparent that NUG and Hi-Tech's current business endeavors could serve as a platform for continuing violations of the FTC Act.

If NUG and Hi-Tech's violations recur, the harm to consumers is certain and serious. The advertisements that they disseminated deceived consumers into spending approximately $15.8 million; accordingly, future violations of a similar nature will almost certainly result in financial harm to consumers. More concerning, however, is the physical harm that these types of deceptive claims

could foreseeably inflict on consumers' health.  It is easy to imagine that a consumer, relying upon false and unsubstantiated advertising about a dietary supplement's safety, efficacy, and ability to conquer health threatening circumstances, could forgo a much needed medical appointment.  Moreover, it is also easy to imagine the physical harm that a consumer, relying upon a product's assertions of safety and clinical testing, might experience when suddenly struck by a violent side effect.  These are but two examples of many that this discussion could generate.  Thus, it is clear to the court that the recurrence of the corporate defendants' violations could cause significant harm to consumers.

Although a permanent injunction is clearly proper under these circumstances, the defendants make one last argument against it. They claim that the Consent Decree they entered into with the FDA requires them to submit all advertising efforts to the FDA prior to dissemination and, thus, makes it extremely unlikely that they will violate the FTC Act.  Because the FDA applies "a standard that is 'consistent with' the FTC's approach" when reviewing advertisements, the defendants argue that "any oversight remedy sought by the FTC in this case" is redundant and not in the public interest.  [Doc. No. 168, p. 48]

Upon review of the admissible evidence, the court concludes that the defendants' arguments are groundless.  First, the Consent

Decree only applies to the FDA defendants; thus, it has no impact

on the behavior of Holda, Smith, or Wright.   Second, none of the

terms of the Consent Decree appear to require the FDA to pre-screen

every advertisement issued by the FDA defendants,[26] rendering the

defendants' arguments that they are prevented from dispensing

deceptive advertising unsubstantiated.   Finally, the injunctive

relief sought in this case is not identical to the relief achieved

by the FDA Consent Decree and, thus, does not present any public

interest concerns.   The focus of the FDA Consent Decree is

unauthorized drug claims, not false or misleading claims regarding

dietary supplements.   Although the FDA and FTC may attempt to apply

---

[26]    The Consent Decree, entered into in 2003, required the
FDA defendants to retain an independent auditor to conduct
inspection of the defendants' advertising and labeling to ensure
that they were no longer making drug claims and that they were
appropriately tracking and investigating adverse events.   There is
no evidence that this auditor was ensuring that the defendants were
not disseminating misbranded dietary supplements or engaging in
other FTC Act violations.   However, even if this auditor did keep
a watchful eye for these violations, there is no evidence that the
auditor was required to continue to pre-screen the defendants'
products after they were introduced or re-introduced into the
market.   The Consent Decree did require the FDA defendants to
retain an auditor to conduct inspections of their operations at
least twice a year for two years after they resumed operations to
ensure compliance with the Food, Drug and Cosmetic Act ("FDCA").
Consent Decree, ¶ 11 [Doc. No. 168, Ex. I].   If still ongoing,
these bi-annual visits hardly constitute an injunctive prohibition
against disseminating deceptive advertising; rather, they seem to
function more as a check-in to ensure the defendants have not
violated the Consent Decree.   Moreover, the defendants have pointed
the court towards no evidence establishing that these audits are
still ongoing.

consistent standards when evaluating advertisements, nothing in the Consent Decree indicates that the FDA was actively evaluating the defendants' advertisements for all of the issues present here.

Even if there is some overlap between the Consent Decree and the injunctive relief requested here, it does not follow that the injunctive relief is not in the public interest.  Generally, any action commenced by the FTC to "stop deception in its incipiency" will be deemed in the public interest.  Regina Corp. v. Federal Trade Commission, 322 F.2d 765, 768 (3d Cir. 1963) (citing Progress Tailoring Co. v. Federal Trade Commission, 153 F.2d 103, 105 (7th Cir. 1946).  This action seeks to prevent the defendants from continuing to violate the FTC Act by: (1) enjoining the defendants from continuing violations, and (2) requiring the defendants to bear the consequences of their previous violations by compensating consumers for money spent on the defendants' deceptively advertised products.  Although the public interest is not necessarily served when one agency duplicates the gains that another agency has already achieved, see June 24, 2005, Order, p. 49 [Doc. No. 75], an action like this which seeks new, more targeted relief is not against the public interest simply because the injunctive relief

requested inadvertently echoes the injunctive relief already achieved in some respects.[27]

As indicated above, there is ample reason for the FTC to believe that the violations are likely to recur. Accordingly, the FTC is entitled to injunctive relief from NUG and Hi-Tech. As Wheat, Holda, and Smith have admitted continuing involvement in these corporations, the FTC is entitled to injunctive relief from these individual defendants as well.

---

[27]   Practically speaking, the court notes that the defendants' real motivation in making their public interest argument appears to be avoiding monetary liability, not injunctive relief. If the Consent Decree really does, as the defendants argue, prohibit and reign in all of the activities that the FTC seeks to enjoin in this case, the defendants would have no reason to contest the injunctive relief here because it creates no new restraints for them. However, the defendants argue that all monetary relief requested is contingent upon the grant of a permanent injunction; therefore, they claim that if the court does not grant a permanent injunction, it cannot award monetary redress. This contention is not correct. Even if the primary injunctive relief is not requested, the court is still entitled to grant other equitable remedies. See FTC v. Southwest Sunsites, Inc., 665 F.2d 711, 717-18 (5th Cir. 1982) ("[It is] indisputably clear that a grant of jurisdiction such as that contained in Section 13(b) carries with it the authorization for the district court to exercise the full range of equitable remedies traditionally available to it.") (internal citations omitted); In re Evans Products Co., 60 B.R. 863, 867 (S.D. Fla. 1986) ("The district court's power under § 13(b) to exercise the full range of equitable remedies, including rescission and restitution, is not diminished by the fact that primary injunctive relief might not be granted.").

ii. **The FTC's Entitlement to Monetary Relief from the Corporate Defendants and Wheat, Holda, and Smith**

In addition to injunctive relief, the FTC has requested monetary relief from the corporate defendants and Wheat, Holda, and Smith. "A corporation is liable for monetary relief under Section 13(b) if [the FTC] shows that the corporation engaged in misrepresentations or omissions of a kind usually relied on by reasonably prudent persons and that consumer injury resulted." Natural Solutions, Inc., 2007 U.S. Dist. LEXIS 60783, at *19. "To demonstrate reliance and resulting consumer injury, [the FTC] must prove that [the] 'defendant made material representations, that they were widely disseminated, and that consumers purchased the defendant's product.'" Id. (citing FTC v. Figgie International, Inc., 994 F.2d 595, 606 (9th Cir. 1993)).

As established in detail above, the advertisements made many material misrepresentations. Moreover, the FTC has conclusively demonstrated that the advertisements were widely disseminated.[28]

---

[28]    The FTC has established that approximately 10 million copies of the Thermalean advertisements attached to the complaint were mailed to consumers between the first half of 2001 and the first half of 2003. Defs.' Resp. to FTC's Statement of Facts, ¶¶ 114 and 130 [Doc. No. 197]. Similarly, the FTC has demonstrated that approximately 4 million copies of the Lipodrene advertisement attached to the complaint as Exhibit D were mailed to consumers, that the Lipodrene advertisement attached to the complaint as Exhibit C was placed in Cosmopolitan Magazine, and that the Lipodrene advertisement attached to the complaint as Exhibit E was

Finally, the FTC has proven that consumers spent $7,456,010.00 on Thermalean between May 1, 2001, through March 31, 2004; that consumers spent $3,163,073.00 on Lipodrene between January 1, 2001, and March 31, 2004; and that consumers spent approximately $5,263,353.00 on Spontane-ES between January 1, 2001, and March 31, 2004. Defs.' Resp. to FTC's Statement of Facts, ¶¶ 248, 250, and 313 [Doc. No. 197]. Thus, it is clear that consumers purchased the products at issue. Accordingly, the defendants are liable for consumer redress.

In similar Section 13(b) actions, "the proper amount of restitution has been held to be the purchase price of the relevant product or business opportunity, less any refunds." US Sales Corp., 785 F. Supp. at 753; Transnet Wireless Corp., 506 F. Supp. 2d at 1271; Peoples Credit First, 2005 U.S. Dist. LEXIS 38545, at *29, n.18. The primary purpose of restitution in the context of deceptive advertising is to restore victims to their position prior to the deceptive sales. Thus, in calculating a refund, the court looks to the price paid by the consumer and does not deduct any value received. Figgie International, 994 F.2d at 606.

--------

maintained on an internet website. Id. at ¶¶ 67, 166, and 188. The FTC has also demonstrated that approximately 4 million copies of the Spontane-ES advertisement in Exhibit F to the complaint were mailed to consumers. Id. at ¶ 260.

Using the above formula, the FTC claims that the defendants are jointly and severally liable for $15,882,436.00.[29]   The defendants argue that this figure is improper because it represents the amount of the sales to consumers rather than profits made by the defendants.  In addition, the defendants argue that the damages should be reduced by the amount of sales to customers who re-ordered the product.  The defendants further argue that this figure presumes joint and several liability, which they contend is improper in this case.  Finally, the defendants request that the court allow them to pay consumer redress directly to their customers rather than to the FTC.

The defendants have provided no case law in support of their position that consumer redress should be measured by the profits made by the defendants rather than the expenses incurred by consumers, and the court concludes that this argument does not comport with the theory behind restitution.  Restitution is intended to return the injured party to the status quo and is measured by the amount of loss suffered by the victim.  Transnet Wireless Corp., 506 F. Supp. 2d at 1271.  Requiring the defendants

---

[29]   This figure represents the total of $7,456,010.00 in Thermalean sales between May 1, 2001, and March 31, 2004; $3,163,073.00 in Lipodrene sales between January 1, 2001, and March 31, 2004; and $5,263,353.00 in Spontane-ES sales between January 1, 2001, and March 31, 2004.

to return the profits that they received rather than the costs incurred by the injured consumer would be the equivalent of making the consumer bear the defendants' expenses.  The court will not make the victimized consumers shoulder such a burden.

The court finds the defendants' second argument - that the damages should be reduced by the amount of sales to customers who reordered the product - equally unavailing.  Essentially, the defendants argue that they should not be required to compensate customers who reordered the products because "those customers were obviously influenced by their actual experience with the product and not the advertisement." [Doc. No. 196, p. 58].  The defendants do not introduce any evidence of what actually influenced the customers' decisions to reorder the products; instead, they merely speculate that it was the customers' experiences rather than the advertisements.

While it may be logical to infer that the customers who reordered the defendants' products relied to some degree upon their experience with the products, the fact that the customers' experiences played a role in their purchasing decisions does not mean or even imply that the customers did not also rely upon the representations in the advertisements when making their subsequent

purchases.[30]   The FTC has demonstrated that the defendants made material representations, that the misrepresentations were widely disseminated, and that consumers purchased the defendants' products; thus, the court may presume that the consumers actually relied upon the advertisements, even when making subsequent purchases.  See Figgie International, 994 F.2d at 605-06.  To rebut this presumption, the defendants must introduce evidence demonstrating that the repeat customers did not rely on the advertisements.  Id. at 606.  The defendants have presented nothing more than mere speculation in this regard and, thus, have failed to meet their burden.  Accordingly, the court will not reduce the defendants' monetary liability by the amount of the sales to consumers who reordered the products.

---

[30]   Indeed, the advertisements contain several express statements that indicate that consumers who reorder the products and use them long term will see favorable results.  See Doc. No. 1, Ex. A-4 (noting that Thermalean recipients can expect to lose a whopping 73 pounds in a year); Id. at Ex. A-6 ("Thermalean users can expect to lose 30 pounds in 60 days"); Id. at Ex. C (noting that Lipodrene can help customers achieve their weight loss goal of 125 pounds and can also help customers lose up to 42% of their total body fat).  In addition, the Spontane-ES advertisement indicates that the product is in short supply and encourages customers to purchase it quickly before it is no longer available [Id. at Ex. F-1].  This type of advertisement could have encouraged multiple orders and rapid re-orders from customers who were particularly vulnerable to the extreme promises made by the advertisement.

Next, the defendants argue that they should not be held
jointly and severally liable because the advertisements were
promulgated by different companies, albeit companies with
overlapping but not identical ownership. In short, the defendants
seem to argue that they are not all liable for the same violations
and, thus, should not be held jointly and severally liable as if
they were.

The FTC has demonstrated that the corporate defendants acted
as a common enterprise. Consequently, each corporation may be held
liable for the actions of the other corporations. Because all of
the individual defendants are liable for the corporations' actions,
joint and several liability is appropriate here.

Finally, the defendants request that the court allow them to
pay consumer redress directly to the purchasers of its products
rather than to the FTC. The defendants propose contacting every
single customer and providing or offering to provide each customer
with a complete refund. The FTC, on the other hand, has proposed
that all funds earmarked for consumer redress be deposited into a
fund in its name to be used for consumer redress and any attendant
expenses for the administration of such equitable relief. If the
FTC determines that consumer redress is wholly or partially
impracticable or if funds remain after redress is completed, the
FTC has proposed using any remaining funds for such other equitable

relief as it determines to be related to the defendants' practices as alleged in the complaint.  The FTC proposes depositing any additional funds into the United States Treasury as disgorgement.

The court has ample discretion to grant the FTC's requested relief, and the defendants have offered no compelling reason why they, the purveyors of the deception, should be charged with competently and honestly reimbursing the consumers.  Hence, the court denies the defendants' request.

The FTC has demonstrated that it is entitled to the consumer redress requested.  Accordingly, the court finds NUG, NICWL, Hi-Tech, Wheat, Holda, and Smith jointly and severally liable for $15,882,436.00.

### iii.  Remedy Against Dr. Wright

The FTC has requested that this court enter a permanent injunction against Dr. Wright.  The FTC has also requested that the court order disgorgement of ill-gotten gains from Dr. Wright in the amount of $15,454.00 for his participation in the deceptive marketing of the products.

Dr. Wright contends that the FTC is not entitled to injunctive relief from him because the FTC can show no "cognizable danger" that he will violate the law again.  Dr. Wright contends that, if the FTC is not entitled to a permanent injunction, it is barred from recovering any ancillary damages from him.

Dr. Wright's arguments are unpersuasive.  As detailed above, Dr. Wright's previous violations of the FTC Act were significant. In the Thermalean advertisement alone, he made numerous false and unsustainable endorsements that afforded the product an air of clinical safety that it otherwise may not have had.[31]  Moreover, the FTC has demonstrated that Dr. Wright is still making endorsements for the defendants.  Indeed, in a recent Lipodrene brochure, Dr. Wright makes some of the very same claims at issue in this case. While the FTC has not attacked the new Lipodrene brochure in this action, Dr. Wright's continuing endorsements indicate, at the very least, that he is positioned to commit future violations of the FTC Act.  Finally, any future FTC Act violations on the part of Dr. Wright will likely result in monetary and physical harm similar to that discussed in regard to future violations on the part of the corporate defendants.  Thus, it is clear that injunctive relief is warranted against Dr. Wright.

Other than arguing that the FTC is not entitled to a permanent injunction against him, Dr. Wright does not contest the monetary damages that the FTC seeks.  Accordingly, the court finds that the FTC is entitled to the monetary relief requested.

---

[31]    Although the FTC only pursues this action against Dr. Wright for his involvement in the Thermalean advertising campaign, his participation in the deceptive Lipodrene and Spontane-ES advertisements is obvious.

-96-

### iv.  **Entry of the Proposed Orders**

The FTC has provided the court with two proposed orders in this case.  In these proposed orders, the FTC sets forth the injunctive relief that it seeks from the defendants, the monetary relief requested, and monitoring and other provisions.

The defendants have requested that the court grant them further opportunity to address issues raised by the proposed orders before the court adopts them.  Citing "space limitations," they contend that they were unable to fully address the "numerous deficiencies" in the proposed orders.  Defs.' Resp. Br., p. 58 [Doc. No. 196].

In the interest of justice, the court will grant the defendants' request.  However, the court cautions the defendants that it is persuaded by case law that "injunctive relief may be broader than the violations alleged in the complaint as long as the relief is reasonably related to the violations of the FTC Act which occurred, and is not too indefinite."  United States v. Vend Direct, Inc., C.A. No. 06-cv-02423, 2007 U.S. Dist. LEXIS 83759, at *6 (D. Colo., July 26, 2007); see also SlimAmerica, 77 F. Supp. 2d at 1275 ("Broad injunctive provisions are often necessary to prevent transgressors from violating the law in a new guise.").  Thus, the defendants are instructed to concisely frame their objections with this standard in mind.

## IV.   Conclusion

Pursuant to the reasons stated herein, the court **DENIES** the defendants' motion to strike the declaration of Jennifer Thomas [Doc. No. 214], **DENIES** Hi-Tech's motion for summary judgment [Doc. No. 170], and **DENIES** the defendants' motion for summary judgment [Doc. No. 168].  The court **GRANTS** the FTC's motion for summary judgment [Doc. No. 172].  The court concludes that the FTC is entitled to a permanent injunction against all parties, with the exception of NICWL.   In addition, the court concludes that defendants NUG, NICWL, Hi-Tech, Wheat, Holda, and Smith are jointly and severally liable for $15,882,436.00 in consumer redress, and that Dr. Wright is liable for $15,454.00.

The defendants are hereby **ORDERED** to submit to the court, within 15 days, any objections they have to the proposed orders presented by the FTC.  The FTC will then have 15 days to file any response to the defendants' objections.   Both parties are **INSTRUCTED** to limit their response to **ten (10) pages**.  In addition, both parties are **INSTRUCTED** to include any citations to the record in their briefs, and are further **INSTRUCTED** to cite directly to any supporting evidence that they wish the court to consider.

SO ORDERED, this <u>4th</u> day of June, 2008.


<u>/s/ Charles A. Pannell, Jr.</u>
CHARLES A. PANNELL, JR.
United States District Judge