UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.  04-11136-GAO

FEDERAL TRADE COMMISSION,
Plaintiff

vs.

DIRECT MARKETING CONCEPTS, INC., d/b/a TODAY'S HEALTH and DIRECT
FULFILLMENT, ITV DIRECT, INC., d/b/a DIRECT FULFILLMENT, DONALD W.
BARRETT, TRIAD ML MARKETING, INC., KING MEDIA, INC., ALLEN STERN, LISA
STERN, STEVEN RITCHEY, and BP INTERNATIONAL, INC.,
Defendants

OPINION AND ORDER
July 14, 2008

O'TOOLE, D.J.

The Federal Trade Commission ("FTC") has brought this action to remedy alleged violations

by the defendants of sections 5(a) and 12 of the Federal Trade Commission Act ("FTC Act"), 15

U.S.C. §§ 45, 52, in connection with the production and dissemination of two "infomercials" and the

sales of the products advertised in those infomercials. See 15 U.S.C. §§ 53(a)-(b), 57b (permitting

the FTC to initiate federal court actions to enforce violations of section 5 and 12). The complaint

focuses on two particular infomercials – one for a product marketed and sold as "Coral Calcium

Daily" ("Coral Calcium") and one for a product marketed and sold as "Supreme Greens with MSM"

("Supreme Greens"). Both are herbal dietary supplements.

The FTC has moved for summary judgment (dkt. no. 130) against all defendants on all counts

of the complaint. The FTC has also moved to strike (dkt. no. 157) portions of the defendants'

materials submitted in support of their opposition to the motion. Upon consideration of the issues

presented, as explained herein I GRANT in part and DENY in part the FTC's motion for summary judgment. In a separate Order, I also GRANT in part and DENY in part the motion to strike.

## I.   The Defendants

The complaint alleges that seven defendants participated in violating the FTC Act. These so-called "liability defendants" are: (1) Direct Marketing Concepts, Inc. ("Direct Marketing"), (2) ITV Direct, Inc. ("ITV"), (3) Donald W. Barrett, (4) Robert Maihos, (5) Allen Stern, (6) King Media, Inc. ("King Media"), and (7) Triad ML Marketing ("Triad"). In addition, the complaint seeks relief from three other defendants (referred to as the "relief defendants"), Lisa Mount,[1] Steven Ritchey, and BP International, Inc. ("BP International"), for their receipt of proceeds derived from the infomercials.

The FTC claims that Direct Marketing produced the Coral Calcium infomercial and that ITV produced the Supreme Greens infomercial. Those two companies also provided customer service for the two infomercials. Although Direct Marketing and ITV are separate corporations, they are commonly owned and operated by Donald Barrett and Robert Maihos. The FTC alleges that Barrett, as president and director of both Direct Marketing and ITV, oversaw the production of the infomercials and was ultimately responsible for their content as well as the content of related brochures, packaging inserts, and other sales materials. As vice president at Direct Marketing, Robert Maihos oversaw the shipping and customer service departments and the company's finances, while at ITV he acted as treasurer and vice president, overseeing its merchant account.[2] Maihos had authority to enter into contracts on behalf of both companies. (Maihos Dep. 12:16-14:25.)

---

[1] Lisa Mount was previously known as Lisa Stern. She was married to Allen Stern but has since divorced him and resumed use of her former name, "Mount."

[2] Maihos had also previously served as president and treasurer at Direct Marketing.

Between January 2002 and February 2003, Triad functioned as the processing intermediary between Direct Marketing and its consumers. In this role, Triad allowed Direct Marketing to use its "merchant account" so that individual consumers purchasing Coral Calcium via personal credit cards could be processed. (Stern Dep. 28:4-7.) Triad received fifty percent of the net profits from sales generated by the Coral Calcium infomercial as compensation for its services. (Ritchey Dep. 22:10-23, 36:11-21.) Furthermore, as part of its agreement with Direct Marketing, Triad also exerted some editorial influence over the Coral Calcium infomercial.

Direct Marketing contracted with King Media to purchase the television air time for Coral Calcium, from approximately December 2001 to March 2003.[3] (Id. 21:11-25, 35:9-12.) As compensation, King Media earned "upwards of 15 percent" commission from Direct Marketing. (Id. 22:1-9; Stern Dep. 26:14-16.)

Allen Stern is the president and chief executive officer of both Triad and King Media. Stern owns sixty-six percent of King Media (with the other thirty-three percent owned by relief defendant Steven Ritchey). Stern actively conducted the businesses of both Triad and King Media. (Stern Dep. 71:17-73:20.)

As noted above, Lisa Mount, Steven Ritchey, and BP International are only sued as relief defendants. Although the FTC does not claim that Mount, Ritchey, or BP International are themselves liable for any wrongdoing, it does claim that they were unjustly enriched by receipt of proceeds from the infomercial to which they have no legitimate claim. Lisa Mount owned approximately thirty-three percent of both King Media and Triad from 1996 to about 2003, at which

---

[3] By the time the Supreme Greens infomercial aired, King Media and Triad were no longer involved with Direct Marketing or ITV.

point she relinquished her ownership positions as part of her divorce settlement with Allen Stern. (Stern Dep. 19:1-4.) The FTC seeks to reclaim $1,545,305 from Lisa Mount, which represents the total of her Subchapter S distributions from Triad for the year 2002. (Federal Trade Commission's Rule 56.1 Statement of Material Facts Not in Dispute ¶ 376.) It is estimated that ninety percent of Triad's earnings in 2002 were attributable to the Coral Calcium infomercial. (Id. ¶ 378.)

Steven Ritchey owned about thirty-three percent of both King Media and Triad since both companies' inception. The FTC seeks an order requiring him to disgorge the $772,652 he received from Triad in Subchapter S distributions in 2002. (See id. ¶ 377.)

BP International did database work for Direct Marketing's master distributors[4] to help organize the master distributors' businesses. BP International was entitled to receive royalties from sales of the products advertised by the infomercials. (Barrett Dep. 40:4-16 (July 21, 2005).)

## II.    The Claims

The FTC brings an eight count complaint that alleges the following:

- Count One - The Coral Calcium infomercial makes express or implied representations that coral calcium is an effective treatment or cure for cancer, Parkinson's disease, heart disease, and autoimmune diseases such as multiple sclerosis and lupus.

- Count Two - The Coral Calcium infomercial makes express or implied representations that Coral Calcium has an absorption rate of 100% within twenty minutes.

- Count Three - The Coral Calcium infomercial makes express representations that scientific research published in the Journal of the American Medical Association ("JAMA") and the New England Journal of Medicine ("NEJM") supported the proposition that calcium supplements are able to prevent, reverse, or cure cancer in humans.

---

[4] Barrett defines master distributors as "other distributors that ran the show on a small basis and brought product." (Barrett Dep. 40:5-8 (July 21, 2005).)

- <u>Count Four</u> - The Supreme Greens infomercial makes express or implied representations that the Supreme Greens product is an effective treatment, cure, or preventative for cancer, heart disease, diabetes, and arthritis.

- <u>Count Five</u> - The Supreme Greens infomercial makes express or implied representations that Supreme Greens will cause significant weight loss.

- <u>Count Six</u> - The Supreme Greens infomercial makes express or implied representations that Supreme Greens can be taken safely by pregnant women, children, and persons on medication.

- <u>Count Seven</u> - The format of the Supreme Greens infomercial is deceptive.

- <u>Count Eight</u> - The defendants' automatic billing and shipping practices ('autoship"), without first obtaining the consent of customers, was an unfair practice in violation of § 5(a) of the FTC Act.

## III.  The Challenged Infomercials

### A.  *The Coral Calcium Infomercial*

The Coral Calcium infomercial at issue, which aired from about January 2002 to September 2003, advertises and promotes the nutritional supplement "Coral Calcium Daily." The infomercial is styled as a half-hour long talk show entitled "A Closer Look" in which Kevin Trudeau, the host, interviews Robert Barefoot, who is characterized as a "Scientist/Author."

Trudeau opens the infomercial by saying, "We're going to be talking about health this half hour, specifically cancer, heart disease." (Am. Compl. Ex. 2 at 3 [hereinafter Coral Calcium Infomercial Transcript].) The infomercial goes on to say that the "cause" of cancer, heart disease, lupus, fibromyalgia, and multiple sclerosis is an acidic body marked by "a lack of oxygen" and a calcium deficiency. (<u>Id.</u> at 5-6.) Barefoot attempts to bolster this theory by speaking at length about the scientific community's collective knowledge regarding "alkalizing" one's body, about the findings of Nobel Prize scientists that supposedly support Barefoot's claims, and about the conspiracy by the

5

traditional medical community and the pharmaceutical industry to keep this information from the public. As an example, Barefoot explains that the true cause of heart disease is acidosis, not cholesterol. (Id. at 14-16.) Barefoot says that instead of lowering cholesterol to prevent heart disease, one's focus should be on "the calcium deficiency that's going to cause a problem, not the cholesterol." (Id. at 19.)

He also asserts that if one can "drive out the acid," (id. at 4) by "consum[ing] a lot more calcium," then these illnesses can be prevented. (Id. at 8.) Barefoot states:

> I can tell you there are tens of millions of people, millions of testimonials. I've had 1,000 people tell me how they've *cured their cancer*. I've witnessed people *get out of wheelchairs with multiple sclerosis just by getting on the coral*.

(Id. at 20 (emphasis added).) And again:

> [I]f you make your body alkaline by taking calcium, the free radicals are destroyed on entry, *you can't get Parkinson's….every disease can be explained*.

(Id. at 33 (emphasis added).) Barefoot even cites journals published by "the medical community" for support for the proposition that calcium cures cancer:

| Kevin Trudeau: | Now, the medical community would say to say that calcium is a cure for cancer is ridiculous. |
|---|---|
| Robert Barefoot: | Then why did the Journal of the AMA this year quote the Strain (phonetic) Cancer Research Institute and said that *calcium supplements reverse cancer*. That's a quote from the Journal of the AMA and they quoted how much. They said 1,500 milligrams a day is enough to *reverse colon cancer* and they said other cancers will grow back to normal. |

(Id. at 20 (emphasis added).) Barefoot also argues that calcium has similar curative properties with respect to general pain:

| Kevin Trudeau: | Pain, talk about pain, Read in your book if a person has pain, muscle pain, joint pain – |
|---|---|

| | |
|---|---|
| Robert Barefoot: | Yes, yes. |
| Kevin Trudeau: | – they take calcium. |
| Robert Barefoot: | Yes. |
| Kevin Trudeau: | Their body turns from acid to alkaline, *pain goes away*. |
| Robert Barefoot: | That's exactly – |
| Kevin Trudeau: | Is that common? |
| Robert Barefoot: | Yes, very, very common. |

(Id. at 29 (emphasis added).)

Barefoot goes on to suggest that in order to maximize the benefits of calcium, people should take the *coral form* of calcium because it has the highest absorption rate. In fact, according to the infomercial, the coral form of calcium has "100 percent absorption." (Id. at 11; see also id. at 22.) The product advertised – Coral Calcium Daily – is coral calcium encapsulated. As the infomercial promises, "with just three little capsules a day [of Coral Calcium Daily]," individuals should begin to see "miraculous" results. (Id. at 22.)

B.      *The Supreme Greens Infomercial*

The Supreme Greens infomercial promotes the nutritional supplement "Supreme Greens with MSM," which is described as a "natural healing technique" for many major illnesses. Like the Coral Calcium infomercial, the Supreme Greens infomercial is produced as a *faux* talk show, called "Today's Health." The defendant Donald Barrett is the host and his "guest" is Dr. Alejandro Guerrero, OMD[5]. Guerrero discusses his "treatment" of sick people at his clinic, especially those with "chronic conditions – like…cancer patients, Aids [sic] patients, people with MS, diabetes, Parkinson's." (Am.

---

[5] OMD denotes a "doctor of oriental medicine."

Compl. Ex. 6 at 6 [hereinafter Supreme Greens Infomerical Transcript].) Like the Coral Calcium infomercial, the Supreme Greens sales pitch is that chronic conditions are a "result of over acidification of the blood and tissues," so that methods or treatments that alkalize the body will prevent and/or cure these chronic diseases because it removes the acidic "environment." (Id. at 9.) The infomercial contains this exchange:

> Mr. Barrett:     And now here's the question: *If I alkalize my body, am I going to come up with one of these chronic degenerative diseases*?
>
> Dr. Guerrero:     *No.*
>
> …
>
> Mr. Barrett:     How can you say that so confidently?
>
> Dr. Guerrero:     I'm very confident in saying that, primarily because of the clinical studies we've done. I've seen it in my – in my – in my clinical practice. I've seen it every day in my clinical practice.

(Id. at 11 (emphasis added).) And again:

> Mr. Barrett:     …You're saying if someone is acid, they're on the road to disease?
>
> Dr. Guerrero:  Right. You're in a state of degeneration. And your signs of a degenerative condition would be, for example, someone who has [a] difficult time waking up in the morning. You know, they – they sleep seven hours and wake up and think, Oh, man, I just can't believe today's another day. You know, those are people that – that's a sign of an over acidic condition.
>                  Acne, obesity, diabetes, foggy thinking – those are all conditions, are all signs and symptoms of a body that's in an acidic

(Id. at 10.)

Having identified the curative method – alkalizing the body – the infomercial then discusses the various methods by which that can be accomplished, such as by eating "water containing foods," which include "obviously your cruciferous vegetables – the darker the green, the better." (Id. at 13.)

8

However, Guerrero cautions that because modern-day vegetables lack the necessary nutritional value, supplementation is necessary—specifically, Supreme Greens with MSM.

Dr. Guerrero then describes some of the benefits of Supreme Greens with MSM, including weight-loss:

| | |
|---|---|
| Guerrero: | [People] lose weight as a by-product because, again remember, weight is the – fat is your body's way of protecting itself from the acidic fluids. And so when you alkalize your – |
| … | |
| Barrett: | And when you have a high acid system your body needs a layer of protection which is called fat. |
| Guerrero: | It's called fat. |
| Barrett: | So when you alkalize your body you don't need that fat? |
| Guerrero: | You don't need that fat. Your body burns it actually for fuel. |
| Barrett: | So not only will this product help people get the nutrition they need, but they can actually lose weight on this product. |

(Id. at 21-22.) Guerrero suggests that side effects from pregnancy can also be alleviated:

| | |
|---|---|
| Guerrero: | It's great for women that are pregnant because it certainly applies – |
| Barrett: | So she can take it when she's pregnant? |
| Guerrero: | No question. My wife took it, my wife took it through all of her pregnancies. |
| … | |
| Guerrero: | And she took it through all of her pregnancies, never had to deal with, you know, prenatal vitamins, never got morning sickness. |

(Id. at 22.) Regarding arthritis, this:

[Guerrero:]   And, you know, think about arthritis. Let's talk about arthritis for a minute. Arthritis is an inflammation in the joint. What happens because it's so acidic that when a cell receives nourishment and it breaks it

9

> down, the mucosal lining again is so hard that it can't excrete the
> waste out. So the cell accumulates and just gets bigger and bigger and
> bigger and bigger so we get inflamed joints. So the MSM really is a
> great anti-inflammatory,

…

Guerrero:    Because as a superconductor it makes the cell wall more permeable.
             So now the cell can actually release all of its metabolic waste.

Barrett:     It takes down the swelling.

(Id. at 28-29.) And finally diabetes:

Guerrero:    …So now [the professional medical community is] not going to call
             it hypoglycemia anymore, we're going to call it insulin resistence or
             we're going to label it and call it Syndrome X. So you now have
             Syndrome X. So now they're coming up with medications to help you
             deal with Syndrome X when the reality is all you really need to do is
             if you can nourish the cell, maintain more permeability, your body will
             metabolize insulin.

(Id. at 33-34.) The Supreme Greens infomercial concludes:

Guerrero:    …All disease is in the blood.…Cleanse the blood, nourish the
             cell. You're now in a state of regeneration and you will stay
             healthy.

Barrett:     Supreme Greens is the best product, you feel, to cleanse the
             blood?

Guerrero:    Absolutely no question.

(Id. at 35.)

    C.    The Autoship Billing Program

    Direct Marketing utilized a practice whereby consumers who purchased either Coral Calcium

or Supreme Greens were automatically enrolled to receive future shipments of the products unless

they affirmatively cancelled. As explained by Barrett, sales representatives were instructed to tell

customers:

> As a bonus today, we will enroll you in our Coral Calcium Clum [sic]. After you run out, you will receive the lowest price of $29.99 per month supply. And, of course, you can cancel at any time.

(Barrett Dep. 16:18-22.) As long as the customer did not object, she would be automatically enrolled in the Coral Calcium Club or the equivalent for Supreme Greens. With each additional shipment, the consumer's credit card was automatically billed. Additionally, when consumers called to order Supreme Greens, Direct Marketing sales representatives would offer a "free" bottle of another product – E8 Daily – without disclosing the fact that after the initial free bottle, they would be charged $12.50 for each monthly shipment of E8 Daily. (Federal Trade Commission's Rule 56.1 Statement of Material Facts Not in Dispute ¶¶ 293-304.)

## IV.   Relevant Legal Standards

### A.   Summary Judgment Standard

Summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Gulf Coast Bank & Trust Co. v. Reder, 355 F.3d 35, 39 (1st. Cir. 2004) (quoting Fed. R. Civ. P. 56(c)). Once the movant has served a properly supported motion asserting entitlement to summary judgment, the burden is on the nonmoving party to present evidence showing the existence of a trialworthy issue. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986); Gulf Coast Bank & Trust Co., 355 F.3d at 39.

### B.   Deceptive Acts or Practices under the FTC Act

Section 5(a) of the FTC Act prohibits engaging in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce…."15 U.S.C.

11

§ 45(a)(1). Section 12 provides that "[t]he dissemination or the causing to be disseminated of any false advertisement within the provisions of subsection (a) of this section shall be an unfair or deceptive act or practice in or affecting commerce within the meaning of [Section 5]." Id. § 52(b).

To successfully prove a claim under section 5(a), the FTC must establish three elements: (1) that the advertisement conveyed a representation through either express or implied claims; (2) that the representation was likely to mislead consumers; and (3) that the misleading representation was material.  See Fed. Trade Comm'n v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003); see also Fed. Trade Comm'n v. Freecom Commc'ns, Inc., 401 F.3d 1192, 1203 (10th Cir. 2005) ("[N]either proof of consumer reliance nor consumer injury is necessary to establish a § 5 violation." (citing Fed. Trade Comm'n v. Think Achievement Corp., 144 F. Supp. 2d 993, 1010 (N.D. Ind. 2000))); Federal Trade Commission, Policy Statement on Deception (1983), appended to In re Cliffdale Assoc., 103 F.T.C. 110, 174 (1984) [hereinafter Policy Statement on Deception], available at http://www.ftc.gov/bcp/policystmt/ad-decept.htm.

As to the first element,  the representation may be explicitly stated in the advertisement, as are some of the statements in the infomercials complained of here. See Fed. Trade Comm'n v. Colgate-Palmolive Co., 380 U.S. 374, 386 (1965) (determining the meaning of an advertisement based on an examination of the advertisement itself).  Even in the absence of an explicit representation, a court may determine whether the advertisement in question makes a representation by considering whether, from the point of view of a reasonable consumer-viewer, the "net impression" of the advertisement is to make such a representation. See Removatron Int'l Corp. v. Fed. Trade Comm'n, 884 F.2d 1489, 1497 (1st Cir.1989) (looking to "common-sense net impression" of an advertisement); Fed. Trade Comm'n v. U.S. Sales Corp., 785 F. Supp. 737, 745 (N.D. Ill.

1992) (concluding that there was no genuine issue of fact as to the net impression of the television advertisements upon a reasonable viewer).

Once a representation has been identified, the FTC must prove that the representation is likely to be misleading. The FTC may prove this by demonstrating that "the advertiser lacked a reasonable basis for asserting that the message was true."[6] In re Thompson Med. Co., 104 F.T.C. 648, 819 (1984); see In re Pfizer Inc., 81 F.T.C. 23 (1972). "The FTC is not, however, required to prove intent to deceive," Fed. Trade Comm'n v. Bay Area Bus. Council, Inc., 423 F.3d 627, 635 (7th Cir. 2005), and so by extension, the advertiser's subjective good faith is not a valid defense. Fed. Trade Comm'n v. Sabal, 32 F. Supp. 2d 1004, 1007 (N.D. Ill. 1998).

For an advertiser to have had a "reasonable basis" for a representation, it must have had some recognizable substantiation for the representation prior to making it in an advertisement. See Fed. Trade Comm'n v. QT, Inc., 448 F. Supp. 2d 908, 959 (N.D. Ill. 2006) ("Defendants have the burden of establishing what substantiation they relied on for their product claims."), amended on reconsideration in part by 472 F. Supp. 2d 990, (N.D. Ill. 2007), aff'd, 512 F.3d 858 (7th Cir. 2008) (Easterbrook, J.); Federal Trade Commission, Policy Statement Regarding Advertising Substantiation (1984), appended to In re Thompson Med. Co., 104 F.T.C. at 839 [hereinafter Policy Statement on Advertising Substantiation], available at http://www.ftc.gov/bcp/guides/ad3subst.htm. The necessary level of prior substantiation varies depending on the nature of the representation. In re Thompson Med. Co., 104 F.T.C. at 819.

---

[6] As an alternative to this so-called "reasonable basis" theory, the FTC could also proceed under a more stringent "falsity" theory, which would require it to prove that the express or implied claims were actually false. Either approach suffices.

Generally, claims can be divided into two categories – establishment claims and non-establishment claims. Establishment claims are those that contain "statements regarding the amount of support the advertiser has for the product claim." Policy Statement on Advertising Substantiation. They are in effect statements "that scientific tests establish that a product works." Removatron, 884 F.2d at 1492 n.3. Common examples include statements such as "tests prove," "doctors recommend," or "studies show." Policy Statement on Advertising Substantiation; see also Thompson Med. Co. v. Fed. Trade Comm'n, 791 F.2d 189, 194 (D.C. Cir. 1986); Spalding Sports Worldwide, Inc. v. Wilson Sporting Goods Co., 198 F. Supp. 2d 59, 67 (D. Mass. 2002); Gillette Co. v. Norelco Consumer Prods. Co., 946 F. Supp. 115, 121 (D. Mass. 1996) ("An establishment claim is one that says, in substance, that 'tests or studies prove' a certain fact."). In the case of establishment claims, the advertiser must be able to demonstrate that it has at least the advertised level of substantiation.

In contrast, for non-establishment claims, what constitutes sufficient substantiation may depend on multiple factors, such as the type of claim, the product, the consequences of a false claim, the benefits of a truthful claim, the cost of developing substantiation for the claim, and the amount of substantiation experts in the field believe is reasonable. Removatron, 884 F.2d at 1492 n.3; QT, 448 F. Supp. 2d at 959 (citing Policy Statement Regarding Advertising Substantiation). For health-related efficacy and safety claims, the FTC has commonly insisted on "competent and reliable scientific evidence." See, e.g., Removatron, 884 F.2d at 1498 (reviewing Commission Order that required claims to be supported by "competent and reliable scientific evidence"); Sterling Drug, Inc. v. Fed. Trade Comm'n, 741 F.2d 1146, 1156-57 (9th Cir. 1984) (same).

The final element, materiality, is measured by whether a representation is "likely to affect the consumer's conduct or decision with regard to a product or service." In re Cliffdale Assocs., 103

14

F.T.C. 110 at Appendix; see also Fed. Trade Comm'n v. Transnet Wireless Corp., 506 F. Supp. 2d

1247, 1266 (S.D. Fla. 2007) ("A representation is material if it is of the kind usually relied on by a

reasonably prudent person."). In particular, information has been found material where it "'concerns

the purpose, safety, efficacy, or cost, of the product or service.'" Novartis Corp. v. Fed. Trade

Comm'n, 223 F.3d 783, 786 (D.C. Cir. 2000) (quoting Policy Statement on Deception); see also J.B.

Williams Co., 68 F.T.C. 481, 546 (1965), aff'd, 381 F.2d 884 (6th Cir. 1967).

     C.     *Unfair Practices under the FTC Act*

A three-part test is used to analyze "unfair practices":

> To justify a finding of unfairness the injury must satisfy three tests. It
> must be substantial; it must not be outweighed by any countervailing
> benefits to consumers or competition that the practice produces; and
> it must be an injury that consumers themselves could not reasonably
> have avoided.

Am. Fin. Serv. Ass'n v. Fed. Trade Comm'n, 767 F.2d 957, 971 (D.C. Cir. 1985); see also Orkin

Exterminating Co. v. Fed. Trade Comm'n, 849 F.2d 1354, 1364 (11th Cir. 1988); Fed. Trade

Comm'n v. J.K. Publ'ns, Inc., 99 F. Supp. 2d 1176, 1203 (C.D. Cal. 2000); Letter from Federal

Trade Commission to Senators Ford and Danforth (Dec. 17, 1980), appended to In the Matter of Int'l

Harvester Co., 104 F.T.C. 949 (1984).

     In most cases "substantial injury" involves monetary harm. See Letter from Federal Trade

Commission to Senators Ford and Danforth, supra. Furthermore, an injury may be deemed substantial

"if it does a small harm to a large number of people, or if it raises a significant risk of concrete harm."

Id. at n.12. The potential costs of the proposed remedy on the parties and society in general are

balanced against the benefits of avoiding injury to consumers. Am. Fin. Serv. Ass'n, 767 F.2d at 975.

Finally, the last element, that the injury cannot be reasonably avoided by the consumers, represents

the Commission's inclination to take corrective action only if traditional market forces fail. Such corrective action is taken "'not to second-guess the wisdom of particular consumer decisions, but rather to halt some form of seller behavior that unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decisionmaking.'" Id. at 976 (quoting Letter from Federal Trade Commission to Senators Ford and Danforth, supra).

## V.    Application of Law to Undisputed Facts

### A.    Misleading Representations in the Coral Calcium Infomercial

As illustrated by the excerpts quoted above, there is no question that the net impression of the Coral Calcium infomercial would lead a reasonable viewer to believe that it was being claimed that consumption of Coral Calcium would treat and/or prevent certain diseases, specifically including cancer, autoimmune diseases, Parkinson's, and heart disease (as alleged in Count One), that Coral Calcium will be absorbed 100 percent within about twenty minutes, making it far superior to other forms of calcium (as alleged in Count Two), and that both the Journal of the AMA and the New England Journal of Medicine quote medical researchers who affirm that calcium reverses cancer (as alleged in Count Three). Because the allegedly misleading misrepresentations in Counts One through Three center on the efficacy claims about Coral Calcium for relieving health ailments, they are clearly material. See Kraft, Inc. v. Fed. Trade Comm'n, 970 F.2d 311, 322-24 (7th Cir. 1992); Fed. Trade Comm'n v. SlimAmerica, Inc., 77 F. Supp. 2d 1263, 1272 (S.D. Fla.1999) ("Express claims or deliberately-made implied claims used to induce the purchase of a particular product or service are presumed to be material."). Therefore, the only significant question with respect to these three counts is whether the liability defendants had sufficient substantiation for the claims asserted.

1.   Counts One and Two

The claims identified in both Counts One and Two are non-establishment claims. Through Count One, the FTC alleges that the Coral Calcium infomercial makes deceptive claims regarding Coral Calcium's successful treatment of cancer, autoimmune diseases, Parkinson's disease, and heart disease. Because those are non-establishment health-related efficacy claims, the defendants must be able to point to "competent and reliable scientific evidence" as substantiation for the claims. Removatron, 884 F.2d at 1498. Although the parties dispute what may constitute competent and reliable scientific evidence, see infra, after review of the proper summary judgment record I conclude that the defendants did not have *any* support for those claims at the time of the airing of the commercial.

As to King Media and Triad, Allen Stern admitted that neither corporation nor its employees considered that they had any responsibility or "function" to substantiate the claims made in the Coral Calcium infomercial. (Stern Dep. 62:11-66:4.) As for the Direct Marketing defendants[7], the only substantiation offered consists of statements from Eileen Barrett Maihos and others that they "read Robert Barefoot's books and additional materials he had provided regarding coral calcium." (Barrett Maihos Aff. ¶4, Feb. 10, 2006.) Accepting those statements as true, reliance on the referenced books alone is insufficient substantiation. While the defendants' assertion that Barefoot's books contain "numerous citations to scientific studies and journals," (The DMC Defs.' Opp'n to Pl.'s Mot. for Summ. J. 17), is literally true, the books are little more than a compilation of citations, with no context or explanation. They do not contain any independent analysis or support for the claims made

---

[7] The "Direct Marketing defendants" are Donald Barrett, Robert Maihos, Direct Marketing, and ITV.

in the infomercial. The defendants have essentially provided nothing more than a bibliography, without any of the actual studies or journal articles, apparently on the theory that whatever the cited documents say can be simply incorporated by reference and will suffice as "substantiation." That is not an appealing proposition, and it is not the law.

The defendants have also proffered thirty binders of studies attached to the affidavit of Andrew Aldrich which purport to contain substantiation for the challenged claims. The FTC has moved, however, to strike these materials from the record because they do not meet the standard established by Federal Rules of Civil Procedure 56(e)(1), which requires that affidavits opposing a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  I agree with the FTC that the materials do not satisfy that standard and therefore grant the motion to strike them from the record. The thirty binders supposedly represent "the materials relating to these products that were in the possession of and reviewed by [Direct Marketing] at the time these shows were aired," (Aldrich Aff. ¶ 5), and the "materials [that are] available in the public domain that would provide substantiation for the claims made in each of the subject infomercials" (id. ¶ 6), and would speak to the general benefits of the products advertised therein. Because Aldrich was not employed by the defendants at the time either infomercial was aired, (Id. ¶ 5), he has not demonstrated the personal knowledge necessary to attest to what the defendants possessed at that time.

Moreover, to the extent that Aldrich could establish personal knowledge as to any of the proffered documents, they are inadmissible hearsay. The exhibits are clearly offered for the truth of the matter asserted therein; the defendants wish me to find that the studies' findings and conclusions reliably substantiate the claims in their infomercial. Because Aldrich would be unable to testify at trial

for these reasons[8], the evidence would be inadmissible at trial and therefore may not be considered at summary judgment. See Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668, 681 (1st Cir. 1994) ("Under Rule 56(e), affidavits supporting or opposing summary judgment must set forth facts that would be admissible in evidence.").

At most the defendants have shown that prior to the airing of the Coral Calcium infomercial, they *inquired* into obtaining substantiation for the claims, but the record lacks evidence that the defendants received or reviewed any scientific substantiation beyond mere summaries or conclusory assurances. (See Barrett Aff. ¶ 9 ("Both Kevin Trudeau and Allen Stern told me on several occasions that they had provided the A Closer Look show [the coral calcium infomercial] to counsel for review, and had also worked with Robert Barefoot to obtain and review his substantiation for the show."); Barrett Maihos Aff. ¶¶ 3-4 (stating that she was told by Robert Maihos that "the show had been reviewed by Trudeau's experts and lawyers...." and that she "heard" that "Allen Stern had given a copy of the show to his lawyer to review").) These statements may offer support for a claim that the defendants relied in good faith on some materials, but their good faith is not the question. See, e.g., Koch v. Fed. Trade Comm'n, 206 F.2d 311, 317 (6th Cir. 1953) ("The fact that petitioners made the representations in good faith is immaterial."); Sabal, 32 F. Supp. 2d at 1009 (stating that "good faith is not a valid defense to a claim brought under section 5(a) of the Federal Trade Commission Act"). The issue is whether there was adequate substantiation for the claims. On the proper record, it is clear that there was not. Accordingly, as a matter of law, the defendants did not have a reasonable basis for the claims. Removatron, 884 F.2d at 1498. As to Count One, then, the FTC is entitled to summary

---

[8] It is also likely that any testimony by Aldrich or anyone else regarding how the written materials substantiate the claims would have to meet the criteria of Rule 702 of the Federal Rules of Evidence. There is no indication that Aldrich could meet those criteria.

judgment.

In Count Two the FTC alleges that the defendants misled consumers with their claim that "within about 20 minutes you get 100 percent absorption, you're literally getting 50 times as much calcium, 50 times as fast if you take coral calcium versus, say, an antacid calcium." (Coral Calcium Infomercial Transcript at 13-14.) Based on his expertise in mineral bioavailability, Dr. Wood, the FTC's expert, concluded that "competent and reliable scientific evidence does not support the claims [made in Count Two]." (Wood Decl., Report of Richard J. Wood, Ph.D. 3.) Although the defendants assert that "published studies and literature substantiate the claim that the calcium in coral calcium would be better absorbed than the calcium from a commonly available antacid," (Defs. Direct Marketing Concepts, Inc., ITV Direct, Inc., Donald Barrett and Robert Maihos' Statement of Material Facts in Dispute ¶¶ 132-37), they have failed to submit their own expert evidence or produce any of the published studies or literature to substantiate this proposition. In essence, they are left simply restating the bald representations made in their Coral Calcium infomercial as their defense. Because the defendants have failed to raise a trialworthy dispute by not submitting admissible support for the claim, the FTC is entitled to summary judgment on Count Two.

2.   Count Three

The statements identified in Count Three are establishment claims. Count Three focuses on the assertions in the Coral Calcium infomercial that "the Journal of the AMA is quoting medical researchers now that say, calcium reverses cancer," (Coral Calcium Infomercial Transcript at 21), and that "the New England Journal of Medicine also carried the same story with the same quote." (Coral Calcium Infomercial Transcript at 28.) In opposing summary judgment, the defendants do not even specifically identify the two studies referred to in the infomercial. The FTC's experts aver that the two

studies they have identified that may be the ones Barefoot was referring to do not in fact support the proposition that calcium supplements reverse or cure any form of cancer. (Federal Trade Commission's Rule 56.1 Statement of Material Facts Not in Dispute ¶¶ 152-53.) In light of this undisputed interpretation of the two studies, it can reliably be concluded that the defendants had no substantiation for the claims made in Count Three.

### B. Misleading Representations in the Supreme Greens Infomercial

Like the Coral Calcium infomercial, the Supreme Greens infomercial creates the net impression that one will experience beneficial health effects by consuming Supreme Greens. Just as in "A Closer Look," the Supreme Greens infomercial employs the technique of using a "scientist" who praises Supreme Greens in order to persuade consumers to purchase it. The infomercial insinuates, as demonstrated in the excerpts quoted above, that the product helps avoid or treat cancer, heart disease, diabetes, and arthritis. There can be no genuine dispute that the Supreme Greens infomercial makes representations to the effect that Supreme Greens would effectively treat, cure, or prevent cancer, heart disease, diabetes, and arthritis. Furthermore, just like the claims made regarding Coral Calcium, I find that the claims identified in Counts Four, Five, and Six relate to health and safety issues and are therefore material.

### 1.   Count Four

The representation in Count Four – that Supreme Greens with MSM is an effective treatment, cure, or preventative for cancer, heart disease, diabetes, and arthritis – is a non-establishment claim regarding health and safety. The FTC correctly argues that competent and reliable scientific evidence is necessary to substantiate those representations. The defendants contend that they had a reasonable basis for the claims made in Count Four based on the "significant scientific support and studies" in

their possession, including at least one double-blind study. (Barrett Aff. ¶ 13, Feb. 10, 2006.) Importantly, Eileen Barrett Maihos states that "Guerrero also provided me with substantiation for the opinions he expressed in the show, including at least one double blind study and a summary of his clinical research."  (Barrett Maihos Aff. ¶ 5; Barrett Maihos Aff. Ex. 1.) Because the materials proffered by the Aldrich affidavit have been stricken, the substantiation materials attached to Eileen Barrett Maihos' affidavit remain as the only admissible substantiation eligible for consideration on the motion for summary judgment.

While the defendants lack any admissible substantiation as to the Coral Calcium infomercial, for the reasons described above, regarding the Supreme Greens infomercial the defendants have presented *some* quantum of substantiation that they had prior to airing the infomercial. Thus, it must be determined whether that prior substantiation was sufficient to provide a "reasonable basis" for the claims made in the advertisement. In arguing for summary judgment on this Count, the FTC cites numerous courts that "have consistently found or upheld that double-blind, placebo-controlled studies are required to provide adequate substantiation for the truthfulness of health-related efficacy claims." (Federal Trade Commission's Mem. of Points & Authorities in Supp. of Its Mot. for Summ. J. 36-37.) While it seems well-accepted that double-blind, placebo-controlled studies are necessary to substantiate health-related efficacy claims, it is not firmly accepted by the courts how many such studies must be offered. See, e.g., Removatron, 884 F.2d at 1493 (reviewing an FTC Order requiring one well-controlled clinical study); Thompson Medical Co., 791 F.2d at 194-96 (requiring two well-controlled clinical studies); QT, 448 F. Supp. 2d at 962 (requiring only one randomized, double-blind, placebo-controlled study as sufficient).

The defendants have submitted as substantiation a double-blind study concerning the effects

of Lignisul MSM on arthritis.[9] The FTC argues that:

> This study does not support [the defendants'] claims for Supreme Greens. Not only did it not test the actual Supreme Greens product, but subjects in the test group received 2,250 milligrams of MSM per day. The recommended daily dose of Supreme Greens provides a total of 3,850 milligrams of the _entire_ 39-ingredient proprietary blend.

(Reply Br. of Federal Trade Commission in Resp. to Opp'n of Defs. Direct Marketing Concepts, Inc., ITV Direct, Inc., Donald W. Barrett, and Robert Maihos to Pl.'s Mot. for Summ. J. 8 n.13 (citations omitted).) In light of the limited nature of the study, that study alone cannot constitute sufficient substantiation for the claims made in the Supreme Greens infomercial. Moreover, that single study does not purport to analyze Supreme Greens's effect on cancer, heart disease, or diabetes, and so it is no support for the claims with respect to those conditions. Furthermore, the defendants have not submitted any actual studies that could support those claims. Thus, when taken as whole, it is clear that the defendants did not have a reasonable basis for those claims. Accordingly, summary judgment will be granted as to the claims identified in Count Four.

### 2.   Counts Five and Six

Count Five addresses the claims made by a person who purportedly "calls in" to the "talk show." The "caller" says, "the first week that I was on Supreme Greens with MSM I lost four pounds. And the second week I lost four and-a-half pounds.  And I've been on Supreme Greens now

---

[9] The FTC disputes that the defendants had possession of this study _prior_ to airing the Supreme Greens infomercial. It contends that Barrett previously stated in his June 4, 2004 affidavit that he received this study in October 2003, which is _after_ the infomercial aired. (Reply Br. of Federal Trade Commission in Resp. to Opp'n of Defs. Direct Marketing Concepts, Inc., ITV Direct, Inc., Donald W. Barrett, and Robert Maihos to Pl.'s Mot. for Summ. J. 8.) That affidavit is far from unambiguous. While the FTC's interpretation is plausible, it is not definitive. At this stage, I must view the facts in the light most favorable to the non-moving party, and so will assume the defendants had received and reviewed this study before airing the infomercial.

for eight months and I have lost a total of eighty-one pounds." (Supreme Greens Infomercial Transcript 20.)

Count Six addresses the claim made in the Supreme Greens infomercial that it can be taken safely by pregnant women, children, and persons on other medication.

FTC expert Dr. Cassileth states in his affidavit that he was "unable to locate any published scientific literature indicating that any clinical studies had been conducted to evaluate the potential weight loss efficacy of Supreme Greens or on any substantially similar formula." (Cassileth Decl., Report of Barrie R. Cassileth Ph.D. 12.) The defendants have not provided the Court with any admissible scientific studies supporting the claim concerning weight loss addressed in Count Five. Similarly, there is no substantiation offered for the safety claim referred to in Count Six. Without any scientific evidence offered in support of the claims, there is no material dispute that the defendants did not possess adequate substantiation for the claims made in Counts Five and Six. Summary judgment shall enter for the FTC as to Counts Five and Six.

C.    *Deceptive Format of Supreme Greens Infomercial*

In Count Seven, the FTC alleges that the defendants violated section 5(a) of the FTC Act because of the deceptive format of the Supreme Greens infomercial. Particularly, the FTC asserts that the defendants presented the infomercial as "an independent television program," (Am. Compl. ¶ 48), when in fact, it was a paid advertisement. The FTC further alleges that the airing of the Supreme Greens infomercial with only limited disclaimers before and after the broadcast (but not during the infomercial) was likely to mislead customers and thus constituted a deceptive act or practice in violation of Section 5. The defendants, on the other hand, argue that express disclaimers in the infomercial make clear that the program is a paid advertisement, that the views expressed are solely

24

the opinion of the guest (Guerrero), that the product does not heal or cure any illnesses, that individual results may vary, and that the opinions expressed may not be supported by scientific evidence.

Whether a particular format is deceptive in violation of section 5 is necessarily a highly fact- and context-specific question. The deceptive tendency of the format, and the degree to which disclosures counteract such tendency, are disputed matters which can only be resolved by a fact-finder on a full trial record.[10] Accordingly, I deny the motion for summary judgment with respect to Count Seven.

D.     *Unfair Billing Practices*

In Count Eight, the FTC alleges that the defendants' "autoship" practice of sending and charging new supplies of products to consumers until the consumer instructed them to stop constituted an unfair business practice in violation of 15 U.S.C. § 45(n).

The FTC contends that the consumers were enrolled in the autoship program without their consent, with the result that in substantial numbers consumers were billed for products they had not agreed to buy. In support, the Commission relies on a statistical analysis of the rate at which charges initially made to consumers were reversed upon objection by the consumer. It is sufficient for present purposes to say that the defendants dispute both whether the autoship program had the purpose or effect of enrolling consumers without their consent and the extent or significance of any injury to

---

[10]   The FTC argues that I have previously found the format of the infomercial to be sufficiently deceptive to warrant a preliminary injunction.  Fed. Trade Comm'n v. Direct Mktg. Concepts, Inc., No. 04-11136-GAO, 2004 WL 1399185, at *5 (D. Mass. June 23, 2004) (order granting preliminary injunction).  I did not, however, conclude as a matter of law that the format was deceptive, but rather simply applied the customary preliminary injunction standard to the case, which included an assessment of likelihood, not inevitability, of success on the merits.

consumers. Summary judgment is inappropriate as to Count Eight.

## VI.   Defenses

### A.   *Res Judicata Defense*

The defendants argue that the counts involving the Coral Calcium infomercial are barred by res judicata by reason of a final settlement reached by the FTC with Robert Barefoot and Kevin Trudeau in a previous case filed in the Northern District of Illinois. Fed. Trade Comm'n v. Trudeau, Case No. 03-03904. The earlier case involved a different product, "Coral Calcium Supreme," as distinguished from the "Coral Calcium Daily" product involved in this case, and a different infomercial, the "Debbie and Kevin Show," rather than the "A Closer Look" infomercial at issue here. Fed. Trade Comm'n v. Trudeau, Case No. 03-03904, First Am. Compl. ¶ 16. In these circumstances, res judicata is inapplicable. See Realex Chemical Corp. v. S.C. Johnson & Son, Inc., 849 F.2d 299, 303 (8th Cir. 1988) (reversing the district court's finding of res judicata because the second case was contesting a different product's violation of the same statute).

### B.   *First Amendment Defense*

The defendants argue that what the FTC contends are deceptive claims in the Supreme Greens infomercial are rather expressions of opinion protected by the First Amendment. Commercial speech is protected by the First Amendment, albeit at a lesser level than non-commercial speech. Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York, 447 U.S. 557, 562-63 (1980). In Central Hudson, the Supreme Court articulated a four-part test to determine whether governmental regulation of commercial speech is permissible. "[T]he threshold question is whether 'the commercial speech concerns unlawful activity or is misleading.'" Wine & Spirits Retailers, Inc. v. Rhode Island, 481 F.3d 1, 8 (1st Cir. 2007) (quoting Thompson v. W. States Med. Ctr., 535 U.S. 357, 367 (2002)).

26

The government may "ban forms of communication more likely to deceive the public than to inform it, or commercial speech related to illegal activity." Cent. Hudson, 447 U.S. at 563-64 (citations omitted); In re Willis Furniture Co., Inc., No. 92-2391, 1992 WL 363625, at *1 (1st Cir. Dec. 11, 1992) ("Misleading or deceptive advertising is not protected by the First Amendment" (citing Friedman v. Rogers, 440 U.S. 1, 13-16 (1979))).

Moreover, if the commercial speech at issue "concern[s] lawful activity and [is not] misleading," the next step is to determine "whether the asserted governmental interest is substantial." Cent. Hudson, 447 U.S. at 566. To regulate such speech, a governmental body "must demonstrate that the harms it recites are real and that its restrictions will in fact alleviate them to a material degree." Edenfield v. Fane, 507 U.S. 761, 770-71 (1993). If the governmental interest is substantial, then a court must determine whether "the regulation directly advances the governmental interest asserted." Cent. Hudson, 447 U.S. at 566. If so, the final step requires the court to ensure that the regulation "is not more extensive than is necessary to serve that interest." Id. Under Central Hudson, the infomericals at issue in this case qualify as commercial speech.

The FTC seeks a permanent injunction banning outright the dissemination of either the Coral Calcium or Supreme Greens infomercials. In an early articulation of permissible governmental regulation of commercial speech, the Supreme Court stated that "Obviously, much commercial speech is not provably false, or even wholly false, but only deceptive or misleading. We foresee no obstacle to a State's dealing effectively with this problem." Friedman, 440 U.S. at 9-10. However, since then, the Supreme Court has made a "doctrinal refinement." As noted by the First Circuit, commercial speech that "is *actually* misleading 'may be prohibited entirely.'" In re R.M.J., 455 U.S. 191, 203 (1982). Contrastingly, a state 'may not place an absolute prohibition on certain types of *potentially*

misleading information…if the information also may be presented in a way that is not deceptive.'" Wine & Spirits Retailers, Inc., 481 F.3d at 8-9 (emphasis added).[11]

On the present motion, I have concluded that the FTC has shown that claims in the Coral Calcium and Supreme Greens infomercials are deceptive, that is, that they are *likely* to mislead consumers. That is sufficient for relief under the FTC Act, but it nonetheless is a level of proof that falls short of proving that the infomercials are *actually misleading*. See TransWorld Accounts, Inc. v. Fed. Trade Comm'n, 594 F.2d 212, 214 (9th Cir. 1979) ("Proof of actual deception is unnecessary to establish a violation of Section 5. Misrepresentations are condemned if they possess a tendency to deceive."). In moving for summary judgment, the FTC has chosen to proceed on the basis that the defendants lacked a reasonable basis for asserting that the claims made were true, not that they were actually misleading or false.

The defendants' First Amendment objection thus has merit to the extent it may preclude a remedy that includes complete suppression of the infomercials. In the regulation of commercial speech in other contexts, courts have fashioned other remedies that are adequate to reduce or eliminate any tendency of the infomercials to mislead, such as more frequent and more prominent disclaimers and qualifiers. See, e.g., 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 507 (1996) (plurality opinion) (striking down a prohibition on advertising the price of alcoholic beverages in part because "alternative forms of regulation that would not involve any restriction on speech would be more likely to achieve the State's goal of promoting temperance"); Rubin v. Coors Brewing Co., 514

---

[11] The First Circuit observed that the dichotomy between actually misleading and potentially misleading was "a doctrinal refinement" that was originally crafted in the context of professional services advertising, but noted, without deciding, that this dichotomy has been applied in other contexts as well. See Wine & Spirits Retailers, Inc., 481 F.3d at 8-9 (citing Pearson v. Shalala, 164 F.3d 650, 655 (D.C. Cir. 1999)).

U.S. 476, 490-91 (1995) (finding that a total prohibition on beer labels which displayed alcohol content to be unconstitutional in part because of alternative lesser restrictive means "such as directly limiting the alcohol content of beers, prohibiting marketing efforts emphasizing high alcohol strength..., or limiting the labeling ban only to malt liquors").[12]

Tailoring an appropriate remedy short of outright suppression is something not adequately addressed in the parties' motion papers, nor is it necessarily a suitable matter to be resolved on summary judgment. Moreover, because issues regarding the scope of relief to be ordered remains as to all defendants, as discussed below, the matter will be addressed in subsequent proceedings.

## VII.    Corporate Defendants' Liability

The FTC has sought to hold the corporate defendants Direct Marketing, ITV, King Media, and Triad liable. Section 53(b) permits courts to enjoin violations of the FTC Act. See Trudeau v. United States, 68 Fed. Cl. 121, 124 (Fed. Cl. 2005) ("In such cases, the district court's authority to issue injunctive relief carries with it the full range of equitable remedies, including consumer redress and disgorgement of profits."). This grant of permanent injunctive power gives the court broad equitable authority to "'grant any ancillary relief necessary to accomplish complete justice.'" Fed. Trade Comm'n v. Five-Star Auto Club, Inc., 97 F. Supp. 2d 502, 533 (S.D.N.Y. 2000) (quoting Fed. Trade Comm'n v. H.N. Singer, Inc., 668 F.2d 1107, 1113 (9th Cir. 1982)). Such ancillary equitable remedies may include the power to order equitable monetary relief for redress through remedies such as restitution or disgorgement. See  Fed. Trade Comm'n v. Verity Int'l, Ltd., 443 F.3d 48, 66 (2d Cir. 2006) ("Although [§53(b)] does not expressly provide for restitution, several courts, including

---

[12] Furthermore, as the Supreme Court noted in Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, imposing affirmative disclosure requirements cannot be said to impose a separate First Amendment violation on the defendants. 471 U.S. 626, 651 (1985).

the Fifth, Seventh, Eighth, Ninth, and Eleventh Circuits, have concluded that § 13(b) of the FTC Act allows restitution or other ancillary equitable relief.") (footnotes omitted).

In this case, the FTC seeks permanent injunctive relief and equitable monetary relief from the four corporate defendants in the amount of $54,683,436.00, which represents the full amount of consumer sales less the refunds derived from the sales of Coral Calcium Daily and Supreme Greens with MSM. To obtain restitution on behalf of consumers, the FTC must show consumer reliance but it is not required to show reliance and injury by each individual consumer. Fed. Trade Comm'n v. Peoples Credit First, LLC, No. 8:03-CV-2353-T, 2005 WL 3468588, at *7 (M.D. Fla. Dec. 18, 2005), aff'd 244 Fed. Appx. 942 (11th Cir. 2007). A presumption of actual reliance arises where the FTC has demonstrated that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product or service. Id. at *7. Based on my findings above, the FTC has met the three conditions necessary in order for actual reliance to be presumed. Although the exact amount of the restitution owed will not be established at this time, the question as to whether the various defendants can be liable can be addressed.

A.    Direct Marketing and ITV

ITV does not contest its involvement in the Supreme Greens infomercial.[13] As it has conceded, ITV produced, edited, and distributed the Supreme Greens infomercial. (The DMC Defs.' Opp'n to Pl.'s Mot. for Summ. J. 6-7.)

---

[13] By the time the Supreme Greens infomercial was developed, Direct Marketing had become essentially defunct; it evolved into ITV.

With respect to the Coral Calcium infomercial, Direct Marketing and ITV claim that they did not play a central role in its production and dissemination. Instead, they seek to deflect the responsibility for producing the infomercial to Kevin Trudeau and the responsibility for disseminating, servicing, and controlling the infomercial to Allen Stern and his companies.

Contrary to these defendants' protestations, however, the record reveals that both Direct Marketing and ITV did play a central role in the creation and distribution of the Coral Calcium infomercial. Maihos testified that he and Barrett financed the Coral Calcium infomercial with their own personal funds. (Maihos Dep. 85:15-86:5.) Barrett personally prepared the sales script that was used for the Coral Calcium infomercial, (Barrett Dep. 14:2-6 July 21, 2005).), and he attended the taping of the original Coral Calcium infomercial in California. (Barrett Dep. 26:12-16 (July 21, 2005).) It was Barrett's goal "to handle every aspect of the business." (Id. 28:3-5.) In fact, that opportunity materialized when Direct Marketing severed ties with King Media and Triad and assumed total responsibility for the infomercials. As Barrett testified:

> Q:    And at that point in time did DMC fully takeover every aspect of the infomercial, the Coral Calcium commercial?
> A:    Every aspect. Every aspect of the infomercial?
> Q:    Yes.
> A:    Yes, that would be true.

(Id. 31:15-20.) Also undisputed is the fact that neither Direct Marketing nor ITV attempted to obtain any substantiation prior to at least the airing of the Coral Calcium infomercial. (Maihos Dep. 77:22-25.)

Thus, Direct Marketing and ITV can be held liable for their promotion and dissemination of both the Coral Calcium infomercial and the Supreme Greens infomercial.

B.      *King Media and Triad*

King Media and Triad generally contend that they are not liable because neither created, scripted, developed, nor produced the Coral Calcium infomercial. Furthermore, King Media argues that it cannot be held responsible for the Coral Calcium infomercial because it never "disseminated" the Coral Calcium infomercial. King Media says that the individual television stations were the entities that actually "disseminated" the infomercial, whereas its only role was to deliver the infomercial to the television stations. In sum, King Media argues that it was simply the "middle man" and that the real liability lies with the producers of the infomercial (Direct Marketing) and the actual broadcasters of the infomercial (the individual television stations).

Similarly, Triad contends that it had no role in the sale or advertising of Coral Calcium. Triad also asserts a kind of "middle man" defense by arguing that the true target of the FTC should be the company that took the customers' orders, and not Triad which simply transmitted orders to the companies that would fill the orders.

These defendants have too narrow a view of what participation in deceptive practices may be reached and regulated by the FTC. As for Triad, the summary judgment record establishes that it in fact exercised greater control over the creation and production of the Coral Calcium infomercial than it now acknowledges.  Allen Stern admitted that Triad was involved in deciding to change the composition of the Coral Calcium product itself as well as changing the label for the product to Coral Calcium Daily because "we liked the name…better than [the] name that was on the label." (Stern Dep. 61:16-62:5.) Moreover, Triad was compensated for its work on the Coral Calcium infomercial

32

by an equal split of the net profits earned from the sales of Coral Calcium Daily. (Id. 28:8-19.) Triad was, on the undisputed facts, essentially a joint venturer with Direct Marketing in the promotion and sale of Coral Calcium Daily.

With respect to King Media, section 12 of the FTC Act makes it unlawful to "disseminate or *cause to be* disseminated, any false advertisement." 15 U.S.C. § 52 (emphasis added). King Media admittedly was responsible for arranging and buying air time for the Coral Calcium infomercial to run on various television stations. Therefore, even on an excessively narrow definition of "dissemination," King Media may still be held responsible under § 52 for *causing* the dissemination.

Furthermore, Stern admitted that "King Media and Triad did not have a practice of having infomercials reviewed for compliance with FTC law," viewing that as the function of the advertiser and producer. The only attempts at substantiation made by King Media and Triad were to require that "Barefoot and DMC….provide assurances that any claims could be substantiated…."  (Stern Aff. ¶¶ 78-80, Feb. 10, 2006.) That approach permitted claims that were not substantiated to be made to consumers and Triad and King Media share responsibility for that outcome.

## VII.   Individual Defendants' Liability

### A.   *Liability Defendants*

The FTC seeks permanent injunctive relief and equitable monetary relief from the individual defendants Donald Barrett, Robert Maihos, Allen Stern, for which they would be jointly and severally liable. As with the corporate defendants, at this stage, only the issue of *whether* any of these individuals ought to be held liable can be settled, without determining the precise remedy to be imposed.

In order to hold individual corporate officers liable once the corporation's liability has been established, the FTC must demonstrate that the individual defendants either participated directly in the deceptive acts or practices or had authority to control them; it is not necessary to show that the individual personally made the misleading or deceptive representations. Bay Area Bus. Council, Inc., 423 F.3d at 636; Freecom Commc'ns Inc., 401 F.3d at 1204; Fed. Trade Comm'n v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1170 (9th Cir.1997); Fed. Trade Comm'n v. Amy Travel Serv., Inc., 875 F.2d 564, 573 (7th Cir. 1989). The requisite authority to control may be demonstrated by active participation in the corporation's affairs as a corporate officer. Amy Travel, 875 F.2d at 573; see also Bay Area Bus. Council, Inc., 423 F.3d at 637 ("Acting in [the role of owner and CEO] he made countless decisions that demonstrate his authority to control the corporate defendants."); Fed. Trade Comm'n v. World Media Brokers, 415 F.3d 758, 764-66 (7th Cir. 2005) (service as director, president, and secretary of multiple corporations demonstrated defendant's authority to control).

The FTC must also prove that the individual defendants either knew or should have known about the deceptive practices, but it is not required to prove subjective intent to defraud. Amy Travel, 875 F.2d at 573-74. The FTC may fulfill the knowledge requirement by evidence that the person in question had "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." Id. at 574 (citation and internal quotations omitted).

I.   Donald Barrett

The record makes clear that Barrett played an integral role in commissioning, producing, and disseminating both the Coral Calcium and Supreme Greens infomercials. Not only did he occupy a position of control in both Direct Marketing and ITV, but he also personally wrote at least one sales

34

script and personal testimonial (Barrett Dep. 14:2-6, 56:5-16 (July 21,2005)) used with the Coral Calcium infomercial and financed the production of the Coral Calcium infomercial with his own personal money (Barrett Dep. 23:21-24:6 (July 21, 2005)). With respect to the Supreme Greens infomercial, Barrett instructed his employees to pursue producing an infomercial with Guerrero. Once an agreement was reached, Barrett not only provided his companies' studios to record the Supreme Green infomercial (Barrett Dep. 82:16-18), but he also personally participated in the infomercial. Barrett's reliance on <u>Federal Trade Commission v. Garvey</u>, 383 F.3d 891, 902  (9th Cir. 2004) is misplaced. Unlike Garvey, who was "merely a spokesperson," Barrett was a driving force behind these infomercials. It is appropriate to hold him individually liable.

### ii.   Robert Maihos

Relying on <u>United States v. Building Inspector of America, Inc.</u>, 894 F. Supp. 507 (D. Mass. 1995), Maihos draws a distinction between his "operational 'back-office' role" at Direct Marketing and ITV, which included overseeing the corporations' finances, personnel, shipping, and other roles that involved "the actual production of either infomercial, control over the content…or supervision over the editing of the infomercial." (The DMC Defs.' Opp'n to Pl.'s Mot. for Summ. J. 34); <u>see</u> <u>QT</u>, 448 F. Supp. 2d at 973 (finding that Secretary of corporation was not individually liable because despite her formal title, she had no control over the deceptive acts and practices nor did she have any knowledge of the corporate defendants' deceptive practices).

At all relevant times, Maihos was an equal co-owner with Donald Barrett, responsible for overseeing the companies' financial health, supervising the sales operation, and aware of the high volume of customer complaints and chargebacks. He participated in and received minutes from managerial meetings in which concerns about the need for substantiation for the claims made in the

infomercials were raised. Even more to the point, he was privy to the concerns expressed by others regarding the veracity of the claims made in the Coral Calcium infomercial. His dismissal of their doubts by labeling them as "skeptics" is reasonably taken as "an awareness of a high probability of fraud along with an intentional avoidance of the truth." Amy Travel, 875 F.2d at 574. In sum, on the summary judgment record, it is not subject to reasonable dispute that Maihos either had actual knowledge of the misleading claims or at the very least, that he had the equivalent of actual knowledge by reason of willful blindness or reckless indifference.

### iii.   Allen Stern

Stern is individually liable for his controlling position in both King Media and Triad. Through Triad, he managed the Coral Calcium program, and through King Media, he procured placement of the infomercial. It is likely that he had actual knowledge that the infomercial had a tendency to mislead consumers, but in any event, like Maihos, he was at least willfully blind or recklessly indifferent to the deceptive nature of the infomercial. As with King Media and Triad, Stern's responsibility is limited to the Coral Calcium infomercial.

### B.   Relief Defendants

The concept of "relief defendants" originates from SEC proceedings. In that context, courts have held that equitable relief against an individual or corporation who is not accused of wrongdoing may be entered where that person has "(1) received ill-gotten funds; and (2) does not have a legitimate claim to those funds." Sec. & Exch. Comm'n v. Cavanagh, 155 F.3d 129, 136 (2d Cir. 1998) (citing Sec. & Exch. Comm'n v. Colello, 139 F.3d 674, 677 (9th Cir.1998)). Based on § 13(b)'s grant of equitable powers over "innocent persons," courts have extended and applied the practice of disgorgement from relief defendants to the FTC context. See, e.g., Fed. Trade Comm'n

v. Transnet Wireless Corp., 506 F. Supp. 2d at 1273; Fed. Trade Comm'n v. Ameridebt, 343 F. Supp. 2d 451, 464 (D. Md. 2004); Fed. Trade Comm'n v. Think Achievement Corp., 144 F. Supp. 2d 1013, 1020 (N.D. Ind. 2000), aff'd 312 F.3d 259 (7th Cir. 2002).

All three relief defendants assert that they have legitimate claims to the proceeds the FTC seeks to recover. A legitimate claim may be established if the relief defendant can demonstrate that he provided some services as consideration for the identified monies. See Transnet Wireless Corp., 506 F. Supp. 2d at 1273 ("Nothing on the record indicates that [relief defendant] had a legitimate claim to the funds; [relief defendant] did not provide any services to either company to warrant the payments."); U.S. Commodity Futures Trading Com'n v. Schiera, No. CV05 2660 CAS, 2006 WL 4586786, at 6 (S.D. Cal. Dec. 11, 2006) ("The Relief Defendants did not provide services to or on behalf of the Corporate Defendants and do not have a legitimate claim to the funds."); Cavanagh, 155 F.3d at 136-37 (finding that neither relief defendant had legitimate claim to proceeds of sale of shares because SEC was likely to be able to show that relief defendants gave no consideration for shares and thus received them as gift).

Mount asserts that she received payments as compensation for performing her duties as part owner, and Ritchey states that he was employed as vice president of both King Media and Triad for which he received compensation. Likewise, both Stern and Ritchey have testified that funds were transmitted from Triad to BP International in the ordinary course of business at the request of Barrett. (Ritchey Dep. 126:13-127:11, 130:1-6; Stern Dep. 133:23-134:2; see also Barrett Dep. 39:7-40:24 (July 21, 2005).) The FTC has not established conclusively on the present record that the funds it

wants Mount, Ritchey, and BP International to disgorge are not legitimate compensation from the corporations. Thus, there remains a question of fact as to whether funds in the possession of the relief defendants can be ordered disgorged.

## VIII.   Conclusion

For the foregoing reasons, the FTC's motion for summary judgment is granted as to Counts One, Two, Three, Four, Five, and Six. The motion is denied as to Counts Seven and Eight.

In sum, the Coral Calcium infomercial was deceptive in the respects alleged in Counts One, Two, and Three. The Supreme Greens infomercial was deceptive in the respects alleged in Counts Four, Five, and Six. However, whether the format of the Supreme Greens infomercial was deceptive and whether the autoship program was an unfair trade practice are questions as to which there are genuine disputes of material fact that cannot be resolved on summary judgment.

The corporate defendants – Direct Marketing, ITV, King Media and Triad – and the individual defendants Donald Barrett, Robert Maihos, and Allen Stern are each liable for consumer redress. The specific amount of redress owed by each those defendants cannot be resolved on summary judgment. Whether relief should be ordered against the relief defendants Lisa Mount, Steven Ritchey, and BP International also involves disputed questions of fact that cannot be resolved on summary judgment.

It is SO ORDERED.

     /s/ George A. O'Toole, Jr.
                    United States District Judge