UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11136-GAO

FEDERAL TRADE COMMISSION,
Plaintiff,


vs.

DIRECT MARKETING CONCEPTS, INC., d/b/a TODAY'S HEALTH and DIRECT
FULFILLMENT, ITV DIRECT, INC., d/b/a DIRECT FULFILLMENT, DONALD W.
BARRETT, TRIAD ML MARKETING, INC., KING MEDIA, INC., ALLEN STERN,
LISA STERN, and BP INTERNATIONAL, INC.,
Defendants.


MEMORANDUM AND ORDER
August 13, 2009


O'TOOLE, D.J.

The Federal Trade Commission ("FTC") brought this action to remedy violations by the

defendants of sections 5(a) and 12 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C.

§§ 45, 52, in connection with the production and dissemination of two "infomercials"—one

marketing a product known as "Coral Calcium Daily" ("Coral Calcium") and the other

marketing a product known as "Supreme Greens with MSM" ("Supreme Greens"). All

substantive liability questions were previously resolved essentially in the FTC's favor on its

motion for summary judgment and by the parties' stipulation. I conducted a bench trial to

determine the appropriate terms of injunctive relief and the amount of monetary relief to be

ordered. I make the following findings and conclusions with respect to remedies and order

judgment accordingly.

# I.    Background

## A.    Claims

The FTC's amended complaint contains eight counts. Count One alleges that the Coral Calcium infomercial made express or implied representations that Coral Calcium is an effective treatment or cure for cancer, Parkinson's disease, heart disease, and autoimmune diseases, such as multiple sclerosis and lupus.

Count Two alleges that the Coral Calcium infomercial made express or implied representations that Coral Calcium has an absorption rate of 100 percent within twenty minutes.

Count Three alleges that the Coral Calcium infomercial made express representations that scientific research published in the Journal of the American Medical Association and the New England Journal of Medicine supported the proposition that calcium supplements are able to prevent, reverse, or cure cancer in humans.

Count Four alleges that the Supreme Greens infomercial made express or implied representations that the Supreme Greens product is an effective treatment, cure, or preventative for cancer, heart disease, diabetes, and arthritis.

Count Five alleges that the Supreme Greens infomercial made express or implied representations that Supreme Greens will cause significant weight loss.

Count Six alleges that the Supreme Greens infomercial made express or implied representations that Supreme Greens could be taken safely by pregnant women, children, and persons on medication.

Count Seven alleges that the format of the Supreme Greens infomercial was deceptive.

Finally, Count Eight alleges that the defendants' automatic billing and shipping practices (the "autoship" program), without first obtaining customers' consent, was an unfair practice in violation of section 5(a) of the FTC Act.

### B. Defendants

#### 1. *Liability Defendants*

The amended complaint alleges that seven defendants participated in violating the FTC Act. These so-called "liability defendants" are: (1) Direct Marketing Concepts, Inc. ("Direct Marketing"); (2) ITV Direct, Inc. ("ITV"); (3) Donald W. Barrett; (4) Robert Maihos (collectively, the "DMC/ITV defendants"); (5) Triad ML Marketing ("Triad"); (6) King Media, Inc. ("King Media"); and (7) Allen Stern (collectively, the "Triad defendants").

The responsibility of the liability defendants for the marketing of Coral Calcium and Supreme Greens is described in Federal Trade Commission v. Direct Marketing Concepts, Inc. et al., 569 F. Supp. 2d 285 (D. Mass. 2008) (granting the FTC's summary judgment motion).

#### 2. *Relief Defendants*

The amended complaint also seeks relief from two so-called "relief defendants," BP International, Inc. ("BP International") and Lisa Mount,[1] as recipients of proceeds derived from the infomercials, though not actors in the violative conduct.[2]

##### a.    BP International

Donald Barrett's cousin, Steven Paris, was employed at Direct Marketing from 2002 to 2004 and again from 2006 to mid-2008. He held various management positions at Direct Marketing, including Vice-President of Operations and Chief Operating Officer.

---

[1] Lisa Mount was previously known as Lisa Stern. She was married to Allen Stern, but has since divorced him and now uses the surname "Mount."

[2] A third relief defendant, Steven D. Ritchey, was dismissed from the action on September 15, 2008.

Barrett and Paris formed BP International in April 2002 ostensibly to support sales of Direct Marketing products. Paris is the sole owner of BP International.

Paris was employed for Direct Marketing as the Vice-President of Operations at the same time he ran BP International. BP International's office was in the same office complex as Direct Marketing's office.

Both Barrett and Paris received salaries from BP International, although it does not appear that Barrett performed any work for BP International. Rather, I find on the evidence that BP International was a device and conduit for channeling profits from Direct Marketing to Barrett personally, outside the corporate structures of Direct Marketing and ITV. Barrett directed Triad to wire portions of the Coral Calcium revenues into BP International's bank account. Stern was never told why funds were sent to BP International; he simply complied with Barrett's directions. In total, BP International received $574,274.23 from Triad between April 2002 and September 2002. (See Pl.'s Trial Ex. 66.)

Although Maihos was the Vice-President and Treasurer of Direct Marketing during the hawking of Coral Calcium, he was not aware of the existence of BP International in 2002, but only became aware of it as a result of the FTC's lawsuit. It appears that his partner, Barrett, deliberately kept information about BP International from him. Despite the fact that Barrett and Maihos had agreed to split Direct Marketing's profits fifty/fifty, Maihos was unaware that money was being sent from Triad to BP International or that Barrett was receiving payments from BP International in 2002.

### b.    Lisa Mount

Lisa Mount was married to Allen Stern. Before their divorce, Mount and Stern together owned a two-thirds interest in both King Media and Triad. Mount worked full-time as the Media

Director for King Media from March 31, 1992 to January 12, 1996, but then remained at home to raise her children. She returned to work part-time at King Media for a six-month period during late 2001 through early 2002. She did not receive a salary during this period. Other than her employment until January 1996 and for the six-month period in 2001 and 2002, Mount was not actively involved with King Media. She had no direct involvement in King Media's activities concerning Coral Calcium. Triad's 2002 tax return indicates a distribution to her of $1,545,305.00. (See Pl.'s Trial Ex. 102.)

    C.    <u>Prior Proceedings</u>

        *1.    Summary Judgment*

I previously granted the FTC's motion for summary judgment on Counts One through Six of the amended complaint, but denied the motion as to Counts Seven and Eight. <u>Direct Mktg. Concepts, Inc. et al.</u>, 569 F. Supp. 2d at 312.

The summary judgment ruling determined that the defendants' claims in the Coral Calcium infomercial that the supplement would treat and/or prevent certain diseases (as alleged in Count One), that Coral Calcium could be fully absorbed within about twenty minutes, making it far superior to other forms of calcium (as alleged in Count Two), and that both the Journal of the American Medical Association and the New England Journal of Medicine quote medical researchers who affirm that calcium reverses cancer (as alleged in Count Three) lacked any substantiation and constituted deceptive advertisements in violation of sections 5 and 12 of the FTC Act. <u>Id.</u> at 302.

The ruling further determined that the defendants' claims in the Supreme Greens infomercial that Supreme Greens is an effective treatment, cure, or preventative for cancer, heart disease, diabetes, and arthritis rested on insufficient substantiation to provide a "reasonable

basis" for these claims. That infomercial also constituted a deceptive advertisement in violation of sections 5 and 12 of the FTC Act. Id. at 303-04. It was further determined that the infomercial's claims that Supreme Greens stimulated weight loss (as alleged in Count Five) and was safe for consumption by pregnant women, children, and persons on other medication (as alleged in Count Six) lacked any substantiation and constituted deceptive advertisements in violation of sections 5 and 12 of the FTC Act. Id. at 304.

Summary judgment was denied as to Counts Seven and Eight, however, because disputed issues of fact existed as to whether the Supreme Greens infomercial had a deceptive format which violated section 5(a) of the FTC Act (as alleged in Count Seven), see id. at 305, and whether the defendants' "autoship" practice constituted an unfair business practice in violation of section 5(n) of the FTC Act (as alleged in Count Eight), see id..

Finally, I determined that Direct Marketing, ITV, King Media, Triad, Barrett, Maihos, and Stern were each liable for the violations of the FTC Act. Id. at 310-11. Determination of the appropriate terms of injunctive relief and the amount of monetary relief was left to be resolved at trial. See id. at 310. I also concluded that there were disputed issues of fact that needed to be resolved before deciding whether relief should be granted against the relief defendants, BP International and Mount. See id. at 311-12.

2.    *Stipulation*

On November 13, 2008, the FTC and the DMC/ITV defendants stipulated to language to be included in the final order addressing Counts Seven and Eight.

D.    Relief Sought

Based on the evidence submitted at trial, the FTC seeks broad permanent injunctive relief and equitable monetary relief from the DMC/ITV and Triad defendants. Specifically, the FTC

seeks equitable monetary relief from all liability defendants in the amount of $54,034,394.82, which represents the full amount of consumer sales, less refunds, derived from the sales of Coral Calcium, plus pre- and post-judgment interest. The FTC also seeks equitable monetary relief from the DMC/ITV defendants in the amount of $14,644,936.24, which represents the full amount of consumer sales, less refunds, derived from the sales of Supreme Greens, plus pre- and post-judgment interest. Additionally, the FTC requests that relief defendants BP International and Mount be ordered to disgorge $574,274.23 and $1,545,305.00, respectively, plus pre- and post-judgment interest.

## II.    **Pending Motions**

The DMC/ITV defendants filed two motions after the trial which are resolved as follows.

The motion to strike (dkt. no. 241) is denied because the Veggie Cal D and Elite Virtual Systems video clips were admitted at trial as impeachment evidence and are therefore properly before the Court for that limited purpose.

The second motion to strike several of the FTC's proposed findings of fact and supporting exhibits (dkt. no. 247) is granted in part and denied in part. Attachment A merely summarizes the trial exhibits and is therefore a proper basis for the FTC's proposed findings of fact. Attachment B and paragraph 159, however, must be stricken because the newspaper article was not admitted at trial and judicial notice is not appropriate given that the facts contained therein are neither "generally known" nor "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned," as required by Federal Rule of Evidence 201(b). Finally, the Veggie Cal D and Elite Virtual Systems video clips were admitted for impeachment purposes only and cannot be transformed into substantive evidence. To the extent that any of the FTC's proposed findings of fact are supported only by these video clips

and not by Barrett's direct testimony or other evidence, those proposed findings of fact will not be considered.

## III.    Summary of Applicable Law

Section 13(b) of the FTC Act authorizes courts to enjoin violations of the FTC Act. 15 U.S.C. § 53(b); see Trudeau v. United States, 68 Fed. Cl. 121, 125 (Fed. Cl. 2005). This grant of injunctive power also gives courts "broad equitable authority to 'grant any ancillary relief necessary to accomplish complete justice,'" including monetary relief in the form of restitution or disgorgement, and other miscellaneous relief, such as an asset freeze, an accounting, and discovery to aid in providing redress to injured consumers. Fed. Trade Comm'n v. Five-Star Auto Club, Inc., 97 F. Supp. 2d 502, 533 (S.D.N.Y. 2000) (quoting Fed. Trade Comm'n v. H.N. Singer, Inc., 668 F.2d 1107, 1113 (9th Cir. 1982)).

### A.    Injunctive Relief

A permanent injunction serves twin goals: avoiding repeat violations of and monitoring compliance with the law and the terms of the injunction itself. See United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953). To obtain an injunction, the FTC need not show that the defendants are likely to engage in violations involving precisely the same conduct. An injunction is justified if the FTC shows that similar violations are likely to occur. See TRW, Inc. v. Fed. Trade Comm'n, 647 F.2d 942, 954 (9th Cir. 1981). The commission of past illegal conduct is highly suggestive of the likelihood of future violations. Five-Star Auto Club, Inc., 97 F. Supp. 2d at 536. Courts should consider, "[i]n deciding whether to issue an injunction in light of past violations," several factors, including:

> the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful

> nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

Fed. Trade Comm'n v. Think Achievement Corp., 144 F. Supp. 2d 1013, 1017 (N.D. Ind. 2000). An injunction is unnecessary if the defendants carry their heavy burden of demonstrating that there is "no reasonable expectation" of future repetitions of the wrongful conduct. W.T. Grant Co., 345 U.S. at 632-33 (internal quotation omitted).

Under the FTC Act, courts have discretion to issue multi-product injunctions (often referred to as "fencing-in" orders) that extend beyond the specific violations at issue in the case to prevent defendants from engaging in similar deceptive practices in the future. See Fed. Trade Comm'n v. Colgate-Palmolive Co., 380 U.S. 374, 395 (1965) ("The Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past. Having been caught violating the [FTC] Act, respondents must expect some fencing in.") (internal quotation omitted).

Factors that courts may consider in determining whether fencing-in relief is justified in light of a defendant's violation of the FTC Act include: any history of prior violations, the deliberateness and seriousness of the violation, and the degree of transferability of the unlawful behavior to other products. Courts should consider the circumstances of the violation as a whole, and not merely the presence or absence of any one factor. See, e.g., Kraft, Inc. v. Fed. Trade Comm'n, 970 F.2d 311, 327-28 (7th Cir. 1992) (upholding the FTC's imposition of fencing-in relief, despite absence of prior violations by Kraft, in light of seriousness, deliberateness, and transferability of violations); see also Am. Home Prods. Corp. v. Fed. Trade Comm'n, 695 F.2d 681, 706 (3d Cir. 1982) (noting that courts will look to see whether the advertiser's conduct evidenced a "willingness to flout the law," thereby giving rise to concern regarding further, additional violations) (internal quotation omitted).

Courts have also included monitoring provisions in final orders in FTC cases to ensure compliance with permanent injunctions. See, e.g., Think Achievement Corp., 144 F. Supp. 2d at 1018 (ordering record retention, notification of changed employment or residence, access to premises, and monitoring); Fed. Trade Comm'n v. U.S. Sales Corp., 785 F. Supp. 737, 753-54 (N.D. Ill. 1992) (recognizing the need for monitoring by the FTC to ensure adequate compliance).

Permanent injunctions, however, must not infringe the defendants' First Amendment rights. The Supreme Court has established a four-part test for determining whether government regulation of commercial speech is permissible. See Cen. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 566 (1980). However, "the threshold question is whether the commercial speech . . . is misleading." Wine & Spirits Retailers, Inc. v. Rhode Island, 481 F.3d 1, 8 (1st Cir. 2007) (internal quotation omitted). Commercial speech which is actually, as opposed to just potentially, misleading receives no First Amendment protection. See In re R.M.J., 455 U.S. 191, 203 (1982); Wine & Spirits Retailers, Inc., 481 F.3d at 8-9. It is well-accepted that unsubstantiated claims are deemed actually, as opposed to potentially, misleading. See, e.g., In re Porter & Dietsch, Inc., 90 F.T.C. 770, 872 (1977) ("We conclude that respondents' advertising is false and *misleading*, because it implicitly represents that 'substantially all users of X-11 tablets will lose a significant amount of weight' and that respondents possess competent scientific evidence supporting that claim, even though respondents did not have a reasonable basis for making such a claim at the time the advertising was disseminated.") (emphasis added).

B.    Monetary Relief

Section 13(b) also permits courts to award monetary relief in the form of either restitution (or consumer redress) or disgorgement. Fed. Trade Comm'n v. Gem Merch. Corp., 87 F.3d 466, 469-70 (11th Cir. 1996). Restitution is measured by the amount of money paid by the consumers, less any refunds made. See U.S. Sales Corp., 785 F. Supp. at 753. "The primary purpose of restitution in the context of deceptive advertising is to restore victims to their position prior to the deceptive sales." Fed. Trade Comm'n v. Nat'l Urological Group, -- F. Supp. 2d --, 2008 WL 2414317, at *33 (N.D. Ga. June 4, 2008).

Disgorgement, on the other hand, is ordinarily measured by the amount of "profits causally connected to the violation," Sec. & Exch. Comm'n v. Happ, 392 F.3d 12, 31 (1st Cir. 2004), because the primary purpose of disgorgement is not to compensate the victims of the deceptive advertising, but to deprive the wrongdoer of his ill-gotten gains, see Gem Merch. Corp., 87 F.3d at 469-70. However, "[w]here the defendant's own recalcitrance and system of recordkeeping have so obscured matters" such that unlawful gains cannot be determined, "it is well within the discretion of the court to rule that the measure of disgorgement will be the more readily measurable amount of losses incurred by the defendants' customers in the unlawful transactions." Commodity Futures Trading Comm'n v. Am. Bd. of Trade, Inc., 803 F.2d 1242, 1252 (2d Cir. 1986); see also Fed. Trade Comm'n v. Febre, 128 F.3d 530, 535 (7th Cir. 1997) (applying same principle in an FTC case); Commodity Futures Trading Comm'n v. Am. Metals Exch. Corp., 991 F.2d 71, 76-78 (3d Cir. 1993) (indicating that courts can measure disgorgement by net revenues so long as defendant has had ample opportunity to present evidence of its profits).

Regardless of the measure used for monetary relief, courts apply a burden-shifting framework to determine the precise amount of monetary relief to award. The FTC bears the initial burden of showing that the amount sought is a reasonable approximation. See Fed. Trade Comm'n v. Verity Int'l, Ltd., 443 F.3d 48, 67 (2d Cir. 2006). This calculation may be properly based on estimates because sometimes that is the only information available, such as when defendants do not keep the data necessary to make an exact determination. Fed. Trade Comm'n v. QT, Inc., 512 F.3d 858, 864 (7th Cir. 2007) ("A court is entitled to proceed with the best available information . . . ."); Verity Int'l, Ltd., 443 F.3d at 69 ("Of course, the reasonableness of an approximation varies with the degree of precision possible."). Once that showing is made, the burden shifts to defendants to show both that the estimate is inaccurate and what the proper estimate should be. Verity Int'l, Ltd., 443 F.3d at 67. Under either measure of damages, "the risk of uncertainty [falls] on the wrongdoer whose illegal conduct created the uncertainty." Febre, 128 F.3d at 535.

In awarding equitable monetary relief in section 13(b) cases, courts routinely hold corporate and individual defendants jointly and severally liable where those defendants are directly responsible for the acts or practices violating the FTC Act. See, e.g., Gem Merch. Corp., 87 F.3d at 470; Fed. Trade Comm'n v. Amy Travel Serv., Inc., 875 F.2d 564, 573 (7th Cir. 1989).

C.     Relief Defendants

Principles of equity also empower courts to grant relief against a "relief defendant," who has not committed any wrongdoing, if (1) he possesses ill-gotten gains derived from the unlawful acts or practices of the liability defendants; and (2) has no legitimate claim to the property. Sec. & Exch. Comm'n v. George, 426 F.3d 786, 798 (6th Cir. 2005). The imposition of a constructive

trust, or disgorgement of ill-gotten gains, can be an appropriate remedy for a relief defendant. Fed. Trade Comm'n v. AmeriDebt Inc., 343 F. Supp. 2d 451, 464 (D. Md. 2004) ("Section 13(b) of the FTC Act invests the Court with equitable powers over 'innocent persons' in order to accomplish such relief as repayment, restitution, rescission or disgorgement of any unjust enrichment."); see also Think Achievement Corp., 144 F. Supp. 2d at 1021-22 (ordering a relief defendant, the principal defendant's wife, to disgorge profits received from husband's deceptive business practices that were held by her, either individually or jointly with her husband, even though she was not accused of any law violations).

D.     Prejudgment Interest

A court has discretionary authority to award prejudgment interest. Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 146 n.37 (1st Cir. 2009). An award of prejudgment interest is based on a consideration of several factors, including the remedial purpose of the statute involved, the goal of depriving culpable defendants of their unlawful gains, and unfairness to defendants. See, e.g., Sec. & Exch. Comm'n v. Sargent, 329 F.3d 34, 40 (1st Cir. 2003).

**IV.     Conclusions of Law**

A.     Injunctive Relief

The FTC is entitled to permanent injunctive relief against all liability defendants in order to prevent future illegal conduct and to monitor compliance with this Court's orders.

*1.     Need for a Permanent Injunction*

The DMC/ITV defendants' advertising for Coral Calcium and Supreme Greens violated the FTC Act. Direct Mktg. Concepts, Inc. et al., 569 F. Supp. 2d at 303-05. Apart from the established violations themselves, the DMC/ITV defendants' activities in the past have shown that they will continue or resume misleading advertising unless restrained. For example, after the

FTC had expressed concern about the apparent misleading nature of their Coral Calcium infomercial, the defendants launched the Supreme Greens infomercial in August 2003 without having substantiation for the disease claims made in that infomercial. Perhaps more ominously, I previously found that the DMC/ITV defendants violated aspects of this Court's preliminary injunction with their infomercial for the dietary supplement Flex Protex. See Fed. Trade Comm'n v. Direct Mktg. Concepts, Inc. et al., No. 04-11136 (D. Mass. Jan. 19, 2006) (dkt. no. 137) (memorandum and order). They have persisted in teaming up with Kevin Trudeau, despite knowing that he had been "in trouble repeatedly" with the FTC. (Trial Tr. 29, Nov. 21, 2008.) Finally, Direct Marketing and ITV remain active in the infomercial business and in the marketing and sale of health care products making disease and weight loss treatment claims, creating a continuing opportunity for future violations.

The Triad defendants also violated the FTC Act through their participation in the marketing and sale of Coral Calcium. Direct Mktg. Concepts, Inc. et al., 569 F. Supp. 2d at 309-10. King Media, as a media buyer, and Triad, as a provider of merchant account and other services, are both in a position to transfer their violations of the FTC Act to other products. Even though the Triad defendants currently have no employees and are not engaged in any business, they could resume such activities in the future, as could their founder, Stern. See, e.g., Fed. Trade Comm'n v. Freecom Commc'ns, Inc., 401 F.3d 1192, 1204 (10th Cir. 2005) (concluding that the FTC need only show the "possibility" that unlawful conduct will recur, even if business operations may have ceased); United States v. Bldg. Inspector of Am., Inc., 894 F. Supp. 507, 521 (D. Mass. 1995) (noting that the government is entitled to injunctive relief against a corporate defendant, even though it appears to have ceased engaging in the underlying business of issuing franchises because "it remains a going concern and could resume at any time").

2.     *Terms of the Permanent Injunction*

The permanent injunctive provisions proposed by the FTC are appropriate relief in light of the circumstances of this case.

a.     General Provisions

Section I of the FTC's proposed final orders for the DMC/ITV and Triad defendants would prohibit the defendants, in connection with the marketing and sale of Coral Calcium or any substantially similar product, from making the misrepresentations set forth in Counts One through Three of the amended complaint.

Section II of the FTC's proposed final order for the DMC/ITV defendants would prohibit the DMC/ITV defendants, in connection with the marketing and sale of Supreme Greens or any substantially similar product, from making the misrepresentations set forth in Counts Four through Six of the amended complaint.

The injunctive language that was agreed upon by the FTC and the DMC/ITV defendants addressing the allegations in Counts Seven and Eight of the amended complaint is incorporated into sections VI and VII, respectively, of the proposed final order submitted by the FTC, and is also appropriate relief here.

b.     Fencing-In Provisions

I further conclude that the FTC's proposed fencing-in provisions, contained in sections III and IV of the proposed final order for the DMC/ITV defendants and sections II and III of the proposed final order for the Triad defendants, are appropriate to remedy the violations of the FTC Act and to prevent them from engaging in similar deceptive practices in the future.

The proposed fencing-in provisions are also reasonably related to the defendants' unlawful conduct. Here, the DMC/ITV and the Triad defendants made unsubstantiated disease

prevention and treatment claims for Coral Calcium and Supreme Greens. They also misrepresented that studies published in the Journal of the American Medical Association and the New England Journal of Medicine supported the proposition that calcium cures cancer. The DMC/ITV defendants also made unsubstantiated disease prevention and treatment claims, weight loss claims, and safety claims for Supreme Greens.

The proposed orders submitted by the FTC for the DMC/ITV and the Triad defendants each contain two fencing-in provisions. The first would prohibit the defendants from making any claim about the health benefits, performance, or efficacy of any food, drug, dietary supplement, or device unless the representation is true, non-misleading, and substantiated by competent and reliable scientific evidence in the defendants' possession. The second would prohibit the defendants from misrepresenting support from any test or study in connection with the marketing of any food, drug, dietary supplement, or device. I conclude that the fencing-in provisions proposed by the FTC are appropriate and reasonably related to the DMC/ITV defendants' and the Triad defendants' violations of the FTC Act.

c.    Monitoring Provisions

Monitoring provisions are also appropriate to ensure compliance with the terms of the injunction. As noted above, the DMC/ITV defendants violated a preliminary injunction issued by this Court and have demonstrated a history of poor diligence in monitoring which versions of their infomercials are on the air.

The proposed orders submitted by the FTC contain provisions, in sections IX-XII and XIV-XVI of the proposed final order for the DMC/ITV defendants, sections VI-XI of the proposed final order for the Triad defendants, and sections II-IV of the proposed final order for BP International, that are both reasonable and necessary to ensure that the defendants take

responsibility to ensure that the orders are followed by themselves and their associates, and that the FTC has the ability to monitor compliance with the orders and prevent future illegal conduct.

### 3. First Amendment Implications

During the summary judgment phase, I observed that the defendants' First Amendment objections might have "merit to the extent it may preclude a remedy that includes complete suppression of the infomercials." Direct Mktg. Concepts, Inc., et al., 569 F. Supp. 2d at 306-07. The tailoring of an appropriate remedy, however, was not amenable to resolution at summary judgment. Id. at 307. After review of the FTC's proposed injunctive provisions, it is clear that the provisions do not raise any constitutional concerns because they only prohibit the dissemination of deceptive and misleading advertising, which, by definition, does not have any First Amendment protection. See In re R.M.J., 455 U.S. at 203; Wine & Spirits Retailers, Inc., 481 F.3d at 8-9.

Here, the FTC's proposed injunctive provisions would only prohibit the defendants from making the specific claims that the Court already found in this case to be misleading or equivalent deceptive representations. The FTC's proposed injunctive provisions do not prohibit the dissemination of advertising for any particular product. For example, they do not prohibit the DMC/ITV defendants from airing non-misleading infomercials for Coral Calcium or Supreme Greens. Nor do the FTC's proposed injunctive provisions prohibit the DMC/ITV defendants from making any claims that are truthful, non-misleading, and adequately substantiated for any other product. The relief requested by the FTC even permits the dissemination of the infomercials challenged in this case, provided they are revised so as not to convey any of the specific claims found to be misleading, or any other claims covered by the proposed fencing-in provisions adopted here. In sum, the FTC's proposed injunctive provisions merely require the

defendants to refrain from making false representations and to ensure that they have adequate substantiation for the claims they do make.

      B.      <u>Monetary Relief</u>

After review of the parties' positions, I conclude that any distinction between restitution and disgorgement is largely irrelevant in this case because, under either measure, the calculation would be the same on the evidence in the record. Nevertheless, for the following reasons, disgorgement seems to be the apt term.

The cases cited by the parties appear to use the terms "restitution" and "disgorgement" with some imprecision. It is clear that any monetary relief related to a section 13(b) violation derives from the court's authority, granted by the statute, to fashion equitable relief. Therefore, any monetary award must be capable of being classified as an equitable, as opposed to a legal, remedy.

As the Second Circuit explained in <u>Verity International, Ltd.</u>, restitution can be either a legal or an equitable remedy. <u>See</u> 443 F.3d at 66-67. Equitable restitution is available "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds." <u>Great-West Life & Annuity Ins. Co. v. Knudson</u>, 534 U.S. 204, 213 (2002). "[F]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." <u>Id.</u> at 214. In contrast, legal restitution is available where

> the plaintiff [cannot] assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him. . . . In such cases, the plaintiff's claim was considered legal because he sought to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money.

Such claims were viewed essentially as actions at law for breach of contract (whether the contract was actual or implied).

Id. at 213 (internal quotation and citation omitted).

For example, a disappointed consumer, who had purchased Coral Calcium and sought a refund because the defendants' advertising had been misleading would not be making a claim of title or right to possession of particular funds, but rather would be pursuing a legal remedy for damages flowing from misleading representations. The funds given in payment for the product would have long since been commingled with other funds in the defendants' hands, and the consumer would be equivalent to a general creditor owed money damages for a wrong. See id. at 213-14. The consumer would, in other words, be entitled to legal restitution, not equitable restitution. The doctrine of equitable restitution does not, therefore, fit the nature of the monetary remedy the FTC seeks. Disgorgement, on the other hand, does.

The defendants ask that their present ability (or inability) to pay be taken into account in determining any disgorgement amount. Courts are split as to whether ability to pay can be a relevant factor in determining whether to impose an order of disgorgement. Compare Sec. & Exch. Comm'n v. Warren, 534 F.3d 1368, 1370 (11th Cir. 2008), and Sec. & Exch. Comm'n v. Huffman, 996 F.2d 800, 803 (5th Cir. 1993) (ability to pay can be considered), with Sec. & Exch. Comm'n v. Druffner, 517 F. Supp. 2d 502, 512 (D. Mass. 2007), and Sec. & Exch. Comm'n v. McCaskey, 2002 WL 850001, at *5 (S.D.N.Y. Mar. 26, 2002) (ability to pay cannot be considered). Consideration of a defendant's ability to pay, while perhaps relevant in some cases, is not relevant here. Given the defendants' proclivity for siphoning off funds (i.e., the creation of BP International) and creative record keeping, there is reason to be concerned that their most recent tax returns do not adequately reflect their true financial status.

Determination of the precise amount of disgorgement owed is set out below.

      *1.*     *DMC/ITV Defendants*

         a.     Coral Calcium

Disgorgement here will be calculated by reference to the net revenues received by the defendants (or, to put it another way, by net consumer loss)—rather than by their net profits—from the Coral Calcium infomercial for two reasons, one practical and one theoretical.

The practical reason is that the defendants have not, despite ample opportunity to do so, provided a reliable basis for making a judgment about the true net profits made from the non-retail sales of Coral Calcium. For example, Direct Marketing's financial statements exist in multiple versions with different amounts listed for sales and net income. The degree of difference was not so great that a reasonable estimate could not be made on the basis of the differing figures, but the very fact of the variations, together with other evidence about the casual and deceptive way financial information was maintained and reported by Direct Marketing, undermines any confidence that even the ranges reported are close to accurate. The DMC/ITV defendants were fiction writers in their infomercial and there is reason to be concerned they were fiction writers in their financial statements. See Febre, 128 F.3d at 535; Am. Metals Exch. Corp., 991 F.2d at 76-78; Am. Bd. of Trade, Inc., 803 F.2d at 1252.

The theoretical reason is that an order for the disgorgement of sales revenues, as opposed to profits, is equivalent to the grant of a full purchase price refund to consumers. It is, in effect, a rescissionary measure that is just both as a remedy and as a deterrent. The FTC has undertaken an attempt to locate purchasers of Coral Calcium, using the defendants' customer records, and to make actual refunds to those consumers who can be found. That is a very appropriate course and setting the disgorgement order in the amount of net consumer loss is consistent with that effort.

Here, the FTC's evidence supports the conclusion that a reasonable approximation of the net non-retail sales,[1] or net consumer loss, attributable to the deceptive Coral Calcium infomercial was $54,034,394.82. That figure is the sum of (1) the sales for the period from January 2002 to February 2003, when Triad and King Media were joint venturers with the DMC/ITV defendants, and (2) the sales for the period from February 2003 to July 2003, when the DMC/ITV defendants marketed the product without their former Triad partners.

The FTC presented evidence, in the form of testimony by Steven Ritchey of Triad, that $40,917,603.89 was the best estimate of the net non-retail sales of the Coral Calcium product processed by the Triad defendants during the January 2002 through February 2003 period. (Defs.' Trial Ex. 7, Ritchey Dep. 40:21-41:25, July 14, 2005.) Sales data produced by Triad indicates that the Triad defendants processed $42,416,951.29 in net non-retail sales of Coral Calcium during the January 2002 to February 2003 time period. (Pl.'s Trial Ex. 185.) Since the FTC has used the lower figure in its request for monetary relief, I will also use that figure. Accordingly, I conclude that $40,917,603.89 is a sound estimate of the net non-retail sales of Coral Calcium from January 2002 to February 2003.

The FTC also presented evidence, in the form of Direct Marketing's own records, showing that Direct Marketing processed approximately $13,116,790.93 in net non-retail sales of Coral Calcium from February 2003 to July 2003. (See FTC's Proposed Findings of Fact &

---

[1] Sales generated through the infomercial are referred to, in the evidence, as "non-retail" sales, to distinguish them from "retail" sales. "Retail" sales were sales of Coral Calcium products that were marketed to consumers by having them available for purchase on the shelves of stores, such as drug stores and general purpose retail outlets like Wal-Mart. The dollar volume of retail sales was very small in comparison to the non-retail, infomercial-generated sales. It is likely that some retail sales were attributable to the infomercial. Some consumers who did not purchase the product directly in response to the infomercial by "calling the number on the screen" may nonetheless have been motivated to buy Coral Calcium after spotting it on a store shelf because they had previously seen the infomercial. Nonetheless, retail sales figures are excluded from the calculations of total sales for the purposes of relief.

Conclusions of Law Ex. A) (compiling data from trial exhibits 187 and 209). A sample calculation for February 2003 is below:

| | Total Sales – | Retail Sales = | Non-Retail Sales | – Refunds = | Net Non-Retail Sales |
|---|---|---|---|---|---|
| All Coral Calcium Products | $4,209,854.53 | $73,776.11 | $4,136,078.42 | $91,343.49 | $4,044,734.93 |

(See id. at 3.)

The FTC also presented evidence at trial showing that the defendants continued to receive substantial Coral Calcium revenues long after July 2003, but it does not seek to rely on those amounts in arguing for an appropriate amount of monetary relief.

The defendants have not shown that the FTC's estimate is inaccurate or unreasonable. Although they contend that the FTC's estimate is not necessarily an exact calculation of consumer loss, there are three answers to that objection: First, it is not necessary that the amount to be disgorged by precisely calculated; a sound estimate will suffice. See Verity Int'l, Ltd., 443 F.3d at 69. Second, once the FTC has put forward a reasonable estimate, the burden shifts to the defendants to show why it is unreliable or inaccurate. Id. at 67. They have not. And third, it is apparent in this case that any difficulty in determining an exact amount is substantially due to the defendants' own record keeping. For example, Donald Barrett testified that there is no way to determine what Coral Calcium sales derived from advertising media other than the Coral Calcium infomercial. Testimony offered by the DMC/ITV defendants that retail sales accounted for a significant portion of the Coral Calcium revenues processed by Triad is inconsistent with other testimony and is not credible. Similarly, the testimony that Triad processed significant revenues for non-Coral Calcium products on behalf of the defendants is not credible. Ritchey and Stern both testified unequivocally in their July 2005 depositions that virtually all of the consumer

revenues they processed pursuant to their partnership with the DMC/ITV defendants were attributable to the Coral Calcium infomercial.

In sum, $54,034,394.82 is a reasonable estimate of net non-retail sales, or net consumer loss, resulting from the deceptive sales of Coral Calcium from January 2002 to July 2003 based on the evidence available. This represents the sum of the $40,917,603.89 received from January 2002 to February 2003, when the DMC/ITV defendants and Triad defendants were joint venturers, plus the sum of $13,116,790.93 received from March to July 2003 by the DMC/ITV defendants alone.

Since the agreement between the DMC/ITV defendants and the Triad defendants was to split the proceeds of Coral Calcium sales equally during the time they collaborated, it is appropriate to assess against the each group one half of the disgorgement amount for that period. Joint and several liability among the DMC/ITV defendants, for their half, is warranted here because both DMC and ITV played a "central role" in creating and distributing the infomercial, Direct Mktg. Concepts, Inc. et al., 569 F. Supp. 2d at 308; Barrett was a "driving force" behind this infomercial, id. at 310; and Maihos was aware of, but dismissed, concerns expressed by others regarding the veracity of the claims made in the Coral Calcium infomercial, id. at 311.

Accordingly, a disgorgement order pertaining to the Coral Calcium infomercial will be entered against the DMC/ITV defendants in the sum of one half of the net non-retail sales of $40,917,603.89 (or $20,458,801.95) for the period January 2002 to February 2003, plus $13,116,760.93 for the period March 2003 to July 2003, for a total of $33,575,562.88.

b.    Supreme Greens

As with the Coral Calcium infomercial, disgorgement will be calculated by reference to the revenues received from the Supreme Greens infomercial.

Here, the FTC has met its burden of providing that a reasonable estimate of the net sales, or net consumer loss, resulting from the deceptive claims for Supreme Greens between August 2003 and April 2004 is $14,683,436.24. This amount, representing total sales less refunds, is derived from sales data created and maintained by the DMC/ITV defendants. (See Pl.'s Trial Ex. 79.) A sample calculation for September 2003 is below:

| | Product Revenue + Sub-Total | Shipping Revenue | = Total Revenue | Product + Refund | Shipping Refund | = Total Refund | = Net Sales |
|---|---|---|---|---|---|---|---|
| Supreme Greens | $853,464.65 | $110,516.19 | $963,980.84 | $43,936.35 | $4,272.17 | $48.208.52 | $915,772.32 |

(See id.) Direct Marketing's accountant testified that the underlying data is accurate.

The DMC/ITV defendants have not shown that the FTC's estimate of net sales, or net consumer loss, is inaccurate or an unreasonable estimate. To the extent the defendants argue that the FTC's estimate is not an exact calculation of consumer loss, I again conclude that problems with the defendants' own record keeping are a primary reason why a more exact figure cannot be easily determined.

The defendants will be given a credit against that amount, however, in the sum of $38,500.00, which is the amount paid by other persons who were original defendants in this action, but who early on came to a stipulated agreement with the FTC. The total to be disgorged in respect of the Supreme Greens infomercial shall be $14,644,936.24. Again, joint and several liability among the DMC/ITV defendants is warranted because all parties were directly responsible for the acts or practices that violated the FTC Act: ITV produced, edited, and distributed the Supreme Greens infomercial, Direct Mktg. Concepts, Inc. et al., 569 F. Supp. 2d at 308, Barrett "played an integral role in commissioning, producing, and disseminating" the infomercial and personally participated in it as well, id. at 310; and Maihos, in addition to being

a co-owner of ITV with responsibility for the company's financial health and sales operations, participated in meetings where concerns about substantiation for the infomercial were raised, id. at 311.

2.    *Triad Defendants*

The equitable monetary relief sought against the Triad defendants—the full $54,034,394.82 in net non-retail sales, or net consumer loss, resulting from the sales of Coral Calcium from January 2002 to July 2003—is too broad. As discussed above, joint and several liability is appropriate only where all defendants are directly responsible for the acts or practices violating the FTC Act. See, e.g., Amy Travel Serv., Inc., 875 F.2d at 573; Gem Merch. Corp., 87 F.3d at 470.

For the same reasons discussed above, see section B.1.a, a disgorgement order will be entered as to Triad defendants in the sum of $20,458,801.95 because they were joint venturers with the DMC/ITV defendants with respect to the Coral Calcium infomercial from January 2002 to February 2003. Joint and several liability among the Triad defendants, for their half, is appropriate because Stern essentially managed the media placement and the order fulfillment aspects of the Triad defendants' participation with the DMC/ITV defendants in the Coral Calcium infomercial. See Direct Mktg. Concepts, Inc., 569 F. Supp. 2d at 311.

The Triad defendants, however, will not be assessed a disgorgement amount for consumer losses resulting from sales of Coral Calcium after February 2003. Even if Triad participated in the creation of the infomercial, the decision to continue airing the deceptive Coral Calcium infomercial after February 2003, and thus effectively to continue violating the FTC Act, was made solely by the DMC/ITV defendants.

3.    *Relief Defendants*

The liability of the relief defendants, BP International and Lisa Mount, was not resolved at the summary judgment stage because questions of fact existed as to whether these defendants had legitimate claims to the proceeds the FTC seeks to recover. After review of the evidence submitted at trial, their liability is now resolved as follows.

a.    BP International

BP International will be ordered to disgorge $574,274.23 received in proceeds from sales of Coral Calcium between April and September 2002. (See Pl.'s Trial Ex. 66.) The reason for the disgorgement is not that BP International had a role in producing or airing the Coral Calcium infomercial, but rather exactly the opposite. BP International has no legitimate claim to any funds from the marketing of Coral Calcium. As a factual matter, the evidence did not establish that BP International or its principal, Paris, did any work that would have entitled it to any share of revenues or profits from Coral Calcium, whether legitimately derived or not. Rather, BP International was essentially a conduit for siphoning off funds from Coral Calcium sales for Barrett's personal benefit. Neither the Triad defendants nor Maihos knew of the existence of BP International in 2002.

The fact that some of the money funneled to BP International was funneled back to Barrett does not obviate the need for an order of disgorgement against BP International. Where defendants create uncertainty as to the source and legitimacy of funds by commingling and transfers back and forth, they bear the risk of the resulting uncertainty. See Sec. & Exch. Comm'n v. Breed, No. 01-Civ-7798, 2004 WL 1171241, at *2 (S.D.N.Y. May 26, 2004). An inability to allocate funds because of confusing, incompetent, or suspect record keeping among

defendants and relief defendants should be construed against them. See Sec. & Exch. Comm'n v. Hughes Capital Corp., 124 F.3d 449, 456 (3d Cir. 1997).

Absent evidence of a legitimate claim to these funds, it is appropriate to hold BP International liable as a relief defendant and to require it to disgorge $574,274.23.

b.     Lisa Mount

The Court will not impose an order of disgorgement on relief defendant Lisa Mount. The evidence indicated that while Mount was married to Stern, she was a shareholder in Triad and King Media. The FTC relies exclusively on Triad's federal income tax return for 2002, which reports a subchapter-S distribution of $1,545,305.00 to her. (See Pl.'s Trial Ex. 102.) The bare fact of that distribution is not a sufficient basis to order her to disgorge that amount. The evidence was that, while she had actively worked for King Media in the 1990s, she performed only limited work, without payment, for about six months in late 2001 and early 2002. There is no evidence that she had any role in the production or placement of the Coral Calcium infomercial. The amount distributed may or may not have included proceeds of Coral Calcium sales. In short, there is an insufficient equitable basis for requiring her to forfeit a large sum which may have been a legitimate distribution.

4.     *Prejudgment Interest*

Prejudgment interest will not be awarded in this case. See Tobin, 553 F.3d at 146 n.37 ("Under federal law, the award of prejudgment interest and the appropriate rate, if not prescribed by the statute providing the plaintiff's recovery, are discretionary decisions for the judge."). The size of the disgorgement orders is such that adding prejudgment interest is unnecessary.

## V.      Conclusion

Based on the foregoing, as well as prior rulings of the Court on the motion for summary judgment, judgment shall enter, on all counts of the amended complaint, in favor of the FTC against the following defendants: Direct Marketing, ITV, Barrett, Maihos, Triad, King Media, and Stern.

Judgment shall also enter in favor of the FTC and against relief defendant BP International. However, judgment shall enter in favor of the relief defendant Lisa Mount and against the FTC.

Separate final orders and judgments for permanent injunction and other equitable relief shall issue forthwith.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge